ACCEPTED
05-15-01480-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/4/2015 2:42:24 PM
LISA MATZ
CLERK

05-15-01480-CV

NO. _____

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT
AT DALLAS, TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/4/2015 2:42:24 PM
LISA MATZ
Clerk

**IN RE MICHELIN NORTH AMERICA, INC.**

*Samuel Medina, et al*
*v.*
*Michelin North America, Inc., et al*

Original Mandamus Proceeding
From the 134th Judicial District Court of Dallas County, Texas
No. DC-14-07255

# MANDAMUS RECORD

Debora B. Alsup
State Bar No. 02006200
debora.alsup@tklaw.com
Nathan K. Palmer
State Bar No. 24098220
nathan.palmer@tklaw.com
**THOMPSON & KNIGHT LLP**
98 San Jacinto Blvd., Suite 1900
Austin, Texas 78701-4238
(512) 469-6100
(512) 482-5028 Alsup Facsimile
(512) 482-5006 Palmer Facsimile

Thomas M. Bullion III
State Bar No. 03331005
tbullion@germer-austin.com
Chris A. Blackerby
State Bar No. 00787091
cblackerby@germer-austin.com
**GERMER BEAMAN & BROWN PLLC**
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 Facsimile

**COUNSEL FOR RELATOR**
**MICHELIN NORTH AMERICA, INC.**

# INDEX TO RELATOR'S MANDAMUS RECORD

1. MR 1-2       November 11, 2015 Order on Plaintiffs' Motion to Compel

2. MR 3-4       November 19, 2015 Amended Order on Plaintiffs' Motion to Compel

3. MR 5-6       November 21, 2015 Order regarding November 3 Hearing

4. MR 7-70      September 8, 2015 Hearing Transcript

5. MR 71-108    October 5, 2015 Hearing Transcript

6. MR 109-160   November 3, 2015 Hearing Transcript

7. MR 161-193   Plaintiffs' Original Petition, 7/9/14

8. MR 194-202   Michelin's Special Exceptions, Amended Answer to Plaintiffs' Original Petition, 10/15/15

9. MR 203-333   Plaintiffs' Amended Motion to Compel Michelin to Respond to Discovery and Identification of Withheld Michelin Documents, 8/25/15
                [Redacted copy]

10. MR 334      Letter from Michelin's counsel to Medina's counsel, 9/1/2015

11. MR 335-351  Affidavit of Vaneaton Price, 9/1/15

12. MR 352-431  Michelin's Response in Opposition to Plaintiffs' Motion to Compel Discovery and Identification of Withheld Michelin Documents, 9/4/15

13. MR 432-592  Plaintiffs' Reply in Support of Their Motion to Compel, 9/4/15

14.    MR 593-754    Plaintiffs' Supplement in Support of its Original (08-25-15) Motion to Compel, 11/24/15

15.    MR 755-757    Plaintiffs' Short Motion to Compel Michelin's Employee Most Knowledgeable about: Financial Information of Michelin North America, Inc., 10/19/15

16.    MR 758-784    Michelin's Response to Plaintiffs' Short Motion to Compel Michelin Employee Most Knowledgeable about Financial Information of Michelin North America, Inc., 10/30/15

17.    MR 785-789    Plaintiffs' Reply in Support of Motion to Compel the Depositions of Michelin's Employees Most Knowledgeable about Financial Information & Net Worth, 11/2/15

18.    MR 790-791    Plaintiffs' Short Motion to Compel Michelin to Comply with Order and Produce Tire Training Documents, 10/19/15

19.    MR 792-810    Michelin's Response to Plaintiffs' Short Motion to Compel Michelin to Comply with Order and Produce Tire Training Documents, 10/30/15

20.    MR 811-829    Michelin's Motion for Clarification, Reconsideration, and for Stay, 11/18/15

21.    MR 830-896    Plaintiffs' Response to Michelin's Motion for Clarification, Reconsideration, and for Stay, 12/02/15

22.    MR 897-900    Michelin's Motion for Bifurcated Trial, 11/30/15

23.    MR 901-918    Michelin's Motion for Stay of Disclosure of Financial Information and Supplement to Michelin's Response Opposing Disclosure of Financial Information, 11/30/15

Respectfully submitted,

**THOMPSON & KNIGHT LLP**

By: _____/s/ *Debora B. Alsup*_____
        Debora B. Alsup
        State Bar No. 02006200

Nathan K. Palmer
State Bar No. 24098220
nathan.palmer@tklaw.com

98 San Jacinto Blvd., Suite 1900
Austin, Texas  78701-4238
(512) 469-6100
(512) 482-5028 Alsup Facsimile
(512) 482-5006 Palmer Facsimile

**GERMER BEAMAN & BROWN PLLC**

        Thomas M. Bullion III
        State Bar No. 03331005
        tbullion@germer-austin.com

        Chris A. Blackerby
        State Bar No. 00787091
        cblackerby@germer-austin.com

301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 Facsimile

**ATTORNEYS FOR RELATOR**
**MICHELIN NORTH AMERICA, INC.**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via e-service, facsimile, or e-mail on this 4th day of December, 2015.

*Via E-Service and E-Mail*
Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona  85016

*Via E-Service and E-Mail*
James B. Ragan
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas  78401

*Via E-Service and E-Mail*
Noel Sevastianos
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri  63105

***Via Regular Mail***
Jose Bustillo d/b/a Mundo Cars
6422 Day Street
Dallas, Texas  75227


　　　　　/s/ *Debora B. Alsup*
Debora Alsup

# VERIFICATION

STATE OF TEXAS     §

                        §

COUNTY OF TRAVIS  §

Before me, the undersigned authority, on this day personally appeared Debora B. Alsup, who after having been sworn by me, upon her oath deposed and said the following:

My name is Debora B. Alsup and I am one of the attorneys for Relator/Defendant Michelin North America, Inc. in this cause. I am of legal age and otherwise competent and authorized to give this affidavit. All documents included within this Electronic Record are true and correct copies of documents filed in and/or discovery served or hearings conducted in the above-referenced proceeding and the related appellate proceedings.

Further affiant sayeth not.

_____
Debora B. Alsup

Subscribed and sworn to before me on the 4th day of December, 2015.

Jennifer Lee Molenaar
Notary Public
State of Texas
My Comm. Exp. 05-04-2017

_____
Notary Public in and for the
State of Texas

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § § | 134TH JUDICIAL DISTRICT |
| VS. | § § | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § § | |
| DEFENDANTS, | § | DALLAS COUNTY, TEXAS |

## ORDER ON PLAINTIFFS' MOTION TO COMPEL MNA TO RESPOND TO DISCOVERY AND IDENTIFICATIONOF WITHHELD MNA DOCUMENTS

On September 8, 2015, after reviewing the legal memoranda, hearing the arguments of counsel and the Parties met and conferred in the jury room. The Court grants Plaintiffs' Motion and makes the following orders:

**It is hereby ORDERED** that Michelin shall produce to Plaintiffs' counsel within fourteen (14) days – on or before November 24, 2015 – the oldest version of all Aspect Specifications.

**It is further ORDERED** that, at this time, the Scope for Production concerning Michelin's production is expanded to include:

1. All Michelin P255/70R16 LTX M/S tires including the three (3) common green tires made at the Dothan, Alabama plant from the date production started (1998) until the date it allegedly stopped in 2003.

2. All Michelin P-Metric 235, 245, 255 and 265 LTX M/S tires manufactured, within six (6) months before and one (1) year after the incident made the basis of this lawsuit.

**It is further ORDERED** that Michelin will produce the following documents – which it agreed to disclose:

1. Technical Notes and Tire Non Conform (TNC) Procedures

2. Training documents

3. General Principles

4. Nylon Cap Ply documents

5. All versions of Michelin's Position Paper re: Date Limit

6. Manufacturing Tolerances and Reaction Limits

7. Adjustment data/claims/lawsuits/manuals

Finally, the Court grants Plaintiffs' Request for Leave to Supplement Legal Authority concerning the production of Belt Skim Stock and Tire Component data, which Plaintiffs filed on Friday, September 11, 2015 titled "Legal Authority Requiring Production of Belt Skim Stock." Michelin is allowed to respond to it.

All relief not expressly granted is hereby denied.

Signed this ⫽ day of November, 2015.

HONORABLE JUDGE DALE TILLERY

2

MR 0002

43999

000661

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § | |
| VS. | § § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § § | |
| DEFENDANTS, | § | DALLAS COUNTY, TEXAS |

## AMENDED ORDER ON PLAINTIFFS' MOTION TO COMPEL MNA TO RESPOND TO DISCOVERY AND IDENTIFICATIONOF WITHHELD MNA DOCUMENTS

On September 8, 2015, after reviewing the legal memoranda, hearing the arguments of counsel and the Parties met and conferred in the jury room. The Court grants Plaintiffs' Motion and makes the following orders:

**It is hereby ORDERED** that Michelin shall produce to Plaintiffs' counsel on or before December 8, 2015, the oldest version of all Aspect Specifications.

**It is further ORDERED** that, at this time, the Scope for Production concerning Michelin's production is expanded to include:

1.    All Michelin P255/70R16 LTX M/S tires including the three (3) common green tires made at the Dothan, Alabama plant from the date production started (1998) until the date it allegedly stopped in 2003.

2.    All Michelin P-Metric 235, 245, 255 and 265 LTX M/S tires manufactured, within six (6) months before and one (1) year after the incident made the basis of this lawsuit.

**It is further ORDERED** that Michelin will produce the following documents – which it agreed to disclose:

1.    Technical Notes and Tire Non Conform (TNC) Procedures

2.    Training documents

MR 0003

3. General Principles

4. Nylon Cap Ply documents

5. All versions of Michelin's Position Paper re: Date Limit

6. Manufacturing Tolerances and Reaction Limits

7. Adjustment data/claims/lawsuits/manuals

Finally, the Court grants Plaintiffs' Request for Leave to Supplement Legal Authority concerning the production of Belt Skim Stock and Tire Component data, which Plaintiffs filed on Friday, September 11, 2015 titled "Legal Authority Requiring Production of Belt Skim Stock." Michelin is allowed to respond to it.

All relief not expressly granted is hereby denied.

Signed this _19_ day of November, 2015.

HONORABLE JUDGE DALE TILLERY

AMENDED ORDER ON PLAINTIFFS' MOTION TO COMPEL MNA TO RESPOND TO DISCOVERY AND
IDENTIFICATION OF WITHHELD MNA DOCUMENTS                                    Page 2 of 2

MR 0004

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| VS. | § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § § § | DALLAS COUNTY, TEXAS |
| DEFENDANTS, | § | |

**ORDER re: November 3, 2015 Hearing**

On November 3, 2015, after reviewing the legal memoranda and hearing the arguments of counsel, the Court makes the following orders:

**It is hereby Ordered** that Michelin shall produce a Corporate Representative to testify about the financial condition, wealth, assets, and financial statements of Defendant Michelin North America, Inc.

**It is hereby Ordered** that Michelin shall produce a Corporate Representative to testify about the tire training documents discussed in Plaintiffs Motion to Compel Tire Training Documents.

**It is further Ordered** that Michelin shall produce a Corporate Representative to testify about the Aspect Specifications produced in this case in response to Plaintiffs' Request for Production.

MR 0005

**It is further Ordered** that Michelin shall produce a Corporate Representative(s) to testify about the code key to decipher the documents provided by Michelin to date with Bates Nos. MNA-MEDINA3380-3386 and MNA-MEDINA1313-1365, 1530-1814, 3516-3615, 3819-4513.

Signed this _21_ day of November, 2015.

HONORABLE JUDGE DALE TILLERY

2

MR 0006

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. DC-14-07255

SAMUEL MEDINA AND OBDULIA          ) IN THE DISTRICT COURT
MEDINA, HUSBAND AND WIFE,          )
INDIVIDUALLY; NATALYE MEDINA       )
INDIVIDUALLY; NAVIL GIBSON,        )
INDIVIDUALLY,                      )
                                   )
        Plaintiff(s),              )
                                   )
vs.                                ) DALLAS COUNTY, TEXAS
                                   )
MICHELIN NORTH AMERICA, INC.;      )
AND JOSE BUSTILLO D/B/A MUNDO      )
CARS, AN IN STATE DEFENDANT,       )
                                   )
        Defendant(s).              ) 134TH JUDICIAL DISTRICT

---

**PLAINTIFFS' AMENDED MOTION TO COMPEL MICHELIN TO RESPOND TO DISCOVERY AND IDENTIFICATION OF WITHHELD MICHELIN DOCUMENTS HEARING**

---

On the 8th day of September, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Dale B. Tillery, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

VIELICA DOBBINS, CSR, RPR

**APPEARANCES**

LUIS P. GUERRA
SBOT NO. (Admitted Pro hac vice)
DAVID C. SHAPIRO
SBOT NO. (Admitted Pro hac vice)
Luis P. Guerra, L.L.C.
6225 N. 24th Street
Suite 125
Phoenix, Arizona 85016
Telephone:  (602) 381-8400
Fax:  (602) 381-8403
E-mail:  Pmigliorini@lpguerra.com
**Counsel for PLAINTIFFS**

CHRIS A. BLACKERBY
SBOT NO. 00787091
Germer Beaman & Brown, P.L.L.C.
301 Congress Avenue
Suite 1700
Austin, Texas 78701
Telephone:  (512) 472-0288
Fax:  (512) 472-0721
E-mail:  Cblackerby@germer-austin.com
**Counsel for DEFENDANTS**

VOLUME 1

**PLAINTIFFS' AMENDED MOTION TO COMPEL MICHELIN TO RESPOND TO DISCOVERY AND IDENTIFICATION OF WITHHELD MICHELIN DOCUMENTS HEARING**

September 8, 2015

**PAGE VOL.**

Proceedings ........................................4    1

Adjournment .......................................63   1

Reporter's Certificate ...........................64   1

**P R O C E E D I N G S**

THE COURT: All right. We're on the record in Cause No. DC-14-07255, <u>Medina, et al vs. Michelin North America</u>. Announcements and appearance on the record for the Plaintiff, please.

MR. GUERRA: Luis Guerra and David Shapiro. And I have with me also, Your Honor, my clients, in fact, the real parties in interest, Mr. and Mrs. Medina, Samuel and Obdulia. And in the middle of them is an interpreter so they can understand what we are saying here, Your Honor, is Olga --

THE COURT: All right. Very, very good. Welcome to y'all. Welcome to the Court.

And for the Defendants.

MR. BULLION: Your Honor, Tom Bullion and Chris Blackerby for Michelin North America Corporation.

THE COURT: All right. Plaintiffs' motion.

MR. GUERRA: Yes, Your Honor.

We are here -- we are here but we shouldn't be here. We are here talking about can we hide the evidence, can we hide documentation, can we not give these folks the ability to fairly adjudicate their claims in court.

Your Honor, when we were here in May 11

when I met you, at the end of their hearing, I said, Your Honor, I'm having problems with documentation and how fast can I get a hearing?  I don't know if you remember that.  You said, Luis, three days; unless they object, they have waived their notice.

I ask Chris, do you object, do you waive the notice?

And he said, no.

I said, okay, Your Honor, I'll go down there.  I'm going to talk to him about this document. It's all on the record.

I went outside, talked to Chris.  And he said, Luis, I'm not in charge of discovery.  I don't do any of that.  This is the national discovery counsel, Nelson Mullins.  And the guy that you need to talk to is Giles, you know Giles Schanen.  He is not here today. You notice that.  He's not here.  Giles Schanen.

I said, I never met Giles.  I hold you accountable because you are the face of Michelin.

And he said to me, okay, but, you know, that's the guy that is dealing with this.  You dealt with Kate Helm before, same firm, Nelson Mullins, on a case that we have previous against Michelin, same tire, same exact stuff.  And so you know how it goes.

I said, no, I don't know how it goes, but

okay.

And he said, you sign a protective order, you get the documents.

I don't like protective orders. I really don't, Your Honor, because they hide all these defects, problems with these products away from the public forever.

Okay. Onto documents. That's how they get us. They have us because without the documents I can't prove my case.

Obdulia is quadriplegic. These are the facts. It's not my case. It's her. So when I'm speaking, it's her speaking. I'm asking you, she is sleeping, coming with her husband from Chicago to St. Louis laying on his shoulder --

THE COURT: I'm familiar with the facts from last time and from reading the pleadings. Tell me what you want. How about that?

MR. GUERRA: Yes. I'll do that, Your Honor.

I want fairness. And the fairness that I want -- we were here on May 11th and we were talking about that --

THE COURT: Yeah. What documents do you want?

MR. GUERRA:  I'll tell you, Your Honor. I'll tell you, but I need to explain a little bit.  I can tell you exactly which documents I want.

THE COURT:  Okay.

MR. GUERRA:  There they are, Your Honor. Here's the list.  Would you give a list to opposing counsel, please.

But the point I was making, all the objections of the Defendants are absolutely worthless at this point.  First, the documents are trade secret. There's a protective order.  There was no problem before. There's no problem now.  They are protected.  They never proved that they were confidential or trade secret documents.  That's okay.  They have that.

The documents are not relevant.  Okay. All right.  But this is discovery.  We're not talking about admissibility for trial.  If they are not relevant, you will be able to file the motions in limine.

But they also say, Your Honor, that -- one of the arguments that the documents are not relevant is because it relates to different tires and the tires that have nothing to do with this tire.  That's not true.  The LTX M/S line is a line of tires -- and, in fact, Michelin doesn't even categorize them by line.  It categorizes them by the type of use.  So light truck tires are

manufactured, inspected and designed the same way.  And I can prove it to you with physical evidence not talk.

And also, Your Honor, remember if in fact we follow Michelin logic about just giving the documents -- you can only try the case with the documents that I choose you should have.  That's not the way the system works based upon good Texas case law.

The Cheer Mark (phonetic) case, Your Honor, that I'm sure you're familiar with from the court of appeals has pages and pages and pages of explanation why you are entitled to similar tires, not identical, not just the product, not just the identical product, similar so you can look for alternative designs, notice to the manufacturer, consequences of not putting the alternative design, all of it covered by our lawsuit.

And it says -- the phrase is relevant to the subject matter and reasonably calculated to lead to admissible evidence and legally construed to allow litigants to obtain the fullest knowledge of the facts and issues prior to the trial.  And that's the point here.

Mr. Blackerby came here on May 11th and said, Your Honor, we need to have that tire -- we need to have those tires so we can have what Plaintiffs have. Just fairness, just level playing field, that's what I

want.

Because if we follow Michelin's logic, I can only have some portions of it. I believe you will only be able to look at that tire, not even the rim. Since we were here, this is what we've done for Michelin, we sent them that tire plus the three additional tires plus the spare tire plus all the rims. Then they call us and said, we need to inspect the vehicle.

Now, there is no evidence that any of the other tires caused anything. And, in fact, all the other types are not even Michelin. They inspected them all.

In addition, they said, we want to inspect the vehicle. Okay. There is no evidence that the vehicle caused anything, but they inspected the vehicle. And then they said, we want to inspect the seatbelts. They inspected the seatbelt.

THE COURT: Okay. But what do you want?

MR. GUERRA: I want all those documents. But most important, Your Honor, they told me --

THE COURT: All right. Let's start going through them. We have got to go through your request and what they're not providing.

MR. GUERRA: Okay. Aspect specifications, Your Honor. Aspect specifications and you have the listings there, documents that are used by the verifiers,

inspectors at the factory to determine whether or not the tire that has been manufactured is up to speed, up to spec. And the aspect verifiers the -- the inspectors have a full set at the inspection station -- these are guys that do this day in and day out -- and they still must have all of the aspect specifications present. There's 200 of them. On this case -- 200 aspect specifications. On this case -- don't be sorry. I got excited. Interrupt me, please.

On this case, they gave me nine useless aspects. So I'm missing 191.

Let me show you, Your Honor, how useless they are.

THE COURT: No. I just need you to tell me what you want.

MR. GUERRA: Just with this stuff, but it shows they are not providing evidence. They know that nobody can read this because what is -- what is an R3H? What is an A? What is an E? What is a D? What is an H? They have the code. It's on a general principles, which is another document.

Now, recently, about a couple of days ago or maybe Thursday, we got a letter from Mr. Blackerby that said, oh, you can have the general principles. I've been waiting five months for them. All right. You can

have the technical notes. Okay. I've been waiting nine -- five months, in fact, a year for them.

Then they said, you can have the technical notes. Okay. Then they said, you can have the tire nonconforming procedures. Okay. I also want all of the technical repertoire which tells me all technical notes that exist and then also the aspect specifications repertoire, which is French for the least of aspect specifications.

Now, I speak French, just happen to, Your Honor. It's my second language. My first one is Portuguese, second one is French, third one is Spanish, and this is my fourth language. Sometimes I'm not very accurate in what I say in English and for that I apologize, Your Honor. But I do know French. And all I want is the same courtesy that I gave these folks that Michelin gives to us.

I also need the tolerance and the limits. The tolerances and the limits, the actual limits and tolerances, are the specifications of the tire before the tire gets baked or cured. I don't have that, Your Honor.

I also need to get the belt skim stock, which is the material that Michelin makes or the component of material that Michelin makes that covers the components to glue them together. It's in lay terms kind

of the glue of the materials so they stay together.

I also need, Your Honor, the warranty data, the warranty data. Every time there's a defect on a tire -- and defect includes separation, a separation of the tread belt, edge belt, because the tire is inside of two steel belts. And when the tread comes apart with the belt, separates from the rest of the carcass, that's what I'm talking about. It's a well-known defect and they warrant for that.

I want the warranty data on that. It's called the adjustment data. And it gives you all kinds of details about that gives you -- not only it gives you the claims forms initially, but also the Michelin claims forms, the dealer claims forms, gives you also those code keys for those -- for the codes. For instance, in the case of Discount Tire, 23 is tread belt separation, 54 is edge separation. So I need the code keys that come with the code; otherwise, I will have the same problem that I have here with the aspect specs.

You know, the issue with the aspect specs, Your Honor, and you can see that they apply even though this gentleman here filed something to say that the tires are different. That's nonsense. Michelin classifies their tires based upon the type of use. So passenger and light truck, the manufacturing process, the design

MR 0018

process, the inspection process is exactly the same.  And the proof is in the pudding.

This is one of the aspect specifications, one of the nine useless that they gave me, 51.  And each one of them will say aspect specifications, passenger and light truck, not lines, not different lines of tires, not different molds of tires, not different speeds or ratings or whatever, light truck.  All the same across the board for all light truck tires.  Michelin LTX M/S 275s, 255s, 265s, 245s, 255s, all of it.  So I need all that adjustment data, Your Honor.

I also need the work instructions.  The adjustment data also has graphs and photographs that depict the exact -- the type of data that they see when they get the defective tires returned and they're going to issue credits or issue -- allow the client to buy a new tire, they take photographs and they analyze all that data and send it to two centers here in the United States.  And they put charts and graphs so it shows the trend of what they are seeing.  I don't have any of that.

Also I need the work instructions of the training for the tire inspectors.  The tire inspectors don't get on first day on the job and know how to inspect a tire or to build a tire.  I don't have any of that, Your Honor.

MR 0019

I mean, it's -- they gave us absolutely nothing. They waited six months now and they're offering something else with a caveat, which is, I will give you this but you can't do that. No. I'm not going to take any less than what I came at. I mean, if it was me or if it was anybody that we know, you wanted to know why that tire came apart, Your Honor. So I need all of those documents. I have manufacturing defects, design defects, claims for manufacturing defects, design defects. And so, Your Honor, I need exactly those documents for the defective design, defect in manufacturing, defect in inspection, defect warranty adjustment data. Those are documents that absolutely are necessary for Plaintiffs to fairly adjudicate their claims, Your Honor.

THE COURT: All right. Response?

MR. BULLION: Your Honor, let me first start off by saying that I'm probably the guy who hates discovery disputes worse in this courtroom other than Your Honor. I've been representing Michelin for more than 15 years. I almost never have hearings on discovery disputes. This is the first one I've had in more than two years. I've had -- I literally have had a handful except one case up in Wichita Falls where I had them over and over and over again about 12 or 15 years ago.

The reason that I don't have discovery

dispute hearings is we work these things out with good and reasonable lawyers.  We work them out.

I'll submit to you, Your Honor, if you've read the briefing provided by the Plaintiffs lawyers in this case, you will know they're not interested in discovery in this case.  They're interested in a discovery dispute.  What they want to do is try to prejudice this Court against Michelin by citing orders in out-of-state cases where Michelin allegedly did things that they shouldn't have done.

If I was -- these folks are from Arizona. And if I was appearing in a case in Arizona, I would admit upfront I don't know anything about the Arizona rules, but I would sure enough find somebody who did know them.  And I would rely upon them to make sure that the rules were followed.

As the Court is aware, when these lawyers from Arizona got admitted pro hac vice in this case, they had to certify that they had read the Texas rules and were familiar with them and would follow them.  And I'll submit to you they have not done that in this case, Your Honor.

They also have a Texas lawyer on their pleadings, a lawyer I know very well from Corpus named Jim Reagan.  And Mr. Reagan has had cases against

Michelin over the years, not just in Texas but in other states. I've got a current -- got a case with him now. He's very familiar with the Texas rules. The other case I've got pending with him, which is up in Palmer County, right up between Amarillo and almost on the border of New Mexico, we didn't have any kind of a hearing on discovery disputes. We got together and we talked about what he wanted and we worked out an agreement.

We basically begged these guys -- as you will see from the letters that we attached to our response, we have begged these guys to confer with regard to this motion, Your Honor, and they have -- they have thwarted us every step of the way.

The Texas rules require a conference. The local Dallas rules are strong as horseradish on this. As the Court knows, they have to schedule a conference to resolve the disputed matters. They have to schedule a conference to resolve the disputed matters. They have to have a substantive discussion of every item presented to the Court. Before they come in here and burden the Court and take the Court's time, there is supposed to be a substantive discussion of every item.

Instead, what these fellows do is they write letter after letter after letter and make telephone calls, where are our documents, where are our documents,

where are our documents?  They are unyielding in what it is that they want and we can talk about the details if the Court is so inclined.

Even after they filed their motion to compel, we have still continued to say, hey, there's a requirement that you confer with us on this.  We want to do it.  We had a conference scheduled for a week ago today, September 1.  We had said, hey, we need to get together on a conference call and go through these discovery requests.  We had a court reporter lined up in order to do it.  It was going to be last Tuesday afternoon, which I remember well because it was opening day of dove season.  I was taking two of my boys out dove hunting.  So I was trying to figure out, how am I going to get this call in before I take them dove hunting.

And Mr. Shapiro, who is here, you haven't heard from him, but he works with Mr. Guerra. Mr. Blackerby talked and he said, hey, in order to be able to sell Mr. Guerra on this on having a call, I'm going to need some kind of a proposal from you.

So we worked hard, Your Honor, to put together a proposal.  We went through Plaintiffs' motion to compel point by point and we put together a proposal which we think is very reasonable to try to compromise the disputes that are set out in the Plaintiffs' motion

to compel.  That letter is part of Exhibit C to our response to the motion.

Mr. Blackerby sent it to Mr. Shapiro I think via e-mail.  He almost immediately got a call back where Mr. Shapiro said, this proposal is BS.  He didn't use the abbreviation.  He called it BS and he said, if I show this to Mr. Guerra he will flip out.

Mr. Blackerby said, you need to respond to it.  We need to try to confer on this.  You need to respond.  And as I understand it -- I wasn't a party to the conversation, but Mr. Shapiro said, I will have you a counterproposal in 30 minutes.  We never got any such thing.

Given all this, Your Honor, the failure of these lawyers to follow not just the Texas Rules of Civil Procedure, but the local rules of the Dallas courts, I would urge the Court not to consider this motion today, but instead to order the parties to confer.  We were prepared to do it in the presence of a court reporter and that's the only way, frankly, that we would want to do it.  But I would urge the Court to order the parties to confer, at least to narrow the issues and see that they're submitted to the Court in writing or come back for a followup hearing.

I don't think that -- when parties don't

follow the applicable rules, they should not be able to take advantage of a ruling of the Court.

THE COURT:  Well, y'all go in the jury room and start conferring and let me know when you get through conferring and we'll look at this at that time.

MR. BULLION:  Could we -- could we -- I don't know, your court reporter may be tied up with other things, but we need a --

THE COURT:  She will be tied up.

MR. BULLION:  We need to make a record of it, Your Honor.

THE COURT:  Of the conferring?

MR. BULLION:  Yes, sir.

THE COURT:  Why?

MR. BULLION:  Because we need a record of what's said.  If we're able to reach any kind of agreements, we need a record of what is said.

MR. GUERRA:  Your Honor, we met with these folks more than 10 times, starting with Chris Blackerby. This gentleman was never involved, Your Honor.

THE COURT:  Whoa.  Whoa.  Whoa.  Whoa. Y'all are both here.  Have these guys working on it through y'all.  Y'all are the ones that are always with the ultimate say in it.  Y'all are here now.  Y'all are going to confer.  That's what you're going to do.

MR. GUERRA:  Okay, Your Honor.  Thank you.

THE COURT:  If you can't trust each other, okay, we'll come back and you'll make your notes and we'll put on the record the different notes and we'll just kind of see how it goes.

MR. GUERRA:  Thank you, Your Honor.

THE COURT:  I think more highly of y'all than you think of yourself.  I think y'all will be able to know what you agree on and what you don't agree on.  I think y'all will figure out that and you'll be able to communicate that to the Court and I'll go from there.  All right?

MR. GUERRA:  Thank you, Your Honor.

MR. BULLION:  So I guess, Your Honor, to the extent that we're not able to reach an agreement on everything, I would like to obviously address the substantive issues.

THE COURT:  Sure.  Yeah.

MR. BULLION:  Thank you.

THE COURT:  I don't imagine y'all are going to agree on everything, but we'll deal with it.

Nice accommodations in there.  It's good enough for the jurors.  I think there's a coffee machine in there.

Mr. Fisher, make sure that gets working

and --

MR. GUERRA:  Thank you, Your Honor.

MR. BULLION:  Thank you, Your Honor.

*(A break is taken.)*

THE COURT:  All right.  We're back on the record in <u>Cause No. DC-14-07255 Medina vs. Michelin</u>.  All right.  What is the results of y'all's conferring?

MR. BULLION:  Your Honor, we went through Mr. Blackerby's letter dated September 1 of 2015 which is attached as Exhibit C to our response to the Plaintiff's motion and we can just take these items in the order in which they are set out and I think we'll need to have some additional argument.

THE COURT:  All right.

MR. BULLION:  We have proposed and I probably ought to give you a little bit of background on the tire, Your Honor.

MR. GUERRA:  All right.  This was a Michelin LTX M/S in the size P25570R16 and I'm sure you've read the affidavit and briefing but this tire was about 11 years old at the time of the accident.  We have already produced the specs for this particular tire plus three.  There were three common green tires.  The common green tires are basically are just the same guts but different outside.

MR 0027

THE COURT: Uh-huh. Branded different.

MR. BULLION: I'm sorry.

THE COURT: Basically branded different.

MR. BULLION: Yes, sir. There might be a -- this is a Michelin tire but in the Uniroyal or BF Goodrich world there might be a Uniroyal version or a BF Goodrich version and they're virtually -- from a performance standpoint they're the same, but the outside they're different.

MR. GUERRA: If I may, Your Honor, just really quick. If we are going talk about the agreement, we are going talk about the agreement. If it's just the argument, I'll just sit down.

THE COURT: Well, you can sit down.

MR. GUERRA: It's going to be the argument or it's only going to talk about the scope.

THE COURT: Well, you know, I'll hear what I want to hear and then when I get tired I'll move on to something else.

MR. GUERRA: Thank you, Your Honor.

MR. BULLION: I was just going to try to give you a little flavor for what this dispute was about and then tell you where we are and maybe argue it when you're ready.

THE COURT: All right.

MR. BULLION:  So what we have already given them is the tire in question plus the three common greens, made in Dothan, Alabama which is where this tire was made six months before and after the production of this tire, which was the 31st week of 2001.  We agreed in our letter to expand that to the whole time this tire was produced.  It was about a six-year period sometime in '98 to --

THE COURT:  Why not the LTX M/S line?

MR. BULLION:  Well that -- the affidavit, I think, makes it clear, Your Honor.  The line is -- this is a marketing-type -- a marketing-type designation. It's been a round for 20 plus years.  It comes in a wide variety of sizes.  The designs are different.

THE COURT:  Well sure it comes in different sizes.

MR. BULLION:  The proof in front of the court -- the only proof in front of the court today, Your Honor, is the affidavit of Mr. Andy Price and it talks about the fact that the tires are different sizes or are different designs and that's certainly the case.

We have -- we have -- we have offered to give --

THE COURT:  Why that would not be somewhat relevant to the alternative design.

MR. BULLION: I'm assuming that the safer alternative design -- the alleged safe or alternative design is Nylon Calphalon. That typically is the safe or alternative design in this case. We have not gotten to the expert disclosure form, but I'm assuming that's what their safe or alternative design is.

THE COURT: Well, I know, but when you say that the --

MR. BULLION: Yeah, in the other point, Your Honor, is we have established via Mr. Price's affidavit that information on all of this is trade secret and there's not any counterproof on it. And as the Court knows under the Supreme Court's decision in In re Continental General Tire, once we establish the information as trade secret then the burden shifts to the Plaintiffs to come in with evidence and show that it's necessary for a fair adjudication of the Plaintiff's claims. They've certainly claimed with lawyer talk that information on other tire lines is necessary to a fair adjudication of Plaintiff's claim, but they haven't brought forward any proof at all with respect to that.

We're willing to give up the -- we're willing to give up information on the tire in question because there is a protective order in place and we're willing to concede that information on the tire in

question is necessary to a fair adjudication. But when you get far afield and what they want, Your Honor, is '98 all LTX M/S tires from '98 to 2012 from the affidavit we've looked at a six-year period from '98 to 2003 if you got all of those tire lines we're talking about 50 some odd different tires, 5,000 specs almost 20 million tires.

If you expand it to their scope this is one of Michelin's best selling tires in history. They have been making it for 20 plus years. LTX M/S, Your Honor, is to Michelin like Chevrolet is to General Motors. It's a market. And if you expand it to 150 to discover -- if I talk in between 50 and hundred million tires, maybe more than 100 million tires and they haven't demonstrated a need for them. They haven't demonstrated that it's necessary to a fair adjudication of Plaintiff's claims. That's really is the point that I'll come back to with regard to anything.

If you're trying to expand the scope, you've got to show a need for these documents. They can do that. They can come up with an affidavit from their tire expert and he can say, I need this that and the other. In order to be able to prove my case I need this, that and the other and they have not done it. They've got no proof whatsoever. They could've submitted an affidavit or they could have had testimony.

MR 0031

As I said the only evidence before the Court is the affidavit.

THE COURT: The trade secret affidavit.

MR. BULLION: Sir?

THE COURT: Right? The only evidence is you say it's y'all's trade secret affidavit.

MR. BULLION: Yes, sir. And it's got more than just trade secret. It's got a lot of information --

THE COURT: I understand but your argument.

MR. BULLION: Right.

THE COURT: Or part of this was.

MR. BULLION: Right. That's exactly right.

THE COURT: And established trade secret. They've got to come forward.

MR. BULLION: Yes, Your Honor. That's exactly right.

THE COURT: And you're saying they didn't come forward with any evidence.

MR. BULLION: Right. Exactly right.

THE COURT: What about that?

MR. GUERRA: Yes, Your. The case that you -- if I may refer you to Your Honor, Exmark case. It talks about all of this. In fact, when we were in there

we were willing to reduce -- and this is 20 million tires.  That's 20 million tires sold.  The specifications are much less than that.  And we were willing to reduce it to 10 years from '98 to 2008.

THE COURT:  Wait a minute.  You're off point.

MR. GUERRA:  Yes.  Yes.

THE COURT:  He said that they've got an uncontroverted trade secret.

MR. GUERRA:  They don't.

THE COURT:  Affidavit and that y'all needed to come forward with some evidence.

MR. GUERRA:  Your Honor, we got this request in April.  No affidavit in May, June, July until we file the motion to compel no affidavit still.  Now we got this affidavit.

This they got that can only two people that give affidavit or testimony in the case, only two type of witnesses, fact witnesses, expert witnesses. This guy has never been disclosed.  I don't know who he is.  I know who he is.  I will tell you in a second.  If you look at his affidavit.

THE COURT:  I don't know that he has to be for the purpose of a discovery dispute.

MR. GUERRA:  Just for one second.

THE COURT:  And a trade secret affidavit.

MR. GUERRA:  Your Honor, he needs to be qualified to testify about that.

THE COURT:  Okay.

MR. GUERRA:  Okay once he tells us that he is -- he says that he is a senior consultant.  Is he a tire builder, no.  Is he a tire designer, no.

THE COURT:  Wait.  Wait.  Does this all go to the point that you didn't have to come forward with any evidence because they didn't establish trade secret?

MR. GUERRA:  First, they didn't establish trade secret and secondly, Your Honor, second, I have the proof and the documents.  Every single one of these documents relate to light truck and tires.  Now they refuse to produce the documents and then they say you come up with evidence, but it's difficult to do, Your Honor.  But I know for a fact that this applies across the board aspect specification and warranty data.  How do I know that warranty data the adjustment data may tell us all the information about the tires.  Because on the Velo case.

THE COURT:  All right.  If y'all have an agreement, we'll take y'all up.  We'll break here because y'all will be what's left.

MR. BULLION:  You want us to leave, Your

Honor.

THE COURT: No. Y'all are fine. Y'all come up here. Vielica if you will.

*(A break is taken.)*

THE COURT: All right. We're back on the record in Cause No. DC-15-07255.

All right. I'm sorry I interrupted you counsel.

MR. GUERRA: No problem, Your Honor. It was good we took a breather.

Your Honor, we have that Velo case before this one and discovery on that case was end of with a lady by the name of Kate Helms from the same firm of that gentlemen Giles and I just found out when I was in there that she's involved also in the discovery of this case, this specific case. So the Velo case was the LTX M/S from the same plant and was also from 2001, three weeks before so the Velo tire is a little older than this tire, three weeks old.

On that case we got production and that was a 265. We got production on some 235s, 245s, 265. We got 16 rims, 17 rims. This argument here is made for the courtroom today.

Now the point that we're talking about visible alternative design, this is what the Court of

Appeals said. What Defendants are confusing is they wanted to give us only the identical tires, the identical design.

THE COURT: I understand. I understand.

MR. GUERRA: -- as opposed to alternative design and this is what the Court of Appeals said back in 2009; and this is the products liability case, trade secrets. It's about vehicle aspects or whatever and it's about also a lawn mower.

Indeed. Indeed. Because products liability claimants must prove a safer alternative design, it would be absurd to limit the discovery to the specific model at issue because that would necessarily preclude alternative discovery and alternative request. It doesn't even make sense, you know, Your Honor. I need to put alternative --

MR. BULLION: I'm sorry. I thought you were done with that.

MR. GUERRA: I need to prove alternative design. I need to prove awareness of the danger. I need to prove visibility, all of that information is there. This millions and millions. This is lawyer talk, Your Honor. And going back to the affidavit that you demand and I check them because it's not a tire builder, not a tire manufacturer. It doesn't say on the affidavit

anywhere not a tire designer; didn't design this tire; was not a project manager; didn't work on the plant and I remember that name, Your Honor.  I remember that name because years ago I did a deposition in South Carolina at the Nelson Mullins office and who attended that deposition in addition to the four attorneys who were representing Michelin Vandy Price. He works on the litigation Defendant of Michelin.  I think he a paralawyer, you know, I know if he is a paralegal or a lawyer.  I don't know.  He is some type of individual on that tier which was 2014.  I got on the record he is currently employed in the legal department for Michelin.

Now they have other people there and I checked to see if he was a professional engineer registered in South Carolina where Michelin is located at the MARC Center.  That's why he works at MARC Center because the litigation is at the MARC Center.  The lobbyist, the major lobbyist we choose them that testifies in all these case runs the litigation department.  Vandy works underneath him.

So I checked South Carolina.  He is not a professional engineer in South Carolina so maybe he has some technical experience so I checked Alabama, Dothan. No, he is not registered as a professional engineer in Dothan.  He never claims to have worked at the plant in

Dothan, never been at the plant, never been a professional so I also checked if he was a professional engineer in Texas because that's where it -- he is not, Your Honor. He is a guy that they wrote the affidavit and decided in the end but he's not qualified. They have not established any qualifications for him to say that he knows the tire that the tires are differently manufactured that the tires are differently inspected and be there that it's a trade secret, Your Honor. If it were, there was a protective order. What is the harm. If the documents are not relevant shove them away. Force them to return like I did on a prior case. There is no harm. But this woman is entitled to know why the tire came apart.

THE COURT: All right. Let me ask you: Different sizes and all that you have alluded it in the LTX M/S line, how many different sizes are we talking about?

MR. BULLION: If you look at Mr. Price's affidavit, Your Honor. Can I briefly respond?

THE COURT: Well, why don't you answer my question first.

MR. GUERRA: 245, 255.

MR. BULLION: There are -- if you look at that pair of 18 in Mr. Price's affidavit it says the LTX

M/S line in it's common greens manufactured between '98 and 2003 that's the time frame that we've offered to decide will encompass approximately 54 tire models built more than 5,000 tire specifications, approximately 19.2 million different tires; that's for a six-year -- a six-year period.

THE COURT:  Well --

MR. BULLION:  Can I -- I definitely need to respond to what he said about the Velo at some point whenever you're ready.

THE COURT:  Yes.  Well, tell me.

MR. BULLION:  Velo involved a certain size of LTX tire also made at Dothan.  I wasn't in this case.

MR. GUERRA:  I was.

MR. BULLION:  But I do have the Rule 11 Agreement.  There was a motion to compel filed.  There were no common greens to the Velo tire.  I'm saying it wrong, I'm sure.  In this case there are common greens. We've given up the common greens.  So just by way of compromise, Your Honor, Michelin agreed to give some other tires because he wanted -- the Plaintiffs wanted to compare different sizes so they agreed to give us as set out in the Rule 11 Agreement which I'll be glad to give you.  They agreed to give up six P metric tires and two light truck tires.

The letter specifically says this agreement is limited to this matter and may not be revealed outside of this case or used by any party in any matter. It's not right to be doing what he just did. It was a compromise like we should have compromise this case before we came in here today.

Mr. Price is -- he's got a mechanical engineering degree. He worked at MARC, Michelin of America Research and Development Corporation, for a number of years as a tire designer. He is now in the litigation department. His qualifications are set out in the affidavit and the affidavit speaks for itself and it's uncontroverted.

MR. BLACKERBY: Your Honor, can I just speak about the law real quick?

THE COURT: Yeah.

MR. BLACKERBY: They've cited the Exmark case. We've cited in our brief the In re Cooper Tire which deals with this same exact issue and if you -- I don't know what they call it now -- shepherdize.

THE COURT: Yeah.

MR. BLACKERBY: If you go on Westlaw or whatever and you do that, guess what, decline(phonetic) to follow by In re Cooper that case and in In re Cooper what the court is deciding if when you get discovery on

these other tires that don't have the same design that they're a different tire than the one at same issue and this was on a mandamus proceeding the Court of Appeals in Houston said no you don't because they established it as a trade secret and you have to -- and it doesn't because it's just relevant it has to be -- it's necessary for the fair adjudication of claims. You use the same kind of affidavit that we have in this case proving it up as a trade secret. And once you've done that the burden shifts. And the language on the shifting burden is pretty pointed both by the Dallas Court of Appeals and the Houston. Both Court of Appeals have talked about this and it's not supposed to be -- you can't satisfy it by general assertations [sic] of fairness or relevance. What you have to do is you must demonstrate with specificity exactly how lack of this information will harm the presentation of the case. So you won't have a fair opportunity. That's what they call for. Once you establish it's a trade secret. That's what we've done in this case so the burden has shifted. We try to do some negotiation and part of the processes in these cases is all of these are trade secrets. We know they need something so we negotiated with them. That's why I have been yelling at them to please confer. We'll come up with something. But in the absence of it, we have our

trade secret.  We've proved it all up as trade secrets.

THE COURT:  Well the conferring didn't work out so good.

MR. BLACKERBY:  Yeah, I agree with you.

THE COURT:  Well, I don't know why he would want to confer if it didn't work out so good.  It come to the same conclusion and the one tire is what y'all want to get.  Well, y'all didn't want to give that but --

MR. BLACKERBY:  Well we've expanded.

THE COURT:  Well you don't want to give any.  I mean that's --

MR. BULLION:  We recognize they're entitled to that, Your Honor.  And you know this is -- this is not about discovery fights.  I've tried -- I've tried eight cases for Michelin similar cases to this involving tires and Blackerby and I are not into discovery fights.  We want to try the case.  And he's going to accuse us of just being discovery hounds, but we are interesting in trying cases.  We like to give them the documents they are legitimately entitled to, to allow them to prosecute their case and get on down the road.

We think given the State of the record though that what we've offered is more than fair.  This size tire for the period during which it was made at

Dothan which is approximately a six-year period, and they want all LTX's for a 15-year period and that is just not supported by the facts or the law.

MR. GUERRA:  If I may, Your Honor. Mr. Bullion I don't -- in fact, his name is Bullion in French, Tom, but he has done nothing, Your Honor and I'm very sorry and I'm used to it being insulted all the time and while we there were repeatedly told me I didn't know the rules.  I'm not from here.  I get it.  It's fine. It's par for the course.  But he said this letter that I used from Ms. Helms says anything about being protected the letter that letter I used says absolutely nothing. That's a misrepresentation to the Court, Your Honor, they I couldn't use.

THE COURT:  Well, is that part of the Rule 11?

MR. BULLION:  Yes, Your Honor.

THE COURT:  Just because you pulled a part off that have a the --

MR. GUERRA:  This is from my case in Arizona.  This is from my case in Arizona.

MR. BULLION:  I'll give you, Your Honor -- there's a June 12th 2013 letter.

THE COURT:  Well, I'm talking about this letter.  This is what he used.  This is what he used.  Is

MR 0043

that what you're referring to?

MR. GUERRA: Separate and apart.

MR. BULLION: That is the same letter. It says this agreement is limited to manner and may not be revealed outside this case.

MR. SHAPIRO: It is not signed.

MR. BULLION: I've got a signed copy.

MR. GUERRA: That is not signed.

MR. BULLION: I've got a signed copy and his is a signed one.

MR. BLACKERBY: Yeah.

MR. BULLION: It has the language in it. And I've also got a -- he had a local lawyer in to sign this one, Your Honor. I've got an e-mail back as a local lawyer accepting -- there was effective equivalent of a Rule 11 Agreement in Arizona.

MR. GUERRA: If I may, Your Honor. Here is what it says: This case they want us to be stuck to the same exact tire. That's not the way. This is good law earmark. We can all read it.

THE COURT: He says Cooper tire chunked --

MR. BLACKERBY: Exmark is not a tire case. It didn't involve tracing.

MR. GUERRA: But it cites tire case reportedly all over the place.

THE COURT: But he says Cooper tire specifically rejects it.

MR. GUERRA: Your Honor, it doesn't reject it. What it does is it states in certain circumstances you need to be more specific.

THE COURT: Yeah.

MR. GUERRA: But this is discovery, Your Honor. This is just discovery. I cannot find what the alternative designs are.

THE COURT: All right. Tell me -- I can be persuaded that it's not limited to just this one tire. That having been said, there's got to be a basis for expanding it and you've got to identify for me what tires we're going into.

MR. GUERRA: I was willing to reduce it to 10 years, Your Honor, LLTM [sic]--

THE COURT: I'm not talking about 10 years. I'm talking about first the tires. We'll talk about the period of time --

MR. GUERRA: Your Honor, physical evidence.

THE COURT: -- is a separate thing.

MR. GUERRA: Physical evidence. All -- this is the inspecting of the manufacturer. It relates to all light truck tires independently of rim size, line

MR 0045

size, pressure speed rating.  One more example, Your Honor.  This is the Velo owners manual of the tire.  This owners manual of the tire.  This is the Medina owner's manual of the tire.  The same owner's manual, different sizes and it applies to all LTX M/S's, Your Honor, same exact document, same ID number, same version, all the same.  It is the same.  It is absolutely no different on the manufacturing, design and inspection of the tire.  I'm entitled to take a look at that information.

Moreover, Your Honor, this is not my -- this is not lawyer talk -- this is not part of lawyer talk.  These are the documents.  The owner's manual that Michelin puts out for the owners of these different tires, the 255's on this case the 265 on the Velo case, the same word, same documents; everything the same, Your Honor.

THE COURT:  Okay.  So I go the 265 to what else?

MR. GUERRA:  At least I have two right now.

THE COURT:  Well, I'm willing to go more, but you have got to have something.

MR. GUERRA:  The aspect specs again, which is the major document.

THE COURT:  Look.  I'm not going to go

solely by that document that says all passengers of light trucks.

MR. GUERRA: Okay.

THE COURT: Because that will be --

MR. GUERRA: Your Honor --

THE COURT: How many?

MR. GUERRA: Your Honor, if I may Your Honor; if I may, Your Honor.

*(Simultaneous speakers.)*

MR. GUERRA: I'm not done. I'm not done.

MR. BULLION: It will probably be hundreds of millions, Your Honor.

MR. GUERRA: I'm not done. Your Honor, the general principal which is the basic document that it tells all these folks how to manufacture and inspect these tires and repair the tires before they leave the factory. It specifically says that applies to all.

THE COURT: I'm not giving you all tires, okay.

MR. GUERRA: No. No.

THE COURT: You've argued it.

MR. GUERRA: No. No. No. I only want the LTS and then --

*(Simultaneous speakers.)*

MR. BULLION: Your Honor -- I think there

is a rule.  I think there's a little confusion that I think I can clear up very easily.  Aspect specification is a plant document.  That's a document that we use at the Dothan plant.

Mr. Guerra is right, it is not tire line specific.  The manufacturing documents by definition are not going to be.  They're going to apply to whatever tires are being made at the time at the plant.

THE COURT:  Whatever is rolling off.

MR. BULLION:  What we're talking about here in terms of this scope is design documents and adjustment data and he doesn't -- and, you know, with all due respect, Your Honor, we can't just willy-nilly expand this without any proof.  He doesn't have any prove whatsoever.  The proof is in the form of an affidavit or a live witness or a document that's admitted into evidence.  And he does not have any proof whatsoever that would support expanding beyond what we've offered to give which is this tire line during the time frame that it was made at Dothan, Alabama.

MR. GUERRA:  That's not true, Your Honor. They preclude me from having the documents and then want to say that the documents prove that.

THE COURT:  No.  No.  No.  What he's saying is you hadn't put on any evidence for this

MR 0048

hearing.  Tell me what the evidence for the record what's the evidence --

MR. GUERRA:  The owners manual.

THE COURT:  What's the evidence?

MR. GUERRA:  The owners manual is the same.

THE COURT:  All right.  That tells us --

MR. GUERRA:  The aspect specifications it's a pile of documents, Your Honor, that state on the first page apply to all light truck tires.  The general principal its says on the page 17, I think, that applies to all light and truck tires.  They don't make this distinction.  This sounds letter on the Velo case, I saw it, Your Honor.  The warranty claims -- the document itself doesn't make a distinction.  The passenger -- this is from Michelin.  The warranty claims -- the thousands of warranty claims for the defect on the tires the same across the board for all light truck tires.  These are people on are the field after the tires left the plant and failed on the field, Your Honor.  So they prevent me from having documents that would prove that and then say come up with proof.

THE COURT:  All right.  On those warranty claims, what are the sizes?

MR. GUERRA:  Warranty claims --

THE COURT: Yeah, what are the sizes?

MR. GUERRA: All I want is the LTX M/S's.

THE COURT: I have already told you, you're not getting every LTX M/S. That's too broad.

MR. GUERRA: Your Honor, give me the 225s through 265s.

THE COURT: 255 to 265?

MR. GUERRA: 225 to 265.

THE COURT: 225 to 265?

MR. GUERRA: On Velo I have 235s, 245s --

THE COURT: All right. I get it. I get it.

MR. GUERRA: So all I want is the same, Your Honor.

THE COURT: I get it. You are going to tell me into something less. Tell me why 225, 265 wouldn't be similar.

MR. BULLION: It's trade secret, Your Honor. And he has not yet come forward with any proof. They're different design. Each tire size is made to a different spec and Mr. Price is very specific in his affidavit. In paragraphs 19 they really -- if you are inclusive 17 through 22.

THE COURT: What's the next one after 225?

MR. GUERRA: I'm sorry, Your Honor.

THE COURT:  What's the next one, 235?

MR. GUERRA:  235.

MR. BULLION:  Yeah, there's a 225, 235.

*(Simultaneous speakers.)*

THE COURT:  All right.  235 to 265.  225 is getting pretty small for my rudimentary knowledge of tires dealing with trailers and --

MR. BULLION:  And you're talking P metric tires as opposed to LT metric tires, I assume, Your Honor.  This is a P metric tire.

MR. GUERRA:  That's fine.  Your Honor.

THE COURT:  Yeah.  Now from there where do we go.

MR. BULLION:  Your Honor -- we.

MR. GUERRA:  We have an issue with the aspects.

THE COURT:  Wait.  Wait.  Wait.  I asked them.

MR. BULLION:  We are -- just going through the letter to Exhibit C to our response, Your Honor.  We've agreed to produce the oldest available copies of the general principals, technical notes and not tire marks (phonetic), informed procedures.  It's my understanding that the Plaintiffs have agreed to accept that.

THE COURT: The oldest they got. It sounds like a pretty good start.

MR. GUERRA: One down.

MR. BULLION: Aspect specifications. We have a dispute, Your Honor. And that's the document he has shown you a couple of times. Aspect specifications are used by the people that are called plaspectors (phonetic).

THE COURT: Okay. You would only have those as they relate to the sizes I gave you.

MR. BULLION: Well, this is not a size issue.

THE COURT: I understand what you're saying, but there's got to be a way to correlate it, isn't there?

MR. BULLION: Here's what we typically do in these cases, Your Honor and what we think is reasonable.

THE COURT: All right.

MR. BULLION: There are aspect specifications that deal with a lot of things. Aspect specifications are just documents that are reference documents for the people who are inspecting the tires after they're cured.

THE COURT: Okay.

MR 0052

MR. BULLION: And there may be a blemish on the side wall. There may be a white side wall that has got a blemish on it and they go to a category for that.

THE COURT: Okay.

MR. BULLION: Or maybe there's any number. It's a stack about this big.

THE COURT: Yeah.

MR. BULLION: And what we typically do and we've done in this case is we get the Plaintiff to identify the components of the tire that are at issue and we give them aspect specifications related to that.

For instance, the expert I assume they're using whom Mr. Blackerby and I are very familiar with has a theory where regard to steel belts. There was a gap belt splice that should have been butt to butt. There was not belt splice.

THE COURT: Okay. So ordinarily you would argue that your aspect material sheet should be limited to those that deal with the --

MR. BULLION: Plaintiff's theories in the case.

THE COURT: The ply, the belt.

MR. BULLION: Well, not just that, but just any theory that have in the case we have done that

and we have provided those to them.

THE COURT: What about that?

MR. BULLION: They are super trade secret, Your Honor. And again, we felt we've proven them up as trade secret and we're happy to give them the ones that relate -- not happy to be blunt, but we are willing to give them the ones that relate to the case, but we don't think we should have to give them something that relates to a B when there's never a B allegation in this case. So that's our whole issue.

MR. GUERRA: So, Your Honor, on that issue you heard it has nothing to do with the tire size, the rim size or pressure size. It's just across the board on light truck tires. Therefore, on Velo I add exactly the same conditions that I had on this one minus a few. So on the Medina case I have more conditions at issue than on the Velo case. I got more than 60 aspect specifications, Your Honor. I got more issues --

THE COURT: All right. You need to tell me I'm not going to give just a blanket aspect sheet for everything in the world. So how are these --

MR. GUERRA: His aspect specifications relates to a specific defect on the tire, Your Honor.

THE COURT: Okay.

MR. GUERRA: First we have --

THE COURT: I'm not giving them every defect.

MR. GUERRA: Not saying that I wanted to.

THE COURT: I understand.

MR. GUERRA: I want a little less than that but I know at least 63 apply because on the Velo case we have exactly the same issue a few less in fact and we got 63 of them so I want all of the Velo ones and you know it has nothing to do with the tire size. The tire was manufactured on the same plant manufactured on the same year on the same line. I should at least get those 63. I think that's the ones I got in Velo plus I have more issues on this case and they have a specific problem.

THE COURT: Well, no. Look. The way to go is not just to say, well, they did this in another case.

MR. GUERRA: Okay, Your Honor.

THE COURT: I might as well let Mr. Fisher wear the robe if I'm going do that and trade places.

MR. GUERRA: I can do that, Your Honor. They gave me the document. This is the issue that I have and they also have it in Velo.

THE COURT: Here's what I'm going to do to you unless can you talk me out of it, all right?

MR. GUERRA:  All right.

THE COURT:  I kind of buy his argument the Plaintiffs got to say the defect that they're -- but then again that leaves no room for the possibility and that's part of discovery is taking a fresh look at it because there maybe have been something else.

MR. GUERRA:  That's fine.

THE COURT:  So how I do get there?

MR. GUERRA:  How I do get there, Your Honor?

THE COURT:  No how do I get there not how do you get there.  Because how you get there is going to be different from how I get there.  How you get there you would get all the aspects sheets --

MR. GUERRA:  And I should, Your Honor.

THE COURT:  And all the LTMS tires.  I get it.

MR. GUERRA:  This has nothing do with specific lines.

THE COURT:  But you and I don't agree with that.

MR. GUERRA:  This has nothing to do with specific lines and I'm not done Tom.

MR. BULLION:  I was just going to volunteer a solution.  But we have a plane to catch and

all.  I have a proposed solution.

THE COURT:  Well, let me hear it.

MR. GUERRA:  Go ahead.  Let me hear it.

MR. BULLION:  We talked in chambers about giving him a list of the aspect specifications and let him pick them and it came clear to me that he was going to pick all of them and I didn't think that was fair. I'll agree on behalf of Michelin give him a list and he picks the ones that are really at issue in the case.  If he comes back and picks all of them I think the Court ought not tolerate that and it seems like to me that's a fair compromise.

MR. GUERRA:  Your Honor, again, the characterization is I'm the bad guy.  I gave him this --

THE COURT:  You know I'm not taking it that way.

MR. GUERRA:  That's nonsense.

THE COURT:  I understand you are.

MR. GUERRA:  Your Honor, I told him what I needed.  I told him exactly what I needed.  I need all of the aspect specifications about blisters.  I need all of the aspect specifications about defects on the moldings, defects on the inner line, defects in the junctures between material, defects in the joints, defects regarding the sticking of the joint.

THE COURT: And that's going to be everything, right?

MR. BULLION: Yeah.

MR. GUERRA: No, no, it's not everything, Your Honor. It's not everything. I just know these documents but it's not everything. Defects in the bead defects in the tread and they said to me, Luis you have an allegation about the bead. I said, no. And I said, but I always see when I go against tires the bead is always the issue so I'm waiting for that and I'm not willing to sit on it and then you make that allegation on the defense side. There was a problem with the bead and I have to come back and ask for the documents.

THE COURT: What's wrong with that?

MR. GUERRA: Timing. Timing. Timing. It's been going on a year. But, Your Honor, I asked the gentlemen here to provide me the factual basis of this defense that the tire -- tire abuse that's the defense, tire abuse. And he has refused to give me the factual basis, Your Honor. So I'm fighting in the dark. I submitted three letters talk about not complying with the rules. He said that's the expert disclosure. It's not the expert disclosure. It's the factual basis for the defense before the expert disclosure. I need to know that. I have allowed them to take deposition after

MR 0058

deposition.  I don't know what I'm defending against so here is the problem.

THE COURT:  Hold on.  I get it over there.

MR. BULLION:  I'm sorry.

THE COURT:  I get his argument over there. You know I could see you put it together then all of a sudden your guy comes in and says, well, really.  It was something else totally out there and I had limited his discovery to where he can't even defend against that affirmative defense.

MR. BULLION:  I understand what you you're saying, Your Honor.  I've never seen this being an issue. I will tell you generally what our position is in the case, but I don't think it is an expert issue.  We don't have company witnesses who talk about why this tire failed.

THE COURT:  I understand.

MR. BULLION:  Our position is this tire was 11 years old at the time of the accident and it should not have been in service.  There were five different tires on this vehicle.  It was an expedition. There was a light truck tire on it.  There were 4P metric tires and they were a horrible mess of tires.  These folks should not have been driving with these on this vehicle.

And there is going to be plenty of proof at the appropriate time that this tire was run underinflated.  Probably there's going to be proof that it suffered an impact which caused its failure.

MR. GUERRA:  No it's not.

MR. BULLION:  This is all expert stuff that --

THE COURT:  Well, wait a minute.  Wait a minute.  He just went through a litany of them.  They're all on the record.  You get aspect sheets related to --

(Simultaneous speakers.)

MR. GUERRA:  Wait.  I don't get all of it.  Let me explain.  Let me explain why.

THE COURT:  No, I've been hearing you.

MR. GUERRA:  If I may, Your Honor.  If I may.  If I may.  Tire inspectors, the verifiers, tire verifiers that do this day in and day out they cannot see all of these defects and they're experienced people.  They need all the aspect specs to compare.  Why am not entitled to have that to compare to see if there's initial defects.  They are so precised as defects, Your Honor, that they don't even let you make color copies of the photographs.  They have to be colored laser copies of the photographs because of preciseness.  So I'm entitled to all the aspect specs for these truck tires so I can

compare to see if there's any defects that we miss.  Why can't we have that for this specific tire, Your Honor?  It has nothing to do with other tires -- this tire.  Give meet the aspect specs so my expert and we can take a look at what should be.

THE COURT:  What was the year of the manufacture of this tire?

MR. BULLION:  2001.

THE COURT:  What happens with all the aspect sheets for 2001, 2002 and 2000?

MR. BULLION:  We probably don't have those, Your Honor.  What we typically would give would be the oldest available.  They're not going to be appreciably different.

THE COURT:  All right.

MR. BULLION:  The question is not the date I don't think in this case.  It's there are -- I don't know, this many --

THE COURT:  Okay.

MR. BULLION:  I'm showing 3 inches maybe.

THE COURT:  Oldest available two years what does that do to you?

MR. BULLION:  It's not -- again, it's not the date.  It's just having to give up all of them.  What we ought to have to give up -- if there's anything --

(Simultaneous speakers.)

THE COURT:  It's defects.

MR. BULLION:  If there's anything --

THE COURT:  It's defects.

MR. BULLION:  But a lot of them don't relate to anything having to do with what they claim in this case.  He for example-- he wants the one relating to B.

THE COURT:  Yeah, but y'all got a whole bunch of allegations against the Plaintiffs that you just went through.

MR. BULLION:  But --

MR. GUERRA:  For the first time.

MR. BLACKERBY:  These documents are used in the plant to look at tires that have just been cured. These have not been used to look at tires that are 11 years old and have been run down on a vehicle.

THE COURT:  Well, I understand.  But it would certainly go to discovery of issues that were potentially that were out there and that way they can look at these tires in the context of these defects.  But I didn't want to give 10 years of all that massive documentation because I just think it's irrelevant and too much now.

MR. BULLION:  Well the issue is trade

secret though.  That's the problem we have with this whole deal.  If we give them the aspect specifications that relate to the claims in the case and it can be relate to the defenses too that's fine.  There won't be anything I think on what I just said.  But if we give them the aspect specifications that relate to the claims in the case, then we'll concede that that's necessary for a fair adjudication of the claim.  When you get beyond that then we're back in the mode of the In re Continental tire case where we have proven this --

THE COURT:  Oldest two years.

MR. BULLION:  I'm sorry.

THE COURT:  Oldest two years.

MR. BULLION:  Okay.  You want us to you give them all of them, huh?

THE COURT:  The oldest two years.

MR. BULLION:  Your Honor, one thing I didn't -- you said 235 through 265 but we didn't talk about a date range.  I would urge the court on that if what he wants to do is be able to compare to limit it to a narrower date range like maybe plus or minus six months as opposed to it's going a ton of documents if you give him those sizes for the five years that we offered plus there's a reason -- there's a basis for the '98 to 2003 time frame with regard to the tire in question on

MR 0063

this case because that's when it was made there.  I would urge you to either pick.

THE COURT:  Two years forward or two years after.  That's what we're going to start with.

MR. BULLION:  I'm sorry.

THE COURT:  Two years before or two years after the manufacturing year.

MR. BULLION:  That's going to be a ton, Your Honor.  That's going to be a whole lot.  I can come back to you and tell how it's -- just printing these specs takes a lot of time.

THE COURT:  All right.  What about six months before and the year after to start.

MR. BULLION:  Okay.  I don't know how much effort that will be frankly, but I will put six months before and one year after.

With regard to the aspect specification, Your Honor, I want to make sure that I'm being clear. Giving up two different versions of it --

THE COURT:  I don't know what you're talking about two different versions.

MR. BULLION:  You said the oldest two years.

THE COURT:  Yeah, just because most likely you will have them for the year of manufacture.  If you

had it the year of manufacture then it's the year of manufacture.

MR. BULLION:  What we typically would do is give them the oldest version that we have.

MR. GUERRA:  That's good enough, Your Honor.

MR. BULLION:  But what you're saying is you want more than just the oldest version?

MR. GUERRA:  That's good for now, Your Honor.

THE COURT:  The oldest version.

MR. GUERRA:  Yes.  For now, yes.

MR. BULLION:  You won't go with my proposal to give them a list and let them pick?

MR. GUERRA:  No.

MR. BULLION:  That seems --

MR. GUERRA:  It's a waste of time.

MR. BULLION:  From a standpoint of protecting trade secrets, Your Honor.

THE COURT:  I understand your argument. The oldest version.  I wanted the manufacturer if it's not there it's not there.

MR. GUERRA:  Are you talking about the skin stock?

MR. BULLION:  That's the biggest lay down

of all, Your Honor. He's asking for actual the rubber content formula which is the -- that's the Coca-Cola formula of the tire world. In re Continental General Tire is directly on point.

THE COURT: You're going to tell me how you get there on that.

MR. GUERRA: Coca-Cola doesn't kill people. These tires kill people, Your Honor. We are talking about the ability to hold materials together. We have a claim for that. We cannot know whether or not that product can do it. You can't test. You can't do anything. You can put the claim out there, but you can't do anything about it. You cannot conduct any discovery. How is that fair? They might as well check that out and say you can never make that claim because the --

THE COURT: What's your best case on it that specific formulation is a red flag, red flag.

MR. GUERRA: Yes, let me have it.

THE COURT: No. You show me your best case. What's your best legal authority that you're going to get the specific formulation?

MR. GUERRA: I mean right now --

THE COURT: I'm not going to be a pioneer on that.

MR. GUERRA: It's not a pioneer --

THE COURT:  This is not first tire case.

MR. GUERRA:  I understand, Your Honor.

THE COURT:  I'm just telling you give me the best case on this specific issue.

MR. GUERRA:  Would you give me a couple of days.

THE COURT:  Yeah.

MR. GUERRA:  All right.

THE COURT:  I'm ruling with him until you give me a case from the specific formulation.

MR. GUERRA:  Fantastic, Your Honor.

THE COURT:  And if he gives one, you get to counter back.

MR. BULLION:  Thank you, Your Honor.  I sure hope so.

THE COURT:  I don't want 15 cases from both of you.

MR. GUERRA:  No problem.

THE COURT:  You give me your best case.  You give me the best counter.

MR. BULLION:  We have already submitted two that are on this direct point that we're talking about.

THE COURT:  I understand.  I'm just saying that's what you can do.

MR 0067

MR. BULLION:  Okay.  One other thing that we discussed in chambers that I just want to put on record that I agree to do.

THE COURT:  Well, actually y'all were in the jury room not in the judge's chamber.  I wasn't part of the conversation.

MR. BULLION:  No.  No.  No.  I misspoke. I apologize.

THE COURT:  Well, I didn't want anyone reading the record -- well I didn't want anyone reading the record being confused.

MR. BULLION:  It says jury room all on the door.

THE COURT:  I don't want anyone to be confused and think this was a conversation among us all in chambers.  I wasn't a party.  That was y'all's conference.

MR. BULLION:  I appreciate the clarification.  Mr. Guerra thinks that --

MR. GUERRA:  Call me Luis.

MR. BULLION:  Usually in the courtroom I would call you Mr. Guerra.

MR. GUERRA:  Call me Luis.  That's my name.

MR. BULLION:  We have produced what is

known in Michelin as physician paper on tire service life and he thinks that there is a different version of the one we produced and I had agreed to check on that. I don't think that there is but I just want to put on the record that that is something I agreed to.

THE COURT: If there is a different version, you give it to him.

MR. BULLION: To check on it. I think that's all I have on my notes.

MR. GUERRA: I think it's covered.

THE COURT: All right. Y'all got a record of it. Y'all got a record of it. It's good to see y'all.

(End of Proceedings.)

STATE OF TEXAS

COUNTY OF DALLAS

I, Vielica R. Dobbins, Official Court Reporter in and for the 134th District Court of Dallas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $384.00 and was paid/will be paid by Mr. Thomas Bullion, III.

/s/ Vielica Dobbins

Vielica R. Dobbins, CSR, RPR
Texas CSR No. 6248
Official Court Reporter
134th District Court
Dallas County, Texas
600 Commerce Street, Suite 650
Dallas, Texas 75202
Telephone: (214) 653-7239
Expiration: 12/31/2016

VIELICA DOBBINS, CSR, RPR

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. DC-14-07255

| | |
|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) IN THE DISTRICT COURT )<br>)<br>)<br>)<br>) |
| Plaintiff(s), | ) ) |
| vs. | ) DALLAS COUNTY, TEXAS ) |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | )<br>)<br>) |
| Defendant(s). | ) 134TH JUDICIAL DISTRICT |

_____

**SHORT MOTION TO STRIKE MICHELIN'S CLAIMS OF TIRE ABUSE HEARING**

_____

On the 5th day of October, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Dale B. Tillery, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

VIELICA DOBBINS, CSR, RPR

MR 0071

**APPEARANCES**

LUIS P. GUERRA
SBOT NO. (Admitted Pro hac vice)
DAVID C. SHAPIRO
SBOT NO. (Admitted Pro hac vice)
Luis P. Guerra, L.L.C.
6225 N. 24th Street
Suite 125
Phoenix, Arizona 85016
Telephone:  (602) 381-8400
Fax:  (602) 381-8403
E-mail:  Pmigliorini@lpguerra.com
**Counsel for PLAINTIFFS**

THOMAS M.'TOM' BULLION, III
SBOT NO. 03331005
CHRIS A. BLACKERBY
SBOT NO. 00787091
Germer Beaman & Brown, P.L.L.C.
301 Congress Avenue
Suite 1700
Austin, Texas 78701
Telephone:  (512) 472-0288
Fax:  (512) 472-0721
E-mail:  Cblackerby@germer-austin.com

- and -

DEBORA B. ALSUP
SBOT NO. 02006200
Thompson Knight
98 San Jacinto Blvd., Ste. 1900
Austin, TX 78701-4238
Telephone:  (512) 469-6114
Fax:  (512) 482-5028
E-mail:  Debora.alsup@tklaw.com
**Counsel for DEFENDANTS**

VOLUME 1

**SHORT MOTION TO STRIKE MICHELIN'S CLAIMS OF TIRE ABUSE**

**HEARING**

October 5, 2015

|  | PAGE | VOL. |
|---|---|---|
| Proceedings | 4 | 1 |
| Adjournment | 37 | 1 |
| Reporter's Certificate | 38 | 1 |

VIELICA DOBBINS, CSR, RPR

**P R O C E E D I N G S**

THE COURT: All right. We're on the record in <u>Cause No. DC-14-07255 Medina vs. Michelin</u>. Announcements and appearance on the record for the Plaintiffs, please.

MR. GUERRA: Luis Guerra and David Shapiro, Your Honor.

THE COURT: And for the Defendants.

MR. BULLION: Your Honor, Tom Bullion and Chris Blackerby and we brought Debbie Alsup from the Thompson Knight firm today as well. She is Michelin's appellate lawyer in the case.

THE COURT: All right. You may proceed.

MR. GUERRA: Do you have any preference, Your Honor, how you want me to argue this?

Here is my problem, Your Honor. Concerning the orders that you made at our prior hearing September 8th we would like to, you know, request the Court to review the transcript and it will be available shortly. I know that Vielica has been working admirably and she has explained it to me. And I think she going to it available shortly so you can just read it and just issue the order regarding some of the disputes that we have here.

THE COURT: Yes. That's what I'll do.

MR. GUERRA: Concerning Your Honor -- here's the problem that I have in a nutshell. On March 30th you gave us until December 15 to produce the expert opinions. That is about from March 30th -- I'm sorry -- April 30th. You gave us -- on April 30th you gave us the Court's scheduling order until December 15th to produce the expert's opinions. And that is, Your Honor 229 days.

Of those 229 days I am supposed to conduct discovery, get the information. I have not been able to do that. I was here on May 11 asking for documents.

THE COURT: I understand.

MR. GUERRA: I've been here on September 8th asking for --

THE COURT: So what is it that you want to do?

MR. GUERRA: I those documents and I want the documents they promised to produce. And so they promised prior to the hearing to give me -- that's the letter to us -- general principals, the technical notes, the tire nonconfirming procedures and the oldest available tire building training document for tires. Then they came to the hearing on September 8th and they promised again that I would get all that stuff. Then they wrote a letter to you on September 17th saying

MR 0075

again, despite that proposal on September 1st to produce additional documents Plaintiffs used a -- (unintelligible) --their offer, despite that we agree during the hearing to produce the documents any way. So three times they have told them. They told us, they told you, they've made judicial declarations. We're going to produce them. I don't have them. I don't have -- all I have out of those documents, I have the general principal. That's it.

They produced incompletely the tire nonconforming. There's no qualifications on what they're going to produce. There's no qualifications. We will produce --

THE COURT: Well, but isn't this part of what we all, I mean what whey went through?

MR. GUERRA: Yes, Your Honor.

THE COURT: Okay.

MR. GUERRA: I don't have the documents.

THE COURT: Well, I'm sure they're going to say we're waiting on the order and y'all don't agree to the order. I'll go over the order as soon as we get the transcript. And if this creates a problem for the December, your time will be extended. That's the way it's going to be.

MR. GUERRA: Your Honor, I don't want to

lose my trial date. I do not want to lose my trial date. I have spent 70 percent of the time -- 70 percent of the time -- some this I've been up to today 158 days of those 229. This is the traditional traditional litigation strategy of this company. On May 11 when I was here I stated that I'm already having problems, Your Honor. I know that's the way they work. So out of my time that I have to conduct discovery on the merits of the case, I have spent 70 percent of my time --

THE COURT: Yeah, but if your concern is over the amount of time you have to commit to accomplish your discovery, you're not going to have a problem with that.

MR. GUERRA: Okay. Okay. All I need is the documents really so can I conduct my discovery. In the meantime --

THE COURT: As soon as I get the transcript, I will read it over and do the order since y'all couldn't agree to what the rulings were.

MR. GUERRA: Some of these documents they claim, Oh, we agree to produce them so and it's not even part of the order. We agreed to produce them. No, it's got to be on the order because they promised they would produce them. So if they don't produce them and when I find through the witnesses they didn't produce these

MR 0077

documents, I can come back here and talk to you about these matters, Your Honor.

MR. BULLION: Your Honor, it's not correct that we're waiting on an order to produce documents. It's not correct. We have produced --

THE COURT: Well, if you produced all those that he's got his poster on and he'd said that y'all agree to produce then there's nothing to argue about.

MR. BULLION: He is wrong, Your Honor. He is wrong. We made a proposal as the Court will recall a week before the hearing on September 8th we made a proposal. He has excerpted part of it on the board that he has got there. And it was we will produce certain documents in an effort to resolve this motion to compel and you withdraw your motion to compel. They didn't accept it. They called it BS as you'll recall. They didn't accept the offer.

Despite that we came in, in good faith at the hearing and we said we'll agree to produce these documents. We have produced almost 5,000 pages of documents. Now we have produced the documents.

THE COURT: Are you saying that you have already gave him what he is talking about on that poster?

MR. BULLION: Yes. That's what I'm

MR 0078

saying.

THE COURT: Okay. Then he can say what he wants. If you've already gave it him, you gave it to him and you will be sitting good. He don't think you did and he's going to have to prove that.

MR. BULLION: The only thing, Your Honor, is I understand that the motion for sanctions that he filed only relates to thing that are not things the Court ordered us to produce, but things that we voluntarily offered that we would produce. We have not produced documents relating to the other tire sizes that the court ordered because, again, we are waiting on the order on that.

THE COURT: I understand.

MR. BULLION: Aspect specifications, expanding aspect specifications, we have not produced that.

THE COURT: I understand.

MR. BULLION: But with regard to the documents that we said in that proposed Rule 11 Agreement that we will produce on September 1 even though he didn't accept it, we have produced those. There are certain of those documents that he is complaining about in the motion that don't exist that we have said it in our responses.

THE COURT:  Okay.  Sounds easy.

MR. BULLION:  I wish it was.

MR. BLACKERBY:  We agree I think it should be easy, but it has not been.

MR. GUERRA:  Your Honor, it's absolutely not true.  They have not produced a single technical note.  It's right here; not a single one, not a single one tire nonconfirming --

THE COURT:  Okay.  Well, how are you going to prove that?

MR. GUERRA:  They have told me.  They have told me they have not produced them.

THE COURT:  Have y'all not produced a single technical note?

MR. GUERRA:  Not a single technical note.

MR. BULLION:  Technical notes, Your Honor, are referred to in certain aspect specifications.  You will recall briefly at least what the aspect specifications are.  They're the documents that --

THE COURT:  Yeah, I remember --

MR. BULLION:  Class spectors use in the final finish department.  Certain of the aspect specifications have technical notes associated with them certain of them don't.  The ones that we have produced in the case today, he did not.

THE COURT: It's an easy question. He says you have not produced a single technical note.

MR. BULLION: We have, Your Honor.

THE COURT: You're saying, yes, we have.

MR. BULLION: There are no technical notes associated with the aspect specifications we have produced today. If we --

THE COURT: Okay but if there are just none because there is none created then that's why you have none.

MR. BULLION: We've said that in our responses. The Court has ordered that we produce additional aspect specifications --

THE COURT: Yeah, and you're waiting for an order.

MR. GUERRA: All of them.

MR. BULLION: And when we do that --

*(Simultaneous speakers.)*

THE COURT: I understand.

MR. GUERRA: Here we are, Your Honor. He said he will produce them. He told you --

THE COURT: No. No.

MR. GUERRA: He said I will produce all the documents that he had here.

THE COURT: And he has.

MR 0081

MR. GUERRA:  He hasn't.

THE COURT:  He says on his aspect size those don't have technical levels.

MR. GUERRA:  No, Your Honor.

THE COURT:  On the remaining ones he is waiting for the order that there are some that have technical notes.

MR. GUERRA:  No, Your Honor.

THE COURT:  I don't know that to be factually true or incorrect.

MR. GUERRA:  In general, Your Honor, there are no qualifications here or here or in the courtroom. There were no qualifications.

THE COURT:  Well, no, I'm not going to suggest -- I'm not going to entertain that they agreed to produce every technical note that they've ever had or anything -- that's a little broad.

MR. GUERRA:  No, Your Honor.  It's concerning the aspect specifications.

THE COURT:  That's what I just said.  He gave you the aspect specifications.  He said they don't have technical notes.  The other ones are subject of the order.  And he says soon as the order comes down, they'll be some that have technical notes.  I don't know if that's true.  I'm just saying that's what he's telling

me.  Isn't that what you're telling me?

MR. BULLION:  That's exactly right, Your Honor.

THE COURT:  All right.  You may know different but you need to give me proof.

MR. GUERRA:  If we came here during the oral argument and the court ordered for them to produce all of the aspect specifications it's on the record.  And the aspect specifications --

THE COURT:  That's one of the things y'all disagree with.  That's one of the things y'all disagree with.  That's why there's not an order signed.  You think I ruled certain ways.  He thinks I ruled other ways.  We're going to get the transcript.  And if you're right, then he may have a problem.  If he's right the way he heard it, then what he's telling you --

MR. SHAPIRO:  Your Honor, part of the problem is they have the documents.  We don't have the documents.

THE COURT:  I know that.

MR. SHAPIRO:  So you're telling us to prove what we don't have.  How do we do that?

THE COURT:  No.  No.  You said you've got no technical notes.  He says I understand for the aspect specs that we've given you voluntarily --

MR. GUERRA: They gave us nine aspects, nine, Your Honor.

THE COURT: Exactly. That's fine. He's saying there's no technical notes for those. Now if you can prove, yes, there are. There are technical notes for all those then you would be showing me that what he saying is not correct. He says the other things that would include and have technical notes are subject of the order.

MR. GUERRA: Your Honor, they play this game in every single litigation parsing things that were said. Your Honor, it's the strategy that they use, Your Honor. The general note --

THE COURT: What do you want me to do? You want me to take this and say you've got to give them some technical notes because --

MR. GUERRA: All of the technical notes; not some, all of them. All of it, Your Honor.

THE COURT: I done asked you. If your argument is they have got to give you every technical note that has ever flown past Michelin no matter what, that would be a little broad.

MR. GUERRA: Concerning the aspect specifications they've been ordered to produce and the court ordered them all produced, so I need the technical

notes.

THE COURT:  Have you ever seen a dog chase his tail?  That's where you and I -- that's what you and I are doing.  I get it.  I hear your argument.  You want me to accept as a fact your position on what I've ordered.  He wants me to accept as a fact their position on what I've ordered.

He says if their position is right, he's given you all the aspects --

MR. GUERRA:  No, he hasn't, Your Honor.  He hasn't.

THE COURT:  Show me one piece of evidence for the aspect sizes he's given you, technical notes exist and he didn't give it to you.

MR. GUERRA:  Your Honor, I came here on September 8th because I don't have the aspect specifications that I need.  We wasted another month on this nonsense that have 200 aspect specifications.  We have already heard this argument, Your Honor.  You ordered them produced -- what's clear as daylight.

THE COURT:  Y'all don't agree to what I ordered.  As soon as I get the transcript, I'll read it.  One of y'all is going to be right and one of y'all is going to be wrong.  Maybe y'all will both be a little right, y'all both will be a little wrong.  Any way you

MR 0085

will get an order. And if there are -- if it comes the way you think I've ordered, then he probably has a lot of technical notes from what you're telling me he needs to give.

If it comes out the way he thinks the ruling was, he says he's good and you will be getting technical notes because some of the information that he thinks I ordered will be associated with technical notes, right?

MR. BULLION: Exactly.

MR. SHAPIRO: Your Honor, on the tire building training, we don't have any of them. These folks that start at Michelin they don't just start building tires. They're trained. We don't have any of them, not a single one.

THE COURT: Any what?

MR. SHAPIRO: The tire building training, how they build the tires.

MR. BULLION: We given them a ton of --

*(Simultaneous speakers.)*

MR. SHAPIRO: No, they have not.

MR. BULLION: It would be proper and polite to let me finish addressing the Court before interrupting, okay. We have referenced in our supplemental discovery responses what we have produced

MR 0086

specifically. Without an order from the Court we produced 3,000 approximately more pages of documents since that hearing. We've referenced in our responses what we produced and they can go -- if they're willing to read it, they can go and find the documents we have produced. We have produced our builder. We've build machine setup type documents and tire builder training documents.

THE COURT: You said you got no tire builder training.

MR. BULLION: Your Honor --

THE COURT: Here is the way we are going to handle that. You know what you sent them. Bates stamped --

MR. BULLION: Yes, Your Honor. It's set out in our response --

THE COURT: Listen. Do me a little favor all right. Humor me. Send them the Bates Stamp range where you say tire training.

MR. SHAPIRO: Yes, Your Honor, tire training.

THE COURT: Tire training information exist.

MR. BULLION: That is set in out in our response to the motion for sanctions as well, but I will

MR 0087

send it again.

THE COURT: And just send a letter pursuant to my instruction to you that specifically addresses here are the Bates number ranges for the tire installation training or what is it tire --

MR. SHAPIRO: Your Honor, When some of --

THE COURT: What is it that you want?

MR. SHAPIRO: We want the orientation documents.

THE COURT: No. No. You started off with tire training information.

MR. SHAPIRO: Yes.

THE COURT: That's what I want you to Bates Stamp range.

MR. BULLION: Just backing up just briefly, Your Honor. We produced a lot of documents. We produced them even before we supplemented our discovery responses --

THE COURT: If they're Bates stamped just tell them ranges.

MR. BULLION: I am.

THE COURT: And then you're going to look at that and if none of that is tire training information, bring it to me. If it's not tire training information, I guess you overlooked and it's going to be a problem. It

goes to your credibility and what you're asking.

MR. SHAPIRO: Okay.

THE COURT: All right. What else.

MR. GUERRA: Your Honor, I'm sorry. I call him my son's name. My apologies.

These folks here -- for instance, Your Honor. They say that they produce all these documents. They don't produce the most important. That is the tactic.

THE COURT: Okay. We are waiting on the order.

MR. GUERRA: So the tire nonconforming procedures we know for a fact they are missing. First of all, we just got them 14 days ago, but they're missing all of the reference documents contained on the ones that they produced. They proved TNC2s and 3s but they didn't produce the reference documents associated with it. In addition, Your Honor, they didn't produce TNC4s and 5s. They claim they didn't exist then.

Now they have to deal with those complaints at the same time at the time that the tire was manufactured which were already complaints and after the tires left the factory. Those are 4s and 5s. So --

THE COURT: What do you want me to do?

MR. GUERRA: Order them produced, Your

Honor.

THE COURT: I've already gone through a whole big order that y'all don't agree with. I'm going to go through the transcript. I'm going to give you that order. This wasn't part of the order. All of this that you're bringing up wasn't part of --

MR. GUERRA: No. Because they agreed with it. They agreed to produce them and here I am again another 58 days into --

THE COURT: He just told me he produced them.

MR. BULLION: Your Honor --

MR. GUERRA: He hasn't, Your Honor.

MR. BULLION: This is the hide the ball game and we are not the ones playing it.

*(Simultaneous speakers.)*

THE COURT: Hold on. Do don't interrupt them.

MR. BULLION: We have asked these guys they have complained every day multiple times about our discovery responses every day. I promise you.

THE COURT: Okay.

MR. BULLION: We have asked them, what is your problem? What is it that you think we haven't produce and they don't respond. when they finally put in

their motion for sanctions what they claimed we hadn't produced, the TNC4 and 5, we wrote a letter and said, Hey, it here is why you don't have TNC4. We were able to erase original equipment tires. This is a replacement market tire. Here is why you don't TNC5. It didn't exist at the time.

We have explained this to them and asked them to withdraw their motion for sanctions yet they don't do it.

The reason, Your Honor, there are so many miscommunications in this case. We feel like everything needs to be put in writing and we have requested and that I'm going to stick with that position.

THE COURT: I can't blame them.

MR. GUERRA: These folks we call them more than 15 times after this hearing. They refused to take the calls, refused to take the calls even discuss it.

THE COURT: That's all right. Send it in writing then. I've been in your shoes then send it in writing.

MR. GUERRA: Your Honor, we have send them in writing. They know exactly what we want. They just hide the ball and then pretend that we gave you 5,000 documents. None of them include this nonsense. It's missing, Your Honor. They do this on every game. If I

read the Bates number order to you it's the same thing.

THE COURT:  You don't have an order on that.

MR. GUERRA:  I don't.

THE COURT:  We went through all of that because you said we've got all of these things they're supposed to give us.  They didn't me and went through a whole big hearing.  I made an order.  Y'all don't agree with what that order was.  I'm going to go through the transcript and I'll give you the order.

He says they're going respond.  I'm sure they are because they don't have much choice and then you will know where you are.

MR. GUERRA:  On the Velo case which they refer to it several times.  It was a very similar tire which was LTX M/S manufactured at same plant different size was a 265 as opposed to 255, but other than that was exactly the same.  The tires are exactly manufactured the same way.

I got many more aspect specifications, many many more and I have the same exact defects plus more on this one.

THE COURT:  So maybe when I do my order and they do their response based on the order you will have that same treasure troll.  You want me to assume

that you won't.

MR. GUERRA: Your Honor, I just want what was ordered here after we had the oral argument about that matter and I want the matters that they promised me that they will produce so I didn't put it on the other argument and I think I am entitled to that. There is absolutely no qualifiers anywhere about what they're going to produce and they now after we did that -- they do this in every case, Your Honor.

THE COURT: Wait a minute. We're going round and round. He said they produced it. You say they didn't.

MR. GUERRA: He didn't.

THE COURT: Well what's the proof. He says they don't exist.

MR. GUERRA: No. No. No. What they say is that they didn't exist at the time, but there has to be some way to deal with that matter; complaints after the original equipment for the original equipment customers. It's the same tire. So I need to --

THE COURT: Look. Here's the deal. He says on the record they don't exist. They don't exist. Bring me in one that show they don't exist and that's going to somewhat problematic for him.

MR. GUERRA: Okay.

THE COURT: Right now you're telling me they do exist. He says no they don't.

MR. GUERRA: Can you just incorporate on the order for them produce the documents so then I have an order that I can go against.

THE COURT: What documents?

MR. GUERRA: All tire nonconfirming procedures to be produced, technical notes to be produced concerning these aspect specifications. That's all I need and the tire building documents. Just put it in the order, Your Honor.

MR. BULLION: Your Honor, you have already said multiple times you are going to read the transcript and prepare an order that reflects your rulings and we trust that you'll do that. He keeps referring to agreement. The September 1 document was written as a Rule Agreement. It has a place for a signature for Mr. Guerra and Mr. Shapiro here. They never signed it. It says in exchange for the production agreed above --

THE COURT: It doesn't matter. Like I said it's not a Rule 11. It's not signed.

MR. BULLION: There was not an agreement despite that we produced a lot of documents.

MR. GUERRA: What not signed but he came into the court and said that I'm going to produce them.

THE COURT:  If he did that it's on the record.

MR. GUERRA:  It's on the record.  And then --

THE COURT:  Y'all obviously don't agree.  Why do we keep going around on this.

MR. GUERRA:  Because he is saying -- now he is trying to go back on his word.  He said it in open court.  He then said it here despite what we said.  We agree to again to produce the documents any way.

THE COURT:  You said it's on the record.

MR. GUERRA:  It's on the record.

THE COURT:  Okay.  I told you I'm going to go based on what the record was.

MR. BULLION:  Your Honor, they're here asking for sanctions against us and it doesn't relate to the Court's ruling.  They say in footnote note one of their motion it does not relate.  This motion does not address the documents the Court ordered Michelin to produce.

THE COURT:  The Court can award sanctions based upon representations and, you know, representations in writing you know that's possible.  But right now I don't -- until I read that transcript, you're telling me all that matter that's on your posters it was stated on

MR 0095

the record.

MR. GUERRA: Yeah. I need to see it, but words to the effect.

THE COURT: Yeah.

MR. GUERRA: I am going produce them any way.

THE COURT: Well then we'll deal with that. If it's on the record, it's going to be there.

MR. GUERRA: During the hearing --

THE COURT: If it's not on the record --

MR. GUERRA: During the hearing we agree -- during the hearing we agree to produce the documents any way. He wrote it. That's a letter to you, Your Honor. That's the representation he made to the Court.

THE COURT: Okay.

MR. GUERRA: It's here. It's on our record right here.

THE COURT: I'll look at it. When he gets an order he is waiting on the order. He's a got right to do that.

What else?

MR. BULLION: We've got a motion to designate responsible third parties, Your Honor, the first one we've ever had to have a hearing on in my

MR 0096

memory. I've done hundreds of these. This is the first one we've had to have a hearing on. But if you want to take that up, we'll be glad to do that. Mr. Blackerby will address that.

THE COURT: Is it timely?

MR. BULLION: Oh yeah.

MR. GUERRA: Yes, sir.

MR. BULLION: It's been set. It's been filed a long time ago.

MR. BLACKERBY: It's pretty simple pretty straightforward. We've -- the owners and the operator of the vehicle were the Rico family. We went out and deposed the Ricos and about 10 days later we filed a motion to designate them as responsible parties. This is what happens in every single tire case. The allegation is they properly maintained the tire and the allegation is the driver failed to maintain control of the tire. We should be good. The objection that they are allowed to make is we didn't complete it. The sufficiency to special exceptions. They filed an objection and instead of doing that, their objection is it is baseless and unsupported and they have given a lot of testimony primarily from actually all leading questions by the Plaintiffs saying you took care of the tire, right, yes and all these kind of sayings and basically that's their

objection which is not a proper objection you know.

THE COURT:  Not for -- not at this stage.

MR. BULLION:  Not at this stage.

THE COURT:  Maybe at the time of submission --

MR. BLACKERBY:  Exactly.

THE COURT:  -- when the evidence is before the court as to whether or not there's anything that would raise the issue of responsibility but not just on just designating.

Response.

MR. SHAPIRO:  Your Honor, first of all Mr. Blackerby actually asked the questions about the tire.  He didn't like the answer.  The driver and the owner of the vehicle and the tires say I had the tires checked.  So they're just completely -- it's sad to say they're making up facts.  There's no evidence of poorly maintaining the tire and it goes hand and hand with our motion to strike claims of tire abuse.

They won't disclose it.  We keep asking them.  You know it's just trial by ambush.  We keep asking them.  We provide the vehicle.  We send them the tire.  They had the tire for over a month.  They looked at everything.  We gave them the vehicle.  They deposed the driver, all the folks, nothing.  There's no tire

abuse.  We ask -- we're taking fact discovery.  We're taking depositions.  They claim there's tire abuse.  They don't tell us how, where, when, nothing.  They have to plead some specificity under the rule that we cited, Your Honor.

And even if there is a claim of only checking the tire once, how does that cause the tire to fall apart.  There's no causation.  Even if can the take the pleadings as true so their motion to designate does fail.  There's no evidence of responsibility.  We've asked them for it.

THE COURT:  All right.

MR. BLACKERBY:  I'll respond, again, Your Honor.  The amount evidence is not at issue here.  It's whether we've pled it.  What we've pled is they checked the air pressure one time and they never had the tire inspected during the time they own the tire.  That's our allegation.  We'll see what the evidence says but that's what they testified to during his deposition.  A lot of the other things and a lot of the other evidence that we'll have to support either tire abuse claim or service history is going to come from expert.  We've looked at the tire and we do expert disclosures.  They'll get those in theory just like we'll get what their expert says caused the tire to fail when we get their experts and

disclosures. So that's the rest of it and they'll get all that. That's the way these cases go and we are following procedure today.

MR. GUERRA: Your Honor, we have that motion on that issue. I would like talk a little bit about it.

And the is these folks said it was tire abuse but it's like saying your tire failed because there was a defect. That wouldn't fly. I need to give some specificity. The same goes for them. They say tell us what it is. What is the tire abuse -- anything; not all the evidence. They don't have too much, but they need to put facts. They have not put a single fact, not one.

Maintenance demanded the tire for a month.

THE COURT: All right. I understand your argument. I understand your argument.

MR. GUERRA: And on that month it went to the shop; undisputed evidence. So all this lack -- even if that were the case-- lack of maintenance for a month even though it went to the shop as recommended by Michelin, checked the tires, looked at them and said that they all look good; how does that go into the fact that the tire came apart and there was tire abuse? We don't have one single fact of tire abuse.

THE COURT: All right. I'll look at it.

What else?

MR. GUERRA:  We have a motion.

THE COURT:  Yeah, y'all had your motion on the deposition.

MR. GUERRA:  Yes.  We need to depose that folk that came here with the affidavit.

THE COURT:  On the trade secret stuff.

MR. GUERRA:  Yeah.  And, Your Honor, we just got that stuff.

THE COURT:  You get to depose him.

MR. GUERRA:  Thank you.  Your Honor, I'm a little concerned about deposition dates.  Because the way this has been going, no documents, no witnesses, no contacts, I sense it's going to be a lot of problems to get deposition.  I have sent them a letter on Friday --

THE COURT:  When are you going to take this guy's deposition?

MR. GUERRA:  I'm sorry, Your Honor.

THE COURT:  When do you want it?

MR. GUERRA:  I want it -- when can we do it?

MR. BULLION:  The next couple of weeks.

THE COURT:  Is that a problem?

MR. BULLION:  I have to check his availability, Your Honor.  I don't need to be there for

them, but certainly I would think we would get it done by the end of the month.

THE COURT: All right. Today is the 5th. It's ordered to be taken on October 23rd at 10 a.m. at your offices.

MR. BULLION: He is in Greenville, South Carolina, Your Honor.

THE COURT: Will that work for y'all?

MR. GUERRA: I don't mind. Yeah, I love Greenville.

THE COURT: All right. At the Greenville, South Carolina, unless y'all agree to something different. So that way you got plenty of time to work.

MR. GUERRA: Thank you.

THE COURT: If you can work out something, wonderful. If you can't, Greenville, South Carolina 10 a.m. on the 23rd.

MR. GUERRA: Can I ask you one last thing, Your Honor? I think it's the last thing that we have to talk about. When you issue your order, would you please put a time in which they have to produce the documents with the order?

THE COURT: Sure.

MR. GUERRA: Since we have been asking for these things since April 3rd.

THE COURT:  Okay.  I will do that.

MR. GUERRA:  A week will be more than plenty of time.

THE COURT:  I will do that.

MR. BULLION:  We put our proposed order. We put a blank in there for you to complete.

THE COURT:  Y'all got proposed orders on the motion for leave?  Both sides got any proposed orders.  If not, just e-mail one to Francine to both sides.

MR. BULLION:  We will submit it to the responsibility third party when we submitted it with our motion.

THE COURT:  That, too, if you need one. All right.  Anything else?

MR. GUERRA:  Yes.

THE COURT:  Anything else?

MR. GUERRA:  No.  I'm very concerned that I'm not going to get the documents.

THE COURT:  All right.

MR. GUERRA:  I'm very concerned that I'm not going to get documents and I'm going to have to come back here and talk to you about these again, Your Honor.

MR. BULLION:  I bet we will be back, Your Honor.  I think he's a soothsayer on that.  I just bet

you we will be back.  I hate it.

THE COURT:  We'll see.  We'll see.

MR. BLACKERBY:  Your Honor, who do you want me to give the proposed order on responsible third parties?

THE COURT:  Do y'all have one yet?

MR. SHAPIRO:  No.

THE COURT:  You can e-mail me.

MR. BULLION:  Your Honor, the motion on the tire abuse, did the Court rule on that?

MR. GUERRA:  We need to submit an order. They're want to strike our defense.  You're not striking our defense entirely.

THE COURT:  Oh I thought y'all were arguing that on the designated responsible third parties.

MR. BULLION:  No.  He had a separate motion to strike our defense.  Our position is it's expert stuff.

THE COURT:  Well, that's more in the nature of special exception, right, whether or not you've been given fair notice.

MR. GUERRA:  Yes.  I don't have any notice about what --

THE COURT:  I don't than I'm going strike it, but -- y'all are probably going have to plead a

little bit more.

MR. BULLION: The way that this typically plays out in these cases, Your Honor, is the expert will -- and I will just give you an example. There is a concept known as compression roots in the B area of a tire that there is proof according to some experts that the tire has been run underinflated or overdeflected. If there is evidence on this tire of that which I think there is our expert in his report would say this tire has a history of overdeflected operation and here are the conditions. It's all expert stuff. This isn't a -- this is --

THE COURT: But still basic notice in pleadings in Texas they are probably entitled to something a little more than a whatever y'all said this has been used.

MR. GUERRA: Tire abuse.

THE COURT: Just like the flip side the Plaintiff says you are negligent.

MR. GUERRA: Exactly.

THE COURT: You know in a special exception, you're going to have to put a little bit more meat on the bone than you're negligent. The same thing with it's been abused.

MR. BLACKERBY: Right. And that's not

where the pleadings are right now.  I will tell you what we've alleged is that they were negligent in the maintenance and the driving of the vehicle.  That all came in before we went out and deposed Ricos.  And then once they deposed them, we did our motion to designate responsible third party, where we specifically said they're negligent because they didn't check the pressure.

THE COURT:  Yeah, but that's a motion for designated parties --

MR. SHAPIRO:  Your Honor, he is rearguing the same motion.

THE COURT:  That's not your pleading.

MR. BLACKERBY:  I'm actually -- I'm not actually regarding the same motion.

THE COURT:  I understand what you are saying.

MR. BLACKERBY:  We put it out there.

THE COURT:  What answer you are you on?  Do you have an amended answer?  I don't remember what iteration you are on, on your plea -- are you still on your original answer?

MR. BULLION:  No.  I think it's our amended answer.  But also they want is for us to update our responses to request for disclosures I think is the vehicle they have been going at.  That's what they have

this cited in this motion.

THE COURT: No. The discovery rules control when you have to supplement and all that. Basically I take that as a special exception. You need to amend your pleadings within 10 days on what abuse is.

MR. SHAPIRO: Thank you, Your Honor.

MR. BLACKERBY: Thank you.

THE COURT: Some fact basis for the allegation of abuse.

MR. BLACKERBY: Will do.

THE COURT: All right. We'll see y'all.

STATE OF TEXAS

COUNTY OF DALLAS

     I, Vielica R. Dobbins, Official Court Reporter in and for the 134th District Court of Dallas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     I further certify that the total cost for the preparation of this Reporter's Record is $228.00 and was paid/will be paid by Mr. Luis Guerra.

/s/ Vielica Dobbins

Vielica R. Dobbins, CSR, RPR
Texas CSR No. 6248
Official Court Reporter
134th District Court
Dallas County, Texas
600 Commerce Street, Suite 650
Dallas, Texas 75202
Telephone:  (214) 653-7239
Expiration:  12/31/2016

VIELICA DOBBINS, CSR, RPR

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. DC-14-07255

| | |
|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) IN THE DISTRICT COURT ) ) ) ) |
| Plaintiff(s), | ) ) |
| vs. | ) DALLAS COUNTY, TEXAS ) |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) |
| Defendant(s). | ) 134TH JUDICIAL DISTRICT |

---

**VARIOUS MOTIONS' HEARING**

---

On the 3rd day of November, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Dale B. Tillery, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

VIELICA DOBBINS, CSR, RPR

MR 0109

**APPEARANCES**

LUIS P. GUERRA
SBOT NO. (Admitted Pro hac vice)
DAVID C. SHAPIRO
SBOT NO. (Admitted Pro hac vice)
Luis P. Guerra, L.L.C.
6225 N. 24th Street
Suite 125
Phoenix, Arizona 85016
Telephone:  (602) 381-8400
Fax:  (602) 381-8403
E-mail:  Pmigliorini@lpguerra.com
**Counsel for PLAINTIFFS**

THOMAS M.'TOM' BULLION, III  (Appeared by telephone)
SBOT NO. 03331005
Germer Beaman & Brown, P.L.L.C.
301 Congress Avenue
Suite 1700
Austin, Texas 78701
Telephone:  (512) 472-0288
Fax:  (512) 472-0721
E-mail:  Cblackerby@germer-austin.com
**Counsel for DEFENDANTS**

VOLUME 1

Various Motions' Hearing

November 3, 2015

                                              PAGE  VOL.

Proceedings ...................................4    1

Adjournment ..................................51    1

Reporter's Certificate .......................52    1

**P R O C E E D I N G S**

THE COURT: All right. We're on the record in Cause No. DC 14-07255 Medina, et al vs. Michelin North America, et al. Announcements and appearance on the record for the Plaintiffs, please.

MR. GUERRA: Luis Guerra and David Shapiro for the Plaintiffs, Medina.

THE COURT: And for the Defendant.

MR. BULLION: Your Honor, Tom Bullion for Michelin North America, Incorporated.

THE COURT: All right. You may proceed.

MR. GUERRA: Your Honor, we have I think all together six motions on the docket.

THE COURT: Yeah.

MR. GUERRA: Tom, can you hear me?

MR. BULLION: Yes.

THE COURT: You want to come up here?

MR. GUERRA: Yes.

THE COURT: Y'all come up here.

MR. GUERRA: Out of the six motions, I was wanted to see if we can maybe the motions that we filed to quash your depositions and the motion that you filed to quash Wischhusen's deposition maybe that's something, you know, in between this hearing we can take a five-minute break, we can go outside and talk and work it

MR 0112

out.

MR. BULLION:  Well neither one of those are set for a hearing properly.  We didn't get -- you sent a notice of the hearing on your motion to quash yesterday afternoon which is not timely pursuant to the Texas rules.  But the way the Texas rules work is the depositions are automatically quash if you file a motion within three days of the notices so I'm happy to take that up or not whatever your preference is on that, Your Honor.

THE COURT:  I would certainly rather hear those type of issues rather than make either one of y'all come back or spend additional time on something that's, you know, motions to quash depositions are easy to talk about.  It doesn't take a lot of -- not a lot of facts a lot of time, you know.  So I would rather deal with that today if we can get it dealt with.

MR. GUERRA:  Tom.

THE COURT:  But y'all can take a break and talk about it.  I am going to be here.  It don't matter. I'm willing to entertain them.  If he's going to make a notice if Mr. Bullion makes a notice objection then we'll deal with that.  But I would prefer to deal with those deposition issues.

MR. BULLION:  I'm fine with that, Your

MR 0113

Honor.

MR. GUERRA: And what I was suggesting Tom is that since this just seems to be mostly calendaring issues we could probably take five minutes and talk on the phone and try to resolve it really quick and come back and talk to the Judge on what we agree upon.

MR. BULLION: Whatever you want to do. With regard to the depositions that we noticed.

MR. GUERRA: Yes.

MR. BULLION: Your Honor, I got a stack of e-mails and letters conferring on dates and we never got a response and we noticed the depositions up and they quashed them and we've asked them. We said this is Mr. Bustillo. He's the codefendant and the trooper and some fact witnesses and we've been trying since July to get those scheduled and we surprisingly we have not been able to do that.

MR. GUERRA: Tom --

THE COURT: Well, that's all right. We'll get them scheduled. I got a way to handle that if y'all can't agree. So y'all are going to talk about it and we'll take that up after we discuss it but we will get that set up today.

MR. GUERRA: I was trying not to argue this matter at all. I mean I was just trying to get to

the --

THE COURT: Well, it's all right. I told y'all how I'm going to handle this.

MR. GUERRA: I can argue back, Your Honor.

THE COURT: No, you can't. Let's go to the next thing. I told you how we're going to do this.

MR. SHAPIRO: So we're going to talk to him on the phone.

THE COURT: Yeah, and then we'll come back in here.

MR. SHAPIRO: Perfect.

MR. GUERRA: You want to do that right now or do that at the end.

THE COURT: No let's take care of that.

MR. GUERRA: Tom, we're going to be outside for a second to talk to you.

THE COURT: No. No.

MR. SHAPIRO: No, he wants to do the motions.

MR. GUERRA: I'm sorry.

THE COURT: We are going to do the motions and then you will break to do the quash stuff.

MR. GUERRA: No problem. So then we also have the motion for the --

MR. SHAPIRO: The Bates range regarding

the tire training.

MR. GUERRA:  Did you hear that, Tom?

MR. BULLION:  Yes.  We've given you the Bates number for the tire builder training documents and I don't know -- I don't if you want to take that up or if you're good with that.

MR. SHAPIRO:  No, Your Honor.  And Tom, in fact that was October 5th when the Judge ordered the Bates range to be produced we got it on Friday because the first time it was set on Monday he gave us the wrong Bates numbers.  So, you know, we looked at the Bates numbers and we looked at the Bates ranges and these are not tire training documents.  I have for example, the first Bates range document that Mr. Bullion represented was a tire training document.  It's a work instruction. It doesn't mention training anywhere on there, Your Honor.

THE COURT:  Wait.  What about that, Mr. Bullion?  I want you to give him the tire training documents.

MR. BULLION:  Your Honor, we've given them the documents that are used to train tire builders.  A lot of them are documents like work methods and things like that.  They don't say tire builder training on them, but those are the in fact the tire builder training

MR 0116

documents that were available and that we used and given them.

THE COURT: Well, it don't have to say it on there. But if it is what was used and what was relied upon as documents for that purpose, it doesn't have to be headed or title that. So I don't have a problem with titling.

MR. SHAPIRO: I don't have a problem with title either. The problem is in previous cases by the way, in Velo, these same documents were produced and they were called work instructions. Now they're calling them tire building training. They're not tire building training and I can show it to and you there is nothing about how the tire is built.

THE COURT: Hold on. What you want was the tire training, right?

MR. SHAPIRO: That's right.

THE COURT: All right. He's saying he provided that. What Bates range, Mr. Bullion?

MR. BULLION: Let me look real quick, Your Honor. This is as we discussed before this -- this was in our supplemental responses and in our response to a motion for sanctions. I've got to pull this motion up. It is -- let's see, in the 3362 through 3515 it's about a little over -- a little over 150 pages of documents.

THE COURT: And that's supposed to be responsive to the tire training.

MR. BULLION: Yes, Your Honor.

MR. SHAPIRO: Your Honor, they're not tire training.

THE COURT: Okay. But what do you want? Do you think I know?

MR. SHAPIRO: Your Honor, the problem is we don't have the documents. They have the documents. So I can't tell what you they look like because they've never produced them to us.

THE COURT: I understand but --

MR. SHAPIRO: And that's the problem. These are not tire training documents.

THE COURT: Wait a minute. Listen to me. All right. He has represented to you that's what they are, right? So he is bound by that representation. You say it's not. Okay. There's a way to deal with that, right?

MR. SHAPIRO: Yeah, there is a way to deal with that which kind of segues into the next motion which is about a person who is responding to discovery, the employee, because the employee would know --

THE COURT: Wait. Wait. You're getting ahead of the deal.

MR 0118

MR. SHAPIRO: I'm not trying to get ahead.

THE COURT: I know. Understand y'all are in this. Y'all know. Y'all know what these documents are. I don't know. So I hear this gentlemen from Michelin, Mr. Bullion say, Gave these, gave everything we got responsive what you told us to you give on tire training. Here they are Bates range M3362 through 3515 easy for me to identify, know what those are. It can be not a problem. And you say that's not what that is. And he says, Yeah, it is. So where do we go from there?

MR. BULLION: Your Honor, might I suggest that we've offered the deposition. They've sent us a they sent us several letters asking for depositions of representatives of Michelin and we offered the deposition of the manufacturing witness from Dothan and I've offered a couple of days for it and they have not yet noticed it and it seems to me that they have -- if they don't think these are in fact tire builder training documents the way for them to develop that is to ask the manufacturing witness from Dothan what was used to train tire builders back in this time frame and are these the documents and are there other documents out there and I'm assuming at some point they're going to take their deposition.

THE COURT: Not a bad idea.

MR. BULLION: I offered them

November 13th --

THE COURT:  Hold on.  Would you hold on --

*(Simultaneous speakers.)*

THE COURT:  Can you not hear me?

MR. BULLION:  I can hear you, Your Honor, mostly.

THE COURT:  Can you not hear me?

MR. BULLION:  Yes, Your Honor, I can hear you right now.

THE COURT:  Well I asked you to stop talking in the middle of that.

MR. BULLION:  Again, I apologize, Your Honor.  I apologize if I talked on top of you.

THE COURT:  All right.  Now what about taking that deposition?

MR. GUERRA:  Here is the problem.  Here is here is the manufacturing guy and we don't have documents that we have questions to ask.  Not these documents.  The other documents the aspect specifications.

THE COURT:  No.  No.  Listen to what he's say.  Listen to what he's saying.

MR. GUERRA:  I did.

THE COURT:  No, you didn't.  Because he is saying you trot down here and you take the deposition of the person who knows whether or not these are the

MR 0120

documents.

MR. GUERRA: I understand, Your Honor.

THE COURT: Okay. That's not the same thing as what you're talking about. Now that would be a costly deposition.

MR. GUERRA: Yes.

THE COURT: And if that guy were to say this range that has 33 through 62 -- 3362 through 3515. If he were saying, for instance, that's some of it or not all of it or if he says, no, that's not the tire building training documents, Bullion is going to pay for all of that. He is going to pay for your time to go down there. He is going to pay the whole turnkey deal because he's the one making the representation that these are the responsive documents and then he's saying, Well, if you don't believe me, go talk to the people and they'll tell you that these are the responsive documents. And if you go down there and you go through that and the guy says, No, it's not all the responsive, Bullion is going -- he is the one making the representations to the Court.

Now if they say, yes it is and you're like good and you're able to come in and prove somehow that they're not, it starts getting pretty serious Rule 215 stuff in Texas.

MR. GUERRA: Your Honor, the issue is, you

know, we're trying to schedule the deposition and we know the man, Mr. Riley, in Alabama, but there's other documents unrelated to the training documents related to the inspection of the tires that we've been able to receive them. So our thinking -- and that's Mr. Bullion I give him the dates, no. Until we get the documents we cannot be setting depositions of these folks willy-nilly until we get the basis for us to prepare to go take the depositions. I understand what you're saying.

THE COURT: I don't think you do.

MR. GUERRA: It's a little different. You're saying, Luis, go down there. Talk to this guy and if anything --

*(Simultaneous speakers.)*

THE COURT: It's calling the bluff.

MR. GUERRA: Yes. Yes. I get it.

THE COURT: It's calling the bluff and like I say I do this from the position that y'all both have been involved in these cases before. Y'all both know these documents. It's not like you've never seen these documents before. It's not like Mr. Bullion has never seen these documents before. You know it's calling somebody's bluff.

For instance from Mr. Bullion's position I leave room for the possibility that he's like they know

these are the documents and they're just trying to get that Judge down there to throw something else in when they know these are the documents.  Maybe that's what he believes.  And then he's calling your bluff.  He's calling your bluff saying, Well, you don't think so.

Hook'em on down here.  Talk to this. Because you know you know he gone say, yeah, that's all we got.  Those are the documents.  And then you didn't get anymore from me through this exercise than what he gave you.  I leave that as a possibility.

MR. GUERRA:  Okay, Your Honor.

THE COURT:  The flip side is you've seen it.  You've seen it and they're stepping right into your analysis.

MR. GUERRA:  And my caveat is, Your Honor, is, you know, I get the additional documents concerning when this gentleman is supposed to testify about when the Court makes the ruling and then I will go back and depose him about that.

THE COURT:  See how that works.

MR. GUERRA:  No problem.  No problem. That will be fantastic.

THE COURT:  That's the way it works around here.

MR. GUERRA:  Thank you, Your Honor.  I

guess we're done with that and the only question is to set the deposition of Mr. Riley.

THE COURT: It should be quick.

MR. GUERRA: Yep. Thank you, Your Honor.

THE COURT: Mr. Bullion, how long you said this guy would be available. They can hot foot it on down there. You ought to be able to have this guy available certainly within the next 30 days for sure.

MR. BULLION: Yes, Your Honor. I don't think that's a problem at all. I will say that I told Mr. Guerra and Mr. Shapiro that we only want to put these witnesses -- I've got four maybe five witnesses identified to cover their topics and we only want to put them up once so I would like to --

THE COURT: Mr. Bullion, hey, hey, hey. We all got wants and needs in life.

MR. BULLION: Yes, sir. May I proceed, Your Honor? What I was going to say is --

THE COURT: I told you how we're going to do this little part of it. We move in small fight bites around here. Simple things for simple minds. Unfortunately you got the simple mind on the bench here. So you're going to do things in small bites and simple-minded ways, all right?

MR. BULLION: Yes, sir.

MR 0124

THE COURT:  It's like Sisyphus pushing that rock up the hill.  It's just what you have to endure.  I'm not trying to the level --

MR. BULLION:  What I would like to say on the record if possibly, Your Honor, is once we get a ruling on that on that motion to compel then we will be in a position to produce the additional documents and they can ask all of these witnesses whatever questions they want to ask them with regard to all of the documents we produced.  So that is what I would like to make sure it's clear on the record.

THE COURT:  Well, we'll see how it goes. We'll see how it goes.  I've got a way to go about this. It might not be the way you'd go about it.  It might not be the way opposing counsel would go about it, but it will be the way I go about it.

So I don't want to get distracted with all of these other things.  It just confuses the simple mind. I have a dispute on whether or not these responsive documents have been produced.  You've been very kind to identify for the Court exactly the range and what they are and you feel very confident that those are the only ones that are responsive to the point you told him, come on down and talk to the guy.  They can either take up that invitation or not.  If they choose not to, then they

have what you give them and we move on to the next issue.

Now what's the next thing? I told you how we're going to handle this little issue about the motion to compel on the tire building training documents. That is done and closed for the record.

MR. SHAPIRO: Thank you, Your Honor.

MR. GUERRA: If we can go on a segue that David was talking about. We would like to discuss that motion regarding identification of the individuals that provided them discovery responses and the financial information.

Did you hear that, Tom?

MR. BULLION: Yes.

MR. SHAPIRO: And, Your Honor, Mr. Bullion's brief outlines the Exxon case which talks about -- in that case by the way the Plaintiff served several depositions and in fact they were depositions. Deponents were produced from Exxon to talk about documents.

THE COURT: Okay.

MR. SHAPIRO: Now what the Court denied was the production of an attorney of record to discuss the documents. That's not what we want. We want the employees' bios --

THE COURT: Right.

MR. SHAPIRO:  For example --

THE COURT:  Okay.  But what if the person in charge just happens to have a J.D. from one of the finer legal institutions of this country.  Just because you're a lawyer doesn't mean -- just because you have a law degree doesn't exclude you --

MR. SHAPIRO:  That's why the Court was very careful and the Court of Appeals wrote the attorney of record.

THE COURT:  Right.

MR. SHAPIRO:  And we're not looking for work products here.  We're looking for folks that actually do this day in and day out who can identify, you know for example those glass aspects.  These are how they come to that.  Those are those glass specters that Mr. Bullion talks about all the time.  They actually use those documents on the field.

THE COURT:  All right.  You want a person who has knowledge of that information with the corporation.

MR. SHAPIRO:  That's right.

THE COURT:  Mr. Bullion, what about that?

MR. GUERRA:  Regarding the responses for discovery specifically who is the guy that told these folks.

THE COURT: I got it. What about that? Can you tell them that?

MR. BULLION: I'm not sure I got everything. What I understand the Plaintiffs are asking for is somebody to be deposed about our discovery responses and we've in our brief in Texas law I think it's very clear that that is not permitted. It's work product and it's not -- it's not permitted to get to basically do discovery into discovery. I heard him mention of class spectors (phonetic) and I am not sure what that is related to.

THE COURT: I don't hear them asking for that. What you're hearing is different from what they are saying. Run that by me again. What is it that you want.

MR. SHAPIRO: We want the folks that identify for example we asked for the aspect specifications.

THE COURT: You want the person who has knowledge of the aspect specifications.

MR. SHAPIRO: Yeah.

THE COURT: Right.

MR. SHAPIRO: Yeah, who took those conditions. They asked for conditions at issue that we're claiming.

THE COURT: Yeah.

MR. SHAPIRO: And they have gave us nine aspect specifications.

MR. GUERRA: We want that the guy.

THE COURT: You want to talk to that person who made that judgment that decision.

MR. SHAPIRO: Exactly, Your Honor.

THE COURT: All right. Mr. Bullion, what about that?

MR. BULLION: They're asking for somebody in the legal department, Your Honor. The people who make decisions as to what documents are responsive to discovery requests are either lawyers in the legal department at Michelin or their representatives that are either engineers or paralegals. And so what they're asking for is what I just said; discovery about discovery.

If they want to talk to somebody about how the aspect specifications are used in the plant then the plant manager would be able to get into that.

THE COURT: No.

MR. BULLION: But if they want to get into why you picked these aspects specifications as opposed to others, that's a lawyer's decision or a lawyer's representative's decision and it's clearly work product

under Rule 192.5.

THE COURT: That's not what they're asking for from what I'm hearing. Here is what I'm hearing that they're asking for and they'll tell me if I've stated this wrong. What they're asking for is based upon the answers to the discovery somebody has knowledge and went through a process of giving the responsive information. They want to know who is that person in the company that has knowledge about these -- this particular aspect information.

MR. BULLION: I -- I think we're on the same page, Your Honor, but the people who have knowledge about that would have the use of the aspect specifications that would be the people at the Dothan plant.

THE COURT: Okay.

MR. BULLION: We offered a witness who can address the aspect specifications. The question of --

THE COURT: Hold on. Hold on. Hold on. That's what y'all want, right?

MR. GUERRA: We want that but we certainly want the person that for these responses said these are the ones. It cannot be --

THE COURT: No. No. No. No. That's getting kind of gray area. Now listen to me. Here's the

deal. Remember small minds. Small minds. Simple ways for small minds. You're going to go down there and you're going to talk to these people that he's saying know all about these aspects and then you're going to ask them how come I was given these and he is going to say, I don't know. I don't know. And you're going to have all kinds of good little questions about, Well, did you give this information to somebody and who did you give this information to somebody and then you will find out who the filter is. And then maybe we will take the next step once we know what that filter is, right?

MR. GUERRA: Sounds good, Your Honor.

MR. SHAPIRO: Sounds good, Your Honor.

MR. GUERRA: Simple things for simple minds.

THE COURT: I know it tends to make things more costly, but sometimes that's only way to get to the truth.

MR. GUERRA: Thank you, Your Honor.

MR. BULLION: One thing I also want to point out for the record is Your Honor ordered at least from the bench that we produce the oldest version of all of the aspect specifications and you said at Dothan and once you entered an order on that and we produced those and I think why certain ones were selected to be produced

in discovery probably becomes moot as well.

THE COURT: I disagree. I disagree. I'm not sure about your framing of that order, but the purpose was not just to say give them old irrelevant, you know, material but to give them the current responsive material and the only reason there would be an issue about old or how far back or dated is just to set a date on how far back. Not saying you only give them old, irrelevant, out of date and, you know, none -- nonmaterial information. I don't think my order said that.

MR. BULLION: No. No. Your Honor, that wasn't what I was saying. It was that this was a really old tire. This tire was built in 2001 and Your Honor you wanted us to produce the oldest version of all of the aspect specifications in use at Dothan. And that's at least the way we understood the order. I think there's some disagreement on that. So once you enter your written order, then we'll produce the oldest version. Whether they were actually in effect at the time this tire was built or newer than that I think will depend on the aspect specifications?

THE COURT: Huh, that's an interesting dance.

MR. BULLION: Well just all the aspects

MR 0132

specifications, Your Honor, are not dated the same. They don't have the same date on them. Some might have been written in the late '90s. Some might have been written in the late 2000s. They don't have all the same date on them is all I'm trying to say.

THE COURT: Yeah, I think what the court would probably be interested in is up until the time of the production of this particular aspect and going back a reasonable period of time all of those responsive documents not just the oldest and not just the current but it would be really from the time of production back a reasonable period of time. Have we not done that with that order?

MR. GUERRA: It has not been written down, Your Honor.

THE COURT: You just got the language.

MR. BULLION: You know Michelin has a document retention policy, Your Honor, and, you know, I think there's some confusion on what -- on what it is that you ordered us to you produce. Because my understanding of what the oldest version of the aspect specifications in use at Dothan I think that's different than what you are saying now and I think Mr. Guerra and Mr. Shapiro have a different understanding as to what you ordered too --

THE COURT: Yeah, listen to me.

MR. BULLION: -- we will simply have to see the written order and see what it is that you ordered us to produce.

THE COURT: All right. Listen to me all right.

MR. BULLION: Yes, sir.

THE COURT: Do you have any confusion when I say for the aspect of this tire that's the subject of this litigation I'm ordering production from the time of production of that tire back, the aspect documents on that tire or that aspect.

MR. BULLION: Yes, I understand what you're saying, Your Honor. And to the extent they exist we'll produce those.

THE COURT: Yeah, I get it. You can't create or something that doesn't exist, you don't have that, but you will set it out in there. I'm sure you'll answer with, if they don't exist but they used to how a document retention program affected your ability to produce, right?

MR. BULLION: Yes, Your Honor.

THE COURT: All right.

MR. SHAPIRO: When, Your Honor?

MR. GUERRA: When.

MR 0134

THE COURT: When can you get that? What's a reasonable period of time on that, Mr. Bullion?

MR. BULLION: Once we get the written order, I think we can get those within two weeks.

THE COURT: All right. We'll put 14 days from the signing of the order.

MR. GUERRA: Your Honor, that motion had a second issue which is the financial information.

Did you get that, Tom?

MR. BULLION: Yes.

MR. SHAPIRO: Your Honor, in their response we're shocked that they would even challenge this because they cited that statute.

MR. GUERRA: Tell the Judge what you are looking for specifically.

MR. SHAPIRO: Oh, that the witness -- the financial information of the net worth of Michelin.

THE COURT: Yeah.

MR. SHAPIRO: And they quoted the statute and it took effect on September 1st 2015, expressly, expressly wrote that this act takes effect on September 1st 2015.

MR. GUERRA: That for.

MR. SHAPIRO: So in fact it says Section 3. The change in law made by this action apply only to

MR 0135

an action filed on or after the effective date of this act. And, Your Honor, all of the case law we provided certainly provides and mandates for the production of this witness.

THE COURT: What about that?

MR. BULLION: The statute does say on it's face that it's effective to lawsuits filed after whatever date. There is -- the Supreme Court has indicated in our brief is considering whether that should be applied retroactively and that's been briefed and it's before the Court at this point. And I think frankly the reason that and I don't pretend to understand why the Court has done a lot of things it's done. But I think the reason is there has been a lot of confusion as to what should be discovered and there has been a lot of abuse from this.

To the extent all you have to do is plead punitive damages and then you get to go out and do discovery as to financial information particularly with a company like this that is not publicly traded, Michelin North America Incorporated is not a publicly traded company and it's financial information is very sensitive to it. The entire industry is very competitive and just mere allegation of punitive damages -- we don't think this is a punitive damage case and not even close. And just to be able to allege punitives and then be able to

get a bunch of financial information from a privately held company we don't think it's fair and we think that's what the Supreme Court is likely going to find in response to this.

And from a timing standpoint they don't need early in the discovery of this case to develop net worth information on Michelin North America. If the Supreme Court doesn't apply this statute retroactively and if the court decides that they're entitled to net worth information that is something they wouldn't need until basically until the time of trial because the, you know, there's a bifurcation statute as to punitive damages. And the only time that net worth information would be admitted would be in the second phase of the trial.

THE COURT: Okay.

MR. BULLION: So I ask given that the Supreme Court.

THE COURT: Hold on. Hold on. Hold on.

MR. BULLION: Yes, sir.

THE COURT: What about that?

MR. GUERRA: We have experts.

MR. SHAPIRO: Yes, Your Honor we have experts about that.

THE COURT: Well, yeah I understand.

MR 0137

That's an issue of you don't want to get short-haired on the expert and say the Court say, Oh, the expert deadline is cut off and all that.  That's not going to go down that way.

MR. SHAPIRO:  Your Honor, it's important to know that first off this is a punitive damage case.

THE COURT:  Well, how I do know that?

MR. SHAPIRO:  Hold on a second.  The reality is when we're talking about early discovery, we're talking about just over a month.  It's just over a fact discovery.  Your Honor, that's really no time to waste.  That is the law and the law is on our side.  They have not -- but that's great the Supreme Court is considering this, but they haven't.  And in fact right now the statute I don't think it could be more clear honestly.  The change of law made by statute applies only --

THE COURT:  All right.  Until the Supreme Court tells me something different I'm going to go by the statute, Mr. Bullion.

MR. BULLION:  So are you -- is your order then, Your Honor, that we put up a witness to discuss this or that we respond to an interrogatory or what?  I think the lawyers are supposed to use the least obtrusive means to do the discovery.

MR. SHAPIRO: Your Honor, we asked for the deposition.

THE COURT: I'm going to let him take the deposition, but I do buy your confidentiality issue. So we've got to have a way --

MR. BULLION: Your Honor, for the record I might ask you to stay that order in the event that we decide to take that up to the Court of Appeals. Are you going to put a deadline on the deposition or how do you want to do that?

THE COURT: Yeah, when do y'all want the deposition?

MR. GUERRA: As soon as possible.

THE COURT: How do you want me to do it, Mr. Bullion? And I will stay if y'all chose to seek review because I think this is an important issue for your client.

MR. BULLION: Typically the way I've seen requests for depositions handled is they would send their notice of the deposition and we would file a response with objections to it.

THE COURT: Okay.

MR. BULLION: But I would ask you to stay you know I understand what the Court's ruling is but I would ask you to stay it pending a filing of the petition

for writ of mandamus to the Dallas Court of Appeals.

THE COURT: I will when that's filed. So here is what we're going to do. I'm going to order that this be taken no less than 30 days. That way you got a certain time period that you have to deal with. And then if you chose to seek the writ of mandamus, I will stay the discovery on the net worth while you do that.

MR. BULLION: Okay. Would it be okay, Your Honor, for you to order that they notice the depositions so that we'll have an opportunity to file a response with objections to it before we have to take it up if we do?

THE COURT: Yeah, I think that's the way procedurally that it ought to be done and for a record to be clear that there was a deposition notice and request. I'm ordering that they serve y'all with that and I'm also ordering that it be done, and no less than 30 days from the service of that notice for the deposition of the person with knowledge of relevant facts regarding the net worth. And then if you file -- if you serve notice and file a writ from mandamus on that issue, I will stay the deposition until the Court of Appeals has addressed that issue.

MR. BULLION: Thank you, Your Honor.

THE COURT: All right.

MR. GUERRA: The next one up, Your Honor, is the motion regarding indecipherable design documents which is these documents. We can't read them without the code keys for the codes and the acronyms and that's the issue.

Did you hear that, Tom?

MR. BULLION: Yes.

THE COURT: What about that, Mr. Bullion?

MR. BULLION: There is no code key. It's set out in our response, Your Honor. I have been doing this for a really long time and I have never seen a motion like this ever. What happens is when we produce documents that have acronyms and Michelin uses a lot of acronyms and some of them are based on French words because the parent company is a French company.

Well happens is they take the documents to the deposition or the design witness and they say, What does FE mean, what does GI mean and he says sidewalk, tread. I mean there is not a document to produce it and it would be improper in the Texas rules just to create some kind of a code key.

THE COURT: Hold on. Hold on. No, I'm not going to compel you to do that.

How do you think I'm going to handle this now.

MR 0141

MR. SHAPIRO: Your Honor, I will say that --

THE COURT: No. How do you think I'm going to handle this now?

MR. GUERRA: Take the deposition.

MR. SHAPIRO: Take the deposition.

THE COURT: See. You will take the person -- the deposition of the person with Michelin that has knowledge of these acronyms and these keys. It has gotta be a person with Michelin that does that or knows that, right Mr. Bullion?

MR. BULLION: I don't know that there would be one person, Your Honor. I mean some of these documents are design documents and some of the documents are manufacturing documents and the way that it would be typically happening is on a manufacturing document. They would ask the manufacturing witness that they're deposing this witness any way about the quality control processes and the manufacturing processes and they would ask them what does this acronym mean --

THE COURT: No. Mr. Bullion. Mr. Bullion. Mr. Bullion --

MR. BULLION: -- if they want to know want to know acronyms they would ask that witness. I don't know that there's a -- I don't know --

MR 0142

THE COURT:  Mr. Bullion.

MR. BULLION:  -- I don't know that there is any one person that you could go in and give every single definition of every abbreviation that's used on the --

THE COURT:  Mr. Bullion.

MR. BULLION:  -- on all these productions documents.  We produced thousands of pages -- yes, sir.

THE COURT:  Mr. Bullion, I guess you can't hear when you are talking.

MR. BULLION:  I think it's -- I'm on the speaker phone.  It somehow mutes the other side.  If I talked on top of you again, I apologize.

THE COURT:  Okay.  Here's going to be the deal.  Michelin is a corporation or a legal entity.  It's bound to have somebody that knows these acronyms and keys.  It may not anybody that knows them all.  It may be several people with Michelin's knowledge, but I found it hard to believe that Michelin somehow don't know what everything in these documents means whether it's an acronym, an abbreviation or code or whatever.  So you're going to produce the person or persons who have knowledge of what these codes and acronyms mean in the documents that you've produced or you will -- and you will identify those acronyms so forth that nobody in Michelin knows

MR 0143

what it means.  You understand?

MR. BULLION:  Yes, sir.  Can I ask for clarification?

THE COURT:  Yeah.

MR. BULLION:  And I alluded to this earlier, but they sent us a number of letters with topics for depositions.  And I understand the Court may not -- may not agree with me that it makes sense for them to be able to only depose this witness once.  But what I would like to do is I don't want to have to go to Greenville for a deposition on abbreviations and then go back to Greenville for a deposition on the design of a tire.  What I would ask is if they will include that in whatever notice of the deposition of the company that they served in, then we might designate the design witnesses to talk about the design of the tire and talk about it's field performance and to talk about the abbreviations on the specs.  And we might designate the manufacturing witness to talk about the manufacturing processes and procedures and the abbreviations on the manufacturing documents.

So I'd just want to do it as efficiently as we possibly can.  And once they notice these depositions, I think maybe some of this will kind of come out in the wash.

THE COURT:  My order is that you're going

MR 0144

to produce somebody from Michelin the person or persons who have knowledge of these acronyms, abbreviations, codes for deposition.

MR. BULLION:  Okay.

THE COURT:  If it ends up being a person who has knowledge of these four or five different subject matters, well, we will have to deal with that when the time comes, but it's not going to change the fact that I'm ordering at this time that you produce the person or people who have knowledge of the information of the abbreviation, the codes, the acronyms and the documents that you have produced to opposing counsel so that they can ask Michelin's understanding of those -- of that information in the record.

MR. BULLION:  I get it, Your Honor.  Just for clarification purposes, if it turns out that we would have the design witness talk about some of the abbreviations and addition to the design of the tire are you saying that it's okay with you that that's two different depositions still on two different days.

THE COURT:  Well, yeah, it may have to be.

MR. SHAPIRO:  And Your Honor --

THE COURT:  If y'all can work it out to where you it's not, I'm not saying it can't be.  I'm just saying that it does not have to be because simple

MR 0145

steps --

MR. SHAPIRO: Right. Simple steps we're having --

THE COURT: Really bad idea. You don't have an idea how bad an idea that is. Simple steps. So, you know, we'll figure out what these codes are and whatever and then we'll see where we go on the next area of discovery.

MR. BULLION: Okay.

THE COURT: What's next?

MR. GUERRA: Next, Your Honor, if we're going to work out the depositions motion to quash outside after we're done with this. There is one more, Your Honor, after Mr. Bullion's motion concerning motion to designate the records as responsible third parties.

Did you hear that, Tom?

MR. BULLION: Yes.

MR. GUERRA: It's Tom's motion.

THE COURT: All right. You may proceed.

MR. BULLION: Your Honor, you are ordered after the last hearing that we plead additional facts with regard to the liability of the Ricos who were the owners and driver of the accident vehicle and we have done that and there's no question but that we have complied with Texas law with regard to the requirements

of designating these folks as responsible third parties. I don't really have anything to add. It will be reversible error in the case if they're not -- I think very clearly based on talking to my appellate people. If they're not designated as responsible third parties, it will be reversible error in the case.

THE COURT: Response.

MR. GUERRA: Yes, Your Honor. The arguments -- the additional arguments that they place the problem is that these facts have nothing to do with the Ricos, Your Honor. The Ricos were using an old tire, okay, but that comes from a bulletin from Michelin. The technical bulletin came from February 9, 2006. We deposed Michelin employees in the past about this specific bulletin that allegedly performs that the tires that are within 10 years --

THE COURT: Okay. But what does it have to do with somebody being named responsible third parties?

MR. GUERRA: Because they have nothing to do with that. The Ricos had nothing to do with that. It's alleged facts that the Ricos had anything to do with it.

THE COURT: Well, he says that they used a tire that they knew or should have known was not safe.

MR. GUERRA: That's not what they said, Your Honor. They say that they used a 10-year-old tire which they depose the Ricos and the Ricos told them who inspected the tire it looked good --

THE COURT: I know but it's not a mini trial under Texas rules.

MR. GUERRA: I understand.

THE COURT: They may not get submitted in the body of the trial but so I'm going to grant your motion, Mr. Bullion, for the responsible third party.

MR. BULLION: Okay. Thank you, Your Honor.

THE COURT: Anything else? Y'all want to take's y'all's break and discuss --

MR. BULLION: The only thing I want to make sure I'm clear on, Your Honor, has to do with the on -- I think I might have gotten us offtrack a little bit on the aspect specifications, but they want a deposition of a Michelin employee to talk about discovery.

THE COURT: That's not.

MR. BULLION: I don't know what the -- real clear what the Court's ruling is on that.

THE COURT: That's not what they requested at least my understanding. That's not the way I treated

MR 0148

it.  I've given you the ruling that I've made in that regard.  I even asked you if understood it and you said you did.  I understand what your argument is and you want it on the record.  It is on the record.  Ms. Dobbins is just taking it away feverishly.  I am not going to snake you without a record.  It is on the record that you feel like this is a deposition to try to get somebody's mental processes on discovery answers, right?

MR. BULLION:  Yes, Your Honor.

THE COURT:  All right.

MR. BULLION:  When they notice the deposition if they do then we will have an opportunity to file objections to it and come back before the Court.  I think I understand the Court's ruling.  I didn't mean to beat a dead horse.  I just wanted to make sure it was clear.

THE COURT:  I'm not planning on you being back here for an objection.  I've ordered this deposition and you've made your objection based on you feel like it's, you know, them trying to take discovery of people who made basically a legal decisions on how to answer discovery.  Okay.  You've made that or I've overruled that objection.  I do not believe -- and especially based upon the way I've attempted and the way I have ordered it -- that it does that.

So you've made an objection that it's improper discovery on discovery analysis and decision making. I've overruled your objection. It's on the record. And I've ordered the deposition be taken with, you know, so within.

MR. BULLION: In light of that, Your Honor, I would ask you to stay that one as well and same procedure I would like for them to notice the deposition they want give us a chance to respond it and then I would ask you to stay that ruling pending a petition for writ of mandamus.

THE COURT: No, I'm not staying that one. Not staying that one.

MR. BULLION: Okay.

THE COURT: All right. Y'all take y'all's break and come about on the issue on the scheduling I guess that y'all were talking about.

MR. GUERRA: Tom, we'll talk outside, okay.

MR. BULLION: Okay.

MR. GUERRA: Thank you so much.

THE COURT: You can use the jury room if you want to or conference room or outside.

*(A break is taken.)*

THE COURT: All right. We're back on the

record in Cause No. DC-14-07255.  This is on a motion to quash depositions, right?

MR. GUERRA:  Yes.

MR. SHAPIRO:  Yes, Your Honor.

THE COURT:  All right.

MR. SHAPIRO:  Tom, I'm going to reiterate what we talked about.  Concerning the four depositions that Michelin noticed and we quashed Mr. Bullion and I discussed it and I will talk to Wendy Emmons, Mr. Blackerby's paralegal to coordinate dates to pair down the witnesses to a day or a day and a half, the ones in Dallas and then obviously the gentleman is in a different state, the trooper, and we will take that deposition.  We'll coordinate and work those dates out.

MR. BULLION:  That sounds right.

MR. SHAPIRO:  Okay.  Concerning Mr. Wischhusen, Plaintiffs noticed that deposition.  That date is unavailable for Mr. Bullion.  Mr. Bullion's position is that -- I will let Mr. Bullion explain.

MR. BULLION:  Your Honor, backing up just slightly.  Plaintiffs sent us letters asking for witnesses on 20 some odd topics and I've offered one witness in Dothan, Alabama, and I've offered three in Greenville.  And then after that they asked for depositions of six different Michelin employees by name

MR 0151

and they happen to be the same people other than one. And what I've told them is I will put Michael Wischhusen up who is the subject of this motion to quash to address a couple of the topics in their letters which ultimately will get turned into deposition notices. But I don't think it's fair for them to be able to notice him as an individual and as a representative of the company and he get to depose him for technically 12 hours.

So what I've said is when we get these deposition scheduled in Greenville, I will put Mr. Wischhusen up. They apparently want to do it on a different trip, but I'm not agreeable to that just from a cost perspective; just make a special trip out there to depose Michael Wischhusen when they can depose him as a corporate rep on these topics maybe in a couple of hours. So that's my position on that. I think it's something we ought to be able to work out. And I certainly -- and again, I don't think these depositions can take place until we have an order from the court on that motion to compel so that we have the all of the documents out there.

MR. GUERRA: Your Honor, here is the issue Mr. Wischhusen -- first of all, we sent the letters about the topics separate and apart from this and Mr. Bullion refused to tell us or identify witnesses. So he never

MR 0152

told us who the witnesses were.  He just said notice them and I will give you people and certain names, but he didn't give us names or the identity, never gave us.  We had the hearing October.

MR. SHAPIRO:  October 5.

MR. GUERRA:  And he left.  We found him at the airport and we ended up talking to him.  But meanwhile we had to send a letter out saying in addition to those guys we want to depose these specific people and Wischhusen was one of them.  If we wants to offer him in addition to cover some of the areas that's fine.  But I am going to ask him every question that I want about any topic that is relevant to this matter and that he knows about.  And that's what Mr. Bullion is trying to do.  Oh, no, he's only going to be offered on these two topics and nothing else.  No.  No.

Also he is telling us when we're going to conduct the depositions.  That's not the way it works.  We tried to accommodate folk, we do.  We waited for two long hours for Mr. Blackerby in Dallas on the depositions on the records.  He was late.  We said no big deal buddy. You ordered the deposition on Mr. Vaneaton Price for a specific date.  After that hearing there was -- (unintelligible) -- Mr. Bullion wrote a little ML that said, Hey, it's not good for me that day I have a

commitment and we said anything for opposing counsel and we moved it two days back. How long did that deposition take, two hours. That was it.

We got to the point. We asked the questions we are done. We don't want to be told by Michelin how to conduct the discovery for our burden of proof.

Mr. Wischhusen is a very well known man with a lot of knowledge on that company. He knows a lot about the company and a lot about the documents at issue here not just two topics. That's our problem with the issue, Your Honor.

THE COURT: All right. Mr. Bullion, tell me about that.

MR. BULLION: I had a little bit of a hard time understanding some of that, Your Honor.

MR. GUERRA: I'm sorry for my accent.

MR. BULLION: But the thing is they have deposed Wischhusen before. Mr. Guerra deposed him in that case -- and he's referring to Velo case out in Arizona. I'm probably mispronouncing it so I apologize. He has deposed him before and he asked for him by name and I figure the Court is going probably going to let them depose Mr. Wischhusen.

All I'm asking is we're going have to

spend a week in for Greenville these depositions. There's three other witnesses. And I don't want to make a special trip out there for Michael Wischhusen if we can help it. I would like to make as few trips out there as I can.

Just from a personal perspective, I've got a bunch of little kids and that are playing baseball. I've got all kind of stuff going on and I would like not to have to go out there one deposition at a time. I would like to do it efficiently and at the least cost to my client and the Plaintiffs.

MR. GUERRA: Like Mr. Bullion we have a small practice and it's just difficult for us to take a full week off. So we'll, accommodate counsel but it's not going to be all in one trip. It's not going to be all in the same time. That's just not the way we work and I'm sorry about that.

THE COURT: I'm not going to make you do that. Y'all both have reasons why and you would certainly want to be efficient. I don't see an inherent inefficiency if the person he's named Wischhusen or however you pronounce it. They've named him as a person who has relevant knowledge of facts for this issue. If Mr. Bullion Michelin wants to designate him also as a person with knowledge of relevant facts for the

MR 0155

corporation, you certainly can do that and I'm going to say that Plaintiffs need to cover those areas too at the time. If they want to take Mr. Wischhusen -- if you have give him notice that he is going to serve as a person with knowledge of relevant facts for Michelin on certain issues if you identify that then they need to cover that. And if they don't cover it then they didn't cover the person for Michelin that Michelin tendered regarding those areas that you designate Mr. Wischhusen's or whatever as the person who had knowledge of relevant facts.

MR. BULLION: That's fair, Your Honor. I told them the topics in their letters that he would address and that's fair.

THE COURT: You get what I'm saying there?

MR. BULLION: Yes, sir.

THE COURT: Plaintiffs need to cover that with him. I understand can you call anybody you want to as a named person. But if Michelin and Mr. Bullion in trying to be efficient I think it's a good idea says, Hey, by the way we're also going to be identifying him as a corporate spokesperson a person with knowledge of relevant facts of the corporation on these areas. You need to cover those areas too or when you get there you've passed that by.

MR. SHAPIRO:  Yes, Your Honor.

THE COURT:  Y'all understand.

MR. BULLION:  I doubt it's going to be know issue, but, you know, they're entitled to six hours on whatever corporate rep we put up under the rules.  If we then put up 10 of them they get 60 hours.  But it sure seems like a lot to me.  I don't think they will take 12 but --

THE COURT:  We won't be doing that.  But I don't know that we're going to get there until we do, but I get your point.  I appreciate the heads up.  Plaintiffs need to be observant of the fact that, you know, as you take these depositions of people of kind of dual capacity components, we're not going to have, you know, crazy number of hours racked up because of dual capacity.  That's -- it's not likely to go that way.

MR. BULLION:  Okay, Your Honor.  I just wanted to make that clear.

THE COURT:  I appreciate the heads up on it because I see what you're saying.

MR. BULLION:  I never had thought those rules were very fair frankly.  If you come up with infinite topics you can take infinite hours of depositions.  I have looked at it a number of times and I have not been able to figure out any argument to limit it

so.

THE COURT: You know it would be hard to argue that was the intent or purpose of the rules because the intent or purpose was to limit it and make it less costly. So I get your point and I will be cognizant of that.

MR. BULLION: Thank you, Your Honor.

THE COURT: I caution both sides to keep that in mind. Anything else?

MR. GUERRA: I have one small issue that I would like to ask Tom on the record. We have had some documents produced that are not on its original format, specifically the document that I produced that are in black and white that in the original format that are in color and the color makes the difference because there are different colors in the document and those colors mean something concerning the color.

THE COURT: Well, produce the original format.

MR. BULLION: If we have color copies, we'll certainly produce them to you.

THE COURT: All right. The Court is ordering it be produced in the original format. If it's not technologically possible, advise the Court. Thank y'all.

MR. GUERRA:  Thank you, Tom.  Tom, we certainly missed you hear buddy.

THE COURT:  All right.  We're off the record.

(End of Proceedings.)

MR 0159

STATE OF TEXAS

COUNTY OF DALLAS


I, Vielica R. Dobbins, Official Court Reporter in and for the 134th District Court of Dallas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $312.00 and was paid/will be paid by Mr. Thomas Bullion.


/s/ Vielica Dobbins
_____
Vielica R. Dobbins, CSR, RPR
Texas CSR No. 6248
Official Court Reporter
134th District Court
Dallas County, Texas
600 Commerce Street, Suite 650
Dallas, Texas 75202
Telephone:  (214) 653-7239
Expiration:  12/31/2016

FILED
DALLAS COUNTY
7/9/2014 2:20:46 PM
GARY FITZSIMMONS
DISTRICT CLERK

Pointer Tonya

CAUSE NO. DC-14-07255 _____

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; PLAINTIFFS, | § § § § § § | IN THE DISTRICT COURT |
| VS. | § § | _____ JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | DALLAS COUNTY, TEXAS |

DEFENDANTS

## PLAINTIFFS' ORIGINAL PETITION

COME NOW Plaintiffs, SAMUEL and OBDULIA MEDINA; NATALYE MEDINA; and NAVIL GIBSON, complaining of Defendants MICHELIN NORTH AMERICA, INC. and JOSE BUSTILLO d/b/a MUNDO CARS, an-in State Defendant; and for cause of action would show the Court the following:

### 1.0 DISCOVERY CONTROL PLAN – LEVEL THREE

1.01    Discovery is intended to be conducted under Level 3 according to Rule 190 of the Texas Rules of Civil Procedure.

### 2.00. PARTIES – PLAINTIFFS

2.01    Plaintiff SAMUEL MEDINA is an individual and a citizen, domiciliary, and resident of Missouri and the last 4 digits of his Social Security Number are 1004, and the last three digits of his driver's license is 016.

2.02    Plaintiff OBDULIA MEDINA is an individual and a citizen, domiciliary, and resident of Missouri and the last 4 digits of her Social Security Number are 1574, and the last three digits of her driver's license is 004.

2.03    Plaintiff NATALYE MEDINA is an individual and a citizen, domiciliary, and resident of Missouri and the last 4 digits of her Social Security Number are 7931, and the last three digits of her driver's license is 010.

MR 0161

2.04    Plaintiff NAVIL GIBSON is an individual and a citizen, domiciliary, and resident of Missouri and the last 4 digits of her Social Security Number are 6831, and the last three digits of her driver's license is 011.

### 3.0 PARTIES – DEFENDANTS

3.01    Defendant Michelin North America, Inc. ("Michelin") is a New York corporation that conducts business in the State of Texas.

3.02 Michelin sells and distributes tires throughout Texas, and maintains its principal place of business in South Carolina and which conducts business in Texas as authorized. Michelin may be served by serving its registered agent for service of process (CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201).

3.03    Defendant Jose Bustillo d/b/a Mundo Cars JOSE BUSTILLO d/b/a MUNDO CARS is a resident of the State of Texas who may be served with process at 6422 Day Street, Dallas, Texas 75227.

### 4.0    JURISDICTION AND VENUE

4.01    The amount in controversy is within the jurisdictional limits of this Court.

4.02    Venue is proper in Dallas County, Texas, pursuant to section 15.002(a) of the Texas Civil Practice and Remedies Code because Dallas County is the residence of Defendant Jose Bustillo d/b/a Mundo Cars and a portion of the events and omissions giving rise to the claim occurred in Dallas County.

4.03    Pursuant to § 13.005 of the Texas Civil Practices & Remedies Code, because venue is proper as to Defendant Jose Bustillo d/b/a Mundo Cars, venue is proper as to the other Defendant, Michelin North America, Inc., because the claims against such Defendants arise out of the same occurrence.

### 5.0    FACTUAL BACKGROUND

5.01    On or about September 3, 2012 at approximately 0451 hours, Adrian Rico, Adriana Rico, Maria Rico and Laura Rico, along with Plaintiffs Samuel Medina, Obdulia

2

MR 0162

Medina and Natalye Medina, were traveling in a 2000 Ford Expedition southbound on Interstate 55 near Exit 60 in Illinois.

5.02    Adrian Rico was the driver and owner of the Ford Expedition, and the remaining Plaintiffs were passengers and occupants.

5.03    At this time and place, Mr. Rico's operation of the 2000 Ford Expedition was careful, lawful and prudent.

5.04    Suddenly and without warning and a result of Defendants' negligently, grossly negligently and carelessly designed, tested, processed, assembled, fabricated, manufactured, labeled, engineered, inspected, distributed, sold and warranted tire, the left rear tire on the Ford Expedition experienced a catastrophic failure directly and proximately causing the subject vehicle to, crash, flip, roll and/or overturn on Interstate 55.

5.05    Each of the Plaintiffs in the vehicle at the time the subject Tire (the "Tire") failed sustained serious, permanent and/or catastrophic injuries.

5.06    The Tire failed as alleged due to the defendants negligence, gross negligence, recklessness and/or carelessness in designing, testing, processing, assembling, fabricating, manufacturing, labeling, engineering, inspecting, distributing, selling and/or warranting the Tire.

5.07    The official Illinois Traffic Crash Report states in pertinent part that the Ford Expedition "[w]as traveling south on I-55, approximately .30 miles north of exit 60, when the driver's side rear tire blew out." The Crash Report also states that at the time of the incident, all of the occupants of the subject vehicle were wearing their safety seatbelt restraints.

5.08    The subject Tire that failed (the "Tire") was a Michelin LTX M/S P255 70R16 tire (DOT B7LBEVUX3101) manufactured, designed, assembled, fabricated, labeled, inspected and distributed by Defendant Michelin.

5.09    Upon information and belief, the Tire was sold with the 2000 Ford Expedition by Defendant Jose Bustillo, d/b/a Mundo Cars in Dallas, Texas.

5.10    At the time the Tire failed, Plaintiffs were driving and traveling carefully and prudently, with the Tire being used for its ordinary use and intended purpose.

3

MR 0163

5.11    At and before the collision date of September 3, 2012, Defendant Michelin was engaged in the business of designing, testing, processing, assembling, fabricating, manufacturing, engineering, constructing, distributing, labeling, inspecting, warranting and selling tires to the public, including the subject defective and dangerous Tire.

5.12    Michelin was responsible for the research, development, design, manufacture, labeling, construction, assembly, testing, labeling, marketing, inspecting, warranting and sale of the Tire.

5.13    The Tire was manufactured, assembled and constructed at Michelin's Dothan, Alabama tire plant during the 31st week of 2001.

5.14    Prior to the date of the permanent, catastrophic and severe injuries sustained by Plaintiffs and at all times material hereto, Michelin placed the defective and ultra-hazardous Tire into the stream of commerce.

5.15    At the time of the aforementioned incident, the subject defective and ultra-hazardous Tire was being used as intended and in a manner foreseeable to Michelin, and as so foreseeably used was defective, unfit, unreasonably dangerous, failed to provide adequate warnings, notices and instructions concerning its safety, use, maintenance, inspection, replacement, expiration and repair.

5.16    The defective and unreasonably dangerous nature of Michelin's subject Tire rendered it unsafe for the use and purpose for which it was intended, and this dangerous and defective condition was known or should have been known by Michelin.

5.17    The two most important components of a steel-belted radial tire including the subject Tire are the two (2) steel belts layered on top of each other underneath the tread area.

5.18    One of the primary concerns in the manufacture of steel-belted radial tires is the adhesion between the two (2) steel belts, which must stick to each other and not move.

4

MR 0164

5.19    Another primary concern in the manufacture of steel-belted radial tires is the adhesion between the steel belts and the rubber, both on top the tread and on the bottom of the carcass.

5.20    Michelin is aware that the rubber and steel materials in its tires do not naturally adhere to each other. Therefore, the steel belts are coated with an adhesive rubber compound called skim stock.

5.21    Michelin knows that the edges of the radial tire's steel belts suffer the most strain, heat and stress during operation and are susceptible to tread separation like what happened to the subject Tire.

5.22    Michelin admitted in an official document submitted to NHTSA in 2006 under the heading of "*Fundamental Mechanics of Belt Separation ...*" and under the subheading "Basic Concepts" of belt separation that "Belt crack initiation and propagation" starts around the ends of the cable. p.6-7.

5.23    This undeniable fact is also concluded by NHTSA in its white paper "*What Applied Research Has Learned From Industry About Tire Aging*" dated May 1, 2003 which at Slide 4 reads "Failures of Tires In the Field - Industry has told NHTSA that common tire failure modes seen in the field are: Belt Edge Cracking,"

5.24    Defendants defectively designed, tested, fabricated, manufactured, constructed, assembled, inspected, advertised, labeled, maintained, sold and/or distributed the subject Tire and placed it into the stream of commerce in an unreasonably dangerous condition.

5.25    The defects and lack of reliability in the Tire were beyond the contemplation of a reasonable and foreseeable consumer because Michelin knew or should have known that ultimate users, operators or consumers are not tire manufactures, tire technicians, or tire experts

5

MR 0165

and merely members of the public whom would not and could not properly inspect this product for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons or individuals.

5.26 Michelin negligently and recklessly caused the following non-exhaustive list of deadly and hazardous defects to exist in the subject Tire: over-age rubber stock, liner pattern marks, excessively thin inner-line, premature oxidation on the belt skim; improper splicing and spacing of belts and improper final inspection.

5.27 Michelin also carelessly and recklessly designed the subject Tire by failing to incorporate nylon overlays and a nylon cap ply, nylon belt edge layers, nylon safety belts to reduce the hazard of tread belt separation and catastrophic tire failure, as well as failing to incorporate adequate protection against air migration through the inner liner and tire aging.

5.28 Such inadequate quality control measures and inappropriate manufacturing and design practices and procedures promoted, allowed and failed to prevent separation of the Tire's internal components and contributed to the tire failure and tread belt separation of the subject Tire.

5.29 Michelin also is in possession of documents, testimony and information which confirm that its manufacturing practices have included 1) building tires after they had trapped air or steam and had been exposed to inappropriate levels of moisture within the components of the tire, 2) not promptly using pre-cured rubber and rubber-coated tire components to prevent premature oxidation from occurring within the tires' components so as to cause liner pattern marks, 3) misplacement of the steel belts in the assembly which increases strain at the belt edges, promoting belt edge separation, 4) insufficient use of x-rays to detect improper and defective manufacturing practices after the tires are built, 5) stacking of rubber components on

6

MR 0166

the unclean floor where those components were subject to contamination and **6)** improper splicing of the steel belts and innerliner of the tire which increases strain at the belt edges and the tires' susceptibility to oxidative degradation and premature failure.

5.30    Michelin, knows or in the exercise of reasonable care should know, that some of the manufacturing defects found in the subject Tire are invisible to the naked eye and can only be detected or identified with an x-ray.

5.31    Michelin knows that the older the age of the tire, the more likely it is to suffer tire failure.

5.32    Michelin knows that its steel belted radial tires such as the subject Tire **1)** have a date limit or expiration date of ten (10) years, **2)** have a finite life and **3)** suffer inevitable aging processes. Meanwhile, Michelin also knows that its consumers are not very experienced with tires.

5.33    Michelin is aware of the risk to its company posed by 10 year-old tires is very small because there are only a very small percentage of these very old tires on the road.

5.34    Michelin privately and publicly opposes tire age legislation such as laws requiring expiration dates on tires because it would "create supply chain issues . . . Larger customers may well expect a stock buy-back for tires they can't sell before the age deadline lapses."

5.35    Michelin's tire verification department at its Dothan, AL plant follows work instructions titled "General Principles" during the inspection of its finished tires. According to Michelin's own General Principles, tires that are rejected by the tire inspectors and not up to the standards of Michelin's vehicle manufacturer customers such as GM or Ford are downgraded and sold to the replacement market as new replacement Michelin tires. However, Michelin's

7

MR 0167

consumers and even the dealers who purchase replacement tires have no idea that the tires they are purchasing were downgraded and rejected by Michelin's automotive customers.

5.36    Michelin purports that its Dothan tire plant is ISO QS 9000 certified and compliant but Michelin does not comply with ISO QS 9000 requirements and quality standards.

5.37    Because of Michelin's poor manufacturing practices, the Tire at issue fails to meet standards, which Michelin itself recognized as necessary through its own internal standards concerning tire-building practices.

5.38    Michelin has a Bad Habits List of manufacturing issues which sets forth some of these internal standards.

5.39    In addition, Michelin has Decision Tree and Aspect Specification documents, which set forth Michelin's own internal standards concerning tire building and tire manufacturing of its tires.

5.40    Michelin's Decision Tree and Aspect Specification documents have annexes, glossaries, illustrations, photographs, and attachment with additional information and caveats pertaining to such standards.

5.41    Michelin's Decision Tree and Aspect Specification documents and their annexes set forth numerous standards, which tire inspectors must check when inspecting cured tires.

5.42    Michelin also has a Product Standards and Guidelines Manual for Required Tire Dimensional Tolerances, work procedures, reaction limits, product tolerance limits training materials and videotapes and tests for the tire builders – all of which set forth internal standards which Michelin is required to follow in the assembly, manufacturing and making of its tires.

8

MR 0168

5.43 In connection with Michelin's design, manufacturing and warranty practices, Michelin performs Failure Modes and Effects Analysis and tire endurance tests, which address failure modes of its tires.

5.44 Michelin also maintains and analyzes warranty return adjustment data with graphs to chart and compare tire models against other tire models and tire plants against other tire plants.

5.45 Michelin has a tire adjustment claims procedure and replacement policy administration guidelines to maintain its knowledge of the link between its manufacturing practices and designs and tire tread separations.

5.46 Michelin's own internal confidential data about the LTX M/S tire line returns reveal that more than 700 (just from one of its hundreds of dealers and the largest tire retailer in the world – Discount Tire) of its defective LTX M/S tires were returned for belt edge separations. In addition, over 1,000 tires were returned to Michelin's dealers for ride vibration – an admitted precursor to tread belt separation.

5.47 This staggering number of many more than 1,500 defective tires demonstrates, documents and proves that Michelin knew – as early as 2001 (11 years before the incident) – that its LTX M/S tire line was dangerously defective.

5.48 Instead of investigating this epidemic of defects, discovering the cause of the excessive number of tread separations and correcting it, Michelin did the exact opposite and concealed and still conceals this information from the public and its consumers that its LTX line posed and poses unreasonable risks of deadly danger to its consumers.

5.49 Therefore, Michelin has direct knowledge of the link between its improper and inadequate tire design and manufacturing practices and procedures and tire tread separations.

9

MR 0169

5.50    Michelin also is in possession testimony and information, which confirms that the individuals responsible for inputting, monitoring, reviewing and analyzing the adjustment data were careless and never bothered to look at the staggering number of returns made to Discount Tire for tread belt edge separation.

5.51    The subject Tire was defectively designed and the risks of the chosen design of the tire outweighed the utility of the chosen designs, because known safer alternative designs were technologically and economically feasible and were used by Michelin in other tires made for foreign markets while not used in the U.S. market.

5.52    Safer alternative designs for the tire at issue also include the use of a belt skim rubber compound more resistant to heat and less susceptible to degrading from ozone and other factors, which Defendants knew through its own research would cause premature degradation of the chemicals in its tires.

5.53    Safer alternative designs for the subject Tire also include a thicker gauged belt skim rubber and inner liner, effective use of nylon reinforcement of one or both steel belts (such reinforcement could have been implemented as a full-width cap ply, a spirally wound strip, or two strips of sufficient width to reinforce to belt package at the steel belt edges).

5.54    Through its access to the underlying patents and other research regarding tire design and manufacturing including but not limited to J.Boileau/Michelin, U.S. Patent 3,717,190, February 20, 1973 and A.L. Pollard/Michelin, U.S., Patent 5,711,829, January 27, 1998, Uniroyal Tire Sales Promotional Literature, YHL31123 1997 MNA Inc, Uniroyal Laredo Durashield Registered 7704185 Aug. 1997 UGTC The Laredo Tire's Patented 6 ply Durashield Construction, Michelin specifically knew about the efficacy, safety and cost-efficiency of these safer alternative designs concerning its design and manufacture of its tires.

10

MR 0170

5.55 Through its access to the underlying patents and other research including J.Boileau/Michelin, U.S. Patent 3,717,190, February 20, 1973 and A.L. Pollard/Michelin, U.S., Patent 5,711,829, January 27, 1998, Uniroyal Tire Sales Promotional Literature, YHL31123 1997 MNA Inc, Uniroyal Laredo Durashield Registered 7704185 Aug. 1997 UGTC The Laredo Tire's Patented 6 ply Durashield Construction, Michelin specifically knew that the nylon cap ply prevents belt-edge separations by: **1)** reducing corrosion of the steel wires, **2)** maximizing constriction of the steel belts, and **3)** substantially reducing the centrifugal forces/stress at the belt edges of a tire – which cause the tread and steel belts to separate from the tire – by compressing the belt package during periods of high centrifugal force which occurs when, like in this case, a vehicle is traveling at highway speed.

5.56 Even though Michelin's new LTX M/S2 tire has a lower speed rating than the subject LTX M/S, the LTX M/S2, has a nylon cap ply, defeating Michelin's claim that cap plies are only used for high speed tires.

5.57 There are at least twenty-three (23) defective Michelin LTX M/S tires involved in tread separations leading to vehicular wrecks. These Michelin LTX M/S tires are of the same: **a)** type, **b)** model, **c)** line and **d)** come from the same exact manufacturing plant – Michelin's Dothan, Alabama facility:

| TIRE TYPE | PLANT | MANUFACTURE DATE |
|---|---|---|
| 1. Michelin LTX P265/70R17 | Dothan, Alabama | 37th week, 1997 |
| 2. Michelin LTX P235/70R16 | Dothan, Alabama | 1st week, 1999 |
| 3. Michelin LTX P265/70R16 | Dothan, Alabama | 2nd week, 1999 |
| 4. Michelin LTX P265/70R17 | Dothan, Alabama | 12th week, 2000 |
| 5. Michelin LTX P265/70R17 | Dothan, Alabama | 28th week, 2001 |

11

MR 0171

| 6. | Michelin LTX P255 70R16 (Subject Tire) | Dothan, Alabama | 31st week, 2001 |
|---|---|---|---|
| 7. | Michelin LTX P265/70R16 | Dothan, Alabama | 4th week, 2002 |
| 8. | Michelin LTX P265/70R17 | Dothan, Alabama | 6th week, 2002 |
| 9. | Michelin LTX LT245/75R16 | Dothan, Alabama | 47th week, 2002 |
| 10. | Michelin LTX P265/70R16 | Dothan, Alabama | 6th week, 2003 |
| 11. | Michelin LTX P265/70R17 | Dothan, Alabama | 8th week, 2006 |
| 12. | Michelin LTX LT265/70R16 | Dothan, Alabama | 16th week, 2006 |
| 13. | Michelin LTX LT245/75R16 | Dothan, Alabama | 34th week, 2006 |
| 14. | Michelin LTX LT265/75R16 | Dothan, Alabama | 51st week, 2006 |

5.58 These Michelin tires share common characteristics with the subject Tire. These tires suffered from defective premature oxidation like the subject Tire that caused or contributed to their failures and were aged when they failed like the subject Tire, which caused or contributed to their failures. Many of these tires evidenced liner pattern marks like the subject Tire, indicative of poor adhesion that similarly caused or contributed to their failures. Many of these tires contained belt irregularities such as improper splicing and spacing which existed in the subject Tire that caused or contributed to their failures. Finally, all of the above-referenced tires, like the subject Tire, failed to include the well-known safety nylon cap plies aforementioned, which are now used on the lower speed Michelin LTX M/S2.

5.59 Therefore, Michelin consciously sells a line of defectively dangerous tires that it knows have killed or maimed dozens of Americans across the Country.

12

MR 0172

## 6.0 CAUSES OF ACTION AGAINST MICHELIN
### (Strict Liability against Michelin North America, Inc.)

6.01    Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

6.02    Michelin was negligent, malicious and grossly negligent in designing and manufacturing the tire in such a manner that it was a defectively designed and manufactured tire that was unreasonably dangerous, failed to meet Defendants' own recognized standards and was unfit for its ordinary uses.

6.03    Michelin was aware at all relevant times prior to the design, prior to the manufacture, prior to the sale, and prior to the failure of the subject Tire of the magnitude of the risk - including the risk of death or catastrophic injuries - posed by a tread belt separation.

6.04    Michelin's awareness and knowledge of the risks is proven by its own knowledge of prior property damage claims, injury claims and death claims caused by tread separation of Defendants' tires.

6.05    Michelin carelessly, negligently and grossly negligently failed to exercise reasonable care when issuing and disseminating instructions and warnings for its passenger car and light truck tires such as the subject Tire by failing to ensure that its end-users and consumers such as Plaintiffs were warned about the dangers and hazards posed by aged tires. Therefore, as a result of said conduct, Michelin's tire, which caused the permanent, catastrophic and fatal injuries to Plaintiffs, was defective and unreasonably dangerous when used in a reasonably foreseeable manner since Michelin failed to warn or protect against a danger or hazard in the use or misuse of those instrumentalities and failed to provide proper instructions for the use of those instrumentalities.

13

MR 0173

6.06    That the negligent, grossly negligent and reckless conduct of Michelin, in addition to the hereinabove alleged, consisted of, but was not limited to:

a.    Carelessly and recklessly making dangerous and unsafe the said tire by defectively designing, manufacturing, assembling, constructing, labeling, selling, distributing, inspecting, warranting, and selling the subject Tire;

b.    Carelessly and recklessly making dangerous and unsafe the said tire by failing to develop and incorporate a proper and safe design in the construction, assembly, and manufacture of the tire;

c.    Carelessly and recklessly utilizing improper materials which were inferior, unsafe, unsuitable, and which were mechanically, physically, structurally, and chemically defective;

d.    Carelessly and recklessly failing to properly inspect and test the tire for defects and, reasonable and adequate structural integrity, reliably and durability;

e.    Carelessly and recklessly failing to design, assemble, construct, manufacture and incorporate reasonably safe, appropriate, feasible, inexpensive and available means, mechanisms, procedures, policies and safeguards to prevent injuries and death caused by tire failure;

f.    Carelessly and recklessly failing to recall the said tire, modify the design and failing to provide a post-manufacture, post-sale and post-inspection warning to the foreseeable public, end-users, consumers, operators, motorists, occupants and passengers such as Plaintiffs;

g.    Carelessly and recklessly manufacturing, producing, assembling, labeling, designing, testing, inspecting, and selling the subject Tire;

h.    Carelessly and recklessly and completely failing to provide a reasonably safe tire for the public, end-users, consumers, motorists, occupants and passengers;

i.    Carelessly and recklessly allowing and permitting on its tires, such as the subject Tire, hazardous and extremely dangerous and defective conditions;

j.    Carelessly and recklessly failing to warn the public, end users, consumers, motorists, occupants and passengers lawfully and carefully utilizing the said tires, such as Plaintiffs, of dangerous, defective and hazardous conditions present;

k.    Carelessly and recklessly failing to appropriately assess and identify the hazards to which the end-users, consumers, motorists, occupants and passengers were exposed and likely to arise under foreseeable circumstances;

14

MR 0174

l.  Carelessly and recklessly failing to provide easy, available, and inexpensive safety means, measures, mechanisms, devices and safety equipment that would have provided end-users and consumers such as Plaintiffs with reasonably safe tires for travel;

m.  Carelessly and recklessly maintaining, inspecting, managing and supervising its tires, tire design firms and tire factories, allowing or implicitly approving hazardous and extremely and highly dangerous conditions to be present;

n.  Carelessly and recklessly failing to warn the pubic, end-users, consumers, motorists, occupants and passengers of dangerous, defective and deadly hazardous conditions and defects present;

o.  Carelessly and recklessly failing to provide and intentionally removing or ordering to be removed, easy, available, and inexpensive safety means, measures, devices, policies, processes and equipment that would have prevented the subject Tire failure and tire tread belt separation and would have provided a reasonably safe tire to Plaintiffs and others similarly situated;

p.  Carelessly and recklessly failing to close down or suspend business operations at Michelin's tire factories, tire design firms, tire manufacturing facilities, tire manufacturing plants until reasonably safe conditions, policies, procedures, equipment, means, measures and devices were implemented and foreseeable hazards, defects and dangers eliminated;

q.  Carelessly and recklessly failing to evaluate the exposures, dangers and hazards present at Michelin's tire factories, tire design firms, tire manufacturing facilities, and tire manufacturing plants, including the subject Dothan, Alabama plant;

r.  Carelessly and recklessly failing to design, manufacture, produce, test, inspect, distribute, fabricate, assemble, sell, place, warrant and label Defendants' tire with reasonable care;

s.  Carelessly and recklessly failing to recall Michelin's tire or red-tag and shut-down Michelin's tire factories, tire manufacturing facilities, and tire manufacturing plants, until dangerous, defective and hazardous conditions were eliminated;

t.  Carelessly and recklessly intentionally increasing the risk of injury by manufacturing, selling, distributing, and designing a defective and dangerous tire such as the subject Tire;

u.  Carelessly and recklessly failing to exercise reasonable care to undertake special and specific precautions in view of the peculiar risk of physical harm which the

15

MR 0175

foreseeable public, end-users, consumers, motorists, occupants and passengers such as Plaintiffs were subject or exposed to;

v.   Carelessly and recklessly failing to exercise reasonable care by selling and distributing tires such as the subject Tire containing design, manufacturing and inspection defects that caused the tire to fail;

w.   Carelessly and recklessly manufacturing, designing, assembling, labeling, testing and producing tires such as the subject Tire without adequate and reasonable quality control measures and with inappropriate manufacturing procedures and processes to prevent the manufacture, design, assembly, labeling, testing and production of tires containing, the following non-exhaustive list of dangerous, deadly and hazardous defects concerning tires: over-age rubber stock, inappropriate exposure of materials and matter to moisture during the manufacturing process, improper material handling of belt wire, improper splicing of belts and improper final inspection. Said inadequate quality control measures and inappropriate manufacturing practices and procedures contributed to the tire failure and tread belt separation of the subject Tire;

x.   Carelessly and recklessly manufacturing, designing, assembling, labeling, testing and producing tires such as the subject Tire that lacked proper adhesion of the steel belts to surrounding material resulting in tread belt separation and catastrophic failure during normal use such as the subject Tire;

y.   Carelessly and recklessly manufacturing, designing, assembling, labeling, testing and producing tires such as the subject Tire, including a substandard design, that failed to incorporate gum edge strips, nylon overlays, nylon belt edge layers, nylon safety belts to reduce the hazard of tread belt separation and catastrophic tire failure, as well as failing to incorporate adequate protection against tire aging;

z.   Carelessly and recklessly manufacturing, designing, assembling, labeling, testing and producing tires such as the subject Tire that contained improper tire specifications;

aa.  Carelessly and recklessly failing to warn the public end-users, consumers, motorists, occupants and passengers including Plaintiffs and Plaintiffs' beloved decedent, of the dangerous conditions and defects described herein and the unreasonable risk of tread belt separation and catastrophic tire failure, resulting therefrom, as well as the dangers and risks associated with tire aging in the subject Tire;

16

MR 0176

6.07    The subject Tire was defective in design, manufacture and marketing and presented an unreasonable risk of injury resulting from such defects, which include, but are not limited to the following:

    a.    Manufacturing and/or design defects resulting in inadequate adhesion between the layers of the tire;

    b.    Design defects, which allowed the tread to separate from the tire during diminished adhesion;

    c.    Lack of warnings regarding use of tires beyond a certain age; and

    d.    The Tire lacked a nylon cap ply.

6.08    Michelin's conduct, including its design and manufacturing defects and/or its failure to warn and instruct in the safe and proper use of the subject Tire, Michelin's tire failed and separated, directly and proximately causing the incident and resulting catastrophic injuries to Plaintiffs. Therefore, Defendants are strictly liable to Plaintiffs for their defective product.

**(Negligence – Michelin)**

6.09    Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

6.10    As designers, testers, assemblers, fabricators, manufacturers, engineers, distributors, labelers, inspectors, warrantors and sellers of the subject Tire, the Michelin had a duty towards Plaintiffs to use ordinary care in the design, manufacture, testing and marketing of the subject Tire to avoid foreseeable risks of injury caused by defects in the product which include, but are not limited to the following:

    a.    Michelin failed to adequately design and test the product;

17

MR 0177

b.   Michelin failed to utilize a manufacturing process that would have resulted in a reasonably safe tire;

c.   Michelin knew or should have known that the subject Tire would experience a tread separation when used in a reasonably safe manner;

d.   Michelin knew or should have known that such a tread separation could result in injuries and/or loss of life;

e.   Michelin failed to adequately protect the public when they became aware of the problem; and

f.   Michelin failed to adequately warn of the risks involved in using the tire including but not limited to about tire aging.

6.11   Said negligent conduct by Michelin was a proximate cause of Plaintiffs' injuries and damages.

**(Breach of Implied and Express Warranties – Michelin)**

6.12   Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

6.13   That the subject Tire was covered by express and implied warranties and promises made by Michelin including the subject "Service Life for Passenger Car and Light Truck Tires including Spare Tires" bulletin. Michelin herein represented and warranted that said tire was safe and fit for use and was of merchantable quality and safe condition.

6.14   That the aforesaid representations, promises, and express and implied warranties were false and untrue in that said tire was not safe nor fit for use; was not of merchantable quality and, in fact, was defective and unreasonably dangerous for use by the purchaser and

18

MR 0178

those would foreseeably come in contact or rely upon said product. Said misrepresentations made by Michelin were made knowingly and in conscious disregard of a substantial risk to others.

6.15    That the breach of the express and implied warranties was a proximate cause of Plaintiffs' catastrophic, serious, permanent and fatal injuries.

6.16    That the conduct on the part of Michelin, and each of them, was negligent, reckless, careless, wanton and willful in that the likelihood of harm was highly probable and the result and foreseeable harm was devastating.

## (Deceptive Trade Practices Act Violations – Michelin)

6.17    Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

6.18    Michelin engaged in false, misleading, and/or deceptive acts or practices that Plaintiffs relied on to their detriment. Specifically, Michelin failed to disclose, warn, alert, tell, inform and admit to its consumers, users and foreseeable occupants that its tires have a finite life, weaken with age, are more likely to fail as they become older and that ten (10) year old tires are "extremely old," exposing consumers, users and foreseeable occupants such as Plaintiffs to risks of tire failure, tread and/or belt edge separation and the catastrophic injuries associated therewith.

6.19    That the aforesaid acts, conduct and promises were false and untrue in that said tire was not safe nor fit for use; was not of merchantable quality and, in fact, was defective and unreasonably dangerous for use by the purchaser and those would foreseeably come in contact or rely upon said product. Said misrepresentations made by Michelin were made knowingly and in conscious disregard of a substantial risk to others since Michelin had actual awareness of the falsity, deception and unfairness

19

MR 0179

of its representations which, to Plaintiffs' detriment, took advantage of its superior knowledge, science, engineering, test data and education about tire aging, all of which was a producing and proximate cause of the incident and catastrophic injuries alleged herein.

### 7.0    CAUSES OF ACTION AGAINST DEFENDANT JOSE BUSTILLO d/b/a/ MUNDO CARS
**(Negligence against Jose Bustillo d/b/a/ Mundo Cars)**

7.0    Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

7.01    At all times relevant to this cause of action, Jose Bustillo d/b/a/ Mundo Cars had a duty to act reasonably and prudently in the distribution and sale of the subject vehicle as well as the Michelin LTX M/S tire.

7.02    Jose Bustillo d/b/a/ Mundo Cars breached its duty by selling a vehicle equipped with a tire that was defectively manufactured, designed and marketed, as alleged herein. The above-referenced negligent acts and/or omissions, among others, each individually and cumulatively, contributed to Plaintiffs' catastrophic injuries and damages.

**(Strict Liability against Jose Bustillo d/b/a/ Mundo Cars)**

7.03    Plaintiffs hereby incorporate and adopt all of the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set length herein.

7.04    Jose Bustillo d/b/a/ Mundo Cars furnished and/or sold the subject Ford Expedition with the subject Tire. Such tire was a defective product, unreasonably dangerous to potential customers, end-users and occupants of the vehicle including the Plaintiffs where it was mounted in that such tire was

20

MR 0180

defectively designed, manufactured and marketed and failed during normal, foreseeable use for which it was fit.

7.05    The defective condition of the tire and failure of Jose Bustillo d/b/a/ Mundo Cars to warn of its defects condition rendered the tire unreasonably dangerous and was the direct and proximate cause of the catastrophic injuries sustained by Plaintiffs.

## 8. DAMAGES

8.01    As a producing, direct and proximate result of the incident, injuries, and damages for which all defendants are liable, the Medina family seeks and are entitled to general damages, special damages, economic damages, punitive damages and non-economic damages in an amount in excess of the minimum jurisdictional limits of the Texas state district court, as determined to be just and fair by the jury, and as augmented by prejudgment interest, post-judgment interest, and an award of costs.

8.02    In addition to all breach of warranty damages, the actual damages sought herein include but are not limited to personal injury damages (such as pain and mental anguish in the past and future, lost earnings and loss of earning capacity in the past and future, disfigurement in the past and future, physical impairment in the past and future, medical expenses in the past and in the future, and all other personal injury damages allowed by law and equity) and all lawful compensations for injuries to the familial relationship including all harms one spouse suffers when the other spouse in injured (such as loss of household services in the past and future and loss of consortium in the past and future).  In addition to each of these damages, the Medina family also seeks prejudgment and post-judgment interest as well as all compensable court costs.

8.03    That Defendants' egregious and willful conduct constitutes serious and conscious disregard for the life and limb of Plaintiffs in that the Defendants knew or should

21

MR 0181

have known of that their tires were not reasonably safe, contained manufacturing and design defects, and would not adequately, reasonably and safely protect the public, end-users, consumers, motorists, occupants and passengers such as Plaintiffs from serious injuries. Defendants' egregious and willful conduct in failing to warn Plaintiffs of said tire design, manufacturing, tire aging including but not limited to that tires have a date limit and other dangerous conditions further constitutes serious and conscious disregard for the life and limb of Plaintiffs.

Additionally, Defendants acted to serve their own interests, having reason to know yet consciously disregarding the consequential injuries to Plaintiffs by placing the subject Tire in the stream of commerce and selling it to the public. Further, Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiffs. Accordingly, Plaintiffs are entitled to and demand exemplary and punitive damages against Defendants, and each of them, in a sum that is reasonable and just in the premises.

8.04     That furthermore, upon information and belief, the outrageous misconduct of Defendants, and each of them, was committed with an "evil mind" and constituted a serious and willful disregard for the safety and welfare of Plaintiffs and of the deceased. The events herein arose from Defendants' callous disregard for the safety and welfare of Plaintiffs, in that Defendants, and each of them, knew full well of the consequences of their unlawful and reckless acts. Further, Defendants, and each of them, acted to serve their own interests, having reason to know and consciously disregarding the substantial risk that their conduct might significantly cause serious injury and/or damages. Furthermore, Defendants, and each of them, consciously pursued a course of conduct knowing that the conduct as described herein created a substantial risk of significant harm to others.

22

MR 0182

8.05 That the tortious misconduct of Defendants, and each of them, was clearly and convincingly outrageous, oppressive, and committed with "evil mind" such that these Defendants, and each of them, deserve to be punished in a substantial, meaningful way in order to deter these Defendants from committing future misconduct, deter others from committing similar misconduct, to make an example out of these Defendants, and to send a message to these Defendants and others expressing society's detestation and condemnation of such reprehensible misconduct. Michelin's conduct was such that when viewed objectively from the standpoint of the actor at the time of its occurrence, Michelin was aware that its conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Further, Michelin had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Accordingly, Plaintiffs are entitled to and demand exemplary and punitive damages against Defendants, and each of them, in a sum that is reasonable and just in the premises.

8.06 Specifically, as a direct and proximate result of the above-described acts, omissions and conduct of Defendants, jointly and severally, Plaintiffs have sustained the following serious, disabling, catastrophic and permanent injuries:

### (Plaintiff Obdulia Medina)

8.07 Plaintiff OBDULIA MEDINA, hereby realleges and adopts all the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set forth at length herein.

8.08 That prior to the said acts of Defendants, and each of them, Plaintiff OBDULIA MEDINA was a spirited, energetic young woman and mother in the prime of her life, and that as a direct and proximate result of the defective, careless, reckless and grossly negligent acts of

23

MR 0183

Defendants, Plaintiff OBDULIA MEDINA was caused to sustain, amongst many other injuries, a C6 and C7 fracture causing permanent quadriplegia and suffer other severe and permanent injuries including but not limited to a C7 ASIA B spinal cord injury, and many other injuries to her body and systems all of which completely destroyed Plaintiff OBDULIA MEDINA's life as she knew it and forced her into a permanently disabled life, all to Plaintiffs' detriment and damages.

8.09 That Defendants' reckless actions and misconduct caused Plaintiff OBDULIA MEDINA to be severely, permanently and catastrophically injured about her body and person, and to severely and permanently injure among other things, her back, head and spinal cord as well as sustaining severe, catastrophic and permanent injuries and shock to her whole spine and nervous system, and because of said injuries, Plaintiff OBDULIA MEDINA was caused to be subject to several surgeries and caused to be committed to the care and treatment of healthcare providers, which she is informed and believes that she will be required for the rest of her life, that as a result of the intense and excruciating pain it became necessary that Plaintiff OBDULIA MEDINA be administered sedatives and pain medication in an effort and attempt to relieve the physical pain and suffering sustained by said Plaintiff, and as a further result of said injuries Plaintiff has had to undergo medical treatments, and will in the future be required to continue in the care of physicians, surgeons and nurses, the exact extent of which is at the present time unknown, to Plaintiffs' damages, that Plaintiffs are at this time unable to supply the itemized actual damages and costs of physicians services, hospital costs, medical and surgical appliances, surgeries and treatments, and other future medical expenses, but upon request of this Court, and at the proper time, said itemized statements and costs will be supplied.

24

MR 0184

8.10 That as a direct and proximate result of the misconduct, negligence and fault of Defendants, and each of them, Plaintiff OBDULIA MEDINA sustained catastrophic, serious, painful, lasting, catastrophic and disabling spinal cord injuries. Plaintiff has suffered and will continue to endure and experience tremendous physical and mental pain and suffering and loss of enjoyment of activities for the rest of her natural life. Plaintiff has been required to make numerous and diverse expenditures for surgery, medical care, and occupational, speech and physical therapies, and other medical/medical-related treatments and will continue to incur expenses for future surgeries, medical care, and medical treatment.

8.11 That as a further direct and proximate result of the misconduct, negligence and fault of Defendants, and each of them, Plaintiff OBDULIA MEDINA is informed and believes that she will be permanently unemployable or have a diminished earning potential and that her future earning capacity is permanently impaired, all to the detriment and damage of Plaintiffs in a sum that is reasonable and just in the premises.

8.12 That as a further direct and proximate result of the misconduct, negligence and fault of Defendants, each of them, Plaintiff OBDULIA MEDINA has suffered severe mental anguish and anxiety as a result of the catastrophic injuries suffered, and her mental anguish is expected to continue indefinitely. That prior to the time of the injuries to Plaintiff OBDULIA MEDINA, she was young thirty- female in the prime of her life and was fully capable of performing and actually did perform all of the usual duties as a spouse and mother. By reason of her permanent and catastrophic injuries, Plaintiff OBDULIA MEDINA is now forced into a permanently disabled life and has been unable to perform the spousal, and motherly duties, which she had previously performed.

25

MR 0185

8.13 In addition, the resulting serious, permanent, and disabling injuries to Plaintiff OBDULIA MEDINA have permanently interfered with the husband-wife and parent-child relationship in a substantially gratifying way, and therefore she has sustained major, permanent and catastrophic losses of consortium with her husband and children (Plaintiff SAMUEL MEDINA, NATALYE MEDINA and NAVIL GIBSON).

**WHEREFORE**, Plaintiff OBDULIA MEDINA prays for judgment against Defendants, and each of them, as follows:

1. For that amount as is reasonable and just as and for compensatory damages to the plaintiff and for the losses of consortium suffered by plaintiff;

2. For that amount as is reasonable and just as and for punitive damages;

3. For the amount necessary as and for medical expenses incurred herein and to be incurred in the future to be supplied at a later date;

4. For loss of income to Plaintiffs to date and to be incurred in the future;

5. For the loss of earning power;

6. For costs of suit incurred; and

7. For such other and further relief as to the Court may deem just and proper in the premises.

### (Plaintiff Samuel Medina)

8.14 Plaintiff SAMUEL MEDINA, hereby realleges and adopts all the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set forth at length herein.

8.15 That prior to the said acts of Defendants, and each of them, Plaintiff SAMUEL MEDINA was a spirited, energetic young father and husband in the prime of his life, and that as

26

MR 0186

a direct and proximate result of the defective, careless, reckless and grossly negligent acts of Defendants, Plaintiff SAMUEL MEDINA was caused to sustain injuries including a left trapezius strain and cervical strain.

8.16    That as a result of his injuries Plaintiff SAMUEL MEDINA has been required to make numerous expenditures for surgery, medical care, and other medical/medical-related treatments and will continue to incur expenses for future surgeries, medical care, and medical treatment, the exact extent of which is at the present time unknown, to Plaintiffs' damages, that Plaintiffs are at this time unable to supply the itemized actual damages and costs of physicians services, hospital costs, medical and surgical appliances, surgeries and treatments, and other future medical expenses, but upon request of this Court, and at the proper time, said itemized statements and costs will be supplied.

8.17    That as a further direct and proximate result of the misconduct, negligence and fault of Defendants, each of them, prior to the time of the injuries to Plaintiff OBDULIA MEDINA, she was a young wife in the prime of her life, in good health, and was fully capable of performing, and actually did perform all of the usual duties as a wife and was a loving and pleasing wife to Plaintiff SAMUEL MEDINA, and he received much comfort and happiness in her society and companionship. By reason of her permanent and catastrophic injuries, Plaintiff OBDULIA MEDINA is now forced into a permanently disabled life and has been unable to perform any of the spousal duties which she had previously performed, and is unable to render and provide the same love, affection, companionship, care, protection and guidance to her husband, Plaintiff SAMUEL MEDINA, who now is required to care for Plaintiff OBDULIA MEDINA.

27

MR 0187

8.18 Accordingly, Plaintiff SAMUEL MEDINA has been deprived of her services as his wife, and his comfort and happiness in her society and companionship and consortium have been permanently impaired and destroyed; and Plaintiff SAMUEL MEDINA is informed and believes that his loss of his wife's consortium and her incapacity to do her duties will continue permanently and for an indefinite time in the future, all to Plaintiff's damages in that sum found reasonable and just.

8.18 In addition, the resulting serious, permanent, and disabling injuries to Plaintiff OBDULIA MEDINA have permanently interfered with the husband-wife relationship in a substantially gratifying way, and therefore Plaintiff SAMUEL MEDINA has sustained major, permanent and catastrophic losses of consortium with his wife.

**WHEREFORE**, Plaintiff SAMUEL MEDINA prays for judgment against Defendants, and each of them, as follows:

1. For that amount as is reasonable and just as and for compensatory damages to the plaintiff and for the losses of consortium suffered by plaintiff;

2. For that amount as is reasonable and just as and for punitive damages;

3. For the amount necessary as and for medical expenses incurred herein and to be incurred in the future to be supplied at a later date;

4. For loss of income and earning capacity and potential to date and to be incurred in the future;

5. For costs of suit incurred; and

6. For such other and further relief as to the Court may deem just and proper in the premises.

28

MR 0188

**(Plaintiff Natalye Medina)**

8.21 Plaintiff NATALYE MEDINA, hereby realleges and adopts all the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set forth at length herein.

8.22 That prior to the said acts of Defendants, and each of them, Plaintiff NATALYE MEDINA was a spirited, energetic young woman in the prime of her life, and that as a direct and proximate result of the defective, careless, reckless and grossly negligent acts of Defendants, Plaintiff NATALYE MEDINA was caused to sustain severe injuries including but not limited to a thoracic strain and multiple contusions all of which completely changed Plaintiff NATALYE MEDINA's life as she knew it, all to Plaintiffs' detriment and damages.

8.23 That Defendants' reckless actions and misconduct caused Plaintiff NATALYE MEDINA to be severely injured about her body and person, and to severely and permanently injure among other things, her back and because of said injuries, Plaintiff NATALYE MEDINA was caused to be committed to the care and treatment of healthcare providers, which she is informed and believes that she will be required for the rest of her life, that as a result of the intense and excruciating pain it became necessary that Plaintiff NATALYE MEDINA be administered sedatives and pain medication in an effort and attempt to relieve the physical pain and suffering sustained by said Plaintiff, and as a further result of said injuries Plaintiff has had to undergo medical treatments, and will in the future be required to continue in the care of physicians, surgeons and nurses, the exact extent of which is at the present time unknown, to Plaintiffs' damages, that Plaintiffs are at this time unable to supply the itemized actual damages and costs of physicians services, hospital costs, medical and surgical appliances, treatments, and

29

MR 0189

other future medical expenses, but upon request of this Court, and at the proper time, said itemized statements and costs will be supplied.

8.24 That as a further direct and proximate result of the misconduct, negligence and fault of Defendants, each of them, prior to the time of the injuries to Plaintiff OBDULIA MEDINA, she was a young mother in the prime of her life, in good health, and was fully capable of performing, and actually did perform all of the usual duties as a mother and was a loving and pleasing mother to Plaintiff NATALYE MEDINA, and she received much comfort and happiness in her society and companionship. By reason of her permanent and catastrophic injuries, Plaintiff OBDULIA MEDINA is now forced into a permanently disabled life and has been unable to perform any of the motherly duties which she had previously performed, and is unable to render and provide the same love, affection, companionship, care, protection and guidance to her daughter, Plaintiff NATALYE MEDINA.

8.25 Accordingly, Plaintiff NATALYE MEDINA has been deprived of her services as her daughter, and her comfort and happiness in her society and companionship and consortium have been permanently impaired and destroyed; and Plaintiff NATALYE MEDINA is informed and believes that her loss of her mom's consortium and her incapacity to do her duties will continue permanently and for an indefinite time in the future, all to Plaintiff's damages in that sum found reasonable and just.

8.26 In addition, the resulting serious, permanent, and disabling injuries to Plaintiff OBDULIA MEDINA have permanently interfered with the parent-child relationship in a substantially gratifying way, and therefore Plaintiff NATALYE MEDINA has sustained major, permanent and catastrophic losses of consortium with her mother.

30

MR 0190

WHEREFORE, Plaintiff NATALYE MEDINA prays for judgment against Defendants, and each of them, as follows:

1.     For that amount as is reasonable and just as and for compensatory damages to the plaintiff and for the losses of consortium suffered by plaintiff;

2.     For that amount as is reasonable and just as and for punitive damages;

3.     For the amount necessary as and for medical expenses incurred herein and to be incurred in the future to be supplied at a later date;

4.     For loss of income to Plaintiffs to date and to be incurred in the future;

5.     For the loss of earning power;

6.     For costs of suit incurred; and

7.     For such other and further relief as to the Court may deem just and proper in the premises.

### (Plaintiff Navil Gibson)

8.27    Plaintiff NAVIL GIBSON, hereby realleges and adopts all the allegations contained in the previous claims for relief, counts and paragraphs, and incorporates the same by reference, the same as though fully set forth at length herein.

8.28    That as a further direct and proximate result of the misconduct, negligence and fault of Defendants, each of them, prior to the time of the injuries to Plaintiff OBDULIA MEDINA, she was a young mother in the prime of her life, in good health, and was fully capable of performing, and actually did perform all of the usual duties as a mother and was a loving and pleasing mother to Plaintiff NAVIL GIBSON, and she received much comfort and happiness in her society and companionship. By reason of her permanent and catastrophic injuries, Plaintiff OBDULIA MEDINA is now forced into a permanently disabled life and has

31

MR 0191

been unable to perform any of the motherly duties which she had previously performed, and is unable to render and provide the same love, affection, companionship, care, protection and guidance to her daughter, Plaintiff NAVIL GIBSON.

8.29     Accordingly, Plaintiff NAVIL GIBSON has been deprived of her services as her daughter, and her comfort and happiness in her society and companionship and consortium have been permanently impaired and destroyed; and Plaintiff NAVIL GIBSON is informed and believes that her loss of her mom's consortium and her incapacity to do her duties will continue permanently and for an indefinite time in the future, all to Plaintiff's damages in that sum found reasonable and just.

8.18     In addition, the resulting serious, permanent, and disabling injuries to Plaintiff OBDULIA MEDINA have permanently interfered with the parent-child relationship in a substantially gratifying way, and therefore Plaintiff NAVIL GIBSON has sustained major, permanent and catastrophic losses of consortium with her mother.

**WHEREFORE**, Plaintiff NAVIL GIBSON prays for judgment against Defendants, and each of them, as follows:

1.     For that amount found reasonable and just as and for compensatory damages and for the loss of consortium suffered by Plaintiff;

2.     For that amount as is reasonable and just as and for punitive damages;

3.     For costs of suit incurred; and

4.     For such other and further relief as to the Court may deem just and proper in the premises.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited and required to answer herein accordingly to law, that this cause be set for trial before a jury on all

32

MR 0192

their claims, that Plaintiffs recover judgment of and from Defendants, jointly and severally, for all damages referenced above, including such actual, compensatory, punitive and special damages – all of which exceed of the minimum jurisdictional limits of the Texas state district court – in such a manner as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plaintiffs may show themselves justly entitled to at law or in equity.

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY.**

Respectfully submitted,

LAW OFFICES OF JAMES B. RAGAN

723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
email: Jimragan13@gmail.com

By: _____
James B. Ragan
State Bar No. 16466100

33

MR 0193

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) | |
| VS. | ) ) | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) | |
| DEFENDANTS. | ) ) | 134TH JUDICIAL DISTRICT |

## DEFENDANT MICHELIN NORTH AMERICA, INC.'S SPECIAL EXCEPTIONS, AMENDED ANSWER TO PLAINTIFFS' FIRST AMENDED PETITION, AND RELIANCE UPON JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Michelin North America, Inc. ("MNA"), one of the defendants in the above-styled and numbered cause, and files this its Special Exceptions, Amended Answer to Plaintiffs' Original Petition, and Reliance Upon Jury Demand, and shows the Court as follows:

A.     Special Exceptions

1.     MNA specially excepts to Paragraph 6.0 in Plaintiffs' Original Petition and respectfully asks that plaintiffs be required to replead to specify the managing agent at MNA who committed the alleged malice or gross negligence and specifically what acts he or she committed.

2.     MNA also specially excepts to Paragraph 8 in Plaintiffs' Original Petition where plaintiffs seek damages in unspecified amounts. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, plaintiffs should be required to replead to specify the range of damages sought and

MR 0194

should not be allowed to conduct discovery until this failure is corrected. Plaintiffs should additionally be required to state the maximum amount of damages sought.

3. MNA requests that these Special Exceptions be granted and that the offending allegations be stricken or that plaintiffs be given an appropriate but limited period of time within which to replead. If plaintiffs do not timely replead, MNA requests that the allegations in question be stricken.

B. General Denial

MNA invokes the provisions of Rule 92 of the Texas Rules of Civil Procedure and exercises its legal right to require plaintiffs to prove all of the allegations contained in their pleadings, if plaintiffs can so prove them, which is denied. Accordingly, MNA denies generally the allegations in plaintiffs' pleadings and demands strict proof thereof by a preponderance of the evidence.

C. Affirmative Defenses

1. MNA alleges that the tire in question met or exceeded all applicable government standards. As such, MNA is entitled to a presumption that it is not liable under a theory of strict products liability.

2. MNA alleges that plaintiffs' alleged damages were proximately caused by or, in the alternative, were solely proximately caused by the acts, omissions, or fault of Adrian Rico, the driver of the vehicle in question. The acts and/or omissions of Adrian Rico amounting to negligence include losing control of the vehicle in question and causing the accident in question. The investigating officer's crash report notes that Adrian Rico's "failing to reduce speed to avoid crash" was a contributory cause of the crash. In addition, Adrian Rico was driving without adequate sleep and failed to properly steer the vehicle following the failure of the tire. MNA

MR 0195

alleges that Adrian Rico was negligent in his operation of the accident vehicle and that said negligence was a proximate cause of the accident. In addition, Adrian Rico and Maria Rico were negligent in their maintenance of the tire in question. Specifically, they never had the vehicle or tires inspected prior to the accident and only checked the air pressure in the tire in question once during the time they owned the vehicle. The tire was more than 10 years old at the time of the accident, which is contrary to the service life recommendation of MNA and other tire manufacturers. The tire failed because of a history of overdeflection, which weakened the tire, and damage suffered due to a prior impact. Evidence of overdeflection includes rim line compression grooves and balance weight clip marks. Evidence of prior impact includes a radial split, bare and broken polyester cords, broken steel cords and accelerated tread wear. MNA alleges that Adrian Rico and Maria Rico were negligent in their maintenance of the tire and that said negligence was a proximate cause of the accident. MNA alleges that Adrian Rico and Maria Rico are responsible third parties as those terms are defined and used in sections 33.003, 33.004 and 33.011 of the Texas Civil Practice and Remedies Code.

3. MNA alleges that plaintiffs' claims for damages may be barred in whole or in part, whether under the doctrine of comparative responsibility or failure to mitigate damages, by the failure of plaintiffs to utilize available and functional safety restraint devices as required by Illinois law. The same constitutes negligence *per se* and MNA requests that the jury be so instructed.

4. MNA alleges in the alternative that plaintiffs' alleged damages were proximately caused by, or, in the alternative, were solely proximately caused by, the acts, omissions, or fault of third parties for whose conduct MNA is not in any way liable or responsible.

MR 0196

5.    MNA specifically pleads the provisions of Chapters 32 and 33 of the Texas Civil Practices and Remedies Code dealing with contribution and comparative responsibility and requests that any damages be assessed in accordance with those provisions. Plaintiffs have sued Jose Bustillo d/b/a Mundo Cars and alleged that his negligence was a proximate cause of the accident. MNA alleges he was negligent because he sold a vehicle with 5 different tires of 4 different sizes including the subject tire that was over 10 years old. MNA alleges that Jose Bustillo d/b/a Mundo Cars is a co-defendant or, if the claims against him are subsequently dismissed, a responsible third party or settling party as those terms are defined and used in sections 33.003, 33.004 and 33.011 of the Texas Civil Practice and Remedies Code.

6.    MNA specifically pleads Chapter 82 of the Texas Civil Practices and Remedies Code dealing with design defects and requires plaintiffs to meet their burden of proof with regard to all claims of design defect as specified in Chapter 82. Plaintiffs must prove by a preponderance of the evidence (1) there was a "safer alternative design," as that term is statutorily defined, and (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery. MNA requests that the jury be instructed on all statutorily required elements of a "design defect case."

7.    MNA asserts that plaintiffs' recovery of medical or health care expenses incurred be limited to the amount actually paid or incurred by or on behalf of the plaintiffs. Tex. Civ. Prac. & Rem. Code § 41.0105.

8.    MNA alleges that plaintiffs' claims for breach of warranty are barred by the applicable statute of limitations, having been asserted more than four years after original delivery of the subject tire.

9. MNA alleges that plaintiffs' claims for breach of warranty are barred on account of plaintiffs' failure to give notice as required by Tex. Bus. & Com. Code § 2.607.

10. MNA alleges that by virtue of the 1995 amendments to the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.,* recovery under the DTPA is limited to "economic damages" as defined by statute. Tex. Bus. & Com. Code § 17.45(11). "Economic damages" are statutorily limited to pecuniary loss. By statute, plaintiffs may not recover exemplary damages, damages for physical pain and mental anguish, lost of consortium, disfigurement, physical impairment, or loss of companionship and society. Furthermore, "mental anguish" damages may not be awarded unless the trier of fact finds that MNA's conduct was committed intentionally. Tex. Bus. & Com. Code § 17.50(b)(1).

11. With respect to plaintiffs' allegation of punitive or exemplary damages, MNA alleges as follows:

a. Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained because an award of punitive damages in this case would contravene and violate Section 1 of the Fourteenth Amendment of the Constitution of the United States, which guarantees due process of law and equal protection of the laws; Article 1, Section 3 of the Texas Constitution, which guarantees equal protection of the law; and Article 1, Section 19 of the Texas Constitution, which guarantees due process. Plaintiffs' claims for punitive or exemplary damages are unconstitutional in the following respects:

b. Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained because the standard for determining liability for punitive damages under Texas law is vague and arbitrary and does not define with

MR 0198

sufficient clarity the conduct or mental state which gives rise to such a claim and therefore violates MNA's constitutional due process rights under the Fourteenth Amendment of the United States Constitution and Article 1, Section 19 of the Texas Constitution.

c.       Plaintiffs' claims for punitive or exemplary damages cannot be sustained against MNA in this case because Texas law does not (i) provide a standard of sufficient clarity for determining the appropriateness, or the appropriate size, of a punitive damages award, (ii) provide limits on punitive damages imposed by the applicable principles of deterrence and punishment, (iii) prohibit an award of punitive damages, in whole or in part, on the basis of invidiously discriminatory characteristics, including the corporate status of defendants, and (iv) provide for judicial review on the basis of objective standards in violation of defendants' due process and equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution and the double jeopardy clauses of the Fifth Amendment as incorporated into the Fourteenth Amendment and by Article 1, Section 3 of the Texas Constitution, which guarantees equal protection of the law; and Article I, Section 19 of the Texas Constitution, which guarantees due process, and Article 1, Section 14 of the Texas Constitution, which guarantees against double jeopardy.

d.       Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained in this case because any award of punitive damages under Texas law without bifurcating the trial of all punitive damages issues and the failure of the Court to adopt other procedural constitutional safeguards in the submission of

MR 0199

evidence relative to determining the size of any punitive damages award would violate the Fourteenth Amendment of the Constitution of the United States, which guarantees due process of law and equal protection of laws; Article I, Section 3 of the Texas Constitution, which guarantees equal protection of the laws; and Article I, Section 19 of the Texas Constitution, which guarantees due process of law.

e.      Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained in this case because imposition of a punitive damages award would violate the due process clauses of the Constitution of the United States and the Texas Constitution because the standard for the imposition of punitive damages lacks objective guidelines, invites the jury to engage in caprice and discrimination in the administration of the law and permits repeated and unlimited punishment for the same alleged misconduct.

f.      Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained because an award of punitive damages under the Texas law for the purposes of compensating plaintiffs for elements of damage not otherwise recognized by Texas law would violate MNA's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and by the due process provisions of Article 1, Section 19 of the Texas Constitution.

g.      Any award of punitive damages based on anything other than MNA's conduct in connection with the sale of the specific single tire that is the subject of this lawsuit would violate the due process clause of the Fourteenth Amendment to the United States Constitution and the double jeopardy clause of the Fifth Amendment as incorporated into the Fourteenth Amendment and the due process

clause of Article 1, Section 19 of the Texas Constitution and Article I, Section 14 of the Texas Constitution providing guaranty against double jeopardy, because any other judgment for punitive damages in this case cannot protect defendants against impermissible multiple punishment for the same alleged wrong.

h.      Plaintiffs' claims for punitive or exemplary damages against MNA cannot be sustained because any judgment for punitive damages in this case would constitute multiple punishment for the same alleged wrong and cannot protect defendants against multiple punishment for the same alleged wrong in future cases in violation of MNA's rights to due process and equal protection of the laws under the Fourteenth Amendment of the United States Constitution and Article I, Section 3 and 19 of the Texas Constitution.

i.      Alternatively, in the event the Court allows the jury to consider awarding punitive damages despite the constitutional defects described above, MNA asserts that the cap on exemplary damages contained in Chapter 41 of the Texas Civil Practice & Remedies Code applies and limits the amount of exemplary damages which can be awarded.

D.      <u>Reliance Upon Jury Demand</u>

MNA relies upon plaintiffs' jury demand.

WHEREFORE, PREMISES CONSIDERED, defendant Michelin North America, Inc. prays that plaintiffs take nothing by their suit, that MNA have judgment for its costs in this proceeding, and that the Court grant MNA such other and further relief as the Court may deem just and proper.

MR 0201

Respectfully submitted,

GERMER BEAMAN & BROWN, P.L.L.C.
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By: /s/ Thomas M. Bullion III
        Thomas M. Bullion III
        tbullion@germer-austin.com
        State Bar No. 03331005
        Chris A. Blackerby
        cblackerby@germer-austin.com
        State Bar No. 00787091

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via facsimile, on this 15th day of October, 2015.

Luis P. Guerra                                *Via E-Service & Facsimile*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

James B. Ragan                                *Via E-Service & Facsimile*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

Noel Sevastianos                              *Via E-Service & Facsimile*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars               *Via Regular Mail*
6422 Day Street
Dallas, Texas 85227


/s/ Thomas M. Bullion III
Thomas M. Bullion III/Chris A. Blackerby

MR 0202

FILED
DALLAS COUNTY
8/25/2015 10:02:37 AM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| | § | 134TH JUDICIAL DISTRICT |
| VS. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | **(Oral Argument Requested)** |
| DEFENDANTS, | § § | |

# *Plaintiffs' <u>Amended</u> Motion To Compel Michelin To Respond To Discovery And Identification Of Withheld Michelin Documents*

MR 0203

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § § | 134TH JUDICIAL DISTRICT |
| VS. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | (Oral Argument Requested) |
| DEFENDANTS, | § § | |

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Snapshot | 1 |
| II. | Background | 2 |
| III. | Michelin's Discovery *Modus Operandi* | 4 |
| IV. | Michelin's stonewalling | 5 |
| V. | Aspect Specifications | 11 |
| V.a. | Aspect Specification Annexes | 12 |
| V.b. | Instructions | 13 |
| V.c. | Tire Non Conforming Procedures (TNCs) | 13 |
| VI. | General Principles | 13 |
| VII. | Technical Notes | 14 |
| VIII. | Michelin's Aspect Specifications (and related documents), General Principles and Technical Notes are inextricably intertwined | 14 |

MR 0204

IX.     Reaction Tolerance and Limits for both Green and
Cured Tires      16

X.     Adjustment Data including Warranty Claims      16

     a.     Michelin Warranty Claims      17

     b.     Michelin's Tire Dealers Warranty Claims      18

XI.     Critical Evidence      18

XII.     Prejudice to Plaintiffs      19

Conclusion      20

MR 0205

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | 134TH JUDICIAL DISTRICT |
| VS. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | (Oral Argument Requested) |
| DEFENDANTS, | § | |

TO THE HONORABLE JUDGE DALE TILLERY:

COME NOW Plaintiffs complaining of Defendant MICHELIN'S intentional and deliberate failure to disclose critical documents and evidence requested since April:

**Plaintiffs' <u>Amended</u> Motion To Compel Michelin To Respond To Discovery And Identification Of Withheld Michelin Documents**

**I.** <u>Snapshot</u>: The 2012 Labor Day weekend had been great for the Medinas. The family reunion in Chicago was a success. Family, food, and fun. That was what life was all about. The Medinas were happy and on their way back home to St. Louis after a great weekend. Belted and fast asleep by her husband, Obdulia was in heaven. Suddenly, and without any warning the left rear Michelin LTX M/S comes apart with a loud noise. Try as he might, Obdulia's brother can't control his now disabled SUV. In the blink of an eye, it veers to the left and rolls over and over and over in the ditch median. When it stops, tragedy: Obdulia, the Medina mom, had become a quadriplegic.

Thus, this lawsuit is a products liability and negligence case arising out of the catastrophic failure of that defective Michelin LTX M/S tire on September 3, 2012 which caused

MR 0206

the quadriplegia of Plaintiff Obdulia Medina and a myriad of injuries to the other occupants. Just like it has done to many other families including the Velo family, Michelin's defectively designed and manufactured LTX M/S tire line just added another victim to its long list and Plaintiffs can prove it with Michelin's own documents. That is why Michelin refuses to produce the critical information, documents and evidence repeatedly requested since **April**. All of it reasonably calculated to lead to the discovery of admissible evidence in accordance with the Texas Rules of Civil Procedure.

**II.    Background:**   This Motion simply requests the Honorable Court to order Defendant Michelin to comply with the Texas discovery rules and produce the critical documents, information and evidence repeatedly asked for more than four (4) months since the beginning of **April 2015.**    *Requests for Production, Exhibit A.*  At the end of April, Michelin produced next to nothing. *Defendant's Responses, Exhibit B.* On May 11, 2015, after the hearing, in a meeting just outside this courtroom, and thereafter, defense counsel **repeatedly** promised that if Plaintiffs *just signed* Michelin's Protective Order, they would get the remaining documents:

> Your email is correct that **MNA anticipates being able to make its supplemental production within 10-14 days of the protective order being entered.**

*E-Mail from **Nelson Mullins**, counsel for MNA, May 28, 2015, Exhibit C.*

> [W]e will move forward with the agreed protective order and with **our supplemental production, which we would anticipate making within 10-14 days of entry of the protective order.**

*E-Mail from **Nelson Mullins**, counsel for MNA, May 29, 2015, Exhibit D.*

> **We are working on the production and still anticipate making it within 10-14 days of entry of the protective order** as originally estimated.

*E-Mail from **Nelson Mullins**, counsel for MNA, June 4, 2015, Exhibit E.*

2

MR 0207

Though Plaintiffs disagree with Protective Orders, in view of Michelin's repeated promises, Plaintiffs executed it. All a sham. Michelin's production at the *end of June* was a joke. It failed to produce about forty (40) of the fifty (50) requests for production. Despite countless e-mails, correspondence and phone calls by Plaintiffs' counsel concerning Michelin's production of documents about the design, inspection, testing, building, curing, quality control processes, manufacture and returns concerning Michelin LTX M/S tires, it is clear that Michelin has misled Plaintiffs about its production every step of the way.

So, on **July 16, 2015**, Plaintiffs informed Michelin that their production was extremely deficient and that they would seek sanctions from the Court. **In response Michelin did nothing.** They never tried to reach Plaintiffs' counsel by phone, e-mail or letter. So, on **August 3, 2015**, Plaintiffs sent another letter. **Still nothing.** The next day, on **August 4, 2015**, Plaintiffs' counsel David Shapiro directly contacted defense counsel about the deficient disclosure and was informed that the attorney in charge of Michelin's discovery was no longer working on the case. Mr. Shapiro did not give up. So, he contacted other Michelin counsel. Still, Michelin offered no additional production and Mr. Shapiro was told that the production of documents had to be *negotiated* with Michelin. Yet, again, Plaintiffs' counsel wrote to Michelin's counsel. Still, no additional production. Instead, Michelin played dumb, wasted time and acted like it did not know that their production was grossly deficient. Refusing to give up, the next day, **August 5, 2015**, Plaintiffs' counsel Luis Guerra called and also wrote to Michelin's counsel about its deficient disclosure. *Correspondence, Exhibit F.* In response, Plaintiffs' counsel got no documents and was told that Plaintiffs needed to *negotiate* the discovery with Michelin. Still, just four (4) days ago on **August 17, 2015**, during the depositions of the driver and his family, Plaintiffs' counsel again discussed this issue with defense counsel in Dallas, Texas. In response,

3

MR 0208

Plaintiffs' counsel was again told that they should know the process by now having done it in Velo and that they needed to *negotiate* the production with Michelin.

In short, after waiting nearly five (5) months and even executing Michelin's Protective Order, Michelin responded to about **ten (10)** of Plaintiffs' **fifty (50)** Requests for Production. Thousands of pages of relevant documents *intentionally concealed* and withheld by Michelin to prevent Plaintiffs from exposing their shoddy practices and known defects that led to this LTX M/S failure. Therefore, this Motion simply requests the Honorable Court to order Defendant Michelin to comply with the Texas discovery rules and produce the critical documents, information and evidence repeatedly asked for more than four (4) months since the beginning of **April 2015**.

**III.   Michelin's Discovery *Modus Operandi*:** The subject defective Michelin tire itself and the documents requested *together* with a plant inspection are critical evidence in this case. Michelin knows the critical importance of the documents and how they are interrelated to each other. Plaintiffs' counsel knows the documents because a couple of years ago they had a case similar to this one named Velo. *Similar* to Velo, the passengers of this vehicle were severely injured. *Similar* to Velo, a seat-belted mom became a quadriplegic, paralyzed from the neck down. *Similar* to Velo, this case involves a rollover caused by a defective Michelin tire coming apart on the highway. *Similar* to Velo, the defective Michelin tire is a light truck tire. *Similar* to Velo, the defective Michelin light truck tire is a LTX M/S. *Similar* to Velo, the defective Michelin LTX M/S was manufactured at Michelin's plant in Dothan, Alabama. *Similar* to Velo, the defective Michelin LTX M/S tire was manufactured in the year of 2001. *Similar* to Velo, the defective Michelin LTX M/S tire had a significant amount of useable and legal tread. The cases are so similar that in the present case Michelin demanded to use the exact same Protective Order

4

MR 0209

as the one used in Velo. *Similar* to Velo, one of Michelin's law firms handling the discovery is *Nelson Mullins.* So, because of *Velo* Plaintiffs' counsel knows that each of the documents requested is critical in this case.

Unfortunately, just like the *Velo* case and a myriad of other Michelin cases, stonewalling is Michelin's strategy and discovery practice. **First,** Michelin makes up its own self-serving scope of discovery and disregards the applicable Rules of Discovery. **Second,** Michelin claims it did nothing wrong, denies liability and discloses nothing. **Third,** Michelin promises to produce documents *after* it tricks the Plaintiffs into signing a Protective Order. **Fourth,** even after executing a Protective Order, Michelin still produces next to nothing. **Fifth,** Michelin alleges that procedural technicalities such as meet and confer[1] has not been met to further delay production. **Sixth,** Plaintiffs are forced to file motions to compel. This is not argument. This is a fact. There are multiple examples of Michelin's illegal course of conduct in Courts across the country. (Plaintiffs will search and obtain the best example they can and will provide it to the Court prior to the hearing on this motion).

This way the all mighty Michelin misdirects the lawsuit from its merits and forces the disabled quadriplegic Plaintiff to waste their limited resources in time consuming and expensive discovery disputes. As a result, the Plaintiffs gain nothing and waste precious time and resources. Just plain wrong. Therefore, Plaintiffs respectfully ask this Honorable Court to deal swiftly with Michelin's illegal conduct and order it to comply with the Rules of Civil Procedure and produce the long overdue requested discovery immediately or face severe sanctions.

**IV.** **Michelin's stonewalling:** At the inception of this products liability lawsuit, Plaintiffs served Michelin with discovery requests asking for products liability documentation concerning

---

[1] True to form a few days ago on August 13, 2015, Michelin's counsel wrote a letter threatening that meet and confer requirements were not complied with. *Defense counsel correspondence, August 13, 2015, Exhibit G.*

5

MR 0210

their LTX M/S tire. *Requests for Production, April 3, 2015, Exhibit A.* In response, Michelin withheld thousands of documents[2] about the design, testing, inspection, building, manufacture, and warranty claims of the subject tire. Here is the breakdown:

| **Summary of Information requested** | **Requested** | **Relevance** | **Produced?** |
|---|---|---|---|
| 1. Documents about the organizational structure of Michelin North America | 4/03/2015 | Design & Manufacture | **No** |
| 2. Aspect Specifications Repertoire and all its inclusive documents (criteria used by tire builders to test the production quality of tires) | 4/03/2015 | Manufacture | **No** |
| 3. General Principles | 4/03/2015 | Manufacture | **No** |
| 4. Tire date/expiration date materials produced by Michelin | 4/03/2015 | Design & Manufacture | **No** |
| 5. 2011 Michelin LTX M/S Data Sheet | 4/03/2015 | Design & Maintenance | **No** |
| 6. 2001 Michelin Limited Warranty Manual | 4/03/2015 | Maintenance | **Yes** |
| 7. Claim forms and consumer claims for Michelin LTX M/S tires returned for tread/belt separation. | 4/03/2015 | Design & Manufacture | **No** |
| 8. Discount Tire claims and code sheet for Michelin LTX M/S tires. | 4/03/2015 | Design & Manufacture | **No** |
| 9. Identify and produce copies of the model tire's and similar tires specifications, including belt skim stock, carcass ply, belt edge strip, and belt edge cushion or insert specifications, steel cord specifications, green tire specifications, cured tire specifications, tire building specifications, blueprints, drawings, schematics, diagrams, photographs, x-rays, I-rays, and/or | 4/03/2015 | Design & Manufacture | **No**[3] |

---

[2] In *Velo*, the case Defendants repeatedly cite that involved the same tire from the same manufacturing plant and the same year, Michelin produced in excess of 20,000 pages of documents. **Here, Michelin produced not even 10% of what it disclosed (after repeated Motions to Compel were filed) in Velo.**

[3] Compared to *Velo*, Michelin's production falls way short. In addition, Michelin failed to produce its **belt skim stock formula** pertaining to the subject tire. The rubber used between the steel belts is referred to as skim stock. **Skim stock** is what makes the belts adhere to one another. Therefore, the design of the skim stock and its resistance to degradation is critical evidence to understand the subject tire's resistance to tread belt separation failure like it happened here.

MR 0211

| | | | |
|---|---|---|---|
| holograms from the date those tires were manufactured to the present or to the end of production. | | | |
| 10. Identify and produce the reaction limit specifications and/or OPL Working Limits and Aging for the subject tire. | 4/03/2015 | Design & Manufacture | **No** |
| 11. Personal injury claims/lawsuits/testimony of current and former employees concerning passenger and light truck tires such as the subject LTX tire line | 4/03/2015 | Design & Manufacture | **No** |
| 12. Adjustment data re: subject tire (internal documents/data/return reasons/codes about how a tire is performing in the field) | 4/03/2015 | Design & Manufacture | **No** |
| 13. Property claims and all supporting documentation of such concerning the subject tire | 4/03/2015 | Design & Manufacture | **No**[4] |
| 14. Records of any communication between Michelin North America and any insurer, state or federal governmental entity, consumer or safety group or advocates relation to questions, insurance claims, trends, patterns or failure of the subject tire or model tires including but not limited to the subject of tread, ply, belt, and/or cord separation. | 4/03/2015 | Design & Manufacture | **No** |
| 15. Michelin North America's internal recommendations, determinations, or guidelines as to the acceptable or unacceptable rate or frequency of loss adjustment (how the tire is doing in the field) | 4/03/2015 | Design & Manufacture | **No** |
| 16. Design drawings of the subject tire. | 4/03/2015 | Design | **Yes** |
| 17. All non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Michelin North America alleging a tread separation of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line | 4/03/2015 | Design & Manufacture | **No** |
| 18. Adjustment data/personal injury claims/property damage claims from before and after the introduction of nylon cap plies (safety mechanism) in Michelin tires | 4/03/2015 | Design & Manufacture | **No** |

[4] Michelin identified only **two (2)** property claimants. No other information was provided.

MR 0212

| | | | |
|---|---|---|---|
| **19.** Training documents relating to the building, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the subject tire was manufactured. | 4/03/2015 | Manufacture | **No** |
| **20.** Audits performed by Michelin re: failure/durability/design or quality of the subject tire and similar tires | 4/03/2015 | Design & Manufacture | **No** |
| **21.** All training documents made available, at the time the subject tire was built, to persons who construct, manufacture or assemble tires or operate tire-building equipment at the plaint where the subject tire was built. | 4/03/2015 | Manufacture | **No** |
| **22.** All training program materials or other documents provided to Michelin North America's employees building P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line. | 4/03/2015 | Manufacture | **No** |
| **23.** Inspection methodology materials used to identify trapped air/steam blisters in finished tires (quality control procedures about the specific manufacturing defects in tires) | 4/03/2015 | Manufacture | **Yes** |
| **24.** Testing of steel belted radial passenger and light truck tires manufactured with the same belt skim stock as subject tire, including peel tests, pull tests, performance tests and endurance tests | 4/03/2015 | Design & Manufacture | **No** |
| **25.** Testing results relating to the relationship between under-inflation and tread separation | 4/03/2015 | Design & Manufacture | **No** |
| **26.** Rim groove analysis documenting the relationship between under-inflation, rim groove profile and tread belt separation | 4/03/2015 | Design & Manufacture | **No** |
| **27.** Department of Transportation testing concerning the Michelin LTX tires manufactured at the Dothan, Alabama plant | 4/03/2015 | Design & Manufacture | **No** |
| **28.** Curing conditions at the Dothan, AL plant used in the manufacture of the subject tire and any and all subsequent changes to the curing conditions | 4/03/2015 | Manufacture | **No** |
| **29.** Documents about 1) the use or potential use of nylon overlay/belt edge strips/belt edge wraps/belt edge gum strips in Michelin passenger or light truck tires and the application of such during the tire building process and 2) patents/articles/materials | 4/03/2015 | Design & Manufacture | **No** |

8

| | | | |
|---|---|---|---|
| authored by or in possession of Michelin re: use of nylon overlays in passenger/light truck tires (nylon overlays are layers of nylon that extend around the two steel belts underneath the tread to provide better tread/belt integrity) | | | |
| 30. Michelin's document retention policy from the time it manufactured the subject tire to the present. | 4/03/2015 | Document retention | **Yes** |
| 31. Written warranty for subject tire | 4/03/2015 | Maintenance | **Yes** |
| 32. Michelin documents/testing about tire aging/tolerances | 4/03/2015 | Tire aging | **No** |
| 33. Communications or correspondence between Michelin and any auto manufacturer and/or NHTSA concerning tire use limits or limit date of utilization for any and all passenger and light truck tires including the subject tire model. | 4/03/2015 | Tire aging | **No** |
| 34. Cut analyses and reports on the subject tire from manufacturing release to time of the subject tire's date of manufacture (analyses of returned cut tire sections) | 4/03/2015 | Design & Manufacture | **No** |
| 35. Cured, finished gauges for the manufacture of the subject tire (thickness levels for the components of the subject tire) | 4/03/2015 | Design | **Yes** |
| 36. Process control chart in place at the time of the manufacture of the subject tire | 4/03/2015 | Manufacture | **No** |
| 37. Quantitative listing of the ingredients of the subject tire's inner liner in use at the time of the manufacture of the subject tire. | 4/03/2015 | Design & Manufacture | **No** |
| 38. DFMEA or PFMEA testing/results and documentation of the subject tire and any other tires incorporating its exact green tire construction. | 4/03/2015 | Design | **No** |
| 39. Design and production tolerances for the subject tire in effect at the time of its manufacture. | 4/03/2015 | Design & Manufacture | **No** |
| 40. Michelin's regulatory compliance test results for the subject tire including endurance tests, high speed endurance tests, plunger energy tests, bead unseat tests | 4/03/2015 | Design | **No** |
| 41. Adjustment data/property damage claims after the introduction of design changes to the subject tire since the date of the subject tire's manufacture | 4/03/2015 | Design & Manufacture | **No** |

9

MR 0214

| | | | |
|---|---|---|---|
| **42.** Aspect specifications including Indexes and Table of Contents (inspection instructions to find defects in manufactured tires) | 4/03/2015 | Manufacture | **No** |
| **43.** Index of any and all technical bulletins concerning passenger and light truck tires | 4/03/2015 | Communication | **No** |
| **44.** Discovery produced by Michelin in *Velo, et. al. v. Michelin, et. al., filed in Maricopa County Superior Court, CV2012-007346* involving the same exact brand and model tire from the same Michelin plant manufactured just a few weeks apart. | 4/03/2015 | Design & Manufacture | **No** |
| **45.** Depositions with exhibits given by Michelin employees Randall Clark, Michael Wiscchusen, Michael Riley, Paul Northrop and Tom Gruenholz who are the most knowledgeable individuals about tire aging, communication with NHTSA, manufacturing, design and adjustment data regarding the subject tire | 4/03/2015 | Design & Manufacture | **No** |
| **46.** Quality control/work procedures including but not limited to: TNC and TNC3R-A work procedures/instructions (tire non-conforming manufacturing instructions) | 4/03/2015 | Manufacture | **No** |
| **47.** Michelin's Technical Notes/Technical Note Repertoire (quality control instructions for tire inspectors to detect and eliminate defects) | 4/03/2015 | Manufacture | **No** |
| **48.** Michelin's Print Advertising concerning the subject tire. | 4/03/2015 | Communication | **No** |
| **49.** Michelin Owner's Manual and Tire Fitment Guide | 4/03/2015 | Maintenance | **Yes** |
| **50.** [5]Michelin's PowerPoint Presentation made to NHTSA | 4/03/2015 | Communication | **Yes** |

*Michelin's Supplemental responses, Exhibit H.*

The evidence is clear: Michelin's stonewalling is undeniable. It reveals Michelin's arrogance and total and complete disregard for: **a)** the Texas judicial system, **b)** this Honorable Court's authority, **c)** the sacred nature of the discovery process, and **d)** the quadriplegic

---

[5] Each of Plaintiffs' separate requests addresses *specific* Michelin documents which Michelin is withholding and refuses to produce.

10

Plaintiff and her family. To illustrate the blatant and intentional extent of Michelin's concealment, as a matter of example, we will address just a few of the requested documents: **1)** Aspect Specifications, **2)** General Principles, **3)** Technical Notes, **4)** Adjustment Data including Warranty Claims, and **5)** Reaction Limits and Tolerances for the green[6] and cured tires.

# DOCUMENTS

# FILED UNDER SEAL

11

MR 0216

# DOCUMENTS
# FILED UNDER SEAL

12

MR 0217

# DOCUMENTS
# FILED UNDER SEAL

13

MR 0218

# DOCUMENTS
# FILED UNDER SEAL

14

# DOCUMENTS
# FILED UNDER SEAL

15

MR 0220

# DOCUMENTS
# FILED UNDER SEAL

16

MR 0221

# DOCUMENTS
# FILED UNDER SEAL

17

MR 0222

# DOCUMENTS
# FILED UNDER SEAL

18

MR 0223

# DOCUMENTS

# FILED UNDER SEAL

## XII.  Prejudice to Plaintiffs

Michelin's actions are extremely prejudicial to Plaintiffs preventing them from conducting products liability discovery in this case.  For instance, Plaintiffs cannot conduct discovery or depose Michelin's witnesses and employees about 1) manufacturing and/or design defects, 2) the manufacturing and design process, 3) the Aspect Specifications, 4) the General Principles, 5) the Technical Notes, 6) Quality Control, 7) Classification of tires, 8) Repair procedures, 9) the LTX M/S reacted tolerance limits, 10) manufacturing and design of the LTX M/S, 11) the warranty claims on the LTX M/S, 12) problems occurring during manufacturing, 13) the tire inspection process and damage analyses, etc., etc., etc.  Without these documents, Michelin prevents: a) Plaintiffs from conducting products liability discovery, b) prevent Plaintiffs' experts from obtaining the necessary foundation, and c) further prevents Plaintiffs from cross-examining Michelin's experts.  Even worse, Michelin will attempt to be rewarded for its absconsion of evidence by filing Motions for Summary Judgment, *Daubert* Motions and Motions to Exclude Plaintiffs' liability expert - claiming that they did not have reliable data

MR 0224

information or evidence supporting their opinions. Thus, Michelin's stonewalling is extremely prejudicial to Plaintiffs.

Michelin's delays are even more egregious when one considers the spastic quadriplegic Obdulia. It is easy to forget and lose sight of the real Plaintiffs including Obdulia whose life was destroyed by Michelin's defective tire. Now, they add insult to injury, preventing discovery and withholding relevant evidence. All this to prevent Obdulia and her family from having their day in Court. **Obdulia has no time to waste.** Her life as a result of the defective Michelin's tire failure is unbearable. She cannot walk. She cannot move. She cannot even turn herself around in bed. She cannot cut her own food. She cannot even open her pill box with her hands to take her strict daily prescription regimen. She cannot urinate or evacuate like a normal human being. Her husband and children have to excavate feces out of her rectum. She cannot perform the most basic human functions. She repeatedly contracts deadly bed sores, and urinary tract infections which require frequent hospitalizations – all of which a direct result of Michelin's defective tire failure.

**<u>Conclusion</u>:     Michelin intentionally withheld and concealed the Aspect Specifications and all corresponding documents. Michelin intentionally withheld and concealed the General Principles. Michelin intentionally withheld and concealed the Technical Notes and related documents. Similarly, Michelin intentionally withheld and concealed all the Reaction and Tolerance Limits documents. In addition, Michelin withheld and concealed the adjustment data and thousands of warranty claims as well as all the internal documents it uses to identify, adjust and evaluate the returned defective tires after they leave the plant.**

20

MR 0225

Conversely, Plaintiffs have diligently assisted Michelin in their discovery by: 1) shipping the defective tire to Michelin for their forty-five (45) day inspection, 2) making the vehicle available for inspection to Michelin's experts, 3) producing Plaintiffs and family for depositions, and 4) assisting in the depositions of the driver and family. In all, nine (9) depositions that Plaintiffs made possible and available to Michelin. Plaintiffs have given Michelin access to all they needed to conduct their discovery and further their defenses.

The facts speak for themselves. Michelin knows the importance of the documents requested and how critical the information is. So, Michelin made a conscious and intentional decision to withhold and conceal them. This is Michelin's *modus operandi*. Defiant, arrogant, and in disregard of the Texas Rules of Civil Procedure. When Michelin is sued, Michelin acts like they have their own special rules of civil procedure and: 1) discloses nothing, 2) delays always, and 3) prevents justice. Michelin's conduct directly violates the Texas discovery rules, the fundamental principles of litigation, and the authority of this Honorable Court. Michelin's actions corrupt the integrity of the legal process and make a mockery of the Texas justice system.

This cannot be tolerated. This is not how litigation is done in the Lone Star State. The tortfeasor does not control the litigation process and usurps from the Great State of Texas its exclusive power to determine the Rules of Civil Procedure and its prescribed scope of discovery. Moreover, with a fast approaching expert disclosure deadline, time is of the essence. Accordingly, pursuant to *Tex. R. Civ. P. 215.2*, Plaintiffs respectfully request this Honorable Court[15] to order Defendant Michelin to immediately produce the requested information and documents and "make such orders . . . as are just."

---

[15] The choice of authorized sanctions is within the sound discretion of the trial court. *In re Estate of Marley*, 390 S.W.3d 421, 424 (Tex. App. 2012).

21

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:    */s/ Luis P. Guerra*
       Luis P. Guerra (*Admitted Pro Hac Vice*)
       AZ State Bar No. 015768
       David C. Shapiro (*Admitted Pro Hac Vice*)
       AZ State Bar No. 028056
       ATTORNEYS FOR PLAINITFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference concerning Plaintiffs' Requests for Production and Michelin's responses and despite best efforts the counsel have not been able to resolve those matters presented.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 24st day of August, 2015.

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

22

MR 0227

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

/s/ David C. Shapiro
David C. Shapiro

23

MR 0228

# EXHIBIT A

MR 0229

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § § | |
| VS. | § § | 134th JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | DALLAS COUNTY, TEXAS |
| DEFENDANTS | § § | |

## PLAINTIFF'S FIRST SET OF REQUEST FOR PRODUCTION TO DEFENDANT, MICHELIN NORTH AMERICA, INC.

TO:   Defendant, Michelin North America, Inc.:

COME NOW, Plaintiffs, by and through their attorney of record, Luis P. Guerra, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016:

Plaintiff in the above entitled and numbered cause, and subject to the provisions of Rule 197, 196 of the Texas Rules of Civil Procedure, propounds the following Requests for Production to Defendant, MICHELIN NORTH AMERICA, INC.

The questions which follow are to be considered as continuing, and you are requested to provide, by way of supplemental answers hereto, additional information as you or any other person acting on your behalf may hereafter obtain which will augment or otherwise modify your answers given to the questions below. Such supplemental answers are to be served upon this party immediately upon receipt of such information.

PRFP00001

MR 0230

Pursuant to the provisions of Rule 197 of the *Texas Rules of Civil Procedure*, the above person is instructed to answer the following written Interrogatories separately and fully, in writing and under oath, have the answers to the Interrogatories signed by said person and duly notarized and to serve a true copy of the answers on the undersigned attorney within fifty (50) days after service hereof.

Pursuant to Rule 196 of the *Texas Rules of Civil Procedure*, Plaintiff requests that Defendant serve written responses to the following Request for Production and produce and permit Plaintiff to inspect and copy all documents which are related in any manner either to an individual item or to a category described and enumerated in the following Requests for Production. Defendant shall serve written responses to the Request for Production and shall produce each and all of the documents for inspection and copying by not later than 10:00 a.m., fifty (50) days after receipt of these requests, at the LAW OFFICES OF LUIS P. GUERRA, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016.

Pursuant to Rule 198 of the *Texas Rules of Civil Procedure*, Plaintiff requests that Defendant admit the truth of each of the matters set forth below. You are advised that each of the requests below shall be deemed admitted unless you cause to be delivered to within fifty (50) days after receipt of these requests, at the LAW OFFICES OF LUIS P. GUERRA, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016.

1. Identify and produce the organizational charts showing the functions and reporting structure of Michelin North America's departments, divisions, or units, whether domestic or foreign, responsible, either directly or indirectly, for: research, design and development; manufacturing and production; quality control of the subject tire and the model tires.

2

PRFP00002

MR 0231

2. Identify and produce true, complete and accurate Michelin's Decision Tree Manual also known as Michelin's Aspect Specifications.

3. Please produce true, complete and accurate copies of the General Principals.

4. Please produce any position paper regarding tire date limitations produced by any employee or past employee of Michelin North America including but not limited to any and all drafts and Versions of the paper titled "Limit Date of Utilization."

5. Please produce a true, complete and accurate copy of the 2011 Michelin LTX M/S Data Sheet.

6. Please produce a true, complete and accurate copy of the 2001 Michelin Limited Warranty Manual.

7. Please produce true, complete and accurate copy of any and all limited warranty claim forms and consumer claims for Michelin LTX M/S tires returned for tread/belt separation.

8. Please produce true, complete and accurate copies of Discount Tire claims and code sheet for Michelin LTX M/S tires.

9. Identify and produce copies of the model tire's and similar tires specifications, including belt skim stock, carcass ply, belt edge strip, and belt edge cushion or insert specifications, steel cord specifications, green tire specifications, cured tire specifications, tire building specifications, blueprints, drawings, schematics, diagrams, photographs, x-rays, I-rays, and/or holograms from the date those tires were manufactured to the present or to the end of production. This request includes documents, including but not limited to change orders and product change proposals (including product change proposals that were not adopted) relating to changes in the specifications for the production life of the model tire and tires that replaced the model tire. This request includes specifications and change documents for the model tire prepared prior to the manufacture of the subject tire. This request also includes any tire data book or Tire Fitment Guide covering the subject model tire.

10. Identify and produce the reaction limit specifications and/or OPL Working Limits and Aging for the subject tire.

11. Identify and produce any and all documents, relating to personal injury claims and/or lawsuits involving separations, or alleged separations of Michelin North America B2001 P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and

3

PRFP00003

MR 0232

all tires from the same LTX tire line from the date those tires were first manufactured to the present or to the end of production. This request also includes incident reports, accident reports, correspondence, and photographs. Also, as to lawsuits, this request includes copies of complaints, discovery responses of Michelin North America, reports of both plaintiffs' and defendants' experts, and deposition and trial testimony of current and former Michelin North America employees and experts. Also please produce a summary of this data.

12. Identify and produce any and all documents, relating to adjustment of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured by Michelin North America with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire, bearing separation related adjustment codes, including but not limited to any and all adjustment codes for tread separation, belt edge separation, separation between the belts, separations between the inner belt and outer body ply, separations between the body piles, separations between the cushion and number one or bottom belt, separations in the sidewall or bead area; all this information from the date the tires were first manufacture to the present or end of production. This request includes, but is not limited to adjustment forms, adjustment tickets, and summaries, including computer and graphical summaries of adjustment forms or adjustment tickets, manuals relating to the adjustment and inspection of tires and the documentation necessary to interpret adjustment records, including the service condition codes index and/or adjustment records. Also, please produce a summary of this adjustment data stating for each tire, the model and size, the month and year of manufacture, the date of the adjustment or rejection of the claim and the state where the adjustment claim or form was made or submitted.

13. Identify and produce any and all documents, computer generated transmissions, such as email, computer printouts, programs, tapes, photographs, and videotapes relating to property damage claims involving separations, or alleged separations, in Michelin North America P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire from the date those tires were first manufactured to the present or to the end of production. This request includes incident reports, accident reports, correspondence, and photographs for every property damage claim arising out of belt separations, belt edge separations, separations between the inner belt and the outer body ply, separations between the body piles, separations between the cushion and the number one, or bottom belt, and separations in the sidewall or bead area.

14. All records of any communication between Michelin North America and any insurer, state or federal governmental entity, consumer or safety group or

4

PRFP00004

MR 0233

advocates relation to questions, insurance claims, trends, patterns or failure of the subject tire or model tires including but not limited to the subject of tread, ply, belt, and/or cord separation.

15. All documents that contain Michelin North America's internal recommendations, determinations, or guidelines as to the acceptable or unacceptable rate or frequency of loss adjustment or any rate of frequency of loss adjustment that requires that action be taken or notification be given by or to any internal Michelin North America persons or organizations.

16. Please produce true, complete and accurate copies of the design drawings for the subject tire.

17. All non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Michelin North America alleging a tread separation of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line documenting similar tires tread, belt, ply or cord separation or detachment, whether partial or full.

18. Identify and produce any and all documents, relating to personal injury claims and/or lawsuits, property damage claims and adjustments involving separations, or alleged separations of similar Michelin North America tires that contain nylon cap pules from the date the similar tire was first manufacture to the present or end of production.

19. Identify and produce any and all documents, relating to the building, tire builder training, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the subject tire was manufactured. This request includes, but is not limited to standard practice binders, tire building manuals, tire builder training manuals, equipment manuals, and/or other materials and videotapes used to train tire builders. This request also includes documents, photographs, and charts used to illustrate defects, or potential defects, in tires and/or problems or potential problems in the tire building process.

20. Identify and produce any audits, reports, examinations, investigations, studies, or reviews, including any work papers, whether created within or outside Michelin North America, in any manner related to the return, failure, performance, durability, and life expectancy, design, or quality of the subject tire and model tires.

21. All training documents made available, at the time the subject tire was built, to persons who construct, manufacture or assemble tires or operate tire-building equipment at the plaint where the subject tire was built.

5

PRFP00005

MR 0234

22. All training program materials or other documents provided to Michelin North America's employees building P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line.

23. All inspection methodology materials or other documents uses or followed to determine any trapped air/steam blisters in finished tires.

24. Any and all documents relating to testing of steel belted radial passenger and light truck tires manufactured with same belt skim stock code as the subject tire at the Dothan, Alabama plant where the subject tire was manufacture. This request includes documents relating to peel tests, pull tests, performance tests, and endurance tests whether conducted on a test wheel or a test track.

25. Any and all documents relating to under-inflation testing that led to tread separation.

26. Any and all documents relating to rim groove analysis in which the rim groove profile was generated by under-inflation and led to tread belt separations.

27. All Department of Transportation (DOT) testing related to all "Michelin LTX" tires manufactured at the Dothan Alabama plant.

28. The curing conditions at the Dothan Plant that were used for the curing of the subject tire and any subsequent changes to those curing conditions.

29. Any and all documents, relating to the use or potential use of nylon overlays, or belt edge strips, or belt edge wraps belt edge gum strips in passenger or light truck tires and the application of the nylon overlays, belt edge strips or belt edge wraps during the tire building process. Also, please produce copies of any documents, including patents and articles in possession of Michelin North America discussing the use or potential use of nylon overlays, or belt edge strips, and/or belt edge wraps in passenger or light truck tires manufactured and/or designed by Michelin North America. This request specifically includes patents discussing the use of nylon overlays or belt edge strips or belt edge wraps. This request also includes brochures, charts, and/or illustrations of Michelin North America tires with nylon overlays, including but not limited to illustrations supplied to Michelin North America dealers or service centers.

30. Identify and produce all documents that discuss Michelin's document retention policy from the time it manufactured the subject tire to the present.

31. The written warranty in effect for the subject tire.

6

PRFP00006

MR 0235

32. Any and all documents that discuss Michelin's recommendations regarding tire aging including Michelin's testing to support those recommendations including any and all technical bulletins.

33. Produce a complete copy of any communications or correspondence between Michelin and any auto manufacturer and/or NHTSA concerning tire use limits or limit date of utilization for any and all passenger and light truck tires including the subject tire model.

34. Please produce true, complete and accurate copies of any and all cut analysis (sectional) reports on the subject tire from production release to time of subject tire's manufactured date or architecture reportoire.

35. Please produce all cured, finished gauges for the manufacture of the subject tire.

36. Please produce true, complete and accurate copies of the plant's process control chart or documentation at the time of the manufacture of the subject tire.

37. Please produce true, complete and accurate copies of the quantitative listing of the ingredients of the subject tire's inner liner in use at the time of the manufacture of the subject tire.

38. Please produce true, complete and accurate copies of any and all DFMEA or PFMEA documentation of the subject tire and any other tires incorporating its exact green tire construction.

39. Please produce the design and production tolerances for the subject tire in effect at the time of its manufacture.

40. Please produce true, complete and accurate copies of any and all specific regulatory compliance test results for the subject tire and all associated brand and line name tires sharing the same green tire construction as the subject tire from production release to present, including but not limited to endurance tests, high speed endurance tests, plunger energy tests, bead unseat tests all for FMVSS requirements.

41. Please produce the adjustment and claim data for the subject tire and all associated brand and line name tires sharing the same green tire construction after each change to design occurring after the manufacture date of the subject tire.

7

PRFP00007

MR 0236

42. Please produce true, complete, and accurate copies of all the aspect specifications including Indexes and Table of Contents.

43. Please produce an index of any and all technical bulletins.

44. Please produce a true, complete and accurate copy of all discovery produced by Michelin in *Velo, et. al. v. Michelin, et. al., filed in Maricopa County Superior Court, CV2012-007346.*

45. Please provide true, complete and accurate copies of any and all depositions with exhibits given by Michelin employees Randall Clark, Michael Wiscchusen, Michael Riley, Paul Northrop and Tom Gruenholz.

46. Please provide true, complete and accurate quality control/work procedures including but not limited to: TNC and TNC3R-A work procedures/instructions.

47. Please provide true, complete and accurate copies of Michelin Technical Notes.

48. Please provide true, complete and accurate copies of Michelin's Print Advertising concerning the subject tire.

49. Please provide true, complete and accurate copies of Michelin's Owners Manual and Tire Fitment Guide.

50. Please provide a true, complete and accurate copy of Michelin's Power Point Presentation made to NHTSA on November 1, 2006.

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
(602) 381-8400 - Office
(602) 381-8403 - Fax

By: _____
Luis P. Guerra, Esq.
State Bar No. 015768
David C. Shapiro, Esq.
State Bar No. 028056

8

PRFP00008

MR 0237

ATTORNEY FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via U.S. Mail, on this day of April, 2015.

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

/s/ David C. Shapiro
David C. Shapiro

9

PRFP00009

MR 0238

# EXHIBIT B

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) | IN THE DISTRICT COURT OF |
| | ) | |
| PLAINTIFFS, | ) ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

### MICHELIN NORTH AMERICA, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUEST FOR PRODUCTION

TO: Plaintiffs, by and through their attorneys of record, Luis P. Guerra, David C. Shapiro, Luis P. Guerra, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016 and James B. Ragan, Law Offices of James B. Ragan, 723 Coleman Ave., Corpus Christi, Texas 78401 and Noel Sevastianos, Sevastianos & Associates, PC, 120 S. Central Avenue, Suite 130, St. Louis, Missouri 63105.

COMES NOW Michelin North America, Inc. ("MNA"), defendant in the above-styled and numbered cause, and submits these, its responses and objections to Plaintiff's First Set of Request for Production.

Respectfully submitted,

GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

PRFP00010

MR 0240

By: _____

Thomas M. Bullion III
tbullion@germer-austin.com
State Bar No. 03331005
Chris A. Blackerby
cblackerby@germer-austin.com
State Bar No. 00787091

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 30th day of April, 2015.

Luis P. Guerra                          *Via Certified Mail, Return Receipt Requested*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

James B. Ragan                          *Via Regular Mail*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

Noel Sevastianos                        *Via Regular Mail*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars          *Via Regular Mail*
6422 Day Street
Dallas, Texas 85227
*Pro Se*

_____

Thomas M. Bullion III/Chris A. Blackerby

4526987                                 2

PRFP00011

MR 0241

## INTRODUCTION

The tire at issue in this case is a Michelin LTX M/S P255/70R16 tire bearing DOT number B7LBEVUX3101 (the "tire in question"). The tire in question was designed by Michelin Americas Research & Development Corporation ("MARC"), which merged with and became a division of MNA on January 1, 2008, and manufactured by MNA during the 31st week of 2001 at its Dothan, Alabama plant. Unless otherwise indicated, MNA's responses are limited to information concerning the tire in question and tires built to the specification in place for the tire in question at the Dothan, Alabama plant during the sixth months before and six months after the date of manufacture of the tire in question (the "relevant scope").

## TRADE SECRETS OBJECTION

MNA objects to many of the discovery requests because they seek information and/or documents that are of a confidential, proprietary or commercially sensitive nature to MNA, exempt from discovery under notions of constitutional privacy and/or that may be covered by or be the subject of express or implied confidentiality, secrecy or nonpublication agreements or understandings. To the extent necessary, MNA objects to the discovery requests in that they seek the discovery of trade secret information and documents, including confidential research, development and technical information. MNA states that information and documents responsive to some of the discovery requests may have been withheld because these discovery requests seek privileged information and privileged documents that constitute the trade secrets of MNA. Disclosure of these trade secrets would result in substantial prejudice and harm to MNA. Therefore, MNA contends it is essential to MNA's operations that its work and documents remain confidential.

Texas law protects the disclosure of MNA's trade secrets. A trade secret may consist of any trade formula, pattern, device or compilation of information that is used in one's business

4526987                                      3

PRFP00012

MR 0242

and gives one an opportunity to obtain an advantage over competitors who do not know or use it. Computer Assoc. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 453 (Tex. 1996) (citing Hyde Corp. v. Huffines, 314 S.W.2d 763, 776 (1958)).

MNA's confidential policies, research, development and technical information are valuable and crucial trade secrets of MNA that give it an advantage over its competitors in a highly competitive and secretive industry. Moreover, MNA makes reasonable efforts to maintain the secrecy of this information, the information is of substantial value to MNA, the information would be very valuable to MNA's competitors, and the information derives its value by virtue of the effort of its creation and lack of dissemination. Accordingly MNA believes such information constitutes a trade secret and should be protected from disclosure.

Unless otherwise stated in its responses, MNA is not withholding any privileged documents/information within the relevant scope. However, to the extent plaintiffs do not agree with the scope of MNA's discovery responses, MNA reserves the right to have its objections to scope ruled upon prior to expanding the scope of its responses and its search for responsive and/or privileged documents/information.

Subject to the foregoing, MNA hereby answers the individual requests as follows:

## RESPONSE TO REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Identify and produce the organizational charts showing the functions and reporting structure of Michelin North America's departments, divisions, or units, whether domestic or foreign, responsible, either directly or indirectly, for: research, design and development; manufacturing and production; quality control of the subject tire and the model tires.

### RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request relating to the Dothan, Alabama plant during the relevant scope. Upon entry of an

4526987                                  4

PRFP00013

MR 0243

appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request because it is overly broad and because it seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 2:

Identify and produce true, complete and accurate Michelin's Decision Tree Manual also known as Michelin's Aspect Specifications.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for the components and processes identified during the relevant scope.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the plant and time period relevant to this action.

4526987                                5

PRFP00014

MR 0244

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 3:

Please produce true, complete and accurate copies of the General Principals.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the plant and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 4:

Please produce any position paper regarding tire date limitations produced by any employee or past employee of Michelin North America including but not limited to any and all drafts and Versions of the paper titled "Limit Date of Utilization."

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request. To the extent this request seeks documents outside the

PRFP00015

MR 0245

relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 5:

Please produce a true, complete and accurate copy of the 2011 Michelin LTX M/S Data Sheet.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

REQUEST FOR PRODUCTION NO. 6:

Please produce a true, complete and accurate copy of the 2001 Michelin Limited Warranty Manual.

RESPONSE:

MNA produces the limited warranty manual as MNA-MEDINA-0001270 - MNA-MEDINA-0001285.

PRFP00016

MR 0246

<u>REQUEST FOR PRODUCTION NO. 7:</u>

Please produce true, complete and accurate copy of any and all limited warranty claim forms and consumer claims for Michelin LTX M/S tires returned for tread/belt separation.

<u>RESPONSE:</u>

MNA produces claim forms and consumer claims for the model of the tire in question manufactured at Dothan during the relevant scope returned with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000001 - MNA-MEDINA-0000010, MNA-MEDINA-0000151, and MNA-MEDINA-0000231 - MNA-MEDINA-0000259. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for tires common green to the tire in question, if any exist. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

<u>REQUEST FOR PRODUCTION NO. 8:</u>

Please produce true, complete and accurate copies of Discount Tire claims and code sheet for Michelin LTX M/S tires.

<u>RESPONSE:</u>

MNA produces Discount Tire claim forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000231 and MNA-MEDINA-0000260 - MNA-MEDINA-0000563. Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request for tires common green to the tire in question, if any exist. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and

4526987                                             8

PRFP00017

MR 0247

seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 9:

Identify and produce copies of the model tire's and similar tires specifications, including belt skim stock, carcass ply, belt edge strip, and belt edge cushion or insert specifications, steel cord specifications, green tire specifications, cured tire specifications, tire building specifications, blueprints, drawings, schematics, diagrams, photographs, x-rays, I-rays, and/or holograms from the date those tires were manufactured to the present or to the end of production. This request includes documents, including but not limited to change orders and product change proposals (including product change proposals that were not adopted) relating to changes in the specifications for the production life of the model tire and tires that replaced the model tire. This request includes specifications and change documents for the model tire prepared prior to the manufacture of the subject tire. This request also includes any tire data book or Tire Fitment Guide covering the subject model tire.

RESPONSE:

MNA produces the data book and fitment guide relating to the model of the tire in question during the relevant scope as MNA-MEDINA-0000152 - MNA-MEDINA-0000230 and MNA-MEDINA-0000564 - MNA-MEDINA-0001192. Upon entry of an appropriate confidentiality order, MNA will search for and produce the specifications, change documents, and mold drawings for tires in the relevant scope. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

4526987                                    9

PRFP00018

MR 0248

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA specifically objects to this request to the extent it seeks production of MNA's rubber compound formulas. Rubber compound formulas are trade secrets that are closely guarded and protected by MNA. The information is of significant value to and is not known to MNA's competitors. Plaintiffs have not demonstrated any need to discover these valuable trade secrets of MNA.

REQUEST FOR PRODUCTION NO. 10:

Identify and produce the reaction limit specifications and/or OPL Working Limits and Aging for the subject tire.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

4526987                                        10

PRFP00019

MR 0249

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 11:

Identify and produce any and all documents, relating to personal injury claims and/or lawsuits involving separations, or alleged separations of Michelin North America B2001 P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line from the date those tires were first manufactured to the present or to the end of production. This request also includes incident reports, accident reports, correspondence, and photographs. Also, as to lawsuits, this request includes copies of complaints, discovery responses of Michelin North America, reports of both plaintiffs' and defendants' experts, and deposition and trial testimony of current and former Michelin North America employees and experts. Also please produce a summary of this data.

RESPONSE:

MNA produces MNA-MEDINA-0000131 - MNA-MEDINA-0000150 for the model of the tire in question manufactured at the Dothan plant during the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce any lawsuit complaints, or documents identifying any personal injury claims, concerning tires common green to the tire in question during the relevant scope, if any exist. MNA objects to this request as being vague and ambiguous in its use of the term "B2001" as that term is undefined. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined.

To the extent this request seeks documents outside the relevant scope, and to the extent it seeks documents in addition to those which identify personal injury claims, or lawsuit complaints, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the

4526987                                      11

PRFP00020

MR 0250

scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 12:

Identify and produce any and all documents, relating to adjustments of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured by Michelin North America with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire, bearing separation related adjustment codes including but not limited to any and all adjustment codes for tread separation, belt edge separation, separation between the belts, separations between the inner belt and outer body ply, separations between the body piles, separations between the cushion and number one or bottom belt, separations in the sidewall or bead area; all this information from the date the tires were first manufacture to the present or end of production. This request includes, but is not limited to adjustment forms, adjustment tickets, and summaries, including computer and graphical summaries of adjustment forms or adjustment tickets, manuals relating to the adjustment and inspection of tires and the documentation necessary to interpret adjustment records, including the service condition codes index and/or adjustment records. Also, please produce a summary of this adjustment data stating for each tire, the model and size, the month and year of manufacture, the date of the adjustment or rejection of the claim and the state where the adjustment claim or form was made or submitted.

RESPONSE:

MNA produces the warranty claim procedure manual for the relevant scope as MNA-MEDINA-0001193 - MNA-MEDINA-0001220 and claim forms for the model of the tire in question manufactured at Dothan during the relevant scope with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000001 - MNA-MEDINA-0000010 and MNA-MEDINA-0000231 - MNA-MEDINA-0000259. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to

4526987                                    12

PRFP00021

MR 0251

the tire in question manufactured at Dothan during the relevant scope for the condition of a tread or belt separation, if any exist. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any exist. To the extent this request seeks documents concerning codes that are not relevant to the condition of the tire in question and plaintiffs' claims in this matter, or seeks information concerning tires outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 13:

Identify and produce any and all documents, computer generated transmissions, such as email, computer printouts, programs, tapes, photographs, and videotapes relating to property

4526987

13

PRFP00022

MR 0252

damage claims involving separations, or alleged separations, in Michelin North America P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire from the date those tires were first manufactured to the present or to the end of production. This request includes incident reports, accident reports, correspondence, and photographs for every property damage claim arising out of belt separations, belt edge separations, separations between the inner belt and the outer body ply, separations between the body piles, separations between the cushion and the number one, or bottom belt, and separations in the sidewall or bead area.

RESPONSE:

MNA produces MNA-MEDINA-0000151 which contains information responsive to this request regarding property damage claims for the model of the tire in question manufactured at Dothan during the relevant scope with the condition of a tread or belt separation. After a reasonable and diligent search, MNA has not located any documents responsive to this request regarding property damage claims for the tires common green to the tire in question manufactured at Dothan during the relevant scope with the condition of a tread or belt separation. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, and to the extent it seeks documents in addition to those which identify personal injury claims or lawsuit complaints, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion.

4526987                                  14

PRFP00023

MR 0253

See <u>Barcenas v. Ford Motor Co.</u>, 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); <u>McCloud v. Goodyear Dunlop Tires NA, Ltd.</u>, 2006 WL 64491, *1 (C.D. Ill. 2006). MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges.

REQUEST FOR PRODUCTION NO. 14:

All records of any communication between Michelin North America and any insurer, state or federal governmental entity, consumer or safety group or advocates relation to questions, insurance claims, trends, patterns or failure of the subject tire or model tires including but not limited to the subject of tread, ply, belt, and/or cord separation.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 15:

All documents that contain Michelin North America's internal recommendations, determinations, or guidelines as to the acceptable or unacceptable rate or frequency of loss adjustment or any rate of frequency of loss adjustment that requires that action be taken or notification be given by or to any internal Michelin North America persons or organizations.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and

4526987                                   15

PRFP00024

MR 0254

seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 16:

Please produce true, complete and accurate copies of the design drawings for the subject tire.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request, if any.

REQUEST FOR PRODUCTION NO. 17:

All non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Michelin North America alleging a tread separation of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line documenting similar tires tread, belt, ply or cord separation or detachment, whether partial or full.

RESPONSE:

MNA produces consumer claims for the model of the tire in question manufactured at Dothan during the relevant scope returned with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000151. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce consumer claims for the tires common green to the tire in question manufactured at Dothan during the relevant scope with the allegation of the condition of a tread or belt separation, if any exist.

4526987                                      16

PRFP00025

MR 0255

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Further, the tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

REQUEST FOR PRODUCTION NO. 18:

Identify and produce any and all documents, relating to personal injury claims and/or lawsuits, property damage claims and adjustments involving separations, or alleged separations of similar Michelin North America tires that contain nylon cap plies from the date the similar tire was first manufacture to the present or end of production.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. No tires in the relevant scope were manufactured with nylon cap plies. MNA objects to this request as being vague and ambiguous in its use of the term "nylon cap plies" and "similar tires," as those terms are undefined.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 19:

Identify and produce any and all documents, relating to the building, tire builder training, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the subject tire was manufactured. This request includes, but is not limited to standard practice binders, tire building manuals, tire builder training manuals, equipment manuals, and/or other

4526987                                                17

PRFP00026

MR 0256

materials and videotapes used to train tire builders. This request also includes documents, photographs, and charts used to illustrate defects, or potential defects, in tires and/or problems or potential problems in the tire building process.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 20:

Identify and produce any audits, reports, examinations, investigations, studies, or reviews, including any work papers, whether created within or outside Michelin North America, in any manner related to the return, failure, performance, durability, and life expectancy, design, or quality of the subject tire and model tires.

4526987

18

PRFP00027

MR 0257

RESPONSE:

MNA produces claims forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000011 - MNA-MEDINA-0000130, MNA-MEDINA-0000260 - MNA-MEDINA-0000563, and MNA-MEDINA-0000231. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to the tire in question manufactured at Dothan during the relevant scope. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any.

MNA objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Finally, MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 21:

All training documents made available, at the time the subject tire was built, to persons who construct, manufacture or assemble tires or operate tire-building equipment at the plaint[SIC] where the subject tire was built.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question.

4526987                                   19

PRFP00028

MR 0258

Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 22:

All training program materials or other documents provided to Michelin North America's employees building P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

4526987                                        20

PRFP00029

MR 0259

MNA objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 23:

All inspection methodology materials or other documents uses[SIC] or followed to determine any trapped air/steam blisters in finished tires.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

4526987

21

PRFP00030

MR 0260

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 24:

Any and all documents relating to testing of steel belted radial passenger and light truck tires manufactured with same belt skim stock code as the subject tire at the Dothan, Alabama plant where the subject tire was manufacture. This request includes documents relating to peel tests, pull tests, performance tests, and endurance tests whether conducted on a test wheel or a test track.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock. See Barcenas v.

4526987                                    22

PRFP00031

MR 0261

Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 25:

Any and all documents relating to under-inflation testing that led to tread separation.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA further objects to this request on the grounds that it is a premature request for expert testimony. MNA states that it will provide discovery of its experts and expert testimony in accordance with the Texas rules and the scheduling order for this case. MNA further reserves the right to rely on information generated or produced by Plaintiffs or their experts in discovery.

REQUEST FOR PRODUCTION NO. 26:

Any and all documents relating to rim groove analysis in which the rim groove profile was generated by under-inflation and led to tread belt separations.

4526987                                    23

PRFP00032

MR 0262

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA further objects to this request on the grounds that it is a premature request for expert testimony. MNA states that it will provide discovery of its experts and expert testimony in accordance with the Texas rules and the scheduling order for this case. MNA further reserves the right to rely on information generated or produced by Plaintiffs or their experts in discovery.

REQUEST FOR PRODUCTION NO. 27:

All Department of Transportation (DOT) testing related to all "Michelin LTX" tires manufactured at the Dothan Alabama plant.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action.

4526987                                       24

PRFP00033

MR 0263

<u>REQUEST FOR PRODUCTION NO. 28:</u>

The curing conditions at the Dothan Plant that were used for the curing of the subject tire and any subsequent changes to those curing conditions.

<u>RESPONSE:</u>

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request, if any exist. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

<u>REQUEST FOR PRODUCTION NO. 29:</u>

Any and all documents, relating to the use or potential use of nylon overlays, or belt edge strips, or belt edge wraps belt edge gum strips in passenger or light truck tires and the application of the nylon overlays, belt edge strips or belt edge wraps during the tire building process. Also, please produce copies of any documents, including patent and articles in possession of Michelin North America discussing the use or potential use of nylon overlays, or belt edge strips and/or belt edge wraps in passenger or light truck tires manufactured and/or designed by Michelin North America. This request specifically includes patents discussing the use of nylon overlays or belt edge strips or belt edge wraps. This request also includes brochures, charts and/or illustrations of Michelin North America tires with nylon overlays, including but not limited to illustrations supplied to Michelin North America dealers or service centers.

<u>RESPONSE:</u>

MNA objects to this request as being vague and ambiguous in its use of the term "belt edge wraps belt edge gum strips" and "belt edge strips" as those terms are not terms used by MNA and are undefined. MNA further objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably

4526987                                              25

PRFP00034

MR 0264

calculated to lead to the discovery of admissible evidence. No tires in the relevant scope were manufactured with nylon cap plies. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 30:

Identify and produce all documents that discuss Michelin's document retention policy from the time it manufactured the subject tire to the present.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. MNA further objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

REQUEST FOR PRODUCTION NO. 31:

The written warranty in effect for the subject tire.

RESPONSE:

MNA produces MNA-MEDINA-0001270 - MNA-MEDINA-0001285.

REQUEST FOR PRODUCTION NO. 32:

Any and all documents that discuss Michelin's recommendations regarding tire aging including Michelin's testing to support those recommendations including any and all technical bulletins.

4526987                                    26

PRFP00035

MR 0265

RESPONSE:

MNA objects to this request as being vague and ambiguous in its use of the term "tire aging" as that term is undefined. MNA produces its Technical Bulletin regarding the Service Life for Passenger and Light Truck Tires as MNA-MEDINA-0001269. Further, MNA produces its fitment guide and limited warranty manual as MEDINA-0000564 - MNA-MEDINA-0001192 and MNA-MEDINA-0001270 — MNA-MEDINA-0001285, both of which contain MNA's recommendation concerning service life of tires. Upon entry of an appropriate confidentiality protective order, MNA will produce additional documents in its possession related to service life.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 33:

Produce a complete copy of any communications or correspondence between Michelin and any auto manufacturer and/or NHTSA concerning tire use limits or limit date of utilization for any and all passenger and light truck tires including the subject tire model.

RESPONSE:

MNA produces its Technical Bulletin regarding the Service Life for Passenger and Light Truck Tires as MNA-MEDINA-0001269.

REQUEST FOR PRODUCTION NO. 34:

Please produce true, complete and accurate copies of any and all cut analysis (sectional) reports on the subject tire from production release to time of subject tire's manufactured date or architecture repertoire.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly

4526987                                    27

PRFP00043

MR 0266

burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 35:

Please produce all cured, finished gauges for the manufacture of the subject tire.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce the specifications it has for tires in the relevant scope.

REQUEST FOR PRODUCTION NO. 36:

Please produce true, complete and accurate copies of the plant's process control chart or documentation at the time of the manufacture of the subject tire.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 37:

Please produce true, complete and accurate copies of the quantitative listing of the ingredients of the subject tire's inner liner in use at the time of the manufacture of the subject tire.

4526987                                          28

PRFP00044

MR 0267

RESPONSE:

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA specifically objects to this request because it seeks production of MNA's rubber compound formulas. Rubber compound formulas are trade secrets that are closely guarded and protected by MNA. The information is of significant value to and is not known to MNA's competitors. Plaintiffs have not demonstrated any need to discover these valuable trade secrets of MNA.

REQUEST FOR PRODUCTION NO. 38:

Please produce true, complete and accurate copies of any and all DFMEA or PFMEA documentation of the subject tire and any other tires incorporating its exact green tire construction.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

4526987                              29

PRFP00045

MR 0268

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 39:

Please produce the design and production tolerances for the subject tire in effect at the time of its manufacture.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 40:

Please produce true, complete and accurate copies of any and all specific regulatory compliance test results for the subject tire and all associated brand and line name tires sharing the same green tire construction as the subject tire from production release to present, including but not limited to endurance tests, high speed endurance tests, plunger energy tests, bead unseat tests all for FMVSS requirements.

4526987                                    30

PRFP00046

MR 0269

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 41:

Please produce the adjustment and claim data for the subject tire and all associated brand and line name tires sharing the same green tire construction after each change to design occurring after the manufacture date of the subject tire.

RESPONSE:

MNA produces claim forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000011 - MNA-MEDINA-0000130, MNA-MEDINA-0000260 - MNA-MEDINA-0000563, and MNA-MEDINA-0000231. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to the tire in question manufactured at Dothan during the relevant scope. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in

4526987                                          31

PRFP00036

MR 0270

question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any. To the extent this request seeks documents concerning codes that are not relevant to the condition of the tire in question and plaintiffs' claims in this matter, or seeks information concerning tires outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 42:

Please produce true, complete, and accurate copies of all the aspect specifications including Indexes and Table of Contents.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and

4526987                                          32

PRFP00037

MR 0271

processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 43:

Please produce an index of any and all technical bulletins.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request. MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

4526987 33

PRFP00038

MR 0272

REQUEST FOR PRODUCTION NO. 44:

Please produce a true, complete and accurate copy of all discovery produced by Michelin in *Velo, et. Al. v. Michelin, et al., filed in Maricopa County Superior Court, CV2012-007346.*

RESPONSE:

MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. *Velo, et. al. v. MNA* involved a different tire from the tire in question in this case. Plaintiffs have failed to limit the scope of this request to the tire relevant to this action. MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 45:

Please provide true, complete and accurate copies of any and all depositions with exhibits given by Michelin employees Randall Clark, Michael Wisechusen, Michael Riley, Paul Northrop and Tom Gruenholz.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4526987                                34

PRFP00039

MR 0273

REQUEST FOR PRODUCTION NO. 46:

Please provide true, complete and accurate quality control/work procedures including but not limited to: TNC and TNC3R-A work procedures/instructions.

RESPONSE:

After a reasonable and diligent search, MNA has not located any TNC and TNC3R-A work procedures/instructions for the relevant scope.

To the extent this request seeks additional documents, MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4526987

35

PRFP00040

MR 0274

<u>REQUEST FOR PRODUCTION NO. 47:</u>

Please provide true, complete and accurate copies of Michelin Technical Notes.

<u>RESPONSE:</u>

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request as being vague and ambiguous in its use of the term "Michelin Technical Notes" as that term is undefined. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

<u>REQUEST FOR PRODUCTION NO. 48:</u>

Please provide true, complete and accurate copies of Michelin's Print Advertising concerning the subject tire.

<u>RESPONSE:</u>

MNA produces MNA-MEDINA-0000152 - MNA-MEDINA-0000230. MNA objects to this request as being vague and ambiguous in its use of the term "Print Advertising" as that term is not defined.

<u>REQUEST FOR PRODUCTION NO. 49:</u>

Please provide true, complete and accurate copies of Michelin's Owners Manual and Tire Fitment Guide.

PRFP00041

MR 0275

<u>RESPONSE:</u>

MNA produces MNA-MEDINA-0001270 - MNA-MEDINA-0001285 and MNA-MEDINA-0000564 - MNA-MEDINA-0001192 for the relevant scope.

<u>REQUEST FOR PRODUCTION NO. 50:</u>

Please provide a true, complete and accurate copy of Michelin's Power Point Presentation made to NHTSA on November 1, 2006.

<u>RESPONSE:</u>

MNA produces MNA-MEDINA-0001221 - MNA-MEDINA-0001268.

4526987

37

PRFP00042

MR 0276

# EXHIBIT C

MR 0277

| From: | David Shapiro |
|---|---|
| Sent: | Thursday, May 28, 2015 4:56 PM |
| To: | Pat |
| Subject: | Fwd: Medina v. Michelin |

**David C. Shapiro, Esq.**
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

O: 602.381.8400
F: 602.381.8403
E: dshapiro@lpguerra.com
W: www.lpguerra.com



Begin forwarded message:

**From:** David Shapiro <dshapiro@lpguerra.com>
**Subject: Re: Medina v. Michelin**
**Date:** May 28, 2015 at 8:34:12 AM MST
**To:** Giles Schanen <giles.schanen@nelsonmullins.com>
**Cc:** Chris Blackerby <cblackerby@germer-austin.com>

We added two paragraphs at the very end. Thx.

**David C. Shapiro, Esq.**
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

O: 602.381.8400
F: 602.381.8403
E: dshapiro@lpguerra.com
W: www.lpguerra.com

Sent from my iPhone

On May 28, 2015, at 4:21 AM, Giles Schanen <giles.schanen@nelsonmullins.com> wrote:

David,

1

Thank you for sending this draft. Would you mind identifying the changes you have made to the Velo protective order? This version is not redlined and so I would appreciate if you could please list any changes/additions so that we do not have to make a line by line comparison, which will take time.

Your email is correct that MNA anticipates being able to make its supplemental production within 10-14 days of the protective order being entered.

Also, after we spoke yesterday I went back through the discovery requests/responses. For several requests, particularly those seeking manufacturing/inspection related documents, Michelin has asked you to identify your defect theories and the tire components/manufacturing processes at issue so that Michelin can identify and produce relevant documents. In order for Michelin to locate the appropriate responsive documents and produce them within the time frame discussed above, we need you to provide this information as soon as possible. If you have any questions or would like to discuss further, please let me know.

Thanks,
Giles


<image001.gif>
**Giles M. Schanen, Jr.**
Partner
giles.schanen@nelsonmullins.com

**Nelson Mullins Riley & Scarborough LLP**

Poinsett Plaza, Suite 900
104 South Main Street, Greenville, SC 29601
Tel: 864.250.2296 Fax: 864.232.2925

www.nelsonmullins.com
(View Bio)

MR 0279

# EXHIBIT D

MR 0280

**Pat Migliorini**

| | |
|---|---|
| **From:** | Giles Schanen [giles.schanen@nelsonmullins.com] |
| **Sent:** | Friday, May 29, 2015 1:20 PM |
| **To:** | David Shapiro; 'e.pmigliorini@lpguerra.com'; guerra@lpguerra.com |
| **Cc:** | Chris Blackerby (cblackerby@germer-austin.com); Tom Bullion (tbullion@germer-austin.com) |
| **Subject:** | FW: Medina - Protective Order |

David and Luis,

I have been in an offsite meeting all day and just retrieved two voice mails from you in which you state that I have not responded to your communications concerning your proposed protective order. You voice mails are not correct, as I responded in writing concerning your proposed protective order early this morning. Please see below, where I am again forwarding my response. I believe our position on the protective order is very clear—that we cannot agree to your added language, which would render the protective order meaningless and would expose Michelin's trade secrets to public disclosure. If you will agree to remove that language, we will move forward with the agreed protective order and with our supplemental production, which we would anticipate making within 10-14 days of entry of the protective order. If you will not agree to remove the language, please let me know as soon as possible so we can move the court for entry of our protective order.

Also, you have not acknowledged my email to David of 5/28/15, in which I noted that for several requests, particularly those seeking manufacturing/inspection related documents, Michelin has asked you to identify your defect theories and the tire components/manufacturing processes at issue so that Michelin can identify and produce relevant documents. In order for Michelin to locate the appropriate responsive documents and produce them within the time frame discussed above, we need you to provide this information as soon as possible. If you have any questions or would like to discuss further, please let me know.

Thanks, and I hope you both have a great weekend.

-Giles

# Nelson Mullins

**Giles M. Schanen, Jr.**
Partner
giles.schanen@nelsonmullins.com

### Nelson Mullins Riley & Scarborough LLP

Poinsett Plaza, Suite 900
104 South Main Street, Greenville, SC 29601
Tel: 864.250.2296 Fax: 864.232.2925

www.nelsonmullins.com
(View Bio)

**From:** Giles Schanen
**Sent:** Friday, May 29, 2015 6:19 AM
**To:** 'David Shapiro'

1

MR 0281

# EXHIBIT E

MR 0282

**Pat Migliorini**

| From: | David Shapiro |
|---|---|
| Sent: | Friday, August 21, 2015 9:42 AM |
| To: | Pat |
| Subject: | Fwd: Medina v. Michelin |

**David C. Shapiro, Esq.**
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

O: 602.381.8400
F: 602.381.8403
E: dshapiro@lpguerra.com
W: www.lpguerra.com

Sent from my iPhone

Begin forwarded message:

> **From:** Giles Schanen <giles.schanen@nelsonmullins.com>
> **Date:** June 4, 2015 at 2:51:01 PM MST
> **To:** "dshapiro@lpguerra.com" <dshapiro@lpguerra.com>
> **Subject: RE: Medina v. Michelin**
>
> David, I got your email and am basing the production off what you identified in the complaint and response to disclosures. We are working on the production and still anticipate making it within 10-14 days of entry of the protective order as originally estimated.
>
> Sent from my Android phone using TouchDown (www.nitrodesk.com)
>
> -----Original Message-----
> **From:** David Shapiro [dshapiro@lpguerra.com]
> **Received:** Thursday, 04 Jun 2015, 5:48PM
> **To:** Giles Schanen [giles.schanen@nelsonmullins.com]
> **Subject:** Medina v. Michelin
>
> Giles:
>
> We never heard back from you. When can we expect to receive the documents?
>
> **David C. Shapiro, Esq.**
> Luis P. Guerra, L.L.C.
> 6225 N. 24th Street, Suite 125
> Phoenix, Arizona 85016
>
> O: 602.381.8400

1

MR 0283

# EXHIBIT F

MR 0284

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 4, 2015

<u>Via E-mail and U.S. Mail</u>
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

Re: Medina v. Michelin, et al

Dear Chris:

We are very disappointed by your letter[1]. It is misleading and inaccurate. The burden is on Michelin when it withholds and conceals its own documentation and evidence. Since all of the documents requested are Michelin's documents, Michelin knows exactly which documents it withheld and did not produce. Plaintiffs have been waiting for more than three (3) months for this documentation with false promises and assurances.

Notably, to assure that these shenanigans did not occur, while waiting for Michelin's disclosure over the last several months, Plaintiffs' counsel took the initiative and repeatedly reached out to Michelin's defense counsel and performed many meets and confers about the outstanding discovery. All to no avail. Michelin's production at the end of June was grossly defective and deficient — even after these numerous meets and confers.

After Plaintiffs finally received the deficient Michelin production, we wrote a letter documenting Michelin's total lack of production on July 16, 2015 – **20 days ago**. Still, up to today, on August 4, 2015, no one from Michelin or Michelin's counsel contacted us about it. In fact, Michelin sat on this letter for about three (3) weeks and did absolutely nothing. Not once did Michelin through its multiple defense counsel reach out to us by letter, phone call, personally or e-mail. Moreover, I saw you for a full day last week during the depositions our clients including the quadriplegic mom Obdulia Medina, and not once did you state that Michelin had problems understanding

---

[1] In the future, please direct all correspondence to us by e-mail.

MR 0285

our letter concerning its reprehensible lack of disclosure.

Consequently, your letter of today is nothing but a self-serving letter only sent *after* I called you today about Michelin's lack of production. Still, Michelin had no further production to offer. Therefore, the meet and confer already took place not only today but throughout the wait for the outstanding discovery. As such, Plaintiffs much more than met and complied with the letter, spirit and intent of Rule 191.2 of Tex. R. Civ. Proc.

Still, in spite of Michelin's steadfast refusal to produce the documents and even after receiving your letter, we attempted yet another meet and confer just minutes ago when Luis left you a voicemail. Still, in a final effort before we file our Motion, we would be willing to meet and confer with Michelin this afternoon at a time convenient.

Michelin's actions are even more egregious because at the same time Michelin hides and conceals relevant documents, Plaintiffs have made the tire available, have offered themselves for depositions (which have taken place) and made the vehicle available for an unfettered inspection for Michelin's experts.

Enough is enough. Obdulia's life - as you saw last week - is a day-to-day struggle to survive without any resemblance to the life she led before the tire failure. There is no time to waste. We are not on Michelin's schedule. The lives of this family are at stake. It is time to act. Words have proved useless. So, unless we hear from you today about the meet and confer, we are ready and willing to file the necessary motion informing the Court of Michelin's violation of the discovery rules and defiant conduct in this case and others.

To make sure that you have received this letter, we have e-mailed it to you and have contacted your office informing them of it.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MR 0286

# EXHIBIT G

MR 0287



**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**THOMAS M. BULLION III**
PARTNER

Direct Dial: 512.482.3535
tbullion@germer.com

August 13, 2015

<u>VIA FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134[th] District Court of Dallas County, Texas.*

Dear Counsel;

I am writing this letter to respond to your letters dated August 2, 3, 4 and 5 in which you allege that Michelin North America, Inc. ("MNA") has refused to produce documents in this case. MNA responded to plaintiffs' request for production, lodged objections, and produced documents subject to those objections. As we have made clear several times, we will be glad to confer with you about each of MNA's discovery responses and the scope of discovery. Please let us know if you are willing to confer as required by the Texas Rules of Civil Procedure. If you file a motion to compel without doing so, we will inform the Court that you have refused to engage in a meaningful discovery conference.

The request in your August 2 letter for information on MNA's contentions about why the tire in question failed calls for the opinions of MNA's testifying experts and is premature. MNA will timely disclose the opinions of its testifying experts and provide them for deposition in accordance with the scheduling order entered in this case.[1] Further the Texas Rules do not provide for discovery by correspondence. Your statement that your letters or ours amount to admissible evidence is contrary to both the Texas Rules of Civil Procedure and the Texas Rules of Evidence.

With respect to your letter dated August 3, MNA will produce corporate representative witnesses for deposition pursuant to the Texas Rules. Let me know when you would like to

---

[1] To the extent you are equating your request for such contentions to MNA's request that you identify the components and processes at issue in this case, the two are not comparable. MNA was trying to work with you to respond to plaintiffs' discovery requests while at the same time protecting its trade secrets. Identifying generally the components and processes (such as the steel belts) in no way reveals your expert opinions and serves to help define the scope of discovery.

discuss dates and topics. In Texas, it is standard practice to provide a list of proposed topics so the parties can address and hopefully resolve any issues before the depositions.

Finally, in response to the statements in your August 4 and 5 letters regarding the *Velo* case, MNA has offered to confer with you on a scope of discovery as was done in *Velo*. We have not offered to produce the same documents as produced in *Velo* as that case involved a different tire.

We remain willing to have a meaningful conference on any discovery issue and we look forward to hearing from you regarding scheduling such a conference.

Yours very truly,

Thomas M. Bullion III

cc.:  Noel Sevastianos (via facsimile)

MR 0289

# EXHIBIT H

MR 0290

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

## MICHELIN NORTH AMERICA, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUEST FOR PRODUCTION

TO:   Plaintiffs, by and through their attorney of record, Luis P. Guerra, David C. Shapiro, Luis P. Guerra, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016.

COMES NOW Michelin North America, Inc. ("MNA"), defendant in the above-styled

and numbered cause, and submits these, its supplemental responses and objections to Plaintiff's

First Set of Request for Production.

Respectfully submitted,
GERMER BEAMAN & BROWN, P.L.L.C.
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By: *Tom Bullion w/p by Ryan C. Buck*
Thomas M. Bullion III
State Bar No. 03331005
Chris A. Blackerby
State Bar No. 00787091

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

PRFP00047

MR 0291

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 16th day of June, 2015.

Luis P. Guerra                  *Via Certified Mail, Return Receipt Requested*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

James B. Ragan                  *Via Regular Mail*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, TX 78401

Noel Sevastianos                *Via Regular Mail*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars      *Via Regular Mail*
6422 Day Street
Dallas, Texas 85227
*Pro Se*

Thomas M. Bullion III/Chris A. Blackerby

4530886                    2

PRFP00048

MR 0292

## INTRODUCTION

The tire at issue in this case is a Michelin LTX M/S P255/70R16 tire bearing DOT number B7LBEVUX3101 (the "tire in question"). The tire in question was designed by Michelin Americas Research & Development Corporation ("MARC"), which merged with and became a division of MNA on January 1, 2008, and manufactured by MNA during the 31st week of 2001 at its Dothan, Alabama plant. Unless otherwise indicated, MNA's responses are limited to information concerning the tire in question and tires built to the specification in place for the tire in question at the Dothan, Alabama plant during the sixth months before and six months after the date of manufacture of the tire in question (the "relevant scope").

## TRADE SECRETS OBJECTION

MNA objects to many of the discovery requests because they seek information and/or documents that are of a confidential, proprietary or commercially sensitive nature to MNA, exempt from discovery under notions of constitutional privacy and/or that may be covered by or be the subject of express or implied confidentiality, secrecy or nonpublication agreements or understandings. To the extent necessary, MNA objects to the discovery requests in that they seek the discovery of trade secret information and documents, including confidential research, development and technical information. MNA states that information and documents responsive to some of the discovery requests may have been withheld because these discovery requests seek privileged information and privileged documents that constitute the trade secrets of MNA. Disclosure of these trade secrets would result in substantial prejudice and harm to MNA. Therefore, MNA contends it is essential to MNA's operations that its work and documents remain confidential.

Texas law protects the disclosure of MNA's trade secrets. A trade secret may consist of any trade formula, pattern, device or compilation of information that is used in one's business

4530886                                                    3

PRFP00049

MR 0293

and gives one an opportunity to obtain an advantage over competitors who do not know or use it. Computer Assoc. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 453 (Tex. 1996) (citing Hyde Corp. v. Huffines, 314 S.W.2d 763, 776 (1958)).

MNA's confidential policies, research, development and technical information are valuable and crucial trade secrets of MNA that give it an advantage over its competitors in a highly competitive and secretive industry. Moreover, MNA makes reasonable efforts to maintain the secrecy of this information, the information is of substantial value to MNA, the information would be very valuable to MNA's competitors, and the information derives its value by virtue of the effort of its creation and lack of dissemination. Accordingly MNA believes such information constitutes a trade secret and should be protected from disclosure.

Unless otherwise stated in its responses, MNA is not withholding any privileged documents/information within the relevant scope. However, to the extent plaintiffs do not agree with the scope of MNA's discovery responses, MNA reserves the right to have its objections to scope ruled upon prior to expanding the scope of its responses and its search for responsive and/or privileged documents/information.

Subject to the foregoing, MNA hereby answers the individual requests as follows:

## RESPONSE TO REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Identify and produce the organizational charts showing the functions and reporting structure of Michelin North America's departments, divisions, or units, whether domestic or foreign, responsible, either directly or indirectly, for: research, design and development; manufacturing and production; quality control of the subject tire and the model tires.

### RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request relating to the Dothan, Alabama plant during the relevant scope. Upon entry of an

4530886                                                    4

PRFP00050

MR 0294

appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request because it is overly broad and because it seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

REQUEST FOR PRODUCTION NO. 2:

Identify and produce true, complete and accurate Michelin's Decision Tree Manual also known as Michelin's Aspect Specifications.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for the components and processes identified during the relevant scope.

4530886

5

MR 0295

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the plant and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001287 – MNA-MEDINA-0001312 and MNA-MEDINA-0001815 – MNA-MEDINA-0001820 for the relevant scope or the oldest available for the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 3:

Please produce true, complete and accurate copies of the General Principals.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible

4530886                                         6

PRFP00052

MR 0296

evidence. Plaintiffs have failed to limit the scope of this request to the plant and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

REQUEST FOR PRODUCTION NO. 4:

Please produce any position paper regarding tire date limitations produced by any employee or past employee of Michelin North America including but not limited to any and all drafts and Versions of the paper titled "Limit Date of Utilization."

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4530886                          7

PRFP00053

MR 0297

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001435 – MNA-MEDINA-0001441.

REQUEST FOR PRODUCTION NO. 5:

Please produce a true, complete and accurate copy of the 2011 Michelin LTX M/S Data Sheet.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

REQUEST FOR PRODUCTION NO. 6:

Please produce a true, complete and accurate copy of the 2001 Michelin Limited Warranty Manual.

RESPONSE:

MNA produces the limited warranty manual as MNA-MEDINA-0001270 – MNA-MEDINA-0001285.

REQUEST FOR PRODUCTION NO. 7:

Please produce true, complete and accurate copy of any and all limited warranty claim forms and consumer claims for Michelin LTX M/S tires returned for tread/belt separation.

4530886                                    8

PRFP00054

MR 0298

RESPONSE:

MNA produces claim forms and consumer claims for the model of the tire in question manufactured at Dothan during the relevant scope returned with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000001 - MNA-MEDINA-0000010, MNA-MEDINA-0000151, and MNA-MEDINA-0000231 - MNA-MEDINA-0000259. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for tires common green to the tire in question, if any exist. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001286, MNA-MEDINA-0001366 – MNA-MEDINA-0001376 and MNA-MEDINA-0001431 – MNA-MEDINA-0001434 for tires common green to the tire in question for the relevant scope.

REQUEST FOR PRODUCTION NO. 8:

Please produce true, complete and accurate copies of Discount Tire claims and code sheet for Michelin LTX M/S tires.

RESPONSE:

MNA produces Discount Tire claim forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000231 and MNA-MEDINA-0000260 - MNA-MEDINA-0000563. Upon entry of an appropriate confidentiality

4530886                                   9

PRFP00055

MR 0299

protective order, MNA will produce documents responsive to this request for tires common green to the tire in question, if any exist. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001286 and MNA-MEDINA-0001431 – MNA-MEDINA-0001434 for tires common green to the tire in question for the relevant scope.

REQUEST FOR PRODUCTION NO. 9:

Identify and produce copies of the model tire's and similar tires specifications, including belt skim stock, carcass ply, belt edge strip, and belt edge cushion or insert specifications, steel cord specifications, green tire specifications, cured tire specifications, tire building specifications, blueprints, drawings, schematics, diagrams, photographs, x-rays, I-rays, and/or holograms from the date those tires were manufactured to the present or to the end of production. This request includes documents, including but not limited to change orders and product change proposals (including product change proposals that were not adopted) relating to changes in the specifications for the production life of the model tire and tires that replaced the model tire. This request includes specifications and change documents for the model tire prepared prior to the manufacture of the subject tire. This request also includes any tire data book or Tire Fitment Guide covering the subject model tire.

RESPONSE:

MNA produces the data book and fitment guide relating to the model of the tire in question during the relevant scope as MNA-MEDINA-0000152 - MNA-MEDINA-0000230 and MNA-MEDINA-0000564 - MNA-MEDINA-0001192. Upon entry of an appropriate confidentiality order, MNA will search for and produce the specifications, change documents,

4530886                                      10

PRFP00056

MR 0300

and mold drawings for tires in the relevant scope. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA specifically objects to this request to the extent it seeks production of MNA's rubber compound formulas. Rubber compound formulas are trade secrets that are closely guarded and protected by MNA. The information is of significant value to and is not known to MNA's competitors. Plaintiffs have not demonstrated any need to discover these valuable trade secrets of MNA.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001313 – MNA-MEDINA-0001365, MNA-MEDINA-0001469 – MNA-MEDINA-0001506 and MNA-MEDINA-0001530 – MNA-MEDINA-0001814 for tires in the relevant scope.

REQUEST FOR PRODUCTION NO. 10:

Identify and produce the reaction limit specifications and/or OPL Working Limits and Aging for the subject tire.

4530886

11

PRFP00057

MR 0301

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case.

To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 11:

Identify and produce any and all documents, relating to personal injury claims and/or lawsuits involving separations, or alleged separations of Michelin North America B2001 P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line from the date those tires were first manufactured to the present or to the end of production. This request also includes incident reports, accident reports, correspondence, and photographs. Also, as to lawsuits, this request includes copies of complaints, discovery responses of Michelin North America, reports of both plaintiffs' and defendants' experts, and deposition and trial testimony of current and former Michelin North America employees and experts. Also please produce a summary of this data.

RESPONSE:

MNA produces MNA-MEDINA-0000131 - MNA-MEDINA-0000150 for the model of the tire in question manufactured at the Dothan plant during the relevant scope. Upon entry of an

4530886                                    12

PRFP00058

MR 0302

appropriate confidentiality protective order, MNA will search for and produce any lawsuit complaints, or documents identifying any personal injury claims, concerning tires common green to the tire in question during the relevant scope, if any exist. MNA objects to this request as being vague and ambiguous in its use of the term "B2001" as that term is undefined. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined.

To the extent this request seeks documents outside the relevant scope, and to the extent it seeks documents in addition to those which identify personal injury claims, or lawsuit complaints, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001377 – MNA-MEDINA-0001430 for tires common green to the tire in question for the relevant scope.

4530886          13

PRFP00059

MR 0303

REQUEST FOR PRODUCTION NO. 12:

Identify and produce any and all documents, relating to adjustments of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured by Michelin North America with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire, bearing separation related adjustment codes including but not limited to any and all adjustment codes for tread separation, belt edge separation, separation between the belts, separations between the inner belt and outer body ply, separations between he body piles, separations between the cushion and number one or bottom belt, separations in the sidewall or bead area; all this information from the date the tires were first manufacture to the present or end of production. This request includes, but is not limited to adjustment forms, adjustment tickets, and summaries, including computer and graphical summaries of adjustment forms or adjustment tickets, manuals relating to the adjustment and inspection of tires and the documentation necessary to interpret adjustment records, including the service condition codes index and/or adjustment records. Also, please produce a summary of this adjustment data stating for each tire, the model and size, the month and year of manufacture, the date of the adjustment or rejection of the claim and the state where the adjustment claim or form was made or submitted.

RESPONSE:

MNA produces the warranty claim procedure manual for the relevant scope as MNA-MEDINA-0001193 - MNA-MEDINA-0001220 and claim forms for the model of the tire in question manufactured at Dothan during the relevant scope with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000001 - MNA-MEDINA-0000010 and MNA-MEDINA-0000231 - MNA-MEDINA-0000259. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to the tire in question manufactured at Dothan during the relevant scope for the condition of a tread or belt separation, if any exist. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any exist. To the extent this request seeks documents concerning codes that are not relevant to the condition of the tire in question and plaintiffs' claims in this matter, or seeks

4530886                                    14

PRFP00060

MR 0304

information concerning tires outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001286, MNA-MEDINA-0001366 – MNA-MEDINA-0001376 and MNA-MEDINA-0001431 – MNA-MEDINA-0001434 for tires common green to the tire in question for the relevant scope.

REQUEST FOR PRODUCTION NO. 13:

Identify and produce any and all documents, computer generated transmissions, such as email, computer printouts, programs, tapes, photographs, and videotapes relating to property damage claims involving separations, or alleged separations, in Michelin North America P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line manufactured with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire from the date those tires were first manufactured to the present or to the end of

4530886                                         15

PRFP00061

MR 0305

production. This request includes incident reports, accident reports, correspondence, and photographs for every property damage claim arising out of belt separations, belt edge separations, separations between the inner belt and the outer body ply, separations between the body piles, separations between the cushion and the number one, or bottom belt, and separations in the sidewall or bead area.

RESPONSE:

MNA produces MNA-MEDINA-0000151 which contains information responsive to this request regarding property damage claims for the model of the tire in question manufactured at Dothan during the relevant scope with the condition of a tread or belt separation. After a reasonable and diligent search, MNA has not located any documents responsive to this request regarding property damage claims for the tires common green to the tire in question manufactured at Dothan during the relevant scope with the condition of a tread or belt separation. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, and to the extent it seeks documents in addition to those which identify personal injury claims or lawsuit complaints, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006). MNA objects to this

4530886                                    16

PRFP00062

MR 0306

request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

REQUEST FOR PRODUCTION NO. 14:

All records of any communication between Michelin North America and any insurer, state or federal governmental entity, consumer or safety group or advocates relation to questions, insurance claims, trends, patterns or failure of the subject tire or model tires including but not limited to the subject of tread, ply, belt, and/or cord separation.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 15:

All documents that contain Michelin North America's internal recommendations, determinations, or guidelines as to the acceptable or unacceptable rate or frequency of loss adjustment or any rate of frequency of loss adjustment that requires that action be taken or notification be given by or to any internal Michelin North America persons or organizations.

PRFP00063

MR 0307

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 16:

. Please produce true, complete and accurate copies of the design drawings for the subject tire.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request, if any.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA MNA-MEDINA-0001469 – MNA-MEDINA-0001506.

REQUEST FOR PRODUCTION NO. 17:

All non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Michelin North America alleging a tread separation of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line documenting similar tires tread, belt, ply or cord separation or detachment, whether partial or full.

4530886                                    18

PRFP00064

MR 0308

RESPONSE:

MNA produces consumer claims for the model of the tire in question manufactured at Dothan during the relevant scope returned with the allegation of the condition of a tread or belt separation as MNA-MEDINA-0000151. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce consumer claims for the tires common green to the tire in question manufactured at Dothan during the relevant scope with the allegation of the condition of a tread or belt separation, if any exist.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA also objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. Further, the tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires common green to the tire in question manufactured at Dothan during the relevant scope with the allegation of the condition of a tread or belt separation.

REQUEST FOR PRODUCTION NO. 18:

Identify and produce any and all documents, relating to personal injury claims and/or lawsuits, property damage claims and adjustments involving separations, or alleged separations of similar Michelin North America tires that contain nylon cap pules from the date the similar tire was first manufacture to the present or end of production.

PRFP00065

MR 0309

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. No tires in the relevant scope were manufactured with nylon cap plies. MNA objects to this request as being vague and ambiguous in its use of the term "nylon cap pules" and "similar tires," as those terms are undefined.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 19:

Identify and produce any and all documents, relating to the building, tire builder training, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the subject tire was manufactured. This request includes, but is not limited to standard practice binders, tire building manuals, tire builder training manuals, equipment manuals, and/or other materials and videotapes used to train tire builders. This request also includes documents, photographs, and charts used to illustrate defects, or potential defects, in tires and/or problems or potential problems in the tire building process.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

4530886

20

PRFP00066

MR 0310

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001287 – MNA-MEDINA-0001312 and MNA-MEDINA-0001815 – MNA-MEDINA-0001820 for the relevant scope or the oldest available for the components and processes identified by plaintiffs. MNA has located no additional responsive documents for the relevant scope for the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 20:

Identify and produce any audits, reports, examinations, investigations, studies, or reviews, including any work papers, whether created within or outside Michelin North America, in any manner related to the return, failure, performance, durability, and life expectancy, design, or quality of the subject tire and model tires.

RESPONSE:

MNA produces claims forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000011 - MNA-MEDINA-0000130, MNA-MEDINA-0000260 - MNA-MEDINA-0000563, and MNA-MEDINA-0000231. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for

PRFP00067

MR 0311

the tires common green to the tire in question manufactured at Dothan during the relevant scope. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any.

MNA objects to this request on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. Finally, MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001286, MNA-MEDINA-0001366 – MNA-MEDINA-0001376 and MNA-MEDINA-0001431 – MNA-MEDINA-0001434 for tires common green to the tire in question for the relevant scope.

REQUEST FOR PRODUCTION NO. 21:

All training documents made available, at the time the subject tire was built, to persons who construct, manufacture or assemble tires or operate tire-building equipment at the plaint[SIC] where the subject tire was built.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question.

4530886                                             22

PRFP00068

MR 0312

Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. After a reasonable and diligent search, MNA has located no documents for the relevant scope applicable to the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 22:

All training program materials or other documents provided to Michelin North America's employees building P265/70 R17 Michelin LTX M/S p-metric tires, similar tires and all tires from the same LTX tire line.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for

4530886                                          23

PRFP00069

MR 0313

information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

MNA objects to this request as being vague and ambiguous in its use of the term "similar tires" as that term is undefined. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action. The tire is incorrectly identified as a "P265/70 R17" tire. The tire in question is a P255/70R16.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. After a reasonable and diligent search, MNA has located no documents for the relevant scope applicable to the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 23:

All inspection methodology materials or other documents uses[SIC] or followed to determine any trapped air/steam blisters in finished tires.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question.

4530886                                    24

PRFP00070

MR 0314

Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001287 – MNA-MEDINA-0001290, MNA-MEDINA-0001294 and MNA-MEDINA-0001301 – MNA-MEDINA-0001304 for the relevant scope or the oldest available for the components and processes identified by plaintiffs. After a reasonable and diligent search, MNA has located no other documents for the relevant scope applicable to the components and processes identified by plaintiffs.

4530886                                    25

PRFP00071

MR 0315

REQUEST FOR PRODUCTION NO. 24:

Any and all documents relating to testing of steel belted radial passenger and light truck tires manufactured with same belt skim stock code as the subject tire at the Dothan, Alabama plant where the subject tire was manufacture. This request includes documents relating to peel tests, pull tests, performance tests, and endurance tests whether conducted on a test wheel or a test track.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. Tires are not necessarily substantially similar to each other because they share a common component, such as belt skim stock. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in

4530886                                26

PRFP00072

MR 0316

place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

REQUEST FOR PRODUCTION NO. 25:

Any and all documents relating to under-inflation testing that led to tread separation.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA further objects to this request on the grounds that it is a premature request for expert testimony. MNA states that it will provide discovery of its experts and expert testimony in accordance with the Texas rules and the scheduling order for this case. MNA further reserves the right to rely on information generated or produced by Plaintiffs or their experts in discovery.

REQUEST FOR PRODUCTION NO. 26:

Any and all documents relating to rim groove analysis in which the rim groove profile was generated by under-inflation and led to tread belt separations.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside

4530886

27

PRFP00073

MR 0317

the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA further objects to this request on the grounds that it is a premature request for expert testimony. MNA states that it will provide discovery of its experts and expert testimony in accordance with the Texas rules and the scheduling order for this case. MNA further reserves the right to rely on information generated or produced by Plaintiffs or their experts in discovery.

REQUEST FOR PRODUCTION NO. 27:

All Department of Transportation (DOT) testing related to all "Michelin LTX" tires manufactured at the Dothan Alabama plant.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 28:

The curing conditions at the Dothan Plant that were used for the curing of the subject tire and any subsequent changes to those curing conditions.

4530886                              28

PRFP00074

MR 0318

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce documents responsive to this request, if any exist. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. After a reasonable and diligent search, MNA has located no documents for the relevant scope applicable to the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 29:

Any and all documents, relating to the use or potential use of nylon overlays, or belt edge strips, or belt edge wraps belt edge gum strips in passenger or light truck tires and the application of the nylon overlays, belt edge strips or belt edge wraps during the tire building process. Also, please produce copies of any documents, including patent and articles in possession of Michelin North America discussing the use or potential use of nylon overlays, or belt edge strips and/or belt edge wraps in passenger or light truck tires manufactured and/or designed by Michelin North America. This request specifically includes patents discussing the use of nylon overlays or belt edge strips or belt edge wraps. This request also includes brochures, charts and/or illustrations of Michelin North America tires with nylon overlays, including but not limited to illustrations supplied to Michelin North America dealers or service centers.

RESPONSE:

MNA objects to this request as being vague and ambiguous in its use of the term "belt edge wraps belt edge gum strips" and "belt edge strips" as those terms are not terms used by

PRFP00075

MR 0319

MNA and are undefined. MNA further objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. No tires in the relevant scope were manufactured with nylon cap plies. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 30:

Identify and produce all documents that discuss Michelin's document retention policy from the time it manufactured the subject tire to the present.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request to the extent it seeks information protected by the attorney-client and/or attorney work product privileges. MNA further objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

4530886

30

PRFP00076

MR 0320

REQUEST FOR PRODUCTION NO. 31:

The written warranty in effect for the subject tire.

RESPONSE:

MNA produces MNA-MEDINA-0001270 - MNA-MEDINA-0001285.

REQUEST FOR PRODUCTION NO. 32:

Any and all documents that discuss Michelin's recommendations regarding tire aging including Michelin's testing to support those recommendations including any and all technical bulletins.

RESPONSE:

MNA objects to this request as being vague and ambiguous in its use of the term "tire aging" as that term is undefined. MNA produces its Technical Bulletin regarding the Service Life for Passenger and Light Truck Tires as MNA-MEDINA-0001269. Further, MNA produces its fitment guide and limited warranty manual as MEDINA-0000564 - MNA-MEDINA-0001192 and MNA-MEDINA-0001270 – MNA-MEDINA-0001285, both of which contain MNA's recommendation concerning service life of tires. Upon entry of an appropriate confidentiality protective order, MNA will produce additional documents in its possession related to service life.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001435 – MNA-MEDINA-0001468.

4530886                                    31

PRFP00077

MR 0321

REQUEST FOR PRODUCTION NO. 33:

Produce a complete copy of any communications or correspondence between Michelin and any auto manufacturer and/or NHTSA concerning tire use limits or limit date of utilization for any and all passenger and light truck tires including the subject tire model.

RESPONSE:

MNA produces its Technical Bulletin regarding the Service Life for Passenger and Light Truck Tires as MNA-MEDINA-0001269.

REQUEST FOR PRODUCTION NO. 34:

Please produce true, complete and accurate copies of any and all cut analysis (sectional) reports on the subject tire from production release to time of subject tire's manufactured date or architecture repertoire.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 35:

Please produce all cured, finished gauges for the manufacture of the subject tire.

RESPONSE:

Upon entry of an appropriate confidentiality protective order, MNA will produce the specifications it has for tires in the relevant scope.

4530886                                                    32

PRFP00078

MR 0322

<u>SUPPLEMENTAL RESPONSE:</u>

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001530 – MNA-MEDINA-0001814 for tires in the relevant scope.

<u>REQUEST FOR PRODUCTION NO. 36:</u>

Please produce true, complete and accurate copies of the plant's process control chart or documentation at the time of the manufacture of the subject tire.

<u>RESPONSE:</u>

After a reasonable and diligent search, MNA has not located any documents responsive to this request in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

<u>SUPPLEMENTAL RESPONSE:</u>

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

<u>REQUEST FOR PRODUCTION NO. 37:</u>

Please produce true, complete and accurate copies of the quantitative listing of the ingredients of the subject tire's inner liner in use at the time of the manufacture of the subject tire.

4530886                                            33

PRFP00079

MR 0323

RESPONSE:

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

MNA specifically objects to this request because it seeks production of MNA's rubber compound formulas. Rubber compound formulas are trade secrets that are closely guarded and protected by MNA. The information is of significant value to and is not known to MNA's competitors. Plaintiffs have not demonstrated any need to discover these valuable trade secrets of MNA.

REQUEST FOR PRODUCTION NO. 38:

Please produce true, complete and accurate copies of any and all DFMEA or PFMEA documentation of the subject tire and any other tires incorporating its exact green tire construction.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

4530886

34

PRFP00080

MR 0324

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

REQUEST FOR PRODUCTION NO. 39:

Please produce the design and production tolerances for the subject tire in effect at the time of its manufacture.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA. MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4530886                                      35

PRFP00081

MR 0325

<u>SUPPLEMENTAL RESPONSE:</u>

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

<u>REQUEST FOR PRODUCTION NO. 40:</u>

Please produce true, complete and accurate copies of any and all specific regulatory compliance test results for the subject tire and all associated brand and line name tires sharing the same green tire construction as the subject tire from production release to present, including but not limited to endurance tests, high speed endurance tests, plunger energy tests, bead unseat tests all for FMVSS requirements.

<u>RESPONSE:</u>

After a reasonable and diligent search, MNA has not located any documents responsive to this request for the relevant scope. Upon entry of an appropriate confidentiality protective order, MNA will produce its record retention policy in place at the time this lawsuit was served upon MNA.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the time period relevant to this action.

MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4530886 36

PRFP00082

MR 0326

## SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces its record retention policy in place at the time this lawsuit was served upon MNA as MNA-MEDINA-0001507 – MNA-MEDINA-0001529.

## REQUEST FOR PRODUCTION NO. 41:

Please produce the adjustment and claim data for the subject tire and all associated brand and line name tires sharing the same green tire construction after each change to design occurring after the manufacture date of the subject tire.

## RESPONSE:

MNA produces claim forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000011 – MNA-MEDINA-0000130, MNA-MEDINA-0000260 – MNA-MEDINA-0000563, and MNA-MEDINA-0000231. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to the tire in question manufactured at Dothan during the relevant scope. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any. To the extent this request seeks documents concerning codes that are not relevant to the condition of the tire in question and plaintiffs' claims in this matter, or seeks information concerning tires outside the relevant scope, MNA objects to this request because it is overly broad, unduly burdensome, and seeks information that is neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. Tires are not

4530886                                     37

PRFP00083

MR 0327

necessarily substantially similar to each other because they share a common component, such as belt skim stock or belt edge cushion. See Barcenas v. Ford Motor Co., 2004 WL 2827249 (N.D. Cal. Dec. 9, 2004); McCloud v. Goodyear Dunlop Tires NA, Ltd., 2006 WL 64491, *1 (C.D. Ill. 2006).

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001286, MNA-MEDINA-0001366 – MNA-MEDINA-0001376 and MNA-MEDINA-0001431 – MNA-MEDINA-0001434 for tires common green to the tire in question for the relevant scope.

REQUEST FOR PRODUCTION NO. 42:

Please produce true, complete, and accurate copies of all the aspect specifications including Indexes and Table of Contents.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and

4530886                                    38

PRFP00084

MR 0328

processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001287 – MNA-MEDINA-0001312 and MNA-MEDINA-0001815 – MNA-MEDINA-0001820 for the relevant scope or the oldest available for the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 43:

Please produce an index of any and all technical bulletins.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request. MNA objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. MNA further objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more

4530886                                     39

PRFP00085

MR 0329

than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. Plaintiffs have failed to identify the components and processes at issue in this case.

REQUEST FOR PRODUCTION NO. 44:

Please produce a true, complete and accurate copy of all discovery produced by Michelin in *Velo, et. Al. v. Michelin, et al., filed in Maricopa County Superior Court, CV2012-007346.*

RESPONSE:

MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. *Velo, et. al. v. MNA* involved a different tire from the tire in question in this case. Plaintiffs have failed to limit the scope of this request to the tire relevant to this action. MNA objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 45:

Please provide true, complete and accurate copies of any and all depositions with exhibits given by Michelin employees Randall Clark, Michael Wiscchusen, Michael Riley, Paul Northrop and Tom Gruenholz.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request because it is overly broad and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action. MNA objects to the extent this request seeks or attempts to seek information that constitutes

4530886                                    40

PRFP00086

MR 0330

commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

REQUEST FOR PRODUCTION NO. 46:

Please provide true, complete and accurate quality control/work procedures including but not limited to: TNC and TNC3R-A work procedures/instructions.

RESPONSE:

After a reasonable and diligent search, MNA has not located any TNC and TNC3R-A work procedures/instructions for the relevant scope.

To the extent this request seeks additional documents, MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs identify the components and processes at issue in this case, upon entry of an appropriate confidentiality protective order, MNA will search for and produce documents responsive to this request for the components and processes identified at the time the tire in question was manufactured at the Dothan, Alabama plant.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

4530886                                                     41

PRFP00087

MR 0331

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. After a reasonable and diligent search, MNA has not located any responsive documents used at the Dothan plant for the relevant scope for the components and processes identified by plaintiffs. If any such documents are located in the future MNA will supplement its response accordingly.

REQUEST FOR PRODUCTION NO. 47:

Please provide true, complete and accurate copies of Michelin Technical Notes.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. MNA objects to this request as being vague and ambiguous in its use of the term "Michelin Technical Notes" as that term is undefined. To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

4530886                                42

PRFP00088

MR 0332

REQUEST FOR PRODUCTION NO. 48:

Please provide true, complete and accurate copies of Michelin's Print Advertising concerning the subject tire.

RESPONSE:

MNA produces MNA-MEDINA-0000152 - MNA-MEDINA-0000230. MNA objects to this request as being vague and ambiguous in its use of the term "Print Advertising" as that term is not defined.

REQUEST FOR PRODUCTION NO. 49:

Please provide true, complete and accurate copies of Michelin's Owners Manual and Tire Fitment Guide.

RESPONSE:

MNA produces MNA-MEDINA-0001270 - MNA-MEDINA-0001285 and MNA-MEDINA-0000564 - MNA-MEDINA-0001192 for the relevant scope.

REQUEST FOR PRODUCTION NO. 50:

Please provide a true, complete and accurate copy of Michelin's Power Point Presentation made to NHTSA on November 1, 2006.

RESPONSE:

MNA produces MNA-MEDINA-0001221 - MNA-MEDINA-0001268.

PRFP00089

MR 0333



AUSTIN BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

Direct Dial: 512.482.3534
cblackerby@germer.com

September 1, 2015

<u>VIA E-MAIL</u>

David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear David:

This is a follow up to our telephone conversation just a moment ago where you called MNA's discovery proposal "bullshit" and indicated that you could not show it to Luis or he would flip out. As I requested, if you will not agree to meet and confer, please send a written response to MNA's proposal.

Thanks.

Yours very truly,

Chris A. Blackerby

CAB:lq

4537956

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL.     PAGE 61

**EXHIBIT**
tabbies
B

MR 0334

FILED
DALLAS COUNTY
9/1/2015
04:45:49 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-14-07255

SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually,

§§§§§
Plaintiffs,

vs.

MICHELIN NORTH AMERICA, INC. and JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant,

Defendants.

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

134th JUDICIAL DISTRICT

## AFFIDAVIT OF VANEATON PRICE, III

Having first been duly sworn, I, Vaneaton Price, III, an employee of Defendant Michelin North America, Inc. ("MNA"), competently testify as follows:

1. This affidavit is based on my personal knowledge and my review of information available to me in my role at MNA. I am over 18 years of age, of sound mind, and competent to execute this Affidavit.

2. I have never been convicted of a felony or a crime of moral turpitude.

3. I am a Senior Technical Advisor employed by MNA. I was employed with Michelin Americas Research and Development Corporation ("MARC"), which merged with and became a division of MNA on January 1, 2008, from January 2007 to December 2011. Since May 1999, I have been employed by MNA. During my employment with MNA and MARC, I have become familiar with the tires that are designed by MARC and manufactured by MNA, as well as the design and manufacturing procedures used.

MR 0335

4. I am familiar with the process by which tire specifications are developed, with the composition and dimensions of certain tires MNA has designed and manufactured during my employment, with MNA manufacturing processes and equipment, and with the efforts that MNA makes to protect its proprietary and trade secret information.

5. The Subject Tire is a P255/70R16 109S Michelin LTX M/S bearing DOT number B7LBEVUX3101 and manufactured by MNA in its Dothan, Alabama plant in the 31st week of 2001.

6. A tire is built to a single green tire and a single cured tire specification. The Subject Tire was manufactured pursuant to a particular specification in place for P255/70R16 109S LTX M/S tires manufactured at MNA's Dothan, AL plant during the 31st week of 2001.

7. The "P" designation means "passenger." The "255" is this tire's nominal section width in millimeters. The "70" is the tire's aspect ratio – the sidewall height is 70% of the tire's width. The "16" is the tire's inner diameter in inches, which means that the tire fits on a 16" wheel. The tire's service description, "109S," includes the load index (109), which means that the tire is designed to support loads of 2271 pounds at 35 psi inflation pressure, and the speed rating (S), which indicates that the tire is certified to carry a load, under specified conditions, at a maximum speed of 112 mph.

8. "Common green" tires are tires that share the same specifications except for exterior moldings. The model of the Subject Tire has three common green tires that also were manufactured at the Dothan, AL plant. With the exception of these common green tires, there are no other tires that were made to the same green tire specifications as the Subject Tire.

- 2 -

MR 0336

9. Throughout my employment with MARC and MNA, MNA has manufactured steel belted radial tires for a wide variety of passenger vehicles, light trucks, medium trucks, heavy trucks, and special purposes such as high performance tires, and aircraft tires. During 2001, the year the Subject Tire was manufactured, MNA manufactured approximately 1500 different tire designs at its various plants in North America. The design of these tires often varies significantly depending on the particular service applications such as highway, mud and snow, all-season, off-road, and high performance.

10. A tire is a highly engineered, scientifically developed, complex laminate structure. It incorporates elements of the disciplines of polymer chemistry and mechanical engineering, among others.

11. For a tire to perform properly, it must be engineered so that the numerous components and rubber compounds work together to carry the intended load at the inflation pressures appropriate for the service applications. Thus, even tires bearing the same marketing label or "name", like the "LTX M/S", have different design features to accommodate the intended load and expected service application.

12. Most modern automotive tires share some basic features. Virtually all tubeless tires have a tread, belt assemblies, a body ply or plies, an inner liner, and bead wires. Steel belt assemblies typically consist of two or more steel belts with a rubber compound that surrounds and coats the steel cables. Textile body ply or plies generally consist of one or more plies of textile cord coated with another rubber compound. The inner liner consists of a different rubber compound and performs a function similar to that of an inner tube in a tube-type tire, helping the tubeless tire maintain air pressure. The bead wires are two

- 3 -

MR 0337

hoop-shaped bundles of wire encased in rubber and located at the tire's inner edges, which help hold the tire flush against the rim flange and anchor the tire's components.

13. Most modern automotive tires are assembled in stages as a laminate structure and then placed in a mold and vulcanized, or "cured." Vulcanization consists of exposing the assembled tire to high temperature and pressure for a pre-determined time; this process causes various chemical changes in the rubber compounds, causes bonds to form between the tire's various components, and increases the rubber's strength, resilience and durability. A tire that has been assembled but not yet vulcanized is referred to as a "green tire."

14. Despite this common basic structure, however, it would be a gross oversimplification to say that all passenger and light truck tires with a steel-belted radial construction are similar in design. Although certain tires may share one or more common components or compounds, the unique performance requirements of each tire will lead to design differences between them.

15. There are many ways in which tire designs may differ. For example, tire designs may differ according to (1) the basic classification as a passenger, light truck, truck or specialty tire; (2) inner diameter size; (3) width; (4) aspect ratio (the tire's width as compared to its sidewall height); (5) load index or load capacity; (6) component materials; (7) intended use or application; (8) bead wire design; (9) sidewall reinforcements; (10) speed rating; (11) recommended inflation pressures; (12) tread design; and (13) the use of additional components such as belt edge wedges and extra strips or plies.

- 4 -

16. Most tires are broadly classified into four categories: passenger tires, light truck tires, truck tires, and specialty-use tires (such as commercial tires, temporary spare tires, or trailer tires). There are substantial differences in the design of tires in each classification. Tires in one classification are not substantially similar to tires in another classification. There are no Michelin tires in one classification that are "common green" to tires in another classification. The federal regulations in place in 2001 governing light truck tires, 49 C.F.R. § 571.119, was different than those governing passenger car tires like the tire in question, 49 C.F.R. § 571.109.

17. Plaintiffs' Requests for Production seek information on all "Michelin LTX M/S tires." The names of tire lines, such as "LTX M/S," the line of the Subject Tire, are marketing labels used by MNA to describe many tires that are suitable for use in a sport utility vehicle ("SUV") or light truck application. They are not a designation of a tire's design or a specific set of manufacturing specifications. The "LTX M/S" marketing label has been used for at least 20 years, for multiple sizes, load ranges, and applications of tires. Further, "LTX M/S" tires are made in multiple sizes and load ranges, for different vehicle fitments and applications, all of which would have different designs. At the time the tire in question was manufactured in 2001, the "LTX M/S" label was used for approximately 40 different tire sizes. MNA uses many different marketing labels for its tires.

18. For example, the LTX M/S tire line and its common green lines manufactured between 1998 and 2003 would encompass approximately 54 tire models built to more than 5000 tire specifications, and approximately 19.2 million different tires. These tires were manufactured at 5 different MNA and MNA (Canada), Inc. plants in North America.

- 5 -

MR 0339

19. All tires manufactured under the "LTX M/S" marketing label are not substantially similar. These tires differ in design in many ways, including size, load capacity, components, number of plies, types of plies, recommended pressures, speed ratings, tread depths, and intended applications.

20. The Subject Tire is a 16" P-Metric (Passenger) tire; however, the LTX M/S line encompasses LT-Metric, P-Metric and Flotation tires. Moreover, the LTX M/S line includes tires with rim diameters ranging from 15" to 17" section widths from 205 millimeters to 285 millimeters, and with total diameters from 27" to 32.8". These tires of different sizes, dimensions and applications are necessarily of different designs, and are not substantially similar to each other.

21. Tires of different sizes do not, as a general rule, merely have proportionally larger dimensions; there are a number of other specification changes, as well. For example, an LTX M/S 15" tire will have very different performance requirements and expected service conditions than an LTX M/S 17" tire. The carcass strength, load-carrying capacity, inflation pressure, rubber compounds, number of carcass plies, and densities of steel belt cables or polyester carcass ply cords may all be different, depending on tire size and expected vehicle fitment. The tire designer will use different components, materials, and configurations for different tire sizes, depending on the performance goals for the tire. Thus, tires of different sizes are not substantially similar to each other.

22. The LTX M/S line includes tires designed for original equipment fitments as well as tires designed for the replacement market. Tires designed specifically for fitments on new vehicles may be tuned specifically to meet the requirements of the original equipment programs. They may be made of different components than replacement market tires,

- 6 -

MR 0340

have different tread depths and designs than replacement market tires, and have different performance profiles than replacement market tires. Thus, original equipment tires may have very different designs and constructions than replacement market tires, and are not necessarily substantially similar to replacement market tires.

23. The LTX M/S line of tires includes tires with different aspect ratios ranging from 65 to 85. The term "aspect ratio" describes the relationship between the height and width of the tire. More precisely, aspect ratio is the ratio between the "section height" (the distance from the top of the tread down to an imaginary line running from bead to bead at the bottom of the tire) and "section width" (the distance from the outermost bulge of one sidewall to the other) when the tire is mounted on a rim that is 70% of the tire section width and inflated to a prescribed pressure. A tire with a high aspect ratio may be a tall, skinny tire, while one with a low aspect ratio may be a short, squatty tire. These different structures are affected in different ways by the loads and forces that they encounter in service, and the design of tires with different aspect ratios differ significantly. Tires of different aspect ratios are not substantially similar.

24. The LTX M/S line of tires encompasses tires with different load indexes and speed ratings, which also make a difference in the application for which the tire is suitable. The LTX M/S tire line includes tires with load indexes from 97 to 123 and speed ratings from R to H. For example, an LTX M/S tire with "H" speed rating (130 mph) would have a significantly different design than the Subject Tire, which has an "S" speed rating (112mph), to accommodate the increased heat and centrifugal forces the tire would be expected to withstand at higher speeds. For example, a P205/75R15 97S LTX M/S, which has a load index of 97, is rated to carry a maximum load of 1435 pounds at 35 psi,

- 7 -

MR 0341

whereas the Subject Tire, which has a load index of 109, is rated to carry a maximum load of 2271 pounds at 35 psi. The design of these tires is different to accommodate the differences in load and expected application. Thus, tires of different load indexes and speed ratings are not substantially similar.

25. Tires within the LTX M/S line differ according to their component materials, even when the basic type, size, load index, and speed rating are the same. Among other differences, tires within the LTX M/S line made in different plants contain different tread compounds, and undertread compounds. In addition, steel belt construction and strength, as well as polyester ply construction and strength, can differ. The tread compound is the material comprising the outermost layer of the tire in the part of the tire that is intended to contact the road; the undertread compound is the material comprising the next layer down, between the tread and steel belt assembly. Tire designs within the LTX M/S line can differ for many other reasons, including tread designs, bead designs, recommended inflation pressures, sidewall reinforcement, and others. Tires with these differences in component materials and design features are not substantially similar.

26. The LTX M/S line includes tires manufactured with 2-belt and 3-belt configurations. Tires with different numbers of belts are not substantially similar.

27. MNA uses many different rubber formulations in its tires, including different rubber formulations between tires within the LTX M/S tire line. For example, all passenger and light truck tires contain different types of rubber. Rubber formulas in replacement-market tires may differ from those used in certain original equipment applications. MNA, through its MARC division, researches, tests, and develops the rubber compounds used in the construction of tires. The type of rubber compound ultimately used in each

- 8 -

MR 0342

component will affect the tire's performance results. Even within a single manufacturing facility, the rubber compound formulas used may differ depending on the size and application of the tire. Tires that use different rubber formulations are not substantially similar.

28. Tires are not substantially similar simply because they use the same belt skim compound. Tires with the same belt skim but different sizes, classifications, load ranges, speed ratings, and/or applications will have different designs and different service life, and are not substantially similar tires.

29. Tire designs evolve over time as new technology, materials, and equipment are developed and the tire manufacturing processes and procedures in any given plant change. Although bearing the same marketing label and size designation, tires that are manufactured under different specifications are of different designs. Over the period of time during which the model of the Subject Tire was made, changes were made to its design and specifications.

30. Tire designs generally will differ for tires manufactured at different facilities. Because MNA operates facilities formerly owned by three different manufacturers (which use different processes), manufacturing specifications and component compounds are frequently different for tires otherwise of the same marketing label and size designation, to account for varying plant-specific technology and available equipment, including mixing equipment, tire building equipment, and curing methods.

31. No two MNA plants have the exact same equipment and manufacturing processes.

- 9 -

MR 0343

32. Specifications are developed for the equipment and processes at a particular manufacturing plant. Tires manufactured at one plant are produced based on a specification different than the specification used at other plants.

33. In the last thirty (30) years, MNA has manufactured tires under several thousand different brand names and sizes. Each of these tire types is of a different design. Within each category, the designs have changed multiple times as the specifications evolved.

34. In the last ten (10) years alone, MNA has manufactured several hundred million tires, to tens of thousands of different specifications, including those marketed under the "Michelin," "Uniroyal," "BF Goodrich," and various private brand name.

35. Certain of Plaintiffs' requests seek MNA's adjustment data, including comparisons of adjustment data concerning tires manufactured with and without nylon cap plies.

36. Adjustment data is information collected by MNA that records the number of tires returned, as well as the condition of the returned tire, without regard to cause.

37. One condition which may be discerned by a trained inspector is a tread or tread/belt "separation." A "separation" refers to a crack or potential crack between two of a tire's components. A "separation," if actually present, does not mean or imply that the tire became disabled. It also does not mean or imply that the tire is defective in design or manufacture. If the inspector observed a tread/belt separation in a returned tire, that condition would be noted and the adjustment would be coded accordingly.

38. Tread/belt detachments resulting from separations occur infrequently, but they have occurred and do occur in steel belted radial tires generally, regardless of their size, design, or intended use.

39. A tread/belt separation can occur in any steel belted radial tire.

- 10 -

MR 0344

40. A tread/belt separation in a tire does not indicate a defect in the design or manufacture of the tire because there are many different causes for tread/belt separation that are independent of the design and manufacture of the tire. Numerous other factors, such as tire overloading, under inflation, unrepaired or improperly repaired punctures or cuts, damage from road hazards, to name a few, can lead to tread/belt separation in a properly designed and manufactured tire.

41. The MNA's design and manufacturing specifications, specification changes, testing and design-related documents requested by Plaintiffs in their discovery requests contain highly protected trade secrets of MNA. In addition, Plaintiffs requests call for the production of other highly protected trade secrets of MNA, including but not limited to information concerning MNA's research and development, formulas, tire adjustment processes and analysis, marketing strategies, internal research and studies, propriety manufacturing and inspection processes and procedures, and tire production information.

42. Furthermore, MNA's adjustment data is of significant value to MNA because it reveals MNA's processes and analysis, and because it is not known to MNA's competitors. This information constitutes valuable trade secrets of MNA and gives MNA an advantage over its competitors. Disclosure of this information to those competitors would cause irreparable damage to MNA.

43. Certain of Plaintiffs' requests seek MNA's design and manufacturing specifications, specification changes, testing and design-related documents, research and development, tire adjustment processes and analysis, internal research and studies, propriety manufacturing and inspection processes and procedures, and tire production information. All such documents are highly protected trade secrets of MNA.

- 11 -

MR 0345

44. MNA spends millions of dollars each year on research, development, testing of tires and their component parts, and developing its proprietary design and manufacturing technologies. Disclosure of this information to those competitors would cause irreparable damage to MNA's competitive advantage.

45. MNA takes extreme care to protect this information from being disclosed because this information is what gives MNA an advantage in the competitive field of tire design and allows it to deliver economic value to its customers. MNA derives economic value and competitive advantage by not having that information available in the public domain. Any disclosure, direct or indirect, of such trade secrets and confidential information would severely and permanently impair MNA's competitive position.

46. Disclosure of MNA's confidential information to multiple individuals would subject MNA to a substantial risk of subsequent disclosure to MNA's competitors, the consequences of which would be irreversible.

47. The steps that MNA has in place to protect the secrecy of its confidential design and development information include, but are not limited to, the following:

    (a)    An 8-foot high cyclone topped with barbed wire fence surrounds the perimeter of MARC's facility and premises in Greenville, South Carolina;

    (b)    All employees access the premises through a gated entrance by use of a limited access turnstile and badge reader. Visitors are given access only after registering with a security officer, presenting identification and naming the specific employee with whom they have business. Thereafter, the MNA employee escorts or supervises the visitor(s), who must display "Visitor" credentials while on the premises.

- 12 -

MR 0346

(c) The security gates are manned Monday through Friday from 6:30 a.m. to 5:00 p.m. and patrolled by security all other hours, weekends, and holidays. In addition, the entire MARC campus and its perimeter is monitored 24 hours a day by surveillance cameras;

(d) While vehicles generally are not allowed on MNA's premises, if a vehicle does enter, it is subject to a random search by security before it is permitted to exit;

(e) To the extent MNA maintains its confidential design and development information electronically, it is stored in a secure, limited access database;

(f) MNA's employees execute stringent non-disclosure and secrecy agreements as a condition of their employment;

(g) MNA's vendors sign confidentiality agreements before they are provided access to any documents or information regarding MNA's work for them;

(h) The research and development information developed by MNA at MARC is maintained at MARC; and

(i) Certain areas on the MARC campus are accessible only to MARC personnel with heightened security access, and are not accessible to other MNA employees.

48. MNA employs these extreme efforts to maintain the confidentiality of information relating to its testing, research, technology, processes, designs, compilations of information, and formulas because it is this information that gives MNA and its clients an advantage in the competitive field of tire design and manufacture.

- 13 -

49. I understand Plaintiffs are requesting documents and/or testimony concerning one or more of MNA's rubber compound formulas.

50. For many decades, MNA has spent millions of dollars and hundreds of thousands of man hours researching, testing, and developing rubber formulas in an effort to increase the performance of its tires. The rubber compound formulas are of significant value to MNA because they are not known to MNA's competitors.

51. MNA believes that its superior rubber compound formulas are an extremely critical factor in its ability to maintain its competitive advantage over its rivals.

52. Because a tire is vulcanized during manufacture (a process that alters the tire's chemistry and dimensions), it cannot be "reverse engineered." Thus, a competitor cannot recreate all of its design specifications simply by purchasing and analyzing a tire, nor can a competitor take a tire apart and determine the components in the rubber, the length of time the rubber is cured, or the machinery used.

53. In addition to the measures discussed above, MNA takes even more extreme steps to protect its compound formula information. Only MNA employees who have a business need to know the information have access to the formulas. Of MNA's thousands of employees, only a few know or have access to the rubber compound formulas.

54. Any disclosure, direct or indirect, of MNA's compound formulas would severely and permanently impair MNA's competitive position. Once disclosed, this damage could not be repaired, even if the disclosure was inadvertent and/or subject to a confidentiality order.

55. Plaintiffs have also requested information and documents relating to MNA's manufacturing and quality procedures.

- 14 -

MR 0348

56. Like all tire manufacturers, MNA keeps secret its specific design, manufacturing, and quality assurance processes. MNA's specific manufacturing processes and equipment are not known to MNA's competitors or the general public. MNA has developed the processes, including manufacturing techniques, machinery, and methods of production, for many decades at a cost of many millions of dollars. MNA also spends millions of dollars every year replacing and updating facilities and equipment. A principal part of MNA's competitive edge in the tire industry derives from its proprietary and unique manufacturing methods and equipment. Most of MNA's processes are not patented for fear of losing their secrecy.

57. The divulgence of MNA's proprietary manufacturing and quality processes to the public or to a competitor would cause an unacceptably high risk of irreparable harm and injury. If third parties were allowed access to these trade secrets, they could take advantage of proprietary information which MNA has spent years and millions of dollars developing, and which MNA's competitors could not duplicate on their own without a similar investments of time, expertise, and money, and perhaps not even then. The damage that could be created by the loss of trade secrets is a direct financial threat to MNA, its parent and affiliated corporations, and risks the loss of MNA's competitive edge and, potentially the employment of thousands of employees throughout the United States and worldwide.

58. MNA spends millions of dollars and countless man hours developing manufacturing processes and quality procedures. Specifically, MNA's building procedures employed at the Dothan plant were developed over an extensive amount of time and at tremendous expense.

- 15 -

MR 0349

59. MNA takes extraordinary measures to maintain the secrecy of its proprietary manufacturing processes and equipment, including the following:

    (a)    Plants are not open to the public. Facilities are surrounded by fences. The Dothan plant maintains a security department with security systems and security officers.

    (b)    Additional security controls are imposed in certain departments because of the highly confidential manufacturing and industrialization work that is carried on in those departments. Persons with access authority are subject to strict control, and employees with access authority are required to execute confidentiality agreements. Employees are not permitted to photograph or videotape the interior of the plant and are not permitted to remove documentary trade secrets except for controlled, business purposes.

    (c)    MNA does not generally permit third persons to enter any plant unless there is a legitimate business reason. Each visitor must wear a badge denoting his or her status and the extent of their access within the plant was limited based on business need and prior approval, with signed secrecy agreements in many instances. The MNA employee with whom the visitor is meeting has to accompany the visitor until the conference is terminated and the visitor leaves the plant.

    (d)    Many of the production machines at the MNA plants are designed, built, and/or modified and installed by MNA itself.

- 16 -

MR 0350

(e)     Employees at MNA plants sign stringent non-disclosure and secrecy agreements as a condition of their employment.

60. The tire development and manufacturing industry is extremely competitive and is dependent on continuing research and development of new tire products and component parts.

61. The information concerning MNA's manufacturing processes, design processes, testing and testing methods, green tire specifications, compounds, and components of tires, including those pertaining to the Subject Tire, is of significant value to MNA because it reveals MNA's design, testing, and analytical processes. This is information that is not known to MNA's competitors. Disclosure of this information to those competitors would cause irreparable damage to MNA's competitive advantage.

FURTHER, AFFIANT SAITH NAUGHT.

_____
Vaneaton Price, III

SWORN to and subscribed before me

this /5ᵗ day of September 2015.

_____(L.S.)
Notary Public for South Carolina
My Commission Expires: 09/14/2016

- 17 -

MR 0351

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) ) | 134TH JUDICIAL DISTRICT |
| DEFENDANTS. | ) | |

## MICHELIN NORTH AMERICA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL MNA TO RESPOND TO DISCOVERY AND IDENTIFICATION OF WITHHELD MNA DOCUMENTS

(Oral Argument Requested)

MR 0352

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) ) | |
| VS. | ) ) | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Summary of Argument | 4 |
| II. | Factual Background | 5 |
| III. | Procedural Background | 5 |
| IV. | Discovery at Issue | 5 |
| V. | Argument and Citation of Authority | 6 |
| | A. Plaintiffs have violated the meet and confer obligations under Texas Rules of Civil Procedure and the Local Rules of this Court | 6 |
| | B. Plaintiffs have moved to compel responses to requests which MNA has answered fully | 8 |
| | C. Plaintiffs' requests are overly broad and are not related to the tire at issue or the issues in this case | 9 |
| | 1. Design, testing and performance documents should be limited to those that relate to the tire at issue and substantially similar tires | 10 |

MR 0353

2. Plaintiffs' requests for manufacturing and quality documents should be limited to those in place at the time of manufacture of the tire in question and those that relate to the components and processes at issue ................................................ 12

D. Plaintiffs are not entitled to discovery of MNA's trade secrets ................................................ 15

VI. Conclusion ................................................ 20

EXHIBIT A ................................................ 23

EXHIBIT B ................................................ 38

EXHIBIT C ................................................ 59

EXHIBIT D ................................................ 62

EXHIBIT E ................................................ 64

MR 0354

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA | ) | IN THE DISTRICT COURT OF |
| MEDINA, HUSBAND AND WIFE, | ) | |
| INDIVIDUALLY; NATALYE MEDINA, | ) | |
| INDIVIDUALLY; NAVIL GIBSON, | ) | |
| INDIVIDUALLY, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) | |
| | ) | |
| MICHELIN NORTH AMERICA, INC.; AND | ) | |
| JOSE BUSTILLO D/B/A MUNDO CARS, AN | ) | |
| IN STATE DEFENDANT, | ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

## DEFENDANT MICHELIN NORTH AMERICA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL MNA TO RESPOND TO DISCOVERY AND IDENTIFICATION OF WITHHELD MNA DOCUMENTS

TO THE HONORABLE JUDGE DALE TILLERY:

Defendant Michelin North America, Inc. ("MNA") files this Response in Opposition to Plaintiffs' Motion to Compel MNA to Respond to Discovery and Identification of Withheld MNA Documents and shows the Court as follows:

### I.    SUMMARY OF ARGUMENT

Plaintiffs' Motion should be denied for the following reasons:

1.  Plaintiffs failed to meet and confer in good faith about the issues in their motion.

2.  Plaintiffs have moved to compel responses which MNA has answered fully.

3.  Plaintiffs' requests are overly broad and not tailored to the product at issue or substantially similar products.

4.  Plaintiffs have not met their burden to obtain MNA's trade secrets.

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL     PAGE 4

MR 0355

## II.    FACTUAL BACKGROUND

This product liability case involves a single vehicle rollover accident. On September 12, 2012, Adrian Rico was driving a 2000 Ford Expedition in Illinois when the left rear tire failed. Mr. Rico lost control of the vehicle and it rolled over. At the time of the accident, the vehicle had eight (8) occupants. Obdulia Medina was seriously injured in the accident. Mr. Rico purchased the Expedition approximately 2 months before the accident and had not changed or checked the tires.

The tire at issue is a Michelin P255/70R16 LTX M/S 109S tire bearing DOT number B7LBEVUX3101 and manufactured by MNA in its Dothan, Alabama plant during the 31st week of 2001. The tire was eleven (11) years old at the time of the accident.

## III.    PROCEDURAL BACKGROUND

On April 3, 2015, plaintiffs served their First Set of Requests for Production. MNA timely responded and produced the non-confidential documents responsive to plaintiffs' requests on April 30, 2105, indicating that it would supplement its production with confidential documents after the parties agreed upon a protective order. The parties agreed to a Protective Order and it was entered on June 2, 2015. Thereafter, on June 16, 2015, MNA supplemented its responses and produced additional, confidential documents responsive to plaintiffs' requests.

## IV.    DISCOVERY REQUESTS AT ISSUE

Attached as Exhibit A is a chart reflecting plaintiffs' discovery requests, a summary of MNA's responses, and the Bates numbers of the documents produced. The discovery requests in dispute can be placed into five general categories:

1.  Documents produced by MNA or those that do not exist (Requests 1, 6, 14, 15, 30, 31, 35, 36, 43)

MR 0356

2. Manufacturing and quality documents (Requests 2, 3, 10, 19, 21, 22, 23, 42, 46, 47)

3. Design specifications and testing (Requests 9, 16, 24, 25, 26, 27, 28, 34, 35, 38 & 40)

4. Claims, lawsuits and warranty adjustment data (Requests 7, 11, 12, 13, 15, 17, 18, 20, 40 & 41)

5. Compound formulas (Request 37)

## V. ARGUMENT AND CITATION OF AUTHORITY

### A. Plaintiffs have violated the meet and confer obligations under the Texas Rules of Civil Procedure and the Local Rules of this Court

The Texas Rules of Civil Procedure and the Rules of this Court make it clear that the parties shall meet and confer prior to filing a motion such as the one before the Court.

> Parties and their attorneys are expected to cooperate in discovery and to make any agreements reasonably necessary for the efficient disposition of the case. All discovery motions or requests for hearings relating to discovery must contain a certificate by the party filing the motion or request that a reasonable effort has been made to resolve the dispute without the necessity of court intervention and the effort failed.

Tex. R. Civ. P. 191.2

> "Prior to the filing of a motion [for discovery sanctions], counsel for the potential movant shall personally attempt to contact counsel for the potential respondent to hold or schedule a conference to resolve the disputed matters. Counsel for the potential movant shall make at least three attempts to contact counsel for the potential respondent. The attempts shall be made during regular business hours on at least two business days.").

Civ. Dist. Loc. R. 2.07(b) (App. C)

The Rules of this Court specify that a meet and confer requires "a substantive discussion of every item presented to the Court . . . ." *Id.* Contrary to their certification, plaintiffs have steadfastly refused to comply with the Texas Rules and the Rules of this Court. Instead, following receipt of the production and supplemental production by MNA, plaintiffs' lawyers initiated a letter writing and telephone call campaign complaining that not enough documents

MR 0357

were produced and accusing MNA and its lawyers of "stonewalling" and "wasting time" because MNA asked them to meet and confer to discuss the discovery disputes. Plaintiffs' lawyers refused to engage in any meaningful discussion of the issues before the Court. Attached as Exhibit B is a collection of plaintiffs' lawyers letters and MNA's responses. A review of this information reveals that, contrary to plaintiffs' claims, MNA has attempted to communicate with plaintiffs' lawyers in a productive, thoughtful fashion; to obtain identification of the specific discovery responses or objections plaintiffs claimed were deficient; to address plaintiffs' concerns regarding discovery; and to resolve this dispute without the need for court intervention. In return, plaintiffs' lawyers refused to negotiate toward a resolution of the dispute and have resorted to accusations and name-calling. Plaintiffs should not be rewarded for these efforts.[1]

The Court should not be persuaded by plaintiffs' unsubstantiated allegations and name calling. MNA has produced approximately 1850 pages of documents concerning the design, manufacture, and performance of the tire in question and substantially similar tires, including common green tire models.[2] MNA has produced information and documents concerning thousands of tires including, but not limited to, *all* available design specifications and design drawings which MNA has located for the model of the tire in question and the common green models made at the Dothan plant for a one year period surrounding the date of manufacture of the tire in question. MNA has produced information on other lawsuits, property damage claims, consumer claims and warranty returns for the tire in question and substantially similar tires.

---

[1] One specific example of this is a letter from plaintiffs' lawyers dated September 2, 2015 in which they, for the first time, stated that a document (which MNA had agreed to produce) had not been produced. Within a few hours, MNA produced the document. Despite receiving the document, plaintiffs' lawyers responded with another accusation. See, Exhibit D

[2] A "common green" tire is a tire manufactured under the same specifications as another tire of a different brand name, except for certain exterior moldings. (Affidavit of Vaneaton Price, attached as Exhibit E, at (8).)

MR 0358

MNA has also produced manufacturing and quality documents relating to the components and processes plaintiffs claim are at issue.

In an attempt to resolve this dispute, MNA offered to expand the scope and to produce additional documents. When MNA made that offer, rather than consider it and engage in a meaningful discussion, the response of one of plaintiffs' lawyers was to call it "bullshit" and he refused to share it with lead counsel. See, Exhibit E.

Texas Rule of Civil Procedure 191.2 ensures that parties cooperate during the discovery process and make reasonable efforts to resolve discovery disputes without the necessity of court intervention. *See In re Alford Chevrolet–Geo*, 997 *S.W.2d 173, 184 (Tex.1999) (orig. proceeding); see also Tex.R. Civ. P. 191.2; Dallas (Tex.) Civ. Dist. Ct. Loc. R. 2.07(c) (*even in emergency, motion must include certificate of conference setting out dates, times, methods, and results of contact or attempts to contact). *Union Carbide Corp. v. Martin*, 349 S.W.3d 137 (Tex. App. – Dallas 2011). Here, plaintiffs took offense to the notion they were supposed to discuss the discovery and potentially compromise to accept less than the overly broad requests they served.

Because plaintiffs refused to comply with the Texas Rules and refused to engage in a meaningful meet and confer, their motion to compel is not properly before the Court, and should be denied.

      B. <u>Plaintiffs have moved to compel responses to requests which MNA has answered fully.</u>

As is set forth in Exhibit A, plaintiffs inexplicably move to compel responses to at least 4 requests which MNA answered fully including 1, 4, 43 and 48. Further, MNA responded to other requests and answered that, after a reasonable and diligent search, it did not have information or documents responsive to the requests for the time the tire was made. MNA produced its record retention policy that shows how long it maintains records. Plaintiff's

MR 0359

inclusion of these requests, and specious arguments concerning the same, demonstrate the futility of the Motion.

        C.   <u>Plaintiffs' requests are overly broad and are not related to the tire at issue or the issues in this case.</u>

Rule 192.3 of the Texas Rules of Civil Procedure defines the scope of discovery as any unprivileged information "relevant to the subject matter of the pending action." TEX. R. CIV. P. 192.3(a); *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (per curiam). The scope of discovery under Texas law is not unlimited. *See In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) "Requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution."; *In re American Optical*, 988 S.W.2d 711, 713 (Tex. 1998) (per curiam).

Requests which could have been more narrowly tailored to avoid including tenuous information are overbroad under Texas law. *In re CSX*, 124 S.W.3d at 153 (citing *American Optical*, 988 S.W.2d at 713). A "fishing expedition" is prohibited, in which the discovery "[is] an effort to dredge the lake in hopes of finding a fish." *Id.* (citing *Texaco Inv. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995)). Parties may not abuse the discovery process by attempting to cast a wide and uncertain net hoping to reach anything that may relate to the core issues in a lawsuit. *K Mart Corp. v. Sanderson,* 937 S.W. 429, 431 (Tex. 1996).

Where a party uses the request for production discovery tool as a means simply to explore but not to reach the main issues, such efforts are rightfully thwarted. *See Dillard Dep. Stores, Inc. v. Hall*, 909 S.W.2d 491, 492 (Tex. 1995); *In re Sears, Roebuck and Co.*, 146 S.W.3d 328, 331 (Tex. App. – Beaumont 2004, orig. proceeding). In *Dillard Dept. Stores, Inc. v. Hall*, the trial court ordered Dillards to produce all incident reports from 1985-1990. The requesting party stated that it needed the information to develop another cause of action against Dillards. The Texas Supreme Court held it an abuse of the lower court's discretion to order Dillards to

MR 0360

respond to such overbroad discovery. The Court noted that "requests for production may not be used simply to explore." 909 S.W.2d at 492; *see also In re Graco Children's Products, Inc.*, 210 S.W.3d 598, 601 (Tex. 2006) ("In this case, there is again no apparent connection between the alleged defect and the discovery ordered.").

      1.  Design, testing and performance documents should be limited to those that relate to the tire at issue and substantially similar tires.

MNA has produced approximately 1850 pages of documents concerning the design, testing, and performance (i.e. lawsuits, claims and warranty adjustment data) of the model of the tire in question, as well as the common green tires manufactured at the Dothan plant during a one year period.[3] MNA's production relating to design, testing and performance includes, but is not limited to:

- *All* design specifications and design drawings which MNA has located for the model of the tire in question and the common green models made at the Dothan plant for the year surrounding the manufacture of the tire at issue;

- The list of condition codes used by MNA in its warranty return process;

- MNA offered to provide adjustment (warranty return) data for the tire in question and the common green models for all conditions requested by Plaintiff, but Plaintiff has not yet identified those conditions;

- Warranty claim forms pertaining to the return of the model of the tire in question or the common green tires manufactured at Dothan within six (6) months before or after the manufacture of the Tire in question;

- Production data for the Dothan plant concerning the model of the tire in question and the two common green tire models;

- MNA's warranty manual for the model of the tire in question;

- MNA's data book containing information concerning the tire in question; and

---

[3] As explained in detail in the Affidavit of Mr. Price, tire designs differ in many ways, including, but not limited to, basic type, dimension, aspect ratio, components, materials, load index, speed ratings, tread designs, bead designs, and recommended inflation pressures. The *only* tires substantially similar to the tire in question are two common green tires.

MR 0361

- MNA's fitment guide indicating appropriate vehicle fitments for the model of the tire in question.

By making this extensive production concerning the tire in question and *all* substantially similar tire models, MNA responded to plaintiffs' discovery requests under a scope appropriate by time, product, and plant. Further, MNA proposed an even more expansive scope to resolve this dispute. By comparison, the scope and magnitude of plaintiffs' discovery requests for design, testing and performance information is massive because it asks for information for all Michelin LTX M/S tires (for all time).[4] As set forth in the Affidavit of Mr. Price, the names of tire lines, such as "LTX M/S," are marketing labels used by MNA to describe many tires suitable for use in a sport utility vehicle ("SUV") or light truck application. They are not a designation of a tire's design or a specific set of manufacturing specifications. The "LTX M/S" marketing label has been used for at least 20 years, for multiple sizes, load ranges, and applications of tires. Further, "LTX M/S" tires are made in multiple sizes and load ranges, for different vehicle fitments and applications, all of which would have different designs. When the tire in question was manufactured in 2001, the "LTX M/S" label was used for approximately 40 tire sizes. MNA uses many marketing labels for its tires. For example, the LTX M/S tire line and its common green lines manufactured just between 1998 and 2003 would encompass approximately 54 tire models built to approximately 5000 tire specifications, and approximately 19.2 million different tires. These tires were manufactured at five (5) MNA and Michelin North America (Canada), Inc. plants in North America, each of which may have employed different manufacturing specifications. All tires manufactured under the "LTX M/S" marketing label are not substantially similar. These tires differ in design in many ways, including size, load capacity, components, number of plies, types of plies, recommended pressures, speed ratings, tread depths, and intended

---

[4] Similarly, plaintiffs' demand for all documents produced in the *Velo* case (an Arizona case handled by plaintiffs' lawyers) seeks information on tires that are not substantially similar to the tire at issue in this case.

MR 0362

applications. These tires of different sizes, dimensions and applications are necessarily of different designs, and are not substantially similar to each other. Exhibit E at para. (19)-(20).

> 2. Plaintiffs' requests for manufacturing and quality documents should be limited to those in place at the time of manufacture of the tire in question and those that relate to the components and processes at issue.

Plaintiffs' requests for manufacturing and quality documents are not limited by time, plant or the components at issue in this case. Plaintiffs simply demand documents by name without regard to plant or whether they apply to the manufacture of the tire at issue or plaintiffs' manufacturing claims. MNA searched for and produced (or told plaintiffs it had not located) the manufacturing and quality documents in effect at the Dothan plant when the tire in question was made relating to the conditions plaintiffs allege exist in the tire in question and the components and processes plaintiffs allege are at issue. Again, by making this production, MNA responded to a scope of discovery appropriate by time, plant and the issues in this case. As set forth in the Affidavit of Mr. Price, no two MNA plants have the exact same equipment and manufacturing processes. Specifications are developed for the equipment and processes at a particular manufacturing plant. Tires manufactured at one plant are produced based on a specification different than the specification used at other plants. MNA does not treat tires manufactured at different plants as substantially similar.

Texas law mandates that a "trial court must make an effort to impose reasonable discovery limits." *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003). Although the scope of discovery is broad, requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution. *Id.*; *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998). "[D]iscovery requests must be 'reasonably tailored' to include only relevant matters." *In re CSX*, 124 S.W.3d at 152.

MR 0363

In products liability cases, Texas courts define the scope of discovery by reference to the specific product at issue. *See, e.g., Gen. Motors Corp. v. Lawrence*, 651 S.W.2d 732 (Tex. 1983) (request for information on "all vehicles" was overbroad and discovery was limited to particular model year of similar full-size pickup trucks). And Texas courts have disallowed discovery in product liability cases regarding products the plaintiff never used. *See In re Graco Children's Prods., Inc.*, 210 S.W.3d 598 (Tex. 2006); *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 180 n.1 (Tex. 1999) (finding request overly broad when it sought information on product different than allegedly defective product at issue); *In re Am. Optical*, 988 S.W.2d at 713-14 (reversing discovery order regarding respiratory equipment plaintiffs did not use).

In tire cases specifically, courts across the country limit the scope of discovery to tires made from the same specification, at the same plant, and for the same time frame as the tire at issue. *Hajek v. Kumho Tire Co., Inc.*, 2010 WL 503044, at *7-8 (D.Neb. Feb. 8, 2010) (denying motion to compel because plaintiffs did not limit discovery to similar tires manufactured within relevant time period); *Murphy v. Cooper Tire & Rubber Co.*, 2008 WL 5273548, at *6 (N.D. Fla. Dec. 18, 2008) (limiting scope of discovery to materials relating to tires manufactured from same specification, at same plant, and within one year of tire in question); *Bradley v. Cooper Tire & Rubber Co.*, 2006 WL 3360926, at *3 (S.D. Miss. Nov. 20, 2006) (limiting scope of discovery to materials relating to tires made from same specification and during same time period as tire in question); *Gonzales v. Goodyear Tire & Rubber Co.*, No. CIV 05-941 slip op. at 24-25 (D.N.M. Aug. 10, 2006) (limiting discovery to "the tire in question and all other Goodyear tires made from the same green tire, and with the same tread pattern, as the tire in question")

In *Hajek*, 2010 WL 503044, the plaintiffs moved to compel Kumho Tire to produce documents regarding "the entire 'Kumho Road Venture line of tires.'" *Id.* at *3. And, unlike

MR 0364

plaintiffs here, the *Hajek* plaintiffs supported their motion with expert testimony alleging relevance. However, the district court found the requests to be overly broad, reasoning: "There are many recognized causes for tread separation," including "poor tire maintenance and motorist negligence." *Id.* at *7. The court found "'nothing indicating a common component of all 'Kumho Road Venture line of tires' caused the accident tire to fail." *Id.* Although the plaintiffs alleged that the tire failed due to a defective design or improper manufacturing practices, no evidence was submitted to support a motion to compel discovery about specific design or manufacturing defects. The court explained:

> Collecting volumes of information regarding all Kumho tires, without any threshold of evidentiary showing of how those tires are similar to the accident tire for the purposes of this litigation, or that the information requested has any relationship to the underlying cause of the alleged tread separation at issue, is unduly burdensome and not likely to lead to the discovery of relevant information. *Id.* at 7-8 (citations omitted).

As discussed below and in the Affidavit of Mr. Price, all of this information is trade secret. MNA produced it for the tire at issue, substantially similar tires and for the manufacturing components and processes at issue without requiring plaintiffs to prove a necessity for them in their case. However, as to such information for dissimilar tires, MNA stands on the trade secret privilege. Plaintiffs have provided no evidence about why they need the trade secret discovery discussed above or why they need discovery of the entire LTX M/S line of tires, information on documents used in other plants or relating to other tires or components and conditions. Their requests are overly broad and plaintiffs' motion should be denied.

     D. <u>Plaintiffs are not entitled to discovery of MNA's trade secrets.</u>

MNA raised proper trade secret objections to which plaintiffs' efforts to obtain MNA's: (a) trade secret rubber compound formulas, (b) trade secret information concerning MNA's

MR 0365

design, testing and performance of tires unrelated to the tire at issue and substantially similar tires, during time periods following the Tire in question's manufacture, and (c) MNA's manufacturing and quality procedures not in effect when the tire in question was manufactured and do not relate to the components and processes at issue. MNA also raised the objection to preserve the trade secret status of documents and information outside of MNA's proposed scope (while producing the requested trade secret documents within the scope). MNA's imposition of a trade secret objection under these circumstances is entirely consistent with Texas law.

The procedures for trade secret protection were stated by the Texas Supreme Court in *In re Continental General Tire, Inc.*, 979 S.W.2d 609 (Tex. 1998). There, the plaintiffs requested production of one of Continental Tire's trade secret rubber compound formulas. After the trial court granted the requested discovery, Continental Tire sought mandamus. The Texas Supreme Court held that the formula was protected from disclosure under Texas Rule of Evidence 507. The court held that once the defendant establishes the trade secret nature of the information being sought, Rule 507 shifts the burden to the requesting party to establish that the information "is necessary for fair adjudication of its claim or defense." *Id.* at 610. The Court emphasized that the requesting party must establish more than mere relevance to discover trade secrets or the statutory privilege would be meaningless. *Id.* at 611. "Rule 507 clearly contemplates a heightened burden for obtaining trade secret information," the Court ruled. *Id.* at 613-14.

A requesting party's burden of proof *requires the presentation of evidence* to justify the disclosure of a trade secret. *Id.* at 615. See, e.g., *Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 586-87 (Pa. Super. 2006); *In re Continental Gen. Tire, Inc.*, 979 S.W.2d at 611. The party seeking trade secrets must demonstrate that, without the requested disclosure, "an unjust result is a real, rather than a merely possible, threat." In Re Bridgestone/Firestone,

MR 0366

<u>Inc.</u>, 106 S.W.3d 730, 733 (Tex. 2003). As the great weight of authority establishes, the party seeking production of confidential trade secrets must overcome a considerably higher burden than when a party simply requests documents that do not contain confidential trade secrets. MNA has met its burden of establishing trade secrets. As forth in the affidavit of Mr. Price, the design, manufacturing, quality and adjustment processes are trade secrets. MNA has made and continues to make reasonable efforts to maintain the secrecy of this information, and the information would be very valuable to MNA's competitors. In contrast, plaintiffs have offered *no* evidence to support their argument for disclosure, as required under Texas law.

1. <u>Rubber Compound Formulas</u>

Request for No. 37 seeks, among other things, inner liner specifications. These specifications include information concerning MNA's sensitive, trade secret rubber compound formulas. Plaintiffs have not and cannot demonstrate any need for these rubber compound formulas. plaintiffs' Motion is devoid of any statement or evidence attempting to demonstrate a need for the rubber compound formulas. Because plaintiffs provide no evidence, as required by the cases cited above, to support their request for the rubber compound formulas, the requests should be summarily denied.[5]

MNA has provided ample evidence of the confidential trade secret nature of the rubber compound formulas through the affidavit of Mr. Price. For many decades, MNA has spent millions of dollars and hundreds of thousands of man hours researching and developing its rubber formulas to increase the performance of its tires. The rubber compound formulas are of significant value to MNA because they are not known to MNA's competitors. The rubber compound formulas are subject to not only reasonable, but extensive, measures to protect their

---

[5] To the extent plaintiffs attempt to demonstrate a need for the rubber compound formulas or other MNA trade secrets through affidavit or other evidence from their tire expert, MNA respectfully requests an opportunity to cross-examine plaintiffs' witnesses before the Court rules on the disclosure of MNA's trade secrets.

MR 0367

secrecy. Access to the rubber compound formulas is limited to those employees with a business need for the information. Only MNA employees with a business need to know the information have access to the formulas. Of MNA's thousands of employees, only a few know or have access to the rubber compound formulas. Disclosure of the rubber compound formulas to MNA's competitors would cause irreparable damage to MNA's competitive advantage. Once disclosed, this damage could not be repaired, even if the disclosure was inadvertent and/or subject to a confidentiality order.

The Texas Supreme Court in *In re Continental General Tire, Inc.*, granted mandamus relief to protect Continental Tire's trade secret compound formulas from discovery. 979 S.W.2d at 613. The court reversed the trial court's order compelling production of tire information under a confidentiality order, and held that plaintiff had not produced adequate evidence to warrant production given the "highly proprietary nature of the information." Id. at 615. The court held that once the nature of the trade secret is established by the holder of the trade secret, the burden shifts to the requesting party to establish that the information is necessary or essential for a fair adjudication of the case, weighing the requesting party's need for the information against the potential of harm to the party resisting disclosure. Id. at 609, 610-13. The Supreme Court elaborated on this threshold in a later case by stating that "a party seeking such information cannot merely assert unfairness but must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733. In that case, plaintiffs stated that they could prove that the tire was defective without knowing the skim stock formulas, yet still argued that disclosure of the formulas was necessary to their case. The court further noted that skim stock rubber is chemically changed during the

MR 0368

vulcanization and curing process such that it "may not be possible to know from the recipe of components how the finished tire will perform." Id. Accordingly, plaintiffs' motion to compel was denied.

As these cases indicate, rubber compound formulas offer little probative evidence of the physical condition of the tire at issue at the time of the accident and, therefore, do not provide evidence relevant to Plaintiff's claims that the Tire in question was defective.

2.   Trade Secret Design, Manufacturing and Quality Documents and Adjustment Data

As addressed above, MNA produced substantial trade secret information relating to design, performance of the tire (what plaintiffs call adjustment and claims data) at issue and substantially similar tires.  In their motion to compel, plaintiffs do not explain why they are entitled to or need trade secret information beyond that already produced, and as such fail to meet their burden to discover that information. Plaintiffs simply do not address their requests for design and testing.[6]  Plaintiffs do address adjustment data, but fail to tell the Court that MNA produced substantial information on the tire at issue and substantially similar tires and offer no explanation as to why they are entitled to that information beyond what was already produced.

Instead, plaintiffs spend much of their motion to compel (pages 11-16) discussing certain of MNA's manufacturing and quality documents used in the inspection of completed tires. Plaintiffs know that these documents are trade secrets as they filed the portions of the motion addressing them under seal.  Plaintiffs' request is not limited to the documents in use at the time the tire was manufactured or procedures applicable to the tire at issue.  Plaintiffs also fail to tell

---

[6] For example, in request for production no. 29, plaintiffs seek documents regarding the use of nylon cap plies in all tires.  As Mr. Price explains, each tire is designed for its performance requirements, and the documents relating to the design of tires are trade secrets.  Plaintiffs do not address this at all, much less state why or how they have a need for those documents.

MR 0369

the Court that MNA produced many of the documents requested that relate to the components and conditions plaintiffs identified as being at issue in this case. See Exhibit A[7]

MNA has established through the Affidavit of Mr. Price that MNA's design, manufacturing and warranty adjust processes are trade secrets. While plaintiffs pontificate and state in great detail the contents of documents produced subject to a protective order in an unrelated case, they failed to provide *any* evidence to prove any particularized need for the information and documents as required by Texas law. As such, as demonstrated in the case law, plaintiffs are not entitled to discover these sensitive trade secrets.[8]

Two Texas courts of appeals have recently issued writs of mandamus vacating orders compelling tire companies to disclose the same type of information plaintiffs request here – including tire design, manufacturing, testing, and claims data – because it is trade secret information that had not been demonstrated to be necessary to a fair adjudication of the case. *See In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 918-19 (Tex. App. – Houston [14th Dist.] 2010, orig. proceeding) and *In re Goodyear Tire & Rubber Co.*, 2010 WL 2510371, *6-7 (Tex. App. – Dallas June 23, 2010, orig. proceeding).

*In re Cooper Tire* involved a tire failure alleging that Cooper Tire failed to incorporate a design element known as belt edge gum strips ("BEGs") into the design, which would have resulted in a safer alternative design. Plaintiffs requested documents showing when BEGs were added and removed from a different tire with a different green tire specification. Cooper Tire established that the requested information was trade secret. The burden then shifted to Plaintiffs

---

[7] In an effort to resolve this dispute, MNA offered to produce certain of these documents, but the response from one of plaintiffs' lawyers was that the offer was "bullshit." See, Exhibit C

[8] Plaintiffs make a passing reference in their motion about the need to inspect the Dothan manufacturing plant. MNA has received no such request. As is clear, the plant is full of trade secrets and any proposed inspection would expose and jeopardize those trade secrets. To the extent plaintiffs intend to pursue a plant inspection, MNA requests the opportunity to brief the issue and provide evidence and an opportunity to be heard.

MR 0370

to show the information was necessary for a fair adjudication of the case. Plaintiffs argued that they needed the information to show safer alternative design and that the use of BEGs on other Cooper tires reduced the number of tire separation incidents. The court held, however, that information about BEGs in other Cooper tires was not essential and protected the information from disclosure.

Likewise, *In re Goodyear* was a tire-failure rollover death case. The allegation was that Goodyear did not incorporate nylon cap plies in the tire design and that the rubber compound used was insufficient to maintain adhesion. The Dallas court ruled that the discovery was overbroad and violated Goodyear's trade secret privilege. After trade secret was shown, the burden shifted to plaintiff who did not prove that information was necessary or essential to the case. The Dallas Court of Appeals issued a writ of mandamus reversing an order compelling production of plant specifications, adjustment and claims data, and testing information because this information met the factors for trade secret qualification and plaintiffs did not meet the heightened burden of proof. *Id.* at *7-8.

The information sought by plaintiffs is some of the most sensitive and valuable of MNA's trade secrets, for which plaintiffs have failed to demonstrate the relevance or necessity. Because the risk of harm from disclosure, even inadvertent, far outweighs plaintiff's non-existent need for this information, plaintiffs' motion to compel this information should be denied.

## VI.    CONCLUSION

Plaintiffs are seeking expansive discovery not tailored to this case and not limited to substantially similar tires, much less substantially similar tires. Plaintiffs also seek MNA's valuable trade secrets without showing any relevance or need for them. Although MNA has worked diligently to resolve this discovery dispute, has produced documents pursuant to an

MR 0371

expansive scope, and has offered to produce even more, plaintiffs have maintained their unreasonable positions. Accordingly, MNA respectfully requests that the Court deny plaintiffs' motion to compel in its entirety.

Respectfully submitted,

GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By:    /s/ Thomas M. Bullion III
         Thomas M. Bullion III
         tbullion@germer-austin.com
         State Bar No. 03331005
         Chris A. Blackerby
         cblackerby@germer-austin.com
         State Bar No. 00787091

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

MR 0372

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 4th day of September, 2015.

Luis P. Guerra                                    *Via E-Service & Electronic Mail*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

James B. Ragan                                    *Via E-Service & Electronic Mail*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, TX 78401

Noel Sevastianos                                  *Via E-Service & Electronic Mail*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars                    *Via Regular Mail*
6422 Day Street
Dallas, Texas 85227
*Pro Se*


/s/ Thomas M. Bullion III
Thomas M. Bullion III/Chris A. Blackerby

MR 0373

Medina v. Michelin

## PLAINTIFF'S FIRST SET OF REQUEST FOR PRODUCTION TO DEFENDANT, MICHELIN NORTH AMERICA, INC.

| | Summary of Information Requested | MNA Response | Bates Numbers | Attempt to compromise |
|---|---|---|---|---|
| 1. | Identify and produce the organizational charts showing the functions and reporting structure of Michelin North America's departments, divisions, or units, whether domestic or foreign, responsible, either directly or indirectly, for: research, design and development; manufacturing and production; quality control of the subject tire and the model tires. | None exist for when tire was made. Produced record retention policy | MNA 1507-1529 | |
| 2. | Identify and produce true, complete and accurate Michelin's Decision Tree Manual also known as Michelin's Aspect Specifications. | Produced for components & processes identified by Plaintiff | MNA 1287-1312 MNA 1815-1820 | |
| 3. | Please produce true, complete and accurate copies of the General Principals. | Trade Secret | | MNA offered to produce oldest available |
| 4. | Please produce any position paper regarding tire date limitations | Produced | MNA 1435-1441 | |



MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL      PAGE 23

MR 0374

| # | Request | Response | Bates | Action |
|---|---------|----------|-------|--------|
| | produced by any employee or past employee of Michelin North America including but not limited to any and all drafts and Versions of the paper titled "Limit Date of Utilization. " | | MNA 000152-000230 | |
| 5. | Please produce a true, complete and accurate copy of the 2011 Michelin L TX M/S Data Sheet. | Tire was made in 2001 not 2011. Produced 2001 version. | | |
| 6. | Please produce a true, complete and accurate copy of the 2001 Michelin Limited Warranty Manual. | Produced | MNA 1270-1286 | |
| 7. | Please produce true, complete and accurate copy of any and all limited warranty claim forms and consumer claims for Michelin L TX MIS tires returned for tread/belt separation. | Produced for scope for tires & common greens | MNA 0001-130 MNA 232-563 MNA 1431-1434 | Offered to expand scope |
| 8. | Please produce true, complete and accurate copies of Discount Tire claims and code sheet for Michelin L TX M/S tires. | Produced for scope for tires & common greens | MNA 0001-130 MNA 232-563 MNA 1431-1434 | Offered to expand scope |
| 9. | Identify and produce copies of the model tire's and similar tires specifications, including belt skim stock, carcass ply, belt edge strip, and belt edge cushion or insert specifications, steel cord specifications, green tire specifications, cured tire specifications. | Produced specifications for tires in scope. | MNA 152-230 MNA 564-1192 MNA 1313-1365 MNA 1469-1506 MNA 1530-1817 MNA 1850-2004 | Offered to expand scope-letter |

MR 0375

| | | | | |
|---|---|---|---|---|
| | specifications, tire building specifications, blueprints, drawings, schematics, diagrams, photographs, x-rays, I-rays, and/or holograms from the date those tires were manufactured to the present or to the end of production. This request includes documents, including but not limited to change orders and product change proposals (including product change proposals that were not adopted) relating to changes in the specifications for the production life of the model tire and tires that replaced the model tire. This request includes specifications and change documents for the model tire prepared prior to the manufacture of the subject tire. This request also includes any tire data book or Tire Fitment Guide covering the subject model tire. | | | |
| 10. | Identify and produce the reaction limit specifications and/or OPL Working Limits and Aging for the subject tire. | None for relevant scope | | Offered to produce oldest available for components and processes |
| 11. | Identify and produce any and all documents, relating to personal injury claims and/or lawsuits involving separations, or alleged separations of Michelin North | Produced for scope | MNA131-150 MNA1401-1424 | Offered to expand scope |

MR 0376

| | | | |
|---|---|---|---|
| America B2001 *P265170 R17* Michelin L TX MIS *P265170 R17* p-metric tires, similar tires and all tires from the same L TX tire line from the date those tires were first manufactured to the present or to the end of production. This request also includes incident reports, accident reports, correspondence, and photographs.<br><br>Also, as to lawsuits, this request includes copies of complaints, discovery responses of Michelin North America, reports of both plaintiffs' and defendants' experts, and deposition and trial testimony of current and former Michelin North America employees and experts. Also please produce a summary of this data. | | | |
| 12. Identify and produce any and all documents, relating to adjustment of P265170 R17 Michelin L TX *MIS* p-metric tires, similar tires and all tires from the same L TX tire line manufactured by Michelin North America with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire, bearing separation related adjustment codes, including but not | Produced claim forms for scope. Produced adjustment codes | MNA 0001-130<br>MNA 232-563<br>MNA 1431-1434<br>MNA 001821-001828 | Offered to expand scope |

limited to any and all adjustment codes for tread separation, belt edge separation, separation between the belts, separations between the inner belt and outer body ply, separations between the body piles, separations between the cushion and number one or bottom belt, separations in the sidewall or bead area; all this information from the date the tires were first manufacture to the present or end of production. This request includes, but is not limited to adjustment forms, adjustment tickets, and summaries, including computer and graphical summaries of adjustment forms or adjustment tickets, manuals relating to the adjustment and inspection of tires and the documentation necessary to interpret adjustment records, including the service condition codes index and/or adjustment records. Also, please produce a summary of this adjustment data stating for each tire, the model and size, the month and year of manufacture, the date of the adjustment or rejection of the claim and the state where the adjustment claim or form was made or

MR 0378

| 13. | Identify and produce any and all documents, computer generated transmissions, such as email, computer printouts, programs, tapes, photographs, and videotapes relating to property damage claims involving separations, or alleged separations, in Michelin North America P265170 R17 Michelin L TX *MIS* p-metric tires, similar tires and all tires from the same L TX tire line manufactured with the same belt skim stock code and/or belt edge cushion or insert code as the subject tire from the date those tires were first manufactured to the present or to the end of production. This request includes incident reports, accident reports, correspondence, and photographs for every property damage claim arising out of belt separations, belt edge separations, separations between the inner belt and the outer body ply, separations between the body piles, separations between the cushion and the number one, or bottom belt, and separations in the sidewall or bead area. | Produced for scope | MNA 00151 1507-1529 | Offered to expand scope |

submitted.

MR 0379

| | | | |
|---|---|---|---|
| 14. | **All** records of any communication between Michelin North America and any insurer, state or federal governmental entity, consumer or safety group or advocates relation to questions, insurance claims, trends, patterns or failure of the subject tire or model tires including but not limited to the subject of tread, ply, belt, and/or cord separation. | None for scope | |
| 15. | All documents that contain Michelin North America's internal recommendations, determinations, or guidelines as to the acceptable or unacceptable rate or frequency of loss adjustment or any rate of frequency of loss adjustment that requires that action be taken or notification be given by or to any internal Michelin North America persons or organizations. | None for scope | Offered to expand scope |
| 16. | Please produce true, complete and accurate copies of the design drawings for the subject tire. | Produced for scope | Offered to expand scope |
| 17. | All non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Michelin North America alleging a tread separation *of P265/70 R17 Michelin LTX M/S p-metric tires, similar tires* | Produced for scope    MNA 1469-1506 MNA 1553-1554 MNA 1558-1568 MNA 00151 | Offered to expand scope. |

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 29

MR 0380

| No. | Request | | | |
|---|---|---|---|---|
| 18. | and all tires from the same LTX tire line documenting similar tires tread, belt, ply or cord separation or detachment, whether partial or full. Identify and produce any and all documents, relating to personal injury claims and/or lawsuits, property damage claims and adjustments involving separations, or alleged separations of similar Michelin North America tires that contain nyloncap plies from the date the similar tire was first manufacture to the present or end of production. | None in scope | | Offered to expand scope |
| 19. | Identify and produce any and all documents, relating to the building, tire builder training, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the subject tire was manufactured. This request includes, but is not limited to standard practice binders, tire building manuals, tire builder training manuals, equipment manuals, and/or other materials and videotapes used to train tire builders. This request also includes documents, photographs, and charts used to illustrate defects, or potential defects, in tires and/or problems or | Produced for components & processes at issue and stated no others located. | MNA 1287-1312 MNA1815-1820 | |

MR 0381

| | | | | |
|---|---|---|---|---|
| 20. | potential problems in the tire building process. | | | |
| | Identify and produce any audits, reports, examinations, investigations, studies, or reviews, including any work papers, whether created within or outside Michelin North America, in any manner related to the return, failure, expectancy, design, or quality of the subject tire and model tires. | Produced for scope | MNA 1286 MNA1366-1376 MNA 1431-1434 | Offered to expand scope |
| 21. | All training documents made available, at the time the subject tire was built, to persons who construct, manufacture or assemble tires or operate tire-building equipment at the plaint where the subject tire was built. | None for scope | MNA 1507-1529 | |
| 22. | All training program materials or other documents provided to Michelin North America's employees building *P265/70 R17 Michelin LTX MIS p-metric tires,* similar tires and all tires from the same L TX tire line. | None for Scope | MNA 1507-1529 | |
| 23. | All inspection methodology materials or other documents uses or followed to determine any trapped air/steam blisters in finished tires. | Produced oldest available | MNA 1815-1820 | |

MR 0382

| No. | Request | | | |
|---|---|---|---|---|
| 24. | Any and all documents relating to testing of steel belted radial passenger and light truck tires manufactured with same belt skim stock code as the subject tire at the Dothan, Alabama plant where the subject tire was manufacture. This request includes documents relating to peel tests, pull tests, performance tests, and endurance tests whether conducted on a test wheel or a test track. | None for scope – produced record retention policy | 1507-1529 | Offered to expand scope |
| 25. | Any and all documents relating to under-inflation testing that led to tread separation. | None for scope | | Offered to expand scope |
| 26. | Any and all documents relating to rim groove analysis in which the rim groove profile was generated by under-inflation and led to tread belt separations. | None for scope | | Offered to expand scope |
| 27. | All Department *of* Transportation (DOT) testing related to all "Michelin LTX" tires manufactured at the Dothan Alabama plant. | None for scope | | Offered to expand scope |
| 28. | The curing conditions at the Dothan Plant that were used for the curing of the subject tire and any subsequent changes to those curing conditions. | None for scope | | |

MR 0383

| | | | |
|---|---|---|---|
| 29. | Any and all documents, relating to the use or potential use of nylon overlays, or belt edge strips, or belt edge wraps belt edge gum strips in passenger or light truck tires and the application of the nylon overlays, belt edge strips or belt edge wraps during the tire building process. Also, please produce copies of any documents, including patents and articles in possession of Michelin North America discussing the use or potential use of nylon overlays, or belt edge strips, and/or belt edge wraps in passenger or light truck tires manufactured and/or designed by Michelin North America. This request specifically includes patents discussing the use of nylon overlays or belt edge strips or belt edge wraps. This request also includes brochures, charts, and/or illustrations of Michelin North America tires with· nylon overlays, including but not limited to illustrations supplied to Michelin North America dealers or service centers. | None in scope | |
| 30. | Identify and produce all documents that discuss Michelin's document retention policy from the time it manufactured the subject tire to the | Produced | MNA 1507-1529 | Offered to expand scope |

MR 0384

| | | | |
|---|---|---|---|
| 31. | present.<br><br>The written warranty in effect for the subject tire. | Produced | MNA 1270-1286 |
| 32. | Any and all documents that discuss Michelin's recommendations regarding tire aging including Michelin's testing to support those recommendations including any and all technical bulletins. | Produced documents on service life | MNA 1269, MNA1270-1285 MNA 1435-1468 |
| 33. | Produce a complete copy of any communications or correspondence between Michelin and any auto manufacturer and/or NHTSA concerning tire use limits or limit date of utilization for any and all passenger and light truck tires including the subject tire model. | Produced responsive documents | MNA 1269 |
| 34. | Please produce true, complete and accurate copies of any and all cut analysis (sectional) reports on the subject tire from production release to time of subject tire's manufactured date or architecture reportoire. | None for scope | |
| 35. | Please produce all cured, finished gauges for the manufacture of the subject tire. | Produced | MNA 1530-1814 |
| 36. | Please produce true, complete and accurate copies of the plant's process control chart or documentation at the time of the manufacture of the | None for scope – produced record retention policy | MNA 1507-1529 |

MR 0385

| | | | | |
|---|---|---|---|---|
| | subject tire. | | | |
| 37. | Please produce true, complete and accurate copies of the quantitative listing of the ingredients of the subject tire's inner liner in use at the time of the manufacture of the subject tire. | Objected on basis of trade secrets<br><br>This requests a formula | | |
| 38. | Please produce true, complete and accurate copies of any and all DFMEA or PFMEA documentation of the subject tire and any other tires incorporating its exact green tire construction. | None in scope – produced record retention policy | MNA 1507-1529 | |
| 39. | Please produce the design and production tolerances for the subject tire in effect at the time of its manufacture. | None in scope – produced record retention policy | MNA 1507 | |
| 40. | Please produce true, complete and accurate copies of any and all specific regulatory compliance test results for the subject tire and all associated brand and line name tires sharing the same green tire construction as the subject tire from production release to present, including but not limited to endurance tests, high speed endurance tests, plunger energy tests, bead unseat tests all for FMVSS requirements. | None in scope – produced record retention policy | MNA 1507 | Offered to expand scope |

MR 0386

| No. | Request | Response | Bates | |
|---|---|---|---|---|
| 41. | Please produce the adjustment and claim data for the subject tire and all associated brand and line name tires sharing the same green tire construction after each change to design occurring after the manufacture date of the subject tire. | No Produced for scope plus adjustment codes. | MNA 001-130 MNA 232-563 MNA 1431-1434 MNA 1821-1828 | Offered to expand scope |
| 42. | Please produce true, complete, and accurate copies of all the aspect specifications including Indexes and Table of Contents. | Produced for components & processes | MNA1287-1312 MNA 1815-1820 | |
| 43. | Please produce an index of any and all technical bulletins. | None exist | | |
| 44. | Please produce a true, complete and accurate copy of all discovery produced by Michelin in *Velo, et. al. v. Michelin, et. al., filed in Maricopa County Superior Court, CV2012-007346.* | Objected | | Offered to expand scope |
| 45. | Please provide true, complete and accurate copies of any and all depositions with exhibits given by Michelin employees Randall Clark, Michael Wisschusen, Michael Riley, Paul Northrop and Tom Gruenholz. | None in scope | | |
| 46. | Please provide true, complete and accurate quality control/work | None in scope | | Offered to produce oldest available |

MR 0387

| | | | |
|---|---|---|---|---|
| | procedures including but not limited to: TNC and TNC3R-A work procedures/instructions. | | | |
| 47. | Please provide true, complete and accurate copies of Michelin Technical Notes. | None in relevant scope | | Offered to produce any applicable |
| 48. | Please provide true, complete and accurate copies of Michelin's Print Advertising concerning the subject tire. | Produced | MNA152-230 | |
| 49. | Please provide true, complete and accurate copies of Michelin's Owners Manual and Tire Fitment Guide. | Produced | MNA1270-1285<br>MNA 564-1192 | |
| 50. | Please provide a true, complete and accurate copy of Michelin's Power Point Presentation made to NHTSA on November 1, 2006. | Produced | MNA 1221-1268 | |

MR 0388

**From:** David Shapiro [mailto:dshapiro@lpguerra.com]
**Sent:** Thursday, June 25, 2015 10:13 AM
**To:** Chris Blackerby; Giles Schanen
**Subject:** Medina v. Michelin

In view of Giles' emails repeatedly asking Plaintiffs to identify their defect theories and components at issue - all before Plaintiffs received any documents under the PO, it reminded me that we are entitled to discovery on Michelin's theories about this case. So, make sure you disclose them accordingly within the next seven (7) days - just like the defense asked Plaintiffs to do.

Thank you.

David.

**David C. Shapiro, Esq.**
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

O: 602.381.8400
F: 602.381.8403
E: dshapiro@lpguerra.com
W: www.lpguerra.com



LUIS P. GUERRA, L.L.C.
personal injury trial attorneys

Click here to report this email as spam.



EXHIBIT
*B*

MR 0389

LAW OFFICES

# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

July 2, 2015

<u>Via Email and U.S. Mail</u>
Giles M. Schanen, Jr.
Nelson Mullins Riley & Scarborough LLP
Poinsett Plaza, Suite 900
104 South Main Street
Greenville, SC 29601

Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

Re: Medina v. Michelin, et al

Dear Counsel:

Last week, we asked Michelin to identify the components and conditions it claims are at issue. We have not heard a peep. Please provide such immediately.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL      PAGE 39

MR 0390

**From:** David Shapiro [mailto:dshapiro@lpguerra.com]
**Sent:** Tuesday, July 07, 2015 1:33 PM
**To:** Wendy Emmons
**Subject:** Re: Medina - Depositions of Rico Family

We are working on it. We need dates of your availability also for these depositions and the Illinois State Trooper. Finally, we still have not received Michelin's defect theories and components it deems at issue. We have asked Chris for this several times. Please have him identify them.

**David C. Shapiro, Esq.**
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

O: 602.381.8400
F: 602.381.8403
E: dshapiro@lpguerra.com
W: www.lpguerra.com



On Jul 7, 2015, at 11:23 AM, Wendy Emmons <wemmons@germer-austin.com> wrote:

Any word on dates for the Rico family depositions?

**From:** Wendy Emmons
**Sent:** Thursday, July 02, 2015 1:48 PM
**To:** 'David Shapiro'
**Subject:** RE: Vehicle

Thanks.

Any word on dates for the Rico family depositions?

MR 0391



**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**THOMAS M. BULLION III**
PARTNER

**Direct Dial: 512.482.3535**
tbullion@germer-austin.com

July 17, 2015

<u>VIA FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

      Re:    *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear Counsel:

I am writing in response to your e-mail dated June 25, your letter dated July 2, and your e-mail dated July 7.

As I thought you understood, we requested information on the components and conditions plaintiffs claim are at issue in this case to enable us to respond to plaintiffs' discovery requests. You have now written three times to request information on the components and conditions we claim are at issue. First, if you want information about our contentions, please propound a proper discovery request. Second, and more importantly, we don't claim any components or conditions are at issue. Our position is that the tire in question was well designed and well manufactured and contained no defects whatsoever when it left the Dothan, Alabama plant during the 31st week of 2001. It failed over 11 years later because of the way it was used and abused during its service life.

Yours very truly,

*Thomas M. Bullion III*

Thomas M. Bullion III

TMB:lq

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4533472

MR 0392

LAW OFFICES

# LUIS P. GUERRA, L.L.C.

6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

July 16, 2015

Via Email and U.S. Mail
Giles M. Schanen, Jr.
Nelson Mullins Riley & Scarborough LLP
Poinsett Plaza, Suite 900
104 South Main Street
Greenville, SC 29601

Re:     Medina v. Michelin, et al

Dear Giles:

On April 3, 2015, Plaintiffs served requests for production of discovery on Michelin. The requests were specific. Plaintiffs knew what they wanted and needed. As you know counsel had a previous case against Michelin involving a similar 2001 LTX M/S tire manufactured at the same exact Dothan, Alabama plant. Both Michelin and Michelin counsel are well aware of this previous case because it has been repeatedly referenced and incorporated by defense counsel in this litigation even to the point of using the same Protective Order.

Originally Michelin refused to produce the documents under the guise of the need for a Protective Order. However, it assured Plaintiffs' counsel that once such order was entered the documents would be produced. Repeatedly by personal contact, telephone call, e-mails and correspondence Plaintiffs' counsel were assured both by *you* and Chris that the documents would be produced. Both David and I spoke with *you* numerous times about it and *you* assured us in no uncertain terms that the documents would be produced as soon as the Protective Order was executed. Not true.

Bear in mind that Michelin had Plaintiffs' requests since April 3, 2015. Still, week after week, nothing was produced. Finally, a few weeks ago, at the end of June, Michelin made a production of documents. It is appalling. Michelin withheld *thousands* of relevant documents.

Michelin's defective LTX/MS tire turned Plaintiff Obdulia Medina - a 49 year

MR 0393

young, beautiful and loving mother and wife into a quadriplegic. Michelin's tire sentenced Obdulia to a life that no one would wish upon their worst enemy. Obdulia is unable to fend for herself. She is unable to perform even the most basic human functions such as defecate, urinate, walk, turn herself in bed, or even scratch her back. Rest assured we will not stop until we get justice for Obdulia and her family.

Michelin's utter disregard for the discovery process, the Honorable Court's authority and the Texas Rules of Civil Procedure is exposed. Each document Michelin has failed to produce constitutes a separate and distinct discovery violation of the Texas Rules of Civil Procedure committed by Michelin. Each day that this goes on constitutes a separate and distinct discovery violation of the Texas Rules of Civil Procedure by Michelin.

As such we will be contacting the Court and requesting a hearing in which in the name of justice, fair play and the truth and in the spirit, letter, and intent of the Texas Rules of Civil Procedure we will request the most severe sanctions permitted under the law. ***Govern yourself accordingly.***

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

cc: Chris Blackerby, Esq.

LAW OFFICES

# LUIS P. GUERRA, L.L.C.

6225 North 24ᵗʰ Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 2, 2015

<u>Via Email and U.S. Mail</u>
Thomas M. Bullion, III
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

Re: Medina v. Michelin, et al

Dear Tom:

A month ago we sent you a letter asking you to disclose Michelin's defenses. You responded with a letter containing a general statement of "tire abuse". We followed up with correspondence reminding you that a general statement saying that the tire was abused *without* any factual basis or evidence does not meet the discovery requirements. We asked you to explain and provide the factual basis unless Michelin had no factual evidence of any alleged tire abuse. We have heard nothing back.

Since Michelin had the tire in its possession at its North America headquarters and research and manufacturing facility in Greenville, South Carolina for over a month and has yet not disclosed any factual basis for its defenses, given Michelin's lengthy inspection, if Michelin had discovered any alleged evidence of such tire abuse Michelin would know it by now. Yet, to date Michelin disclosed absolutely nothing in the form of a factual basis for Michelin's alleged defenses.

Therefore, in view of Michelin's complete lack of disclosure on this matter, Plaintiffs now have proof that Michelin has no evidence of any alleged "tire abuse". Therefore, these letters and your responses on behalf of Michelin will be disclosed as evidence to be used at trial.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 44

MR 0395

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 3, 2015

Via Email and U.S. Mail
Giles M. Schanen, Jr.
Nelson Mullins Riley & Scarborough LLP
Poinsett Plaza, Suite 900
104 South Main Street
Greenville, SC 29601

   Re: Medina v. Michelin, et al

Dear Giles:

   Michelin's intentional concealment of thousands of relevant documents after repeated promises to comply with the Texas Rules of Civil Procedure and produce all relevant and responsive documents has absolutely prevented Plaintiffs from conducting discovery. Amongst others, Plaintiffs intend to depose Michelin's employees most knowledgeable about numerous documents that should have been produced (this is not an exhaustive list):

1. The Michelin Aspect Specifications
2. The Michelin General Principles for North America
3. The Michelin Technical Repertoire
4. The Michelin LTX M/S Tolerances
5. Michelin Passenger and Light Truck Tire Conditions Manual
6. Michelin Tires Inspection Process and Tire Damage Analysis
7. Michelin's Engineer that designed the LTX M/S and LTX M/S2
8. Michelin's employee most knowledgeable about the warranty claims for Michelin LTX M/S
9. Michelin's employee most knowledgeable about the warranty claims and returns concerning the LTX M/S for any and all licenses and authorized Michelin dealers including but not limited to Discount Tire
10. Michelin's employee most knowledgeable about the warranty claims concerning the LTX M/S made directly to Michelin
11. Michelin's adjustment data for the LTX M/S
12. Michelin's Technical Notes

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL  PAGE 45

MR 0396

13. Michelin's specifications for the subject tires inner liner, carcass ply and trend steel belts including the individual(s) most knowledgeable about: **a)** the halobuty content in the subject tire, **b)** the antioxidant package contained in the subject tire and **c)** the belt skim stock contained therein
14. Michelin's returns and causes thereof including spreadsheets documenting returns and return codes
15. The individual(s) responsible for publishing/storing/maintaining Michelin's Technical Bulletins

Because Michelin has not produced countless relevant and responsive documents Plaintiffs cannot conduct or proceed with discovery. While Michelin is directly and consciously aware of its lack of production we have not heard a peep from you on behalf of Michelin about this matter. It is duly noted, and the Court will be directly and specifically informed of it.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

cc:     Chris Blackerby, Esq.



**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

August 4, 2015

<u>VIA FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear Mr. Guerra:

This is in response to your letters regarding discovery. As you know, MNA supplemented is discovery responses after the Protective Order was entered. If you still have issues and you would like a meet and confer as required by Texas Rule 191.2, please let us know when you are available. We will be happy to discuss any specific request and MNA's response thereto to reach a resolution as MNA did in the prior case in Arizona. From your letters, however, I cannot determine which requests are at issue, so please specify which requests you would like to address before we talk. We will also be happy to discuss a discovery scope.

As for your request for depositions, since your list is not exhaustive, it would make the most sense for you to send draft notices of the specific topics you intend to cover. We can then discuss those and determine if there are any issues or concerns.

Without the above information, your letters do not comply with Rule 191.2 as we cannot identify what discovery is at issue.

I look forward to hearing from you.

Yours very truly,

*Chris A. Blackerby*

Chris A. Blackerby

CAB:lq
cc.:   Noel Sevastianos (via facsimile)

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4535400

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL       PAGE 47

MR 0398

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 4, 2015

Via E-mail and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

Re: Medina v. Michelin, et al

Dear Chris:

We are very disappointed by your letter[1]. It is misleading and inaccurate. The burden is on Michelin when it withholds and conceals its own documentation and evidence. Since all of the documents requested are Michelin's documents, Michelin knows exactly which documents it withheld and did not produce. Plaintiffs have been waiting for more than three (3) months for this documentation with false promises and assurances.

Notably, to assure that these shenanigans did not occur, while waiting for Michelin's disclosure over the last several months, Plaintiffs' counsel took the initiative and repeatedly reached out to Michelin's defense counsel and performed many meets and confers about the outstanding discovery. All to no avail. Michelin's production at the end of June was grossly defective and deficient – even after these numerous meets and confers.

After Plaintiffs finally received the deficient Michelin production, we wrote a letter documenting Michelin's total lack of production on July 16, 2015 – **20 days ago**. Still, up to today, on August 4, 2015, no one from Michelin or Michelin's counsel contacted us about it. In fact, Michelin sat on this letter for about three (3) weeks and did absolutely nothing. Not once did Michelin through its multiple defense counsel reach out to us by letter, phone call, personally or e-mail. Moreover, I saw you for a full day last week during the depositions our clients including the quadriplegic mom Obdulia Medina, and not once did you state that Michelin had problems understanding

---

[1] In the future, please direct all correspondence to us by e-mail.

MR 0399

our letter concerning its reprehensible lack of disclosure.

Consequently, your letter of today is nothing but a self-serving letter only sent *after* I called you today about Michelin's lack of production. Still, Michelin had no further production to offer. Therefore, the meet and confer already took place not only today but throughout the wait for the outstanding discovery. As such, Plaintiffs much more than met and complied with the letter, spirit and intent of Rule 191.2 of Tex. R. Civ. Proc.

Still, in spite of Michelin's steadfast refusal to produce the documents and even after receiving your letter, we attempted yet another meet and confer just minutes ago when Luis left you a voicemail. Still, in a final effort before we file our Motion, we would be willing to meet and confer with Michelin this afternoon at a time convenient.

Michelin's actions are even more egregious because at the same time Michelin hides and conceals relevant documents, Plaintiffs have made the tire available, have offered themselves for depositions (which have taken place) and made the vehicle available for an unfettered inspection for Michelin's experts.

Enough is enough. Obdulia's life - as you saw last week - is a day-to-day struggle to survive without any resemblance to the life she led before the tire failure. There is no time to waste. We are not on Michelin's schedule. The lives of this family are at stake. It is time to act. Words have proved useless. So, unless we hear from you today about the meet and confer, we are ready and willing to file the necessary motion informing the Court of Michelin's violation of the discovery rules and defiant conduct in this case and others.

To make sure that you have received this letter, we have e-mailed it to you and have contacted your office informing them of it.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MR 0400

# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 5, 2015

Via E-Mail & U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

Re: Medina v. Michelin, et al

Dear Chris:

This letter confirms our telephone conversation regarding Michelin's non-production of evidence and documentation that took place yesterday at 4:08 p.m. your time after your e-mail. As I reminded you, we have been waiting for more than three (3) months for Michelin to respond to Plaintiffs' long overdue Requests for Production. During that time, we have contacted Michelin's counsel repeatedly to meet and confer about Michelin's lack of production. In response, promises and assurances were made by Michelin that production would be made once the Protective Order was entered. Such meet and confers and assurances took place in May and June with both you **and** Giles Schanen (shockingly, you informed us yesterday that he no longer works on the case) from Nelson Mullins. Finally, Michelin made its production (if you can call it that) at the end of June.

In response, we informed both Michelin's counsel that this "production" could not be taken seriously and that thousands of pages of responsive documents were **not** produced. We heard nothing back from either firm. Weeks went by and neither of Michelin's legal firms responded to us. We then followed up with another letter and phone calls including two (2) yesterday. Throughout this entire time, Plaintiffs' counsel *alone* took the initiative to try to resolve this discovery matter. When you conferred with David yesterday, Michelin did not offer any further production. When we later conferred, Michelin also did not offer any further production. All that Michelin would offer is to start a documentation "negotiation" process from scratch. That is unacceptable

All Plaintiffs want is for Michelin to comply with the Texas Rules of Civil Procedure. Therefore, we will have to agree to disagree. While Michelin seeks to impose its own self-serving discovery rules and scope, such is not allowed under the

MR 0401

Texas Rules of Civil Procedure. Rather, to the contrary, Plaintiffs are entitled to obtain any information that is reasonably calculated to lead to the discovery of admissible evidence. While your offer that Plaintiffs could obtain the same discovery and documentation we received in *Velo v. Michelin* is a start, such Request is 1 of 50 requests that were already made and of course, remain unanswered for more than three (3) months by Michelin.

It is disappointing that Michelin is unwilling to comply with the Texas Rules of Civil Procedure and immediately produce the responsive documents. Surely, after months of assurances from you and Giles and after we entered into a protective order, we thought we would get the documents. We thought we could resolve this matter between us and gave Michelin opportunity after opportunity and month after month to rectify their non-disclosure. This was absolutely inaccurate. However, Michelin's behavior, and its two (2) law firms complete inaction for three (3) full weeks after receiving our July 16, 2015 letter concerning Michelin's deficient production speaks loud and clear.

While our health is – for all intents and purposes – stable, our clients – particularly Obdulia – are not so lucky. Last week, you bore witness to just a *snapshot* of Obdulia's life. While you were fortunate to see and meet her in a sterile conference room in upscale Clayton, MO, such is not her reality. She cannot walk. She cannot cut her food. Her own husband and children have to excavate feces out of her rectum. She cannot even open her pill box with her hands to take her daily prescription cocktail. She cannot perform the most basic functions of human life. You also heard the sworn testimony about Obdulia's repeated contractions of deadly bed sores and urinary tract infections as well as frequent hospitalizations – all of which is a direct result of Michelin's tire failure. Thus, time is an asset Obdulia does not have, and her hopeless circumstances compound Michelin's reprehensible behavior in trying to prevent trial on the merits and justice for this family.

Therefore and reluctantly, Michelin forces Plaintiffs to seek the assistance of the Honorable Court.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm



AUSTIN BEAUMONT HOUSTON
www.germer.com

**THOMAS M. BULLION III**
PARTNER

**Direct Dial: 512.482.3535**
tbullion@germer.com

August 13, 2015

<u>VIA FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear Counsel:

I am writing this letter to respond to your letters dated August 2, 3, 4 and 5 in which you allege that Michelin North America, Inc. ("MNA") has refused to produce documents in this case. MNA responded to plaintiffs' request for production, lodged objections, and produced documents subject to those objections. As we have made clear several times, we will be glad to confer with you about each of MNA's discovery responses and the scope of discovery. Please let us know if you are willing to confer as required by the Texas Rules of Civil Procedure. If you file a motion to compel without doing so, we will inform the Court that you have refused to engage in a meaningful discovery conference.

The request in your August 2 letter for information on MNA's contentions about why the tire in question failed calls for the opinions of MNA's testifying experts and is premature. MNA will timely disclose the opinions of its testifying experts and provide them for deposition in accordance with the scheduling order entered in this case.[1] Further the Texas Rules do not provide for discovery by correspondence. Your statement that your letters or ours amount to admissible evidence is contrary to both the Texas Rules of Civil Procedure and the Texas Rules of Evidence.

With respect to your letter dated August 3, MNA will produce corporate representative witnesses for deposition pursuant to the Texas Rules. Let me know when you would like to

---

[1] To the extent you are equating your request for such contentions to MNA's request that you identify the components and processes at issue in this case, the two are not comparable. MNA was trying to work with you to respond to plaintiffs' discovery requests while at the same time protecting its trade secrets. Identifying generally the components and processes (such as the steel belts) in no way reveals your expert opinions and serves to help define the scope of discovery.

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4535400

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL     PAGE 52

MR 0403

discuss dates and topics. In Texas, it is standard practice to provide a list of proposed topics so the parties can address and hopefully resolve any issues before the depositions.

Finally, in response to the statements in your August 4 and 5 letters regarding the *Velo* case, MNA has offered to confer with you on a scope of discovery as was done in *Velo*. We have not offered to produce the same documents as produced in *Velo* as that case involved a different tire.

We remain willing to have a meaningful conference on any discovery issue and we look forward to hearing from you regarding scheduling such a conference.

Yours very truly,

Thomas M. Bullion III

cc.: Noel Sevastianos (via facsimile)

MR 0404

# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 21, 2015

<u>Via Email and U.S. Mail</u>
Thomas M. Bullion, III
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

     Re:    Medina v. Michelin, et al

Dear Tom:

Thank you for your correspondence of August 13, 2015. It is inaccurate. It misstates the facts, the law and omits our repeated phone and personal conferences as well as other steps Plaintiffs undertook trying to obtain documents reasonably calculated to lead to the discovery of admissible evidence. Multiple opportunities were given to Michelin (including yet another one on Monday's August 17, 2015 in Dallas) to comply with the Texas Rules of Civil Procedure and produce the documents and information requested since **April 2015**. All for naught. So, we are just going to have the Honorable Court decide this matter.

Also, your offer concerning depositions is useless since we are unable to depose Michelin's employees until Michelin produces the documents requested.

Meanwhile, about two (2) months ago we sent you a letter about Michelin's failure to disclose its factual basis of "tire abuse." Since then we wrote you again and again. Still, Michelin refuses to disclose it. This is a violation of the Texas Rules of Civil Procedure. Moreover, the factual basis of this alleged Michelin defense is independent and apart of the disclosure of expert opinions.

We have asked Michelin again and again to explain, disclose and provide the factual basis for it. Yet to date, Michelin has intentionally and consciously disclosed absolutely nothing about it. This refusal is unfair and extremely prejudicial to Plaintiffs who are forced to litigate this case without knowing about this alleged "tire abuse." As a result, I cannot adequately and reasonably prepare for or defend depositions related to the tire including its manufacture, design, and maintenance.

MR 0405

August 21, 2015
Page 2


I prefer to try cases on the merits. However, Michelin's refusal to disclose its basis will force Plaintiffs to bother the Court with yet additional disclosure violation committed by Michelin.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MR 0406

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
**6225 North 24ᵗʰ Street, Suite 125**
**PHOENIX, ARIZONA 85016**

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

August 21, 2015

<u>Via E-Mail & U.S. Mail</u>
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX  78701

      Re:    Medina v. Michelin, et al

Dear Chris:

      This letter memorializes our in-person conference about Michelin's deficient disclosure during the depositions of the driver and his family on Monday, August 17, 2015 in Dallas, Texas.  You told us that the attorneys had no authority to agree to the scope of the discovery, and that we needed to negotiate it with Michelin.  I told you that Michelin does not decide or control the scope of discovery and pointed out that it is not the Michelin Rules of Civil Procedure but the Texas Rules of Civil Procedure that govern discovery.  Therefore, we will have the Court decide this matter.

      Very truly yours,

      LUIS P. GUERRA, L.L.C.

      Luis P. Guerra
      David C. Shapiro

LPG/DCS/pm

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 56

MR 0407



**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

August 26, 2015

<u>VIA ELECTRONIC MAIL AND FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear Luis/David:

In response to your August 21, 2015 letter, I believe you misunderstood our conversation. Attorneys for Michelin regularly negotiate and resolve discovery disputes. National discovery counsel typically takes the lead in these negotiations but Tom Bullion and I will be happy to take the lead in this case if that is helpful.

As I explained the other day, in the vast majority of cases in which a discovery issue arises, the dispute is resolved with a telephone call in which there is a substantive discussion of the specific issues. Contrary to the representation in your recent motion to compel and prior correspondence, no such substantive discussion has occurred in this case. We have offered to confer with you on a number of occasions and are currently available anytime next Monday or Tuesday morning. If you would like to confer as required by the rules, please let me know what time works best for you and I will set it up. To prevent any misunderstanding, we would like to have a court reporter on the phone during the conference so please let me know as soon as possible if and when you are available so that I can make the necessary arrangements.

Yours very truly,

Chris A. Blackerby

cc: James Ragan (via e-mail and facsimile)

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4537414



**GERMER**
ATTORNEYS AT LAW

AUSTIN BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

September 4, 2015

VIA ELECTRONIC MAIL

David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re:  Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.

Dear David:

In response to your September 2, 2015 letter please see my letter dated August 26, 2015 where I explained that attorneys for Michelin negotiate discovery issues on its behalf. Also, I would suggest that you read the Texas rules and/or consult with your local counsel before representing to the Court that you have conferred as required by the rules.

Thanks and have a great weekend.

Yours very truly,

*Chris A. Blackerby*

Chris A. Blackerby

CAB:lq

cc.:  James B. Ragan
      Noel Sevastianos

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4538342

MR 0409



GERMER
ATTORNEYS AT LAW

**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

September 1, 2015

<u>VIA FACSIMILE</u>

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

     *Re:*   *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc.,*
         *and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County,*
         *Texas.*

Dear Luis/David:

Despite the fact that you have refused to confer as required by the applicable rules, I am writing this letter to propose an agreement to resolve the discovery issues in this case. If you agree on behalf of your clients, this letter will serve as a Rule 11 Agreement between the parties governing the scope of discovery. We propose that the agreed scope for design documents, lawsuits, adjustments (once you identify codes), claims, and testing is Michelin P255/70R16 LTX M/S tires and the 3 common green tires made at the Dothan, Alabama plant from the date production started in 1998 to the date it stopped in 2003.

MNA will produce the oldest available copies of the General Principles, Technical Notes, and Tire Non-Conform procedures.

MNA has already produced the aspect specifications relating to plaintiffs' identified components and processes. To the extent annexes are identified in those aspect specifications or other aspect specifications are referred to in those that were not produced, MNA will produce them.

MNA will produce the oldest available tire building training documents for tire building relating to the identified components and processes. MNA will review the aspect specifications produced and, if they refer to another one, MNA will produce that one as well.

MNA will produce the patents it has on nylon cap plies.

MNA has already produced the tire service life documents.

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4537956

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 59



EXHIBIT

C

In exchange for the production agreed to above, plaintiffs will withdraw their motion to compel and all requests for formulas. Plaintiffs also agree not to seek a plant inspection.

Once MNA makes this production and supplements its discovery responses, plaintiffs agree that MNA will have fully responded to all discovery served to date.

If you agree to the terms of this letter, please sign below and return to me in accordance with the Rule 11 of the Texas Rules of Civil Procedure.

Yours very truly,

Chris A. Blackerby

AGREED:

_____

Luis P. Guerra
David Shapiro
Attorneys for Plaintiffs

CAB:lq


**GERMER**
ATTORNEYS AT LAW

AUSTIN BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

September 1, 2015

VIA E-MAIL

David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear David:

This is a follow up to our telephone conversation just a moment ago where you called MNA's discovery proposal "bullshit" and indicated that you could not show it to Luis or he would flip out. As I requested, if you will not agree to meet and confer, please send a written response to MNA's proposal.

Thanks.

Yours very truly,

Chris A. Blackerby

CAB:lq

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4537956

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL     PAGE 61

MR 0412


GERMER
ATTORNEYS AT LAW

AUSTIN BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

**Direct Dial: 512.482.3534**
cblackerby@germer.com

September 2, 2015

VIA FEDERAL EXPRESS AND BISCOM

David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear David:

Thank you for letting me know that the adjustment codes were not included in the prior production. MNA stated in response to Request No. 12 they would be produced but they were inadvertently omitted. We did not realize the omission until you pointed it out today. They are enclosed as MNA –MEDINA-0001821-1828.

Yours very truly,

Chris A. Blackerby

CAB:lq

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4538140

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL        PAGE 62

**EXHIBIT**
tabbies
D

MR 0413

# LUIS P. GUERRA, L.L.C.
### 6225 North 24th Street, Suite 125
### PHOENIX, ARIZONA 85016

**LUIS P. GUERRA\***
**DAVID C. SHAPIRO**
\*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

September 2, 2015

Via Email and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

    Re:    Medina v. Michelin, et al

Dear Chris:

    We are in receipt of your letter of today. We disagree with it. We have dealt with Michelin before, and you and I both know there is nothing inadvertent about Michelin and the manner in which it produces evidence.

               Very truly yours,

               LUIS P. GUERRA, L.L.C.

               Luis P. Guerra
               David C. Shapiro

LPG/DCS/tk

MR 0414

FILED
DALLAS COUNTY
9/1/2015 04:45:49
PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually, | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC. and JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § § | 134ᵗʰ JUDICIAL DISTRICT |
| Defendants. | § | |

## AFFIDAVIT OF VANEATON PRICE, III

Having first been duly sworn, I, Vaneaton Price, III, an employee of Defendant Michelin North America, Inc. ("MNA"), competently testify as follows:

1. This affidavit is based on my personal knowledge and my review of information available to me in my role at MNA. I am over 18 years of age, of sound mind, and competent to execute this Affidavit.

2. I have never been convicted of a felony or a crime of moral turpitude.

3. I am a Senior Technical Advisor employed by MNA. I was employed with Michelin Americas Research and Development Corporation ("MARC"), which merged with and became a division of MNA on January 1, 2008, from January 2007 to December 2011. Since May 1999, I have been employed by MNA. During my employment with MNA and MARC, I have become familiar with the tires that are designed by MARC and manufactured by MNA, as well as the design and manufacturing procedures used.

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 64



MR 0415

4. I am familiar with the process by which tire specifications are developed, with the composition and dimensions of certain tires MNA has designed and manufactured during my employment, with MNA manufacturing processes and equipment, and with the efforts that MNA makes to protect its proprietary and trade secret information.

5. The Subject Tire is a P255/70R16 109S Michelin LTX M/S bearing DOT number B7LBEVUX3101 and manufactured by MNA in its Dothan, Alabama plant in the 31st week of 2001.

6. A tire is built to a single green tire and a single cured tire specification. The Subject Tire was manufactured pursuant to a particular specification in place for P255/70R16 109S LTX M/S tires manufactured at MNA's Dothan, AL plant during the 31st week of 2001.

7. The "P" designation means "passenger." The "255" is this tire's nominal section width in millimeters. The "70" is the tire's aspect ratio – the sidewall height is 70% of the tire's width. The "16" is the tire's inner diameter in inches, which means that the tire fits on a 16" wheel. The tire's service description, "109S," includes the load index (109), which means that the tire is designed to support loads of 2271 pounds at 35 psi inflation pressure, and the speed rating (S), which indicates that the tire is certified to carry a load, under specified conditions, at a maximum speed of 112 mph.

8. "Common green" tires are tires that share the same specifications except for exterior moldings. The model of the Subject Tire has three common green tires that also were manufactured at the Dothan, AL plant. With the exception of these common green tires, there are no other tires that were made to the same green tire specifications as the Subject Tire.

- 2 -

MNA'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO COMPEL    PAGE 65

MR 0416

9. Throughout my employment with MARC and MNA, MNA has manufactured steel belted radial tires for a wide variety of passenger vehicles, light trucks, medium trucks, heavy trucks, and special purposes such as high performance tires, and aircraft tires. During 2001, the year the Subject Tire was manufactured, MNA manufactured approximately 1500 different tire designs at its various plants in North America. The design of these tires often varies significantly depending on the particular service applications such as highway, mud and snow, all-season, off-road, and high performance.

10. A tire is a highly engineered, scientifically developed, complex laminate structure. It incorporates elements of the disciplines of polymer chemistry and mechanical engineering, among others.

11. For a tire to perform properly, it must be engineered so that the numerous components and rubber compounds work together to carry the intended load at the inflation pressures appropriate for the service applications. Thus, even tires bearing the same marketing label or "name", like the "LTX M/S", have different design features to accommodate the intended load and expected service application.

12. Most modern automotive tires share some basic features. Virtually all tubeless tires have a tread, belt assemblies, a body ply or plies, an inner liner, and bead wires. Steel belt assemblies typically consist of two or more steel belts with a rubber compound that surrounds and coats the steel cables. Textile body ply or plies generally consist of one or more plies of textile cord coated with another rubber compound. The inner liner consists of a different rubber compound and performs a function similar to that of an inner tube in a tube-type tire, helping the tubeless tire maintain air pressure. The bead wires are two

- 3 -

MR 0417

hoop-shaped bundles of wire encased in rubber and located at the tire's inner edges, which help hold the tire flush against the rim flange and anchor the tire's components.

13. Most modern automotive tires are assembled in stages as a laminate structure and then placed in a mold and vulcanized, or "cured." Vulcanization consists of exposing the assembled tire to high temperature and pressure for a pre-determined time; this process causes various chemical changes in the rubber compounds, causes bonds to form between the tire's various components, and increases the rubber's strength, resilience and durability. A tire that has been assembled but not yet vulcanized is referred to as a "green tire."

14. Despite this common basic structure, however, it would be a gross oversimplification to say that all passenger and light truck tires with a steel-belted radial construction are similar in design. Although certain tires may share one or more common components or compounds, the unique performance requirements of each tire will lead to design differences between them.

15. There are many ways in which tire designs may differ. For example, tire designs may differ according to (1) the basic classification as a passenger, light truck, truck or specialty tire; (2) inner diameter size; (3) width; (4) aspect ratio (the tire's width as compared to its sidewall height); (5) load index or load capacity; (6) component materials; (7) intended use or application; (8) bead wire design; (9) sidewall reinforcements; (10) speed rating; (11) recommended inflation pressures; (12) tread design; and (13) the use of additional components such as belt edge wedges and extra strips or plies.

- 4 -

MR 0418

16. Most tires are broadly classified into four categories: passenger tires, light truck tires, truck tires, and specialty-use tires (such as commercial tires, temporary spare tires, or trailer tires). There are substantial differences in the design of tires in each classification. Tires in one classification are not substantially similar to tires in another classification. There are no Michelin tires in one classification that are "common green" to tires in another classification. The federal regulations in place in 2001 governing light truck tires, 49 C.F.R. § 571.119, was different than those governing passenger car tires like the tire in question, 49 C.F.R. § 571.109.

17. Plaintiffs' Requests for Production seek information on all "Michelin LTX M/S tires." The names of tire lines, such as "LTX M/S," the line of the Subject Tire, are marketing labels used by MNA to describe many tires that are suitable for use in a sport utility vehicle ("SUV") or light truck application. They are not a designation of a tire's design or a specific set of manufacturing specifications. The "LTX M/S" marketing label has been used for at least 20 years, for multiple sizes, load ranges, and applications of tires. Further, "LTX M/S" tires are made in multiple sizes and load ranges, for different vehicle fitments and applications, all of which would have different designs. At the time the tire in question was manufactured in 2001, the "LTX M/S" label was used for approximately 40 different tire sizes. MNA uses many different marketing labels for its tires.

18. For example, the LTX M/S tire line and its common green lines manufactured between 1998 and 2003 would encompass approximately 54 tire models built to more than 5000 tire specifications, and approximately 19.2 million different tires. These tires were manufactured at 5 different MNA and MNA (Canada), Inc. plants in North America.

- 5 -

MR 0419

19. All tires manufactured under the "LTX M/S" marketing label are not substantially similar. These tires differ in design in many ways, including size, load capacity, components, number of plies, types of plies, recommended pressures, speed ratings, tread depths, and intended applications.

20. The Subject Tire is a 16" P-Metric (Passenger) tire; however, the LTX M/S line encompasses LT-Metric, P-Metric and Flotation tires. Moreover, the LTX M/S line includes tires with rim diameters ranging from 15" to 17" section widths from 205 millimeters to 285 millimeters, and with total diameters from 27" to 32.8". These tires of different sizes, dimensions and applications are necessarily of different designs, and are not substantially similar to each other.

21. Tires of different sizes do not, as a general rule, merely have proportionally larger dimensions; there are a number of other specification changes, as well. For example, an LTX M/S 15" tire will have very different performance requirements and expected service conditions than an LTX M/S 17" tire. The carcass strength, load-carrying capacity, inflation pressure, rubber compounds, number of carcass plies, and densities of steel belt cables or polyester carcass ply cords may all be different, depending on tire size and expected vehicle fitment. The tire designer will use different components, materials, and configurations for different tire sizes, depending on the performance goals for the tire. Thus, tires of different sizes are not substantially similar to each other.

22. The LTX M/S line includes tires designed for original equipment fitments as well as tires designed for the replacement market. Tires designed specifically for fitments on new vehicles may be tuned specifically to meet the requirements of the original equipment programs. They may be made of different components than replacement market tires,

- 6 -

MR 0420

have different tread depths and designs than replacement market tires, and have different performance profiles than replacement market tires. Thus, original equipment tires may have very different designs and constructions than replacement market tires, and are not necessarily substantially similar to replacement market tires.

23. The LTX M/S line of tires includes tires with different aspect ratios ranging from 65 to 85. The term "aspect ratio" describes the relationship between the height and width of the tire. More precisely, aspect ratio is the ratio between the "section height" (the distance from the top of the tread down to an imaginary line running from bead to bead at the bottom of the tire) and "section width" (the distance from the outermost bulge of one sidewall to the other) when the tire is mounted on a rim that is 70% of the tire section width and inflated to a prescribed pressure. A tire with a high aspect ratio may be a tall, skinny tire, while one with a low aspect ratio may be a short, squatty tire. These different structures are affected in different ways by the loads and forces that they encounter in service, and the design of tires with different aspect ratios differ significantly. Tires of different aspect ratios are not substantially similar.

24. The LTX M/S line of tires encompasses tires with different load indexes and speed ratings, which also make a difference in the application for which the tire is suitable. The LTX M/S tire line includes tires with load indexes from 97 to 123 and speed ratings from R to H. For example, an LTX M/S tire with "H" speed rating (130 mph) would have a significantly different design than the Subject Tire, which has an "S" speed rating (112mph), to accommodate the increased heat and centrifugal forces the tire would be expected to withstand at higher speeds. For example, a P205/75R15 97S LTX M/S, which has a load index of 97, is rated to carry a maximum load of 1435 pounds at 35 psi,

- 7 -

MR 0421

whereas the Subject Tire, which has a load index of 109, is rated to carry a maximum load of 2271 pounds at 35 psi. The design of these tires is different to accommodate the differences in load and expected application. Thus, tires of different load indexes and speed ratings are not substantially similar.

25. Tires within the LTX M/S line differ according to their component materials, even when the basic type, size, load index, and speed rating are the same. Among other differences, tires within the LTX M/S line made in different plants contain different tread compounds, and undertread compounds. In addition, steel belt construction and strength, as well as polyester ply construction and strength, can differ. The tread compound is the material comprising the outermost layer of the tire in the part of the tire that is intended to contact the road; the undertread compound is the material comprising the next layer down, between the tread and steel belt assembly. Tire designs within the LTX M/S line can differ for many other reasons, including tread designs, bead designs, recommended inflation pressures, sidewall reinforcement, and others. Tires with these differences in component materials and design features are not substantially similar.

26. The LTX M/S line includes tires manufactured with 2-belt and 3-belt configurations. Tires with different numbers of belts are not substantially similar.

27. MNA uses many different rubber formulations in its tires, including different rubber formulations between tires within the LTX M/S tire line. For example, all passenger and light truck tires contain different types of rubber. Rubber formulas in replacement-market tires may differ from those used in certain original equipment applications. MNA, through its MARC division, researches, tests, and develops the rubber compounds used in the construction of tires. The type of rubber compound ultimately used in each

- 8 -

MR 0422

component will affect the tire's performance results. Even within a single manufacturing facility, the rubber compound formulas used may differ depending on the size and application of the tire. Tires that use different rubber formulations are not substantially similar.

28. Tires are not substantially similar simply because they use the same belt skim compound. Tires with the same belt skim but different sizes, classifications, load ranges, speed ratings, and/or applications will have different designs and different service life, and are not substantially similar tires.

29. Tire designs evolve over time as new technology, materials, and equipment are developed and the tire manufacturing processes and procedures in any given plant change. Although bearing the same marketing label and size designation, tires that are manufactured under different specifications are of different designs. Over the period of time during which the model of the Subject Tire was made, changes were made to its design and specifications.

30. Tire designs generally will differ for tires manufactured at different facilities. Because MNA operates facilities formerly owned by three different manufacturers (which use different processes), manufacturing specifications and component compounds are frequently different for tires otherwise of the same marketing label and size designation, to account for varying plant-specific technology and available equipment, including mixing equipment, tire building equipment, and curing methods.

31. No two MNA plants have the exact same equipment and manufacturing processes.

MR 0423

32. Specifications are developed for the equipment and processes at a particular manufacturing plant. Tires manufactured at one plant are produced based on a specification different than the specification used at other plants.

33. In the last thirty (30) years, MNA has manufactured tires under several thousand different brand names and sizes. Each of these tire types is of a different design. Within each category, the designs have changed multiple times as the specifications evolved.

34. In the last ten (10) years alone, MNA has manufactured several hundred million tires, to tens of thousands of different specifications, including those marketed under the "Michelin," "Uniroyal," "BF Goodrich," and various private brand name.

35. Certain of Plaintiffs' requests seek MNA's adjustment data, including comparisons of adjustment data concerning tires manufactured with and without nylon cap plies.

36. Adjustment data is information collected by MNA that records the number of tires returned, as well as the condition of the returned tire, without regard to cause.

37. One condition which may be discerned by a trained inspector is a tread or tread/belt "separation." A "separation" refers to a crack or potential crack between two of a tire's components. A "separation," if actually present, does not mean or imply that the tire became disabled. It also does not mean or imply that the tire is defective in design or manufacture. If the inspector observed a tread/belt separation in a returned tire, that condition would be noted and the adjustment would be coded accordingly.

38. Tread/belt detachments resulting from separations occur infrequently, but they have occurred and do occur in steel belted radial tires generally, regardless of their size, design, or intended use.

39. A tread/belt separation can occur in any steel belted radial tire.

- 10 -

MR 0424

40. A tread/belt separation in a tire does not indicate a defect in the design or manufacture of the tire because there are many different causes for tread/belt separation that are independent of the design and manufacture of the tire. Numerous other factors, such as tire overloading, under inflation, unrepaired or improperly repaired punctures or cuts, damage from road hazards, to name a few, can lead to tread/belt separation in a properly designed and manufactured tire.

41. The MNA's design and manufacturing specifications, specification changes, testing and design-related documents requested by Plaintiffs in their discovery requests contain highly protected trade secrets of MNA. In addition, Plaintiff's requests call for the production of other highly protected trade secrets of MNA, including but not limited to information concerning MNA's research and development, formulas, tire adjustment processes and analysis, marketing strategies, internal research and studies, propriety manufacturing and inspection processes and procedures, and tire production information.

42. Furthermore, MNA's adjustment data is of significant value to MNA because it reveals MNA's processes and analysis, and because it is not known to MNA's competitors. This information constitutes valuable trade secrets of MNA and gives MNA an advantage over its competitors. Disclosure of this information to those competitors would cause irreparable damage to MNA.

43. Certain of Plaintiffs' requests seek MNA's design and manufacturing specifications, specification changes, testing and design-related documents, research and development, tire adjustment processes and analysis, internal research and studies, propriety manufacturing and inspection processes and procedures, and tire production information. All such documents are highly protected trade secrets of MNA.

- 11 -

MR 0425

44. MNA spends millions of dollars each year on research, development, testing of tires and their component parts, and developing its proprietary design and manufacturing technologies. Disclosure of this information to those competitors would cause irreparable damage to MNA's competitive advantage.

45. MNA takes extreme care to protect this information from being disclosed because this information is what gives MNA an advantage in the competitive field of tire design and allows it to deliver economic value to its customers. MNA derives economic value and competitive advantage by not having that information available in the public domain. Any disclosure, direct or indirect, of such trade secrets and confidential information would severely and permanently impair MNA's competitive position.

46. Disclosure of MNA's confidential information to multiple individuals would subject MNA to a substantial risk of subsequent disclosure to MNA's competitors, the consequences of which would be irreversible.

47. The steps that MNA has in place to protect the secrecy of its confidential design and development information include, but are not limited to, the following:

    (a)    An 8-foot high cyclone topped with barbed wire fence surrounds the perimeter of MARC's facility and premises in Greenville, South Carolina;

    (b)    All employees access the premises through a gated entrance by use of a limited access turnstile and badge reader. Visitors are given access only after registering with a security officer, presenting identification and naming the specific employee with whom they have business. Thereafter, the MNA employee escorts or supervises the visitor(s), who must display "Visitor" credentials while on the premises.

- 12 -

MR 0426

(c) The security gates are manned Monday through Friday from 6:30 a.m. to 5:00 p.m. and patrolled by security all other hours, weekends, and holidays. In addition, the entire MARC campus and its perimeter is monitored 24 hours a day by surveillance cameras;

(d) While vehicles generally are not allowed on MNA's premises, if a vehicle does enter, it is subject to a random search by security before it is permitted to exit;

(e) To the extent MNA maintains its confidential design and development information electronically, it is stored in a secure, limited access database;

(f) MNA's employees execute stringent non-disclosure and secrecy agreements as a condition of their employment;

(g) MNA's vendors sign confidentiality agreements before they are provided access to any documents or information regarding MNA's work for them;

(h) The research and development information developed by MNA at MARC is maintained at MARC; and

(i) Certain areas on the MARC campus are accessible only to MARC personnel with heightened security access, and are not accessible to other MNA employees.

48. MNA employs these extreme efforts to maintain the confidentiality of information relating to its testing, research, technology, processes, designs, compilations of information, and formulas because it is this information that gives MNA and its clients an advantage in the competitive field of tire design and manufacture.

- 13 -

MR 0427

49. I understand Plaintiffs are requesting documents and/or testimony concerning one or more of MNA's rubber compound formulas.

50. For many decades, MNA has spent millions of dollars and hundreds of thousands of man hours researching, testing, and developing rubber formulas in an effort to increase the performance of its tires. The rubber compound formulas are of significant value to MNA because they are not known to MNA's competitors.

51. MNA believes that its superior rubber compound formulas are an extremely critical factor in its ability to maintain its competitive advantage over its rivals.

52. Because a tire is vulcanized during manufacture (a process that alters the tire's chemistry and dimensions), it cannot be "reverse engineered." Thus, a competitor cannot recreate all of its design specifications simply by purchasing and analyzing a tire, nor can a competitor take a tire apart and determine the components in the rubber, the length of time the rubber is cured, or the machinery used.

53. In addition to the measures discussed above, MNA takes even more extreme steps to protect its compound formula information. Only MNA employees who have a business need to know the information have access to the formulas. Of MNA's thousands of employees, only a few know or have access to the rubber compound formulas.

54. Any disclosure, direct or indirect, of MNA's compound formulas would severely and permanently impair MNA's competitive position. Once disclosed, this damage could not be repaired, even if the disclosure was inadvertent and/or subject to a confidentiality order.

55. Plaintiffs have also requested information and documents relating to MNA's manufacturing and quality procedures.

- 14 -

MR 0428

56. Like all tire manufacturers, MNA keeps secret its specific design, manufacturing, and quality assurance processes. MNA's specific manufacturing processes and equipment are not known to MNA's competitors or the general public. MNA has developed the processes, including manufacturing techniques, machinery, and methods of production, for many decades at a cost of many millions of dollars. MNA also spends millions of dollars every year replacing and updating facilities and equipment. A principal part of MNA's competitive edge in the tire industry derives from its proprietary and unique manufacturing methods and equipment. Most of MNA's processes are not patented for fear of losing their secrecy.

57. The divulgence of MNA's proprietary manufacturing and quality processes to the public or to a competitor would cause an unacceptably high risk of irreparable harm and injury. If third parties were allowed access to these trade secrets, they could take advantage of proprietary information which MNA has spent years and millions of dollars developing, and which MNA's competitors could not duplicate on their own without a similar investments of time, expertise, and money, and perhaps not even then. The damage that could be created by the loss of trade secrets is a direct financial threat to MNA, its parent and affiliated corporations, and risks the loss of MNA's competitive edge and, potentially the employment of thousands of employees throughout the United States and worldwide.

58. MNA spends millions of dollars and countless man hours developing manufacturing processes and quality procedures. Specifically, MNA's building procedures employed at the Dothan plant were developed over an extensive amount of time and at tremendous expense.

- 15 -

MR 0429

59. MNA takes extraordinary measures to maintain the secrecy of its proprietary manufacturing processes and equipment, including the following:

(a) Plants are not open to the public. Facilities are surrounded by fences. The Dothan plant maintains a security department with security systems and security officers.

(b) Additional security controls are imposed in certain departments because of the highly confidential manufacturing and industrialization work that is carried on in those departments. Persons with access authority are subject to strict control, and employees with access authority are required to execute confidentiality agreements. Employees are not permitted to photograph or videotape the interior of the plant and are not permitted to remove documentary trade secrets except for controlled, business purposes.

(c) MNA does not generally permit third persons to enter any plant unless there is a legitimate business reason. Each visitor must wear a badge denoting his or her status and the extent of their access within the plant was limited based on business need and prior approval, with signed secrecy agreements in many instances. The MNA employee with whom the visitor is meeting has to accompany the visitor until the conference is terminated and the visitor leaves the plant.

(d) Many of the production machines at the MNA plants are designed, built, and/or modified and installed by MNA itself.

- 16 -

MR 0430

(e) Employees at MNA plants sign stringent non-disclosure and secrecy agreements as a condition of their employment.

60. The tire development and manufacturing industry is extremely competitive and is dependent on continuing research and development of new tire products and component parts.

61. The information concerning MNA's manufacturing processes, design processes, testing and testing methods, green tire specifications, compounds, and components of tires, including those pertaining to the Subject Tire, is of significant value to MNA because it reveals MNA's design, testing, and analytical processes. This is information that is not known to MNA's competitors. Disclosure of this information to those competitors would cause irreparable damage to MNA's competitive advantage.

FURTHER, AFFIANT SAITH NAUGHT.

Vaneaton Price, III

SWORN to and subscribed before me

this 1st day of September 2015.

Notary Public for South Carolina
My Commission Expires: 09/14/2016

- 17 -

MR 0431

FILED
DALLAS COUNTY
9/4/2015 4:37:44 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| VS. | § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | DALLAS COUNTY, TEXAS (Oral Argument Requested) |
| DEFENDANTS, | § § | |

# *Plaintiffs' Reply In Support Of Their Motion To Compel*

MR 0432

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| VS. | § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | DALLAS COUNTY, TEXAS (Oral Argument Requested) |
| DEFENDANTS, | § § | |

## TABLE OF CONTENTS

Page

I.   **Parade of Horrors**                                          3

II.  **LTX M/S's Plague of Defects**                               4

III. **Texas Scope of Discovery**                                 5

IV.  **Absconded Evidence Needed for
     Fair Adjudication of their Claims**                          6

V.   **Michelin's Deceitful Track Record**                        8

**Conclusion**                                                   12

MR 0433

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| vs. | § § | 134TH JUDICIAL DISTRICT |
| | § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § | **(Oral Argument Requested)** |
| DEFENDANTS, | § § § | |

## PLAINTIFFS' REPLY[1] IN SUPPORT OF THEIR MOTION TO COMPEL

TO THE HONORABLE JUDGE DALE TILLERY:

After reviewing Michelins entire Response[2] and squeezing it to the last drop, one (1) question remains:

## Q.  Has Michelin produced the documents?
## A.  <u>The answer is an absolute:  NO</u>.

---

[1] Please see Plaintiffs' Separate Statement of Moving Counsel attached as *Exhibit B*, which proves Plaintiffs' repeated meets and confers with Michelin. Please also see Plaintiffs' multiple exchanges of correspondence with Michelin attached hereto as *Exhibit G*. Regardless of undersigned counsel's countless efforts to reach out, Michelin continues to refuse production of necessary evidence for Plaintiffs to fairly adjudicate their claims. In other words, *Plaintiffs still do not have the documents*.

[2] Michelin's "trade secret" argument holds no water. **First,** Michelin failed to prove the requested information is a trade secret because the law requires that the "subject matter of a trade secret must be secret." *Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 95 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Michelin's only evidence of trade secrets are conclusory statements. **Second,** there is already a **Michelin Protective Order** in place that protects it. Therefore, Michelin's trade secret objection is a red herring.

MR 0434

Therefore, Plaintiffs file their Reply in support of their Motion to Compel to talk about the real issue: **Michelin's refusal to produce documents**. For manufacturing purposes, the entire LTX M/S line is the same. The physical evidence proves it. Michelin's affidavit is yet another smokescreen and more of the same attempt to mislead intentionally and blatantly. Therefore, Plaintiffs respectfully the Honorable Court to read the attached Federal Judge Amy Totenberg Order (attached hereto as *Exhibit A*) to understand the depth, extent and range of deceit Michelin engages in to prevent production of documents and trial on the merits.

Concerning the affidavit, one (1) thought comes to mind: a nicely wrapped turd even with a bow is still a turd. Its Michelin's litigation-made contents from Vaneaton Price are hogwash. It claims that the tires sought by Plaintiffs are *completely* different[3] because of their width, rim size, load indexes, aspect ratio, etc., etc. Nonsense. In the last case Plaintiffs' counsel had against this same defendant, Michelin provided adjustment data, general principles, aspect specifications, design specifications for a multitude of LTX M/S tires with all kinds of different tire widths, rim sizes, aspect ratios and speed ratings. The common denominator? Michelin LTX M/S tires manufactured at Dothan - just like the subject tire.

---

[3] Moreover, even if the design and manufacture of different sizes of the LTX M/S were different – **which they are not** – **Plaintiffs are still entitled to discovery about alternative designs with different features**:

> **Fundamentally, the scope of discovery is obviously much broader than the scope of admissible evidence, and evidence of incidents involving other products besides the exact model at issue can be admissible, and therefore, obviously, discoverable.**

*In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 528 (Tex. App. 2009). (e.a.).

2

MR 0435

Michelin continues its deliberate refusal to disclose critical documents and evidence requested since April. Every Michelin case is the exact same story and strategy. Stonewall. Mislead. Do anything and everything necessary to prevent production of critical documents and evidence. All in a deliberate effort to preclude Plaintiffs from obtaining what they are legally entitled to: "the fullest knowledge of the facts and issues prior to trial." *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 526 (Tex. App. 2009).

## I. Parade of Horrors

We know why. Michelin wants to hide the causes of this epidemic of defective **LTX** tires manufactured at **Dothan**, each of which has either killed, paralyzed, or maimed people across the country such as the following tires:

| TIRE TYPE | PLANT | MANUFACTURE DATE |
|---|---|---|
| 1. Michelin LTX P265/70R17 | Dothan, Alabama | 37th week, 1997 |
| 2. Michelin LTX P235/70R16 | Dothan, Alabama | 1st week, 1999 |
| 3. Michelin LTX P265/70R16 | Dothan, Alabama | 2nd week, 1999 |
| 4. Michelin LTX P265/70R17 | Dothan, Alabama | 12th week, 2000 |
| 5. Michelin LTX P265/70R17[4] | Dothan, Alabama | 28th week, 2001 |
| 6. **Michelin LTX P255/70/R16[5]** | **Dothan, Alabama** | **31st week, 2001** |
| 7. Michelin LTX P265/70R16 | Dothan, Alabama | 4th week, 2002 |
| 8. Michelin LTX P265/70R17 | Dothan, Alabama | 6th week, 2002 |
| 9. Michelin LTX LT245/75R16 | Dothan, Alabama | 47th week, 2002 |
| 10. Michelin LTX P265/70R16 | Dothan, Alabama | 6th week, 2003 |

---

[4] This is the *Velo* tire.

[5] This is the subject tire.

3

MR 0436

| | | |
|---|---|---|
| **11.** Michelin LTX P265/70R17 | Dothan, Alabama | 8th week, 2006 |
| **12.** Michelin LTX LT265/70R16 | Dothan, Alabama | 16th week, 2006 |
| **13.** Michelin LTX LT245/75R16 | Dothan, Alabama | 34th week, 2006 |
| **14.** Michelin LTX LT265/75R16 | Dothan, Alabama | 51st week, 2006 |

These are just the tires Plaintiffs' counsel is aware of that have permanently maimed folks across America including several paraplegic, quadriplegic and deaths. Mothers, sisters, husbands, fathers. All innocent victims initially injured severely by the defective LTX then by Michelin's awful litigation tactics – both as a result of Michelin's secretive defective and shoddy tire design, manufacturing and inspection practices. For instance, in *Velo*, there were seven (7) passengers inside the SUV. One (1) was killed. One (1) became a quadriplegic. Three (3) suffered traumatic brain injuries. And all suffered a multitude of other injuries. So every one of Michelin's tread belt separations leads to many, many more victims including victims not at the scene of the crash. For instance, the dead father left several children without a dad. The quadriplegic mother left several children with a severely disabled mother. So, one (1) single defective tire injured and victimized more than ten (10) individuals.

There are so many more. Plaintiffs know this because in *Velo*, when its back was against the wall due to its lack of disclosure, Michelin was forced to cough up its own internal numbers about the LTX M/S tire line defective returns – ***irrespective*** of width, rim size, aspect ratios or speed ratings. To put it mildly, the evidence was frightening.

## II. LTX M/S's Plague of Defects

For starters, more than **700** (just from one of its hundreds of dealers and the largest tire retailer in the world – Discount Tire) of its defective LTX M/S tires were returned for belt edge separations. In addition, over **1,000** tires were returned to Michelin's dealers for ride vibration

4

MR 0437

– a precursor to tread belt separation. This staggering number of many more than **1,500** defective tires demonstrates, documents and proves that Michelin **knew** – as early as 2001 (10 years before the incident) – that its LTX M/S tire line was dangerously defective. Michelin had to disgorge all this evidence from the LTX M/S line whether they were 235s, 245s, 265s, 275s tread width or whether it is 16 or 17 rim size or whether they had different speed ratings – similarly to what Plaintiffs are asking here.

Instead of warning the public about its defective product,[6], Michelin did and continues to do the exact opposite: conceal from the public and its consumers that its LTX line posed and poses unreasonable risks of deadly danger to its consumers. This adjustment/warranty information and evidence was provided in *Velo* to counsel, undersigned counsel used it in their case to annihilate Michelin. This is the only reason Michelin now refuses to produce it. It is important to note that the defective nature of the LTX M/S line and its injury rate is not a national scandal because in every case, Michelin blackmails the Plaintiffs into protective orders and narrow discovery or will not produce anything.

### III. Texas Scope of Discovery

Thus, like any crime, there is a motive behind Michelin's stonewalling: **prevent** the disclosure of Michelin's shoddy tire design, manufacturing, inspection practices – directly at issue in this case – to prevent the public knowledge of its defective tires. Fortunately, Texas law does not permit it. In Texas, the scope of its Rules of Civil Procedure is the **"just, fair, equitable and impartial adjudication of the rights of litigants"**:

---

[6] Pursuant to the Transportation Recall Enhancement Accountability, and Documentation ("TREAD") Act, Michelin was required to "report . . . **data on claims submitted to the manufacturer for serious injuries (including death) and aggregate statistical data on property damage from alleged defects in a motor vehicle or in motor vehicle equipment**." (e.a.).

5

MR 0438

> **The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law**. To the end that this objective may be attained with as great expedition and dispatch and at the least expense both to the litigants and to the state as may be practicable, these rules shall be given a liberal construction.

*Tex. R. Civ. P. 1.* (e.a.).

To that end, the **Texas** – not Michelin – *scope of discovery* is **"liberally construed to allow litigations to obtain the fullest knowledge of the facts and issues prior to trial"**:

> The rules of procedure provide that **the scope of discovery includes any unprivileged information that is relevant to the subject of the action, even if it would be inadmissible at trial**, as long as the **information sought appears reasonably calculated to lead to the discovery of admissible evidence**.
> \*\*\*\*\*
> **The phrases "relevant to the subject matter" and "reasonably calculated to lead to admissible evidence" are liberally construed to allow litigants to obtain the fullest knowledge of the facts and issues prior to trial**.

*Tex.R. Civ. P. 192.3(a)*; *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex.2003) (orig. proceeding); *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 525-526 (Tex. App. 2009). (e.a.).

So, through its Requests for Production, Plaintiffs asked Michelin to produce the facts and issues concerning the design, manufacture and inspection of the subject LTX M/S tire for the duration of its production. *See Motion to Compel at pp. 6-10.* With the exception of **nine (9)** Requests, Michelin failed to respond and produce the requested documents about the design, testing, manufacture, building, and inspection of the subject LTX M/S. This information is indispensible for Plaintiffs to fairly adjudicate their products liability, negligence, consumer fraud and exemplary damages claims against Michelin.

## IV. Absconded Evidence Needed for Fair Adjudication of their Claims.

1. To fairly adjudicate their claim that the tire was defectively inspected, Plaintiffs requested Michelin produce:

6

MR 0439

a. **Aspect Specifications/Aspect Specification Repertoire/Aspect Specification Annexes** – the same manufacturing and quality control information/laser photographs that the tire inspectors and verifiers use (and used on the subject tire) when they are physically looking for defects, anomalies and abnormal conditions (such as blisters, abnormal coloring, molding, cord/cable placement, improper creases, folds, and openings, mold or curing issues, foreign material found in the tire and other various conditions) found *after* the tire is manufactured but *before* it leaves the factory for distribution. The aspect specifications also provide a decision tree on what the inspector/verifier should do when a specific defect is found (repair, scrap, etc.)

b. **General Principles** – the documents that instruct the tire inspectors and verifies how to use the Aspect Specifications.

c. **Technical Notes/Technical Note Repertoire** – the procedures/processes used to address specific defects found in the tire.

d. **TNC** – Tire Non-Conforming Procedures used to address tires that are not manufactured within specification and are addressed in the Aspect Specifications.

2. To fairly adjudicate their claim that the tire was defectively designed, Plaintiffs requested Michelin produce:

a. **The adjustment data** (internal data (claims, graphs, property claims, adjustment, manuals, returns, return codes, correspondence/information exchanged with NHTSA pursuant to the TREAD act) about how tires are performing in the field – based on design/design changes/modifications to the tire line/implementation of nylon cap plies)

b. **The tire specifications including but not limited to:**

    i. **Belt Skim stock** (the rubber coating used between the steel belts is referred to: as **skim stock**. Skim stock is what makes the belts adhere to one another. **Skim stock consists of:** a mixture of various chemical ingredients, including anti-degradants (added to resist deterioration and loss of physical and adhesive properties), reinforcing agents (added to make the tire sufficiently malleable), and accelerators (added to cause the molecules of the compound to knit together when a particular temperature and pressure are applied for a given length of time during the vulcanization process). The design of the **skim stock** and its resistance to degradation is a critical element in the design of tires concerning the resistance to belt edge separations.

7

MR 0440

ii. **Tire component data** – including but not limited to steel belt specifications, inner liner specifications, carcass ply specifications, bead specifications.

3. To fairly adjudicate their claim that the tire was defectively manufactured, Plaintiffs requested Michelin produce:

   a. **The work instructions** (how to build the tire)

   b. **Reaction and working tolerances/limits** (used by Michelin during manufacturing to determine compliance with design and aging specifications).

Michelin knows that Plaintiffs need these documents. Michelin knows that Plaintiffs cannot fairly adjudicate its product liability, negligence, consumer fraud and exemplary damages claims. Michelin also knows that by enacting its own extremely narrow and self-serving scope of production, it prevents Plaintiffs claims of alternative safer designs, manufacturing processes and inspection. Enough is enough. The stonewalling must stop.

## V. Michelin's Deceitful Track Record

Michelin's surreptitious behavior is well documented from countless cases, attorneys and even federal judges such as Judge Amy Totenberg. Case after case, plaintiff after plaintiff, it is the same exact story. Across the nation, there are countless examples of plaintiffs and their family members — all Michelin users or consumers maimed or killed by Michelin's tires — desperately trying in vain to obtain critical evidence just to be bamboozled and misled time and time again. Like in *Bates v. Michelin attached as Exhibit A* or in *Salinas v. Michelin, attached as Exhibit C* or in *Velo v. Michelin, attached as Exhibit D* or in *Allen v. Michelin attached as Exhibit E* or in *Uribe v. Michelin, attached as Exhibit F,* the plaintiffs had to file Motions to Compel to obtain the evidence needed to fairly adjudicate their claims.

All of these plaintiffs were required to file motions to compel against this same defendant – Michelin. Like here, because of Michelin's self-serving stonewalling, those plaintiffs from all

8

MR 0441

over the country were forced to waste time and resources trying to obtain what any litigant in any case deserves: the facts, discovery and evidence necessary to prepare for trial to prove their case.

In *Bates v. Michelin*, Federal District Court Judge Amy Totenberg found and ruled that Michelin committed blatant and repeated discovery violations by concealing evidence – including through its attorneys and legal counsel. It is worth noting that in *Bates*, Judge Totenberg was *not* an advocate or a party. Rather, Judge Totenbeg was an unbiased, objective and impartial officer of the Court – appointed by the President of the United States – who happened to witness firsthand Michelin's **"pattern of subterfuge and withholding relevant and responsive documents"** including the very same documents (aspect specifications, reaction limits and tolerances, warranty and adjustment data, etc., etc.) that Plaintiffs seek from this Court.

After multiple motions to compel, motions for sanctions and repeated misstatements to the Court, the Honorable Federal District Judge Amy Totenberg had enough of Michelin's conduct and ruled accordingly:

> Michelin's conduct has certainly resulted in delay and disruption of this litigation and has hampered the enforcement of this Court's discovery Orders. *See Malautea v. Suzuki Motor Corp.*, 987 F.2d at 1540 (finding that defendants engaged in an unrelenting campaign to obfuscate the truth by improperly objecting to interrogatories, providing incomplete, evasive and unreasonable narrow discovery responses, delayed compliance with court orders and thus hampered the discovery process and showed disdain for the court's orders).
>
> **First, Michelin's initial production refusal followed by its ongoing delay and obstruction of discovery central to the case have affected the integrity of the legal process.**
>
> For example, Michelin's **misrepresentations** at the December 20, 2010 discovery hearing regarding its production of reaction limits and tolerances resulted in a substantive error in the January 3, 2011 Order that was perpetuated by Michelin's

9

MR 0442

counsel's failure to correct the Court's misunderstanding about what documents had actually been produced.

Michelin **refused** to produce the documents until ordered to do so by the Court on September 19, 2011, thereby **precluding** the Plaintiffs from seeking a more expansive production of these documents for over a year and a half.

Moreover, **Michelin seeks to limit** Plaintiffs' potential recovery on the grounds that there is no evidence to support a claim for punitive damages **after attempting to withhold the very documents on which Plaintiffs rely to demonstrate a conscious indifference to the tire's defective design and manufacture.** (Sept. 19, 2011 Sanctions Hr'g Tr. 54, Doc. 230.)

**Second, Michelin delayed producing its most relevant documents and data for over a year and a half while seeking to exclude the testimony of Plaintiffs' tire expert, in part, on the grounds that his opinions are based on insufficient or unreliable data.** (Doc. 203, 204) Yet, Michelin refused to produce documents and data that might potentially support Plaintiffs' expert's opinions regarding the defectiveness of the subject tire.

Finally, **Michelin's dilatory discovery gamesmanship** has hampered Plaintiffs' pursuit of a swift judicial process to provide a remedy addressing the extreme nature of Mr. Bates' physical injuries. Plaintiffs' steadfast efforts to move the case forward to resolution at trial, including their streamlined discovery, has been **needlessly deferred by Michelin's haggling and endless parsing over the production of its evidence on its own time schedule. Not only has this delay and disruption of the litigation prejudiced Plaintiffs, it demonstrates Michelin's bad faith.** *Byrne v. Nezhat,* 261 F.3d at 1121.

**Thus, Michelin's course of conduct described herein warrants the imposition of sanctions to remedy the impact of repeated violations of the Court's Orders, inaccurate representations to the Court, and prolonged abusive discovery conduct.**

The Court does not impose sanctions lightly and has taken great care in the review of the record before it in its determination of this matter. **The pattern of abuse by Michelin is extremely troubling.** The Court is obligated to uphold the integrity of the legal and discovery process to ensure that Plaintiffs here and all parties have the opportunity to fairly present their claims in a reasonable efficient and prompt manner. Plaintiffs would not have

10

MR 0443

uncovered the majority of the most probative documents in existence in this case but for their persistence in pursuing discovery motions and seeking the Court's intervention. Contrary to Michelin's assertion that this belated production demonstrates its good faith, **it is precisely this ongoing belated production, in conjunction with <u>Michelin's multiple violations</u> of the Court's Orders and its <u>evasive</u>, <u>hair-splitting</u> and <u>inaccurate</u> <u>representations to the Court</u> that demonstrate Michelin's bad faith and why a serious, substantive sanction is warranted.**

A determination that the tire at issue in this case is defective and unreasonably dangerous is an appropriate sanction to remedy **the discovery of abuses perpetrated by Michelin in bad faith and in disregard of this Court's prior discovery Orders. First, Michelin made multiple representations to the Court that it had produced documents as ordered by the Court when it in fact had not.**

Second, Michelin repeatedly refused to produce documents in direct violation of the Court's January 3rd, June 3rd and June 24th Orders.

Third, **Michelin intentionally engaged** in an extremely narrow, unjustified interpretation of the Court's Orders **in order to limit, or altogether avoid, producing relevant and useful documents in response to Plaintiffs' discovery requests.**

\* \* \*

In sum, Michelin's bad faith conduct caused serious prejudice to the integrity of the legal process and to Plaintiffs' orderly, effective development and proof of their case. **Michelin's course of conduct described herein warrants the imposition of sanctions to remedy the impact of repeated violations of the Court's Orders, inaccurate or false representations to the Court, and prolonged abusive discovery conduct.**

*Order, Federal District Judge Amy Totenberg, January 2012, pp. 51-54, 59, Exhibit A.* (e.a.).

Michelin is not your typical defendant. Michelin is a well oiled, refined machine designed to confuse and mislead the Court to disrupt litigation, lengthen the discovery process and prevent disclosure – all at the expense of trying the merits of the case and ensure prejudice to the victimized plaintiffs.

11

MR 0444

Here, from the get go, Michelin has been delaying this case. Exactly a year ago, Michelin and its legal representatives misled the Court to remove the case to the federal district by claiming that Plaintiffs did not serve Texas resident, Mundo Cars. *See Notice of Removal at 4-5.* This was a mistruth and was immediately exposed by Plaintiffs' counsel and documented by Federal Judge David Godbey:

> **The Court notes that MNA also removed this case on the basis that Mundo had not been properly served. In their motion to remand, Plaintiffs established that they served Mundo.**

*Judge Godbey's March 24, 2015 Order Granting Remand, p. 3, footnote 2. (e.a.).*

Michelin and its legal counsel knew their mistruth to the federal district court would be easily exposed. It was blatant and easily dispelled by physical evidence. Still, they did not care because in the end, they got their reward. They delayed the case for an entire year. No scruples. No concerns. No honor. No good faith. That is Michelin's entire game. Delay. Mislead. Obfuscate. Prevent trials on the merits. We ask that the Honorable Court to not allow it.

**Conclusion:** A year later, nothing has changed. Just like in *Bates*, Michelin *still* has the same strategy: delay. Plagued with infections and bed sores, the quadriplegic Obdulia's daily existence is a struggle. Obdulia is out of time.

Also, with looming pretrial deadlines including expert disclosures, disclosure must be made. Michelin will use its lack of production to file summary judgments, *Daubert* motions and further claim that Plaintiffs' experts do not have foundation for their opinions. This is the best evidence that such absconded evidence is needed for Plaintiffs to fairly adjudicate their claims. All extremely prejudicial and unfair to the innocent Plaintiffs and their family. It is time for Michelin to face the music and respond to Plaintiffs' requests for production so Plaintiffs can – pursuant to the Texas Rules of Civil Procedure - **"obtain the fullest knowledge of the facts and**

12

MR 0445

**issues prior to trial.**" *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d at 526. Plaintiffs do not want sympathy or pity. All they want is justice, fairness and a level playing field.

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:     /s/ Luis P. Guerra
        Luis P. Guerra (*Admitted Pro Hac Vice*)
        AZ State Bar No. 015768
        David C. Shapiro (*Admitted Pro Hac Vice*)
        AZ State Bar No. 028056
        ATTORNEYS FOR PLAINITFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 4th day of September, 2015.

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

13

MR 0446

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars


/s/ David C. Shapiro

14

MR 0447

# EXHIBIT A

MR 0448

# EXHIBIT D

MR 0449

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
Michelle Paigen
5/29/2013 5:07:00 PM
Filing ID 5271448

*Law Offices of*
**LUIS P. GUERRA, L.L.C.**
*6225 North 24th Street, Suite 125*
*Phoenix, Arizona 85016*
*(602) 381-8400*
*Luis P. Guerra, #015768*
*David C. Shapiro, #028056*
*Attorneys for Plaintiffs*

**GOLDBERG & OSBORNE,**
*33 North Stone Ave., Suite 900*
*Tucson, Arizona 85701*
*(520) 620-3975*
*John E. Osborne, #07085*
*Maria del Pilar Mendoza, #024740*
*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| SANDRA VELO, et al. | No. CV2012-007346 |
| Plaintiffs, | **PLAINTIFFS' MOTION TO COMPEL** |
| v. | (Assigned to the Honorable Judge Rea) |
| MICHELIN NORTH AMERICA, INC., a New York Corporation, et al. | **Oral Argument set for:** |
| Defendants. | **Tuesday, June 25, 2013** |
| | **3:00 p.m.** |

**Preface:** This Motion and Separate Statement of Moving Counsel simply request the Court to order Defendant Michelin to comply with the Arizona discovery rules and produce the information Plaintiffs have been repeatedly and patiently asking for, dating as far back as **July 31, 2012.** *Correspondence, January 31, 2013, Exhibit A; Correspondence, February 14, 2013; Correspondence, March 6, 2013, Exhibit B; Correspondence, April 4, 2013, Exhibit C; E-mail correspondence, May 6, 2013, Exhibit D; Correspondence, May 10, 2013, Exhibit E.*

MR 0450

After nearly a year of empty promises and countless e-mails, correspondence, phone calls and several meet and confer conferences, concerning the production of documents about the design, inspection, testing, building, curing, quality control processes and manufacture[1] of Michelin's defective LTX tire, Michelin produced nothing in response to 51 of the 56 discovery requests. Adding insult to injury, very recently, after weeks and weeks of false assurances and empty promises that *some* of the documents were forthcoming, Defendants have produced **nothing**. This is Michelin's *modus operandi* in litigation. It discloses nothing. It produces nothing until motions to compel are filed and production is required by a Court Order. Even then, it still produces nothing. This stonewalling should not be permitted and Michelin should be ordered to produce the requested information that is reasonably calculated to lead to the discovery of admissible evidence. *Rule 26(b), A.R.C.P.*

**I.     Defendants have produced next to nothing.**

Since the inception of this lawsuit, Plaintiffs have served Defendants with the following discovery requests – all of which have yielded **ZERO**[2] documents and fact witnesses about the design, testing, inspection, building and manufacture of the subject tire:

| Information requested | Requested | Relevance | Produced? |
|---|---|---|---|
| 1.  Documents about the organizational structure of Michelin North America | 7/31/2012 | Design & Manufacture | **No** |

---

[1] There are **eleven (11)** basic steps to tire manufacturing: 1) mixing and combining the raw materials into rubber compound, 2) milling to warm up the rubber compound, 3) extruding operations to transform rubber compounds into specific tire components, 4) processing fabric and wire and coating them with rubber, 5) processing bead wires and coating them with rubber, 6) cementing and marking of beads, materials and extruded components, 7) cutting and cooling the various extruded components, 8) assembling all of the components (bead wires, coated fabrics, treads) on a tire-building machine forming a green tire, 9) lubrication of the green tire, 10) curing the tire with heat and pressure and 11) finishing and inspecting the completed tire.

[2] As shown below, Michelin produced less than **an inch of documents**. This is not an exaggeration. On the contrary, an inch of documents is an overstatement because nearly all of these documents are illegible or written in French.

MR 0451

| | | | |
|---|---|---|---|
| 2. Decision Tree Manual/Aspect Specifications re: quality control of tires made **(criteria used by tire builders to test the production quality of cured tires)** | 7/31/2012 | Manufacture | **No** |
| 3. Subject tire and similar tire specifications concerning design and manufacture **(the specifications about the construction of the tire's belt skim stock, carcass ply, steel cord specifications)** | 7/31/2012 | Design & Manufacture | **No** |
| 4. Records of other tires built with the same belt skim stock as subject tire | 7/31/2012 | Design & Manufacture | **No** |
| 5. Reaction limit specifications for the subject tire to determine whether built tires comply with design specifications **(criteria used by tire builders to test the production quality of uncured tires)** | 7/31/2012 | Manufacture | **No** |
| 6. Documents arising out of personal injury claims/lawsuits re: the subject line of LTX tires | 7/31/2012 | Design & Manufacture | **No** |
| 7. Documents re: adjustment of the subject tire and similar tires to obtain internal data about Michelin's knowledge of alleged tire defects and failures **(information about how Michelin deals with returned tires with defects and failures)** | 7/31/2012 | Design & Manufacture | **No**[3] |
| 8. Documents re: property damage claims arising out of the subject tire and similar line of tires | 7/31/2012 | Design & Manufacture | **No** |
| 9. Government/consumer safety agency contacts/communications/records re: questions, claims, trends or patterns of failure of the subject tires | 7/31/2012 | Design & Manufacture | **No** |
| 10. Internal recommendations re: acceptable/unacceptable rates of loss of adjustment **(documents about trends of defective tires)** | 7/31/2012 | Design & Manufacture | **No** |

---

[3] In response to this Request for Production, Defendant Michelin produced one-hundred and thirty-five (135) pages of illegible documents.

3

MR 0452

| | | | |
|---|---|---|---|
| 11. Complaints/reports/notices authored by dealerships, customers, consumers or government agencies addressed to Michelin re: tread separations of the subject LTX tires or similar lines of tires | 7/31/2012 | Design & Manufacture | **No** |
| 12. Personal injury claims/lawsuits/property damage claims/adjustments involving failures of Michelin tires that incorporate nylon cap plies | 7/31/2012 | Design | **No** |
| 13. Training, testing and inspection documents concerning the manufacture of tires at the Dothan, Alabama plant | 7/31/2012 | Manufacture | **No** |
| 14. Audits performed by Michelin re: failure/durability/design or quality of the subject tire and similar tires | 7/31/2012 | Design & Manufacture | **No** |
| 15. Training materials issued by Michelin addressed to the tire builders at the Dothan, AL plant at the time the subject tire was built | 7/31/2012 | Manufacture | **No** |
| 16. All training materials issued by Michelin addressed to Michelin North America's employees building the subject tire and similar tires | 7/31/2012 | Manufacture | **No** |
| 17. Inspection methodology materials used to identify trapped air/steam blisters in finished tires **(quality control procedures about the detection of manufacturing defects in tires)** | 7/31/2012 | Manufacture | **No** |
| 18. Testing of steel belted radial passenger and light truck tires manufactured with the same belt skim stock as subject tire, including peel tests, pull tests, performance tests and endurance tests | 7/31/2012 | Design & Manufacture | **No** |
| 19. Testing results relating to the relationship between under-inflation and tread separation | 7/31/2012 | Design & Manufacture | **No** |
| 20. Rim groove analysis documenting the relationship between under-inflation, rim groove profile and tread belt separation | 7/31/2012 | Design & Manufacture | **No** |
| 21. Department of Transportation testing concerning the Michelin LTX tires manufactured at the Dothan, Alabama plant | 7/31/2012 | Design & Manufacture | **No** |

4

MR 0453

| | | | |
|---|---|---|---|
| 22. Michelin testing about the causes of tread separation in the subject tire, similar tires and all tires from the same LTX line of tires | 7/31/2012 | Design & Manufacture | **No** |
| 23. Michelin documents about the relationship between impact testing and tread separation | 7/31/2012 | Design & Manufacture | **No** |
| 24. Curing conditions at the Dothan, AL plant used in the manufacture of the subject tire and any and all subsequent changes to the curing conditions | 7/31/2012 | Manufacture | **No** |
| 25. Documents about 1) the use or potential use of nylon overlay/belt edge strips/belt edge wraps/belt edge gum strips in Michelin passenger or light truck tires and the application of such during the tire building process and **2)** patents/articles/materials authored by or in possession of Michelin re: use of nylon overlays in passenger/light truck tires **(nylon overlays are layers of nylon that extend around the two steel belts underneath the tread to provide better tread/belt integrity)** | 7/31/2012 | Design & Manufacture | **No** |
| 26. Michelin document retention policy – *totaling fifteen (15) pages* | 7/31/2012 | | **Yes** |
| 27. Depositions and statements of Chuck Patrick from *Bates v. MNA, USDC N.D. Georgia, Case No. 1:09-CV-3280-RWS* | 7/31/2012 | Design & Manufacture | **No** |
| 28. Michelin documents and testing about tire aging | 7/31/2012 | Tire aging | **No**[4] |
| 29. Michelin communications addressed to auto manufacturers concerning tire use limits | 7/31/2012 | Tire aging | **No** |
| 30. Quality procedures re: components used in manufacture of subject tire | 2/28/2013 | Manufacture | **No** |
| 31. Customer drawings associated with OE contracts involving the subject tire | 2/28/2013 | Design | **No** |
| 32. Splice overlap standards/tolerances for plies and belt materials re: subject tire **(quality control procedures about the** | 2/28/2013 | Manufacture | **No** |

[4] Instead of producing the internal testing, memoranda, training materials and adjustment data about tire aging, Defendants only produced a **one (1) page** document titled "Technical Bulletin."

5

| | | | |
|---|---|---|---|
| detection of manufacturing defects during the splicing of various tire components) | | | |
| 33. Field surveillance data re: subject tire (claims records about how a tire is performing in the field – different than adjustment data) | 2/28/2013 | Design & Manufacture | **No** |
| 34. Adjustment data/property damage claims from before and after the introduction of nylon cap plies in Michelin tires | 2/28/2013 | Design | **No** |
| 35. Adjustment data/property damage claims since the introduction of nylon cap plies into Michelin tires in the same size as the subject tire | 2/28/2013 | Design | **No** |
| 36. Curing specifications for the subject tire at the time of its manufacture (**chemical process called "vulcanization" in which the green tire obtains its final shape and tread in a "press" under heat and pressure while the various components chemically and physically bond together)** | 2/28/2013 | Manufacture | **No** |
| 37. Current curing specifications for the subject tire | 2/28/2013 | Manufacture | **No** |
| 38. Belt edge integrity test results for the subject tire or other tires with the same green tire or belt skim compound | 2/28/2013 | Design & Manufacture | **No** |
| 39. Michelin's list of substitutions for components concerning the subject tire at the time of its manufacture | 2/28/2013 | Manufacture | **No** |
| 40. Michelin's rheometric measurements produced on the belt skim/tread cap/tread base/undertread for the subject tire to the present | 2/28/2013 | Design | **No** |
| 41. Michelin's endurance testing results for low-pressure testing conducted on the subject tire or tires with the same green specifications or belt skim | 2/28/2013 | Design & Manufacture | **No** |
| 42. Cost reductions applied to the design of the subject tire from initial production release to the date of manufacture of the subject tire | 2/28/2013 | Design | **No** |

6

MR 0455

| | | | |
|---|---|---|---|
| 43. Cost increases applied to the design and manufacture of the subject tire from initial production release to the date of manufacture of the subject tire | 2/28/2013 | Design & Manufacture | **No** |
| 44. Regulatory compliance test results for the subject tire and all associated tires sharing the same green tire construction as subject tire | 2/28/2013 | Design & Manufacture | **No** |
| 45. Green tire specifications and specification change history for the subject tire from production release to present **(changes made to the subject tire's and components' design and manufacture)** | 2/28/2013 | Design & Manufacture | **No** |
| 46. Tread die profile for the subject tire | 2/28/2013 | Design & Manufacture | **No** |
| 47. Adjustment data/property damage claims after the introduction of design changes to the subject tire since the date of the subject tire's manufacture | 2/28/2013 | Design & Manufacture | **No** |
| 48. Design drawings for the subject tire | 2/28/2013 | Design | **No**[5] |
| 49. Cut analyses and reports on the subject tire from manufacturing release to time of the subject tire's date of manufacture **(analyses of returned cut tire sections)** | 2/28/2013 | Design & Manufacture | **No** |
| 50. Cured, finished gauges for the manufacture of the subject tire | 2/28/2013 | Manufacture | **No**[6] |
| 51. Michelin's process control chart concerning the manufacture of the subject tire at the Dothan, Alabama plant | 2/28/2013 | Manufacture | **No** |
| 52. Diagram about the process of applying the innerliner of the subject tire to the building drum | 2/28/2013 | Manufacture | **No** |
| 53. Quantitative listing of ingredients of the sidewalls of the subject tire used at the time of the manufacture of the subject tire | 2/28/2013 | Design & Manufacture | **No** |
| 54. Design Failure Mode and Effects Analysis of the subject tire in possession | 2/28/2013 | Design & Manufacture | **No** |

---

[5] Michelin produced a total of three (3) illegible pages in response to this Request.

[6] These documents – MNA00859-MNA00864 are all written in French and incomprehensible.

MR 0456

| | | | |
|---|---|---|---|
| of Michelin | | | |
| 55. Daily production scrap report for 12 months before and after the manufacture of the subject tire of the subject tire and tires sharing the same components as the subject tire **(tires that are no longer able to be used for their original purpose)** | 2/28/2013 | Manufacture | **No** |
| 56. Identity of tire builders, tire examiners and supervisors employed by Michelin who worked at the Dothan, Alabama plant and were physically present at the time the subject tire was manufactured | 3/1/2013 | Manufacture | **No** |

*See Plaintiffs Irma Olivas, Antoinette Olivas and Marcos Olivas Request for Production dated July 31, 2012, Exhibit F and Michelin responses thereto, Exhibit G; Plaintiff Rafael Olivas' Request for Production dated February 28, 2013 and Michelin responses thereto, Exhibit H; Plaintiff Mary Ann Olivas' Request for Production dated February 28, 2013 and Michelin responses thereto, Exhibit I; Plaintiff Sandra Velo's Request for Production dated February 28, 2013 and Michelin responses thereto, Exhibit J; Plaintiff Maryann Valdez' Request for Production dated February 28, 2013 and Michelin responses thereto, Exhibit K; Plaintiff Irma Olivas, Antoinette Olivas and Marcos Olivas' Non-Uniform Interrogatory dated March 1, 2013 and Michelin's response thereto, Exhibit L.*

**Conclusion:** The facts speak for themselves. In other words, Defendant Michelin has produced next to **nothing**. Enough is enough. Michelin's failure to disclose this evidence and information violates all the Arizona discovery rules, the basic principles of litigation, corrupts the integrity of the legal process and makes a mockery of this litigation.

Michelin's stonewalling is extremely prejudicial to Plaintiffs, preventing them from reasonably preparing for trial including: **1)** conducting discovery, **2)** preparing for and **3)** taking depositions, **4)** cross-examining Michelin's employees or **5)** Michelin's experts, **6)** providing full expert opinions and **7)** disclosing areas of expert testimony, forcing Plaintiff to request the Court's assistance.

8

MR 0457

Accordingly, pursuant to Rules 1, 26, 26.1, 33, 34, 37(a)(c) and (d) A.R.C.P., Plaintiff respectfully requests this Honorable Court to order Defendant Michelin to immediately produce the requested information and documents.

**DATED** this 29 day of May, 2013.

/s/ Luis P. Guerra
Luis P. Guerra
David C. Shapiro
LUIS P. GUERRA, LLC.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
*Attorneys for Plaintiffs*

John E. Osborne
Maria del Pilar Mendoza
GOLDBERG & OSBORNE
33 North Stone Avenue, Su, 900
Tucson, AZ 85701
*Attorneys for Plaintiffs*

ORIGINAL E-filed this 29 day
Of May, 2013 and COPY of the
foregoing MAILED this same day of
May, 2013, to:

C. Bradley Vynalek, Esq.
Ryan S. Patterson, Esq.
QUARLES & BRADY, LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391
*Co-Counsel for Defendants Michelin*

Chris S. Pacetti, Esq.
K. Noelle Ponsetto, Esq.
Christina Ciminelli, Esq.
YUKEVICH CALFO & CAVANAUGH
355 South Grand Avenue, 15th Floor
Los Angeles, CA 90071
*Co-Counsel for Defendant Michelin*

9

MR 0458

Christopher M. Nalón
CARNAHAN PERRY HANLON & HUDONS, PLC
722 E. Osborn Rd., Suite 400
Phoenix, AZ 85014
*Attorneys for Defendant Tire Direct, Inc.*

Josué-Alfonso Munoz S. Esq.
LAW OFFICES OF JOSUÉ-ALFONSO MUÑOZ S.
1802 East Thomas Road, Suite 14
Phoenix, Arizona 85016
Attorneys for Llantera Chandler Heights, L.C.C. dba
El Mil Amores Tires aka Llantera Mil Amores aka
Mil Amores #10; Martin Chacon; David Chacon;
Mario Chacon; Rosie Chacon, and Lauro Chacon

Juvenal Espinoza
298 e. Sheffield Court
Gilbert, AZ 85296
ESPINOZA ENTERPRISES, LLC.
d/b/a JUVES AUTO CLINIC
*Pro se*

John E. Osborne
Maria del Pilar Mendoza
GOLDBERG & OSBORNE
33 North Stone Avenue, Su, 900
Tucson, AZ 85701
*Attorneys for Plaintiffs*

10

# EXHIBIT E

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, Arizona 85705
(520) 620-3975

John E. Osborne, Esq.
State Bar #07085
josborne@goldbergandosborne.com
William C. Bacon, Esq.
State Bar #04895
wbacon@goldbergandosborne.com
Kristin J. Schriner, Esq.
State Bar #026631
kschriner@goldbergandosborne.com
Attorneys for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MOHAVE

| | |
|---|---|
| Kimberly Allen, a single woman,<br><br>    Plaintiff,<br><br>vs.<br><br><br><br><br><br>MICHELIN NORTH AMERICA, a New York Corp.; SUPERIOR TIRE CORPORATION, an Arizona Corporation, JOHN DOES I-X and JANE DOES I-X; ABC CORPORATIONS I-X and XYZ PARTNERSHIPS I-X,<br><br>    Defendants. | No: CV 2013-07176<br><br>PLAINTIFF'S MOTION TO COMPEL DEFENDANT MICHELIN NORTH AMERICA TO PROVIDE FULL AND COMPLETE ANSWERS TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR PRODUCTION, AND TO SUPPLEMENT DISCLOSURES<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff Kimberly Allen, pursuant to Rule 37, Ariz. R. Civ. P., moves this Court for an Order compelling Defendant Michelin North America ("MNA") to produce documents responsive to Plaintiff's Requests for Production, to provide supplemental and verified responses to Plaintiff's Interrogatories, and to supplement its disclosures.

MNA decided that it only had to disclose and answer discovery that 1) fit into MNA's severely restricted self-defined 1 year scope of discovery, and 2) that only concerned this exact model tire. MNA unilaterally acted as the Court and defined this as "The Relevant Scope". This scope not only

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

MR 0461

violates Arizona's broad discovery rules, but it also contradicts Arizona's strict product liability law and the hindsight test articulated in *Dart v. Wiebe*, 147 Ariz. 242, 709 P.2d 876 (1985), which allows for admissibility (and thus discovery) of the manufacturer's knowledge regarding the product up to the date of the trial.

MNA also made the premeditative choice to restrict the discovery of documents to only 6 months after the manufacture of the subject tire knowing that MNA had already allegedly destroyed all of these documents. Thus, Ms. Allen would receive nothing. If MNA destroyed all relevant documents that fall within MNA's "relevant scope," then this alone requires a broader scope of discovery.

MNA also refused to answer discovery based on "trade secret" objections despite the fact that the Court has entered Protective Order ("PO") for MNA's confidential documents.

MNA failed to answer discovery requests that are reasonably calculated to lead to the discovery of admissible evidence regarding both Ms. Allen's manufacturing and design defect claim. MNA's objections are a continued abuse of discovery that contradicts Arizona's rules against gamesmanship in the discovery process. Kimberly Allen therefore requests that this Court compel MNA to answer Plaintiff's discovery requests and for appropriate sanctions pursuant to Rule 37(a)(2)(A) and A.R.S. 12-349 (A)(4).

Ms. Allen proposes the following as the scope of discovery for MNA's responses: For other incidents, adjustment data, claims and complaints, the scope should be the scope of production of the model tire and the similar green tires.

The scope of discovery for testing, which is non-specific to the tire at issue, but rather relates to MNA's knowledge regarding the cause of tire failures, should be all 15, 16, and 17 inch passenger and light truck tires manufactured by MNA for five years prior to the manufacture of the subject tire to the present day.

1.  **BACKGROUND FACTS:**

On October 8, 2011, Kimberly Allen was driving with her daughter on I-40 from California to Mohave Valley, Arizona. Kimberly was moving to Mohave Valley to be with her mother after the

GOLDBERG & OSBORNE
698 E. Wetmore Road. Suite 200
Tucson, AZ 85705
(520) 620-3975

2

MR 0462

unexpected death of Kimberly's stepfather. Kimberly was also starting a new job at the Aquarius Casino in Laughlin in a few days and was very excited about her new life in Mohave County.

While driving on I-40, the Michelin tire on the vehicle Kimberly was driving suddenly and unexpectedly suffered a tread separation. The failed tire caused the vehicle to go out of control and roll over. Kimberly was trapped in the vehicle for close to an hour, hanging from her seatbelt while the emergency responders attempted to extract her. Kimberly suffered severe injuries to her leg/ankle as well as to her arm. It took many surgeries and months of recovery before Kimberly was on her feet again, and the job she was excited about starting was no longer available.

The tire at issue is a P215/70R15 Uniroyal Tiger Paw AWP II tire, manufactured at MNA's Ardmore, Oklahoma plant ("The Subject Tire"). MNA manufactured this tire during the 40th week of 2007 (Oct. 1-Oct. 7).

At the beginning of this case, Plaintiff was concerned about MNA's discovery abuses given past tactics by MNA's current discovery firm. *See e.g.*, Sanction Order in *Bates v. MNA*, attached as Exhibit B; *see also* Sanction Order in *Guzman v. MNA*, attached as Exhibit C. In the Joint Report filed almost a year ago, Plaintiff addressed this concern: "In the past, the Plaintiff's attorneys had a difficult time obtaining timely, complete, and accurate responses to their discovery requests from defendant Michelin North America." *See* June 13, 2014 Joint Report at p. 4. MNA responded stating: "MNA objects to Plaintiff's attorney's unfounded claim as it attempts to portray MNA as uncooperative and unreasonable, neither of which is true. MNA has complied with all applicable rules, regulations and laws and will do so in this case." *See id.* Unfortunately, MNA did not live up to this promise.

## II.  MNA'S IMPROPER OBJECTIONS INCLUDING A VIOLATION OF THIS COURT'S ORDER REGARDING DISCLOSURE OF FACT WITNESSES.

On October 31, 2014, Ms. Allen served MNA with one set of Interrogatories ("NUIs") and one set of Requests for Production ("RFP"). On December 12, 2014, Plaintiff received MNA's responses, which stated: "MNA objects to the extent this Interrogatory seeks or attempts to seek trade secret, proprietary, or otherwise commercially confidential." *See* MNA's Responses to NUIs at p. 3, Exhibit D. MNA made this objection despite the fact that the Court had entered a PO with a Heightened Confidentiality Clause, which protects all of MNA's confidential documents. A heightened

3

MR 0463

confidentiality clause is an extreme protection generally only entered in patent cases, or in litigation against direct competitors. With this PO, MNA has no excuse for its failure to answer discovery.

MNA also took it upon itself to edit Plaintiff's request and restricted its answers to: "the Subject Tire and tires manufactured to the specification in place for the Subject Tire at the Ardmore, Oklahoma plant during the six months before and the six months after the date of manufacture of the Subject Tire." *See id.* at p. 2, Exhibit D. By this means, MNA decided it would create its own discovery rules and defined this as "the Relevant Scope." Then, MNA refused to answer discovery that did not fall within this self-defined "relevant scope." For example, many of Ms. Allen's requests relate to MNA's notice of other incident or claims in which consumers alleged tread separations or other defects involving the same model tire. Other requests involve testing performed by or on behalf of MNA that does not relate specifically to any one model tire, but instead relates to MNA's knowledge regarding the cause of tread separations. MNA failed to answer any of these requests.

MNA also made numerous objections which have no support under Arizona law. For example, MNA refused to identify anyone with knowledge about the design or manufacture of the subject tire claiming it did not have to answer interrogatories until the fact witness deadline. *See* MNA's supplemental responses to NUI 3, 4, 6 and 11, attached as Exhibit E.

Not only does Rule 26.1 require that MNA provide fact witness information in its Initial Disclosure, but Plaintiff also specifically requested this information in an interrogatory.

Moreover, the Court's Scheduling Order instructed: **"This order does not replace the parties' obligation to seasonally disclose Rule 26.1 information on an on-going basis and as it becomes available."** *See* December 4, 2014 Scheduling Order. MNA's refusal to identify lay witnesses is a direct violation of this Court's order and alone is grounds for sanctions. By MNA's refusal to identify any witnesses until the fact witness deadline (April 27, 2015), MNA leaves Plaintiff only two months (June 26, 2015) to depose these out of state individuals.

MNA also refused to answer interrogatories stating that Ms. Allen is required to subpoena a 30(b)(6) witness if she wanted responses. This has no support under Arizona law, and actually negates the entire purpose of serving interrogatories.

One of the MNA's most confusing objections can be found in MNA's objections to Plaintiff's

4

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

NUI's 3, 5, and 6, Exhibit D. In each of these responses, MNA stated it would not answer the request because "Plaintiff has not alleged a specific theory of defect in this case, nor is it clear what aspect of the design and manufacturing process Plaintiff alleges to have been improper." *Id.* MNA's objection fails to recognize that Plaintiff sent MNA a correspondence detailing Plaintiff's defect claims. *See* January 12, 2015 correspondence from counsel for Ms. Allen to MNA, at p. 3, Exhibit F:

> However, in an effort to encourage Michelin to follow Arizona's discovery rules, upon information and belief the potential defect issues with this tire include but are not limited to premature oxidation, inadequate bonding, low belt to tread width ratio, dog eared splices of the belts, which are out of tolerance pursuant to Michelin's standards, gapped belt splices, and no nylon cap ply. These are specific design and manufacturing defects, which are not inclusive or intended to replace the expert disclosure, but are provided to address Michelin's objection.

*Id.*

Even though Plaintiff provided this defect information, MNA still refused to supplement its answers and instead repeated the same objections. *See* Supplemental responses to NUIs, 3, 5, 6, Exhibit E. What is more, in response to NUI 18, which requested MNA describe its position regarding the cause of the tire failure, MNA objected that this was a "premature request for expert testimony." *See id.* at p. 16.

MNA's objection is nonsensical given that MNA had required Plaintiff to disclose her tire defect theories, which MNA then refused to do itself.

Ms. Allen also requested the specifications for the subject tire, which are basic documents that should always be disclosed without a request in a tire product liability suit. However, MNA claims it destroyed the specs as part of it document destruction policy. *See* MNA's Supplemental Response to RFP 1, attached as Exhibit G. Plaintiff therefore asked MNA to provide the following information:

> Please make sure that you include the date on which Michelin destroyed these documents. Please also confirm that Michelin has performed a search and that the specs are not in the possession of any of Michelin's attorneys, representatives, employees, agents and/or that these specs are not in any court depository.

*See* February 16, 2015 email to Giles Schanen, attached as Exhibit H.

Plaintiff never received a response to this request.

In place of the subject 2007 tire specifications, MNA produced specifications for a tire manufactured in 2009. Yet, MNA's scope of discovery is limited so severely that it does not include

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

5

MR 0465

any documents or information past 2008. Therefore, Ms. Allen is left with specifications for a 2009 tire, but absolutely no other information regarding this tire. This is illogical. These are just a few examples of MNA's improper objections.

**Pursuant to Mohave County Local Rule CV-1(D), attached are the questions propounded, MNA's responses, and why these responses are deficient.** *See* Exhibit A.

On January 12, 2015, Plaintiff sent MNA correspondence detailing the deficiencies in MNA's responses and disclosure statements. *See* January 12 correspondence, attached as Exhibit I. Plaintiff provided MNA with Arizona's law regarding the breadth of discovery, as well the law regarding admissibility vs. discoverability because MNA objected to many requests using a strict standard for admissibility at trial. *See id.* at p.4- 5, Exhibit I. Plaintiff also asked that MNA provide support for MNA's numerous objections to "unduly burdensome" and "overly broad."

As the Court knows, boilerplate objections without support are improper. *See id.* (citing *See e.g., Cornet Stores v. Superior Court In & For Yavapai Cnty.*, 108 Ariz. 84, 88-89, 492 P.2d 1191, 1195-96 (1972) ("The objection based upon burden must be sustained by evidence showing the quantum of work required, while to support an objection of oppression there must be some showing either of an intent to create an unreasonable burden or that the ultimate effect of the burden is incommensurate with the result sought.'); *See also e.g.*, April 13, 2011 Trial Transcript from *State of Arizona v ASARCO*:

> THE COURT: And let me tell you, I mean, I'm beyond offended by it, and I'll tell you why. Your general objections are obstructionist, frivolous, lack any basis in law or fact, and are -- actually have been barred by every circuit that has ever ruled on the question, including the Ninth Circuit.
>
> So if I ever see general objections, you object because it's attorney-client privilege, you object because it's overbroad and vague and ambiguous, unduly burdensome and oppress -- you know, you have every boilerplate objection in these answers to interrogatories. And there's absolutely nothing objectionable about the interrogatories asked in this document.
>
> And every circuit has held that if you make an objection based on the fact that they're vague or overbroad, you have a duty to specifically point out why they're vague or overbroad, and you don't do that.
>
> And so I don't know if it's a cultural practice in this district that allows you to do that, but I know it's contrary to Ninth Circuit law and every other circuit law.

*Id.*, attached as Exhibit J.

6

MR 0466

Plaintiff provided this information in an effort to avoid Court intervention.

III. **MNA'S "COMPROMISE" OFFERED TO SUPPLEMENT A FEW ANSWERS ONLY IF MS. ALLEN AGREED TO WITHDRAW ALL OF HER REMAINING DISCOVERY REQUESTS AND AGREED TO FORFEIT HER RIGHT TO HAVE THE COURT DETERMINE THE APPROPRIATE SCOPE OF DISCOVERY UNDER ARIZONA LAW.**

A. Ms. Allen Should Not Have To Withdraw Any Of Her Requests In Exchange For MNA Agreeing To Do What It Is Already Obligated By Law To Do.

On February 12, 2015, Plaintiff and MNA conducted a "meet and confer" to discuss MNA's objections to Plaintiff's discovery. This "meet and confer" was between Plaintiff's counsel and MNA's discovery counsel, which is now the third law firm currently representing MNA in this lawsuit. MNA is currently represented by Farhang & Medcoff from Arizona, Yukevich Cavanaugh from Los Angeles, CA, and now Nelson Mullins Riley & Scarborough LLP from South Carolina.

During the meet and confer, Plaintiff provided her proposal regarding the scope of discovery. *See* February 12, 2015 email to MNA counsel, attached as Exhibit K. MNA responded with its own proposal. This Proposal required Ms. Allen to waive her right to seek court intervention to **all** of her issues regarding MNA's discovery responses as a condition precedent to receiving only a few additional responses from MNA. *See* February 20, 2015 email from Giles Schanen, attached as Exhibit L:" **MNA will agree to provide the above information and documents only if doing so will resolve all issues with regard to plaintiff's discovery requests, and if plaintiff will agree to forego a request for a plant inspection.**" *Id.*

For the tire testing information Ms. Allen requested, MNA has made no offer to expand the scope of discovery in terms of the types of tires even though many of the requests seek information about MNA's knowledge of tread separation causes and testing, which is not specific to a single tire.

MNA's offer to supplement was still excessively restrictive and still failed to comply with Arizona's discovery rules. Ms. Allen was required make this agreement before even having the chance to review the documents MNA intended to disclose. What is more, Ms. Allen would have to withdraw twenty of her requests in exchange for MNA expanding its "Relevant Scope" to three years rather than one, when even three years is too limited under Arizona law. *See* Exhibit R, summary list of the requests Ms. Allen would have to withdraw under MNA's "proposal."

7

MR 0467

Plaintiff immediately responded that this type of threat was unacceptable in Arizona: "Your requirement that Ms. Allen give up all of her issues regarding Michelin's lack of disclosure and answers to her discovery in exchange for your restricted number of documents is unfair gamesmanship at best, and bad faith at worst." *See* February 24, 2015 correspondence to Giles Schanen, attached as Exhibit M. Plaintiff explained that **the proper procedure for discovery is "for Michelin to disclose the information, allow for the Plaintiff to examine it, and then if there are further issues, have the Court determine the narrow issues on which we cannot agree."** *See id.*, Exhibit M.

MNA's "Proposal" makes it appear as if it is making great "concessions." MNA starts every correspondence with wonderful verbiage about how it would like to come to a resolution and that it is making great efforts to do so. When in fact, MNA would require Ms. Allen to withdraw almost all of his discovery requests in exchange for a few documents MNA is already obligated by law to provide. A Court would never condone this type of coercion and game playing by a Plaintiff, and the same standard should be true for a large corporation.

Ms. Allen certainly did not make the disclosure of her medical bills contingent on MNA giving up its right to conduct discovery of other medical records as this would be highly inappropriate. Moreover, Ms. Allen did not put in place a self-defined scope of discovery and only provide one year worth of medical records.

MNA's effort is highly deficient despite its protestations to the contrary. Despite the verbiage in MNA's correspondence that it has gone above and beyond and "bent and bent," MNA providing a few select documents it is already required to provide is not an exceptional effort. *See* March 25, 2015 email from Giles Schanen, attached as Exhibit S.

When Ms. Allen did not agree to MNA's proposal, MNA refused to expand its 1 year scope of discovery. MNA eventually agreed to supplement a few responses. However, when Plaintiff received the supplemented responses, she discovered that MNA only supplemented <u>one (1)</u> RFP, provided little additional information in the interrogatories, and kept the one scope. The responses Ms. Allen received are far from what is required under Arizona law. MNA has a duty to disclose discoverable information and none of this should be contingent on Ms. Allen giving up her rights. Ms. Allen now has no choice but to seek Court intervention.

8

MR 0468

## IV. MNA FAILED TO COMPLY WITH RULE 26.1 BY REFUSING TO NAME A SINGLE INDIVIDUAL WITH KNOWLEDGE ABOUT THE DESIGN OR MANUFACTURE OF THIS TIRE AND BY REFUSING TO DISCLOSE DOCUMENTS DIRECTLY RELEVANT TO THIS TIRE.

Under Rule 26.1, there are certain documents and information that a party is required to disclose without discovery requests. MNA has failed entirely to comply with Rule 26.1 in its disclosure statements and in its answers the discovery Ms. Allen sent in an attempt to cure MNA's deficient disclosure statements.

On October 13, 2014, Plaintiff sent MNA a correspondence requesting that MNA comply with Rule 26.1(a)(4) because MNA's had failed to name a single person who _may_ have knowledge regarding the design or manufacture of the subject tire, or the model tire, including the identities of the tire builders, tire inspectors, or the tire designers/engineers. _See_ Rule 26.1(a)(4) (parties are required to disclose "the names and addresses of all persons whom the party believes may have knowledge or information relevant to the events, transactions, or occurrences that gave rise to the action, and the nature of the knowledge or information each such individual is believed to possess.") _see also_ 2 Ariz. Prac., Civil Trial Practice § 16.4 (2d ed.) ("All that is required to trigger a duty to disclose under Rule 26.1(a)(4) or (9) is a determination that a person _"may"_ have relevant knowledge or a document _"may"_ have relevant content. "Relevance" is not limited to evidence that is admissible at trial, but also includes information that may be useful solely because it may reasonably lead to admissible evidence.") _See_ October 13, 2014 correspondence to MNA, attached as Exhibit N. Plaintiff also requested that MNA comply with Rule 26.1(9) and provide:

> A list of the documents...known by a party to exist whether or not in the party's possession, custody or control and which that party believes may be relevant to the **subject matter of the action, and those which appear reasonably calculated to lead to the discovery of admissible evidence**...Unless good cause is stated for not doing so, a copy of the documents and electronically stored information listed shall be served with the disclosure.

Ariz. R. Civ. P. 26.1(9)(emphasis added).

Plaintiff never received a response to this correspondence. Therefore, on November 25, 2014, Plaintiff followed up, again requesting an updated disclosure statement. _See_ November 25, 2014 email to MNA's counsel, attached as Exhibit O. MNA finally responded and stated: "I will get back to you ASAP." _See_ November 25, 2014 email from MNA counsel, attached as Exhibit P. To date, Plaintiff

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

9

MR 0469

has never received a response from any of the three law firms currently representing MNA.

Plaintiff has since learned that there are documents directly relevant to this tire that MNA has never produced. For example, the Corporate witness MNA identified in this case has recently avowed that: "Michelin requires that its tire designs also meet additional test requirements, including tread wear testing, traction testing, handling testing, and high speed testing." *See* Charles Patrick Affidavit at p.4, para. 7, attached as Exhibit Q. Mr. Patrick also confirmed that MNA "requires that its tires designs undergo finite element analysis." *See id.* at para. 8. However, MNA has failed to produce any testing or finite element analysis relevant to this tire. These are items that should have been included in the Initial Disclosure Statement.

## V.     UNDER ARIZONA LAW, THE DOCUMENTS AND INFORMATION REQUESTED ARE DISCOVERABLE.

Ariz.R.Civ.P. 1 instructs that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." *Id.* Many courts view this rule as the most important mandate regarding discovery obligations. *See e.g., Paulsen v. Case Corp.*, 168 F.R.D. 285, 287 (C.D. Cal. 1996)("There probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be, and by and large have been, interpreted.... The Supreme Court of the United States has stated that these rules 'are to be accorded a broad and liberal treatment.' ")

In Arizona, "relevance" for discovery purposes is broadly construed and not limited to evidence that is admissible at trial but need only be reasonably calculated to lead to the discovery of admissible evidence. *Northwest Bank v. Symington*, 197 Ariz. 181, 185, 3 P.3d 1101, 1105 (App. 2000). The modern practice of allowing pleadings "based on good-faith speculation...requires liberal discovery to determine whether a valid case or defense in fact exists." *U-Totem Store v. Walker*, 142 Ariz. 549, 553, 691 P.2d 315, 319 (App. 1984).

When discovery requests are contested, it is the "burden" of the party resisting (not requesting) the discovery "to explain precisely why its objections are proper" given the broad discovery rules. *United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 411-12 (D. Md. 2005). "This includes, of course, where the resisting party asserts that the discovery is irrelevant." *Id.*

10

MR 0470

MNA restricted what it considers "relevant" for discovery purposes to the subject tire and tires made under the same "internal specifications" (basically the exact same tire) manufactured between April 2, 2007-April 8, 2008. However, MNA did not begin manufacturing the subject tire until August 2007, meaning MNA actually limited the scope of discovery to **only 8 or 9 months**. This scope is too restrictive for purposes of admissibility at trial, much less discovery.

MNA may not create its own definition of relevance that fits within its theory of the case, especially when relevance has already been defined by our courts. *See In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1192 (10th Cir. 2009)(citing 8 Federal Practice, § 2011) ("Cooper essentially seeks to limit the plaintiffs' discovery based upon its own theory of what tires are substantially similar. **However, a party should not be limited by its opponent's theory of the case in determining what is discoverable.**")(emphasis added). Moreover, MNA failed to provide any support as to why a 1 year scope of discovery is proper. MNA has not explained how a tire made under the same specs, but manufactured 6 months and 1 day after our tire makes it irrelevant under the broad discovery rules, or how testing conducted 6 months and 1 day after our tire was built makes it irrelevant.

Uniform Interrogatories allow for at least 5 years of past medical records all the way through present. The same scope should be applied to Defendants.

The proper scope for "other incidents," should be the scope of production of the model tire and the similar green tires. Proper discovery for "testing," which is non-specific to the tire at issue (but rather relates to MNA's knowledge regarding the cause of tire failures) should be all 15, 16, and 17 inch passenger and light truck tires manufactured by MNA for five years prior to the manufacture of the subject tire to the present day.

Other than these two restrictions, the Court should require MNA to answer the Requests as they are written. Prior to trial the Court may determine that some of the information is not admissible for trial, but it is not up to MNA to make this decision for the Court.

A. Under Arizona's Strict Product Liability Hindsight Test, A Plaintiff May Offer Evidence Regarding The Information Available To the Manufacturer At The Time Of Trial. This Means That A Plaintiff Must Be Permitted To Discovery Design Changes, Testing Of The Product And Other Incidents Which Occurred Up To The Present Date.

In *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 709 P.2d 876 (1985), the Arizona Supreme Court

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

11

distinguished between the tests for negligence and strict product liability. The Court held that in a strict liability suit "the quality of the product may be measured not only by the information available to the manufacturer at the time of design, **but also by the information available to the trier of fact at the time of trial.**" *Id.* at 247 (emphasis added). This "hindsight" test allows the trier of fact to inquire as to whether "a reasonable manufacturer would continue to market his product in the same condition as he sold it to the plaintiff with knowledge of the potential dangerous consequences the trial just revealed." *Id.*, citing *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 267, 550 P.2d 1065, 1068 (1976).

Under this standard, MNA may not restrict discovery to only 6 months after the manufacture of the subject tire. Ms. Allen must be permitted to discovery information up to the present time. Without this information, Ms. Allen will be denied her ability to pursue her strict liability claim.

B.    <u>The Scope Of Discovery For Other Incidents And Tires Is Not What Is Admissible At Trial. It Is What Is Discoverable Under Arizona's Rules. "Substantial Similarity" of Products Is Not Required For The Discovery Stage.</u>

MNA limited "other incidents" of tread separations and "other claims" to 8 months for the subject tire, and cited the requirement for "substantial similarity". MNA failed to distinguish the standards for admissibility vs. discoverability. *See Lohr v. Stanley-Bostitch, Inc.*, 135 F.R.D. 162, 164 (W.D. Mich. 1991). It is not until trial that "courts require the plaintiff to demonstrate the 'substantial similarity' of other accidents, complaints, claims or lawsuits." *Id.* In contrast, discovery of other incidents is much broader, as the Court in *Lohr* explained:

> **In order to be entitled to discovery concerning other incidents, plaintiff need not lay the same foundation concerning substantial similarity as would be necessary to support admission into evidence.** For discovery purposes, the court need only find that the circumstances surrounding the other accidents are similar enough that discovery concerning those incidents is reasonably calculated to lead to the uncovering of substantially similar occurrences.
>
> \* \* \*
>
> Admissibility into evidence, however, is not the issue at this stage of the proceedings. **The only issue is whether information concerning such incidents appears reasonably calculated to lead to the discovery of admissible evidence.** Although the previous incidents may not involve the same product, as long as they involve contact-trip devices, **the products are similar enough for discovery purposes.**

*Id.* at 164-165 (emphasis added) (citations omitted); *see also In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 528-29 (Tex. App. 2009) ("Fundamentally, **the scope of discovery is obviously much broader than the scope of admissible evidence,** and evidence of incidents involving other products besides

12

MR 0472

the exact model at issue can be admissible, **and therefore, obviously, discoverable.**")(emphasis added); *Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 166-67 (S.D.N.Y. 2011) ("Unlike at trial, where evidence of similar accidents is admissible only if those accidents are shown to be 'substantially similar,' a court may allow discovery of similar accidents provided that the 'circumstances surrounding the other accidents are similar enough that discovery concerning those incidents is relevant to the circumstances of the instant case.'")

Even if Plaintiffs were held to the substantial similarity standard at the discovery stage, "[t]he 'substantially similar' predicate for the proof of similar accidents is defined ... by the defect ... at issue." *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir.1986), *cited with approval by Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir.1991). As the *Desrosiers v. MAG Indus. Automation Sys., LLC*, 675 F. Supp. 2d 598, 602 (D. Md. 2009) court recognized:

> Courts look to see whether the 'salient characteristics' of the subject incident and prior incident are the same, or whether 'the accidents have occurred under similar circumstances or share the same cause," or whether '[d]ifferent models of a product ... share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation.'

*Id.*

In fact, appellate courts have found it an abuse of discretion to limit admissibility (much less discovery) to the single product in question. *See Stokes v. Nat'l Presto Indus., Inc.*, 168 S.W.3d 481, 484 (Mo. Ct. App. 2005). (The circuit court abused its discretion by applying "single product rule" rather than focusing on the similarity of the previous incidents.)

Courts also routinely permit discovery of incidents involving different products where the different products share the same *component parts* that are part of the injury causing defect claim. *See United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 410-11 (D. Md. 2005):

> [C]ourts have allowed discovery of information regarding **the same component part in a different product in a number of product defect cases.** *See, e.g., Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 441 (S.D.N.Y.1990) ("Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation."); *Schaap v. Executive Industries, Inc.*, 130 F.R.D. 384, 387 (N.D.Ill.1990) (holding information concerning similar models **that have the same component parts to be discoverable**); *Bowman v. General Motors Corp.*, 64 F.R.D. 62, 70-71 (E.D.Pa.1974) (allowing discovery of information about subsequent vehicle model with similar fuel system);

13

MR 0473

*Uitts v. General Motors Corp.*, 58 F.R.D. 450, 451 (E.D.Pa.1972) (allowing discovery of all information relating to similar accidents in vehicles manufactured by defendant with a spring identical to the one at issue).

*Id.* (emphasis added); *see also Lohr*, 135 F.R.D. at 164-165 ("Plaintiff is entitled to discovery concerning accidents involving not only the stapler used by plaintiff but also **other products that exhibit the features** that plaintiff claims caused or contributed to his injury.")(emphasis added).

In terms of this case, tread separations on tires with similar components and manufacturing and design defects, are at a minimum, discoverable. *See In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1191 (10th Cir. 2009) ("Because the plaintiffs' theory of the case includes the argument that Cooper was on notice of the tread separation problem, the district court was not clearly in error in concluding that information on tires manufactured to specifications other than GTS 5015 could tend to lead to discoverable evidence.") (emphasis added); *see also    United Oil Co.*, 227 F.R.D. at 410-12 "[Discovery] of other accidents involving similar products is relevant in products liability cases to show notice to defendants of the danger and cause of the accident.")

Ms. Allen should not be held to MNA's theory of the case, or MNA's self-defined rules of relevance. Ms. Allen is allowed broad discovery of other incidents of tread separations and defects. It will then be for the Court (not MNA) to determine which of these incidents meet the admissibility requirements at trial.

**VI.    THE PURPOSE OF A PROTECTIVE ORDER IS TO ALLOW FOR DISCLOSURE OF COMMERCIALLY SENSITIVE MATERIAL. PLAINTIFF ONLY AGREED TO MNA'S "HEIGHTENED CONFIDENTIALITY PO" WITH THE UNDERSTANDING IT WOULD FACILITATE MNA'S ANSWERS TO DISCOVERY. DESPITE THE PO, MNA STILL REFUSES TO ANSWER BASIC DISCOVERY, OR PROVIDE BASIC DISCLOSURE.**

The Court entered a PO with a "heightened confidentiality" clause at MNA's request to allow for disclosure of MNA's commercially sensitive/trade secret material. The PO requires that Plaintiff file any documents with alleged confidential information under seal with the Court. The PO prohibits dissemination of any of what MNA considers confidential documents. The PO also requires the Plaintiff, her experts, and attorneys to either return or destroy every confidential document they received from MNA at the close of the case. Ms. Allen's counsel and experts are also restricted from showing any of MNA's confidential documents to anyone who has not signed the PO and does not qualify under the terms of the PO. Despite the entry of this highly restrictive PO, MNA still refuses to

14

answer the most basic discovery requests, claiming "trade secrets". Ms. Allen is not a competitor, this is not a patent infringement case and Ms. Allen no has interest in making tires, especially defective tires which MNA claims it no longer manufacturers.

Nevertheless, MNA no doubt will argue in its Response and at oral argument that it will suffer irreparable harm by disclosing to Ms. Allen the requested documents even though every single document that is truly a trade secret must be kept confidential by the Plaintiff.

The entry of a PO preventing open and public litigation is an extreme measure and in contradiction of Arizona's Constitutional mandate for open courts. *Stewart v. Carroll*, 214 Ariz. 480, 484, 154 P.3d 382, 386 (App. 2007) ("The Arizona Constitution requires that 'justice in all cases shall be administered openly'... The 'open courts' provision essentially commands public judicial proceedings.") Even where the claim of a "trade secret" is made, a PO is still an extreme measure. *See Union Oil Co. of California v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000) ("No one would dream of saying that every dispute about trade secrets must be litigated in private. Even disputes about claims of national security are litigated in the open."). However, a PO may be entered to allow for disclosure of documents which may qualify as trade secrets or contain commercially sensitive information. *See* Ariz.R.Civ.P 26(c)(7). A party, however, cannot file a trade secret objection and refuse to answer requests without proper support. *See Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D. Cal. 1996):

> There is no absolute privilege for trade secrets and similar confidential information. *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 362, 99 S.Ct. 2800, 2813, 61 L.Ed.2d 587 (1979); *Centurion Industries, Inc. v. Warren Steurer & Associates,* 665 F.2d 323 (10th Cir.1981). The defendant corporation, moreover, has not shown the requested information to be a trade secret or similar confidential information. Rather, defendant corporation has merely made these claims as conclusory assertions. If defendant corporation believes that disclosure of this information might be harmful, it must explain and support its objection, or seek a protective order under Rule 26(c), rather than refuse to produce the documents. Defendant s objections are without merit, and plaintiff's motion to compel responses to Request Nos. 29 and 30 is GRANTED.

*Id.*

In cases of the most secretive documents (such as cases where parties are direct competitors), a "heightened confidentiality" provision is sometimes entered. *See e.g., Layne Christensen Co. v. Purolite Co.*, 271 F.R.D. 240, 246-47 (D. Kan. 2010) ("Courts allowing these two-tier protective orders have generally allowed their entry to protect against business harm that would result from

15

disclosure of sensitive documents to a competitor...") In this case, MNA requested a provision for "Heightened Confidentiality," which requires the following:

> 19. MNA has expressed the need for heightened protection with respect to a limited number of confidential documents subject to the Confidentiality Order. When producing documents for which it believes that a higher level of protection is required than otherwise specified in this Protection Order, MNA shall advise Plaintiffs as to why the additional level of protection is needed. The parties further agree as follows:

> (a) Disclosure of those certain confidential documents designated by MNA to receive heightened protection (hereinafter "Heightened Protection Documents") is limited to the attorneys in this litigation, their employees, and their experts for use only related to this case. Such documents will be stamped or marked "Heightened Protection."

*See* PO at pp. 9-10, attached as Exhibit T.

As support for its "trade secret" objections, MNA cited to Arizona's definition of "trade secret" in Arizona Uniform Trade Secrets Act. However, even in cases involving trade secret litigation (which this is not), Arizona recognizes that preserving secrecy of "alleged trade secrets" means: **"granting protective orders in connection with discovery proceedings, holding in camera hearings, sealing the records of the action or ordering a person involved in the litigation not to disclose an alleged trade secret without prior court approval."** A.R.S. § 44-405 (emphasis added). This is exactly what the PO in this case already does. If this protection is good enough in cases against direct competitors in trade secret litigation, it is certainly good enough in personal injury cases.

Moreover, MNA's case law citations involve cases against direct competitors. *See* MNA' Responses to Plaintiff's NUIs at pp. 3-4, Exhibit D. For example, *Ex parte Miltope Corp.*, 823 So. 2d 640, 644 (Ala. 2001) involved business competitors. Likewise, *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668 (S.D. Tex. 1990) is a patent infringement case, and even in such a case, the Court held that the trade secret objection was insufficient:

> The Court will allow Lubrizol an opportunity to file an affidavit within fifteen (15) days from entry of this order sufficiently describing the nature of the trade secrets it deserves to protect to warrant non-disclosure, how disclosure would be harmful, **and why a protective order would not adequately protect its trade secrets. Lubrizol should be mindful that an improper assertion of a privilege is no assertion at all.**

*Id.* at 671 (emphasis added).

MNA in its decades of litigation has never shown an example of an injured Plaintiff breaching a PO to disclose confidential trade secrets to one of MNA's competitors. The type of speculative harm described in MNA's objections is the exact type of speculative "harm" courts have largely rejected in

16

product liability suits. In fact, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test" for just the entry of a protective order (much less a complete failure to disclose documents after a protective order is entered). *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)(quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir.1986); *See also Koval v. Gen. Motors Corp.*:

> [O]ther courts have required the movant to show "'a particular and specific demonstration of fact **as distinguished from stereotyped conclusory statements.**'" *Garcia*, 734 S.W.2d at 345, quoting *United States v. Garrett* (C.A.5, 1978), 571 F.2d 1323, 1326, at fn. 3. In recent cigarette litigation the Third Circuit stated: "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning' " do not justify a protective order. *Cipollone v. Liggett Group, Inc.* (C.A.3, 1986), 785 F.2d 1108, 1121. *See also Parsons v. General Motors Corp.* (N.D.Ga.1980), 85 F.R.D. 724, 726 ("GM's allegations of competitive harm are vague and conclusory when specific examples are necessary.")

62 Ohio Misc. 2d 694, 700, 610 N.E.2d 1199, 1200-01 (Com. Pl. 1990).

MNA's claims in its objections are almost identical to the "trade secret" claims the Court rejected in in *Koval* in refusing to grant a protective order:

> General Motors has not given specific examples of competitive harm. It simply argues that the information was costly to develop and that if the materials were to fall into the hands of its competitors, it might or could result in its competitors obtaining information concerning how they how might improve the quality and performance of their products. Such vague conclusions regarding the value of these documents and their possible use by General Motors' competitors are insufficient grounds for a protective order, and fall short of the good cause requirement of the rule.

*Id.* at 610; N.E.2d at 1201.

Ms. Allen's medical records are statutorily protected by Federal law. Yet, Ms. Allen is required to produce all of her medical records including sensitive psychological counseling records. Ms. Allen disclosed her medical records without a PO. MNA, has a PO and as a result no excuse for failing to answer Ms. Allen's discovery requests, or provide full disclosures.

Plaintiff only agreed to the entry of the PO on the good faith basis that MNA would make full and complete disclosures and to eliminate MNA's boilerplate objections to "trade secrets" and "commercially sensitive" material. This has not been the case. Despite the entry of the most extreme type of PO, MNA refused to answer fourteen **(14)** of Plaintiff's discovery request, claiming the

17

MR 0477

responses constitute "trade secrets." *See* MNA's privilege log, attached as Exhibit U. MNA's responses to Plaintiff's discovery are as obstructionist as they would be without any PO.

With a "heightened confidentiality" provision in place, a Defendant should never be objecting to the request of documents because it requires disclosure of a "trade secret," or "commercially sensitive." Trade secret and commercially sensitive information is, by definition, the entire purpose of the entry of a PO. MNA's trade secret objections are in bad faith, unsupported by the law and purposefully obstructionist.

## VII. CONCLUSION:

Wherefore, Ms. Allen respectfully requests that this Court enter an Order compelling MNA to supplement its discovery answers, and for an order awarding Ms. Allen the cost and fees associated with bringing this Motion.

Dated this 15th day of April, 2015.

GOLDBERG & OSBORNE

By _____
John E. Osborne, Esq.
William C. Bacon, Esq.
Kristin J. Schriner, Esq.
Attorneys for Plaintiff

Copy of the foregoing mailed this 15th day of April, 2015, to:

Timothy M. Medcoff
Roberto C. Garcia
FARHANG & MEDCOFF, PLLC
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711
Attorneys for Defendant
Michelin North America

GOLDBERG & OSBORNE
698 E. Wetmore Road. Suite 200
Tucson. AZ 85705
(520) 620-3975

18

MR 0478

Thomas Borncamp
Nina J. Kim
YUKEVICH CAVANAUGH
355 South Grand Avenue, 15th Floor
Los Angeles, CA 90071
Attorneys for Defendant
Michelin North America

Giles M. Schanen, Jr.
NELSON MULLINS RILEY &
  SCARBOROUGH, LLP
104 S. Main Street, Suite 900
Greenville, SC 29601
Attorneys for Defendant
Michelin North America

Douglas H. Fitch
Law Office of Don D. Skypeck
One East Camelback Road, Suite 870
Phoenix, Arizona 85012-1672
Attorneys for Defendant Superior Tire Corporation

By: _____

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

19

MR 0479

# EXHIBIT F

MR 0480

GREENE BROILLET & WHEELER, LLP
LAWYERS
100 WILSHIRE BOULEVARD, SUITE 2100
P.O. BOX 2131
SANTA MONICA, CALIFORNIA 90407-2131
TEL. (310) 576-1200
FAX. (310) 576-1220
BRUCE A. BROILLET, State Bar No. 63910
CHRISTINE D. SPAGNOLI, State Bar No. 126355
ALEXIS B. DJIVRE, State Bar No. 245138
Attorneys for _____ Plaintiffs

(SPACE BELOW FOR FILING STAMP ONLY)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF VENTURA

| | |
|---|---|
| CARLOS ALVAREZ URIBE, individually; ESTATE OF SILVIA SANDOVAL, by and through her Successor in Interest CARLOS ALVAREZ URIBE; ESTATE OF ELENA ALVAREZ, by and through her Successor in Interest CARLOS ALVAREZ URIBE; MANUAL SANDOVAL, individually; MAYRA ALVAREZ, a Minor, by and through her Guardian Ad Litem, BERTHA PRECIADO; YOLANDA RODELA, individually; MARIA DE LA LUZ SANDOVAL, Individually;<br><br>               Plaintiffs,<br><br>vs.<br><br>MICHELIN NORTH AMERICA, INC., a foreign corporation; CALIFORNIA TIRE COMPANY, a California business entity; and DOES 1 through 100,<br><br>               Defendants. | CASE NO. 56-2009-00337811-CU-PL-VTA<br><br>(Dept.43)<br><br>**PLAINTIFFS' MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE, TO MICHELIN NORTH AMERICA, INC. AND REQUEST FOR MONETARY SANCTIONS AGAINST DEFENDANT MICHELIN NORTH AMERICA IN THE AMOUNT OF $3,000; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTINE D. SPAGNOLI WITH EXHIBITS IN SUPPORT THEREOF**<br><br>DATE: April 27, 2010<br>TIME: 8:30 a.m.<br>DEPT: 43<br><br>Trial Date: May 24, 2010 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that on April 27, 2010 at 8:30 a.m. in Department 43 of the above-entitled court, Plaintiffs will move the Court, pursuant to California *Code of Civil Procedure* §§ 2031.310(a)(1) and (3) for an Order Compelling Further Responses to Plaintiffs' Request for

-1-

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

1A16.387

MR 0481

Production of Documents, Set 1, to Defendant Michelin North America, Inc. ("MNA" or "Defendant"), and for monetary sanctions against Defendant MNA in the amount of $3,000.00 on the following grounds:

1. The documents sought are relevant and/or reasonably calculated to lead to the discovery of admissible evidence as they concern specific issues related to the design of the Subject Model Tire and **defects** shared by a variety of tires that were made at the plant in question.

2. MNA has asserted meritless objections to these requests, has refused to provide a statement of compliance in conformance with *CCP* § 2031.220, and has simply refused to produce all responsive documents.

3. The Defendant's objections based upon the qualified attorney work product privilege are without merit given the nature of the material sought – namely correspondence with third parties, traffic collision reports, lawsuit complaints, inspection notes and photos on failed tires that were in MNA's possession, custody and control and were destroyed.

4. Pursuant to *CCP* § 2023.030, Plaintiffs seek both monetary and issue sanctions against Defendant MNA for its continued misuse and obstruction of the discovery process. The failure to provide full and complete production of documents in its possession, custody and control is without substantial justification and is an abuse of discovery and warrants monetary sanctions in the sum of $3,000 for reasonable attorneys fees incurred in the preparation of this Motion.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Christine D. Spagnoli in support thereof and the attached exhibits thereto, the complete file maintained by the Court in this action, and all such other oral and documentary evidence as may be presented at the time of bearing on this Motion.

DATED: April 2, 2010

GREENE BROILLET & WHEELER, LLP

Christine Spagnoli, Esq.
Alexis Djivre, Esq.
Attorneys for Plaintiff

-2-

1A16.387

MR 0482

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 3

I.    INTRODUCTION ...................................... 3

II.    STATEMENT OF FACTS/PROCEDURAL HISTORY .................... 5

III.   A MOTION TO COMPEL FURTHER RESPONSES TO A
DEMAND FOR PRODUCTION OF DOCUMENTS IS
AUTHORIZED PURSUANT TO CALIFORNIA CODE
OF CIVIL PROCEDURE § 2031.310. ........................... 7

IV.   THE QUALIFIED PRIVILEGE OF ATTORNEY WORK
PRODUCT SHOULD NOT PREVENT DEFENDANT FROM
PRODUCING EVIDENCE IN ITS SOLE POSSESSION OF
OTHER TIRE FAILURES ................................... 9

V.    MICHELIN HAS FAILED TO FULLY IDENTIFY SCOPE OF
ITS PRODUCTION OR PROVIDE A MANDATORY
STATEMENT OF COMPLIANCE ............................... 13

VI.   SANCTIONS MUST BE IMPOSED DUE TO THE DEFENDANT'S
ONGOING AND MERITLESS ABUSE OF DISCOVERY .............. 14

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

-ii-

MR 0483

Page

Cases

*2,022 Ranch, L.L.C. v. Superior Court*
(2003) 113 Cal. App.4th 1377 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Aguayo v. Crompton & Knowles Corp.*
(1986) 183 Cal.App.3d 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ault v. International Harvester Co.*
(1974) 13 Cal.3d 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Brake v. Beech Aircraft Corp.*
(1986) 184 Cal. App.3d 930 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Colonial Life & Accident Ins. Co. v. Superior Court*
(1982) 31 Cal.3d 785 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Davies v. Superior Court*
(1984) 36 Cal.3d 291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Doppes v. Bentley Motors, Inc.*
(2009) 174 Cal. App 4th 967 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Elsworth v. Beech Aircraft Corp.*
(1984) 37 Cal.3d 540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Fellows v. Superior Court*
(1980) 108 Cal. App.3d 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ghanooni v. Super Shuttle*
(1993) 20 Cal.App.4th 256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gonzalez v. Superior Court*
(1995) 33 Cal. App.4th 1539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Greyhound Corp. v. Superior Court*
(1961) 56 Cal.2d 355 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Hasson v. Ford*
(1982) 32 Cal.3d 388 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Jensen v. Southern Pacific Co.*
(1954) 129 Cal. App.2d 67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kohan v. Cohan*
(1991) 229 Cal. App.3d 967 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*National Steel Products Co. v. Superior Court*
(1985) 164 Cal. App.3d 476 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-iii-

1A16.387

MR 0484

*Petterson v. Superior Court*
(1974) 39 Cal. App.3d 267 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Reedy v. Bussell*
(2007) 148 Cal. App.4th 1272 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sherman v. Kinetic Concepts*
(1998) 67 Cal. App. 4th 1152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stephen v. Ford*
(2005) Cal.App. 4th 1363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sullivan v. Superior Court*
(1972) 29 Cal.App.3d 64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williamson v. Superior Court*
(1978) 21 Cal.3d 829 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Statutes

*Code of Civil Procedure § 2017.010* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Code of Civil Procedure § 2018.030* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Code of Civil Procedure § 2030.300* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Code of Civil Procedure § 2031.220* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Code of Civil Procedure § 2031.230* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Code of Civil Procedure § 2031.310* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Code of Civil Procedure § 2031.240* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0485

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This is a product liability case in which the Plaintiffs, who lost a mother and a daughter in a rollover crash, contend that a tire manufactured by Michelin North America ("MNA" or "Defendant") in 1998 at its Ardmore Plant contained manufacturing and design defects that caused a tread separation. The separation occurred on July 4, 2007 while Carlos Uribe, his wife, two daughters, father-in-law and sister-in law were driving home on the 4th of July from a picnic in Tehachapie. The tire that failed was on the rear of the family's vehicle. The forces exerted on the vehicle from the separation caused a loss of control and led to the vehicle's rolling over down an embankment on the 5 freeway. Carlos's wife Sylvia and his daughter Elena were killed in the crash. The tire at issue is a P245/75 R 16 Long Trail T/A model tire manufactured at Michelin's Ardmore plant during the 48th week of 1998. The discovery at issue in this motion specifically relates to MNA's notice of lawsuits for personal injury and wrongful death or property damage claims in which consumers alleged a tread separation incident involving the exact same size and model tire.

Defendant MNA has unnecessarily delayed providing appropriate responses to simple, yet important, discovery requests. Although Plaintiffs' counsel has repeatedly attempted to meet and confer about certain deficient responses, the meet-and-confer process has been unproductive. Specifically, Defendant has failed to provide a full and complete response to **Request for Production No. 18** (which is the sole issue of this Motion), which was served on MNA on August 13, 2009. This request, which is crucial to this case seeks the following materials:

### REQUEST NO. 18

All DOCUMENTS or WRITINGS relating or referring to

any report of a full or partial tread separation of a Uniroyal Laredo

tire or any SIMILAR PRODUCT which was manufactured between

1996 and 2005 that YOU have received, including but not limited to

-3-

1A16.387

MR 0486

lawsuits for personal injury or wrongful death, or property damage claims, or correspondence. (This request does not seek any attorney-client or attorney work product documents related to litigation. Rather, it seeks non-privileged information related to such claims and lawsuits, including traffic collision reports, witness statements, correspondence, and photographs of the tire, vehicle or scene.)

In response to this request, MNA initially provided a list of property damage claims and lawsuits. The entirety of the documents (4 pages) produced by MNA in its initial response is attached to the Declaration of Christine D. Spagnoli as Exhibit 1. Michelin also attempted to unilaterally limit the scope of the request to tires manufactured within the 6 months before and the 6 months after the subject tire (basically June 1998 to June 1999). Immediately after the initial responses were received, Plaintiffs' counsel sent a meet-and-confer letter pointing out the obvious deficiencies in the responses, and asking for a supplemental response. MNA's counsel agreed to supplement the responses by January 15, 2010. As that date approached, MNA's counsel asked for additional time, and promised that supplement responses would be provided.

In the face of these delays, Plaintiffs' counsel continued to press MNA's counsel for production of the non-privileged records concerning these other incidents, as well as further expansion of the scope to include other similarly designed tires. In the meantime, Plaintiffs' counsel served additional discovery to determine what, if any, information MNA had in its possession about these other tires and whether it even had the failed tires available for inspection by plaintiffs's experts. As a result of these discovery efforts, it was ultimately determined that MNA had, in fact, obtained possession of many of the failed tires which were the subject of claims and lawsuits, had investigators inspect and photograph these tires, and then after resolving those claims, destroyed the tires.

Finally, after Plaintiffs' counsel's continuing attempts to obtain further responses to Request #18, on March 30, 2010, MNA produced an additional piece of paper on which it listed the names of four additional lawsuits which purportedly stemmed from tread separations involving

-4-

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0487

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

the same model tire. This new piece of paper did not identify the tires involved in the incidents. No other documentation of these incidents was provided. The next day (March 31, 2010) at a deposition of a representative of MNA regarding the design and manufacture of the subject model tire, MNA's counsel hand-wrote the DOT numbers for the tires involved in these additional four incidents on MNA 4195.

As a result, as of April 1, 2010, despite a delay of more than 8 months, MNA has not produced a single document in its possession concerning any of the incidents identified on any of the five pieces of paper identifying 119 consumer complaints and the 26 tread separation property damage claims and lawsuits involving of P245/75R 16 Longtrail T/A tires. MNA has failed to explain the scope of its production, failed to produce documents about these incidents and failed to provide mandatory statements of compliance explaining its lack of production. These inadequate responses are adversely prejudicing Plaintiffs' counsel's trial preparation, are required by law, and as a consequence, the Court must grant this Motion and impose monetary sanctions so that Plaintiffs can obtain complete discovery responses.

## II.

### STATEMENT OF FACTS/PROCEDURAL HISTORY

On August 13, 2009, Plaintiffs sent a Request for Production of Documents, Set One, to MNA. (*See Plaintiffs' Request for Production of Documents, Set One*, attached as Exhibit 2 to the Declaration of Christine D. Spagnoli.) As would be explained to MNA in Plaintiffs' meet-and-confer letter and as set forth in Plaintiffs' concurrently filed Separate Statement of Discovery in Dispute, these requests sought very specific documentary evidence concerning the design of the Subject Model Tire and similar models as well as MNA's manufacturing processes and quality control practices. Since there are signs of both design and manufacturing defects in the Subject Tire and such allegations form the basis of Plaintiffs' complaint, documentary evidence related to the design of the Subject Model Tire and evidence related to the quality control and manufacturing practices at the Ardmore plant are highly relevant, indeed critical, to the central issues in this case.

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

1A16.387

MR 0488

MNA served responses on September 14, 2009, indicating it would produce confidential material only upon the entry of a suitable protective order. *(See Responses to Plaintiffs Request for Production of Documents, Set One*, attached as Exhibit 3 to the Declaration of Christine D. Spagnoli.) Plaintiffs then sent their lengthy meet-and-confer letter, including the proposition that the parties simply agree to an Order previously agreed to by MNA in another case. *(See* Meet-and-Confer letter dated September 24, 2009, attached as Exhibit 4 to the Declaration of Christine D. Spagnoli.)

Although MNA provided some supplemental responses after the September 24th meet-and-confer process, it still failed to provide adequate responses to Plaintiffs' requests. On December 8, 2009, Plaintiffs' counsel sent yet another meet-and-confer letter, which indicated that MNA's responses were still inadequate. *(See* Meet-and-Confer letter dated December 8, 2009, attached as Exhibit 5 to the Declaration Of Christine D. Spagnoli.) Specifically, the December 8th letter addressed **Request Number 18** (which is the sole subject of this Motion); this section of the letter provided:

> *In order to fully comply with this request, MNA must produce a complete list of all claims and lawsuits for the subject model tire, regardless of when the incidents occurred, and including the date MNA received notice of the incident. MNA also must provide a complete record of changes made to the subject model tire, before and after it was manufactured, so that we can evaluate whether the limitation to one year post manufacture as a "relevant scope" is appropriate. **Finally, MNA must produce all of the foundational, non-privileged materials related to these claims and lawsuits, such as traffic collision reports and photographs, and provide a privilege log for any privileged materials that are being withheld, such as notes of inspections of the tires by MNA consultants or investigators.** Accordingly, please supplement this response and provide all responsive documents and/or a proper statement of compliance.*

-6-

In addition to the above letter, Plaintiffs' counsel sent another meet-and-confer letter on December 15, 2009, which again discussed Defendant's deficient responses to Request No. 18. (*See* December 15, 2009 letter attached as Exhibit 6 to the Declaration of Christine D. Spagnoli.) MNA's counsel promised supplemental responses by January 15, 2010, but then requested an extension, which Plaintiffs granted to February 1, 2010. However, February 1st passed and MNA had *still* failed to provide responses. On February 26, 2010, MNA's counsel sent a letter to Plaintiffs' counsel which indicated that they were still working on the supplemental responses. (*See* February 26, 2010 letter attached as Exhibit 7 to the Declaration of Christine D. Spagnoli.) Finally, on March 30, 2010, MNA identified 4 additional lawsuits, but still did not produce any of the foundational documents concerning those incidents or the other incidents identified earlier. (*See* Letter dated March 29, 2010 sent Fed Ex and MNA 4195 attached as Exhibit 8 to the Declaration of Christine D. Spagnoli.)

Given the rapidly approaching trial date and MNA's failure to respond to Plaintiffs' requests (for which Plaintiffs granted MNA *numerous* extensions to respond, and attempted to meet and confer about numerous times), Plaintiffs have no choice but to file a motion to compel Defendant MNA to respond to Request for Production No. 18.

### III.

### A MOTION TO COMPEL FURTHER RESPONSES TO A DEMAND FOR PRODUCTION OF DOCUMENTS IS AUTHORIZED PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 2031.310.

The right to discovery is broad in California, and plaintiffs seek highly relevant information. California courts are to broadly construe the right to discovery. *(Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 377-378.) Information is "relevant to the subject matter of the litigation" if it possibly assists the party in evaluating the case, preparing for trial, or aiding in settlement of the case. (*Gonzalez v. Superior Court* (1995) 33 Cal. App.4th 1539, 1546.) **Any doubt is to be resolved in favor of permitting discovery.** *(Colonial Life & Accident Ins. Co. v. Superior Court* (1982) 31 Cal.3d 785, 790.)

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

1A16.387

MR 0490

Under California *Code of Civil Procedure* §2031.310, a party demanding production and identification of documents may make a motion, supported by specific facts showing good cause justifying the discovery sought by the demand, for an order compelling further responses when the party receives a response that is deemed to be unsatisfactory. A response is unsatisfactory if statements of compliance and representations of inability to comply with the demand are inadequate, incomplete, or evasive, or objections to the demand are without merit or too general. (*See CCP* § 2030.300 and § 2031.310.)

As stated above, Plaintiffs are seeking information regarding tires involved in other similar incidents, specifically those for which individuals filed complaints, claims or lawsuits against MNA related to tread separation failures. MNA's responses to Plaintiffs' requests are inadequate and incomplete. To date, the Defendant has not produced a single piece of paper from the files involved in any of these incidents. Indeed, MNA seems to have completely forgotten the broad swath of permissible discovery in this state. As noted above, *CCP* § 2017.010 (a) provides that "any party may obtain discovery regarding any matter, not privileged, that. . . appears reasonably calculated to lead to the discovery of admissible evidence." Information is relevant if it possibly assists a party to evaluate a case, prepare for trial, or aid in settlement. *(Gonzalez*, 33 Cal. App.4th at 1546.) MNA has not provided complete and straightforward responses to the extent possible to this Request for Production.

Moreover, while MNA has objected based upon privileges of attorney work product and attorney-client privilege to production of notes and photographs which contain factual evidence concerning the condition of these tires, no privilege log has been forthcoming despite plaintiffs' requests for the same. Without a privilege log or a statement under oath, and given that MNA acknowledges it has not produced all the documents plaintiffs requested, there is no way to determine if, in fact, documents have been improperly withheld.

///
///
///
///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

MR 0491

# IV.

## THE QUALIFIED PRIVILEGE OF ATTORNEY WORK PRODUCT SHOULD NOT PREVENT DEFENDANT FROM PRODUCING EVIDENCE IN ITS SOLE POSSESSION OF OTHER TIRE FAILURES

Clear precedent in California establishes that evidence of other similar incidents, both prior and subsequent, involving the type of product that caused the injury, is generally admissible in a products liability action to prove a defect. (*See, e.g. Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 121.)

In *Ault*, which involved a design defect in the gear box of a motor vehicle, the Supreme Court allowed a plaintiff to introduce evidence of two other accidents involving the same model vehicle, including a prior and subsequent accident. The defendant contended that the plaintiff had not established a substantial similarity between the other two accidents and the circumstances of the case at issue. But the court concluded that this did not preclude the admission of the evidence because: **"The focus was not on accidents themselves but upon the inherent similarity in the physical and mechanical properties of the three gear boxes, all of which purportedly contained similar defects."** (*Id.* at 122 (emphasis added).)

Similarly, in *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 555, the California Supreme Court held that admission of evidence of 20 other accidents, including 15 involving a different model airplane, was proper. According to the court: "Evidence of the similarity in the design of the Baron and the Travel Air was sufficient to justify the court's conclusion that evidence regarding accidents in the Baron was admissible." (*Ibid.*)

In *Hasson v. Ford* (1982) 32 Cal.3d 388, the defendant was sued over a defective brake design. Plaintiff sought to admit evidence of accidents caused by brakes that pre-dated a 1966 recall and modification by the defendant. In allowing the evidence to be admitted, the California Supreme Court wrote: "The trial court plainly had a reasonable basis for admitting evidence of the numerous failures occurring in 1965 models for the purpose of showing the nearly identical 1966 models to be similarly defective. **Plaintiffs were not required to prove that the 1965 system was exactly the same as the 1966 system. "Identical conditions will rarely be found.** Substantial

-9-

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0492

similarity is normally sufficient." (*Jensen v. Southern Pacific Co.* (1954) 129 Cal. App.2d 67.) This determination "is primarily the function of the trial judge." (*Hassan, supra,* at 404 (emphasis added).)

It is also well-established that evidence of other incidents is also admissible to prove notice provided that the circumstances of the other incidents are similar and not too remote. (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 103; *Elsworth, supra,* 37 Cal.3d at 540; *Ault, supra,* 13 Cal.3d at 113.) Indeed, where it concerns the issue of notice, the admissibility of evidence of other incidents has been characterized as "quite broad." (*Davies v. Superior Court* (1984) 36 Cal.3d 291, 299.) According to the court in *Elsworth*: "Even if the accidents did not occur in precisely the same manner as in the present case, testimony regarding the accidents that occurred prior to the crash . . . was admissible to show that [the defendant] had notice of a dangerous condition. **For this purpose, 'all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation.'**" (37 Cal. 3d at 555 (emphasis added).)

In *Hasson, supra,* the California Supreme Court held that evidence, including letters and testimony of brake failures in other vehicle models, was admissible to establish notice of a defect in a specific vehicle. The court stated that: "**When evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed.**" (32 Cal.3d at 404.) In fact, in *Brake v. Beech Aircraft Corp.* (1986) 184 Cal. App.3d 930, 937-38, the Court stated that prior accidents were admissible to prove notice by the defendants even though the plaintiff had failed to lay the foundation for similarity for flight altitude, trim settings, engine power, loading, weather conditions, altitudes, feathering etc.

The law clearly allows the discovery of the foundational facts concerning other incidents involving the same product, and it incumbent on the defendant to produce the information that it has in its possession. This is especially true in this case because it can be expected that MNA will attempt to challenge the admissibility of evidence concerning these other incidents as it did in *Stephen v. Ford* (2005) Cal.App. 4th 1363, at 1371-72. There, in determining if the plaintiff's expert was entitled to base his defect opinion on other similar incidents, over Firestone's objection, the

-10-

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0493

court held that sufficient similarity had not been established by plaintiff's expert because he had not produced foundational information about those incidents such as traffic accident reports and photographs.

In light of the evidentiary showing that is necessary to admit evidence of other incidents, the Defendant can not foreclose the ability of the plaintiffs to make such a showing by refusing to produce the underlying information about those incidents that is in its possession, **even if that information may otherwise be protected by the qualified attorney work product privilege.** This is particularly true where the tires were inspected by investigators or consulting experts but have since been destroyed by MNA, leaving plaintiffs' expert no similar opportunity to examine those tires to determine the failure mode and the similarity of the defects in the tires.

*Code of Civil Procedure* section 2018.030(b) sets forth the rules regarding discovery of documents that fall under the attorney work product privilege. It provides a conditional or qualified protection from discovery for materials that do not contain an attorneys impressions, conclusions, opinions, legal research or theories. Discovery is permitted if the court determines that: "denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (*Id.*)

The determination of good cause contemplates a balancing of the need for disclosure against the purpose served by the work-product doctrine. (*National Steel Products Co. v. Superior Court* (1985) 164 Cal. App.3d 476, 490.) "'The rule predicated on fairness articulated in the decisions is a shield to prevent a litigant from taking undue advantage of his adversary's industry and effort, not a sword to be used to thwart justice or to defeat the salut[a]ry objects of the Discovery Act.'" (*Williamson v. Superior Court* (1978) 21 Cal.3d 829, 838, quoting *Petterson v. Superior Court* (1974) 39 Cal. App.3d 267, 273.)[1] Accordingly, privilege statutes generally are narrowly

_____

[1] In *Williamson*, Firestone, a co-defendant in a defective tire case, made an arrangement to indemnify its co-defendant, the manufacturer of a tire-changing machine, if the co-defendant would withdraw a certain expert witness whose report was unfavorable to Firestone. The court rejected Firestone's claim that the report was privileged, and held that the manufacturer of the tire-changing machine could not be permitted to withhold an expert's report that would have been discoverable but
(continued...)

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

1A16.387

MR 0494

construed, while discovery statutes are liberally construed. *(Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 377; *Sullivan v. Superior Court* (1972) 29 Cal.App.3d 64, 72.)

The inability to obtain an adequate substitute for that which is sought by discovery is a compelling basis, according to the courts, for ordering discovery. In *Petterson v. Superior Court, supra,* the court stated that "[i]t would be unthinkable to adopt a rule which, for example, would prohibit a litigant from taking the deposition of an expert who has examined or tested a relevant object even though the object is no longer available or the testing so altered the object tested that the adversary party cannot make like tests, merely because the party who retained the expert has elected not to call him as a witness. It is patent that such a rule would not be consonant with ordinary principles of fairness or the interests of justice." (39 Cal.App.3d at 272.)

In addition to the necessity of the photographs and notes concerning the inspection of similar tires because those tires have been destroyed, presumably by MNA, and are no longer available to plaintiffs' expert for inspection, there is also a question as to whether the notes and photographs are even protected attorney work product privilege. In *2,022 Ranch, L.L.C. v. Superior Court* (2003) 113 Cal. App.4th 1377, the defendant attempted to prevent disclosure of certain memos to the file by claims adjusters concerning the claim and transmittal of information concerning the plaintiff's claim by claims adjusters to their superiors. The court held the work product privilege did not apply and ordered that the materials were discoverable because the claims adjusters were performing claims investigations and the information constituted factual matters concerning that investigation and even though some claims adjustors were attorneys, in this instance they were working as claims adjusters, not legal advisors.

In claiming the statutory protection, counsel must do more than merely state that something is protected by the work product rule. The burden is on the attorney to prove the preliminary facts to show the work product rule applies. *(Fellows v. Superior Court* (1980) 108 Cal. App.3d 55, 66.)

Even if the materials are protected, the privilege is a qualified, not absolute one because the photographs and notes do not contain the opinions, conclusions or legal theories of an attorney. In

---

[1](...continued)
for the payment of consideration by one of the parties to the litigation. (21 Cal.3d 829.)

MOTION TO COMPEL FURTHER RESPONSES TO REQUEST FOR PRODUCTION, SET ONE

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0495

light of the fact that MNA has now admitted that the tires were in its possession and were destroyed, plaintiffs' expert will be unable to examine the tires to establish the foundational similarity for admission of evidence about those tires at trial. Under those circumstances, it would create an unfair advantage to allow MNA to withhold the notes and photographs which document the condition of the tires, while at the same time arguing that plaintiffs' experts can not lay the necessary foundation for admissibility of evidence concerning those incidents at trial.

## V.

## MICHELIN HAS FAILED TO FULLY IDENTIFY SCOPE OF ITS PRODUCTION OR PROVIDE A MANDATORY STATEMENT OF COMPLIANCE

*Code of Civil Procedure* § 2031.220 requires: "A statement that the party to whom an inspection demand has been directed will comply with the particular demand *shall state* that the production, inspection and related activity demanded will be allowed either in whole or in part, and that all documents or things in the demanded category that are in the possession, custody or control of that party and to which no objection is being made will be included in the production."

*Code of Civil Procedure* § 2031.230 requires: "A representation of inability to comply with the particular demand for inspection shall affirm that a diligent search and a reasonable inquiry has been made in an effort to comply with that demand. This statement shall also specify whether the inability to comply is because a particular item or category has never existed, has been destroyed, has been lost , misplaced or stolen, or has never been, or is no longer, in the possession, custody or control of the responding party."

*Code of Civil Procedure* § 2031.240 requires:

(a)     If only part of an item or category of item in an inspection demand is objectionable, the response shall contain a statement of compliance or a representation of inability to comply with respect to the remainder of that item or category.

(b)     If the responding party objects to the demand for inspection of an item or category of item, the response shall do both of the following:

-13-

MR 0496

> (1) **Identify with particularity** any document, tangible thing or land falling within any category of item in the demand to which an objection is being made.
>
> (2) Set forth clearly the extent of, and the specific ground for, the objection.

Michelin has not provided the required statements of compliance. It has narrowly and unilaterally limited its response to Request #18 and has refused to explicitly state either the scope of its search and production or whether it is withholding any responsive documents. MNA must be required to provide a statement under oath that confirms it has conducted a diligent search and reasonable inquiry to locate responsive documents and that it has produced the responsive documents that are in its possession, custody or control. If Michelin is withholding any documents then it must identify the documents it is withholding, and provide a legal basis for its objection to production of the documents. Moreover, where the request seeks a broader time frame of incidents, and Michelin has responded by unilaterally narrowing its production to incidents it contends are relevant, it must explain the scope of the production it is making, and affirm under oath that it has produced all materials within its narrowed scope. Otherwise Plaintiffs will be left with no ability to hold Michelin to its discovery obligations.

## VI.

## SANCTIONS MUST BE IMPOSED DUE TO THE DEFENDANT'S ONGOING AND MERITLESS ABUSE OF DISCOVERY

*Code of Civil Procedure* section 2030.300(d) clearly states that the court *"shall"* (not "may") impose sanctions commencing with Section 2023.010, against any party opposing a motion to compel unless it finds the party acted with substantial justification. Abuses of discovery under *Code of Civil Procedure* section 2023.010, include: "(e) making, without substantial justification, an un-meritorious objection to discovery; or (f) providing evasive responses to discovery requests." Sanctions are **mandated** against defendant Michelin North American in an amount that reflects an

-14-

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1A16.387

MR 0497

appropriate sum associated with the effort of having to file yet a motion to obtain proper discovery responses, since Michelin has established no justification for its refusal to respond. Plaintiffs' counsel spent a minimum of 6 hours preparing this motion, and at the reasonable hourly rate of $500.00, Plaintiffs' counsel requests that the Court order Defendant to reimburse Plaintiffs in the sum of $3,000 for the reasonable attorneys' fees incurred in bringing this motion, plus any filing fee for this Motion.

A trial court has broad discretion to impose discovery sanctions. First, it should be noted that it is not necessarily an "absolute prerequisite" that willfulness is a requirement for the imposition of discovery sanctions. (*See Reedy v. Bussell* (2007) 148 Cal. App.4th 1272,1291; *Ghanooni v. Super Shuttle* (1993) 20 Cal.App.4th 256, 260.) That requirement was dropped from Code of Civil Procedure section 2023, subdivision (b), as part of the Civil Discovery Act of 1986. (*Kohan v. Cohan* (1991) 229 Cal. App.3d 967, 971.) Indeed, the *Reedy* case is instructive because it indicates that courts can construe the willful misconduct and violations of court orders from repeated failures to respond and the use of objections and other tactics to delay production until motions are filed. *(Reedy,* 20 Cal.App.4th 256.)

Courts have been particularly harsh on product manufactures or sellers who conceal or refuse to provide information about other similar incidents involving similar products. For example, in *Sherman v. Kinetic Concepts* (1998) 67 Cal. App. 4th 1152, concealment of evidenced concerning other incidents involving an allegedly defective product led to a new trial after the plaintiffs discovered that a number of such incidents had not been disclosed in discovery. As the court explained: "throughout the litigation, KCI failed to produce and concealed the existence of crucial documents relating to material issues in the Shermans' lawsuit. Compounding that inexcusable dereliction of its **discovery** obligations, at trial KCI created the false impression its product rarely malfunctioned and then with only transient, inconsequential effects on the consumer. In truth, the dozens of undisclosed **incident** reports told a far different story about both the frequency and gravity of the problem. To the Shermans' prejudice, the jury never had a chance to evaluate liability against the backdrop of the big picture." (*Id.* at 1155.)

MR 0498

The California Court of Appeal, in the recent case of *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal. App 4th 967, examined a defendant's persistent misuse of the discovery process in failing to provide discovery concerning consumer complaints about an unusual odor in Bentley Armage vehicles. Nearly two years after plaintiff's initial discovery request, a discovery referee found that "Bentley failed to timely produce relevant and properly demanded, but potentially damaging, documents." (*Id.* at 977.) The referee further found that "Bentley engaged in persistent and serious misuse of the discovery process," specifically concluding that Bentley either withheld documents or failed to conduct a diligent search to find them. (*Id.* at 993.)

Not unlike Bentley, MNA has engaged in persistent and serious misuse of the discovery process by withholding documents and failing to provide meaningful responses to basic requests seeking relevant, pertinent information. MNA's non-compliance and continued delay tactics illustrates an unwillingness to engage in meaningful discovery with the Plaintiffs, and, therefore, monetary sanctions are warranted. Thus, Plaintiffs request that the Court order Defendant Michelin North America, Inc. to pay Plaintiffs' reasonable attorneys' fees in the sum of $3,000, and for the filing fee for bringing the instant Motion.

DATED: April 2, 2010

GREENE BROILLET & WHEELER, LLP

Christine D. Spagnoli
Alexis B. Djivre
Attorneys for Plaintiff

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-16-

1A16.387

MR 0499

# EXHIBIT G

MR 0500



**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**CHRIS A. BLACKERBY**
PARTNER

Direct Dial: 512.482.3534
cblackerby@germer.com

September 1, 2015

VIA FACSIMILE

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

Re:     Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America,  Inc.,
        and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County,
        Texas.

Dear Luis/David:

Despite the fact that you have refused to confer as required by the applicable rules, I am writing this letter to propose an agreement to resolve the discovery issues in this case. If you agree on behalf of your clients, this letter will serve as a Rule 11 Agreement between the parties governing the scope of discovery. We propose that the agreed scope for design documents, lawsuits, adjustments (once you identify codes), claims, and testing is Michelin P255/70R16 LTX M/S tires and the 3 common green tires made at the Dothan, Alabama plant from the date production started in 1998 to the date it stopped in 2003.

MNA will produce the oldest available copies of the General Principles, Technical Notes, and Tire Non-Conform procedures.

MNA has already produced the aspect specifications relating to plaintiffs' identified components and processes. To the extent annexes are identified in those aspect specifications or other aspect specifications are referred to in those that were not produced, MNA will produce them.

MNA will produce the oldest available tire building training documents for tire building relating to the identified components and processes. MNA will review the aspect specifications produced and, if they refer to another one, MNA will produce that one as well.

MNA will produce the patents it has on nylon cap plies.

MNA has already produced the tire service life documents.

In exchange for the production agreed to above, plaintiffs will withdraw their motion to compel and all requests for formulas. Plaintiffs also agree not to seek a plant inspection.

Once MNA makes this production and supplements its discovery responses, plaintiffs agree that MNA will have fully responded to all discovery served to date.

If you agree to the terms of this letter, please sign below and return to me in accordance with the Rule 11 of the Texas Rules of Civil Procedure.

Yours very truly,

Chris A. Blackerby

AGREED:

_____

Luis P. Guerra
David Shapiro
Attorneys for Plaintiffs

CAB:lq

MR 0502

LAW OFFICES

# LUIS P. GUERRA, L.L.C.

6225 North 24ᵗʰ Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

September 2, 2015

Via Email and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

    Re:    Medina v. Michelin, et al

Dear Chris:

    We are in receipt of your letter of today. We disagree with it. We have dealt with Michelin before, and you and I both know there is nothing inadvertent about Michelin and the manner in which it produces evidence.

              Very truly yours,

              LUIS P. GUERRA, L.L.C.

              Luis P. Guerra
              David C. Shapiro

LPG/DCS/tk

MR 0503

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

September 2, 2015

Via E-Mail and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

     Re:   Medina v. Michelin

Dear Chris:

Your last two (2) letters are a misrepresentation of what has happened concerning production of documents and are outright inaccurate. Moreover, concerning your third letter, for all intents and purposes, I stick by it. However, other adjectives which also accurately characterize Michelin's prior actions and recent proposal include: dishonest, deceptive and misleading. Michelin's lack of consideration for the numerous innocent victims such as Obdulia Medina, Sandra Velo and many, many others throughout the years caused by its shoddy and defective tires — coupled with its lack of disclosure about it — demonstrates a corporate culture that has no place in our modern society.

Yours/Michelin's request that *Plaintiffs* "identify codes" reveals Michelin's bad faith discovery tactics since Michelin still **has not produced** the Code Sheets for Adjustment Data including but not limited to "List of Objective or Subjective Damages: Expert Codification." Thus, Michelin's most recent "proposal" is more of the same: intentional refusal to produce discoverable evidence.

Finally, your statement that we have refused to meet and confer is inaccurate, and you know it. Regardless of what you write, we both know we have had multiple and sundry conversations with Michelin's counsel about production since **May of 2015**. Moreover, recently at the deposition of Adrian Rico and his family in Dallas, we conferred with you specifically about the documents. You told us that neither you nor Tom had authority to make decisions, and we needed to *"negotiate discovery"* with Michelin because that was their *"process."*

MR 0504

We told you that Michelin does not make the Rules. It is not the Michelin's Rules of Civil Procedure. We further told you that Plaintiffs follow the Texas Rules of Civil Procedure. The same stands true today. Accordingly, yet again, we ask that Michelin follow the Texas Rules of Civil Procedure and its discovery scope and produce the documents previously requested.

Very truly yours,

LUIS P. GUERRA, L.L.C.

Luis P. Guerra
David C. Shapiro

LPG/DCS/tk

MR 0505

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHNNY BATES and PATRICIA     :
MIDDLETON BATES,     :
    :
Plaintiffs,     :      CIVIL ACTION NO.
    :      1:09-CV-3280-AT
v.     :
    :
MICHELIN NORTH AMERICA, INC.,     :
    :
Defendant.     :

I.    Background of Previous Discovery Disputes ...............................................3
     A.    Plaintiffs' RPD 37 for Adjustment Data .......................................5
     B.    Michelin's Motion for Reconsideration Regarding Adjustment
         Codes ...........................................................................................7
     C.    Michelin's Failure to Produce Adjustment Codes and Supporting
         Data ............................................................................................8
     D.    Plaintiff's First Request for Sanctions .......................................9
         1.    June 3, 2011 Hearing ........................................................9
         2.    June 24, 2011 Order on Sanctions .................................11
II.    Plaintiffs' Second Request for Sanctions ..................................................12
     A.    Standard of Review ...................................................................14
     B.    September 19, 2011 Sanctions Hearing ....................................16
     C.    Michelin's Post-Sanctions Production of Adjustment Data ...........16
         1.    Michelin's multiple misrepresentations regarding
             adjustment codes and conditions.......................................20
         2.    Michelin's failure to produce graphs and other interpretive
             adjustment data ..................................................................23
     D.    Michelin's Misrepresentations About Reaction Limits and
         Production Tolerances and the Failure to Produce Those
         Documents .................................................................................28
     E.    Michelin's Failure to Produce Certain Documents in Response to
         RPD 50 .......................................................................................37
     F.    Michelin's July 19th Production in Response to RPD 50 ...............43
     G.    Michelin's Failure to Produce Expert Reports for Employee
         Experts Patrick and Glazener .....................................................47
     H.    Prejudice to Plaintiffs ............................................................... 50
III.    Conclusion ...............................................................................................53

MR 0506

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHNNY BATES and PATRICIA      :
MIDDLETON BATES,      :
     :
Plaintiffs,      :      CIVIL ACTION NO.
     :      1:09-CV-3280-AT
v.      :
     :
MICHELIN NORTH AMERICA, INC.,      :
     :
Defendant.      :

## ORDER

On September 19, 2011, this Court held a hearing on Plaintiffs' Motion for Sanctions [Doc. 180, 181]. This is the Plaintiffs' second Motion for Sanctions arising out of Defendant Michelin North America Inc.'s ("Michelin") violation of the Court's multiple Orders requiring the production of certain documents.[1] Plaintiffs request that the Court enter an Order establishing issue preclusion as a discovery sanction — specifically, a determination that the subject tire was

---

[1] Plaintiffs did not request that the Court impose sanctions against Michelin's counsel because in Plaintiffs' view the conduct giving rise to the sanctions request is part of a larger pattern of discovery abuse and disregard for the legal process by Michelin. Michelin was initially represented only by Robert Monyak, Bonnie Lassiter and Benjamin Chastain of Peters and Monyak, LLP. On April 5, 2010, Elizabeth C. "Kate" Helm, of Nelson Mullins, Riley & Scarborough, LLP entered an appearance on behalf of Michelin. (*See* Doc. 27.) Ms. Helm is Michelin's national discovery counsel. As a result of her participation on behalf of Michelin in the discovery process, Ms. Helm ultimately became a material witness on the sanctions issue. Thus, after Plaintiffs made their second request for sanctions, Richard K. Hines of Nelson Mullins, Riley & Scarborough, LLP and Susan A. Cahoon of Kilpatrick Townsend & Stockton, LLP-GA entered appearances on behalf of Michelin.

MR 0507

defective and unreasonably dangerous and that the subject tire failed as a result of its defective and unreasonably dangerous condition.

Viewed in isolation, Michelin's failure to produce certain documents in response to Plaintiffs' discovery requests and this Court's Orders could be seen as legitimate mistakes and misunderstandings.   However, Plaintiffs have demonstrated that Michelin has engaged in a pattern of subterfuge and withholding relevant and responsive documents until Plaintiffs are forced to seek the Court's intervention.  In light of this pattern of prejudicial discovery abuse by Michelin throughout the course of the litigation, the Court finds that Michelin acted willfully in violating the Court's discovery Orders.   Therefore, a more substantive sanction than the previous monetary sanction imposed by the Court is warranted.

Accordingly, after careful consideration of the evidence and the record of this case, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Sanctions as set forth below.  Because the district court must clearly state its reasons for imposing sanctions under Federal Rule of Civil Procedure 37 to allow for meaningful appellate review, the Court provides a detailed discussion of the record as background and in its analysis.  *See Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir.1985).

MR 0508

## I.   Background of Previous Discovery Disputes

Plaintiffs brought this products liability and negligence action on November 23, 2009, alleging a defect in a tire designed and manufactured by Michelin.[2]   Plaintiffs served Michelin with their Requests for Production of Documents ("RPDs") on January 15, 2010.   In addition to objecting to Plaintiffs' requests as not being limited to the tire, plant, and time period relevant to this action, Michelin asserted a blanket objection that the requested documents contained confidential trade secrets and were protected from disclosure.   On April 5, 2010, the parties agreed upon a Stipulated Confidentiality Order to govern the production and use of such documents which was entered by the Court on April 7, 2010.   (*See* Docs. 28, 29.)   Michelin produced documents on April 23, 2010, subject to the Stipulated Confidentiality Order.   Michelin initially produced a strikingly small number of documents in response to Plaintiffs' discovery requests.[3]   A dispute ensued between the parties over certain of Plaintiffs' RPDs, and Plaintiffs presented the dispute to the Court in the form of a letter-motion as instructed on November 10, 2010.   (*See* Pls.' Reply Ex. B, Doc. 215-3.)

---

[2] This case was originally assigned to Hon. Richard Story after its initiation and was reassigned to the instant judge on March 7, 2011.

[3] At the time of the December 20, 2010 discovery hearing before the Court, Michelin had not even produced a full banker's box of documents, a fact which was admitted by Michelin's counsel at the June 3, 2011 hearing on Plaintiffs' first request for sanctions. (Dec. 20, 2010 Disc. Hr'g Tr. at 5:5-13, Doc. 104; June 3, 2011 Sanctions Hr'g Tr. 32-33, Doc. 169.)

3

MR 0509

Prior to bringing the discovery dispute before the Court, the parties negotiated an "agreed scope" to govern Plaintiffs' discovery requests generally.[4] The parties agreed to limit Michelin's document production to (1) the subject tire, a P235/7OR15 Uniroyal Laredo AWR ORWL tire, and (2) the time period of 1998-2001, a four year period surrounding the date the Bates tire was manufactured.[5] However, Plaintiffs made clear to Michelin (and subsequently to the Court) that discovery requests seeking information that transcends a particular tire line such as alternate designs and information about conditions at the manufacturing plant should not be limited to the agreed scope. (*See* Pls.' Ex. B, Sept. 19, 2011 Sanctions Hr'g, (June 7, 2010 "Meet and Confer" Tr. 6:8-20); Dec. 20, 2011 Disc. Hr'g Tr. 5-11, Doc. 104; Pls.' Reply Ex. B (November 10, 2010 Letter to J. Story), Doc. 215-3.)

Plaintiffs sought an order compelling Michelin to produce documents responsive to, *inter alia*, RPD 16 (specific documents listed by name), RPDs 25 and 35 (design and production tolerances), RPD 37 (adjustment data), and RPD

---

[4]  Michelin repeatedly asserted at the September 19, 2011 sanctions hearing that Plaintiffs proposed the discovery time scope of 1998-2001 and that Michelin agreed to the scope as reasonable. However, Michelin's representation is misleading. Plaintiffs only ultimately agreed to limit the scope of their requests after Michelin objected that the requests were not limited in scope to the tire, plant, and time period relevant to this action and refused to produce documents on those grounds. Further, Plaintiffs clearly did not agree to this limited time frame in connection with all of their Requests for Production.

[5]  Michelin began designing the P235/7OR15 Uniroyal Laredo AWR ORWL tire in October 1995. The P235/7OR15 Uniroyal Laredo AWR ORWL tire was manufactured solely at the Ardmore Plant. The first P235/7OR15 Uniroyal Laredo AWR ORWL tire was manufactured in April 1998. The Bates tire was manufactured in August 2000. The last P235/7OR15 Uniroyal Laredo AWR ORWL tire was manufactured in April 2007. (Sept. 19, 2011 Sanctions Hr'g Tr. 91:9-24, Doc. 230.)

4

50 (documents relating to specific defects). (*See* Pls.' Reply Ex. B (November 10, 2010 Letter to J. Story), Doc. 215-3.) The Court heard argument on the Plaintiffs' request on December 20, 2010, and on January 3, 2011, the Court entered an Order compelling Michelin to produce nearly all of the documents sought by Plaintiffs.

### A.   Plaintiffs' RPD 37 for Adjustment Data

Plaintiffs' RPD 37 (which was the subject of Plaintiffs' first request for sanctions and remains a subject of Plaintiffs' second request for sanctions) asks Michelin to:

> Produce any documents containing, discussing or summarizing by calendar year tire adjustment or exchange data for the Uniroyal Laredo series of tires, any tires with the same or similar specifications as that series regardless of name or branding, or any tire made from the same or similar "green" tire as that used in that series for tires manufactured at the Ardmore, Oklahoma, [sic] facility as compared to other manufacturing facilities of defendants.

In response to Plaintiffs' request for adjustment[6] data, Michelin initially produced a chart summarizing by month (from 1998 to 2001) the number of tires produced and the total number of tires returned for tread belt separation – the alleged condition at issue.[7] Plaintiffs objected to the creation of the chart for

---

[6] "Adjustment" is the term Michelin uses to describe the process of issuing credits or payments to consumers or dealers when its tires are returned for alleged defects and failures. Plaintiffs' discovery requests seek internal information possessed by Michelin regarding how it "adjusts" credits for tires returned for alleged defects and failures.

[7] Prior to production of the documents, the parties agreed, at least initially, to narrow the scope of the request to cover only the alleged defective condition at issue in this case – tread belt separation. At the discovery hearing, the Court recognized that a variety of adjustment codes

5

purposes of the litigation without the production of accompanying information that was used to create the chart. Plaintiffs argued to the Court that the information provided by Michelin was useless without the raw data, the codes, and the accompanying documents about how the data is collected, tabulated, and analyzed. In addition, Plaintiffs requested that Michelin be compelled to produce the internal manuals that Michelin uses for classifying the various types of manufacturing and design conditions for which tires are returned. Plaintiffs also requested documents used to interpret the adjustment data in order to determine whether additional codes may cover the alleged tread belt separation condition at issue. (Dec. 20, 2010 Disc. Hr'g Tr. 17-18, Doc. 104.)

The Court addressed Plaintiffs' request for these documents at the December 20, 2010 discovery hearing specifically as follows:

> The Court: [M]y concern is if they are input by a code and there's no other information other than entry of a code . . . if [Michelin] would provide the list of codes and what those codes represent so that if [Plaintiffs] wanted to ask for additional codes to be checked, you could do that, fearing that tread separation covers more than one code and it may not have been covered, because what I understand is if you push in . . . the code for tread separation, it will tell you how many there were, but it doesn't tell you specifics. It's just that this tire, this date, tread separation; but there's not a picture, there's not an analysis beyond someone having categorized it as tread separation.

(*Id.* at 57-58.) On January 3, 2011, the Court ordered that

---

might potentially be relevant to the tread belt separation condition. (*See* Dec. 20, 2010 Disc. Hr'g Tr. 57-58, Doc. 104.)

6

MR 0512

**RPD 37:** Defendant shall provide to Plaintiff the codes that are used for identifying the causes for adjustment. As for any adjustment identified in association with components and processes at issue in this case, Defendant shall provide all data available to it concerning that adjustment, including the date the tire was returned, the age of the tire, the mileage, etc.

(Doc. 90 at 5.) Accordingly, the Court ordered production of the documents as a two step process. First, Michelin was required to "provide to Plaintiff[s] the codes that are used for identifying the causes for adjustment," such that Plaintiffs could identify which codes and conditions are potentially relevant to the alleged defect at issue in this case. (*Id.*) Second, with respect to any adjustment codes identified by Plaintiffs as being at issue, Michelin was required to "provide all data available to it concerning that adjustment, including the date the tire was returned, the age of the tire, the mileage, etc." (*Id.*)

### B. Michelin's Motion for Reconsideration Regarding Adjustment Codes

Michelin sought reconsideration of the Court's January 3rd Order only so far as it compelled production of adjustment code data in response to RPD 37 contending that the information contains trade secrets. Consequently, Michelin did not produce the adjustment codes as ordered on January 3, 2011. On April 28, 2011, the Court denied Michelin's motion for reconsideration on the grounds that (1) the trade secret issue was discussed and considered by the Court at the December 20th hearing and (2) Michelin offered no reason or change in law warranting reconsideration of the Court's prior ruling compelling production of

7

MR 0513

the adjustment data. (*See* Doc. 123.) In fact, at the December 20th hearing the Court rejected Michelin's trade secrets objection stating that documents could be produced in accordance with the terms of the parties' Stipulated Confidentiality Order and that counsel would be expected to abide by the terms of that Order as approved and entered by the Court. (Dec. 20, 2010 Disc. Hr'g Tr. 8:9-13, Doc. 104.)

### C.     Michelin's Failure to Produce Adjustment Codes and Supporting Data

After its motion for reconsideration was denied on April 28, 2011, Michelin again did not produce the adjustment data as ordered by the Court. Rather, Michelin informed Plaintiffs two weeks later, on May 12, 2011, that it no longer agreed that Plaintiffs' expert could receive or maintain copies of the documents, as contemplated by the Stipulated Confidentiality Order, due to Michelin's concerns regarding the expert's protection of the confidential nature of the documents. Michelin unilaterally determined it could defer compliance with the Court's Order requiring production of the documents after reconsideration was denied and refused to produce the documents unless Plaintiffs agreed to modify the terms of the Stipulated Confidentiality Order previously entered by the Court. On May 13, 2011, Plaintiffs insisted that Michelin immediately comply with the Court's Order compelling production of the documents and notified Michelin that they would seek sanctions if the documents were not produced.

8

MR 0514

## D.   Plaintiff's First Request for Sanctions

Plaintiffs made their request for sanctions on May 19, 2011, after Michelin failed to produce the adjustment codes and data under the current terms of the parties' Stipulated Confidentiality Order.   Plaintiffs asked the Court to impose issue preclusion sanctions upon Michelin for its failure to produce the adjustment code data ordered by the Court.   On May 20, 2011, only after Plaintiffs made their request for sanctions, Michelin produced a list of conditions identifying, by name only, the causes for adjustment, but not the numeric codes for the adjustments. (Pls.' Reply Ex. E, Doc. 215-6.)

### 1.   June 3, 2011 Hearing

The Court held a hearing on Plaintiffs' request for sanctions on June 3, 2011.   At the beginning of the hearing, counsel for Michelin informed the Court that the adjustment code data had been produced and that the parties had reached an agreement allowing Plaintiffs to provide the documents to their expert. (June 3, 2011 Sanctions Hr'g Tr. 16:18-17:13, Doc. 169.)   Based on these circumstances, Michelin argued that Plaintiffs' continued request for sanctions at the hearing was premature and improper without a "meet and confer" session.[8] (*Id.* at 17:17-19:6.)   Nonetheless, the Court proceeded with the hearing based on

---

[8]   At the hearing and again in the June 24, 2011 Order, the Court rejected this argument and found that Michelin was obligated to comply with the Court's January 3, 2011 Order compelling the production of the documents and that no "meet and confer" was required prior to Plaintiffs seeking sanctions for Michelin's failure to fully comply with the Court's prior orders. (June 3, 2011 Sanctions Hr'g Tr. 19:13-14, Doc. 169;  June 24, 2011 Order at 5 n.4, Doc. 173.)

9

MR 0515

Plaintiffs' contention that Michelin's late production of the six pages of adjustment conditions produced **without** codes (or the explanatory photos or descriptions anticipated by Judge Story) did not fully comply with the January 3rd Order requiring Michelin to provide the numeric "codes that are used for identifying the causes for adjustment." (Doc. 90). The Court found that this issue was the continuation of the same discovery dispute addressed in its Order of April 28, 2011, and Judge Story's Order of January 3, 2011. (June 3, 2011 Sanctions Hr'g Tr. 19:7-14, Doc. 169.)

Michelin's counsel repeatedly represented that the list of adjustment conditions produced to Plaintiffs was "how the conditions are maintained in the regular course of business." (*Id.* at 36:17-18, 37:6-8, 58:14-22.) However, Michelin's counsel subsequently admitted in response to the Court's question at the hearing that there were numbers that corresponded with the conditions and that Michelin (not she) redacted the code numbers from the document produced to Plaintiffs. (*Id.* at 40:7-41:4.) In addition, in response to further inquiry by the Court, Michelin's counsel revealed that additional documents describing the adjustment conditions existed. Michelin maintained that it was not ordered to produce such documents and that the Court's January 3rd Order required only production of the codes. (*Id.* at 43:8-17, 59:1-10.)

The Court found that Michelin's redaction of the codes from the list of adjustment conditions violated the express terms as well as intent of the January

10

MR 0516

3rd Order and that the list of adjustment conditions alone did not provide a sufficient documentary basis or description from which Plaintiffs could identify all codes that might be relevant to the alleged tire defect in this case. (*Id.* at 52:8-55:1; 62:23-64:7.) Therefore, the Court ordered Michelin to produce the numeric codes by June 8, 2011, and all available documentary information describing the nature and causes for each adjustment code by June 13, 2011. At the conclusion of the hearing, the Court warned Michelin that "any further delays, manipulation of discovery ... or basically failure to function in good faith in producing fully all information requested or ordered ... will result in a substantive sanction ... comparable to what Plaintiffs have asked the next time it comes in front of [the Court]." (*Id.* at 65:15-66:4.) The Court also cautioned Michelin's counsel about her client's hairsplitting, narrow construction of the Court's January 3, 2011 Order stating "I'm not going to waste our time for us to go through another conference where you argue about . . . what's really intended." (*Id.* at 54:15-25, 63:20-64:7.)

### 2.    June 24, 2011 Order on Sanctions

On June 24, 2011, the Court issued a written Order on Plaintiff's first request for sanctions. (*See* Doc. 173.) The Court found sanctions were warranted based on Michelin's failure to fully and timely comply with the Court's discovery Orders but declined to impose issue preclusion sanctions. The Court instead awarded Plaintiffs attorney's fees incurred in connection with their request for

11

sanctions and ordered Michelin to produce additional documents in response to Plaintiffs' discovery request for adjustment data. (*Id.*) The Court reiterated its finding at the hearing that Michelin's extremely limited production "essentially side-stepped by its narrow parsing and production response an essential purpose of the Court's original January 3, 2011, discovery order regarding production of the adjustment code data and information." (*Id.* at 10.) With respect to any additional relevant adjustment codes identified by Plaintiffs, Michelin was ordered to produce all tire data and documents available to it concerning those adjustment codes, including the internal manuals Michelin uses for classifying or discussing the conditions and issues arising in connection with application of a specific adjustment code. (*Id.* at 11.) Finally, the Court again cautioned Michelin that "any failure to respond fully in producing these documents and tire data may result in the imposition of sanctions, including the Court's entry of default, determination of issue preclusion relative to the tire defect at issue, or other sanctions authorized by Fed. R. Civ. P. 37(b)(2)(A)." (*Id.*)

## II.   Plaintiffs' Second Request for Sanctions

Just five days after the Court issued its written Order imposing sanctions, Plaintiffs made a second request for issue preclusion sanctions on June 30, 2011, that was supplemented in further submissions in connection with the Court's

12

MR 0518

sanctions hearing conducted on September 19, 2011.[9] (Docs. 180, 215, Hr'g Exs. A-X). Plaintiffs' second sanctions request is based on additional alleged discovery abuses by Michelin since the Court's June 3rd sanctions hearing. Plaintiffs seek the sanction of issue preclusion as to the defectiveness of the tire because, at the time of their second sanctions request, Plaintiffs assert that: (1) Michelin had not produced all the adjustment codes as ordered by the Court on June 3, 2011, and June 24, 2011, and, (2) Plaintiffs learned during the depositions of two Michelin employees that Michelin had withheld documents directly relevant to the defect issue previously covered by the Court's Orders.

Plaintiffs contend that a finding that the tire at issue was defective is warranted for several reasons. First, Michelin withheld numerous documents in violation of Court Orders compelling their production. Second, Michelin made repeated misrepresentations to the Court that all responsive documents had in fact been produced and thereby obstructed and altered the course of discovery. Finally, the Court's prior monetary sanction proved insufficient to ensure compliance with the Court's Orders.

On the other hand, Michelin contends that Plaintiffs have fabricated a discovery dispute where none exists in order to avoid proving the merits of their case. Michelin asserts that no responsive documents were withheld under its

---

[9] The Court ordered that Plaintiffs' letter request for sanctions be filed as a formal motion on the CM/ECF system. (*See* Doc. 180.)

13

MR 0519

interpretation of Plaintiffs' discovery requests and the Court's Orders. To the extent any documents were withheld, Michelin contends it was the result of human error as opposed to any willful violation of the Court's Orders. In addition, Michelin contends it never made any intentional misrepresentations to the Court. Finally, Michelin asserts that Plaintiffs have not been prejudiced because it has now produced all the documents Plaintiffs requested, despite Michelin's belief that such production was not required, in a good faith effort to resolve a manufactured discovery dispute.

As Plaintiffs asserted in their second sanctions request, and more keenly demonstrated at the second sanctions hearing and in response to Michelin's motion for partial summary judgment, Michelin withheld nearly all probative documents for over one and a half years after Plaintiffs served their discovery requests. These documents would likely never have emerged but for Plaintiffs' persistence in seeking the Court's intervention. For the reasons set forth below, Michelin's serial abuses, misrepresentations, and willful violations of the Court's discovery Orders warrant substantive sanctions.

## A.     Standard of Review

When a party fails to obey a court order to provide discovery, the court is authorized to sanction the party by "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims [or] prohibiting the disobedient party from

14

MR 0520

supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *See* Fed. R. Civ. P. 37(b)(2)(A)(i)&(ii). District courts have broad discretion to fashion appropriate sanctions for violations of discovery orders. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1048 (11th Cir. 1994). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 2, 44-45 (1991).

However, this broad discretion is governed by the most fundamental due process safeguard of fairness. *See Ins. Corp. of Ireland*, 456 U.S. at 707. To ensure the provision of due process in the review of a sanctions request, a court must impose sanctions that are both "just" and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* "Due process requires that the party be given fair notice that its conduct may warrant sanctions and the reasons why." *In re Sunshine Jr. Stores*, 456 F.3d 1291, 1306 (11th Cir. 2006). A party can be given notice from either the court or from the party seeking sanctions. *Id.* Moreover, a party's "blatant disregard for the [] Court's orders is itself notice." *Id.*

Rule 37(b)(2) does not require the court to make a finding of bad faith before it may impose sanctions for a party's failure to comply with a court order. *Devaney v. Continental American Ins. Co.*, 989 F.2d 1154, 1162 (11th Cir. 1993).

15

MR 0521

Although not a necessary precursor for sanctions, bad faith is a relevant factor in determining the magnitude of a sanction. *Id.* (noting Court's discussion of bad faith in *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440 (11th Cir. 1985). "A party . . . demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001).

## B.     September 19, 2011 Sanctions Hearing

On September 19, 2011, the Court conducted a full day evidentiary hearing on Plaintiffs' second request for sanctions. Extensive argument was heard and the parties submitted additional exhibits including hundreds of pages of documents produced by Michelin after Plaintiffs filed their second sanctions request. Michelin's national discovery counsel Ms. Helm took the stand as the sole witness at the hearing to testify in Michelin's defense and to accept personal responsibility for all of the alleged discovery "errors."

## C.     Michelin's Post-Sanctions Production of Adjustment Data

Plaintiffs contend that Michelin's continued failure to produce the adjustment codes and adjustment data in violation of the Court's January 3rd, June 3rd, and June 24th Orders warrants issue preclusion sanctions. After Plaintiffs' first request for sanctions, the Court ordered Michelin to produce three things: (1) a list of the numeric adjustment codes that correlate to the list of adjustment conditions produced on May 20, 2011; (2) documents containing

16

MR 0522

explanations and photographs of the adjustment codes and conditions; and (3) for each adjustment code identified by Plaintiffs, all available tire adjustment data and the internal manuals Michelin uses for classifying or discussing the conditions and issues arising in connection with application of the specific adjustment codes. (*See* Doc. 173.)

As ordered, Michelin produced a list of the numeric adjustment codes on June 6, 2011. On June 13, 2011, Michelin produced 313 pages of adjustment conditions with codes, pictures and descriptions in purported compliance with the Court's Order. At that time, Michelin informed Plaintiffs it had fully complied with the Court's orders to produce all the codes. Upon review of these documents however, Plaintiffs discovered there were discrepancies between the May 20th list of adjustment conditions, the June 6th list of conditions with numeric codes, and the June 13th production of the conditions with codes, pictures and descriptions. Accordingly, Plaintiffs contend that Michelin failed to produce all the codes as ordered by the Court on January 3rd, June 3rd, and again on June 24th.

The Court held a status conference on July 7, 2011, to determine whether Michelin was in fact obligated to produce additional documents identified by Plaintiffs in their second sanctions request. At the July 7th status conference Michelin vehemently denied that it had not produced all the adjustment codes, despite the fact that Plaintiffs detailed the discrepancies in the two prior

17

MR 0523

productions. (July 7, 2011 Status Conf. Tr. 27, Doc. 183.) However, on July 14, 2011, Michelin produced another 144 pages of adjustment conditions with codes, pictures, and descriptions.[10]

Plaintiffs assert that Michelin wrongfully withheld the adjustment codes in violation of the Court's June 24th sanctions Order. In its defense, Michelin contends that the incomplete production was the result of human error. At the September 19th sanctions hearing, Ms. Helm testified that after receiving the adjustment conditions with codes, pictures and descriptions from Michelin to be produced on June 13, 2011, she compared them to the June 6th list of adjustment codes and conditions and noticed that the two did not match. (Helm Aff. ¶ 56, Doc. 192-6; Sept. 19, 2011 Sanctions Hr'g Tr. 171:21-175:12, Doc. 230.) There were codes on the June 6th list for which Michelin did not have additional descriptions, and there were additional descriptions of conditions that were not listed on the June 6th code list. (Sept. 19, 2011 Sanctions Hr'g Tr. 171:21-175:12, Doc. 230.)

Ms. Helm testified that she made several mistakes on June 13, 2011. (*Id.*) First, Ms. Helm made mistakes regarding which adjustment codes were missing in her June 13th transmittal letter to Plaintiffs when the additional descriptions

---

[10] Out of the 144 pages produced by Michelin on July 14, 2011, 113 new conditions with codes, pictures and descriptions were produced that had previously been withheld (MNA 8436-8548) and 31 were duplicates of conditions that were produced on June 13, 2011 (MNA 8560-8590).

MR 0524

were produced.[11] (Helm Aff. ¶ 58.) In her attempt to sort through the documents to compare them and determine the differences, Ms. Helm testified she segregated out the documents for the conditions that were not on the June 6th code list. (Sept. 19, 2011 Sanctions Hr'g Tr. 171:21-175:12, Doc. 230.) Ms. Helm further testified that when she compiled the documents to produce to Plaintiffs, the documents for the conditions that were not on the June 6th list were inadvertently left out of the production. (*Id.*) According to Ms. Helm, she did not discover any of this until after Plaintiffs made their second request for sanctions. (*Id.*) Therefore, Michelin contends that its failure to produce all the codes as ordered by the Court, the result of human error, amounts to excusable neglect that does not warrant the imposition of the severe sanction requested by Plaintiffs. However, Plaintiffs contend that Michelin continued to produce the adjustment data documents in bad faith after the Court's June 3rd sanctions hearing.

At the September 19th hearing, Michelin requested that it not be sanctioned for any misconduct, essentially asserting that it should be rewarded for counsel's self-corrective actions. In response to Plaintiffs' contention that Michelin failed to produce all the adjustment conditions with codes, descriptions, and pictures in bad faith, Michelin's counsel claimed that "the only reason they knew of those

---

[11] Ms. Helm admitted these mistakes during the July 7th status conference, but had not yet discovered her failure to produce all the codes as outlined in her July 14, 2011 letter to Plaintiffs.

19

MR 0525

missing items was that there was a self reporting." (*Id.* at 89.)   Michelin contended that the additional 144 pages were produced on its own initiative and not because Plaintiffs had caught Michelin red-handed. (*Id.* at 145.)   However, Michelin's alleged "self reporting" did not occur until after Plaintiffs pointed out there were missing codes and sought sanctions for Michelin's withholding of the documents. Michelin did not simply discover the error on its own and voluntarily come forward with the documents as it would have the Court believe. While this conduct alone would not warrant issue preclusion sanctions, the Court is doubtful of whether Michelin would have discovered this oversight and voluntarily produced the additional 113 adjustment codes that had previously been withheld in the absence of Plaintiffs' second request for sanctions.

### 1.   Michelin's multiple misrepresentations regarding adjustment codes and conditions

Unfortunately, the veracity of Michelin's contentions regarding its conduct in the discovery process for a variety of reasons has proven unreliable. It appears Plaintiffs are correct in their assertion that every one of Michelin's counsel's representations to the Court regarding the production of the adjustment codes and adjustment data has proven to be inaccurate.

First, as noted above, Ms. Helm told the Court at the June 3rd hearing that the six-page list of adjustment conditions "are the codes" and that these are the way the codes are maintained "in the regular course of business." (June 3, 2011

20

MR 0526

Sanctions Hr'g Tr. 36:11-19, Doc. 169.)   However, when pressed, Ms. Helm eventually admitted that the numeric codes had been redacted from this list but that "I didn't do it, Your Honor."[12] (*Id.* at 40:24-41:4.) She further stated that "[b]ut there's been no condition of a tire redacted from this list." (*Id.*) Then, much to the Court's surprise, at the September 19th Sanctions hearing, Ms. Helm denied that Michelin redacted the codes and instead took personal responsibility for the redactions' occurrence.[13] (Sept. 19, 2011 Sanctions Hr'g Tr. 191:17-196:7, Doc. 230.) Ms. Helm was evasive in response to Plaintiffs' questioning of who redacted the list, stating repeatedly that she did not recall. (*Id.*) When asked who provided her with the document that had been redacted, Ms. Helm again testified she did not recall. (*Id.*) Ms. Helm further testified at the September 19th sanctions hearing that when she told the Court on June 3rd that the list contained the adjustment codes as regularly maintained by Michelin, she in fact knew the codes had been cut off the side of the document. (*Id.*)

Ms. Helm admitted that "we should have produced the codes with the numbers." (*Id.*) When asked where was the mistake or human error in the redaction of the codes, Ms. Helm testified "the mistake and human error was

---

[12] Michelin's redaction of the codes was the subject of the Court's June 24th Order on sanctions and does not form the basis for the Court's imposition of sanctions herein. However, the redaction is relevant to the larger pattern of Michelin's abuse of the discovery process as further demonstrated by Michelin's counsel's subsequent evasive testimony regarding who actually made the decision to redact the codes.

[13] It is clear that Ms. Helm attempted to take the blame for the redaction in order to protect Michelin from further sanctions.

MR 0527

making the decision to redact the numbers off or to produce the document with the numbers redacted off." (*Id.*) After repeated questions by Plaintiffs as to who made that decision, Ms. Helm stated she made the decision despite her previous representation to the Court on June 3, that "I didn't do it."[14] (*Id.*) When asked whether she spoke with anyone at Michelin about the decision, Ms. Helm further evaded the issue by responding she did not recall. (*Id.*)

In addition, Michelin's June 13th production of the conditions with codes, pictures and descriptions revealed the falsity of its representations to the Court at the June 3rd hearing that the redacted six-page list of adjustment conditions were the codes and that this skeletal listing constituted the way the codes are kept in the regular course of business. Ms. Helm subsequently confirmed that the full production – including the codes, pictures and verbal descriptions of how to identify the tire conditions represented by each code – are "the documents used by the inspectors in the adjustment centers to evaluate and code returned tires." (Helm Aff. ¶ 55, Doc. 192-6.)

Furthermore, Michelin's counsel represented to the Court at the June 3rd hearing that while the numeric codes may have been redacted, no adjustment conditions were redacted from the May 20th list of adjustment conditions. (June 3, 2011 Sanctions Hr'g Tr. 40:24-41:4, Doc. 169.) This representation turned out

---

[14] Before taking responsibility for the decision, Helm attempted to assert the attorney-client privilege. (Sept. 19, 2011 Sanctions Hr'g Tr. 195, Doc. 230.)

MR 0528

to be only partially true. While certain conditions may not have been redacted from the list, Michelin now admits that 113 adjustment conditions were not included on the original list. (Helm Aff. ¶¶ 56-59, Doc. 192-6; Sept. 19, 2011 Sanctions Hr'g Tr. 171-176, Doc. 230.)

Although the Court originally believed Ms. Helm's affidavit testimony that the failure to produce the missing adjustment codes was an innocent oversight, and while this may very well be true, the credibility of her statements over time has been eroded by the actual course of discovery events. In light of Ms. Helm's evasive and inconsistent testimony at the September 19th hearing and Defendant Michelin's shifting representations made to the Court since June 3, 2011, the Court cannot simply rely on Michelin's avowals of good faith regarding any of these discovery issues.

### 2. Michelin's failure to produce graphs and other interpretive adjustment data

In accordance with the Court's two-step process for the production of the adjustment data, after Michelin produced all the codes that are used for identifying the causes for adjustment and Plaintifts identified the additional codes for which they sought adjustment data, Michelin was required to provide all data available to it concerning the identified adjustment codes. (Doc. 90 at 5; Doc. 173 at 11.)

23

MR 0529

On July 19, 2011, Michelin produced a large chart of indecipherable adjustment data along with a glossary created for the litigation. After Plaintiffs were unable to make any sense of the information, they questioned Michelin's employee-expert Mr. Charles Patrick, who regularly reviewed adjustment data, about the chart. (Patrick Dep. 76-90, July 28, 2011.) Mr. Patrick testified he had never seen the information in that format. (*Id.* at 76.) Mr. Patrick was unable to interpret the chart during his deposition. (*Id.* at 84-90.) Indeed, Michelin's own employee could not decipher the chart using the glossary created by Michelin to decode the chart. (*Id.* at 90-95.)

The chart appears to contain information about the number of tires returned under the relevant adjustment codes identified by Michelin. At the September 19, 2011 sanctions hearing, Plaintiffs maintained that Michelin was still continuing to withhold internal documents necessary to analyze and explain the data in the chart. Like the original list of adjustment conditions provided, the chart was a meaningless listing in and by itself, as demonstrated by Mr. Patrick's deposition testimony.[15]

---

[15] The chart does however highlight the importance for the numeric adjustment codes that were originally redacted by Michelin. The chart references the numeric adjustment code only and not the name of any of the conditions for which the tires were returned. The Court notes that at the June 3rd hearing regarding production of the adjustment codes Michelin's Counsel stated "what is important is not whether we call it number 1, it's whether we call it unsticking or leaking at the joint." (June 3, 2011 Sanctions Hr'g Tr. 41:5-10, Doc. 169.) Yet, it is clear, that without the numeric codes, the subsequently produced chart purportedly summarizing the adjustment data would have been even more incomprehensible.

24

MR 0530

The July 19th chart of adjustment data does not comply with the Court's June 24th Order. The June 24th Order provided that:

> With respect to each adjustment code identified by Plaintiffs, Michelin shall provide to Plaintiffs all tire data and documents available to it concerning that adjustment. To ensure full compliance with this directive, the Court notes that Michelin should produce the internal manuals it uses for classifying or discussing the conditions and issues arising in connection with application of the specific adjustment code.

(Doc. 173 at 11.) Moreover, the Court warned Michelin that "any failure to respond fully in producing these documents and tire data may result in the imposition of sanctions, including the Court's entry of default, determination of issue preclusion relative to the tire defect at issue, or other sanctions authorized by Fed. R. Civ. P. 37(b)(2)(A)." (*Id.*)

An essential purpose of the Order was to ensure that Plaintiffs were provided the information necessary to analyze and evaluate the adjustment data to determine how many tires were being returned for the conditions at issue in this case. Not only did Michelin produce the adjustment data in a format that was indecipherable to Plaintiffs, not even a Michelin employee who was experienced in analyzing adjustment data could understand the information provided in the chart. Indeed, as Mr. Patrick admitted in his deposition, in order to understand the meaning of every column and code in the chart, he would need more than just the glossary prepared by Michelin. (Patrick Dep. 95, July 28, 2011.) In light of the Court's prior directives with respect to the adjustment codes

25

MR 0531

and data, Michelin's production of the adjustment data in this completely unusable format was patently unacceptable. Michelin's mode of production of the chart is yet one more strand in its pattern of failing to produce meaningful responses to Plaintiffs' discovery requests in violation of both the letter and spirit of the Court's Orders.

According to Mr. Patrick, Michelin itself actually did not use the chart form that was produced to Plaintiffs in this litigation but instead compiled its tire adjustment and return data into graphs for comparison and analysis at quarterly meetings. (*Id.* at 76.) As Mr. Patrick testified, these graphs compared the return rates of Laredo tires to other tire lines and to Michelin's overall rates. (*Id.* at 76, 79, 112, 182-83.) No such graphs were produced by Michelin in response to RPD 37 requesting information summarizing Michelin's adjustment data.

At the sanctions hearing, Michelin contended that it did not keep these graphs and that they were destroyed after their use at these quarterly meetings. Ms. Helm testified at the hearing that after Mr. Patrick's deposition, Michelin searched for the graphs and determined that no such graphs exist. (Sept. 19, 2011 Sanctions Hr'g Tr. 185-86, Doc. 230.) Ms. Helm further testified that the graphs were created as demonstratives for the employee meetings and are not maintained after the staff meetings. (*Id.* at 241.)

These graphs would obviously be highly probative of the issue of what Michelin knew about its tires' comparative failure rates, why certain tires were

26

MR 0532

failing, and what changes in the design or manufacturing process may have been initiated to prevent future failures. As Mr. Patrick testified, by using this information Michelin could determine whether it was "starting to see something new when we put in high-tensile steel, I mean, are the tires lasting longer, does it look like the wear rates are lasting longer, things like that." (Patrick Dep. 80, July 28, 2011.) And indeed, Mr. Patrick as Michelin's key design representative testified that this data was supposedly an essential tool used by Michelin's staff in guiding its tire design and quality assurance work on an ongoing basis. (*Id.*) Furthermore, this testimony serves as the basis for Michelin's summary judgment motion asserting that Michelin cannot be found to have engaged in the necessary bad faith to warrant the imposition of punitive damages because it employed design and manufacturing quality assurance procedures. (*See* Doc. 205.)

The adjustment data would be extremely relevant to Plaintiffs' ability to establish whether Michelin knew of identified defects in its tires based on the return information through the warranty process. As Mr. Patrick confirmed, the adjustment data could be analyzed to determine whether tires were being returned for conditions resulting from a manufacturing versus a design issue. (*Id.* at 100-105.) Accordingly, at the conclusion of the September 19th sanctions hearing, the Court ordered Michelin to provide further clarification of the chart's data and mode of information presentation. Until the Court's Order at the

MR 0533

conclusion of the September 19, 2011 sanctions hearing, Michelin delayed in producing information essential to assessing the comparative data it finally produced in the chart it provided to Plaintiffs on July 19, 2011, thus seriously impeding Plaintiffs' preparation of their case.

By withholding the information necessary to understand the adjustment data in the chart, Michelin effectively attempted to prevent Plaintiffs from using the adjustment data to establish whether the tire at issue was being returned for certain manufacturing or design conditions, whether Michelin was aware of these conditions in the tire, and whether Michelin made any changes to the tire as a result of a high return rate. Moreover, the "special" chart that Michelin has now provided is clearly not a full substitute for producing the actual graphs or graph data that Michelin's staff used to review and assess comparative return and failure rates of its various tire lines. Given the centrality of this data to Michelin's design and quality assurance processes – processes that Michelin seeks to use as a lynchpin of its product liability defense in this case – the Court is skeptical that Michelin would not maintain such documents and data.

## D.   Michelin's Misrepresentations About Reaction Limits and Production Tolerances and the Failure to Produce Those Documents

Plaintiffs contend that Michelin also made misrepresentations to the Court regarding reaction limits and production tolerance documents so as to persuade Judge Story to limit his January 3, 2011 Order based on a false factual predicate.

28

MR 0534

They also maintain that Michelin failed to fully produce all available relevant documents responsive to the three Requests for Production covering these documents.

The documents at issue here were initially the subject of the discovery dispute that led to the December 20, 2010 discovery hearing and the January 3, 2011 Order compelling production of documents. Plaintiffs requested "reaction limits" documents in RPD 16, "design and production tolerances" in RPD 25, and "tolerances for plies and belt materials" in RPD 35.[16] Reaction limits and tolerances are used by tire builders during the manufacturing process to determine whether the tires comply with their design specifications. Michelin defines "reaction limits" as "the maximum variation allowed in product, process, or material and still be considered fit for 'right the first time.'"[17] (MNA 9636.)

---

[16] The full text of these Requests to Produce are set forth below:

RPD 16: Produce the following documents, any similar documents and any documents discussing the listed documents specifically identified in the complaint: (a) The Bad Habits List of manufacturing issues; (b) Decision Tree documents; (c) Asset Specifications documents; (d) Reaction Limits documents; (e) Product Standards and Guidelines Manual for Required Tire Dimensional Tolerances; (f) Documents relating to and including an internal study by Tokita entitled "Long Term Durability of Tires"; and (g) All witness statements from current or former Michelin employees or sworn depositions from current or former Michelin employees in *Ford v. Uniroyal* from Georgia, *Carver v. Uniroyal* from California, *Toscano v. Uniroyal* from Texas, *Adams v. Uniroyal* from Texas, and *Castillo v. Uniroyal* from Texas.

RPD 25: Provide the design and production tolerances for the subject tire in effect at the time of its manufacture.

RPD 35: Produce all documents providing specifications for the splice overlaps standards and tolerances for plies and belt materials in the subject tire.

[17] Michelin's training documents discuss "reaction limit" as being "the lower and upper limits allowed for product or process variation from spec without receiving intervention from a quality technician. Product or processes outside 'reaction limits' but within tolerance limits – the operator must stop production and notify the Quality Technician who must make the decision

29

MR 0535

Michelin defines "product/process tolerance" as "the range of variation that by design defines nonconformity. A product or process outside the tolerance limits is non-conforming."[18] (*Id.*)

While the reaction limits and tolerances are related concepts, it is possible for a product or process to be outside of reaction limits but within a tolerance. According to Michelin's internal documents, "a product running outside reaction limits but within the tolerance is considered to be the 'Range of Expertise.'[19] Approval from authorized personnel is needed to continue production within this range." (MNA 9637.) On the other hand, "product variation outside of the tolerance limits is non-confirming; this product must be tagged and placed in the non-conforming area. Operator must immediately react to out of tolerance conditions to bring product in control, if unable to bring product in control, the operators must stop production immediately."[20] (*Id.*)

---

whether to continue with the product or process. If the Quality Tech gives the authorization to continue, the builder must ensure that the authorization is recorded in the comments section of the logbook." (MNA 8779.)

[18] Michelin's training documents discuss "tolerance limits," as "the range above or below the lower and upper reaction limits that a quality tech has the authority to authorize a builder to use products or processes. A builder should never use a product or process that is outside of the tolerance limit – a quality tech cannot approve use of a product or process outside of tolerance limit." (MNA 8779.)

[19] "Variation Range of Expertise" is defined as "the variation in product, process or material that is outside the reaction limits but within the tolerance limits. Approval is required from authorized personnel to continue production with this variation range." (MNA 9636.)

[20] Michelin's internal documents discuss a similar procedure for "process variation outside of reaction limits but within tolerance" and "process variation outside of tolerance." (MNA 9637-9638.)

MR 0536

At the December 20th discovery hearing, Michelin's counsel led the Court to believe that the reaction limits and tolerance data and documents requested by Plaintiffs were duplicative and had already been produced as part of the design file (also referred to as the development file that contains manufacturing specifications and decision trees).[21] (*Id.* at 42:12-21)   Specifically, Michelin's counsel represented to the Court that RPDs 25 & 35 which ask for design and production tolerances were duplicative of RPD 16 because a "reaction limit" is "really a tolerance for a tire before its cured." (Dec. 20, 2010 Disc. Hr'g Tr. 38-39, 42-43, Doc. 104.)   In response, the Court inquired:  "If you gave the reaction limits and the decision trees, that would cover those tolerances."[22] (*Id.* at 42:22-23.)  Ms. Helm responded:  "That would [cover] the manufacturing tolerances because that's really what they are, Your Honor.  So I believe that's duplicative of the earlier discussion." (*Id.* at 42:24-43:1.)

Based on Michelin's representations that the reaction and tolerance limits documents had in fact been produced, the Court did not order any further

---

[21] Michelin counsel advised the Court, "We've produced the entire design file ... We've produced the specifications which show how the tire is to be manufactured and the measurements and the components and all of that." (Dec. 20, 2010 Disc. Hr'g Tr. 42:15-21, Doc. 104.)

[22] According to Ms. Helm, decision trees (or aspect specifications) are the criteria used by tire builders to test the production quality for cured tires whereas reaction limits (used interchangeably by Helm with tolerances) are the criteria used by tire builders to test the production quality for uncured tires. (Dec. 20, 2010 Disc. Hr'g. Tr. 33:14-24; 39:19-22, Doc. 104.)

31

MR 0537

production by Michelin of reaction limits and production tolerances. Specifically, the Order stated as follows:

> **RPD 16:** Defendant shall produce documents responsive to (b) [Decision Tree Documents] and (c) [Asset Specifications documents] that were in effect during the agreed upon time frame and which relate to processes at issue: trapped air, placement of steel belts, molding issues, and adhesion issues. Should other components and processes be identified in the future by Plaintiffs, Defendant shall be required to produce documents related to those components and processes as well. The Court finds that the information sought in [(d) Reaction Limits Documents] has been provided by Defendant in the development files already produced. Therefore no further production is required.
>
> **RPDs 25 and 35:** The documents requested [tolerances] are covered by the Court's rulings as to RPD 16.

(Doc. 90 at 4-5.)

On July 28, 2011, Michelin's former employee tire-design expert, Mr. Patrick was deposed and testified that he had reviewed the development file produced by Michelin and it did **not** in fact contain the reaction limits or tolerances as had been represented to the Court at the December 20th hearing. (Patrick Dep. 64-65, July 28, 2011.) Nine days earlier, on July 19, 2011, in response to Plaintiffs' second request for sanctions for withholding documents responsive to RPD 50 (documents discussing specific tire defects), Michelin for the first time produced documents (MNA 8779, MNA 9634-9658) that defined the notable difference between tolerances and reaction limits and made clear that Plaintiffs' requests for tolerance and reaction limit data and documents would

32

MR 0538

not be duplicative. Until that time, Plaintiffs had accepted the accuracy of the representations of Michelin's counsel to the Court at the December 20th hearing. However, these new internal Michelin documents revealed that Michelin's representations to the Court at the December 20th conference were inaccurate and had effectively restricted discovery of substantive information bearing on Michelin's tire design and manufacturing process.

The Court recognizes that the reaction and tolerance limit tire manufacturing terms – however significant for this case – are terms of art that Michelin counsel might have confused at the December 20, 2010, hearing, as Ms. Helm maintained in her testimony at the September 19, 2011 hearing. (Sept. 19, 2011 Sanctions Hr'g Tr. 161:4-6, Doc. 230.). However, Ms. Helm testified at the September 19th hearing that immediately upon reviewing the Court's January 3, 2010 discovery Order, she realized the Court "put reaction limits in the development file" and that she knew that was not correct. (Sept. 19, 2011 Sanctions Hr'g Tr. 161-62, Doc. 230.) Most significantly, in response to the Court's inquiry at the September 19th hearing Ms. Helm testified that in January 2011 or thereafter she did not advise the Court that the Order was incorrect because of her earlier erroneous representation to the Court nor did she go back and clarify the issue for the Plaintiffs – despite Michelin's later filing a motion for reconsideration of the ruling on RPD 37 (with respect to the adjustment data). (*Id.* at 161-62). Rather, Ms. Helm testified that she simply confirmed for herself

MR 0539

that no such reaction limit documents were still available from the 1998-2001 timeframe (because that was the time scope which the Court had applied to the production under RPD 16 after being advised the reaction limit data and documents would be included in the development file produced).[23]

While Ms. Helm may not have originally on December 20, 2010, intentionally misled the Court, her subsequent failure to correct the mistake once she realized the Court relied on her statements to conclude that the documents had been produced in the development file is plainly unacceptable. As of the September 19th sanctions hearing, more than eight months after Michelin's counsel's review of Judge Story's Order of January 3, 2011, Michelin had not produced the reaction limits or tolerances despite its realization that it had represented to the Court that those documents had previously been produced. Michelin effectively kept the Plaintiffs and the Court in the dark by allowing them to rely on inaccurate information, which Michelin knew to be false upon its receipt of the January 3rd Order. In essence, Michelin thereby precluded the Plaintiffs from asking the Court to reconsider its application of a restricted time scope for these specific production requests.[24]

---

[23] According to Ms. Helm's testimony at the September 19th hearing, Michelin did not produce the reaction limits for an uncured ("green") P235/70R15 Uniroyal Laredo AWR ORWL tire because these documents for the 1998-2001 timeframe were outside their document retention period and were not captured by any prior litigation hold. (Sept. 19, 2011 Sanctions Hr'g Tr. 93:15-17; 99:2-10, Doc. 230.)

[24] Plaintiffs had argued for an unlimited time scope to apply to these specific document requests (RPD 16). However, the January 3rd Order provided a limited time scope to RPD 16, but not to

34

MR 0540

Indeed, Michelin was aware that, although reaction limits no longer existed for the parties' agreed scope, documents concerning reaction limits for other tires manufactured at the Ardmore plant post-2001 existed that had been caught by a prior litigation hold and were produced in other cases. (*Id.* at 228:18-229:10.) While Michelin disputes the relevance of these documents, the Plaintiffs have persuasively argued that they are directly relevant to their proof of Michelin's defective manufacturing and inspection process. (*Id.* at 255-257.) In any event, until these issues came to light in July 2011 after the Court's Orders, Michelin neither clarified the record nor made responsive documents available. Yet, at the December 20, 2010 discovery hearing, Michelin's counsel assured the Court that she was not seeking to limit the production of the tire manufacturing and inspection process documents "so narrow that it ends up I produce zero . . . These documents exist and I know they exist." (Dec. 20, 2010 Hr'g Tr. 35-36.) Moreover, Mr. Patrick's testimony confirmed that reaction limits and tolerances are not tire specific, but relate to the particular processes used at the individual plants and therefore these documents should not have been subject to the 1998-2001 temporal scope. (Patrick Dep. 25-26.) For the foregoing reasons, the Court finds Michelin improperly manipulated the course of discovery and the Court's

---

multiple others requested by Michelin. As discussed below, the Court limited the production responsive to RPD 16 in an effort to address Michelin's concerns regarding disclosure of confidential trade secrets and a potentially over-inclusive document production in light of the evolution of the tire design and manufacturing process.

35

review of the discovery disputes at issue in the December 20, 2010 discovery hearing and the Court's Order of January 3, 2011.

After learning that Michelin had produced reaction limits in other cases at the September 19th sanctions hearing, Plaintiffs requested that the Court order Michelin to produce these documents. On September 23, 2011, the court ordered Michelin to produce the reaction limits documents identified although they fell outside the 1998-2001 time scope. Michelin produced the documents as ordered on September 28, 2011.[25] Plaintiffs assert in their response to Michelin's motion for partial summary judgment that it became clear after Michelin produced the documents why it fought production for so long. According to Plaintiffs, the subject tire failed to meet the tolerance limits and should have been scrapped. Accordingly, Plaintiffs persuasively argued that these documents would go directly to the defect issue. Michelin would never have produced these documents to Plaintiffs in this case without the Court's intervention. Without these documents, Plaintiffs' ability to prove a defect in the tire would be hampered and the delayed production resulted in prejudice to Plaintiffs as discussed more fully below.

---

[25] Indeed, Michelin voluntarily produced 700 pages of documents it deemed nonresponsive to Plaintiffs' discovery requests after receiving Plaintiffs' second sanctions request but did not produce the reaction limits until ordered to do so by the Court after the September 19th sanctions hearing.

MR 0542

**E.   Michelin's Failure to Produce Certain Documents in Response to RPD 50**

A substantial part of Plaintiffs' second sanctions request centers around Michelin's alleged failure to produce documents in response to Plaintiffs' RPD 50.[26] RPD 50 identified several defects that Plaintiffs believed existed in the subject tire and asked for documents discussing how design and manufacturing problems or deficiencies can result in those defects in tires generally. Michelin initially objected to RPD 50 on the basis that it was not limited in scope to the tire, plant, and time period relevant to this action and refused to produce documents on those grounds. Plaintiffs opposed these limitations because RPD 50 was not crafted to be tire or plant specific.

Consequently, the parties addressed the scope of RPD 50 with the Court at the December 20th discovery hearing. Plaintiffs' counsel expressly argued that RPD 50 should not be limited to the 1998-2001 timeframe because RPD 50 is broader in scope than the tire at issue.[27] (*See* Dec. 20, 2010 Disc. Hr'g Tr. 23:24-

---

[26] RPD 50 provides as follows "Please produce any documents which discuss how design or manufacturing problems or deficiencies can result in the following conditions: a) air pockets; b) oxidation; c) internal belts not lined up; d) spreading in internal belts; e) tire overshaped in mold; f) brassy wires with poor adhesion to belts and rubber; and g) reversion."

[27] Michelin's assertion that its interpretation of the Court's Order on RPD 50 as being subject to the 1998-2001 temporal scope applied to RPD 16 "given that plaintiffs' counsel had not clearly stated anything to the contrary" at the December 20 hearing is flatly contrary to the hearing transcript. (*See* Dec. 20, 2010 Disc. Hr'g Tr. 24:20-25:18, Doc. 104.) Michelin's contention that its interpretation of RPD 50 and the Court's January 3rd Order was also based on statements by Plaintiffs' counsel that there was no longer a dispute regarding the agreed scope is likewise spurious. In their November 10, 2010 letter-motion to the Court, Plaintiffs asserted that Michelin narrowed its production of documents to one year before and one year after the date the subject tire was manufactured despite the parties' negotiation of an agreed scope of 1998-

37

MR 0543

25:11, Doc. 104.) Indeed, the Court recognized that not all of Plaintiffs' requests were tire specific requests and that it was clear that some of Plaintiffs' requests sought information "generally on the part of Michelin as opposed to how it may specifically relate to a given tire." (*Id.* at 10:8-13.) Michelin's counsel did not provide any response in support of limiting the scope of RPD 50.[28] While Plaintiffs were ultimately interested in whether certain design and manufacturing deficiencies resulted in the defects in the Bates tire, it is clear from the language of the request itself and Plaintiffs' counsel's statements at the December 20th

2001. As a result, Plaintiffs requested that the Court order Michelin to expand its production to the scope as originally agreed of 1998-2001 for specific requests. In its December 16, 2010 response to the Court, counsel for Michelin acknowledged that not all documents covered by the agreed scope had been produced and represented that Michelin had supplemented its response and produced all documents subject to the agreed scope. Based on this response, Plaintiffs informed the Court at the December 20th hearing that the parties had resolved this issue with the agreed scope for specific RPDs and it need not be addressed by the Court. Michelin's reliance on this statement by Ms. May addressing which years were covered by the agreed scope as support for its assertion that RPD 50 was subject to the 1998-2001 agreed time scope is misplaced. As discussed *infra*, Plaintiffs' counsel also continued to argue for an unlimited time and plant scope for other specific RPDs, including RPD 50.

[28] On the other hand, Michelin opposed Plaintiffs' argument that RPD 16 should not be limited to documents in effect at the time the subject tire was manufactured because Plaintiffs sought to identify what Michelin knew about problems with its tires and its manufacturing processes before the time the subject tire was specifically manufactured. (*Id.* at 6:7-11.) Based on an Affidavit from a Michelin employee detailing the evolving design and manufacturing process for Michelin tires, the Court expressed concern that if RPD 16 (which called for documents subject to protection as trade secrets) were not limited to some extent, it would require the production of a voluminous amount of documents concerning unrelated tires and unrelated components and processes at issue. (*Id.* at 7:19-5.) The parties ultimately agreed at the hearing to limit the scope of RPD 16 to passenger tires. Michelin requested that the Court limit its production of documents in response to RPD 16 to the components and processes at issue and (although not limited to the subject tire itself) to the documents that were in use at the time the subject tire was made (rather than the agreed four year scope). (*Id.* at 33-35.) With the assurance that a complete development file had been produced, the Court entered its January 3rd Order with respect to RPD 16 requiring Michelin to "produce documents . . . that were in effect during the agreed upon time frame and which relate to the processes at issue: trapped air, placement of steel belts, molding issues, and adhesion issues." (Doc. 90 at 4.)

MR 0544

discovery hearing that RPD 50 was crafted to reach Michelin's knowledge about tire defects in general. Although the Court expressly applied the temporal limitation requested by Michelin to other RPDs (i.e., 16, 47 & 48) in the January 3rd Order, the Court delineated no temporal limit for the scope of RPD 50 and ordered Michelin to "produce the requested documents for the components and processes at issue." (Doc. 90 at 5.)

According to Plaintiffs, Michelin produced very few documents following the Court's January 3rd Order. In fact, Michelin confirmed at the September 19th sanctions hearing that the only documents initially produced in response to RPD 50 were the aspect specifications and decision trees (terms used interchangeably) that were specifically identified by Plaintiffs in RPD 16.[29] (Sept. 19, 2011 Sanctions Hr'g Tr. 98:19-23; 156:21-157:19, Doc. 230.) At the December 20, 2010 discovery hearing, Ms. Helm represented to the Court that Michelin was not trying to limit the scope of the requests so narrowly so as to end up having to

---

[29] Michelin limited its response to RPD 50 to these documents because of its admitted "interpretation" of RPD 50 as asking for the same documents as RPD 16. Michelin's interpretation is unreasonable for a number of reasons. First, RPD 16 and RPD 50 call for different documents. RPD 16 requests production of seven specific categories of documents identified by name. RPD 50 requests production of all documents relating to certain design and manufacturing defects. Second, Plaintiffs addressed RPD 16 and RPD 50 separately at the December 20th hearing and described the differences between the requests. Ms. May discussed RPD 16 as being a more narrow request targeting specific documents, (*Id.* at 5:18-6:20), and characterized RPD 50 as asking for a broader scope of documents tied to the specific defects at issue in the case, (*Id.* at 10:24-11:12.) Finally, the Court compelled production separately under RPD 16 and RPD 50, in contrast to its treatment of RPD 16 (calling for reaction limits) as being synonymous with RPDs 25 and 35 (calling for tolerances). (Doc. 90 at 4-5.)

MR 0545

produce essentially nothing in response.[30]  (Dec. 20, 2010 Disc. Hr'g Tr. 35:17-36:6, Doc. 104.)  However, at the September 19, 2011 sanctions hearing, Michelin's counsel (Ms. Cahoon), stated that because the subject tire went out of production by April 2007 "many of the documents, in fact as we'll see later, virtually all of the documents about manufacture [sic] are gone under retention policies before there's ever a lawsuit about the Bates' tire."  (Sept. 19, 2011 Sanctions Hr'g Tr. 92:2-9, Doc. 230.)  Counsel further stated that "there was a pretty clear, we thought, understanding with opposing counsel that there were going to be very few, if anything, by way of documents still available from the '98 to 2001 agreed time frame."  (*Id.* at 104:13-16.)  Michelin's position at the September 19th sanctions hearing presented a remarkable about-face from its counsel's representation to the Court ten months earlier that if RPD 50 was framed to cover the summary processes ultimately identified in the Court's January 3rd Order, she could say that "[t]hese documents exist and I know they exist.") (Dec. 20, 2010 Hr'g Tr. 35-36, Doc. 104).

However, during the deposition of Michelin's in-house experts in June and July 2011, Plaintiffs learned that internal documents such as tire production standards, training manuals, and Design Failure Mode and Effect Analysis (FMEAs) existed that Plaintiffs contend should have been produced in response

---

[30] Michelin admittedly has an aggressive document destruction policy and retains apparently only the narrowest range of documents necessary for business and regulatory reasons.

MR 0546

to RPD 50. Michelin responded that it had not been required to produce these documents because in its view the January 3rd Order on RPD 50 was limited to the tire at issue, the temporal scope of 1998-2001, and documents from the Ardmore plant.[31] Accordingly, Michelin represented to the Court at the July 7th discovery conference that it had produced all documents (almost none) that existed subject to those limitations.

The Court finds that Michelin's interpretation of RPD 50 and the Court's January 3rd Order is neither reasonable nor supported by the record as Michelin contends. Michelin interpreted RPD 50 as being redundant of RPD 16.[32] Consequently, because the Court's January 3rd Order limited RPD 16 to the 1998-2001 time scope, Michelin treated RPD 50 as also being subject to the 1998-2001 time scope. As discussed in footnote 29 above, RPD 16 and RPD 50 call for different documents. Ms. Helm testified at the September 19th sanctions hearing as to her reading of the Court's January 3rd Order:

> The first thing I interpreted was [the Court] had not limited it to the documents in effect at the time the tire was made, which would have been the documents in use on the 32nd week of 2000. But I read it

---

[31] Nonetheless, Michelin contends that even though it does not believe the training manuals and production standards were responsive to RPD 50, it has since produced (after Plaintiffs' second sanctions motion) what is currently available, although not those documents contemporaneous in time with the design and manufacture of the tire because those documents no longer exist.

[32] However, the Court notes that Michelin asserted in its December 16, 2010 response to Plaintiffs' letter-motion seeking to compel documents separately under RPD 16 and RPD 50, that RPD 50 "is inconsistent with Plaintiffs' demand for documents on numerous conditions relating to Request No. 16(b)-(e). If the conditions and components identified in Request No. 50 are those at issue, MNA will search for and produce the documents in place when the Subject Tire was manufactured that address those conditions and components." (Ex. 3 to Resp. to Motion for Sanctions, Doc. 193-4.)

MR 0547

> as the broader temporal scope of all documents in use from '98 to 2001 that related to the components and processes at issue, which we had addressed in the hearing were the aspect specifications or the decision trees, because those were the documents that specifically addressed components or processes.

(Sept. 19, 2011 Sanctions Hr'g Tr. 156-57, Doc. 230.)  The January 3rd Order specifically limited Michelin's response to RPD 16 to documents "in effect during the agreed upon time frame." (Doc. 90 at 4.)  However, with respect to RPD 50, the January 3rd Order contains no temporal limitation.  Ms. Helm acknowledged at the September 19th hearing that the January 3rd Order did not contain the words "1998 to 2001" with respect to the production required for RPD 50 but that she limited the Order to that time frame.  (Sept. 19, 2011 Sanctions Hr'g Tr. 238, Doc. 230.)  Ms. Helm never sought further clarification from the Court on this issue in the event there was actual confusion.

Michelin's interpretation is completely unsupported by the language of the Order differentiating between RPD 16 and RPD 50 and the essence of counsel's discussion with the Court at the December 20, 2010 hearing.[33] (Doc. 90 at 4-5.) By interpreting RPD 50 as requesting the same documents as RPD 16, Michelin limited its production to only those specific documents already known and identified by Plaintiffs.   Michelin thereby avoided producing any other documents which discuss how design or manufacturing problems or deficiencies

---

[33] Michelin asserts that Plaintiffs acquiesced to its interpretation by failing to interpose any objection.  This is inaccurate.  Rather than acquiescing to Michelin's treatment of RPD 16 and RPD 50 as being synonymous, Plaintiffs sought an order compelling production of documents in response to both RPD 16 and RPD 50.

42

can result in the alleged defective conditions at issue, i.e. the training documents and tire production standards discovered by Plaintiffs as having been withheld. The Court therefore must conclude that Michelin made a calculated decision to "interpret" the Court's discovery order in the narrow way it saw fit so as to justify withholding entire categories of documents that were unambiguously responsive to Plaintiffs' request in violation of the Court's direct Order.

## F.   Michelin's July 19th Production in Response to RPD 50

Despite its steadfast position at the July 7th conference with the Court that it had complied with the Court's January 3rd Order and previously produced all required documents, on July 19, 2011, Michelin produced over 700 pages of documents in connection with RPD 50 in response to Plaintiffs' second request for sanctions.[34]

One category of documents Michelin produced on July 19th after Plaintiffs moved for sanctions referred to as "Failure Mode and Effects Analysis" (FMEAs)

---

[34] Plaintiffs contend that the adjustment data (specifically requsted in RPD 37) should have also been produced as responsive to RPD 50 because: (1) the adjustment conditions described a reason for which a tire might be returned; (2) some adjustment sets addressed problems originating with the manufacturing process; and (3) most adjustment conditions listed evolutions associated with the adjustment condition, i.e problems that could develop if the returned tire was not repaired or replaced. Therefore, according to Plaintiffs, "when an adjustment condition belonged to a '**manufacturing**' set and was expected to evolve into '**oxidation**' or the '**infiltration of air**' into the rubber, that adjustment condition was directly responsive to RPD 50." (Doc. 180 at 8.) While the Court agrees that the adjustment data may have been responsive to RPD 50, Michelin sought reconsideration of the January 3rd Order compelling production of the adjustment code data regardless of which of Plaintiffs' RPDs the documents were responsive to. The Court therefore does not find that Michelin's failure to produce the adjustment code data in response to RPD 50 *prior to* the Court's Order on Defendant's Motion for Reconsideration (Doc. 123) was done in bad faith or warrants sanctions for any documents not produced prior to April 28, 2011.

MR 0549

are internal Michelin documents demonstrating how Michelin evaluates its manufacturing process to determine the different ways tires can fail, the effect of the failure, and how to fix the identified deficiency.[35] Michelin contends that it produced these documents in good faith, even though Michelin does not believe them to be responsive to Plaintiffs' requests, and that its subsequent production of these documents should not be used as a basis for imposing the sanction requested by Plaintiffs.[36]   To the contrary, these documents are clearly very relevant to Plaintiffs' claims and are directly responsive to RPD 50. The FMEAs discuss the precise conditions identified by Plaintiffs in RPD 50, i.e., trapped air, adhesion, molding, how those conditions develop in the manufacturing process, and the methods for detection and prevention of those conditions in a tire before it leaves the plant.

As Plaintiffs noted at the September 19th sanctions hearing, Michelin characterized RPD 50 as calling for "cause and effect" documents and the FMEAs

---

[35] Although Michelin produced FMEAs that deal with the manufacturing process on July 19th, Plaintiffs contend that Michelin is still withholding FMEAs that deal with the design process. Plaintiffs learned about the existence of these documents during the July 28th deposition of Mr. Patrick who testified that Michelin also creates and uses FMEAs that deal with problems that arise during the design phase. At the September 19th sanctions hearing Michelin admitted the design FMEAs were not in the design file that was produced: "We agree they were not in that file, but we never represented that the file was complete at all. But what we were able to locate, it was produced. . . So, there's a lot to evaluate how the tire was designed, even though we can't say that we've got everything." (Sept. 19, 2011 Sanctions Hr'g Tr. 118: 10-20, Doc. 230.)

[36] Michelin redacted "nonresponsive information" from several pages of the FMEA document. (MNA 9234- 9271.) Based on the discovery record thus far, Plaintiffs question the propriety of these redactions and whether the redacted information pertains to the alleged tire defect. The Court therefore **DIRECTS** Michelin to submit these un-redacted pages for the Court's in-camera inspection.

MR 0550

are Michelin's ultimate "cause and effect" documents. These documents should have been produced in response to RPD 50 and without question in response to the January 3rd Order compelling production under RPD 50.[37] Michelin was obligated to produce these documents in discovery without the threat of sanctions but failed to do so. The Court finds that Michelin's excuses fall short in light of its obligation to cooperate fully in discovery following an order compelling production, an order imposing monetary sanctions, and the court's prior warning that additional evidence of discovery abuse would not be tolerated. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1543 (11th Cir. 1993) (rejecting the defendants' claim that they simply misunderstood the scope of the discovery orders because defendants failed to offer credible explanations and failed to ask the court for clarification of allegedly confusing orders). Moreover, as the Court in *Malautea* noted, "ultimately, the [plaintiffs] had to file a motion for sanctions to force the [defendant] to comply with the court's orders." *Id.* at 1540. Thus, Michelin's post-sanctions production of documents does not excuse its conduct or obviate the need for sanctions.

Another category of documents Plaintiffs discovered had not been produced in response to the Court's January 3rd Order were tire building training materials and production standards identified by Michelin's in-house

---

[37] During the sanctions hearing, Plaintiffs discussed the relevance of other types of documents that were produced on July 19 that described how certain manufacturing processes resulted in the precise defects at issue. The Court has reviewed these documents and finds that these documents likewise should have been produced far earlier in response to RPD 50.

45

manufacturing expert Jack Glazener.[38]  At the hearing, Ms. Helm testified that Michelin decided to produce the training materials[39] and tire production documents referenced by Mr. Glazener in his deposition even though Michelin did not regard those documents as being responsive to RPD 50 because Plaintiffs asked for them specifically in their request for sanctions.   (Sept. 19, 2011 Sanctions Hr'g Tr. 163-64, Doc. 230.)  Ms. Helm further testified that Michelin has produced such training manuals in the past when specifically requested to do so.  (*Id.* at 164:2-12.)  It appears that Michelin's modus operandi here has been – at very best – to only produce documents specifically identified by Plaintiffs despite the fact a broader set of documents would be responsive to a general discovery request. This case is eerily similar to *Malautea* in this regard where the Court imposed the sanction of default.

> Another technique the Defendants have used to avoid revealing the truth is to refuse to answer general questions, choosing instead to limit the question to a narrower field.  The Plaintiff sought, in

---

[38] Ms. Helm testified at the hearing that Michelin did not characterize tire production standards (also referred to as tire building procedures) as discussing cause and effect type relationships because "they are placed [sic] – this – this component on this drum at this angle, check this, move on the next step, do this. It's very much a – it's kind of like following a recipe." (Sept. 19, 2011 Sanctions Hr'g Tr. 167, Doc. 230.)  This explanation is unavailing – the failure to follow the proper procedures is a prime example of a cause and effect relationship.  As anyone with cooking experience is well aware, the failure to follow certain recipes or to add ingredients in the right order can prove disastrous to the final product.

[39] On July 19th, Michelin produced quizzes that it gave employees, but only produced answer keys to some of them.  For example, Michelin produced a quiz with the following question "____ is used to prevent a tread separation." (Pls.' Ex. X Sept. 19, 2011 Sanctions Hr'g, MNA 9034)  At the hearing Ms. Helm testified that the answers to the quizzes were located on the opposite side of the quiz page and could be found in the other materials produced (MNA 8796 to 8828) but that no separate answer keys were available for these particular quizzes. (Sept. 19, 2011 Sanctions Hr'g Tr. 168:8-169:3, Doc. 230.)

46

MR 0552

> numerous interrogatories and requests for production of documents, information no only about the 1988 ½ Samurai, but also about other model years and about similar sport utility vehicles . . . In all of the early responses to interrogatories, the Defendants steadfastly insisted that Plaintiff was entitled only to information concerning the 1988 ½ model year Suzuki Samurai. Accordingly, the Defendants refused, prior to the status conference, to divulge any information about the [other makes and models]. By restricting their answers in this manner, the Defendants managed to avoid revealing a great deal of discoverable information.

*Malautea v. Suzuki Motor Co.*, 148 F.R.D. 362, 366-67 (S.D. Ga. 1991). Such conduct leaves Plaintiffs and this Court continually uncertain whether all responsive documents have been produced.

## G.     Michelin's Failure to Produce Expert Reports for Employee Experts Patrick and Glazener

A final issue for which Plaintiffs seek sanctions is Michelin's failure to produce expert reports for its two in-house employee experts identified in its Rule 26 Expert Disclosures on April 29, 2011. Fed. R. Civ. Proc. 26(a)(2)(B) requires a written report if the witness is "one whose duties as the party's employee regularly involve giving expert testimony." Michelin's Rule 26 Expert Disclosures identifies Charles Patrick and Jack Glazener as corporate representatives having technical knowledge and experience regarding certain subject areas pertinent to the litigation. (Doc. 232-14 at 4-5.) *See* Fed. R. Evid. 702. However, Michelin produced no expert reports for these two witnesses.

Contrary to its representation at the September 19th sanctions hearing, Michelin did not ever identify Patrick or Glazener as fact witnesses. At the

47

MR 0553

hearing Michelin contended that although it had not identified Glazener and Patrick in their mandatory disclosures, they were specifically identified as fact witnesses on May 11, 2011, in its supplemental responses to Plaintiff's Interrogatories.   (Sept. 19, 2011 Sanctions Hr'g Tr. 134:11-13, Doc. 230.) However, Glazener and Patrick were only identified at that juncture in response to Plaintiffs' Interrogatory #4 requesting the identification of Michelin's expert witnesses.[40]  Indeed, in response to Plaintiffs' Interrogatory # 12 which asked Michelin to identify the corporate representatives with the most knowledge of the design and manufacturing process, Michelin did not identify Glazener or Patrick or any other employee or former employee by name.

Michelin's counsel, Ms. Cahoon, contended that very early in the litigation, "there was an indication that Michelin would have some witnesses as fact witnesses who would talk about the manufacture and design of the tire. Quite frankly, I think Michelin was waiting to see who the tire expert was and what he was saying in his report to determine who would be the best fact witnesses to call, particularly on the design side, to deal with whatever one could say about manufacturing through some knowledgeable witness." (*Id.* at 147.) Ms. Helm confirmed it was in fact true and that Michelin waited until after Plaintiffs' tire expert's report was served to name Glazener and Patrick as fact witnesses "so that

---

[40] Although Michelin only identified Patrick and Glazener at the end of discovery as experts, it simultaneously proclaimed they were not actually experts subject to the requirements of Fed. R. Civ. P. 26(a)(2)(B).

48

MR 0554

[Michelin] identified fact witnesses who could address the issues in his report."[41] (*Id.* at 223.) But Glazener and Patrick were never identified as fact witnesses. In response to the Court's concern at the sanctions hearing that Glazener and Patrick should have been identified earlier as fact witnesses, and while maintaining they are fact witnesses, Michelin responded that "it was a timely identification as to experts." (*Id.* at 133:22-23.)

Michelin identified Mr. Patrick as a Michelin corporate representative expected to testify regarding the design of the subject tire and related issues. (Doc. 232-14 at 4.) Mr. Patrick was disclosed as having technical knowledge and experience regarding the following areas: tire components and nomenclature; tire design generally; the developmental design process; monitoring of tire quality and performance; and industry standards and practices regarding tire design. *Id.* Despite counsel's statement at the September 19th sanctions hearing to the contrary, Michelin also designated Mr. Patrick to testify that "the subject tire's design was not defective." *Id.* Michelin further stated that Mr. Patrick "may also be called to address issues raised by plaintiffs' experts." (Doc. 232-16 at 18.)

Michelin identified Mr. Glazener as a Michelin corporate representative expected to testify regarding the manufacture of the subject tire and related

---

[41] Michelin maintains this was its strategy despite Ms. Helm's representation at the December 20th hearing that "I'm national discovery counsel for Michelin, and ... I can take a one-in-three shot as to who their expert is and get it right, at least I – you know, and I probably know what his theories are and I haven't even seen the tire yet." (Dec. 20, 2010 Disc. Hr'g Tr. 34:20-35:1, Doc. 104.)

MR 0555

issues. (Doc. 232-14 at 4.) Mr. Glazener was disclosed as having technical knowledge and experience regarding the following areas: tire components and nomenclature; tire design generally; manufacturing and quality assurance processes in place at the Ardmore, Oklahoma plant at the time the subject tire was manufactured; the Ardmore, Oklahoma manufacturing plant generally; industry standards and practices regarding tire manufacturing; and MNA generally. *Id.* Michelin further stated that Mr. Glazener "may also be called to testify in rebuttal regarding issues raised by plaintiffs' experts." (Doc. 232-16 at 19.)

Plaintiffs have separately filed motions to exclude the testimony of Messrs. Patrick and Glazener. Therefore, the Court will address the admissibility of testimony of these witnesses in a separate order. However, the Court is troubled by Michelin's extremely late identification of Messrs. Patrick and Glazener, to the extent they qualify solely as fact witnesses and finds that such a late identification was not in good faith and provides further indication of Michelin's pattern of discovery abuse.

## H.   Prejudice to Plaintiffs

As Michelin recognized at the sanctions hearing, the issue in this case is whether the Bates tire was defective – either defective in its design or in its manufacturing – and therefore unreasonably dangerous. The wide array of documents Michelin withheld, is potentially still withholding, and has

50

unquestionably previously destroyed under its internal document "retention" policy, all go to determining this issue. Michelin claims that the Plaintiffs have not been prejudiced in preparing their case to a jury on the merits of the claim because all extant documents have now been produced.

Michelin's conduct has certainly resulted in delay and disruption of this litigation and has hampered the enforcement of this Court's discovery Orders. *See Malautea v. Suzuki Motor Corp.*, 987 F.2d at 1540 (finding that defendants engaged in an unrelenting campaign to obfuscate the truth by improperly objecting to interrogatories, providing incomplete, evasive and unreasonably narrow discovery responses, delayed compliance with court orders and thus hampered the discovery process and showed disdain for the court's orders). First, Michelin's initial production refusal followed by its ongoing delay and obstruction of discovery central to the case have affected the integrity of the legal process. For example, Michelin's misrepresentations at the December 20, 2010 discovery hearing regarding its production of reaction limits and tolerances resulted in a substantive error in the January 3, 2011 Order that was perpetuated by Michelin's counsel's failure to correct the Court's misunderstanding about what documents had actually been produced. Michelin refused to produce the documents until ordered to do so by the Court on September 19, 2011, thereby precluding the Plaintiffs from seeking a more expansive production of these documents for over a year and a half. Moreover, Michelin seeks to limit

51

MR 0557

Plaintiffs' potential recovery on the grounds that there is no evidence to support a claim for punitive damages after attempting to withhold the very documents on which Plaintiffs rely to demonstrate a conscious indifference to the tire's defective design and manufacture. (Sept. 19, 2011 Sanctions Hr'g Tr. 54, Doc. 230.)

Second, Michelin delayed producing its most relevant documents and data for over a year and a half while seeking to exclude the testimony of Plaintiffs' tire expert, in part, on the grounds that his opinions are based on insufficient or unreliable data. (Doc. 203, 204) Yet, Michelin refused to produce documents and data that might potentially support Plaintiffs' expert's opinions regarding the defectiveness of the subject tire.

Finally, Michelin's dilatory discovery gamesmanship has hampered Plaintiffs' pursuit of a swift judicial process to provide a remedy addressing the extreme nature of Mr. Bates' physical injuries. Plaintiffs' steadfast efforts to move this case forward to resolution at trial, including their streamlined discovery[42], has been needlessly deferred by Michelin's haggling and endless parsing over the production of its evidence on its own time schedule. Not only has this delay and disruption of the litigation prejudiced Plaintiffs, it demonstrates Michelin's bad faith. *Byrne v. Nezhat*, 261 F.3d at 1121. Thus, Michelin's course of conduct described herein warrants the imposition of

---

[42] Plaintiffs submitted only one set of Interrogatories and Request for Production of Documents and took a limited number of fact depositions.

52

MR 0558

sanctions to remedy the impact of repeated violations of the Court's Orders, inaccurate representations to the Court, and prolonged abusive discovery conduct.

## III.  Conclusion

The Court does not impose sanctions lightly and has taken great care in the review of the record before it in its determination of this matter.  The pattern of abuse by Michelin is extremely troubling.  The Court is obligated to uphold the integrity of the legal and discovery process to ensure that Plaintiffs here and all parties have the opportunity to fairly present their claims in a reasonably efficient and prompt manner.  Plaintiffs would not have uncovered the majority of the most probative documents in existence in this case but for their persistence in pursuing discovery motions and seeking the Court's intervention.  Contrary to Michelin's assertion that this belated production demonstrates its good faith, it is precisely this ongoing belated production, in conjunction with Michelin's multiple violations of the Court's Orders and its evasive, hair-splitting and inaccurate representations to the Court that demonstrate Michelin's bad faith and why a serious, substantive sanction is warranted.

A determination that the tire at issue in this case is defective and unreasonably dangerous is an appropriate sanction to remedy the discovery abuses perpetrated by Michelin in bad faith and in disregard of this Court's prior discovery Orders.  First, Michelin made multiple misrepresentations to the Court

53

MR 0559

that it had produced documents as ordered by the Court when it in fact had not. Second, Michelin repeatedly refused to produce documents in direct violation of the Court's January 3rd, June 3rd and June 24th Orders.  Third, Michelin intentionally engaged in an extremely narrow, unjustified interpretation of the Court's Orders in order to limit, or altogether avoid, producing relevant and useful documents in response to Plaintiffs' discovery requests.

Furthermore, a finding that the tire was defective and unreasonably dangerous is properly tailored to address Michelin's sanctionable discovery conduct as set forth below:

- Michelin's failure to produce adjustment codes and data:  This is the second round of the parties' dispute over the production of the adjustment codes and data.  After the Court's June 24, 2011 Order sanctioning Michelin for its improper redaction of the adjustment codes and failure to produce the documents necessary to interpret the list of adjustment codes and conditions, Michelin again failed to produce all documents ordered by the Court.  Despite its spirited representations to the Court on July 7, 2011, that all the adjustment codes had been produced as ordered on June 13, 2011, an additional 113 adjustment codes had been withheld and later had to be produced.  While this initial failure may not have been intentional, Michelin's repeated misrepresentations to the Court during the course of discovery call into serious doubt the credibility of Michelin's assertions that the failure to produce the

54

MR 0560

adjustment code documents was an innocent, inadvertent mistake that would have been cured without Plaintiffs pointing to gaps in the production.

Moreover, after providing Plaintiffs with a complete list of the codes and conditions for adjustment, Michelin was required to produce the data demonstrating the number of tires returned under Michelin's adjustment process. Subsequent to the Court's June 24, 2011 Order directing Michelin to "produce all available tire adjustment data and the internal manuals Michelin uses for classifying or discussing the conditions and issues arising in connection with the application of the specific adjustment codes," (Doc. 173 at 11), Michelin instead produced an indecipherable chart along with a glossary created for the litigation.

Despite being previously sanctioned for producing a meaningless list of adjustment conditions without the necessary interpretative documents, Michelin again produced a chart of adjustment data that could not even be interpreted by Michelin's own in-house expert. Mr. Patrick testified that Michelin does not analyze its adjustment data in the format produced to Plaintiffs in this litigation and confirmed that the adjustment data, if presented in a meaningful format, could be used to determine whether (and how many) tires were being returned for conditions resulting from a manufacturing or design issue, whether Michelin was aware of such conditions in the tire, and whether any changes were made to the tire as a result of a high return rate. Michelin's production of the adjustment

55

MR 0561

data in this indecipherable format flies in the face of the Court's June 24, 2011 Order warning Michelin "that any failure to respond fully in producing these documents and tire data may result in the imposition of sanctions, including ... determination of issue preclusion relative to the tire defect at issue." (Doc. 173 at 11.)

- Michelin's failure to produce reaction limits and tolerances: The reaction limits and tolerances used by tire builders to determine whether and how much a tire deviates from its manufacturing specifications and whether the tire must be scrapped are directly probative of the defect issue. Nonetheless, Michelin's counsel allowed the Court and Plaintiffs to rely on her inaccurate statements at the December 20, 2010 discovery hearing that the reaction limits and tolerances had been produced in the design file, when they in fact had not been. When counsel realized she had misled the Court after her review of the Court's January 3, 2011 Order upon immediate receipt, she failed to contact the Court or Plaintiffs' counsel to clarify this seminal issue. Even after Plaintiffs discovered the error during the July 28, 2011 deposition of Mr. Patrick who testified that the file did not contain the reaction limits or tolerances, Michelin refused to produce relevant documents until ordered by the Court after the September 19, 2011 sanctions hearing.

MR 0562

• Michelin's failure to produce documents responsive to RPD 50 as compelled on January 3, 2010:

For nearly two years Michelin failed to produce 700 pages of relevant documents in response to RPD 50 requesting information discussing specific defects that may arise in a tire's components and processes based on Michelin's self-imposed limitation of the temporal scope of the Court's January 3, 2010 Order.   Despite Michelin's repeated insistence at the December 20, 2010 discovery hearing that it was not attempting to limit the scope of Plaintiffs' discovery requests so that it was left having to produce nothing, Michelin's counsel's statements at the September 19, 2011 sanctions hearing confirmed that Michelin knew there were very few documents still in existence within the 1998-2001 time frame.   Thus, Michelin's convenient "interpretation" of the Court's January 3, 2011 Order compelling production of "the requested documents for the components and processes at issue" as being subject to the 1998-2001 temporal scope, was calculated to justify its withholding hundreds of documents that were unquestionably responsive to Plaintiffs' request.

Because the adjustment codes and data, reaction limits and tolerances, and the documents responsive to RPD 50 all specifically relate to Plaintiffs' claim that the tire at issue was defective, an order establishing that the subject tire was defective and unreasonably dangerous as manufactured and sold to Plaintiffs is

57

MR 0563

narrowly tailored to remedy Michelin's violations and therefore appropriate under Fed. R. Civ. P. 37(b). *See Ins. Corp. of Ireland*, 456 U.S. at 707.

Michelin objects to Plaintiffs' sanctions request on the grounds that Plaintiffs did not first initiate a "meet and confer" on each of these discovery issues. The Court previously rejected this argument in its June 24, 2011 Order, and found that Michelin was obligated to comply with the Court's January 3, 2011 Order compelling the production of the documents and that no "meet and confer" session was required prior to Plaintiffs seeking sanctions for Michelin's failure to fully comply the Court's prior orders.[43] *Malautea*, 987 F.2d at 1542-43 (finding that defendants "richly deserved the sanction of default judgment" where the discovery orders clearly encompassed the information requested by plaintiffs"); *In re Sunshine Jr. Stores*, 456 F.3d at 1306. In addition, Michelin received more than adequate notice from (1) the Court's multiple warnings that it would not tolerate any further hampering of the discovery process or violations of its Orders; (2) Plaintiffs' multiple sanctions requests; and (3) its own flagrant disregard of the federal discovery rules and the Court's discovery orders. *In re Sunshine Jr. Stores*, 456 F.3d at 1306. Therefore, the sanction of issue preclusion is warranted by the record in this case. Finally, the Court's previous monetary

---

[43] Moreover, after the Court entered the January 3, 2011 Order compelling production of the various RPDs, Plaintiffs contend they had no reason to believe that documents were being withheld. Plaintiffs were unaware that other internal Michelin documents existed until the deposition of Michelin's in-house expert Glazener — six months later — who testified about his knowledge of certain documents based on his past work as the Ardmore plant manager. Michelin did not identify Mr. Glazener as a witness until close to the end of discovery.

MR 0564

sanction did not serve to remedy Michelin's cavalier attitude toward its obligations to comply with the Court's Orders and the discovery process.

In sum, Michelin's bad faith conduct caused serious prejudice to the integrity of the legal process and to Plaintiffs' orderly, effective development and proof of their case. Michelin's course of conduct described herein warrants the imposition of sanctions to remedy the impact of repeated violations of the Court's Orders, inaccurate or false representations to the Court, and prolonged abusive discovery conduct. Under the circumstances presented here, a finding of issue preclusion as to the subject tire's defective and unreasonably dangerous condition is authorized as an appropriately tailored sanction remedy. *See Ins. Corp. of Ireland*, 456 U.S. at 707. However, the Court declines to move beyond this serious sanction and will not impose Plaintiffs' additional request for an issue preclusion determination that the subject tire failed as a result of its defective and unreasonably dangerous condition.[44] The sanction applied is sufficient under the circumstances to address the scope of Michelin's discovery abuse.

---

[44] The Court recognizes that Michelin has now produced a more complete set of documents and data in response to Plaintiffs' Requests for Production and the Court's Orders. Though the credibility of Michelin's representation as to the completeness of this production remains in question for the reasons discussed in this Order, the Court has recognized Michelin's corrective production as a factor in its decision to refrain from imposing Plaintiffs' requested sanction of total issue preclusion — a determination that the tire failed *as a result of* its defective and unreasonably dangerous condition. That determination would be the death knell of any Michelin defense to liability. Instead, the Court has left open the question of whether the failure of the tire in fact was the proximate cause (or partial cause) of Mr. Bates' car accident.

59

MR 0565

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Sanctions [Doc. 180, 181]. The court further **DIRECTS** Michelin to submit an unredacted copy of MNA 9234-9271 for the Court's *in-camera* inspection. Finally, Plaintiffs may file a petition for reimbursement of their attorney's fees associated with their second request for sanctions pursuant to Fed. R. Civ. P. 37 (b)(2)(C) within 15 days of this Order. Michelin may file its objection, if any, to the reasonableness of the fees requested by Plaintiffs within 15 days after receipt of Plaintiffs' petition.

It is so **ORDERED** this 13th day of January, 2012.

AMY TOTENBERG
UNITED STATES DISTRICT JUDGE

60

MR 0566

# EXHIBIT B

MR 0567

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | §<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | §<br>§ | |
| | §<br>§ | 134TH JUDICIAL DISTRICT |
| vs. | §<br>§ | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | §<br>§<br>§ | **(Oral Argument Requested)** |
| | §<br>§ | |
| DEFENDANTS, | § | |

## SEPARATE STATEMENT OF MOVING COUNSEL DAVID C. SHAPIRO

Undersigned counsel represents and certifies that, after numerous personal consultations, written, e-mail and in-person correspondence, and good faith efforts, Plaintiffs' counsel has been unable to obtain the requested documents outlined in Plaintiffs' Requests for Production.

Since April 2015, Plaintiffs have requested critical evidence concerning the design, manufacture and inspection of the subject LTX M/S tires made at Dothan, AL. *Request for Production attached as Exhibit A to Plaintiffs' Motion.* In response, Michelin produced next to nothing. *Defendant's Responses, Exhibit B.* On May 11, 2015, after the hearing, Plaintiffs met and conferred with defense counsel about Michelin's lack of production. In response, Plaintiffs were **repeatedly** promised by defense counsel that if Plaintiffs *just signed* Michelin's Protective Order, they would get the remaining documents. Michelin's position was repeatedly confirmed by Plaintiffs counsel in correspondence following this meet and confer:

> Your email is correct that **MNA anticipates being able to make its supplemental production <u>within 10-14 days of the protective order being entered.</u>**

*E-Mail from **Nelson Mullins**, counsel for MNA, May 28, 2015, Exhibit C to Plaintiffs' Motion.*

> [W]e will move forward with the agreed protective order and with **our supplemental production, which we would anticipate making within 10-14 days of entry of the protective order**.

*E-Mail from **Nelson Mullins**, counsel for MNA, May 29, 2015, Exhibit D to Plaintiffs' Motion.*

> **We are working on the production and still anticipate making it within 10-14 days of entry of the protective order** as originally estimated.

*E-Mail from **Nelson Mullins**, counsel for MNA, June 4, 2015, Exhibit E to Plaintiffs' Motion.*

In view of Michelin's assurances, Plaintiffs executed it. It was a bait and switch. Michelin's production failed to produce about forty (40) of the fifty (50) requests for production. So, on **July 16, 2015**, Plaintiffs informed Michelin that their production was deficient and that they would seek assistance from the Court. Michelin did not reach out. Not even by phone, e-mail or letter. So, on **August 3, 2015**, Plaintiffs sent another letter. **Still nothing**. The next day, on **August 4, 2015**, undersigned counsel contacted defense counsel about the deficient disclosure and was informed that the attorney in charge of Michelin's discovery was no longer working on the case but no reason was provided.

Undersigned counsel then contacted Michelin other counsel and informed said counsel about Michelin's lack of production and inquired about discovery counsel's removal. Still, no explanation was given in return. Still, undersigned counsel was not offered any additional production. Rather, undersigned counsel was told to negotiate with Michelin. Yet, again, undersigned counsel wrote to Michelin's counsel. Still, no additional production.

Refusing to give up, the next day, **August 5, 2015,** Plaintiffs' counsel Luis Guerra called and also wrote to Michelin's counsel about its deficient disclosure. *Correspondence, Exhibit F*

2

MR 0569

*to Plaintiffs' Motion to Compel.* In response, Plaintiffs' counsel got no documents and was told that Plaintiffs needed to ***negotiate*** the discovery with Michelin.

On **August 17, 2015,** during a break at the depositions of the driver and his family, undersigned counsel again discussed this issue with defense counsel in Dallas, Texas. In response, undersigned counsel was again told that they should know the process by now having done it in *Velo*, and that defense counsel had no authority to commit to production. It needed to be negotiated with Michelin.

Given the numerous meets and confers, Plaintiffs had with defense counsel – all to no avail – Plaintiffs filed their Motion to Compel. Since that date, Plaintiffs have exchanged additional correspondence attached to as *Exhibit H to Plaintiffs' Reply.* In such correspondence, Plaintiffs outline all of the good faith efforts they have made to meet and confer with Michelin.

Therefore, as proven above, Plaintiffs' counsel has bent over backwards and met and conferred with Michelin's counsel over and over and over – since May of 2015 – concerning its April 2015 Request for Production.

David C. Shapiro

3

MR 0570

# EXHIBIT C

MR 0571

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DAVID SALINAS and | § | |
| GRACIELA SALINAS, | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | **CIVIL ACTION NO. 2:12CV187** |
| | § | |
| MICHELIN NORTH AMERICA, INC. | § | |
| and BF GOODRICH in its assumed or | § | |
| common name, | § | |
| DEFENDANTS. | § | |

## PLAINTIFFS' MOTION TO COMPEL DISCOVERY

TO THE HONORABLE JUDGE OF SAID COURT:

Come now Plaintiffs, David and Graciela Salinas ("the Salinas family") in the above-captioned cause and file Plaintiffs' Motion to Compel Discovery, and would show the Court as follows.

### I.    General Background and Standard

1.    On June 4, 2011, in Nueces County, the tread peeled off of the left front tire mounted on David Salinas' Ford F-350 pickup, which resulted in an injury-causing crash. *Doc. No. 9-2; Doc. No. 34-1 pp. 45-46, 48; Doc. No. 30-2, pp. 2, 8, 12, 27.* The failed tire was a BF Goodrich All Terrain T/A made in the 19th week of 2007 by Michelin at its Tuscaloosa, Alabama plant. *Doc. No. 34-1 pp. 18, 42.* In the course of discovery, the Salinas family sought the production of a limited number of specifically identified

1

MR 0572

documents which Michelin has refused to produce based on Michelin's claim of trade secrecy. The Salinas family now seeks an order compelling production.

2. Rule 34 of the Federal Rules of Civil Procedure provides that a party may request another party to produce "any designated documents." Fed. R. Civ. P. 34(a)(1)(A). Rule 34 is balanced against Rule 26, which provides that where information sought is alleged to be "a trade secret or other confidential research, development, or commercial information," the court may order either that the information "not be revealed, or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). The official comments to Rule 26 confirm that alleged trade secrets are entitled to only a very limited protection against discovery:

> The courts have not given trade secrets automatic and complete immunity against disclosure, hut have in each case weighed their claim to privacy against the need for disclosure. Frequently they have been afforded a limited protection.

Fed. R. Civ. P. 26(c) cmt. In "most cases the key issue is not whether the information will be disclosed but under what conditions, as the Supreme Court has recognized. The need for the information is ordinarily held paramount but reasonable protective measures are supplied to minimize the effect on the party making the disclosure." 8 Charles Alan Wright, Arther R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2043, p. 252 (3d ed. 2010). Orders prohibiting "any disclosure of trade secrets and confidential commercial information are rare." *Federal Open Market Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 363 n. 24, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979).

2

MR 0573

3.      This process for the discovery of alleged trade secrets was recently discussed in

*M–I LLC v. Stelly*:

> It is "well settled that there is no absolute privilege for trade secrets and similar confidential information." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2043 (2d ed.1994). Rather, federal courts follow a similar scheme in determining whether and how to order the disclosure of trade secrets or other confidential information. First, the party seeking protection must establish that the relevant information falls within the provision of this rule. *Id.* "'[T]he burden is upon [the party seeking the protective order] to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'" *Sanchez v. Property & Cas.*, 2010 WL 107606, at *1 (S.D. Tex. 2010) (quoting *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir.1998)). ... If the party seeking protection establishes that the information sought is both confidential and that disclosure would cause harm, then the burden falls on the opposing party to "establish that the information is sufficiently relevant and necessary" to its case to outweigh the harm that disclosure may cause. 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2043 (2d ed.1994). "'It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure. Likewise, if the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial court's discretion.'" *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 269 (6th Cir.2010) (quoting *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir.1981)).

*M–I LLC v. Stelly*, 733 F.Supp.2d 759, 801-02 (S.D. Tex. 2010); *see also Oldendorff Carriers GmbH & Co., KG v. Grand China Shipping (Hong Kong) Co., Ltd.*, 2013 WL 1867604, at *2 (S.D. Tex. Apr 22, 2013) (Corpus Christi Div.).

## II.      Training Materials for Michelin's Tire Designers

4.      The failed tire mounted on David Salinas's pickup was designed ███████████

3

MR 0574

███████████████████████████████████████████

████████████████████████



ETEC = nyon cap ply



1  Tread pattern and aggressive sidewall appearance
   adapted from our legendary SCORE Baja
   Series-dominating tires
2  Dual-compound tread and optimized tread contact patch
   help reduce squirm and minimize surface temperatures
3  ETEC System™ (Equal TEnsion Containment System)
4  Raised outline white letters or reversible black letters look
   great on all SUVs, pickups and other popular light trucks
5  Two-ply polyester carcass in single strand beads
   (single wire wrapped continuously)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

5.  Among other causes of action, this case involves claims for negligent tire design, negligent tire designer training, and breaches of Michelin's own internal tire design standards. *Doc. No. 12 ¶¶ 57, 71, 77-78, 80.* In fact, Michelin's tire design witness testified that █████████████████████████████████████████



4



Michelin's tire manufacturing expert also confirmed this

MR 0576



6.      The significance ██████████████████████████████████████

MR 0577



. These tire design school documents are critical to fully understanding the issues raised in this case. ████████████████████

████████████████████████ Accordingly, the Salinas family asks this Court to order production of Michelin's tire design documents,[2] and the family has no objection if these documents are ordered produced according to the agreed confidentiality order entered in this case.

### III. Michelin's Decision Tree (a/k/a Aspect Specification) Documents

7. The Salinas family's pleadings and expert have identified a number of manufacturing defects in the tire at issue, including premature oxidation of the tire's

---

[2] ████████████████████████████████████████

MR 0578

rubber, liner pattern marks that should have been cured out of the tire, air pockets trapped between the tire's components, sloppy placement and splicing of the steel belts, and poor rubber bonding in the steel belts and carcass. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████



MR 0579



8.    The Salinas family's complaint expressly sets forth these decision tree documents as Michelin's manufacturing standards applicable at the Tuscaloosa plant where the tire at issue was made, and Michelin's understaffing of the quality control personnel at the plant is one of the Salinas family's specific complaints:

> Michelin inadequately staffed the quality control operations at its Tuscaloosa plant and assigned too many quality assurance tasks for each of the limited number of quality control personnel.

*Doc. No. 12 ¶ 79; see also id. ¶¶ 34-37.*

9.    Michelin has produced this



In a prior case, Judge Orlando Garcia addressed the critical nature of obtaining these documents in discovery:

> Michelin's inspection practices are an issue in this case.    Michelin's corporate representative testified that the Ardmore plan was producing 32,000 tires a day when the tire in question was manufactured, or more than 22 tires per minute.    The corporate representative testified that 15 inspectors examined the 22 tires per minute, although other witnesses indicate that there were no more than nine inspectors.    Even with 15

9

MR 0580

inspectors, each inspector would have approximately 40 seconds to examine each tire. The corporate representative testified that inspectors were supposed to identify all of the defects referenced in the decision tree manual as well as other issues, such as dirt or crayon marks on the tire. The corporate representative testified that the decision tree documents set forth, as a "ballpark estimate," between 30 and 40 different pass-fail standards which each tire was supposed to pass during the inspection. Plaintiffs argue that the jury would be misled by believing that the inspectors had to inspect each tire according to only eight pages of decision tree documents, when in reality, they had no more than 40 seconds to inspect the tires according to 30-40 different criteria set forth in the decision tree documents. Thus, plaintiffs argue that all the decision tree documents applicable at the time the tire was made are relevant.

The Court agrees. The Court's order is clear. It is not up to Michelin to determine which of the decision tree documents are relevant.

*Ex. 6 (Ramirez v. Michelin N. Am., Inc.*, No. SA-07-CA-1032-OG (W.D. Tex. July 27, 2009); *see also Ex. 7 (Ramirez v. Michelin N. Am., Inc.*, No. SA-07-CA-1032-OG (W.D. Tex. June 20, 2009) ("The Court finds that the plaintiffs' need for the documents outweighs the potential harm of disclosure to Michelin."). Accordingly, the Salinas family asks this Court to order unredacted production of Michelin's Aspect Specification manual ███████████████████████ and the family has no objection if these documents are ordered produced according to the agreed confidentiality order entered in this case.

### IV. Michelin Employees' Recorded Statements and Testimony about Manufacturing Practices and Conditions at the Tuscaloosa Plant

10. Michelin's corporate representative designated to testify about manufacturing conditions at the plant confirmed Michelin's awareness of prior statements regarding

10



In numerous prior cases, Michelin has offered corporate representatives witnesses to address the manufacturing conditions and practices at its Tuscaloosa plant, and in many of these cases, tire builders and tires inspectors from the plant have given statements or testimony about conditions they eyewitnessed [4]

Statements from a defendant's employees are discoverable when they do not reveal attorney work product prepared in anticipation of litigating the case, and such statements are often discoverable even when they require production of such work product. *See Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 584 (S.D. Tex. 1996); 8

_____

[4] ████████████████████████████████████████████

MR 0582

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2026 (2d ed. 2009) (recognizing "a substantial body of authority" for production of "statements taken from witnesses at about the time of the occurrence" described in the statements). In this case, the Salinas family is willing to remove any possibility that the discovery request calls for any work product by seeking employee and ex-employee statements and testimony that predates the tire failure and crash at issue.

11.     As one example of why the eyewitness testimony is pivotal in this case, ███



MR 0583

███████ This circumstance is especially critical in this case because temperatures in Tuscaloosa reached into the 90s during the week the tire was made May of 2007. *Ex. 11.* The danger of either a drop of the tire builder's perspiration or a drop of condensation from the air conditioning unit at the Tuscaloosa plant creates a grave risk ███████

███████ Accordingly, the Salinas family asks this Court to order Michelin to produce the statements and testimony of its Tuscaloosa employees and ex-employees

MR 0584

who testified at any time from May of 2007 (when the tire was made) through June of 2011 (when the crash occurred) where any of the following topics[5] were addressed:

- Michelin's use or evaluation of the use of bloomed rubber stock or rubber-coated components in the 1st or 2nd stage building of radial light truck tires made by Michelin;

- Michelin's use or evaluation of the use of solvent in the 1st or 2nd stage building of radial light truck tires made by Michelin;

- Michelin's use or evaluation of the use of awls or other tools used to release trapped air in the 1st or 2nd stage building or the final finish/classification/cured tire repair of radial light truck tires made by Michelin;

- Michelin's use or evaluation of the use of ply stock pricking used to release trapped air during tire building or tire component building processes for repair of radial light truck tires and radial light truck tire components made by Michelin;

- Michelin's use or evaluation of the use of tarps or water collection containers to re-direct or collect rainwater or air conditioning leaks within the tire building rooms where radial light truck tires have been made by Michelin;

- the causes or effects of belt misplacement and out-of-specification belt splicing in radial light truck tires made by Michelin;

- the causes or effects of inconsistencies in innerliner gauge and out-of-specification innerliner splicing in radial light truck tires made by Michelin;

- Michelin's use or evaluation of the use of rejected materials to build tires despite the fact that those components had previously been scrapped;

- the manufacturing causes of separations between belts in radial light truck tires;

- the causes or effects of trapped air or trapped steam between rubber or rubber coated tire components;

---

5

14

MR 0585

- Michelin's evaluations and internal discussions of liner pattern marks or other processing marks that remain visible between rubber or rubber coated components of a separated cured tire;

- Michelin's use or evaluation of the use of various different standards and increased or decreased tolerances for belt width, belt-to-tread width ratios, belt rubber coverage, belt placement, belt centering, and belt splicing; or

- Michelin's use or evaluation of the use of various different standards and increased or decreased tolerances for innerliner gauge, innerliner uniformity, innerliner shadowing, and innerliner splicing.

12.    Given the key significance of such eyewitness testimony of those Michelin employees who worked at the Tuscaloosa plant, the Salinas family also asks this Court to order Michelin to identify those tire builders and tire inspectors who were employed by Michelin during the 19th week of 2007 (when the tire at issue was made). Specifically, the Salinas family asks for the names, contact information (all known current phone numbers and addresses or last known contact information if current information is unknown), job title, and confirmation whether the employee is a past or current employee. Although the Salinas family has specifically requested this information,[6] Michelin should have disclosed "the name and, if known, the address and telephone number of each individual likely to have discoverable information" even in the absence of such a discovery request. Fed. R. Civ. P. 26(a)(1)(A)(i); *Vickers v. General Motors Corp.*, No. 07-2172 MI/P, 2008 WL 4600997, *3 (W.D. Tenn. Sept. 29, 2008) (in a product liability case, the scope of discovery includes "employees' names, addresses, and

---

[6] This information was requested in Plaintiffs' First Amended Interrogatories to Defendant, Michelin North America, Inc., interrogatory 6. *See Ex. 12 p. 6-7.*

15

MR 0586

telephone numbers" and a general description of the employees' jobs); *see also Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 555 (Tex.1990) ("a party may discover facts known by an employee"); *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 155 (Tex. App.-Fort Worth 2002, orig. proceeding) ("If employees obtain factual information relevant to a case simply by virtue of their employment as employees, rather than as consulting experts, that information is discoverable.").

## V. Design and Manufacturing Tolerances

13.    The Salinas family brings both design defect claims and manufacturing defect claims in this case, and proof of "a deviation from the manufacturer's specifications or planned output serves the essential purpose of distinguishing a manufacturing defect from a design defect." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42 (Tex. 2007). Michelin's corporate witness designated to testify about tire design issues confirmed that



16

MR 0587



...

17



14. Because the design and manufacturing tolerances are necessary to fairly adjudicate whether the tire deviates, in its construction or quality, from the planned output, the Salinas family asks the Court to compel production of the design and manufacturing tolerances applicable to the subject tire.[7] Specifically with regard to the tolerances for BF Goodrich All Terrain T/A tires made by Michelin at its Tuscaloosa plant, the Salinas family asks the Court to compel production of



---

[7] These materials were requested in Plaintiffs' Amended Notice of Deposition of Hank Watkins (with subpoena duces tecum), request 2. *See Ex. 8 p. 5.*

[8]

MR 0589



19



*Ex. 1 p. 68-71.* The Salinas family also asks the Court to compel production of Michelin's FMEA and DFMEA documents.

## VI. Prayer

WHEREFORE, the Salinas family respectfully prays that this Court will grant Plaintiffs' Motion to Compel Discovery and order production of the information and materials as requested above.

Respectfully submitted this 23rd day of July, 2013.

By: /s/ Anthony F. Constant
Anthony F. Constant
State Bar No. 04711000
**CONSTANT LAW FIRM**
800 N. Shoreline Blvd., Ste. 2700 South
Corpus Christi, Texas 78401
Tel: (361) 698-8000
Fax: (361) 887-8010
afc@constantlawfirm.com

ATTORNEY-IN-CHARGE FOR PLAINTIFFS

John Blaise Gsanger
Federal I.D. No. 20883
State Bar No. 00786662
**EDWARDS LAW FIRM**
1400 Frost Bank Plaza (78470)
P.O. Box 480
Corpus Christi, TX 78403-0480

MR 0591

Tel: (361) 698-7600
Fax: (361) 698-7614
jgsanger@edwardsfirm.com

Charles L. Barrera
State Bar No. 01805500
**BARRERA & BARRERA**
700 E. Second Street
Alice, Texas 78332
Tel: (361) 664-2153
Fax: (361) 668-8023

**OF-COUNSEL FOR PLAINTIFFS**

**CERTIFICATE OF CONFERENCE**

The parties have conferred exhaustively and have been unable to reach an agreement.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of July, 2013, the foregoing document was filed electronically via ECF in the United States District Court for the Southern District of Texas with notice of same being furnished by the Court and served upon:

Thomas M. Bullion, III
Chris A. Blackerby
Germer, Gertz, Beaman & Brown LLP
301 Congress Avenue, Suite 1700
Austin, Texas 78701
**ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.**

/s/ John Blaise Gsanger
John Blaise Gsanger

21

MR 0592

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| vs. | § § § | 134TH JUDICIAL DISTRICT DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | (Oral Argument Requested) |
| DEFENDANTS, | § § | |

# PLAINTIFFS' SUPPLEMENT
# IN SUPPORT OF ITS ORIGINAL
# (August 25, 2015) MOTION TO COMPEL

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | §<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | §<br>§ | 134TH JUDICIAL DISTRICT |
| vs. | §<br>§ | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | §<br>§<br>§ | **(Oral Argument Requested)** |
| DEFENDANTS, | §<br>§<br>§ | |

## TABLE OF CONTENTS

### PLAINTIFFS' SUPPLEMENT IN SUPPORT OF ITS ORIGINAL (August 25, 2015) MOTION TO COMPEL

**PAGE**

I. Michelin has not established that the documents and information requested are trade secrets. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998). ... 1

II. Without any basis, for months, Michelin claimed "trade secrets". ... 2

III. Price's Trade Secrets Affidavit lacks personal knowledge and therefore is of no value. *Humphreys*, 888 S.W. 2d 469, 470. ... 3

    a. The September 8, 2015 hearing ... 3

    b. Price's deposition ... 4

IV. Price's affidavit has "no probative value" and is "legally insufficient". *Humphreys*, 888 S.W. 2d 469, 470. ... 14

V. Price's conclusory affidavit fails to establish that the information requested are trade secrets. ... 14

Conclusion ... 15

1

MR 0594

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § § | 134TH JUDICIAL DISTRICT |
| vs. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | (Oral Argument Requested) |
| DEFENDANTS, | § § | |

## PLAINTIFFS' SUPPLEMENT IN SUPPORT OF ITS ORIGINAL (August 25, 2015) MOTION TO COMPEL

TO THE HONORABLE JUDGE DALE TILLERY:

**I.     Michelin has not established that the documents and information requested are trade secrets. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998).**

Michelin failed to meet its burden of establishing that the documents and information sought in Plaintiffs' discovery requests and Motion to Compel are trade secrets. Pursuant to Texas law, Michelin has the mandatory burden of proving that the information requested is a trade secret:

> **[T]he party resisting discovery <u>must</u> establish that the information is a trade secret.**

*In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998). (e.a.).

I

MR 0595

Unlike *Cont'l*, Plaintiffs have not **stipulated**[1] that the requested information constitutes trade secrets, and the Affidavit of Vaneaton Price does not establish anything.[2] As he admitted in hundreds of questions at his recent deposition (*attached in its entirety hereto as **Exhibit A***),[3] Price has no personal knowledge of the contents of his affidavit. Therefore, Michelin has failed to establish that its aspect specifications, inner liner/anti-oxidant/belt skim formulas, adjustment manuals/data/photographs, testing, design documents, and the other documents and information sought by Plaintiffs are trade secrets[4].

Accordingly, pursuant to Texas law, Michelin's trade secrets objection is baseless, of no value and legally insufficient. *Humphreys v. Caldwell*, 888 S.W.2d 469, 470-71 (Tex. 1994); *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613. Therefore, Plaintiff's Motion to Compel should be granted in its entirety.

## II. Without any basis, for months, Michelin claimed "trade secrets".

Back in April, Michelin refused disclosure by claiming "trade secrets[5]" in response to Plaintiffs' requests for production. However, Michelin provided no evidence supporting its

---

[1] Unlike the present case, in *Cont'l* and *In re Bridgestone/Firestone, Inc.*, the plaintiffs conceded and in fact stipulated that the requested information constituted trade secrets. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 615; *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003).

[2] In Texas, an affiant must prove that the facts are within said affiant's knowledge. *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994).

[3] *Deposition of Mr. Price at pp. 28-31, 50-61, 64-65, 82, 91, 109-110, 112-114, 120, 130-131, Exhibit A.* (e.a.)

[4] Such documents include but are not limited to Plaintiffs' Request for Production #1, #2, #8-9, #11-13, #15, #19-22, #24-26, #29, #32, #37, #40-42, #44-47.

[5] As Plaintiffs' counsel pointed out to the Court, Michelin got Plaintiffs' requests in April and did not provide any evidence establishing that the information constituted trade secrets:

> MR. GUERRA: Your Honor, we got this request in April. No affidavit in May, June, July until we file the motion to compel no affidavit still. Now we got this affidavit.

*September 8, 2015 Transcript from Plaintiffs' Motion to Compel Hearing at 27:13-16.*

2

MR 0596

objection. Then, after Plaintiffs' counsel signed a protective order Michelin continued their refusal to produce. So, Plaintiffs were forced to file a Motion to Compel.

**III.**    **Price's Trade Secrets Affidavit lacks personal knowledge and therefore is of no value.** *Humphreys*, **888 S.W. 2d 469, 470.**

To support its trade secrets objection and resist discovery, Michelin relied exclusively on Price's affidavit[6] which Michelin knew did not *pass muster*. In Texas, to testify about privileged information the affiant must have personal knowledge of it. *Humphreys*, 888 S.W.2d 469, 470. Price does not have personal knowledge:

a.    The September 8, 2015 hearing

At the September 8, 2015 hearing, Plaintiffs' counsel informed the Honorable Court that Michelin's affiant Price was unqualified to testify about the contents of his affidavit. As explained, Price works in Michelin's **legal department**. He is **not** a tire builder, **or** a tire manufacturer, **or** a tire designer, **or** a tire project manager, **or** a tire manufacturer, **or** a skim stock compounder, **or** a tire inspector, **or** an adjustment inspector, and therefore did not have personal knowledge or competence to testify that the information requested constituted trade secrets:

> **He works on the litigation Defendant sic [department] of Michelin** . . . And going back to the affidavit . . . [he's] **not a tire builder, not a tire manufacturer . . . not a tire designer; didn't design this tire; was not a project manager; didn't work on the plant.**

*September 8, 2015 Transcript from Plaintiffs' Motion to Compel Hearing at 30:23   32:2. (e.a.)*.

Plaintiffs' counsel further explained that Price was also not a registered professional engineer:

---

[6] Strangely, Michelin used Mr. Price's affidavit as both a sword and a shield. Michelin used the affidavit to prevent disclosure of discoverable evidence but then refused to allow Plaintiffs' to cross-examine him about the affidavit and his personal knowledge of the contents of such affidavit. The Honorable Court overruled Michelin's objection and ordered Mr. Price's deposition, which was conducted on October 22, 2015.

3

MR 0597

He is not a professional engineer in South Carolina so maybe he has some technical experience so I checked Alabama, Dothan. **No, he is not registered as a professional engineer in Dothan. He never claims to have worked at the plant in Dothan, never been at the plant** . . . They have not established any qualifications for him to say that he knows the tire . . . it's [sic] a trade secret,

*September 8, 2015 Transcript from Plaintiffs' Motion to Compel[7] Hearing at 30:23 32:9.* (e.a.).

**b.**    **Price's deposition**

Aware of Price's shortcomings, Michelin tried to block his cross-examination and refused to produce Price for deposition. So, Plaintiffs were forced to file a Motion to Compel which was granted. Deeply worried about Price's lack of personal knowledge about his affidavit's contents, Michelin contacted and retained an army of attorneys from across the country to prepare him for deposition: **1)** Kate Helm, (from Atlanta, Georgia); **2)** Michael Wiggins, (from Orlando, Florida); **3)** Duncan Sturino, (from Chicago, Illinois); **4)** Tom Bullion, (from Austin, Texas); and **5)** Nicole Buntin, (from Greenville, South Carolina).[8] These attorneys spent a minimum of seven (7) hours and some up to several days preparing the **unqualified** Price for his deposition. **It did not help Michelin.** In hundreds of admissions, under oath, Price repeatedly exposed his lack of personal knowledge about the contents of his affidavit:

**1. Price** works in the legal department defending Michelin[9]:

> **Q.** **What is your department called?**
> **A.** **I'm in the Legal Department.**
> \*\*\*\*\*
> **Q.** **All of your work as a Michelin employee in the Legal Department related to litigation?**
> **A.** **That's correct.**

---

[7] The Honorable Court allowed Plaintiffs to supplement its authority regarding skim stock/inner liner/antioxidant formulas.

[8] *Deposition of Mr. Price at pp. 22-27, Exhibit A.*

[9] *Deposition of Mr. Price at pp. 13:20-21, 62-63, Exhibit A.* (e.a.).

4

MR 0598

> **Q.** Helping defend Michelin in cases?
> **A.** I'm not sure what you mean by that.
>
> **Q.** Michelin gets sued and you help defend Michelin?
> **A.** I work on these cases, <u>yes</u>.

2. Yet, **Price** has no personal knowledge of a single (1) Michelin's trade secret policy[10]:

> **Q.** All right. Now, you <u>are not</u> the author of the policies concerning trade secret information within Michelin?
> **A.** That's correct.
>
> **Q.** Somebody else is?
> **A.** <u>I am not aware of a singular policy.</u>

3. **Price's** Affidavit was *made up* by Michelin's legal team: Price and Kate Helm – Michelin's National Discovery Counsel[11]:

> **Q.** All right. Did you write your affidavit?
> **A.** I did.
>
> **Q.** Okay. The affidavit was written by yourself; you typed it out?
> **A.** I would say that there were parts of this that I did not type. And I was given a framework. But I did the work and did the lion's share of the material that's in it.
>
> **Q.** Who gave you the framework?
> **A.** <u>Kate Helm.</u>
>
> &#42;&#42;&#42;&#42;&#42;
>
> **Q.** So the document is a combination of your work and Ms. Helms' work?
> **A.** Some of which on here came from Ms. Helm.

4. Price never worked at Dothan where the subject tire was manufactured[12]:

> **Q.** All right. You have never worked in Dothan?
> **A.** I have never had a position in Dothan.
>
> **Q.** You never had a position in Dothan in the plant itself?

---

[10] *Deposition of Mr. Price at p. 91, Exhibit A.* (e.a.).

[11] *Deposition of Price at pp. 50-52, Exhibit A.*

[12] *Deposition of Mr. Price at p. 52, Exhibit A.* (e.a.).

5

MR 0599

A. Correct.

Q. Or in the office?
A. Correct.

Q. You never worked on the assembly line in Dothan?
A. That's correct.

5. Price never worked as or has been a tire builder, or a tire inspector, or a Licensed Professional Engineer, or a skim stock compounder or a formulator for Michelin[13]:

Q. You never had a position as assembly line workers?
A. I have never been a tire builder.

Q. That's right. You've never been a class spector?
A. That's correct.

Q. You've never been a rubber formulator?
A. That's correct.
                              ******
Q. You're not licensed as a Professional Engineer?
A. That's correct.

Q. That's right. You never created any chem stock formulas for Michelin?
A. I did not.

6. Price has never been an adjustment data inspector[14]:

Q. But you have never been one, right? You don't test? You never tested the LTX M/S prior to its releasing to the market?
A. Not in that tire line, no.

Q. Okay. You've never been an adjustment data inspector?
A. That's correct.

Q. You've never been a designated Michelin inspector at these designated inspection centers?
A. That's correct.

7. Price did not author any aspect specifications, technical notes, general principles, tire non-conforming procedures, tire inspection procedures, or adjustment data policies[15]:

---

[13] *Deposition of Mr. Price at pp. 52-53, Exhibit A.* (e.a.).

[14] *Deposition of Mr. Price at p. 53, Exhibit A.* (e.a.).

6

MR 0600

Q. You didn't write the aspect specifications?
A. That's correct.
***** 

Q. How many aspect specs?
A. I don't know how many aspect specs there are.

Q. You don't know?
A. Not an exact number, no. I know there would be hundreds.

Q. I know. I don't work for Michelin. You don't know?
A. I don't know the exact number of aspect specs, no.
*****

Q. You didn't write the technical notes?
A. That's correct.

Q. You didn't author or write the tire non-conforming procedures?
A. That's correct.

Q. You didn't write or author the general principles?
A. That's correct.

Q. You didn't write or author the adjustment data codes?
A. That's correct.

Q. You didn't set up the adjustment data policies?
A. That's correct.
****

Q. For the LTX M/S line or any other line?
A. That's correct.

Q. You didn't write or author any of the adjustment data manuals of Michelin?
A. That's correct.

Q. You didn't author or write any of the tire inspection procedures?
A. I'm not sure I know what –

Q. The tire inspection procedures for the adjustment data samples.
A. Correct.

Q. You didn't write any of the Michelin tire limited warranties?
A. That's correct.

---

[15] *Deposition of Mr. Price at pp. 53-54, 130-131, Exhibit A.* (e.a.).

7

MR 0601

**8.** Price has no personal knowledge of the name or identify of a single skim stock formulator, tire builders, tire manufacturer inspectors or tire adjustment inspectors[16]:

Q. Michelin also has tire builders, right?
A. That's correct.

Q. You are not one of them, right?
A. <u>That's correct.</u>

Q. Michelin also has chemists that do chem stock formulations and rubber formulations, right?
A. <u>I don't know</u> what their backgrounds are but there are people that work for Michelin that formulate mixes.

Q. You are not one of them?
A. <u>That's correct.</u>

Q. What do you call those folks?
A. Formulators.

Q. Do you know any of them?
A. <u>Not personally.</u>

Q. Do you know their names?
A. Formulators for what?

Q. For skim stock or for rubber.
A. For what rubber?

Q. LTX M/S tires?
A. LTX M/S tires have dozens of different rubber components --

Q. I understand. This subject tire.
A. -- that are formulated by different people. <u>I don't know</u> the formulators in 2001.

Q. Tell me the name of any formulator that you know here that works on LTX M/S --
A. <u>I don't know</u> the names of the formulators that worked on the formulas and the compounds in the LTX line – the LTX M/S line.

Q. Anything.
A. <u>Not that I recall, no.</u>
*****
Q. Do you know any of the formulators or their identity?

---

[16] *Deposition of Mr. Price, pp. 53- 58, 82, Exhibit A.* (e.a.).

8

MR 0602

A.     <u>Not specifically.</u>

Q.     Not a single one?
A.     <u>Not that comes to mind for the LTX M/S2 line, no.</u>
Q.     Or the LTX M/S tire line?
A.     <u>No.</u>

*****

Q.     Who runs the Formulation Department?
A.     <u>I don't know.</u>

Q.     Who is the Manager of the Formulation Department?
A.     <u>I don't know</u> who manages the Formulation Department.

Q.     Who is director of the Formulation Department?
A.     <u>I don't know</u> the answer to that.

*****

Q.     All right. What about tire builders? Tell me the name of anyone that worked on the LTX M/S line.
A.     <u>I don't know</u> the name of the tire builder that I know worked on the LTX M/S line.

Q.     What about -- Michelin has class spectors, right?
A.     In the plant there are class spectors, yes.

Q.     You are not one of them and you've never been one of them?
A.     <u>I have not been</u> a class spector in a plant.

Q.     And did you know the name of any of the class sectors at Dothan?
A.     <u>I don't recall</u> the name of a class spector at Dothan.

Q.     Michelin also has adjustment data inspectors, right?
A.     That's correct.

Q.     You are not one of them?
A.     <u>That's correct.</u>

Q.     Tell me the name of any adjustment data inspectors in any of the designated inspection centers.
A.     <u>I do not know any.</u>

9. **Price** has no personal knowledge of the skim stock formula or even the identities of the formulators who worked on the subject skim stock formula[17]:

---

[17] *Deposition of Mr. Price at pp. 59-61, Exhibit A.* (e.a.).

9

MR 0603

Q.   That's right. <u>You do not know</u> the skim stock formula for this subject tire, right?

A.   <u>That's correct.</u>

Q.   You -- but there's folks within the company, within Michelin, that know that, right?

A.   There would be people in the company that have access to that.

Q.   And what -- who would that be? Who would those people be?

A.   People in the compounding plant and compounders.

\*\*\*\*\*

Q.   Do you know the name of any compounder or people that work on the compounding plant that know the skim stock formula for this subject tire?

A.   <u>I do not.</u>

10. Price never built a tire for public sale or ever worked on a Michelin assembly line[18]:

Q.   But you have never built a tire?

A.   <u>I have not built a tire</u> that was intended for public sale, that's correct.

Q.   That's your business, right? That's Michelin's business?

A.   That is Michelin's business.

Q.   And you have never done that?

A.   <u>I have not built a tire</u> that was intended for sale, correct.

Q.   In fact, you told me you never -- you never worked in an assembly line for Michelin ever, right?

A.   <u>I never worked as a tire builder.</u>

Q.   At a Michelin assembly line?

A.   <u>That's correct.</u>

\*\*\*\*\*

Q.   Again, not -- let's make it correct. Let's make it accurate. You never worked in the Michelin assembly line as a tire builder in any Michelin plant in the United States?

A.   That was never my job to be a tire builder in a Michelin plant.

Q.   Is that a yes or no?

A.   It's yes.

[18] *Deposition of Mr. Price at pp. 64-65, Exhibit A.* (e.a.).

10

MR 0604

**11. Price** has no personal knowledge about the turnstile, badge reader, "Cyclone fence" or vendors[19]:

Q. And what you say is that access turnstile and badge reader, right?
A. That's correct.

Q. All right. And did you write the policy concerning the turnstile and the badge reader?
A. <u>No</u>. I wrote no policy with regards to the turnstile or the badge reader.

Q. Who wrote that policy?
A. <u>I don't know</u>.

Q. Did you talk to him?
A. <u>No</u>.

Q. All right. Did you talk -- did you order the fence, the Cyclone fence?
A. <u>No</u>.

Q. Who ordered that?
A. <u>I do not know</u>.

Q. Did you talk to him, to the person that ordered it?
A. <u>I did not talk</u> to anyone about ordering the Cyclone fence.

Q. Did you talk to anybody that set the policy toward that specific eight-foot high Cyclone fence to keep the secrets out?
A. <u>I did not talk to anyone</u> about ordering the eight-foot high Cyclone fence.

\*\*\*\*\*\*

Q. All right. Who is the person that wrote the policy about vendors not allowed on the MNA premises?
A. <u>I do not know</u>.

Q. Did you speak with him?
A. <u>I did not</u>.

Q. Did you look at the policy?
A. <u>I did not</u>.

Q. Okay.
A. <u>I am not aware that there is a policy</u> other than security guidelines.

---

[19] *Deposition of Mr. Price, pp. 112-114, Exhibit A.* (e.a.).

11

MR 0605

Q. All right. Have you seen those?
A. <u>I have not.</u>

12. Price <u>has</u> <u>no</u> personal knowledge of any of the outside vendors (except attorneys) entering Michelin[20]:

Q. Okay. Thank you. You say also that MNA vendors sign confidentiality agreements before they are provided access to documents. Who are these vendors that you're talking about?
A. Any vendor of MNA would have to sign a confidentiality agreement.

Q. That's great, but I want these vendors that you're talking about. Vendors, what are the names?
A. I'm talking about anybody that provides products and services to Michelin that would come on the facility grounds.

Q. I get it. What's their names? Anyone.
A. <u>I don't have a specific name.</u>

Q. A single one?
A. Any contractor doing work at the facility.

Q. Such as?
A. <u>I don't have the name of a contractor in mind.</u>
\*\*\*\*\*\*
Q. Today, on this case, you're here on behalf of Michelin?
A. I am.

Q. As a Michelin employee?
A. That's correct.

13. Price did not talk to a single (1) Michelin tire builder, manufacturer, inspector, designer, compounder, formulator, or plant worker to draft his Affidavit[21]:

Q. Sir, just answer my question. You didn't speak to any single worker in design, build, class spec, inspector, this subject tire for your affidavit, right?
A. It was not necessary that I speak to any of those people to prepare this affidavit.

Q. Yes or no, did you speak with any of them?
A. It was not necessary and <u>I did not.</u>

---

[20] *Deposition of Mr. Price at p. 120, Exhibit A.* (e.a.).

[21] *Deposition of Price at 28-31, 109-110, Exhibit A.* (e.a.).

12

MR 0606

Q.   You did not?
A.   That's correct.

                     *****

Q.   Oaky. Anybody else that you have talked, either in preparation for this deposition or in preparation for the affidavit, related to being an employee of Michelin?
A.   Not that I recall.

Q.   Anybody from the plant in Dothan?
A.   Not in preparation for this.

Q.   Or for the affidavit?
A.   Affidavit.

Q.   Or the deposition?
A.   Or to the deposition, correct.

Q.   Anybody that works in the Chemical Laboratory for Michelin preparing formulations?
A.   No.

Q.   Any chemical engineer, licensed chemical engineer?
A.   Preparation for this?

Q.   For affidavit or depo.
A.   No.

Q.   Okay. Anybody that is Adjustment Tire Inspector at Michelin --
A.   No.

Q.   -- in preparation for deposition or affidavit?
A.   No.

Q.   Anybody that works for any of the Designated Return Centers for Michelin?
A.   No.

Q.   For either of the events; affidavit or the deposition?
A.   Not in preparation for this, no.

                     *****

Q.   Did you speak with anybody in preparation of the affidavit or the deposition that was a tire spector or tire verifier in the production lines?
A.   I am not familiar with the term "tire spector."

13

MR 0607

Q. Those guys at the Aspect Post.
A. **I did not.**

Q. Okay. Class Spector, I think that's the term that you guys use.
A. Yes, yes. **I did not talk with anyone** else in Class Spector in preparation.

\*\*\*\*\*

Q. Thank you so much. Thank you so much, Mr. Price. Anybody in the Designing Department?
A. **No.**

Q. Mr. Northrup?
A. **No.**

Q. Mr. Gruenholz?
A. **No.**

Q. Any of the designers of this specific tire in preparation for the deposition or the affidavit, did you speak to any of them?
A. **No.**

Price's deposition speaks for itself. He has no personal knowledge about the contents of his affidavit.

## IV. Price's affidavit has "no probative value" and is "legally insufficient". *Humphreys*, 888 S.W. 2d 469, 470.

Price's admitted lack of personal knowledge renders his affidavit worthless; Price's affidavit has "no probative value," is "legally invalid and therefore cannot serve as evidence in support of a claim of" trade secrets[22]. *Humphreys*, 888 S.W.2d 469, 470-71.

## V. Price's conclusory affidavit fails to establish that the information requested are trade secrets.

Price's self-serving affidavit is also filled with worthless conclusory allegations:

---

[22] As shown above, Mr. Price did not talk to a single (1) person in order to obtain the information in his affidavit:

In addition to a person's job title or position, **affiants should also explain how they became familiar with the facts in the affidavit.**

*Valenzuela v. State & Cty. Mut. Fire Ins. Co.*, 317 S.W.3d 550, 554 (Tex. App. 2010). (e.a.).; *Deposition of Mr. Price at pp. 28-31, 109-110, Exhibit A.*

14

MR 0608

**Mark, however, had the burden to establish the seismic data is a trade secret. (citations omitted). Mark has failed to make this showing, simply making the conclusory determination that the seismic data is a trade secret.**

*TXO Prod. Co. v. M.D. Mark, Inc.*, 999 S.W.2d 137, 142 (Tex. App. 1999). (e.a.).

Therefore, Michelin has not met its burden in establishing that the information sought constitutes trade secrets:

**Conclusion:** Because Texas recognizes the importance of fair adjudication of lawsuits, Michelin has the heavy and mandatory burden of establishing that the documents and information requested were trade secrets. *In re Continental*, 979 S.W. 2d 609, 612. Michelin failed to do so. Michelin **has not** established that the documents and information requested by Plaintiffs' Request for Production[23] are trade secrets as required by *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613. Therefore, immediate disclosure is required.

Moreover, Michelin's argument of concealing every internal document by simply claiming "trade secrets" has also been soundly rejected by the Texas Court of Appeals:

Lowe's has cited no authority that a party's (or even expert's) conclusory opinion that information is a trade secret or is not used industry-wide, or a party's mere desire to avoid disclosing information to others, is sufficient to establish the privilege. **Nor would there appear to be any rationale for adopting such a position as it would seemingly allow the privilege to extend to almost any internal company records.**

**Without evidence establishing any of the conventional trade secret factors with regard to the database, Lowe's has failed to demonstrate that the trial court erred in overruling its trade secret objection** to providing deposition testimony on the creation and use of the database. Accordingly, Lowe's first issue is overruled.

*In re Lowe's Companies, Inc.*, 134 S.W.3d 876, 879 (Tex. App. 2004). (e.a.).

Accordingly, since Michelin has not met its burden in establishing the documents and information requested are trade secrets, Plaintiffs respectfully request the Honorable Court to

---

[23] #1, #2, #8-9, 11-13, #15, #19-22, #24-26, #29, #32, #37, #40-42, #44-47

15

MR 0609

order the immediate disclosure of the documentation and information requested by Plaintiffs. *Id.*

*In re Cont'l Gen. Tire, Inc.*

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:    */s/ David C. Shapiro*
     Luis P. Guerra (*Admitted Pro Hac Vice*)
     AZ State Bar No. 015768
     David C. Shapiro (*Admitted Pro Hac Vice*)
     AZ State Bar No. 028056
     ATTORNEYS FOR PLAINTIFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 24th day of November, 2015:

*Via E-Mail & U.S. Mail to:*

Noel A. Sevastianos
SEVASTIANOS & ASSOCIATES, P.C.
120 So. Central Ave., Suite 130
St. Louis, MO 63105

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701

16

MR 0610

Attorneys for Defendant
Michelin North America, Inc.

*Via Mail to*:

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

/s/ David C. Shapiro

17

MR 0611

# EXHIBIT A

MR 0612

CAUSE NO. DC-14-07255

SAMUEL MEDINA and OBDULIA ) IN THE DISTRICT COURT

MEDINA, husband and wife, ) OF DALLAS COUNTY

individually; NATALYE MEDINA, )

individually; NAVIL GIBSON, )

individually, ) 134th JUDICIAL DISTRICT

     Plaintiffs, )

v. )

MICHELIN NORTH AMERICA, ) DALLAS COUNTY

INC.; AND JOSE BUSTILLO )

d/b/a MUNDO CARS, an in- )

state defendant, )

     Defendants. )

VIDEOTAPED DEPOSITION OF VANEATON PRICE

(Taken by Plaintiffs)

October 21, 2015

Reported by: Rebecca L. Arrison

              Court Reporter

              Notary Public

MR 0613

APPEARANCE OF COUNSEL:

FOR THE PLAINTIFFS:

BY:  LUIS P. GUERRA

DAVID C. SHAPIRO

LAW OFFICES OF LUIS P. GUERRA

6225 N. 24th Street, Suite 125

Phoenix, AZ   85016

(602) 381-8400

FOR DEFENDANT MICHELIN NORTH AMERICA, INC.:

BY:  THOMAS M. BULLION, III

GERMER PLLC

301 Congress Avenue, Suite 1700

Austin, TX   78701

(512) 472-0288

Also Present:

Jack Marks, CLVS

Videotaped deposition of VANEATON PRICE, taken by the Plaintiffs, at Nelson Mullins Riley & Scarborough LLP, 104 South Main Street, Suite 900, Greenville, South Carolina, on the 21st day of October, 2015, at 9:30 a.m., before Rebecca L. Arrison, Notary Public and Court Reporter.

MR 0614

CONTENTS

THE WITNESS:   VANEATON PRICE          EXAMINATION

    BY MR. GUERRA                                    5

    BY MR. BULLION                                 133

    BY MR. GUERRA                                  137

    BY MR. BULLION                                 139

INDEX OF EXHIBITS

(There were no Exhibits marked.)

MR 0615

THE VIDEOGRAPHER: We now are on the record in the matter of Samuel Obdulia, et al., versus Michelin North America, Inc., et al. Today's date is Wednesday, October 21st, 2015. The time is approximately 9:28.

This is the video recorded deposition of Vaneaton Price, being taken at the offices of Nelson Mullins Riley & Scarborough, 104 South Main Street in Greenville, South Carolina.

I'm the camera operator, Jack Marks, Certified Legal Video Specialist in association with Alderson Reporting, located at 1155 Connecticut Avenue Northwest, Washington, D.C. The court reporter is Rebecca Arrison, also in association with Alderson Reporting.

Will attorneys please identify themselves and the parties they represent, beginning with the party noticing this proceeding.

MR. GUERRA: Luis Guerra and David Shapiro for the Medina family.

MR. BULLION: Tom Bullion for Michelin North America, Incorporated.

THE VIDEOGRAPHER: And will the

MR 0616

court reporter please administer the oath.

— — —

VANEATON PRICE,

being first duly sworn, testified as follows:

. — — —

EXAMINATION

BY MR. GUERRA:

Q. Nice to see you again.

A. Nice to see you.

Q. Mr. Price, throughout this deposition, I will call you Mr. Price, and you call me anything you want. I go by Luis, but people say differently so it doesn't really matter to me. Is that okay?

A. That's fine.

Q. We met before, maybe a couple of years ago, maybe a year and a half ago in the same office, right?

A. Yes.

Q. But I did not have an opportunity to talk to you on the record, correct?

A. That's correct.

Q. You work here in Greenville, right?

A. I do.

Q. You work at the MARC Center?

A. I do not currently work at the MARC Center

MR 0617

full time, though I am there several days a week, so it wouldn't be unusual for me to be there.

Q.    Where is your office?

A.    My office is at Pelham Road.  It's the Headquarters North America building for Michelin North America.

Q.    You are the building closest to the airport?

A.    Yes, sir.

Q.    And that is Michelin North America --

A.    That's right.

Q.    -- headquarters?

A.    Yes, sir.

Q.    You don't have to call me "sir."  Say Luis or yes or whatever you want to call me.  I will call you sir, you call me whatever you want.  Deal?

A.    That's fine.  If I say "yes, sir" --

Q.    Okay.

A.    -- it's out of habit.

MR. BULLION:  People from the South say "yes, sir" and "yes, ma'am" a lot.

BY MR. GUERRA:

Q.    So would you be kind enough to tell me, please, how many folks, how many employees would you think that work at the MNA headquarters, the one, the building where you work?

MR 0618

A.   I would be totally guessing at above 1,000.

Q.   Above?

What about at the MARC Center?

A.   Same type of number.

Q.   Okay.  How far is the MARC Center from your place, from your office in Greenville?

A.   Twenty miles.

Q.   Twenty miles.

Would you consider both to be in Greenville?

A.   Yes.

Q.   Okay.  Mr. Price, I kind of jumped a little bit and I assumed you have been deposed before.  Have you been deposed before?

A.   I have not.

Q.   Okay.  In all the years that you have worked at Michelin, this is your first deposition?

A.   That's correct.

Q.   Okay.  I am sure that you had an opportunity to speak with your attorney prior to the deposition?

A.   I did.

Q.   Okay.  I'm just going to go over the -- like a brief overview of the rules.

We are here like if you were in a -- in a courtroom, and you do understand that, right?

A.   I do.

MR 0619

Q. You are under oath and you know that, right?

A. I do.

Q. I'm going to ask you questions, you provide me the answers to the best of your knowledge.

A. I will.

Q. And if you need to take a break for any reason, we'll stop it at any time.

A. Okay.

Q. Your attorney's entitled to make objections. If he wants you to make an objection, he will say it on the record, and we will just give him a little time so he can put it on the record, then I'll ask the next question or give the answer. Okay?

A. Okay.

Q. That's about it.

You are not a registered -- registered Professional Engineer?

A. I am not a licensed Professional Engineer.

Q. Or a registered Professional Engineer.

A. I don't know the difference.

Q. Okay. Good.

You are not a licensed Professional Engineer in South Carolina?

A. That's correct.

Q. Or in Alabama?

MR 0620

A. That's correct.

Q. Or in Texas?

A. That's correct.

Q. And you have never been?

A. That's correct.

Q. Okay. You're not a licensed or registered Professional Engineer anywhere in the United States?

A. That's correct.

Q. Okay. Let's talk a little bit about your preparation to write your affidavit. You understand that you're here to talk about that?

A. Yes, I am.

Q. Did you, in preparation to -- for your affidavit, did you have an opportunity to speak with anyone in preparation of that affidavit?

A. Yes.

Q. Okay. Conversations with your attorneys are not to be discussed on the record or with me; you understand that?

A. I do.

Q. All right. But I can ask you about meetings, location of meetings, times of meetings, not surprising, and things of that nature. Okay?

A. Okay.

Q. Did you have an opportunity to speak with

MR 0621

your attorney in preparation for your affidavit?

A. I did.

Q. Okay. How many times?

A. I don't recall specifically, but probably three or four.

Q. Which attorneys?

A. I talked with internal Michelin attorneys and external.

Q. Okay. Would you be kind enough to tell me their names?

A. Nicole Buntin, Kate Helm.

Q. Nicole Buntin?

A. B-u-n-t-i-n.

Q. Would you say the name again?

A. Buntin.

Q. Buntin, B-u-n-e-t-i-n?

A. No E.

Q. Okay. B-u-n-t-i-n?

A. Yes, sir.

Q. Thank you so much, Mr. Price.

And also Kate, what's her last name?

A. Helm.

Q. Thank you.

And that would be -- are those the external attorneys or are those the internal and external

MR 0622

attorney?

A. Internal and external.

Q. Okay. So Nicole would be attorney -- internal attorney, Kate would be the external attorney?

A. That's correct.

Q. Thank you so much.

Anybody else?

A. In preparation of this affidavit, I don't recall anyone else.

Q. Okay. You said, Luis, I spoke with them three or four times. With both three or four times or with one more than the other?

A. I don't recall specifically which one I talked to more or less.

Q. Did you -- I assume that with Ms. Buntin, you talked with her personally?

A. On occasion, certainly, yes.

Q. Well, would you be kind enough to speak louder for the court reporter? She is having difficulty hearing you.

A. Certainly. I will try.

Q. I sometimes have the same problem.

How many times do you think you talked to Ms. Buntin or Buntin in preparation for your

MR 0623

affidavit personally?

A. Three or four.

Q. Okay. How long would those take -- would last, let's say that?

A. A few minutes to five minutes.

Q. What about with Ms. Helm, how many times do you think you spoke with her?

A. Three or four.

Q. Would that all be telephonically?

A. I don't recall. Occasionally she's in town, but --

Q. Okay.

A. -- my recollection is that would have been telephonically.

Q. How long would those contacts would have lasted with Ms. Helm on the phone?

A. Probably the same; a few minutes to five minutes.

Q. Okay. Did you -- did you cover everybody that you spoke, attorney wise, concerning your affidavit?

A. As I recall the preparation of the affidavit, yes.

Q. Thank you so much.

What about other individuals within the

MR 0624

company in preparation of your affidavit within Michelin?

A.   I may have talked with someone in the specifications group.

Q.   Who would that be?

A.   I don't recall specifically who within the specifications group.  I just know that I gathered some numbers, and I may have talked with somebody to validate numbers and specifications; that seems reasonable, but I don't have a specific recollection.

Q.   Who would be that person that you know of?  Who do you know in the specifications group?

A.   Oh, there are several people that I know --

Q.   Tell me their names, please.

A.   -- in specifications.

Carla Wingate.

Q.   Carlo?

A.   Carla.

Q.   Wingate?

A.   Correct.

Q.   Who else?

A.   I don't remember anybody else in particular.  It's likely Carla that I would have talked to.

Q.   And what is Carla's group called?

A.   Specifications.

MR 0625

Q. And what does that relate to?

A. Specifications for tires.

Q. Where does Carla work?

A. At MARC.

Q. And the department at MARC called the Specification Department?

A. I believe that's correct. I don't know the exact name, but I would refer to it as Specifications Department --

Q. Okay.

A. -- or Specifications Group.

Q. Thank you so much, Mr. Price.

Anybody else that you would have spoken within Michelin concerning preparation of your affidavit?

A. Not that I recall.

Q. Okay. So Carla in Specs.

How long have you known Carla?

A. Probably since 2007 when I started working at MARC.

Q. Okay. All right. And since you have known Carla, has she always work in Specs, Specifications?

A. To my recollection.

Q. Okay. And you called her concerning preparation for this affidavit on this case, and on

MR 0626

this specific case the tire that we're talking about is an LTX M/S is that right?

MR. BULLION: Objection; form.

THE WITNESS: It is, and I may have called her. She would have been a person, if I needed information on the number of specs, that person I would have gone to.

BY MR. GUERRA:

Q. So you're not sure if you called her?

A. I don't have a specific memory of talking to her.

Q. But if you did talk to somebody, would that have been her?

A. It would have been her related to the numbers of specifications involved in this affidavit.

Q. Okay. Anybody else, Mr. Price?

A. No, not that I'm --

Q. Okay.

A. -- aware of.

Q. What is your department called?

A. I'm in the Legal Department.

Q. Legal Department.

How many people work at the Legal Department, please?

A. About 40.

MR 0627

Q.   And they are -- what are they, I mean in general?  Would you give me a summary of the people that work there?

A.   They would generally be in Greenville.  In Greenville.

Q.   In Greenville.

But who -- what are their -- what is their background; are they lawyers, are they paralegals, are they secretaries?

A.   All of the above.

Q.   All of the above.

A.   And engineers.

Q.   Okay.  Registered engineers, licensed engineers?

A.   I don't know if the other engineers are licensed.

Q.   Any of them?

A.   I don't know.

Q.   Any of them?

A.   I don't know if any of them are licensed.

Q.   Okay.  What you're saying is that they may have some -- they have education in engineering?

A.   Yes, they have engineering degrees.

Q.   Okay.  But you don't know if a single one of those individuals that works up there in MARC review

MR 0628

is a licensed or registered engineer anywhere in the United States?

A.   I don't know.

Q.   Okay.  Tell me the names of the engineers that work with you in the Legal Department.

A.   Michael Wischhusen and Doug Slagh.

Q.   You may have to spell that name for --

A.   S-l-a-g-h.

Q.   No, the other one.

A.   Good luck.

MR. BULLION:  You've deposed him twice, I would think you would know how to -- how to spell the name, probably.

MR. GUERRA:  I'm sorry?

MR. BULLION:  You've deposed him twice.

MR. GUERRA:  Oh, I know, but the court reporter may not know.

MR. BULLION:  W-i-s-c-h-h-u-s-e-n.

MR. GUERRA:  I like Mr. Wischhusen a lot.

BY MR. GUERRA:

Q.   So you said, Luis, that's three engineers, three people that are trained as engineers in your Legal Department group.

MR 0629

A. That's correct.

Q. The rest of them -- how many attorneys?

A. I don't know the exact number of attorneys.

Q. Give me your best shot.

A. Twelve.

Q. Twelve. Including Nicole that we talked about?

A. That's correct.

Q. Including Ms. Foster?

A. Yes.

Q. She -- she heads the group, the legal group?

A. Not the Legal Department.

Q. But the legal group within the Legal Department?

A. Product Liability Group.

MR. GUERRA: Okay. Wischhusen, isn't that an Alabama fan? I thought that his kids went to Alabama, didn't they?

MR. BULLION: I don't know where his kids go to school.

MR. GUERRA: We talked a lot of football. I think it was Alabama. Maybe I'm wrong. Maybe I'm wrong.

BY MR. GUERRA:

Q. All right. You said, Luis, there's about

MR 0630

three engineers, about 12 lawyers --

A. Yeah.

Q. -- give or take?

A. I know the exact number of engineers, I don't know the exact numbers of lawyers.

Q. So if we go with your numbers, then we have 25 other folks. Who are these 25 other folks?

A. There are paralegals, there are admins.

Q. Who else; secretaries?

A. Certainly there are secretaries.

Q. Anybody else I'm missing?

A. There are people who work in -- in Property Damage.

Q. Property Damage.

What do you call those folks?

A. Claims adjusters --

Q. Claims adjusters.

A. -- would be the term that I would use. I don't know if that's their title.

Q. Okay. How long have you worked at that department, Mr. Price, please?

A. Since 2012.

Q. 2012. Okay. All right.

Now, you -- you call yourself on that affidavit, job title, as Senior Technical Adviser,

MR 0631

right?

A. That's the title of the position.

Q. That's your job title, right?

A. Yes.

Q. And you have held that position since 2012?

A. I have.

Q. What is the -- Mr. Slagh's job title?

A. Senior Technical Adviser.

Q. What is Mr. Wischhusen's job title?

A. Technical Director.

Q. Do you work with Mr. Wischhusen directly?

A. I do.

Q. Would it be fair to call him your boss?

A. He is not my boss.

Q. Who would be your boss?

A. Kip Foster.

Q. Kip Foster.

Does -- Wischhusen is the boss of anyone within the department?

A. No.

Q. Okay. Is anybody the boss of Wischhusen within the department?

A. Kip Foster.

Q. Kip Foster.

And is that Miss or Mrs.?

MR 0632

A.   Mrs.

Q.   Mrs. Foster is a lawyer?

A.   She is.

Q.   All right.   What about this lady Carla McMahan?

A.   She's a paralegal.

Q.   Paralegal.

And how many paralegals do we have up there at your Legal Department, please?

A.   I don't know the exact number.

Q.   Give me your best shot, please.

A.   Six or so.

Q.   All right.   Tell me, would you be kind enough to tell me, what is Ms. Foster -- Mrs. Foster's job title?

A.   Director of Litigation.

Q.   Director of Litigation.

And you said something about -- who is the director of products liability?

A.   I didn't say anything about a director of products liability, but that would be Kip, she's head of the group.

Q.   Okay.

A.   The Litigation Group.

Q.   Thank you so much.

MR 0633

What you're saying is, Luis, that's not a title, director of products liability, right?

A.    I don't know the exact title.

Q.    Okay.  And Mr. Wischhusen, you said, is a Technical Director of Litigation?

A.    That's correct.

Q.    So you are a Senior Technical Adviser of Litigation?

A.    In the Litigation Group.

Q.    Now, in preparation for this deposition, did you have an opportunity to meet with the other attorneys?

A.    I did.

Q.    How many times?

A.    I recall two times.

Q.    Personal meetings?

A.    I guess I would say yes to that.  I don't know what you mean by "personal meetings."

Q.    Thank you.  Live.

A.    Yes.

Q.    Who would be the individuals that you would have met as your attorneys on those live meetings, please?

A.    Tom Bullion.

Q.    Anybody else?

MR 0634

A. At times, Nicole Buntin was there.

Q. Nicole, your colleague --

A. Yes.

Q. -- that we talked about?

All right. When did this personal meeting, the first one, took place, please?

A. Monday afternoon.

Q. This Monday afternoon, so if today is the 21st, would that have been the 20th?

A. That's correct.

MR. BULLION: 19th, I believe.

MR. GUERRA: I'm sorry.

MR. BULLION: Today's Wednesday.

MR. GUERRA: Oh, thank you, Tom.

19th.

BY MR. GUERRA:

Q. Was that the first meeting with Mr. Bullion?

A. Yes.

Q. Where did that meeting take place?

A. Here at this office.

Q. Nelson Mullins?

A. Yes.

Q. Anybody else present other than you and Mr. Bullion?

A. I believe Kate Helm.

MR 0635

Q. Was also live?

A. Yes.

Q. How long did that meeting take place?

A. Roughly an hour.

Q. Anybody else present or on the phone at that meeting?

A. On the 19th, there was no one else present that I recall.

Q. What about the second meeting, when did the second meeting take place, Mr. Price, please?

A. On the 20th.

Q. So yesterday, Tuesday?

A. It did.

Q. Where did that second meeting take place?

A. Here at this office.

Q. What time was that one?

A. I believe we got started in the morning around nine.

Q. And lasted until?

A. About four o'clock, as I recall.

Q. Who was present, please?

A. Tom Bullion.

Q. Anybody else?

A. Danean Sturino.

Q. Tell me that again, please.

MR 0636

A.    Duncan Sturino.

Q.    Danean?

A.    Yes.

Q.    Sturina?

A.    Sturino.

Q.    Would you be kind enough to spell the last name, please?

A.    I'm not sure that I know the correct spelling, but I would spell it phonetically S-t-o-r-i-n-o.

MR. BULLION:    It's S-t-u-r-i-n-o, I think.

BY MR. GUERRA:

Q.    Do you -- do you -- did you know Ms. Sturino prior to that meeting?

A.    Yes, I did.

Q.    Do you know where she works?

A.    She works in Chicago.

Q.    She works in Chicago for?

A.    I believe a law firm called O'Hagan.

Q.    Called what?

A.    O'Hagan.

Q.    O'Hagan.

All right.  Is she a lawyer?

A.    Yes.

MR 0637

Q. In Chicago?

A. Yes.

Q. And did you have an occasion to meet her before on other Michelin cases?

A. No, not related to cases.

Q. Would you be kind enough to tell me who introduced you to Ms. Sturino?

A. Nicole Buntin.

Q. Is she an employee of Michelin?

A. Ms. Sturino?

Q. Yeah.

A. No, she's not an employee of Michelin. She's an attorney that represents Michelin.

Q. Ms. -- would you say it again, the name, so I can remember it?

A. Duncan.

Q. Just the last name.

A. Sturino.

Q. Is that Ms. or Mrs.?

A. I don't know.

Q. Okay. All right. So other than Tom Bullion and Ms. Sturino, anybody else present?

A. Kate Helm.

Q. Kate Helm.

Anybody else?

MR 0638

A. Michael Wiggins.

Q. Michael Wiggins.

Q. Who is Mr. Wiggins?

A. He's an attorney that works in Florida.

Q. Quite the powwow. Wow. Four attorneys and Mr. Price on a meeting yesterday?

MR. BULLION: Objection; form.

THE WITNESS: I believe that Nicole Buntin was there.

BY MR. GUERRA:

Q. So five attorneys. Thank you so much, Mr. Price.

Anybody else that we may have missed out?

A. Not that I recall.

Q. Any of the -- your other -- any of -- other co-workers that work with you at the Legal Department?

A. No.

Q. Thank you so much.

Did you know Mr. Wiggins prior to this meeting?

A. I did.

Q. Did you work with Mr. Wiggins on other cases?

A. I have worked on one case with Mr. Wiggins.

MR 0639

Q.   Mr. Wiggins also is an attorney out of Florida that defends Michelin on cases?

A.   That's correct.

Q.   Thank you so much.

How were you introduced to Mr. Wiggins?

A.   As I recall, the same way; probably through Ms. Buntin.

Q.   Through your work?

A.   That's correct.

Q.   All right.  Anybody else?  Did you ever -- you said no?

A.   I didn't understand the question.

Q.   Anybody else?

A.   Anybody else?

Q.   Present on this second meeting.

A.   No.

Q.   Or on the phone during the second meeting?

A.   No.

Q.   Thank you.

That lady that you said, Luis, if I would have called would be Ms. Wingate or Mrs. Wingate, she wasn't present in any of the meetings?

A.   No.

Q.   Oaky.  Anybody else that you have talked, either in preparation for this deposition or in

MR 0640

preparation for the affidavit, related to being an employee of Michelin?

A.   Not that I recall.

Q.   Anybody from the plant in Dothan?

A.   Not in preparation for this.

Q.   Or for the affidavit?

A.   Affidavit.

Q.   Or the deposition?

A.   Or to the deposition, correct.

Q.   Anybody that works in the Chemical Laboratory for Michelin preparing formulations?

A.   No.

Q.   Any chemical engineer, licensed chemical engineer?

A.   Preparation for this?

Q.   For affidavit or depo.

A.   No.

Q.   Okay.  Anybody that is Adjustment Tire Inspector at Michelin --

A.   No.

Q.   -- in preparation for deposition or affidavit?

A.   No.

Q.   Anybody that works for any of the Designated Return Centers for Michelin?

MR 0641

A. No.

Q. For either of the events; affidavit or the deposition?

A. Not in preparation for this, no.

Q. Anybody that is a tire spector or verifier, tire verifier at the production line?

A. I didn't understand the word.

Q. Did you speak with anybody in preparation of the affidavit or the deposition that was a tire spector or tire verifier in the production lines?

A. I am not familiar with the term "tire spector."

Q. Those guys at the Aspect Post.

A. I did not.

Q. Okay. Class Spector, I think that's the term that you guys use.

A. Yes, yes. I did not talk with anyone else in Class Spector in preparation.

Q. Thank you so much. Thank you so much, Mr. Price.

Anybody in the Designing Department?

A. No.

Q. Mr. Northrup?

A. No.

Q. Mr. Gruenholz?

MR 0642

A.    No.

Q.    Any of the designers of this specific tire in preparation for the deposition or the affidavit, did you speak to any of them?

A.    No.

Q.    All right.  Did you have an opportunity to look at the tire itself, the subject tire?

A.    I have.

Q.    Okay.  When it was here?

A.    Yes.

Q.    Okay.  Who else looked at that tire when you were looking at the tire?

MR. BULLION:  Don't answer that.

MR. GUERRA:  Excuse me?

MR. BULLION:  I said:  "Don't answer that."

MR. GUERRA:  Based on what?

MR. BULLION:  Based on privilege.

MR. GUERRA:  I'm just asking who was present.

MR. BULLION:  I've made my objection or my statement.

MR. GUERRA:  I'm sorry?

MR. BULLION:  I made my statement.

MR. GUERRA:  And what is that.

MR 0643

MR. BULLION: Don't answer that.

MR. GUERRA: Based on?

MR. BULLION: Privilege.

MR. GUERRA: Which privilege?

MR. BULLION: Work product.

MR. GUERRA: Which privilege? He is not an attorney.

MR. BULLION: Work product.

MR. GUERRA: All right.

BY MR. GUERRA:

Q. Are you going to follow the instructions of your attorney?

A. I am.

Q. Okay. How long did you yourself look at that tire?

A. Probably an hour or two.

Q. Okay. Did you yourself unwrap it?

A. No, I didn't.

Q. Did you yourself videotape it?

A. I videotaped the unpacking of the -- and the reception of the evidence, I did.

Q. Okay. Did you yourself took notes?

A. I did not take notes.

Q. Now, the --

A. I want to please clarify that.

MR 0644

Q.    Please.

A.    If I may.  I make notes related to reception in terms of the tire is here, what came with it, pieces and parts, wheels, for example, and where it came from, the date that it was received.  I make a note of those things.  But in terms of the tire itself, beyond recording the DOT, I didn't make notes about the tire.

Q.    You were not the person designated to inspect that tire; is that what you're telling me?

A.    That's correct.

Q.    Okay.  Somebody else was, and I understand that your attorney --

MR. GUERRA:  You're going to make an objection if I ask that question, right?

MR. BULLION:  We're not going to talk about Michelin's experts.

MR. GUERRA:  All right.  No problem.

So my point being is if I ask questions about that, you're going to tell your client:  Don't answer that, work product or attorney-client privilege?

MR. BULLION:  Right.

MR. GUERRA:  Okay.

MR 0645

MR. BULLION: It has more to do with the fact that we haven't designated experts yet --

MR. GUERRA: That's okay.

MR. BULLION: -- and you're not entitled to know who our experts are.

MR. GUERRA: I'm not going to fight you on that here, for sure. I'm not waiving any objections that I have, pure objection from an argument standpoint that I may make, but I respect what you're saying and I'm not going to waste time today because of your objections.

BY MR. GUERRA:

Q. So if I were to ask you, Mr. Price, give me all your notes of your inspection of the tire, you would say, Luis, first, I have no notes of that, right?

A. That's correct.

Q. And second, I was not inspecting the tire, right?

A. I looked at the tire when it came in.

Q. You looked at it?

A. Yes.

Q. But you were not the tire inspector for that

MR 0646

inspection?

A.   That's correct.

Q.   On any days it was here in South Carolina?

A.   That's correct.

Q.   And it was -- where was it located, the tire?

A.   At MARC.

Q.   At MARC.

Within which department at MARC?

A.   The Litigation Group has a room at MARC for that purpose.

Q.   Was it in a room, like an office?

A.   I wouldn't consider it an office.

Q.   What would you call it?

A.   We would refer to it as The Lab.

Q.   The Lab.  Okay.

That's not your place of employment, your traditional place of employment?

A.   I work there probably a couple of days a week.

Q.   Okay.  But that's not what you call your office?

A.   That's correct.

Q.   But you said it's part of the Litigation Department, so occasionally I go there.

MR 0647

A. That's correct.

Q. All right. Who --

MR. GUERRA: Would you object to the question, Tom, if I asked him how many people present?

MR. BULLION: When he inspected it?

MR. GUERRA: When he -- when he looked at the tire.

MR. BULLION: No, no.

BY MR. GUERRA:

Q. When you looked at the tire, how many people were present in the room?

A. To my knowledge, just myself.

Q. Okay. And if I -- if I -- if I'm going to press you on your notes, all I will find in your notes is the logistics of the arrival of the tire, right?

A. That's correct.

Q. I will get the videotaping of the unpacking of the tire, part of your file?

A. There is a videotape of unpacking.

Q. And do you do the same on the packing and sending it out, do you --

A. That's correct.

MR 0648

Q. Do you also videotape it?

A. I do.

Q. And you also write notes?

A. Yes.

Q. Okay. During the time that the tire was here, was there a log for the people that got to inspect it?

A. Not to my knowledge.

Q. Okay. What would be -- what would be your role concerning that tire?

A. I would receive the evidence, log the evidence in, look at the evidence, and --

Q. Videotape.

A. -- video -- well, videotape when I log it in and videotape when I pack it and ship it back out.

Q. Is that a -- is that a specific designation for the person that does that?

A. The STAs that are assigned to the individual case would do that.

Q. So the Senior Technical Adviser assigned to the case does that?

A. That's correct.

Q. All right. You are also not an attorney, right?

A. I am not.

MR 0649

Q. You don't have -- you don't have any law degree?

A. That's correct.

Q. All right.

THE VIDEOGRAPHER: Could we go off the record?

MR. GUERRA: Yes.

THE VIDEOGRAPHER: Going off the video record at 10:02.

(A recess was taken.)

THE VIDEOGRAPHER: We are going back on the video record at 10:11.

BY MR. GUERRA:

Q. Mr. Price, so if I -- if I go back and ask you -- if I were to press you and say, Hey, Mr. Price, I want to see every single note that you took concerning your inspection of the tire, you would say, Luis, I have none? That's what you told me, right?

A. That's correct.

Q. Thank you. And by "note," I mean anything that you wrote down or that you typed on your computer; you didn't do any of that, right?

A. Other than the information I told you about the reception.

MR 0650

Q. Thank you so much.

Did you -- so would it be fair to say that you were -- can I assume or is it correct for my -- me to assume that you were present on the arrival of the tire and on the departure of the tire?

A. I unpacked --

Q. Subject tire.

A. -- the tire and I packed the tire.

Q. Any other time in between that you were present with the tire?

A. I am certain that I was in The Lab at other times and the tire was in The Lab at those times.

Q. At any other time that you were present with the tire, did you write any other notes?

A. I want to make sure I understand the question.

Q. Sure. You told me the notes that you wrote about the --

A. Reception.

Q. -- receiving the tire, and you -- I think you told me that you wrote no notes of the packing of the tire?

A. That's correct.

Q. Other than that, any other notes that you may have written about that subject tire?

MR 0651

A.   When the tire is reviewed with the attorneys.

Q.   Okay.  Okay.  All right.

MR. GUERRA:  I assume that you object to my questions on this area?

MR. BULLION:  If you're going to ask him for a list of notes and discussions with experts or lawyers, I'm going to object to that.

MR. GUERRA:  Okay.  All right.  I was going to ask you that and you're going to say?

MR. BULLION:  I'm going to say: Don't answer that.

MR. GUERRA:  Okay.

BY MR. GUERRA:

Q.   Okay.  Other than those notes that you may have done with the attorneys, any other notes that you have taken there?

A.   No.

Q.   Okay.  So to make sure that I am correct, you have the receiving and packing notes, departure and packing notes, and notes that you have from conversations with attorneys or experts?

A.   Correct.

Q.   No other notes?

MR 0652

A.    That's correct.

Q.    All right.    How many pages do you have of notes altogether?

A.    What notes?

Q.    All of them.

A.    With regards to the subject tire?

Q.    That's correct.

A.    I don't know.

Q.    Give me your best shot.

A.    Ten.

Q.    Ten pages.

How many of those would be packing and unpacking?

A.    I wouldn't consider those pages; they're entries in a log.

Q.    I'm sorry?

A.    I would not consider those pages; they're entries in a log.

Q.    Okay.    So the -- so the notes that we're talking about are not the notes related to the packing and unpacking?

A.    That's correct.

Q.    You have ten notes, and those notes would be notes of conversations with your attorneys?

A.    That's correct.

MR 0653

Q. Ten pages. Thank you so much.

All right. Did you --

MR. GUERRA: Tom, you did say that, Luis, I don't want you to -- I'm going to instruct him not to answer questions that relate to conversations with attorneys and experts, right?

MR. BULLION: Right.

MR. GUERRA: So I'm only asking other people present. Do you have a problem with that?

MR. BULLION: I don't understand what you're asking. Ask the question -- ask the question and I will --

BY MR. GUERRA:

Q. When you -- did you speak with anybody about the subject tire other than the experts or the attorneys?

A. Not to my recollection.

Q. Okay. Anybody else, Michelin employee that is not an attorney or an expert retained for this case?

A. Not that I recall.

Q. Anybody at MARC?

A. Not that I recall.

MR 0654

Q. Okay. Anybody at the headquarters?

A. Not that I recall.

Q. Okay. Anybody of your co-workers that is not an attorney within your Litigation Department?

A. Not that I recall.

Q. And you understand that I'm talking about the subject tire, right?

A. I do.

Q. All right. Any -- any -- any e-mails or text messages with anybody that is not an attorney regarding this subject tire?

A. Not that I recall.

Q. Did you review any documents in preparation for this deposition?

A. I reviewed my affidavit.

Q. Anything else?

A. I reviewed a 2001 data book.

Q. Anything else?

A. That's all that I recall.

Q. Any photographs?

A. No.

Q. Any videos?

A. No.

Q. Any documentation for Michelin that was produced in this case, other than this, these two

MR 0655

documents that you just referred?

A. I referred to the discovery requests.

Q. Okay. Did you review them?

A. No, I did not review them.

Q. But you have a copy available?

A. I had a copy available, yes.

Q. Anything else, Mr. Price?

A. That's all that I recall.

Q. All right. And that would have been when? When was that review, these things?

A. In the past two days.

Q. On your affidavit, you repeatedly referred to what plaintiffs' requested, either referred to plaintiffs' request or plaintiffs' request for documents or plaintiffs' request for production. Do you remember that?

A. I do.

Q. Did you have an opportunity to participate in the answers to those discovery requests?

A. At times I go and look at the technical information and help if there are questions regarding the tires, technical information.

Q. Did you do that in this specific case?

A. It's very likely that I did. I don't have a specific memory of that.

MR 0656

Q.    Okay.  Did you --- is there a person -- when a discovery request like this comes in, is there a specific person that is in charge of that within your department?

MR. BULLION:  Don't answer that.

MR. GUERRA:  And by that, what is your objection, Tom?

MR. BULLION:  Work product.

MR. GUERRA:  Okay.

MR. BULLION:  And also, I sent -- we responded to your Notice, and Texas law is very clear, you can't do discovery about discovery, and you're -- that's what you're attempting to do.

MR. GUERRA:  Discovery about discovery, what do you mean by that?  I just want to find out who is the person that gave the information.

MR. BULLION:  Texas case law is very specific that discovery about discovery is not permitted.  We've filed a response to the notice setting out the cases.

MR. GUERRA:  No, I mean, I have never seen your response but, you know, I take your word for it, but -- when did you do it?

MR 0657

MR. BULLION: Yesterday.

MR. BULLION: Oh, okay.

MR. BULLION: I will forward it to David.

MR. GUERRA: Thank you so much. But the reality is that, you know, the affidavit is about the discovery responses, and that's why, you know, I am entitled to ask questions about it, but --

MR. BULLION: You're entitled to ask questions about the affidavit, no question. But when you get into the process of us responding to your discovery requests or the work done to look for documents or any of that, that's not permitted under Texas law.

MR. GUERRA: I -- I disagree with you but, you know, I -- you know, you make an objection. I'm sure you're going to abide -- abide by the objection of your attorney.

THE WITNESS: I am.

MR. GUERRA: Okay. I'm not going to argue about it here, for sure.

BY MR. GUERRA:

Q. Mr. Price, other than the attorneys, when a request for documentation like the plaintiffs did on

MR 0658

this case comes into your office, is that a Senior Technical Adviser or anybody else that is not an attorney or a paralegal that is assigned to respond to that discovery?

MR. BULLION: Don't answer that.

MR. GUERRA: Okay. Same objection, Tom?

MR. BULLION: Yes.

MR. GUERRA: Okay.

BY MR. GUERRA:

Q. And do you understand that my question is related to non-legal attorneys or paralegals; you understand that, right?

A. I do.

MR. GUERRA: And your objection stands?

MR. BULLION: Yes.

MR. GUERRA: You make -- okay.

MR. BULLION: Everybody in the Legal Department that does this works for the lawyers.

MR. GUERRA: Okay.

MR. BULLION: They're all representatives of lawyers.

MR. GUERRA: Okay.

MR 0659

BY MR. GUERRA:

Q.    Is -- is anybody -- when a request like this comes in that is non-legal, no lawyers, no paralegals, and don't even work in the legal department that is tasked with obtaining the information?

MR. BULLION:  Don't answer that.

MR. GUERRA:  Same objection, Tom?

MR. BULLION:  Yes.

MR. GUERRA:  Thank you.

BY MR. GUERRA:

Q.    Concerning this specific request made by plaintiffs, were you the person assigned within Michelin to obtain the information in response to discovery requests?

MR. BULLION:  You're talking about -- are you talking about what -- what -- are you talking about your discovery request?

MR. GUERRA:  Yes.

MR. BULLION:  Don't answer that. He's not going to talk about any of the -- any of the -- what was done to respond to your discovery requests; it's not fair game.

MR. GUERRA:  Okay.  I just want the identity of the person.

MR 0660

MR. BULLION:  Okay.

MR. GUERRA:  And you object to that?

MR. BULLION:  Yes.

MR. GUERRA:  On the same basis?

MR. BULLION:  Yes.

MR. GUERRA:  Work product, attorney-client privilege?

MR. BULLION:  Right.  And the cases cited in our response.

MR. GUERRA:  Okay.  Thank you so much.

Can I get you some water?

THE WITNESS:  My bottle's down there.  I don't need it right now but -- I'm okay.

MR. GUERRA:  Tom, can we get that water for your man.  Thank you so much?

MR. BULLION:  Here's your water, my man.

THE WITNESS:  Thank you.

MR. GUERRA:  Good move.

Are you going to drink it?

THE WITNESS:  I am.

MR. GUERRA:  We'll stop it for a

MR 0661

second so we don't do a Rubio.

THE WITNESS: I'm fine right now.

BY MR. GUERRA:

Q. All right. Did you write your affidavit?

A. I did.

Q. Okay. The affidavit was written by yourself; you typed it out?

A. I would say that there were parts of this that I did not type. And I was given a framework. But I did the work and did the lion's share of the material that's in it.

Q. Who gave you the framework?

A. Kate Helm.

Q. By "framework," what do you mean?

A. Well, the header, for example; the very ending; and then some of the points that needed to be covered in response to the discovery that I did.

Q. Did you -- so would you be kind enough to tell me which is your work within the affidavit?

A. Well, the majority of what's here would be directly from me. It's -- so it's difficult to select out. It's more along the lines of points that needed to be developed is what I'm referring to as a framework.

Q. How can we -- how can we figure out what was

MR 0662

exactly your work and what was the framework?  I mean, do we have any physical evidence of that that we can go track down?

A.   No.  We would have to go line by line, and the majority of it is going to be my work.  The framework is, you know, would be along the lines of we need information about LTX tires LTX M/S tires from 2001, and then I did the work and wrote the document in terms of that factual information.

Q.   Would you say that the affidavit -- would you call it your own original document?

A.   I would.

Q.   With your own original thoughts?

A.   Yes.  The information in here is from me.

Q.   With your original sentences?

A.   Yes.

Q.   And your own original ideas?

A.   Yes, with guidance on what ideas needed to be covered.

Q.   How were you provided that framework?

A.   As I recall, I was given the beginnings of this document, the header and the footer, and then some points in it that are really no longer here other than in the framework.

Q.   So the document is a combination of your

MR 0663

work and Ms. Helms' work?

A. Some of which on here came from Ms. Helm.

Q. And the document was sent to you by e-mail?

A. As I recall, yes.

Q. All right. You have never worked in Dothan?

A. I have never had a position in Dothan.

Q. You never had a position in Dothan in the plant itself?

A. Correct.

Q. Or in the office?

A. Correct.

Q. You never worked on the assembly line in Dothan?

A. That's correct.

Q. Or in any other plant of Michelin?

A. Could you clarify the question?

Q. You never had a position as assembly line workers?

A. I have never been a tire builder.

Q. That's right.

You've never been a class spector?

A. That's correct.

Q. You've never been a rubber formulator?

A. That's correct.

Q. You've never been a licensed chemist?

MR 0664

A. I don't know what the term means.

Q. Chemical engineer.

A. I'm a chemical engineer.

Q. Licensed chemical engineer?

A. I'm a degreed chemical engineer.

Q. You're not licensed as a Professional Engineer?

A. That's correct.

Q. That's right.

You never created any chem stock formulas for Michelin?

A. I did not.

Q. You have never been a professional tester of Michelin's tires?

A. I don't recognize that term.

Q. But you have never been one, right? You don't test? You never tested the LTX M/S prior to its releasing to the market?

A. Not in that tire line, no.

Q. Okay. You've never been an adjustment data inspector?

A. That's correct.

Q. You've never been a designated Michelin inspector at these designated inspection centers?

A. That's correct.

MR 0665

Q. You didn't write the aspect specifications?

A. That's correct.

Q. You didn't write the technical notes?

A. That's correct.

Q. You didn't author or write the tire non-conforming procedures?

A. That's correct.

Q. You didn't write or author the general principles?

A. That's correct.

Q. You didn't write or author the adjustment data codes?

A. That's correct.

Q. You didn't set up the adjustment data policies?

A. That's correct.

Q. You didn't author the owner's manuals for the LTX or any other Michelin tire?

A. I'm not familiar with what document you're referring to.

Q. The Passenger and Light Truck Tire Owner's Manual of Limited Warranty, you never authored that?

A. That's correct.

Q. For the LTX M/S line or any other line?

A. That's correct.

MR 0666

Q. You didn't write or author any of the adjustment data manuals of Michelin?

A. That's correct.

Q. You didn't author or write any of the tire inspection procedures?

A. I'm not sure I know what --

Q. The tire inspection procedures for the adjustment data samples.

A. Correct.

Q. You didn't write any of the Michelin tire limited warranties?

A. That's correct.

Q. You didn't design the LTX M/S tires?

A. I did not design the LTX M/S tires, correct.

Q. Okay. There are people that do that or did that at Michelin?

A. There were, yes.

Q. Who, who are they?

A. I know that Paul Northrup was a tire designer on that tire line.

Q. Anybody else?

A. Not that comes to mind.

Q. But you are not one of those folks, right?

A. Not for the LTX M/S tire line, correct.

Q. Michelin also has tire builders, right?

MR 0667

A. That's correct.

Q. You are not one of them, right?

A. That's correct.

Q. Michelin also has chemists that do chem stock formulations and rubber formulations, right?

A. I don't know what their backgrounds are but there are people that work for Michelin that formulate mixes.

Q. You are not one of them?

A. That's correct.

Q. What do you call those folks?

A. Formulators.

Q. Do you know any of them?

A. Not personally.

Q. Do you know their names?

A. Formulators for what?

Q. For skim stock or for rubber.

A. For what rubber?

Q. LTX M/S tires?

A. LTX M/S tires have dozens of different rubber components --

Q. I understand. This subject tire.

A. -- that are formulated by different people. I don't know the formulators in 2001.

Q. Tell me the name of any formulator that you

MR 0668

know here that works on LTX M/S --

MR. BULLION:  You're talking about the 2001 time frame or what?

MR. GUERRA:  No.  Just for the LTX M/S line.

THE WITNESS:  I don't know the names of the formulators that worked on the formulas and the compounds in the LTX line -- the LTX M/S line.

BY MR. GUERRA:

Q.  Anything.

A.  Not that I recall, no.

Q.  They're still manufactured today, right?

A.  There may be an LTX M/S tire manufactured today, but I'm not certain of that.  That line is -- is generally not in production today.

Q.  The LTX M/S2?

A.  There is a LTX M/S2.

Q.  Do you know any of the formulators or their identity?

A.  Not specifically.

Q.  Not a single one?

A.  Not that comes to mind for the LTX M/S2 line, no.

Q.  Or the LTX M/S tire line?

MR 0669

A. No.

Q. All right. What about tire builders? Tell me the name of anyone that worked on the LTX M/S line.

A. I don't know the name of the tire builder that I know worked on the LTX M/S line.

Q. What about -- Michelin has class spectors, right?

A. In the plant there are class spectors, yes.

Q. You are not one of them and you've never been one of them?

A. I have not been a class spector in a plant.

Q. And did you know the name of any of the class sectors at Dothan?

A. I don't recall the name of a class spector at Dothan.

Q. Michelin also has adjustment data inspectors, right?

A. That's correct.

Q. You are not one of them?

A. That's correct.

Q. Tell me the name of any adjustment data inspectors in any of the designated inspection centers.

A. I do not know any.

MR 0670

Q.    Okay.   Michelin also has employees that write and set forth manufacturing design and design processes, procedures and techniques for the LTX M/S line; you are not one of them?

A.    I don't think there are any such documents, as I understood your question.

Q.    My fault.

Michelin has employees that write and set manufacturing and design processes, procedures and techniques for the LTX M/S line, right?

A.    I am not aware of any documents that are specific to the LTX M/S line.

Q.    And that is because?

A.    Those types of documents are used on all tire lines.

Q.    That's right.

You do not know the skim stock formula for this subject tire, right?

A.    That's correct.

Q.    You -- but there's folks within the company, within Michelin, that know that, right?

A.    There would be people in the company that have access to that.

Q.    And what -- who would that be?  Who would those people be?

MR 0671

A.    People in the compounding plant and compounders.

Q.    Could you repeat that?  I couldn't hear you. I apologize.

A.    I said people in the compounding plant or compounders.

Q.    Where is the compounding plant located?

A.    There are several.

Q.    Is there one here in Greenville?

A.    There is not.

Q.    So where are they located, tell me, please.

A.    Anderson, South Carolina.

Q.    Where else?

A.    Starr, South Carolina.

Q.    Anything else?

A.    Tuscaloosa, Alabama.

Q.    Any more?

A.    Ardmore, Oklahoma; Fort Wayne, Indiana; Pictou, Ontario, Canada.

Q.    That's it?

A.    That's all that I am aware of in North America.

Q.    Do you know the name of any compounder or people that work on the compounding plant that know the skim stock formula for this subject tire?

MR 0672

A. I do not.

Q. Who would you go to find that information? How would you go about it?

A. I would contact somebody in the compounding department at MARC.

Q. Who would that be?

A. It depends on the compound.

Q. For this specific one.

A. Which specific one?

Q. Skim stock for the subject tire.

A. I believe the manager of that group is Bergman.

Q. Would you speak -- say it again?

A. I believe his name is Bergman, is the manager of the group that compounds tires like that.

Q. What is that group called?

A. I don't know. It would be in the Materials Compounding Group or Formulating Group.

Q. Marking the materials, Compounding or Formulating Group at MARC?

A. That's correct.

Q. And it would -- the last name is Bergman?

A. That's correct.

Q. And the first name?

A. It's -- I can't recall his first name, as I

MR 0673

sit here.

Q.   Okay.   All right.   What about the rubber formulator for the tread, who would you -- how would you go about finding out who would know that formula?

A.   I don't know who's in compounding for tread.

Q.   How would you go about finding him?

A.   I would ask someone at MARC in the compounding area.

Q.   Who would that be?

A.   Certainly Bergman is one that I could go to that would point me in the right direction.

Q.   He is the manager, that's what you guys call it?

A.   He is a manager in that area.

Q.   All right.   Your work is related to litigation nowadays within Michelin?   All your work related to litigation nowadays as a Michelin employee?

A.   I didn't understand the question.

Q.   All of your work as a Michelin employee in the Legal Department related to litigation?

A.   That's correct.

Q.   Helping defend Michelin in cases?

A.   I'm not sure what you mean by that.

Q.   Michelin gets sued and you help defend

MR 0674

Michelin?

A. I work on these cases, yes.

Q. On behalf of Michelin?

A. That's correct.

Q. Today, on this case, you're here on behalf of Michelin?

A. I am.

Q. As a Michelin employee?

A. That's correct.

Q. Your entire testimony or affidavit, all of it provided here as a Michelin employee?

A. That's correct.

Q. You never used an aspect spec to build a tire?

A. I don't understand the question.

Q. You never used an aspect specification of Michelin to build a tire?

A. An aspect specification is not used to build a tire.

Q. It's to inspect at the end of the building process, right?

A. That's correct.

Q. So it's part of it, right?

A. It's an inspection of the finished tire.

Q. Yes. And alterations may be made, fixes may

MR 0675

be made, so it's part of the manufacturing process, right?

MR. BULLION: Objection; form.

THE WITNESS: It's used in the inspection of the finished product.

BY MR. GUERRA:

Q. Okay. Do you know what an aspect specification is?

A. I do.

Q. All right. But you never used it to -- in the process of building a tire?

A. I don't think that's accurate.

Q. You have used it?

A. I have, at times.

Q. In the building of a tire?

A. I have, at times, applied aspect specifications, read aspect specifications, I've looked at tires.

Q. Looked at what?

A. Looked at finished tires in part of my training, I have.

Q. But you have never built a tire?

A. I have not built a tire that was intended for public sale, that's correct.

Q. That's your business, right? That's

MR 0676

Michelin's business?

A.    That is Michelin's business.

Q.    And you have never done that?

A.    I have not built a tire that was intended for sale, correct.

Q.    In fact, you told me you never -- you never worked in an assembly line for Michelin ever, right?

A.    I never worked as a tire builder.

Q.    At a Michelin assembly line?

A.    That's correct.

Q.    Not in Dothan, not anywhere?

A.    As a tire builder, that was never my role.

Q.    That's right, as a tire builder; is that accurate?

A.    That's correct.

Q.    Again, not -- let's make it correct. Let's make it accurate. You never worked in the Michelin assembly line as a tire builder in any Michelin plant in the United States?

A.    That was never my job to be a tire builder in a Michelin plant.

Q.    Is that a yes or no?

A.    It's yes.

Q.    You certainly did not design or build any LTX M/S tire similar to this one?

MR 0677

A.   I don't know that that's accurate to say. When I began work as a tire designer at MARC, I may have been assigned certain LTX M/S tires, especially as -- in the early parts of my training, but I did not design the subject tire in this case.

Q.   So you designed similar ones?

A.   I designed Michelin light truck SUV tires.

Q.   Is that a yes, similar ones?

A.   They would have been different in their design, but they would have been tires intended for the SUV light truck market.

Q.   So have you ever designed or built a LTX M/S tire similar to this one?

A.   I had responsibility for converting a design of an LTX M/S from OE to replacement. I do not remember the size, and I don't think it was this dimension.

Q.   So you know that you have done that because you say you may or may not, but you know that you have done that?

A.   I know that I converted a tire early in my tire design experience from the OE market design to the replacement market design as basically part of my introduction into the tire design business, and it was an LTX M/S tire.

MR 0678

Q. When was that?

A. It would have been in the 2007 time frame.

Q. 2007?

A. Correct.

Q. Where would you go about finding your output ship, those documents?

A. I -- I don't -- I don't know that there would be documents, but if I created the specification, there would a speciiication.

Q. So how would you go about finding that?

A. I would have to ask someone in the specifications group.

Q. Who would you ask?

A. I would probably ask Carla.

Q. Carla Wingate?

A. Correct.

Q. And what would we ask about?

A. Well, I don't know exactly what she would need to know. My question to her would be: Are you able to search the specifications and find a specification with --

Q. For what?

A. -- with my name on it for an LTX M/S tire.

Q. Since then, have you worked --

A. I don't recall ever working on another LTX

MR 0679

M/S tire.

Q. So it would be one? One?

A. I only recall one.

Q. In this case, you have been designated out of the thousands and thousands of employees of Michelin in South Carolina to be the guy to talk about secrets, Michelin secrets, right?

A. Correct.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. All right. And what we're talking about is documents that Michelin wants to keep away from the public, correct?

A. These are documents that are trade secrets, proprietary and, yes, would cause harm to Michelin if they were in the public.

Q. Those are specific documents that you speak of in your affidavit that Michelin wants to keep away from the public eye?

A. They are company trade secrets that could do harm to Michelin if they were in the public, available to our competitors, that's correct.

Q. I got your answer. Do you say your peace?

So my question is: Michelin wants, intentionally and cautiously, to keep them away from

MR 0680

the public?

MR. BULLION: Objection; form.

THE WITNESS: To keep them away from our competitors.

BY MR. GUERRA:

Q. Not from the public? I can have them?

MR. BULLION: Objection.

THE WITNESS: No.

BY MR. GUERRA:

Q. Okay. So it wants to keep them away from the public, from the consumer?

A. That's not the object. The objective is to keep them away from competitors.

Q. No, that's -- that -- the result is that you -- the public does not see them, right?

A. These are trade secrets documents, they're proprietary documents, and there's always a chance that they could leak to competitors.

Q. Yeah, I understand that. But they are not what you -- what Michelin does is does not make them available to the public, to the consumers, right?

MR. BULLION: Objection; form.

Luis, if I could, if you would let him finish his answer --

MR. GUERRA: Yes.

MR 0681

MR. BULLION: -- you're -- you're kind of getting going fast --

MR. GUERRA: Yes.

MR. BULLION: -- and you have that tendency, so let him finish --

MR. GUERRA: No problem.

MR. BULLION: --- if you don't mind before you -- before you start the next question.

MR. GUERRA: No problem.

MR. BULLION: Thank you.

BY MR. GUERRA:

Q. Your answer was "yes," right?

A. You will have to repeat the question.

Q. There are documents that Michelin intentionally and purposefully keeps them away from the public eye?

MR. BULLION: Objection; form.

THE WITNESS: Michelin protects them and keeps them away from anyone outside the company.

BY MR. GUERRA:

Q. Including the public?

A. They would be outside of Michelin; that's correct.

Q. Including the American consumer, right?

MR 0682

A. That's correct.

Q. And you talk about -- you make a comment on your affidavit about patents, right? Do you remember that comment that you made?

A. Not specifically. Could you refer to me -- to what line you're referring?

Q. You specifically talk about Michelin not --

A. Yes.

Q. -- patenting.

A. I do.

Q. And the reason is is because patent documents are public documents, right?

A. That's correct.

Q. So what you're saying is that to keep them away from the public eye and public disclosure, Michelin does not even patent some of its processes and procedures?

A. Michelin designs its own processes and procedures, and they are company secrets that would do us harm if they were in the public; that's correct.

Q. And that would include, concerning the documents that we're talking about here, and that's what you're talking about is this aspects specifications used by the class spectors, right?

MR 0683

A. Any company document is what I would refer to.

Q. But that includes the aspects specifications used by the class spectors?

A. They are company documents, yes.

Q. Those are some of the company documents Michelin keeps secret?

A. That's correct.

Q. Okay. Patent non-conforming procedures; those are some of the documents that Michelin keeps secret.

A. Those are Michelin company documents, yes.

Q. All right. General principles, those are some of the documents that Michelin keeps secret?

A. . Those are company documents, yes.

Q. Adjustment data, those are some of the documents that you claim Michelin keeps secret?

A. That's company data, yes. .

Q. All right. Adjustment document policies, right?

A. That's correct; those are company documents.

MR. GUERRA: We need to go off the record, Tom, the tape is about to be over.

MR. BULLION: Okay.

THE VIDEOGRAPHER: We're going off

MR 0684

the video record of media number one at 10:52.

(A recess was taken.)

THE VIDEOGRAPHER: This is media number two of the video deposition. Going back on the video record at 11:03.

MR. GUERRA: Thank you.

BY MR. GUERRA:

Q. Thank you, Mr. Price.

Some of the documents that Michelin wants to keep secret are the physical evidence that Michelin -- strike that.

Some of the physical evidence and documents that Michelin keeps secret and away from the public includes manufacturing specifications?

A. Manufacturing --

MR. BULLION: Objection. Objection; form.

THE WITNESS: -- specifications are trade secrets and proprietary information; that's correct.

BY MR. GUERRA:

Q. And those are kept secret and away from the public by Michelin?

MR. BULLION: Objection.

THE WITNESS: Absolutely. They

MR 0685

are trademark -- or I'm sorry.  They are

proprietary and trade secret information.

BY MR. GUERRA:

Q.   I got that.

And Michelin keeps that secret and away from

the public?

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.   Yes or no?

A.   Yes.

Q.   All right.  Specification changes --

A.   Yes.

Q.   -- Michelin keeps that secret and away from

the public?

A.   Specifications are proprietary information,

they're trade secrets of Michelin, and, yes.

Q.   And Michelin uses its designation of

trade -- trade secrets concerning this information

and documents to keep them away from the public?

MR. BULLION:  Objection to form.

BY MR. GUERRA:

Q.   Yes or no?

A.   These documents are trade secrets, they are

proprietary information, and they are designated as

such to protect them from anyone outside the company,

MR 0686

competitors.

Q.   And as such, Michelin keeps these documents and physical information away from the public?

A.   That's correct.

MR. BULLION:   Object to the form.

BY MR. GUERRA:

Q.   All right.  Testing and design related documents requested by us, plaintiffs in this discovery, Michelin keeps them secret and away from the public?

MR. BULLION:   Objection; form.

THE WITNESS:   Those documents are trade secrets, they're proprietary information, yes --

BY MR. GUERRA:

Q.   And as such --

A.   -- and kept from the public.

Q.   I'm sorry?

A.   They're kept out of the public, that's correct.

Q.   All right.  The formulas, asked by plaintiffs, Michelin keeps them secret and away from the public?

MR. BULLION:   Objection; form.

THE WITNESS:   Not only are

MR 0687

formulas kept away from the public, they're kept away from almost all internal Michelin employees.

BY MR. GUERRA:

Q.    What is your level of security clearance?

A.    I am not aware of such levels.

Q.    You call it heightened protection?  What is the level of your heightened protection security clearance?

A.    I don't know what's meant by that question.

Q.    Have you ever read an aspect specification?

A.    I have.

Q.    It tells you right on there, level of protection, heightened security.  Do you have that -- what is your clearance level?

A.    To my knowledge, that information is put on documents as they're produced outside of the company, not internally.

Q.    Produced outside.  Okay.

What about the -- you just told me, Luis, I -- there's people in the company that only certain people have access to certain areas.  What are those areas?  Go ahead, Mister --

A.    I didn't understand your question.

Q.    Oh, no problem.

You told me, Luis, in fact, there's areas of

MR 0688

the company that only certain people has access to. You just told me that.

A.    You asked me a question about the compound formulas, and I said they are not available to most people inside the company.

Q.    But on your affidavit, you specifically talked about certain areas.  Do you remember that?

A.    Yes.

Q.    All right.  Tell me those areas, please.

MR. BULLION:  Objection; form.  I don't understand what you're asking.

MR. GUERRA:  In his affidavit, Mr. Price states that certain areas of the company are restricted and only available to certain people.

MR. BULLION:  Certain areas or certain documents?

MR. GUERRA:  Areas.  Areas.

THE WITNESS:  So MARC is only -- is restricted to people that have access to MARC, and then within MARC, there are areas that are restricted to people that have access to those areas.

BY MR. GUERRA:

Q.    That's the areas that I'm asking about.

MR 0689

What are those areas?

A.    I don't know all of those areas.

Q.    Tell me the ones you know, please.

A.    I know The Lab where we store -- stored the subject tire, for example, has limited access.

Q.    And you have access to it?

A.    I do.

Q.    Who else has access to it?

A.    The attorneys and the other technical advisers in the group.

Q.    So the Legal Department people have access to it?

A.    That's my understanding, yes.

Q.    Okay.  Any other areas that you discussed included on the areas that you discussed on your affidavit that are those areas that only limited people have access to it?

A.    There are other areas.

Q.    Would you please tell me.  What are those areas?

A.    I know there is an area where machine development is being done; that area is limited.

Q.    Do you have access back there?

A.    I do not.

Q.    You do not?  Who does have access to that

MR 0690

area?

A.   I do not know.

Q.   For instance, the aspect specification that were produced in this case have Michelin restricted section.

A.   May I see it?

Q.   I'm going to show you one that doesn't have my writing.  Okay?

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   What is that?

A.   That is the classification of the document as D3.

Q.   As Michelin restricted, so D3 is what?

A.   I don't remember the exact language that goes with the D3 classification.

Q.   Tell me a -- give me your best shot.

A.   It would be a document that would not be allowed outside the company.

Q.   That's all?

A.   People that had access to it would not be allowed to take it outside the company; in other words, they would only be able to use it at their place of work.

MR 0691

Q. So it's the level of restriction?

A. That's correct.

Q. And that's your level of clearance too, D3? You got access to D3 documents?

A. There is not an assigned level of clearance that I'm aware of. It would depend on the job at the time, the needs of that job. Certainly I would have access to D3 documents.

Q. You would?

Which areas of the company don't you have access at MARC?

A. Well, I have given you an example of one that I know of.

Q. Okay.

A. I don't have access to the -- to the computers that house the formulation information, for example.

Q. And they are located at?

A. At MARC.

Q. Where?

A. I don't know where the computers are located.

Q. What department?

A. I don't know what department they're in.

Q. Okay. Who would know that?

MR 0692

A.    I don't know who would know that.

Q.    How would you go about finding out?  Who would you ask?

A.    I wouldn't know where to begin with that particular question.

Q.    So how do you know that the computers are even at MARC?

A.    Well, I know that the formulators work at MARC, and if I had a question about a formula and I were to call a formulator, they would access the information through the computer.

Q.    And you would go to Bergman?

A.    For the compound that we discussed, I would.

Q.    What about for formulations?

A.    For the formulation of that compound that we discussed earlier, that's correct.

Q.    From the formulation of the -- of the tread, the rubber compound or the skim stock, that would be Bergman?

A.    Not all of those different compounds, no.

Q.    For the LTX M/S.

A.    It wouldn't be specific to a tire line.

Q.    So how would you go about, other than Bergman, to find out?

A.    I don't know.  I know because of the skim

MR 0693

stock question that you asked me about that Bergman is the person that I would ask.

Q. What other formula do you know out of MARC?

A. I don't -- another name of a formulator --

Q. Yes.

A. -- doesn't come to mind.

Q. Not a single --

A. And in what time period, for what --

Q. Right now.

A. I don't know of another formulator's name right now.

Q. Who runs the Formulation Department?

A. I don't know.

Q. Who is the Manager of the Formulation Department?

A. I don't know who manages the Formulation Department.

Q. Who is director of the Formulation Department?

A. I don't know the answer to that.

Q. Okay. How would you go about finding out? Who would you ask?

A. I could ask Mr. Bergman, perhaps he would know.

Q. All right. Okay. Tire adjustment

MR 0694

processes, it's a type of information and physical evidence that Michelin keeps secret?

MR. BULLION: Objection; form.

THE WITNESS: That information is confidential and trade secret, proprietary information, that's correct.

BY MR. GUERRA:

Q. Just a yes or no. That's information that Michelin keeps secrets, right, sir?

A. It is.

Q. All right. Tire adjustment analysis, that's information that Michelin keeps secret?

A. That is proprietary and trade secret information, yes.

Q. Yes or no, sir?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. That tire adjustment analysis is information that Michelin keeps secret? Yes or no, sir?

A. I'm sorry, would you repeat the question?

Q. Tire adjustment analysis information and physical evidence is information and physical evidence that Michelin keeps secret?

MR. BULLION: Objection.

MR 0695

BY MR. GUERRA:

Q. Yes or no, sir?

A. That's trade secret and proprietary and, yes, we keep it secret.

Q. Yes, sir. I got it, I got your speech. And you can keep doing it, and that's fine, but I want to tell you, that I'm -- I will play this tape to the Jury. You understand that? I'm asking you for a simple answer, yes or no. You understand that, right?

A. I do.

Q. All right.

MR. BULLION: Your questions are argumentative. When you say "secret," it's argumentative, and he can -- he's entitled to answer it the way he wants to.

MR. GUERRA: Is that your objection?

MR. BULLION: Trying to help you out.

MR. GUERRA: I don't need your help.

MR. BULLION: You don't?

MR. GUERRA: I don't need your help, but you are entitled to make objections.

MR 0696

MR. BULLION: I have been.

MR. GUERRA: But that's not a proper objection.

MR. BULLION: Okay.

BY MR. GUERRA:

Q. Who would be the tire adjustment analysis person that you would speak to if you needed to obtain information about it?

A. With regards to?

Q. Tire adjustment, tire adjustment codes, tire adjustments.

A. For what time period?

Q. Analysis, market research, changes on the design, who would you go talk to for the LTX M/S?

A. For the tire made in 2001, for example?

Q. For example.

A. Probably Tom Gruenholz.

Q. Okay. And after 2001, who would you talk to?

A. I don't -- I would go talk to Tom Gruenholtz if I had questions about that.

Q. Does he still work for the company?

A. He does not work; he is retired.

Q. So tell me a guy that works for the company that you would go talk to.

MR 0697

A.    I don't have a name of a person that I would go talk to today.

Q.    How would you --

A.    That I know, I would --

Q.    How would you go find out about it?

A.    If I needed to know that, I would go to that department and ask.

Q.    And that department is?

A.    QTB.

Q.    And who would be the person that you would talk with at QTB?

A.    I don't know who's there now.

Q.    Who would you ask for?  Who would you know that was there before?

A.    I knew Tom Gruenholtz when he was there.

Q.    Would you go about and ask -- how would you go about -- who would you ask for at QTB, even if you don't know a name?  Can I speak with?

A.    It depends on the question that I wanted an answer to, and I'm not clear what -- what I'm hypothetically looking for.

Q.    Tire adjustment analysis, tire adjustment changes, tire adjustment trims.

A.    I don't know what tire adjustment changes are.

MR 0698

Q. Forget that one. So the other two.

A. There is not a person that I know of in the QTB department that --

Q. I understand that. Who would you ask for? Is there a job title? You have been working with the company --

A. I would ask for -- I would ask for who managed that department.

Q. And who is that manager?

A. I don't know who currently manages --

Q. How would you find out who is the manager?

A. I would go to that department and ask.

Q. So the only person that you, under oath, and you even though you have been working with the company for -- let me check here. Even though you have been working with the company since the year of 2000 and -- 1999, since 1999, the only person that you could tell me the name in the adjustment department is Tom Gruenholtz that stopped working there six years ago?

A. He's the one that I would go to if I had a question about tires that were made in the -- in the LTX M/S, which is what you asked me.

Q. Ask you nowadays, too.

A. I don't know who's there today.

MR 0699

Q.   Yesterday, a year ago, two years ago, anybody else in --

A.   When I was a tire designer at MARC, I would go to Larry Mimms, and he is retired; he is no longer with the company.

Q.   What's his name?

A.   Larry Mimms.

Q.   Okay.  Anybody else?  Somebody that works for the company, because they do still have people that work in the Tire Adjustment Department, right?

A.   There are certainly people in that area.  I don't know the name of the person in that area.

Q.   Not a single one?

A.   Not that I can recall as I sit here.

Q.   With all your non-litigation experience with the company, you can't still tell me a single one, right?

              MR. BULLION:   Objection; form.

              THE WITNESS:   That's correct.

BY MR. GUERRA:

Q.   And now with the legal experience within the company, you cannot tell me also any other name than Tom Guenholtz and Larry Mimms, both of them prior employees, not current employees?

A.   To answer your question --

MR 0700

MR. BULLION: Objection; form.

THE WITNESS: -- the question that you asked me about, that's correct, I don't know who is in that role.

BY MR. GUERRA:

Q. I asked you in 2001, I asked you since 2001 up to today. No other names?

A. I gave you the ones that I can recall, yes.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. No other names, right?

A. That's correct.

Q. Now, manufacturing and inspection processes and procedures, this is also information that Michelin keeps secret and away from the public, yes or no, sir?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret and proprietary and we do keep it secret.

BY MR. GUERRA:

Q. Secret and away from the public?

A. Yes.

Q. Tire production information is also information and physical evidence that Michelin keeps

MR 0701

secret and away from the public?

MR. BULLION:  Objection; form.

THE WITNESS:  That information is trade secret and proprietary, and we do keep it away from the public, yes.

BY MR. GUERRA:

Q.  Keep it secret and away from the public, correct, sir?

MR. BULLION:  Objection; form.

THE WITNESS:  We do keep it away from the public, yes.

BY MR. GUERRA:

Q.  All right.  And I'm just going down your affidavit.  You see that, right?

A.  I understand.

Q.  Concerning our specific requests, MNA design and manufacturer specification, manufacturers, that's information that Michelin keeps secret and away from the public?

A.  That information --

MR. BULLION:  Objection; form.

THE WITNESS:  -- is trade secret and proprietary and we do keep it out of public, yes.

MR 0702

BY MR. GUERRA:

Q. Keep it away, secret and away from the public, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Correct?

A. Yes.

Q. All right. Now, you are not the author of the policies concerning trade secret information within Michelin?

A. That's correct.

Q. Somebody else is?

A. I am not aware of a singular policy.

Q. Not singular policy. Policies, all the policies related to trade secrets. There has to be some creator, some author of it, right?

A. So what is the question, please?

Q. The question is: How would you go about finding that person, or those persons or that committee or who they are, their identity?

MR. BULLION: Objection; form.

THE WITNESS: I don't really know how to answer that question because you're -- you're not telling me about a specific document; you're talking about all company confidential

MR 0703

documents and trade secrets?

BY MR. GUERRA:

Q.    Trade -- trade secret policies.  Not the documents.  The policies about what is trade secret and what is not.

A.    I'm not aware of who would have written the policy, if one exists.

Q.    Certainly not you?

A.    That's correct.

Q.    And certainly it's not willy nilly.  It has to be some kind of framework, right?

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.    Or you guys keep all secret, all information secret?  There has to be some framework, right?

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.    To decide what is trade secret and what is not, right?

A.    I'm not sure that I'm understanding your question.

Q.    But let me make it clear for you.  It's okay.  There has to be some kind of policy at Michelin that decides what documents are to be -- will be classified as trade secrets and keep secret

MR 0704

as opposed to ones that are not, correct?

A.    There would be a policy that would define how -- and I should -- I don't like the word define because I haven't seen the document -- but that would describe which types of documents, for example, would be D3, as you pointed to one previously.

Q.    And which documents would be trade secret.

A.    That's correct.

Q.    You are not the author of those policies?

A.    Right, I am not.

Q.    Okay.  And how would you go about getting those documents and talking to the person that authored them or are responsible for them?

A.    I don't know.

Q.    How would you go about finding out?

A.    I'm not sure how I would go about finding out.  I would ask the attorneys if they knew who authored those documents.

Q.    Okay.  And by "attorneys," you mean?

A.    The folks that I work with in the Legal Department.

Q.    Such as?

A.    Any of the attorneys in the Legal Department.

Q.    Nicole?

MR 0705

A. She could be one, yes.

Q. Is that Mrs. Buntin?

A. Yes.

Q. Okay. I apologize. Mrs. Buntin would be one of the people that you would talk to?

A. That I would ask, but I don't -- I don't know who would know.

Q. Ms. Foster?

A. Perhaps.

Q. Okay. All right. Adjustment processes and analysis, that's information that Michelin keeps secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret and proprietary and, yes, we do keep it away from the public.

BY MR. GUERRA:

Q. Keep it secret and away from the public, correct?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Correct?

A. Yes.

Q. Manufacturing and inspection processes and procedures, that's information that Michelin keeps

MR 0706

secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret, proprietary, and we do keep it away.

BY MR. GUERRA:

Q. Michelin keeps it secret and away from the public, correct?

A. That's correct.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. And you understand this is specifically related to requests on this case? You understand that, right?

A. No, I don't understand your statement.

Q. It's paragraph 43 of your --

A. That's correct.

Q. -- affidavit?

And that paragraph reads -- specifically relates to plaintiffs' request, yes.

A. 43 does refer to plaintiffs' request for manufacturing specification, that's correct.

Q. You did write that?

A. I did.

Q. All right. You did review it?

MR 0707

A.   I did.

Q.   You did say this:  Information that we have here is information that Michelin intentionally, cautiously, in a premeditated manner, keep secret and away from the public?

MR. BULLION:  Objection; form.

THE WITNESS:  The information is trade secret, proprietary, and we do keep it out of the public, yes.

BY MR. GUERRA:

Q.   And you do keep it away from the public intentionally, right?

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.   Thought out, premeditated?

A.   Me personally?

Q.   You are the face of the company on this. You are the secrets man here.

MR. BULLION:  Objection; form.

THE WITNESS:  These documents are company trade secret documents, they're proprietary, and we keep them out of the public, yes.

BY MR. GUERRA:

Q.   And you understand that plaintiffs -- you

MR 0708

understand that plaintiffs -- you read the discovery requests, you have been involved in this litigation, right?

A. I am familiar with some of the discovery requests, that's correct.

Q. You know -- sorry.

And you know that those folks are just folks, right, just common folk?

A. I don't know to whom you're referring.

Q. My clients, Sam and Obdulia, right; just folks?

A. Okay.

Q. Right?

A. I don't know them.

Q. Do you know that they work for a competitor?

A. No, I don't know that.

Q. All right. Has anybody told you that they are working for a competitor?

A. No, no one's told me that.

Q. Just common folk, and that's common folk that is asking for these documents, not competitors. And you guys intentionally, Michelin intentionally keeps all this information from these folks, right?

MR. BULLION: Objection; form.

THE WITNESS: These documents are

MR 0709

proprietary, trade secret and, yes, we keep them out of the public.

BY MR. GUERRA:

Q. Not only the public. Your first -- your first story was it's because of our competition. I'm telling you, we're no competition. My people are just common folk. The lady that I represent is quadraplegic. We are saying, we need these documents to prove our case. And you're saying, on behalf of Michelin, here today and in your affidavit, we will not give these documents that I am enumerating here because they are secret and we keep them away from the public, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Right?

A. I'm saying that these documents are trade secret, proprietary, and they are not out in the public, that's correct.

Q. Not even to your clients, laais, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Not even to your clients, right? That's what you're telling me?

A. I believe that we have turned over many

MR 0710

documents related to the subject tire, and that's --

Q. I get it. You are aware that many other documents that I have asked and I've been fighting in court for, you have not turned away, right?

A. I'm aware of that, yes.

Q. And you know that I represent people that are not competitors. You know that.

MR. BULLION: Objection; form.

THE WITNESS: These documents are proprietary --

BY MR. GUERRA:

Q. I didn't ask you for that.

A. -- trade secret --

Q. I asked you: You know that the people that I represent are not competitors of Michelin, right?

MR. BULLION: Objection; form

THE WITNESS: Any chance those documents have of getting out into the public could be a risk to the company, yes, sir.

BY MR. GUERRA:

Q. Okay. That's not what I asked. I asked you: Do you know that the people that I represent are not competitors of Michelin, yes or no?

MR. BULLION: Objection; form.

THE WITNESS: I don't know their

MR 0711

role.

BY MR. GUERRA:

Q. You never heard, nobody has ever told you that they are competitors, right?

A. No one's ever told me that.

Q. Nobody told you that they work for a competitor tire manufacturer, right?

A. Correct, no one's told me that.

Q. Nobody -- nobody told you that they ever worked for a dealer, a tire dealer manufacturer or a tire dealership, right?

A. No one has ever told me that, that's correct.

Q. In your affidavit, you say "we," and by "we," you understand that I am talking about Michelin, right?

A. I do.

Q. And by "we," you understand that out of the thousands of employees that Michelin has in its company, they didn't designate you for anything but for to talk about the secrets of Michelin. You understand that?

MR. BULLION: Objection; form.

THE WITNESS: I understand that I wrote an affidavit regarding Michelin's trade

MR 0712

secret, proprietary information.

BY MR. GUERRA:

Q. They come to you -- they came to you to ask you to write that affidavit, correct?

A. That's correct.

Q. You are the chosen one, right, to talk about the secrets?

A. To write this affidavit, I was asked to do that; that's correct.

Q. Nobody else in the company; you, you, Mr. Price.

A. That's correct.

Q. All right. And then you go on, and you -- when I read this affidavit, I get the impression that this is done intentionally; am I incorrect?

MR. BULLION: Objection; form.

THE WITNESS: The writing of the --

BY MR. GUERRA:

Q. The keeping --

A. -- affidavit was intentionally --

Q. The keeping the documents secret, that's the gist of your affidavit.

MR. BULLION: Objection; form.

MR 0713

BY MR. GUERRA:

Q. This is done intentionally. Michelin does this on purpose, right?

A. Those documents are trade secrets, they're proprietary, and they're not out in the public.

Q. And it's done intentionally and purposefully. That's my question, sir; yes or no?

MR. BULLION: Objection; form.

THE WITNESS: Yes.

BY MR. GUERRA:

Q. All right. And it's done in a thought-out manner and in a premeditated manner.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Right?

A. There is a policy about how to assign trade secret status to documents, yes.

Q. We do that way thought out, and we say, we, Michelin say, these documents we're going to keep hidden and away from the public?

MR. BULLION: Don't answer. Don't answer any more questions about this. You have asked this at least 20 times, and it's beyond harassing. He's not going to answer any more questions about that.

MR 0714

MR. GUERRA: Harassing, that's such a strong word, Tom.

MR. BULLION: It seems to be harassing to me, it's --

MR. GUERRA: No, it's not -- no, it's not harassing.

MR. BULLION: Don't answer any more questions.

MR. GUERRA: We're here and we're relaxed. We're talking about -- you're smiling.

THE WITNESS: I'm on camera.

MR. GUERRA: Thank you, buddy. Thank you for you help, Tom.

MR. BULLION: It wasn't really in an effort to help you. I'm just tired of -- I'm tired of listening to the same questions over and over and over again, and your -- and your tone and -- I just think you've beat the dead horse completely.

MR. GUERRA: Come on, you're calling Mr. Price a dead horse? Come on, that's unfair and maybe rude. I would say that's rude, Tom. But I'm just going down his affidavit. I don't know how many times he wrote it. I'm just reading the different paragraphs. If you think

MR 0715

that's too much, maybe you should have written less, or he should have written less.

MR. BULLION: Ask him about his affidavit.

MR. GUERRA: I'm asking. This is straight out of his affidavit. That was paragraph 41, paragraph 43. I don't have much more to go, and you're telling me that he can't answer those questions.

BY MR. GUERRA:

Q. All right. Be that as it may, let's talk about the intentional actions of Michelin to protect its secrets.

You said an eight-foot high Cyclone topped with barbed wire fence. That's one of the steps that Michelin takes actively to keep the secrets away from the public?

A. There is a security fence around the MARC campus, that's correct.

Q. No, no. You say it's to protect the secrecy.

A. That's correct.

Q. And this is -- this is your words, right?

A. It is.

Q. I didn't make this up, right?

MR 0716

A.   That's correct.

Q.   I had no involvement on your affidavit, right?

A.   That's correct.

Q.   It was you and your attorney, right, that wrote the affidavit?

A.   I wrote this document.

Q.   It was you and Michelin's attorneys that came up with the affidavit, right?

A.   I wrote the affidavit.

Q.   You told me part. You can tell me what Kate did, but part, framework, right?

A.   I told you specific parts that she wrote. She wrote the header at the top of the document, the footer at the bottom of the document and, yes, there was some framework information that went along with it.

Q.   In fact, you said there was more stuff, right? You said there was more stuff than just the footer and the other.

A.   I said there was framework for the document, that's correct.

Q.   But you said, I can't give you the physical evidence of what she gave me, right?

A.   The physical evidence is here in the

MR 0717

affidavit.  These were the areas that were identified as being detailed information.

Q.  No, no.  Before you wrote it, I want to see the framework.

A.  I don't have that document.

Q.  I get it.

Now -- but what I'm saying is that you had the opportunity and the availability of Michelin Legal Department concerning your affidavit, right? You had the opportunity to talk to them anytime you wanted about it?

A.  Certainly.

Q.  And you did have the opportunity and you did speak with them about it.

A.  Yes.

Q.  All right.  And then you had the opportunity to prepare for this deposition about this affidavit, right?

A.  Yes.

Q.  And you talked to your attorneys, you talked to Nicole, right?

A.  Yes.

Q.  You talked to Kate Helm?

A.  Yes.

Q.  You talked to the lady from Chicago?

MR 0718

A. Yes.

Q. You talked to the gentleman from Florida?

A. I did.

Q. You talked to Mr. Bullion?

A. I did.

Q. You had a meeting that lasted an entire day about it, right, from nine to four?

A. The meeting was that long.

Q. Okay. With five attorneys.

A. That's correct.

Q. From Michelin, right?

A. Correct.

Q. I certainly had nothing to do with your affidavit, right?

A. That's correct.

Q. Or they, right?

A. Except that it's written in response to your discovery request.

Q. No. But I didn't. No. So I chose the words that you put in the affidavit, I chose the information to be put on the affidavit?

A. No.

Q. I chose how you wrote it?

A. No, it's based on your discovery request.

Q. Yeah, but it has nothing to do with me,

MR 0719

right?  I had no input on the way you wrote that.

A.    That's correct.

Q.    Other folks did.  You and Michelin folks did, right?

A.    I wrote the document.

Q.    With the framework, right?

A.    That's correct.

Q.    And then you seek advice from those attorneys, right?

A.    I didn't characterize it that way.

Q.    You didn't?

A.    They were involved in the process.  I talked with them.

Q.    I get it.

But you had the opportunity and the availability of all these folks to talk to about your affidavit, right?

A.    I'm not sure which folks and at what time you're referring to now.

A.    Since you wrote the affidavit, since before you wrote the affidavit up to today.

A.    Okay.  Those people weren't all involved in writing the affidavit, no.

Q.    No.  They were involved in writing the affidavit and preparing for the depositions about the

MR 0720

affidavit, right?

MR. BULLION: Object to form.

THE WITNESS: I don't think they were all involved in preparing me for the affidavit.

BY MR. GUERRA:

Q. And for preparing for the deposition concerning the affidavit?

A. I don't believe they were all involved in preparing me for the deposition or the affidavit.

Q. Okay. All right. And you also had the opportunity in preparing your affidavit to talk to the formulators and the compounders and the class spectors and the designing of the tire, you had that opportunity if you wanted to?

A. If I needed to for the information that I put in the affidavit, I had the opportunity.

Q. But you didn't. Those folks you didn't talk to.

A. I didn't need to to have the information that I needed for the affidavit.

Q. Sir, just answer my question. You didn't speak to any single worker in design, build, class spec, inspector, this subject tire for your affidavit, right?

MR 0721

MR. BULLION: Objection; form.

THE WITNESS: It was not necessary that I speak to any of those people to prepare this affidavit.

BY MR. GUERRA:

Q. Yes or no, did you speak with any of them?

MR. BULLION: Objection; form.

THE WITNESS: It was not necessary and I did not.

BY MR. GUERRA:

Q. You did not?

A. That's correct.

Q. I don't know your couch and your words, just yes you did or no you didn't. If you did, I would like to know. That's all my question is.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. If you don't, just say, this, I didn't.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. You didn't, right?

MR. BULLION: Objection; form.

THE WITNESS: That's correct.

BY MR. GUERRA:

Q. You talked to attorneys, right?

MR 0722

A.   I did.

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.   You got the framework from attorneys?

MR. BULLION:  Objection; form.

THE WITNESS:  I did.

BY MR. GUERRA:

Q.   All right.  Now let's go back to the thought-out, premeditated actions taken by Michelin to protect its secrets.

MR. BULLION:  Objection; form.

BY MR. GUERRA:

Q.   In addition to the Cyclone fence, you say there is a limited access turnstile and badge reader; is that correct?

A.   That's correct.

Q.   To keep the secrets protected?

A.   That's correct.

Q.   All right.

A.   And to control access to the facility.

Q.   No, no, no, no, no, no, that's not what you said.  You said on your paragraph 47, the step that MNA has in place to protect the secrecy of its confidential design and developmental information include, not limited, not access to the facility, to

MR 0723

keep the secrecy, right, sir; that's what you wrote?

A.   And that's the process by which we keep the secrecy is limiting access through this turnstile, for example.

Q.   I'm just reading what you wrote.  You don't like what you wrote, that's no problem, but I am reading what you wrote, right?

MR. BULLION:   Objection; form.

THE WITNESS:   Yes.

BY MR. GUERRA:

Q.   And what you say is that access turnstile and badge reader, right?

A.   That's correct.

Q.   All right.  And did you write the policy concerning the turnstile and the badge reader?

A.   No.  I wrote no policy with regards to the turnstile or the badge reader.

Q.   Who wrote that policy?

A.   I don't know.

Q.   Did you talk to him?

A.   No.

Q.   All right.  Did you talk -- did you order the fence, the Cyclone fence?

A.   No.

Q.   Who ordered that?

MR 0724

A.    I do not know.

Q.    Did you talk to him, to the person that ordered it?

A.    I did not talk to anyone about ordering the Cyclone fence.

Q.    Did you talk to anybody that set the policy toward that specific eight-foot high Cyclone fence to keep the secrets out?

A.    I did not talk to anyone about ordering the eight-foot high Cyclone fence.

Q.    To keep the secrets in.  I apologize.  No doubt, you understood the question.

A.    To limit the access to the facility, yes.

Q.    No.  To keep the secrets in.  You said to protect its secrecy, right?  The Cyclone fence is to protect the secrecy, right?

MR. BULLTON:  Objection; form.

THE WITNESS:  It is.

BY MR. GUERRA:

Q.    That's what you wrote.

The security gate's manned Monday through Friday, 6:30 to 5:00 p.m., patrolled by security at all other hours, weekends and holidays.

Did you talk to those folks?

A.    I have at times talked to people in

MR 0725

security, yes.

Q. For this affidavit?

A. No, I did not.

Q. All right. For this deposition?

A. No, I did not.

Q. All right. For the guy that wrote the policy about the manned gates from Monday through Friday?

A. No, I'm not aware of any such --

Q. Who is that person?

A. I don't know who that person would be.

Q. All right. Who is the person that wrote the policy about vendors not allowed on the MNA premises?

A. I do not know.

Q. Did you speak with him?

A. I did not.

Q. Did you look at the policy?

A. I did not.

Q. Okay.

A. I am not aware that there is a policy other than security guidelines.

Q. All right. Have you seen those?

A. I have not.

Q. Certain areas of the MARC campus are accessible only to MARC personnel with heightened

MR 0726

security access.  Do you have that heightened
security access?

A.    I think that would depend on the area.  And
I mentioned one earlier, for example, The Lab where
we had the subject tire in this case stored, I had
access to; most would not.

Q.    Tell me -- tell me -- two questions.  First,
what are the other areas, since you say several, what
are the other areas that are only accessible to
certain people?

A.    Every building has badge access control.

Q.    You say certain areas.  Not every building.
You say certain areas of the MARC campus are
accessible only to MARC personnel with heighten
security access.  Who are those certain areas?  Not
every building, certain areas.

A.    I mentioned the area where machine
development is done.

Q.    What else?

A.    I don't know the other areas.  There are
more, but I don't know them.

Q.    Tell me their names.

A.    I don't know their names.

Q.    Who would know that?

A.    I don't know.

MR 0727

Q. Is there a facility manager?

A. I am certain that there is and I am certain that they would know.

Q. Who is it?

A. I do not know.

Q. How would you go about finding out?

A. I'm not sure. I would ask the attorneys if they knew who the facility manager is.

Q. Oh, the attorneys that are your co-workers?

A. Yes.

Q. Okay. What about the personnel with heightened security access, does everybody that works with you have heightened security access?

A. The folks that work with me in my group have access to that lab, the attorneys and the other technical people.

Q. I'm just using your words. Paragraph 47, the subsection J, you use the words "heightened security access," and that's why I am using that. You understand that, right, Mr. Price?

A. I do understand.

Q. So who -- does everybody that works with you -- I mean, let's start small. The two other folks that are the Technical Adviser and the Technical Director over Litigation, do they have

MR 0728

heightened security access?

A. I'm not familiar with the term "heightened security access" except that certain areas are only accessible to certain people, that context they have heightened security access. I don't know every area that has that, and I don't know every person that has access to those different areas.

Q. I'm not asking for every person. I'm just asking for the people that work with you. Because you say certain areas of the camp -- of the campus are only accessible to MARC personnel with heightened security access. You understand that I am reading exactly what you wrote, right?

A. I do.

Q. And you understand the questions that I am asking is related to that, right?

A. I understand that you asked me who all had heightened security access.

Q. Not all, just the people that work with you, right? There's thousands of employees, and I'm not asking -- you understand that, right?

A. I do now.

Q. Oh. I thought I made it clear that I was talking about the folks that work with you.

So tell me about the guy -- the people that

MR 0729

work with you. Who -- who has heightened security access other than yourself?

A. To what area?

Q. To these certain areas that you talk here on your affidavit.

A. I don't know what areas each individual has access to.

Q. Do you know if they have access to any area at all, the people that work with you?

A. As I mentioned earlier, the people that work with me have access to The Lab where we stored the subject tire.

Q. What about the other areas?

A. I don't know what other areas they may have access to.

Q. And other than The Lab that you what? You said The Lab that what?

A. Where we stored the subject tire.

Q. The Lab that were -- the subject area. Do you have access to any other areas of MARC with restricted access?

A. I have access to other buildings at MARC that have security badge, scanning security.

Q. Not security scan. I'm just reading your words. I mean, it doesn't seem that you know the

MR 0730

information that you wrote, because what I'm asking is: Do you have access to any other areas of MARC only accessible to personnel with heightened security access? You told me The Lab. Any other areas with this heightened security access at MARC that you have access to?

MR. BULLION: Objection; form.

THE WITNESS: Every building that has a badge reader to allow a person in has heightened security.

BY MR. GUERRA:

Q. So what are those buildings?

A. Another one that I have access to is a building where the designers work.

Q. What's that called?

A. I don't know the name of the building.

Q. Do you know the name of the department?

A. Tire Design.

Q. Tire Design.

What else? What other areas or buildings?

A. Nothing that's coming to mind.

Q. Not a single one?

A. Not that I enter with a badge access, that's correct.

Q. Okay. So the only areas that you know of is

MR 0731

The Lab? You call it "Lab?"

A. That's correct.

Q. Is there any other name than Lab?

A. Not that I'm aware of.

Q. Lab department, lab building, laboratory?

A. We refer to it as The Lab.

Q. Okay. Thank you.

You say also that MNA vendors sign confidentiality agreements before they are provided access to documents. Who are these vendors that you're talking about?

A. Any vendor of MNA would have to sign a confidentiality agreement.

Q. That's great, but I want these vendors that you're talking about. Vendors, what are the names?

A. I'm talking about anybody that provides products and services to Michelin that would come on the facility grounds.

Q. I get it. What's their names? Anyone.

A. I don't have a specific name.

Q. A single one?

A. Any contractor doing work at the facility.

Q. Such as?

A. I don't have the name of a contractor in mind.

MR 0732

Q. Anyone? You wrote it.

A. I did.

Q. And I'm just asking for identity.

MR. BULLION: Objection; form.

THE WITNESS: I don't know the identity as I sit here.

BY MR. GUERRA:

Q. Okay.

A. And I would like to correct that answer --

Q. Yes, please.

A. Because I have escorted external attorneys. They would be considered vendors.

Q. Okay. Such as?

A. Such as Tom Bullion.

Q. Okay. Who else?

A. Other attorneys that represent Michelin.

Q. Such as?

A. I have escorted Marvin Quattlebaum.

Q. What else? Who else?

A. I have escorted Ed Stewart.

Q. Who else?

A. I don't recall any others as I sit here.

Q. To where?

A. To The Lab.

Q. Where else?

MR 0733

A.    That's the only location.

Q.    When have you done that?

A.    When it was necessary in the case of litigation.

Q.    When was that?

A.    Monday morning.

Q.    Okay.  2015, October 19th?

A.    That's correct.

Q.    All right.  When else?

A.    I don't recall specific dates.

Q.    Who did you escort on October 19, 2015?

A.    Ed Stewart.

Q.    Who?

A.    Ed Stewart.

Q.    Who else?

A.    He had an assistant with him.  All I know, her name is Teresa.  That's all I know.

Q.    Who are those folks?

A.    They're attorneys that represent Michelin.

Q.    Both?

A.    Yes.

Q.    All right.  Who else?  Who else in the year of 2015?

A.    I don't remember specifically.

Q.    When did you escort Mr. Bullion to the -- to

MR 0734

the facility?

A.    I don't recall a specific date that I escorted him.

Q.    This year, 2015?

A.    It may have been.

Q.    2014?

A.    It may have been.

Q.    2013?

A.    It may have been.

Q.    2012?

A.    It may have been.

Q.    2011?

A.    No.

Q.    Were you -- because you were not working there.

A.    In that group, that's correct.

Q.    All right.  All right.  All right.  Another type of information that Michelin takes active steps to keep it hidden and secret from the public at quality assurance processes, right?

                MR. BULLION:  Objection; form.

                THE WITNESS:  That's correct; those documents are trade secret and proprietary.

BY MR. GUERRA:

Q.    And those are some of the documents that

MR 0735

Michelin intentionally and cautiously keeps away and secret?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Right?

A. Those documents are trade secret and proprietary and we keep them out of the public, yes.

Q. And secret, right?

A. They are, yes.

Q. Keep them secret and away from the public, correct?

A. They are trade secret, yes.

Q. And Michelin keeps them secret and away from the public, correct?

A. That's correct.

MR. BULLION: Objection to form.

MR. GUERRA: All right. Let me take, if that's okay, Tom, can I take five minutes?

MR. BULLION: Yeah, sure. It's almost noon. Are we going to take a lunch break, or what are y'all doing?

MR. GUERRA: No, I'm going to be done.

MR. BULLION: Oh, you are?

MR 0736

MR. GUERRA: Yeah.

THE VIDEOGRAPHER: We're going off the video record at 11:50.

(A recess was taken.)

THE VIDEOGRAPHER: Going back on the video record at 12 o'clock.

BY MR. GUERRA:

Q. Thank you so much. Mr. Price, I think you're going to make lunch. You'll be --

A. Sounds good. I'm hungry.

Q. That's good. What do you recommend? Where do we go?

MR. BULLION: Two Chefs.

MR. SHAPIRO: That's what Judy said.

THE WITNESS: If you want -- if you want a hamburger, you go across the road to Grill Marks.

MR. GUERRA: Grill?

THE WITNESS: Grill Marks.

MR. SHAPIRO: Judy said Nose Dive had the best burger.

THE WITNESS: Really? Everybody's entitled to their opinion.

MR. GUERRA: Right. So you said

MR 0737

this one and that one?

MR. SHAPIRO: Yeah.

MR. GUERRA: Okay. First of all, are we on the record?

THE VIDEOGRAPHER: Yes.

BY MR. GUERRA:

Q. All right. Thank you for coming today. It was a pleasure talking to you. I hope I treated you politely and kindly and that you appreciate this conversation that we had; is that correct?

A. Those are your words, and I'm happy to be here to help in any way I can.

Q. And I treated you politely and kindly?

A. You did.

Q. All right. If you will look at your paragraph 57, Mr. Price, of your affidavit.

A. Yes, sir.

Q. Just -- I just want to know if I read -- if what I'm going to read is correct. This is what you wrote on the first line: The divulgence of MNA's proprietary manufacturing and quality processes to the public or to a competitor would cause an unacceptable high risk of irreparable harm and injury. That's your sentence, right?

A. That's correct.

MR 0738

Q.    And my point is, you have been telling Luis about competitor, but the reality is that MNA, Michelin, keeps the information that we requested intentionally secret from the public itself, and you wrote that in your affidavit.

A.    I did.

Q.    Thank you.

Now, concerning -- all right.  You say here -- you told me before, Luis, I never had a position, an employment position at the Dothan plant in Alabama, and that's correct?

A.    That's correct.

Q.    All right.  You said MNA's building procedures employ that the Dothan plant would develop, in an extensive amount of time at tremendous expense.  What are those procedures that you're talking about here?

A.    Any procedures involved in the manufacture of the tire, the quality process that we follow in the plant, would be included in those documents.

Q.    Tell me what they are.  Tell me the names.

A.    I don't know the specific names of the documents.

Q.    Tell me any names of the documents of this building procedures documents, any one of these

MR 0739

document plans.

A. There are thousands of them.

Q. Go ahead, tell me the ones you know.

A. There are tire building work instructions for workplace tire building, and there are also other buildings that they would use at their post associated with tire building.

Q. Tell me -- tell me the names of all the ones you know.

A. I don't know the names of the documents. They would be related to the quality control standards and procedures that they're following.

Q. How big are they?

A. I don't know the exact size of the documents.

Q. How many pages?

A. I don't know how many pages.

Q. How many inches in height for this tire building procedures that you're speaking of on paragraph 58?

A. It would be hundreds and hundreds, if not thousands of pages of documents in total.

Q. Okay. You told me one name of one document. Tell me other names that you know. You said that there were thousands. Tell me any other name that

MR 0740

you know of this building procedures.

A. Just the tire building procedures.

Q. What are you talking --

A. There would also be second stage tire building procedures and the --

Q. What else?

A. -- quality and process documents that go along with those.

Q. I'm sorry?

A. The quality and process documents that go along with those.

Q. Such as?

A. I don't know the names of the documents, but --

Q. More specific. More specifics, please, about the names of this tire building procedure.

A. I don't know the names of the documents. There would be documents that total what tolerances, there would be documents that gave them the recipe for the specific tire they were building, the component parts and --

Q. What else?

A. -- and the dimensions of those parts.

Q. What else? What other documents? You said thousands. I mean, you have told me maybe five.

MR 0741

Tell me, please.

A. Well, every tire would have -- that they build would have different documents. So by the volume of the different tire specifications they're building, there would be different documents associated with those tires. There is all of the inspection documents --

Q. Such as?

A. We refer to the aspect specifications, for example.

Q. What else?

A. The procedures that they follow --

Q. Such as?

A. -- when they inspect the tires.

I don't know the name of the inspection procedures that they follow.

Q. Who would know that?

A. Someone at the plant would know the names of those documents.

Q. All right. What else, Mr. Price? You said thousands of documents. You gave me maybe seven now.

A. No. Those seven represent thousands of documents. Just the aspect specs alone would be hundreds.

Q. How many aspect specs?

MR 0742

A.    I don't know how many aspect specs there are.

Q.    You don't know?

A.    Not an exact number, no.  I know there would be hundreds.

Q.    I know.  I don't work for Michelin.  You don't know?

A.    I don't know the exact number of aspect specs, no.

Q.    Okay.  What else?  What about these recipes that you're talking about, what do they look like?

A.    They would be the local tire building specifications.

Q.    And what do they look like?  Describe them for me physically, please.

A.    They would have the component parts that are put in the tire and their specification measurements, for example.  And I don't know what all other information would be in those documents.

Q.    What are these recipes called?

A.    Local specifications.

Q.    You refer to them as recipes.  Why is that?

A.    It's another term for the component, the listing of the component parts that go into the tire.

Q.    How would you describe them accurately?  If

MR 0743

I wanted to ask them for documents accurately, how would you -- how would you describe them?

A.   The local tire building specifications.

Q.   Or the local tire building recipe?

A.   I don't know if they would use that term.

Q.   Where have you heard that term?

A.   It's a term that's used within Michelin when it's -- when you're discussing a list of products that go into a component part.

Q.   Okay.  Anything else that you want to add that I haven't asked you that you think is important for me to know?

A.   Not that comes to mind.

Q.   Anything else that I haven't asked you that you believe it's important for the Jury?

MR. BULLION:  Objection; form.

THE WITNESS:  Not that comes to mind.

MR. GUERRA:  It was a pleasure seeing you again, Mr. Price.  I hope you have a wonderful lunch.

THE WITNESS:  Thank you.

MR. GUERRA:  And that you have a great week.

THE WITNESS:  Thank you.

MR 0744

MR. GUERRA: I hope that I will see you soon. Okay?

THE VIDEOGRAPHER: This then completes our videotape --

MR. GUERRA: Oh, no.

THE VIDEOGRAPHER: I'm sorry.

MR. GUERRA: Hold on a second. Thomas?

MR. BULLION: I want to ask you just a few questions, Vandy.

EXAMINATION

BY MR. BULLION:

Q. One is: Mr. Guerra asked you some questions about your job within the Legal Department. I just want to ask you a couple follow-ups on that.

Do you work for and at the direction of lawyers for Michelin North America?

A. I do.

Q. And do you serve as a representative of the in-house lawyers and sometimes the outside lawyers for Michelin in terms of your job as a Senior Technical Advisor?

A. I do.

MR. GUERRA: I'm sorry, Tom, what did you say? Can you -- can you repeat that

MR 0745

question? I don't want him to answer, but can you be kind enough to tell me again?

MR. BULLION: Just that he serves as a representative for the lawyers, both the internal lawyers and the outside lawyers.

MR. GUERRA: Okay.

BY MR. BULLION:

Q. Mr. Guerra asked you --

MR. GUERRA: Call me Luis, man.

MR. BULLION: Well, I think it's more appropriate I call you Mr. Guerra when I'm referring to you on the record, but --

MR. GUERRA: Call me Luis or anything close to it.

BY MR. BULLION:

Q. Mister -- Mr. Guerra asked you a whole bunch of questions about Michelin keeping documents hidden and secret from the public. Do you remember generally that series of questions?

A. I do.

Q. What I want you to do is, with regard to the types of things that are referred to in your affidavit, information about Michelin's processes and various documents, if you would, just explain why it is that it's important for Michelin to keep those,

MR 0746

the trade secret and the proprietary information that you referred to, confidential.

A. My response to that would be that the tire industry is extremely competitive, and the company has invested hundreds of millions of dollars, we invest hundreds of millions of dollars in research and development every year, and the information that we develop over time couldn't be known by our competitors without them doing the same work. And that's why it's important that the company keep those -- that information and those documents secret.

Q. And Mr. Guerra tried to make that point that, well, his folks aren't in the tire business, they're just regular folks. Do you remember that?

A. I do.

Q. Is -- what -- in the -- in terms of confidential business information or trade secret information, once the cat is out of the bag, is there -- is it possible to put the cat back in the bag?

MR. GUERRA: It's always possible. If it's a cat, you can do it.

THE WITNESS: Once that information is out, it cannot be retrieved.

MR 0747

BY MR. BULLION:

Q. And -- and the -- one of the -- one of the reasons that you all designate documents as confidential and certain trade secret protection for documents that are -- that are either sought or produced in discovery in lawsuit have to do with this concept that documents may get leaked or the cat might get out of the bag and you might not be able to put it back, fair?

A. That's certainly a consideration, yes.

Q. Now, with respect to your affidavit, it's obviously very detailed; it's 17 pages long, and Mr. Guerra has asked you about some of the paragraphs but certainly not all of them. But in terms of the factual assertions that are included within your affidavit, do you have support for each and every one of those?

MR. GUERRA: Form. Form.

THE WITNESS: Yes.

MR. GUERRA: And leading.

THE WITNESS: I do.

BY MR. BULLION:

Q. And if he wanted to take you through paragraph by paragraph through this affidavit and ask you about that, he certainly would be entitled to do

MR 0748

it today?

A.   Yes, he would.

MR. BULLJON:   Okay.   That's all I have.   Thank you.

EXAMINATION

BY MR. GUERRA:

Q.   Do you have any physical evidence in this report of your affidavit that would go with your affidavit that you brought here today with you?

A.   I do not.

Q.   All right.   And you understand by "physical evidence," I mean documentation as opposed to talk?

A.   I do.

Q.   And you have none, right?

A.   That's correct.

Q.   All right.   Now, the point that is made is that the reason for the secrecy is, as you say on page 15, paragraph 57, that would be a direct financial threat to MNA.   Do you see that?

A.   Yes, I do.

Q.   You wrote that, right?

A.   I did.

Q.   And that's the reason why; the secrets represent and information kept out would be a direct financial threat to MNA.

MR 0749

A.   That's correct.

Q.   To Michelin.

A.   That's correct.

Q.   Financial reasons.

A.   That's correct.

MR. GUERRA:  All right.  Thank you so much.  Hold on one second.

I'm sorry, say that again?

Hey, Tom, can I take a one-minute break?

MR. BULLION:  Sure.

MR. GUERRA:  And it won't take me much longer.

THE VIDEOGRAPHER:  Going off the video record at 12:13.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record at 12:14:45.

BY MR. GUERRA:

Q.   Do you know the term freezing the kicker?  I didn't mean to go back, but I was -- David was telling me something and we -- we had to talk about it.

You didn't bring a single piece of physical evidence with you today in support or as a basis or

MR 0750

foundation to your affidavit, right?

A.    Only the affidavit itself.

Q.    No physical evidence?

A.    That's correct.

MR. GUERRA:    Thank you so much.

EXAMINATION

BY MR. BULLION:

Q.    Did the note -- you saw the Notice of your deposition to come here, Vandy?

A.    I did.

Q.    Did it -- did it have a request that you produce any documents at the time of the deposition?

A.    It did not.

MR. BULLION:    That's all.

MR. GUERRA:    Thank you.

THE VIDEOGRAPHER:    This then completes our videotaped deposition.    We've used two media, and it lasted approximately two hours and 16 minutes.    We're going off the video record at 12:16.

(The deposition concluded at 12:16 p.m.)

MR 0751

Notice Date: November 4, 2015

Deposition Date: October 21, 2015

Deponent: Vaneaton Price

Case Name: Medina and Obdula v. Michelin

North America, Inc.

Page:Line                Now Reads                Should Read

MR 0752

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____  _____
Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2015, and executed the above certificate in my presence.

_____  _____
NOTARY PUBLIC IN AND FOR

_____  _____
County Name

MY COMMISSION EXPIRES:

MR 0753

STATE OF SOUTH CAROLINA

COUNTY OF SPARTANBURG

REPORTER'S CERTIFICATE

I, Rebecca L. Arrison, a Notary Public in and for the State of South Carolina, do hereby certify that there came before me on the 21st day of October, 2015, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this 28th day of October, 2015.

_____

Rebecca L. Arrison, Notary Public

My Commission Expires:  4/30/2017

MR 0754

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § § | |
| VS. | § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § § | DALLAS COUNTY, TEXAS **(Oral Argument Requested)** |
| DEFENDANTS, | § § | |

TO THE HONORABLE JUDGE DALE TILLERY:

**Plaintiffs' Short Motion To Compel Michelin's Employee Most Knowledgeable about: 1) Michelin's Discovery Responses and 2) Financial Information of Michelin North America (MNA)**

1.  **Discovery Responses:**

Throughout this litigation Michelin has voluntarily produced very sparse documents claiming that documents not produced are privileged, or not relevant to the technical matters including the manufacturing, design and defects alleged. Plaintiffs want to depose the Michelin's employees who assisted in the Michelin's answers to discovery.

2. **Financial Information:**

Similarly, Plaintiffs have made a claim for punitive damages and need to conduct discovery about MNA's financial condition.

**Conclusion:** Plaintiffs have requested the identification and dates for the depositions of Michelin's employees about these two (2) subjects. Without any basis, Michelin has refused,

claiming that it objects. Therefore, Plaintiffs have no choice but to request the Honorable Court's assistance in this matter.

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:    /s/ Luis P. Guerra
Luis P. Guerra (*Admitted Pro Hac Vice*)
AZ State Bar No. 015768
David C. Shapiro (*Admitted Pro Hac Vice*)
AZ State Bar No. 028056
ATTORNEYS FOR PLAINITFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

## CERTIFICATE OF CONFERENCE

Counsel for movant has repeatedly wrote and called Defendant Michelin's counsel. All to no avail. Counsel for Michelin will not respond or answer Plaintiffs' counsel's phone calls or letters. Thus, despite best efforts the counsel have not been able to resolve those matters presented.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 19th day of October, 2015.

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700

2

MR 0756

Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.


Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars


/s/ David C. Shapiro
David C. Shapiro

3

MR 0757

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA | ) | IN THE DISTRICT COURT OF |
| MEDINA, HUSBAND AND WIFE, | ) | |
| INDIVIDUALLY; NATALYE MEDINA, | ) | |
| INDIVIDUALLY; NAVIL GIBSON, | ) | |
| INDIVIDUALLY, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) | |
| | ) | |
| MICHELIN NORTH AMERICA, INC.; AND | ) | |
| JOSE BUSTILLO D/B/A MUNDO CARS, AN | ) | |
| IN STATE DEFENDANT, | ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

### DEFENDANT MICHELIN NORTH AMERICA, INC.'S RESPONSE TO PLAINTIFFS' SHORT MOTION TO COMPEL MICHELIN'S EMPLOYEE MOST KNOWLEDGEABLE ABOUT (1) MICHELIN'S DISCOVERY RESPONSES AND (2) FINANCIAL INFORMATION OF MICHELIN NORTH AMERICA, MOTION FOR PROTECTIVE ORDER, AND MOTION TO DELAY RULING UNTIL TEXAS SUPREME COURT ISSUES RULING IN *IN RE ROBINSON*

COMES NOW Michelin North America, Inc. ("MNA"), one of the defendants in the above-styled and numbered cause, and files this Response to Plaintiffs' Short Motion to Compel Michelin's Employee Most Knowledgeable About (1) Michelin's Discovery Responses and (2) Financial Information of Michelin North America, Motion for Protective Order, and Motion to Delay Ruling Until Texas Supreme Court Issues Ruling in *In Re Robinson*. In support, MNA shows the Court the following:

I.
### TEXAS LAW DOES NOT PERMIT PLAINTIFFS TO DEPOSE MNA EMPLOYEE OR REPRESENTATIVE REGARDING DISCOVERY RESPONSES

Plaintiffs contend that MNA has produced "very sparse documents" during the discovery process and, as a result, seek to depose MNA employees who have assisted in MNA's responses

to plaintiffs' discovery requests. However, under Texas law, it is well established that "discovery about discovery" is prohibited because it violates the work product privilege. *In re Exxon Corp.*, 208 S.W.3d 70 (Tex. App. – Beaumont 2006, orig. proceeding); *In re Boxer Property Management Corporation*, 2009 WL 4250123 (Tex. App. – Houston [14th Dist.] 2009, orig. proceeding); *In re Arpin America Moving Systems, LLC*, 416 S.W.3d 927 (Tex. App. – Dallas 2013, orig. proceeding). This question was squarely addressed by the Beaumont Court of Appeals:

> ... the plaintiffs seek to depose an Exxon representative for the purpose of inquiring specifically into the process by which Exxon's representative responded to the requests for production. This subject necessarily and almost exclusively concerns the 'mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives' and consists of the 'attorney's representative's mental impressions, opinions, conclusions, or legal theories' subject to protection as work product and core work product.

*In re Exxon Corp.*, 208 S.W.3d at 75. The Houston Court of Appeals reached the same conclusion when considering a request to depose a corporate representative with knowledge of "who searched for documents related to roof vents and roof hatches ... which buildings were searched; and the manner in which the search was conducted." *In re Boxer*, 2009 WL 4250123 at *1. Citing *Exxon*, the court concluded that "it is beyond dispute that the requested deposition will explore attorney work product in connection with relators' efforts to respond to the Wells plaintiffs' discovery requests." *Id.* at *6.[1] Consequently, the Houston Court of Appeals ordered the trial court to vacate its order compelling the deposition of the relators' corporate representative.

---

[1] The court further noted that "bare assertions that an opponent is hiding documents" do not justify deposing a corporate representative about whether a diligent search was conducted. *Id.* at *7.

2

4543932

MR 0759

Because Texas courts have clearly and consistently prohibited "discovery about discovery," plaintiffs are not entitled to depose any MNA employee or representative about the efforts that were made to respond to their discovery requests in this case.

II.
NEWLY ENACTED §41.0115 OF TEXAS CIVIL PRACTICE & REMEDIES CODE ESTABLISHES PROCEDURE FOR DISCOVERY OF NET WORTH INFORMATION – COURT SHOULD DELAY RULING UNTIL SUPREME COURT DETERMINES APPLICABILITY OF NEW LAW IN *IN RE ROBINSON*

A.  Motion to Delay Ruling on Discovery of Net Worth Information

By enacting section 41.0115 of the Texas Civil Practice & Remedies Code, the Texas legislature amended the law regarding the pre-trial discovery of net worth information. Exh. A (CPRC §41.0115). By its terms, section 41.0115 applies to all cases that were filed on or after September 1, 2015. Exh. B (Senate Bill 735) While this case was filed prior to September 1, 2015, the Texas Supreme Court is currently considering whether section 41.0115 (the codification of Senate Bill 735) should be applied to cases, like this one, that were filed prior to the law's effective date. Exh. C (*In re Robinson*, 2015 WL 5102928, Petition for Writ of Mandamus). The parties have already submitted briefing on this issue and the matter was submitted for the Supreme Court's consideration on October 13, 2015. Exh. D (Docket Sheet). The Supreme Court will almost certainly issue a ruling in *In re Robinson* during the pendency of this lawsuit, most likely before the end of the year. MNA requests that this Court delay its ruling on plaintiffs' motion to compel the deposition of a representative of MNA regarding its financial status until the Texas Supreme Court has issued its ruling in the *In re Robinson* matter.

B.  Texas Legislature Recently Altered Standard for Discovery of Net Worth Information.

Since the Texas Supreme Court issued its opinion in *Lunsford v. Morris* in 1988, some Texas courts have permitted the discovery of a party's net worth based on nothing more than an

3

4543932

MR 0760

allegation that punitive damages were appropriate. 746 S.W.2d 471. Here there is only a bare allegation of punitive damages and there are no facts to support such an award. Indeed, the facts developed in discovery demonstrate that the conduct of a third party may be responsible for the accident, not the conduct of MNA. Because there are numerous legislative actions and court opinions limiting the recovery of exemplary damages since *Lunsford* was issued, this Court should not allow discovery of punitive damages at all unless and until facts are developed to support them.

Trial courts have struggled with the proper procedures for managing the discovery of a party's net worth in cases involving allegations of punitive damages. To clarify this issue, the Texas legislature added section 41.0115 to the Texas Civil Practice and Remedies Code, announcing a clear and concise procedure for courts to follow when a party's net worth is at issue. MNA contends that the procedure announced in section 41.0115 should govern plaintiffs' request for MNA's financial information in this case. Subsections (a) and (b) of section 41.0115 require that, to obtain net worth information, a party must obtain a written order from the trial court finding that he has demonstrated a "substantial likelihood of success" on the merits of a claim for punitive damages after a hearing on the issue:

> (a) On the motion of a party and after notice and a hearing, a trial court may authorize discovery of evidence of a defendant's net worth if the court finds in a written order that the claimant has demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages. Evidence submitted by a party to the court in support of or in opposition to a motion made under this subsection may be in the form of an affidavit or a response to discovery.

> (b) If a trial court authorizes discovery under Subsection (a), the court's order may only authorize use of the least burdensome method available to obtain the net worth evidence.

TEX. CIV. P. & REM. CODE §41.0115. Even when a plaintiff successfully shows a "substantial likelihood of success" on a punitive damages claim, the court may only authorize the "least

4

4543932

burdensome method available" to obtain the net worth evidence. *Id.* Thus, if a party can produce documents that demonstrate its net worth once a plaintiff has made the requisite showing, it is highly unlikely that compelling the deposition of a representative with knowledge of a corporation's net worth would be found the "least burdensome method available" to demonstrate net worth.

If the Supreme Court determines that section 41.0115 is applicable to cases, like this one, that were filed prior to September 1, 2015, plaintiffs' demand for the deposition of a representative of MNA to testify regarding its financial condition is premature. Plaintiffs have not followed the procedure established in section 41.0115 for obtaining discovery regarding MNA's net worth or even attempted to demonstrate a "substantial likelihood of success" on their claim for punitive damages against MNA. Even if the plaintiffs could make such a showing, which is denied, demanding the deposition of a representative of MNA on its financial status would not be the least burdensome method of obtaining MNA's net worth.

## III.
## DISCOVERY OF NET WORTH AND FINANCIAL INFORMATION SHOULD NOT BE PERMITTED AT THIS POINT EVEN IF NEWLY ENACTED §41.0115 OF TEXAS CIVIL PRACTICE & REMEDIES CODE DOES NOT APPLY TO THIS CASE

Even if the Supreme Court finds that section 41.0115 is not applicable to cases filed prior to September 1, 2015, plaintiffs should not be permitted to obtain discovery regarding MNA's net worth or financial condition at this juncture. The Texas Supreme Court established a bifurcated procedure for trials involving claims for exemplary damages due to the "very real potential" that evidence of a defendant's wealth will prejudice the jury's determination of other disputed issues in tort cases. *Transp. Inc. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1990). The Texas Legislature later codified that procedure in Texas Civil Practice & Remedies Code section 41.009. Under the bifurcated procedure, evidence or mention of a defendant's net worth is

5

MR 0762

*completely inadmissible* during the first phase of a bifurcated trial. In fact, evidence of a defendant's net worth is *only admissible* in the second phase of a bifurcated trial following a *unanimous finding of liability for exemplary damages, by clear and convincing evidence.* TEX. CIV. PRAC. & REM. CODE §§ 41.003; 41.009 (emphasis added).

As a result of these challenging evidentiary hurdles, the majority of cases involving punitive damages do not make it to the second phase of trial. *See In re Jacobs,* 300 S.W.3d 35, 50 (Tex. App. – Houston [14th Dist.] 2009, orig. proceeding) (Sullivan, J., concurring). In such cases, information concerning a defendant's net worth is *absolutely inadmissible* and the discovery of such information is not reasonably calculated to lead to the discovery of admissible evidence.

Moreover, "trial courts should be mindful of protecting sensitive information and utilize the least intrusive means necessary to facilitate discovery." *Jacobs,* 300 S.W.3d at 46, citing *In re Weekly Homes, L.P.,* 295 S.W.3d 309, 321 (Tex. 2009). That includes ensuring the correct timing, as well as the correct scope, of discovery. The discovery of net worth information subjects defendants, like MNA, to extreme risk of prejudice, as well as unnecessary violations of privacy through disclosure of highly sensitive, confidential financial information. The disclosure of such information will result in a grave risk to MNA and endanger MNA's ability to remain financially competitive in a highly competitive business environment. The Court should engage in a proper balancing of the burdens and benefits of discovery, particularly as colored by the importance of the privacy interests at stake, and prohibit discovery of MNA's net worth unless and until it is determined that MNA is liable to plaintiffs for punitive damages.

WHEREFORE, PREMISES CONSIDERED, defendant Michelin North America, Inc. prays that this Court deny plaintiffs' motion to compel the depositions of representatives of

4543932

MR 0763

MNA regarding (1) MNA's discovery responses and (2) MNA's financial condition. In the alternative, MNA requests that this Court delay its ruling on the motion to compel the deposition of a representative of MNA regarding its financial condition until the Texas Supreme Court has issued its ruling in *In re Robinson*.

Respectfully submitted,

GERMER BEAMAN & BROWN, P.L.L.C.
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By: /s/ Thomas M. Bullion III
Thomas M. Bullion III
State Bar No. 03331005
tbullion@germer.com
Chris A. Blackerby
State Bar No. 00787091
cblackerby@germer-austin.com

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

7

4543932

MR 0764

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 30th day of October, 2015.

Luis P. Guerra                             *Via E-Service and Facsimile*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

James B. Ragan                          *Via E-Service and Facsimile*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

Noel Sevastianos                       *Via E-Service and Facsimile*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars       *Via Regular Mail*
6422 Day Street
Dallas, Texas 75227

/s/ Thomas M. Bullion III
Thomas M. Bullion III/Chris A. Blackerby

8

4543932

MR 0765

| Vernon's Texas Statutes and Codes Annotated |
| --- |
|   Civil Practice and Remedies Code (Refs & Annos) |
|     Title 2. Trial, Judgment, and Appeal |
|       Subtitle C. Judgments |
|         Chapter 41. Damages (Refs & Annos) |

V.T.C.A., Civil Practice & Remedies Code § 41.0115

§ 41.0115. Discovery of Evidence of Net Worth for Exemplary Damages Claim

Effective: September 1, 2015

Currentness

(a) On the motion of a party and after notice and a hearing, a trial court may authorize discovery of evidence of a defendant's net worth if the court finds in a written order that the claimant has demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages. Evidence submitted by a party to the court in support of or in opposition to a motion made under this subsection may be in the form of an affidavit or a response to discovery.

(b) If a trial court authorizes discovery under Subsection (a), the court's order may only authorize use of the least burdensome method available to obtain the net worth evidence.

(c) When reviewing an order authorizing or denying discovery of net worth evidence under this section, the reviewing court may consider only the evidence submitted by the parties to the trial court in support of or in opposition to the motion described by Subsection (a).

(d) If a party requests net worth discovery under this section, the court shall presume that the requesting party has had adequate time for the discovery of facts relating to exemplary damages for purposes of allowing the party from whom net worth discovery is sought to move for summary judgment on the requesting party's claim for exemplary damages under Rule 166a(i), Texas Rules of Civil Procedure.

**Credits**

Added by Acts 2015, 84th Leg., ch. 1159 (S.B. 735), § 2, eff. Sept. 1, 2015.

V. T. C. A., Civil Practice & Remedies Code § 41.0115, TX CIV PRAC & REM § 41.0115
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



MR 0766

MR 0767

2015 Tex. Sess. Law Serv. Ch. 1159 (S.B. 735) (VERNON'S)

VERNON'S TEXAS SESSION LAW SERVICE 2015

Eighty-Fourth Legislature, 2015 Regular Session

Additions are indicated by **Text**; deletions by ~~Text~~.
Vetoes are indicated by ~~Text~~;
stricken material by Text .

CHAPTER 1159
S.B. No. 735
DISCOVERY OF EVIDENCE OF THE NET WORTH OF A DEFENDANT IN CONNECTION WITH A CLAIM
FOR EXEMPLARY DAMAGES

AN ACT
relating to discovery of evidence of the net worth of a defendant in connection with a claim for exemplary damages.

Be it enacted by the Legislature of the State of Texas:

SECTION 1. Section 41.001, Civil Practice and Remedies Code, is amended by adding Subdivision (7–a) to read as follows:

<< TX CIV PRAC & REM § 41.001 >>

**(7–a) "Net worth" means the total assets of a person minus the total liabilities of the person on a date determined appropriate by the trial court.**

SECTION 2. Chapter 41, Civil Practice and Remedies Code, is amended by adding Section 41.0115 to read as follows:

<< TX CIV PRAC & REM § 41.0115 >>

**Sec. 41.0115. DISCOVERY OF EVIDENCE OF NET WORTH FOR EXEMPLARY DAMAGES CLAIM. (a) On the motion of a party and after notice and a hearing, a trial court may authorize discovery of evidence of a defendant's net worth if the court finds in a written order that the claimant has demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages. Evidence submitted by a party to the court in support of or in opposition to a motion made under this subsection may be in the form of an affidavit or a response to discovery.**

**(b) If a trial court authorizes discovery under Subsection (a), the court's order may only authorize use of the least burdensome method available to obtain the net worth evidence.**

**(c) When reviewing an order authorizing or denying discovery of net worth evidence under this section, the reviewing court may consider only the evidence submitted by the parties to the trial court in support of or in opposition to the motion described by Subsection (a).**

**(d) If a party requests net worth discovery under this section, the court shall presume that the requesting party has**



EXHIBIT

B

MR 0768

had adequate time for the discovery of facts relating to exemplary damages for purposes of allowing the party from whom net worth discovery is sought to move for summary judgment on the requesting party's claim for exemplary damages under Rule 166a(i), Texas Rules of Civil Procedure.

<< Note: TX CIV PRAC & REM § 41.001 >>

SECTION 3. The change in law made by this Act applies only to an action filed on or after the effective date of this Act.

SECTION 4. This Act takes effect September 1, 2015.

Passed the Senate on April 28, 2015: Yeas 20, Nays 11; the Senate concurred in House amendment on May 28, 2015: Yeas 23, Nays 8; passed the House, with amendment, on May 22, 2015: Yeas 93, Nays 44, one present not voting.

Approved June 19, 2015.
Effective September 1, 2015.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

MR 0769

2015 WL 5102928 (Tex.) (Appellate Petition, Motion and Filing)
Supreme Court of Texas.

In re ROBINSON HELICOPTER COMPANY, INC., Relator.

No. 15-0604.
August 12, 2015.

Original Proceeding from the 11th Judicial District Court of Harris County, Texas Cause No. 2014-34635
Emergency Reelief Requested
oral argument requested

**Petition for Writ of Mandamus**

Coats & Evans, P.C., George Andrew Coats, State Bar No. 00783846, E-mail: coats @texasaviationlaw.com, Gary Linn Evans, State Bar No. 00795338, E-mail: evans @texasaviationlaw.com, Carrie M. McKerley, State Bar No. 24056625, Email: mckerley@texasaviationlaw.com, P.O. Box 130246, The Woodlands, Texas 77393-0246, Telephone: (281) 367-7732, Facsimile: (281) 367-8003.

### *iii TABLE OF CONTENTS

| | |
|---|---|
| IDENTITY OF PARTIES AND COUNSEL | ii |
| TABLE OF CONTENTS | iii |
| INDEX OF AUTHORITIES | v |
| STATEMENT OF THE CASE | viii |
| STATEMENT OF JURISDICTION | x |
| ISSUES PRESENTED | xi |
| STATEMENT OF FACTS | 1 |
| SUMMARY OF THE ARGUMENT | 3 |
| ARGUMENT | 5 |
| I. RESPONDENT'S ERRONEOUS MISAPPLICATION OF THE LAWS GOVERNING NET WORTH DISCOVERY CONSTITUTES A CLEAR ABUSE OF DISCRETION | 5 |
| A. STANDARD OF REVIEW FOR ABUSE OF DISCRETION | 5 |
| B. THE LEGISLATURE HAS PROVIDED A CLEAR AND CONCISE PROCEDURE FOR NET WORTH DISCOVERY IN TEXAS. | 6 |
| a. Senate Bill 735 answers the judicial pleas for clarification of procedure regarding the discoverability of a party's net worth information in cases involving exemplary damages | 6 |
| b. Texas Law regarding exemplary damages has changed substantially, and the courts need clear guidance from this Court on the procedures for addressing net worth discovery | 8 |

EXHIBIT
C

MR 0770

C. EVEN APPLYING THE EXISTING PROVISIONS OF THE TEXAS CIVIL PRACTICES & REMEDIES CODE, NET WORTH DISCOVRY IS IMPROPER ABSENT A FINDING OF LIABILITY FOR EXEMPLARY DAMAGES ............................................................. 11

*iv a. The Pre-Trial Discovery of Net Worth Evidence Exceeds the Scope of Permissible Discovery in Bifurcated Trials ............................................................. 12

II. RELATOR HAS NO ADQUATE REMEDY BY APPEAL ............................................................. 15

A. STANDARD OF REVIEW FOR ADEQUACY OF APPELLATE REMEDY ............................................................. 15

B. RESPONDENT'S ABUSE OF DISCRETION CANNOT BE REMEDIED BY APPEAL ............. 16

PRAYER ............................................................. 19

CERTIFICATE OF SERVICE ............................................................. 20

TEX. R. APP. PROC. 52.3j CERTIFICATION ............................................................. 22

TEX. R. APP. PROC. 9.4(i)(1) CERTIFICATION ............................................................. 22

APPENDIX ............................................................. 23

## *v INDEX OF AUTHORITIES

Cases.

Al Parker Buick Co. v. Touchy, 788 S.W.2d 129 (Tex. App. - Houston [1st Dist.] 1990, no writ) ............................................................. 14

Aramark Uniform Services, Inc. v. Tyson, 40 Tex. Sup. J. 84 (November 15, 1996) ............................................................. 10

Aramark Uniform Servs., Inc. v. Tyson, 40 Tex. Sup. J. 131 (December 13, 1996) ............................................................. 10

DeAtley v. Rodriguez, 246 S.W.3d 848 (Tex. App. - Dallas 2008, no pet.) ............................................................. 9

Huie v. DeShazo, 922 S.W.2d 920 (Tex. 1996) ............................................................. 6

In re Am. Optical Corp., 988 S.W.2d 711 (Tex. 1998) (orig. proceeding) (per curiam) ............................................................. 13, 17, 18

In re Columbia Med. Ctr. of Las Colinas 290 S.W.3d 204 (Tex. 2009) (orig. proceeding) ............................................................. 6

In re CSX Corp., 124 S.W.3d 149 (Tex. 2003) ............................................................. 13

In re Dana Corp., 138 S.W.3d 298 (Tex. 2004) ............................................................. 17

In re Deere & Co., 299 S.W.3d 819 (Tex. 2009 ............................................................. 17

MR 0771

*In re Essex Ins.*, 450 S.W.3d 524 (Tex. 2014) .................................... 5, 15, 16

*In re Graco Children's Prods., Inc.*, 210 S.W.3d 598 (Tex. 2006) (per curiam) .................................... 17, 18

*In re Jacobs*, 300 S.W.3d 35 (Tex. App. - Houston [14th Dist.] 2009, pet. denied) (orig. proceedings) .................................... 9, 11, 14

*In re Jerry's Chevrolet-Buick, Inc.*, 977 S.W.2d 565 (Tex. 1998) .............. 9

*vi In re McAllen Med. Ctr., Inc.*, 257 S.W.3d 458 (Tex. 2008) ................ 16, 17

*In re Prudential Ins. Co.*, 148 S.W.3d 124 (Tex. 1999) .................................... 15, 16, 17

*In re Reece*, 341 S.W.3d 360 (Tex. 2011) .................................... 16

*In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d 861 (Tex. App. - Texarkana 2013, no pet.) (orig. proceeding) .................................... 17

*Lunsford v. Morris* 746 S.W.2d 471 (Tex. 1988) (orig. proceeding) .......... 6, 8, 14

*Perry Home Contractors, Inc. v. Patterson*, 39 Tex. Sup. J. 237 (February 9, 1996) .................................... 10

*Perry Home Contractors, Inc. v. Patterson*, 40 Tex. Sup. J. 398 (March 6, 1997) .................................... 10

*Transp. Inc. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1990) .................................... 11

*Volkswagen, A.G. v. Valdez*, 909 S.W.2d 900 (Tex. 1995) .................................... 16

*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) .................................... 5, 15, 16, 17

*Wal-Mart Stores v. Alexander*, 868 S.W.2d 322 (Tex. 1993) ...................... 13

Statutes

Tex. Civ. Prac. & Rem. Code §§ 41.001-.013 .................................... 8, 9, 14

Tex. Civ. Prac. & Rem. Code § 41.001 .................................... 9

Tex. Civ. Prac. & Rem. Code § 41.002 .................................... 9

Tex. Civ. Prac. & Rem. Code § 41.005 .................................... 9

Tex. Civ. Prac. & Rem. Code § 41.003 .................................... 9, 11, 14

Tex. Civ. Prac. & Rem. Code § 41.007 .................................... 9

*vii Tex. Civ. Prac. & Rem. Code § 41.008 .................................... 9

Tex. Civ. Prac. & Rem. Code § 41.009 .................................... 11, 12

MR 0772

Tex. Civ. Prac. & Rem. Code Section 41.0115 ........................................... 7

Rules.

Tex R. Civ P. 192 cmt. 1 ........................................... 13

Tex. R. Civ. P. 292 ........................................... 9

## *ii IDENTITY OF PARTIES AND COUNSEL

RELATOR: Robinson Helicopter Company, Inc.

*RELATOR'S COUNSEL:* **COATS & EVANS, P.C.** George Andrew Coats State Bar No. 00783846 E-mail: coats@texasaviationlaw.com Gary Linn Evans State Bar No. 00795338 E-mail: evans@texasaviationlaw.com Carrie M. McKerley State Bar No. 24056625 Email: mckerley@texasaviationlaw.com P.O. Box 130246 The Woodlands, Texas 77393-0246 Telephone: (281) 367-7732 Facsimile: (281) 367-8003

*RESPONDENT:* Honorable Mike D. Miller 11th Judicial District Court Harris County Civil Courthouse 201 Caroline, 9th Floor Houston, Texas 77002

*REAL PARTIES IN INTEREST:* Nathan S. Ates, Individually and as Personal Representative of the Estate of Joyce A. Ates, Deceased; Sonia Ates and Nathan M. Ates

**REAL PARTIES IN INTEREST'S COUNSEL: STEVENSON & MURRAY** Mark T. Murray State Bar No. 14724810 E-mail: mmurray@johnstevensonlaw.com 24 Greenway Plaza, Suite 750 Houston, Texas 77046 Telephone: 713-622-3223 Facsimile: 713-622-3224

## *viii STATEMENT OF THE CASE

### Nature of the Underlying Proceedings:

This case arises out of a helicopter accident which took place on September 10, 2012. Plaintiff Nathan S. Ates, is the representative of the Estate of Joyce A. Ates, who died as a result of the accident. Co-Plaintiffs Sonia Ates, and Nathan M. Ates (all plaintiffs referred to herein collectively as "Ates") are heirs of the Decedent. The helicopter was owned by Helicopter Services, Inc., and piloted by Christopher Yeager ("Yeager"). Robinson Helicopter Company, Inc. ("Robinson") is the manufacturer of the helicopter, a 2007 Robinson R22 Beta II helicopter (the "Aircraft"). Plaintiffs and Real Party in Interest bring the current suit for damages arising out of the Accident, in several capacities. Ates sued Relator, Robinson Helicopter Company, Inc., as the manufacturer of the Aircraft, Helicopter Services, Inc., as the owner of the Aircraft and the pilot's employer, as well as the estate of the pilot, Christopher Yeager.

### Respondent:

Respondent, Judge Mike D. Miller, ("Respondent") is the presiding judge of the 11th Judicial District Court of Harris County, Texas.

### Actions from Which Realtor Seeks Relief:

Based on Ates' claims for exemplary damages against Robinson, Ates seeks discovery of Robinson's net worth. Robinson objected to such discovery based on *ix its "good faith argument for the extension, modification, or reversal of existing law." Ates filed a Motion to Compel Discovery which was granted by the trial court. Robinson then filed a Motion for Reconsideration and Motion for Limited Emergency Stay, both of which were denied by the trial court. This petition for writ of mandamus follows.

MR 0773

## *x STATEMENT OF JURISDICTION

The Supreme Court of Texas has jurisdiction to issue a writ of mandamus. Tex. Const. art. 5, §6; Tex. Gov't Code § 22.001(c).

## *xi ISSUES PRESENTED

1. Did Respondent commit an abuse of discretion by misapplying applicable law and ordering the discovery of information relating to Relator's net worth without a finding of liability for exemplary damages?

2. Does Respondent's order requiring discovery of information relating to Relator's net worth constitute an error for which there is no adequate remedy at law?

## *1 STATEMENT OF FACTS

Helicopter Services, Inc. is the owner of that certain 2007 Robinson R22 Beta Helicopter, Registration Number N281RG. Christopher Yeager ("Yeager") was an employee of Helicopter Services. On or about September 10, 2012, Yeager and Joyce A. Ates ("Decedent") were aboard the Aircraft departing from Baytown Airport. Approximately two hours in to the flight, the Aircraft crashed. Yeager and Decedent died as a result of the injuries suffered in the Accident. (App. 5; R0140).

Plaintiffs and Real Party in Interest, Nathan S. Ates, Individually and as Personal Representative of the Estate of Joyce A. Ates, Deceased; Sonia Ates and Nathan M. Ates (collectively "Ates" and/or Plaintiffs) bring the current suit against Relator, Robinson Helicopter Company, Inc., as the manufacturer of the Aircraft, Helicopter Services, Inc., as the owner of the Aircraft and the pilot's employer, as well as the estate of the pilot, Christopher Yeager. (R0001-0054; R0200-0228).

Ates' Original Petition includes claims against Robinson alleging negligence in the design and manufacture of the Aircraft and defective design of the Aircraft. Ates also includes a vague claim of "intentional" conduct and "willful, wonton and malicious activities" by Robinson. However, Ates fails to provide any factual support for their claims. (R0001-0054; R0200-0228).

In connection with their Original Petition, Ates served Requests for Production of Documents, seeking the production of evidence to establish *2 Robinson's net worth. (R0001-0054). Due to the highly sensitive nature of the requested information, combined with the extreme risk of unfair prejudice, Robinson objected. (App. 5; R0140-0199; App. 6; R0246-0257). Ates filed a motion to compel Robinson's net worth, to which Robinson responded with this "good faith argument for the extension, modification, or reversal of existing law." (App. 4; R0095-0136; App. 5; R0140-0199; App. 6; R0246-0257).

Plaintiffs' motion was heard on May 11, 2015. On June 19, 2015, the Governor signed Senate Bill 735 into law, which addresses net worth discovery. (App. 8).

Robinson filed a Supplemental Opposition to Plaintiffs' Motion to Compel on June 26, 2015. (App. 6; R0246-0257). However, the trial court had previously entered an Order granting Plaintiffs' Motion, requiring Robinson to "provide documents sufficient to establish the current net worth of Robinson Helicopter Company, Inc." on June 24, 2015. (App. 1; R0244-0245).

On July 2, 2015, Robinson filed a Motion for Reconsideration based on the recent enactment of SB735. (App. 2; R0258-0270). On July 7, 2015, the trial court denied Robinson's Motion and ordered the requested documents produced by 5:00 p.m. on July 8, 2015. (App. 3; R0271). Robinson's petition for writ of mandamus was filed in the Court of Appeals on July 8, 2015, and was subsequently denied on August 4, 2015. (App. 11). This petition for writ of mandamus follows.

## *3 SUMMARY OF THE ARGUMENT

The existing case law setting the standards for discovery of a defendant's net worth is based on this Court's 1988 opinion in *Lunsford v. Morris*. There have been substantial changes to exemplary damages law in the intervening years, both as a result

of this Court's subsequent opinions and as a result sweeping limitations on exemplary damage claims as passed by the Texas Legislature. Defendants such as Robinson should not be required to disclose its net worth based on a few conclusory, factually devoid assertions in Ates' petition, which includes vague and factually unsupported claims of "intentional" conduct and "wilful, wonton and malicious activities" by Robinson but does not allege any particular design defect or act of negligence. Without more, the discovery of Robinson's sensitive and confidential financial information should not be permitted. For cases pre-dating the effective date of SB735, this Court can give direction and guidance to trial courts by adopting the procedures of SB735 as the proper procedure for managing net worth discovery.

For years, Texas courts have recognized the lack of guidance and constancy in case law and statutes regarding the discovery of net worth evidence. The Legislature has repeatedly acted to tightly restrict the ability of litigants to seek and recover exemplary damages in the years following the decision in *Lunsford.* *4 However, the procedures of Texas courts have not evolved to keep up with these legislative changes.

SB735 provides clarity and guidance for handling net worth discovery. SB735 requires a party seeking net worth discovery to first obtain an order from the trial court finding that there is a substantial likelihood of success on the merits of a claim for exemplary damages. The provisions of SB735 are not effective until September 1, 2015 and are not binding on the present case, leaving cases pre-dating SB735 with no guidance on net worth discovery. The current procedures are do not reflect the changes made by the Legislature and need to be revisited.

Thus, while there is now clarity and direction in cases filed after September 1, 2015, it falls to this Court to clarify when and how net worth discovery should be permitted in cases filed prior to September 1, 2015. Even applying the existing laws, the discovery of a defendant's net worth is improper absent a finding of liability for exemplary damages in a bifurcated trial. Otherwise, the discovery order exceeds the scope of permissible discovery as set out in the Texas Rules of Civil Procedure and violates the limitations on the availability of exemplary damages, as set out in Chapter 41.

Robinson respectfully urges this Court to apply the procedures adopted in SB735 for cases filed before SB735 becomes effective. The Legislature has clearly indicated what it considers to be the proper procedures involving net worth *5 discovery. Accordingly, Robinson respectfully requests that the trial court be required to hold a "gatekeeper" hearing, after an adequate time for discovery has passed, as envisioned by SB735 to determine whether Plaintiffs can demonstrate that there is a substantial likelihood that they will succeed on the merits of their claim for exemplary damages.

Alternatively, Robinson requests that this Court order the trial court to conduct discovery within the limitations of the existing provisions of Chapter 41 and the Texas Rules of Civil Procedure. Only upon a finding of liability during phase one of a bifurcated trial does evidence of a defendant's net worth become relevant and admissible and therefore that is the only circumstance in which disclosure of a defendant's net worth should be compelled.

## ARGUMENT

## II. RESPONDENT'S ERRONEOUS MISAPPLICATION OF THE LAWS GOVERNING NET WORTH DISCOVERY CONSTITUTES A CLEAR ABUSE OF DISCRETION.

### A. STANDARD OF REVIEW FOR ABUSE OF DISCRETION.

A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to guiding rules and principles. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex. 1992). When determining legal principles, a trial court has no discretion to misinterpret or misapply the law. *Id.* at 840. Thus, a clear failure to analyze or correctly apply the law constitutes an abuse of discretion. *Id.; see e.g., *6 In re Essex Ins.,* 450 S.W.3d 524, 525-26 (Tex. 2014). A trial court's erroneous legal conclusion is an abuse of discretion, even if the law is unsettled. *Huie v. DeShazo,* 922 S.W.2d 920, 927-28 (Tex. 1996). Under certain circumstances, a trial court's action can constitute an abuse of discretion even though it is consistent with existing jurisprudence, but where the action conflicts with what the current law ought to be. *In re Columbia Med. Ctr. of Las Colinas,* 290 S.W.3d 204, 213 (Tex. 2009) (orig. proceeding).

MR 0775

## B. THE LEGISLATURE HAS PROVIDED A CLEAR AND CONCISE PROCEDURE FOR NET WORTH DISCOVERY IN TEXAS.

### a. Senate Bill 735 answers the judicial pleas for clarification of procedure regarding the discoverability of a party's net worth in cases involving exemplary damages.

Since this Court's 1988 holding in *Lunsford v. Morris*, (746 S.W.2d 471 (Tex. 1988) (orig. proceeding)), trial courts have struggled with the proper procedures for managing the discovery of a party's net worth in cases involving exemplary damages. This is particularly true in light of the extensive changes made by the Legislature in the years since *Lunsford*. The procedures employed by the courts have not evolved to reflect the legislative changes. The Legislature has responded to the judicial pleas for clarification by setting out a clear and concise procedure for the courts to follow in cases where a party's net worth is in issue by enacting Senate Bill 735. However, for cases pre-dating the effective date of *7 SB735, the struggle remains. It is within the authority of this Court to clarify the procedures for cases pre-dating SB735, including the present case. There should be but one consistent procedure for addressing net worth discovery in all cases, present and future.

SB735 requires parties seeking net worth discovery to obtain a written order from the trial court finding, "the claimant has demonstrated a substantial likelihood of success on the merits of a claim for **exemplary** damages." Tex. Civ. Prac. & Rem. Code Section **41.0115**. (App. 8). SB735 also provides said hearing should only be held after an adequate time for the discovery of facts relating to **exemplary** damages has been made. (App. 8).

Given the recognized need to clarify the appropriate procedures for discovery of net worth evidence, and the dramatic changes in punitive damages law over the last thirty years, Robinson respectfully urges this Court to provide the much needed guidance to the lower courts and adopt the procedures of SB735 for the discovery of a defendant's net worth, even in cases pre-dating SB735. More specifically, Robinson respectfully requests that the trial court be required to hold a "gatekeeper" hearing, as envisioned by SB735 to determine whether Plaintiffs can demonstrate that there is a substantial likelihood that they will succeed on the merits of their claim for exemplary damages against Robinson.

### *8 b. Texas Law regarding exemplary damages has changed substantially, and the courts need clear guidance from this Court on the procedures for addressing net worth discovery.

In 1988, this Court held that a defendant's net worth is relevant in a suit involving exemplary damages. *Lunsford*, 746 S.W.2d at 473. As a result, parties may discover and offer evidence of a defendant's net worth in cases where exemplary damages may be awarded. *Id.* In 1995, the Legislature passed sweeping tort reform to the substantive and procedural law governing exemplary damages. *See* Tex. Civ. Prac. & Rem. Code §§ 41.001-.013. Chapter 41 was significantly rewritten to provide defendants dramatic protection from exemplary-damage awards. Such changes include:

• Exemplary damages were limited to assessing damages with the purpose of punishing the defendant.

• Chapter 41's coverage was expanded to apply to all but a very few types of tort actions.

• A plaintiffs burden of proof for exemplary damages was elevated to clear and convincing evidence.

• With few limitations, a defendant could no longer be exposed to exemplary damages because of another person's criminal act.

• The Legislature lowered the existing cap on exemplary damages.

• Upon a defendant's motion, the trial court had to bifurcate the jury's determination of the amount of exemplary damages, and evidence of a *9 defendant's net worth could not be admitted during the liability phase of the trial. *Id.*

MR 0776

These substantive and procedural amendments changed the legal landscape on two levels. First, they further limited the amount of exemplary damages that could be assessed. *See id.* § 1 secs. 41.007, 41.008. Second, and more significantly, these revisions dramatically lessened the chances of *any* exemplary-damage recovery by a claimant. *See id.* § 1 §§ 41.001(5), 41.002, 41.003(b), 41.005.

In 2003, the Legislature further eroded a plaintiff's ability to recover exemplary damages. Now, unlike the general rule permitting a civil verdict upon the vote of only ten jurors, an award of exemplary damages requires a unanimous verdict as to liability for, and the amount of, such damages. See Tex. Civ. Prac. & Rem. Code § 41.003(d); Tex. R. Civ. P. 292; *DeAtley v. Rodriguez*, 246 S.W.3d 848, 850 (Tex. App.-Dallas 2008, no pet.).

The current procedures are "decades-old [and] do not reflect the changes made by the Legislature and, in light of the evolution of Texas law, and needs to be revisited." *See In re Jacobs*, 300 S.W.3d 35, 50 (Tex. App. - Houston [14th Dist.] 2009, pet. denied) (orig. proceeding) (Sullivan, J., concurring). In 1998, Justice Gonzalez recognized the difficulty which resulted from the lack of direction regarding discovery of net worth information. "These issues are significant and demand the Court's attention." *In re Jerry's Chevrolet-Buick, Inc.*, 977 S.W.2d 565, 566 (Tex. 1998) (Gonzalez, J., dissenting).

**\*10** This Court was willing to address these issues previously. *Id.* This Court granted petitions for writ of mandamus in *Aramark Uniform Services, Inc. v. Tyson*, 40 Tex. Sup. J. 84 (November 15, 1996), and *Perry Home Contractors, Inc. v. Patterson*, 39 Tex. Sup. J. 237 (February 9, 1996), to determine whether a plaintiff must make a prima facie showing of entitlement to exemplary damages before discovering evidence of a defendant's net worth. However, this Court was unable to clarify net worth discovery because each of those cases were settled. *Perry Home Contractors, Inc. v. Patterson*, 40 Tex. Sup. J. 398 (March 6, 1997); *Aramark Uniform Servs., Inc. v. Tyson*, 40 Tex. Sup. J. 131 (December 13, 1996). In the years since, the need to address these issues has grown due to the statutory changes in punitive damages made by the Legislature.

Undeniably, the Legislature has repeatedly acted to tightly restrict the ability of litigants to seek and recover exemplary damages. Robinson respectfully requests this Court harmonize net worth discovery in cases pre-dating SB735 with the changes made to punitive damages law following *Lunsford*.

In light of the legislative changes limiting the availability of exemplary damages, similarly limiting net worth discovery to cases where a finding of liability has actually been made, both plaintiffs and defendants can be protected and neither party is unfairly prejudiced by an unrestricted requirement to disclose sensitive, yet completely irrelevant information. Discovery of Robinson's net **\*11** worth, as well as that of similarly situated defendants, should only be permitted following a finding by the trial court that there is a substantial likelihood of success on a plaintiff's claim for exemplary damages, as set out in SB735.

## C. EVEN APPLYING THE EXISTING PROVISIONS OF THE TEXAS CIVIL PRACTICES & REMEDIES CODE, NET WORTH DISCOVERY IS IMPROPER ABSENT A FINDING OF LIABILITY FOR EXEMPLARY DAMAGES.

This Court established a bifurcated procedure for trials involving claims for exemplary damages due to the "very real potential" that evidence of a defendant's wealth will prejudice the jury's determination of other disputed issues in tort cases. *Transp. Inc. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1990). That procedure was later codified by the Legislature. See Tex. Civ. Prac. & Rem. Code § 41.009. Under the bifurcated procedure, evidence or mention of a defendant's net worth is *completely inadmissible* during the first phase of a bifurcated trial. In fact, evidence of a defendant's net worth is *only admissible* in the second phase of a bifurcated trial following a *unanimous finding of liability for exemplary damages, by clear and convincing evidence.* Tex. Civ. Prac. & Rem. Code §§ 41.003; 41.009 [emphasis added].

As a result of these difficult evidentiary hurdles, most cases involving exemplary damages never make it to the second phase of trial. *See In re Jacobs*, 300 S.W.3d at 50 (Sullivan, J., concurring). In such cases, information concerning **\*12** a defendant's net worth is *absolutely inadmissible* and the discovery thereof is not reasonably calculated to lead to the discovery of admissible evidence. Additionally, the discovery of net worth information subjects defendants, such as Robinson, to extreme risk of prejudice, as well as unnecessary violations of privacy through disclosure of highly sensitive, confidential financial information. The disclosure of such information will most likely result in a grave risk to Robinson and

MR 0777

endanger Robinson's ability to remain financially competitive in a highly competitive business environment. Thus, information concerning Robinson's net worth should not be discoverable unless and until the jury finds that Robinson is liable to Ates for exemplary damages.

### a. The Pre-Trial Discovery of Net Worth Evidence Exceeds the Scope of Permissible Discovery in Bifurcated Trials.

In the first phase of a bifurcated trial, the trier of fact shall determine: (1) liability for compensatory and exemplary damages; and (2) the amount of compensatory damages. Tex. Civ. Prac. & Rem. Code § 41.009. If liability for exemplary damages is established during the first phase of a bifurcated trial, the trier of fact shall, in the second phase, determine the amount of exemplary damages to be awarded, if any. *Id.* The second phase is only necessary after the fact finder has found, by unanimous verdict, that a defendant is liable for exemplary damages. Due to the extremely prejudicial impact, a party cannot even mention a defendant's net worth in the first phase of a bifurcated trial. *13 Consequently, the discovery of Robinson's net worth is absolutely irrelevant and inadmissible in the first phase of trial. If, and only if, a jury determines Robinson is liable for exemplary damages can evidence of Robinson's net worth be introduced during the second phase. Robinson should not be required to produce evidence of its net worth unless and until the jury returns such a verdict.

While the scope of discovery is quite broad, it is nevertheless confined by the subject matter of the case and reasonable expectations of obtaining information that will aid resolution of the dispute. Tex R. Civ P. 192 cmt. 1; *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003). Therefore, discovery requests must be reasonably tailored to include only matters relevant to the proceedings. *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam). The disclosure of Robinson's net worth is relevant only to the *amount* of exemplary damages that may be awarded. *See Wal-Mart Stores v. Alexander*, 868 S.W.2d 322. 329 (Tex. 1993) (Gonzalez, J., concurring). More importantly, in bifurcated trials, that information is not relevant during the first phase because the fact finder cannot determine the amount of exemplary damages to be awarded. Evidence of a defendant's net worth is *only admissible,* and therefore, only relevant, in the second phase following the highly unlikely finding of liability for exemplary damages.

*14 To establish a defendant's liability for exemplary damages, a plaintiff must prove by clear and convincing evidence each element of its exemplary damages claim. Tex. Civ. Prac. & Rem. Code § 41.003(b). This is a higher burden of proof than that required for mere negligence and the recovery of compensatory damages. *See Al Parker Buick Co. v. Touchy*, 788 S.W.2d 129, 130 (Tex. App. - Houston [1st Dist.] 1990, no writ). Additionally, exemplary damages may only be awarded if the jury was unanimous in regard to finding liability for and the amount of exemplary damages. *Id.* at § 41.003(d). Thus, the question is not if this evidence is relevant, but when it is relevant. *Lunsford*, 746 S.W.2d at 474 (Gonzalez, J., dissenting). In most cases, the answer to that question is never.

The Legislative changes made following *Lunsford* reduced the amount of exemplary damages that could be awarded, but more significantly, dramatically reduced the chances of any exemplary damage recovery. *See* Tex. Civ. Prac. & Rem. Code §§ 41.001, *et seq.; In re Jacobs*, 300 S.W.3d at 50. As a result, discovery of a defendant's net worth is both *irrelevant and inadmissible in most* cases. The disclosure of a defendant's sensitive and confidential financial information is unwarranted and unnecessary unless and until a finding of liability for exemplary damages has been made. Consequently, the pre-trial discovery of such information exceeds the scope of discovery permitted under the Texas Rules of Civil Procedure and should not be allowed. Thus, Robinson should not be *15 compelled to disclose confidential financial information unless and until a unanimous finding of liability for exemplary damages has been made by the jury during the trial of this cause.

If, and only if, the jury determines that a defendant is liable for exemplary damages, should a defendant be compelled to disclose its net worth. That disclosure may be made by either providing bottom-line number of a defendant's total net worth, or by only producing evidence necessary to demonstrate its ability to satisfy an award up the maximum amount of exemplary damages that may be awarded pursuant to Chapter 41.

## II. RELATOR HAS NO ADQUATE REMEDY BY APPEAL.

MR 0778

## A. STANDARD OF REVIEW FOR ADEQUACY OF APPELLATE REMEDY.

The second requirement for mandamus is lack of an adequate remedy by appeal. *Walker*, 827 S.W.2d at 839-40. The adequacy inquiry "is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the action of lower courts." *In re Prudential Ins. Co.*, 148 S.W.3d 124, 136 (Tex. 1999). Determining whether an appellate remedy is adequate involves balancing "practical and prudential" considerations, such as the impairment of important substantive and procedural rights, the opportunity to give direction and guidance on the law that would otherwise be lost, and the waste of judicial resources on a *16 proceeding. *See In re Essex*, 450 S.W.3d at 528; *In re Prudential*, 148 S.W.3d at 136.

A party has no adequate remedy by appeal to challenge a discovery dispute if the appellate court will not be able to cure the trial court's error. *See Walker*, 827 S.W.2d at 843; *see, e.g., Volkswagen, A.G. v. Valdez*, 909 S.W.2d 900, 903 (Tex. 1995). Additionally, a party has no adequate remedy by appeal when the trial court's refusal to grant the remedy renders the subject matter of the appeal illusory. *See e.g., In re AIU Ins.*, 148 S.W.3d 109, 115-17 (Tex. 2004); *In re Dickason*, 987 S.W.2d 570, 571 (Tex. 1998).

Further, mandamus is an "extraordinary remedy, not issued as a matter of right, but at the discretion of the court." *In re Prudential*, 148 S.W.3d at 138. "Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss ..." *Id.* at 136. Additionally, mandamus is a proper vehicle for courts to correct blatant injustice that otherwise would elude review by the appellate courts. *See In re Prudential*, 148 S.W.3d at 138; *In re Reece*, 341 S.W.3d 360, 374 (Tex. 2011).

## B. RESPONDENT'S ABUSE OF DISCRETION CANNOT BE REMEDIED BY APPEAL.

Mandamus review is generally a matter within this Court's discretion. *In re McAllen Med. Ctr., Inc.*, 257 S.W.3d 458, 461 (Tex. 2008). Mandamus relief is frequently issued when "the very act of proceeding to trial - regardless of the *17 outcome - would defeat the substantive right involved." *Id.* at 465; *In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d 861, 867 (Tex. App. - Texarkana 2013, no pet.) (orig. proceeding). Generally, the scope of discovery is within the trial court's discretion, but the trial court must make an effort to impose reasonable discovery limits. *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600 (Tex. 2006) (per curiam). An order that compels overly broad discovery is an abuse of discretion for which mandamus is the proper remedy. *Id.; In re Deere & Co.*, 299 S.W.3d 819, 820 (Tex. 2009).

Mandamus relief is available when the trial court compels production beyond the permissible bounds of discovery. *See In re Am. Optical Corp.*, 988 S.W.2d at 714. Intrusive discovery measures - such as the unproven right to discovery of net worth information - require, at a minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party. *See In re Prudential*, 148 S.W.3d at 135-36. "If an appellate court cannot remedy a trial court's discovery error, then an adequate appellate remedy does not exist." *In re Dana Corp.*, 138 S.W.3d 298, 301 (Tex. 2004). After a private document, such as that demonstrating Robinson's net worth, has been produced, inspected, and examined, a holding that the court had erroneously issued the order would be of small comfort to a relator in protecting its privacy. *See Walker*, 827 S.W.2d at 843.

*18 In the present case, the unnecessary discovery of Robinson's net worth constitutes an invasion of privacy and subjects Robinson to the potential for unfair prejudice and abuse. Once the information is disclosed, the damage to Robinson cannot be undone. The benefits to unlimited discovery of such information do not outweigh the risks and burdens imposed upon Robinson, or other similarly situated defendants. It will be impossible to undo the harm to Robinson once the documents are disclosed. Conversely, following the procedures clearly set out in SB735 in cases pre-dating its effective date, raises no risk of prejudice or harm to Ates, or other plaintiffs seeking exemplary damages.

An order may constitute an abuse of discretion if it compels discovery of matters not relevant to the subject matter of the action. *In re Graco*, 210 S.W.3d at 600; *In re Am. Optical Corp.*, 988 S.W.2d at 713. Discovery of a defendant's net worth information is not relevant to the present case unless and until the trial court, following an evidentiary hearing, determines that there is a substantial likelihood that Plaintiffs will succeed on the merits of their claim for exemplary damages. Robinson urges this Court to adopt the requirements of the recently enacted SB735 in cases pre-dating the effective date of SB735.

MR 0779

Delaying the production of Robinson's net worth information until a finding of a substantial likelihood of success is made will have no effect on the pre-trial proceedings in the present case, nor those involving similarly situated defendants.

*19 The premature disclosure of Robinson's net worth information would cause irreparable and irreversible injury to Robinson. Once Robinson's net worth information is disclosed, the harm and prejudice resulting from that disclosure cannot be undone. Conversely, there will be no harm or prejudice of any kind to Plaintiffs if the net worth information is not provided absent a finding of likelihood of success.

Robinson is not publicly-traded and has always been a closely-held corporation. (App. 5; R0140-0199, Exhibit "A"). Robinson has always treated such financial information as carefully guarded trade-secrets. *Id.* The disclosure of Robinson's financial information would gravely impair and endanger Robinson's ability to remain competitive in a highly regulated and competitive business environment. *Id.* As a result, Robinson is entitled to the mandamus relief requested.

## PRAYER

For the foregoing reasons, Relator, Robinson Helicopter Company, Inc. respectfully requests that this Court grant Robinson's petition for writ of mandamus and order Respondent to vacate its order granting Real Parties in Interest's motion to compel the discovery of Robinson's net worth. Robinson further requests that this Court direct the trial court to hold a "gatekeeper" hearing to determine whether Plaintiffs can demonstrate that there is a substantial *20 likelihood that they will succeed on the merits of their claim for exemplary damages against Robinson, or alternatively, defer the discovery of net worth evidence until the conclusion of the first phase of bifurcated trial, and then only in the event the first phase jury's verdict would permit a second phase of trial. Robinson further requests any and all other relief, in law or in equity, to which it is justly entitled. None of the relief requested by Robinson will result in prejudice to any party in any respect.

**Appendix not available.**

End of Document     © 2015 Thomson Reuters. No claim to original U.S. Government Works

MR 0780

TO ORDER COPIES OF ANY DOCUMENTS LISTED BELOW, CALL WESTLAW
COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 10/18/2015**

**Current Date:** 10/26/2015
**Source:**  SUPREME COURT OF TEXAS, TEXAS

### CASE INFORMATION

| | |
|---|---|
| Case Title: | IN RE ROBINSON HELICOPTER COMPANY, INC. |
| Court: | SUPREME COURT OF TEXAS |
| Case Number: | 15-0604 |
| Case Type: | APPEALS |
| Case Subtype: | PETITION FOR WRIT OF MANDAMUS |
| Key Nature of Suit: | CIVIL PROCEDURE; PETITION (100.55) |
| Date Filed: | 08/12/2015 |

### LOWER COURT INFORMATION

| | |
|---|---|
| Trial Court: | 11TH DISTRICT COURT |
| Trial Court County: | HARRIS |
| Trial Court Judge: | MICHAEL DAVID MILLER |
| Trial Court Case Number: | 2014-34635 |

### PARTICIPANT INFORMATION

**ROBINSON HELICOPTER COMPANY, INC.**

| | |
|---|---|
| Type: | RELATOR |
| Attorney: | CARRIE M. MCKERLEY |
| Attorney: | GARY L. EVANS |
| Attorney: | GEORGE ANDREW COATS |

**NATHAN S. ATES**

| | |
|---|---|
| Type: | REAL PARTY IN INTEREST |
| Attorney: | MARK T. MURRAY |
| Attorney: | DARRIN M. WALKER |

Next:



MR 0781

## CALENDAR INFORMATION (2)

| Date/Time: | Description: | Location: | Judge: |
|---|---|---|---|
| 10/13/2015 | **Event:** WORK-UP BY STAFF / REVIEW BY JUSTICES; UNDER REVIEW | | |
| 08/28/2015 | **Event:** STAY ISSUED.; STAY ORDER ISSUED | | |

## APPEALS INFORMATION (1)

| Appeal Date: | Description: | Disposition Information: |
|---|---|---|
| | COURT OF APPEALS CASE NUMBER: 01-15-00594-CV; COURT OF APPEALS DISTRICT: 1ST COURT OF APPEALS; JUSTICE: PER CURIAM **Additional Info Relating to Appeal:** OPINION CITE: ___ SW3D ___, 08-04-15 | **Disposition/Result:** DENIED |

## DOCKET PROCEEDINGS (11)

| Date: | Entry #: | Description: | Date Docketed: | Party: |
|---|---|---|---|---|
| 10/13/2015 | | **Docket Entry:** CASE FORWARDED TO COURT | | Send Runner to Court |
| 10/06/2015 | | **Document Description:** REAL PARTIES IN INTEREST **Docket Entry:** RESPONSE TO PETITION **Remarks:** RESPONSE TO PETITION FOR WRIT OF MANDAMUS, FILED ON BEHALF OF NATHAN ATES, ET AL. | | Send Runner to Court |
| 09/02/2015 | | **Document Description:** REAL PARTIES IN INTEREST **Docket Entry:** MOTION FOR EXTENSION OF TIME TO FILE RESPONSE DISPOSED **Disposition:** FILING GRANTED **Remarks:** UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO PETITION, FILED ON BEHALF OF NATHAN ATES, ET AL. HAS BEEN GRANTED. RESPONSE | | Send Runner to Court |

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| | | |
|---|---|---|
| | IS DUE OCTOBER 8, 2015. FURTHER REQUESTS FOR EXTENSIONS OF TIME FOR THIS FILING WILL BE DISFAVORED. | |
| 09/02/2015 | **Document Description:** REAL PARTIES IN INTEREST **Docket Entry:** MOTION FOR EXTENSION OF TIME TO FILE RESPONSE **Remarks:** UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO PETITION, FILED ON BEHALF OF NATHAN ATES, ET AL. | Send Runner to Court |
| 09/02/2015 | **Document Description:** REAL PARTIES IN INTEREST **Docket Entry:** LETTER FILED **Remarks:** REAL PARTIES IN INTEREST'S NOTICE OF ADDITIONAL COUNSEL, FILED ON BEHALF OF NATHAN ATES, ET AL. | Send Runner to Court |
| 08/28/2015 | **Document Description:** REFERS TO PETITION FOR WRIT OF MANDAMUS **Docket Entry:** SUPREME COURT OF TEXAS REQUESTED RESPONSE **Remarks:** REQUESTED RESPONSE TO PETITION FOR WRIT OF MANDAMUS DUE NO LATER THAN SEPTEMBER 8, 2015. | Send Runner to Court |
| 08/28/2015 | **Document Description:** REFERS TO PETITION FOR WRIT OF MANDAMUS **Docket Entry:** STAY ORDER ISSUED | Send Runner to Court |
| 08/28/2015 | **Docket Entry:** MOTION TO STAY DISPOSED **Disposition:** FILING GRANTED **Remarks:** MOTION FOR LIMITED EMERGENCY STAY GRANTED | Send Runner to Court |
| 08/12/2015 | **Document Description:** RELATOR **Docket Entry:** CASE RECORD FILED **Remarks:** MANDAMUS RECORD FILED ON BEHALF OF ROBINSON HELICOPTER COMPANY, INC. | Send Runner to Court |
| 08/12/2015 | **Document Description:** RELATOR **Docket Entry:** MOTION TO STAY FILED **Remarks:** MOTION TO STAY | Send Runner to Court |

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

FILED ON BEHALF OF
ROBINSON HELICOPTER
COMPANY, INC.

08/12/2015       **Document Description:**                   Send Runner to Court
RELATOR **Docket Entry:**
PETITION FOR WRIT OF
MANDAMUS **Remarks:**
PETITION FOR WRIT OF
MANDAMUS FILED ON
BEHALF OF ROBINSON
HELICOPTER COMPANY, INC.

## TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS
## 1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

End of Document                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

MR 0784

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | 134TH JUDICIAL DISTRICT |
| vs. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | **(Oral Argument Requested)** |
| DEFENDANTS, | § § | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE DEPOSITIONS OF MICHELIN'S EMPLOYEES MOST KNOWLEDGEABLE ABOUT:**

1) RESPONSES TO PLAINTIFFS' REQUESTS FOR PRODUCTION

2) FINANCIAL INFORMATION & NET WORTH

TO THE HONORABLE JUDGE DALE TILLERY:

**I. Michelin's reliance on *In re Exxon Corp.*, 208 S.W.3d 70, 76 (Tex. App. 2006) is a non-starter: the witness compelled to testify in *Exxon* was an attorney.**

Michelin should re-read Plaintiffs' Motion. Plaintiffs have no interest in deposing any lawyers or attorneys of record. Michelin's justification for not producing an employee most knowledgeable about its responses to Plaintiffs' Requests for Production is *In re Exxon Corp.*, 208 S.W.3d 70, 76 (Tex. App. 2006). *Exxon* has nothing to do with the present circumstances. In *Exxon*, the plaintiffs sought to depose "one of Exxon's attorneys":

> **It cannot reasonably be argued in this Court that the anticipated deponent is not one of Exxon's attorneys.** During the June hearing, plaintiffs' counsel informed the trial court that he suspected the knowledgeable representative was

1

MR 0785

indeed an Exxon lawyer and Exxon confirmed with the trial court that counsel responded to the requests for production.

*Id.* (e.a.).

While the trial court compelled the discovery deposition of the attorney involved in the litigation, the Texas Court of Appeals reversed, holding that "[c]ompelling an attorney of record involved in the litigation of the case . . . implicates work product concerns and is inappropriate":

> **Compelling an attorney of record involved in the litigation of the case to testify concerning the suit's subject matter generally implicates work product concerns and is inappropriate under most circumstances.**
> \*\*\*\*\*
> **This inquiry is designed to inquire into mental processes of counsel and is not reasonably calculated to lead to the discovery of admissible evidence.**

*Id.* (e.a.).

Again, here, Plaintiffs have <u>no interest</u> in deposing <u>any</u> lawyers, attorneys of record and discovering the mental processes of counsel concerning this issue. What Plaintiffs want and are entitled to depose is the Michelin **employee or employees** – not lawyer or attorney – most knowledgeable about Michelin's responsive documents to Plaintiffs' Request for Production. Such folks include but are not limited to the tire builders, tire designers, tire verifiers, classspectors, return center personnel, tire adjustment data employees, etc., etc. For example, in response to Plaintiffs' Request for <u>all</u> aspect specifications, Michelin claimed that only **nine (9) aspect specifications** apply to the components and conditions at issue. Only a Michelin employee who uses the aspect specifications daily within a Michelin production plant– **not an attorney** – can determine which aspect specifications correspond to specific conditions. Therefore, Plaintiffs' Motion should be granted.

**II. In cases like this where "punitive or exemplary damages may be awarded, parties may discover and offer evidence of a defendant's net worth." *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988). (e.a.).**

2

MR 0786

To date, there is overwhelming evidence of manufacturing and design defects in the subject tire – all known to Michelin before, during and after the tire was manufactured. Michelin provides no evidence disputing such. *See Plaintiff's Original Petition* and *Objection to Michelin's Renewed Designation re: Adrian and Maria Rico.* Therefore, this case reeks of punitive damages.

Still, Michelin's reliance on Section 41.0115 of the Texas Civil Practice & Civil Remedies Code is misleading. **As Michelin concedes, said statute does <u>not</u> apply to cases that were filed <u>prior</u> to September 1, 2015.** On the contrary, binding Texas law requires and authorizes discovery of a defendant like Michelin's net worth when a plaintiff, like here, seeks punitive damages:

> The Texas Supreme Court has held that in cases in which punitive or exemplary damages may be awarded, **parties may discover and offer evidence of a defendant's net worth**. [Citation omitted].

> The court declared a defendant's net worth to be "relevant" in a suit involving exemplary damages. Id. **Miller seeks punitive damages, which are recoverable for a willful breach of a fiduciary duty** . . . Thus, documents showing the net worth of Gann and Perdue are relevant and discoverable.

*Miller v. O'Neill,* 775 S.W.2d 56, 58 (Tex. App. 1989). (e.a.).

**Michelin's** <u>only</u> argument is to have this Court "delay" its ruling and discovery and consequently continue trial, which would directly violate an express order of this Court:

<u>**Judge want to let you all know that**</u> . . . **there will be no more continuances**.

*E-Mail from Francine Ly, Judge Dale Tillery's 134th Court Coordinator, Exhibit A.* (e.a.).

**Conclusion**: Pursuant to binding Texas precedent, Plaintiffs are entitled to: **1)** depose Michelin's employee or employees – not lawyers or attorneys – about Michelin's responses to Plaintiffs' Request for Production and **2)** conduct discovery about Michelin's net worth including the deposition of its employee most knowledgeable about these matters.

3

MR 0787

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:    /s/ *David C. Shapiro*
Luis P. Guerra (*Admitted Pro Hac Vice*)
AZ State Bar No. 015768
David C. Shapiro (*Admitted Pro Hac Vice*)
AZ State Bar No. 028056
ATTORNEYS FOR PLAINTIFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 2nd day of November, 2015:

*Via E-Mail & U.S. Mail to*:

Noel A. Sevastianos
SEVASTIANOS & ASSOCIATES, P.C.
120 So. Central Ave., Suite 130
St. Louis, MO 63105

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

4

MR 0788

*Via Mail to*:

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

<u>/s/ David C. Shapiro</u>

5

MR 0789

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | §<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br>OF DALLAS COUNTY |
| PLAINTIFFS, | §<br>§ | |
| VS. | §<br>§ | 134TH JUDICIAL DISTRICT |
| | § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | §<br>§<br>§ | **(Oral Argument Requested)** |
| | §<br>§ | |
| DEFENDANTS, | § | |

TO THE HONORABLE JUDGE DALE TILLERY:

**Plaintiffs' Short Motion to Compel Michelin to Comply with the Honorable Court's Order of October 5, 2015 Concerning Bates Stamp Range of Documents**

This _short_ Motion to Compel simply requests the Honorable Court to enforce its October 5, 2015 ruling and order Michelin to disclose the **1)** Bates Stamp range that encompasses the alleged tire building training documents and **2)** the tire training documents.

During the October 5, 2015 hearing, Plaintiffs' counsel alerted the Court that Michelin had not produced the tire building training documents. Michelin cried foul, claiming that they had produced said documents. The Court then ruled as follows:

> Send them the Bates Stamp range where you say tire training . . . [j]ust send a letter pursuant to my instruction to you that specifically addresses here are the Bates number ranges for tire installation training.

_Transcript of October 5, 2015 hearing at 17:18-19, 18:2-5, attached hereto as Exhibit A._

Michelin never complied with this Court's order. So, Plaintiffs sent Michelin's counsel several letters, asking for the Bates' ranges for the tire training documents. _See Letters attached_

MR 0790

*hereto as Exhibit B.* Michelin has failed to respond. All of it in direct violation of this Honorable Court's direct order of October 5, 2015.

Therefore, we reluctantly are forced to file this Motion seeking the Court's assistance, and respectfully request that the Court grant the aforementioned prayer for relief.

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC

6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:     */s/ Luis P. Guerra*
Luis P. Guerra (*Admitted Pro Hac Vice*)
AZ State Bar No. 015768
David C. Shapiro (*Admitted Pro Hac Vice*)
AZ State Bar No. 028056
ATTORNEYS FOR PLAINITFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

## CERTIFICATE OF CONFERENCE

Counsel for movant has repeatedly wrote and called Defendant Michelin's counsel. All to no avail. Counsel for Michelin will not respond or answer Plaintiffs' counsel's phone calls or letters. Thus, despite best efforts the counsel have not been able to resolve those matters presented.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 19th day of October, 2015.

2

MR 0791

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

**DEFENDANT MICHELIN NORTH AMERICA, INC.'S RESPONSE TO PLAINTIFFS' SHORT MOTION TO COMPEL MICHELIN TO COMPLY WITH THE HONORABLE COURT'S ORDER OF OCTOBER 5, 2015 CONCERNING BATES STAMP RANGE OF DOCUMENTS**

COMES NOW Michelin North America, Inc. ("MNA"), one of the defendants in the above-styled and numbered cause, and files this Response to Plaintiffs' Short Motion to Compel Michelin to Comply with the Honorable Court's Order of October 5, 2105 Concerning Bates Stamp Range of Documents and shows the Court the following:

I.
**PLAINTIFFS' MOTION IS MOOT**

Plaintiffs contend that MNA has not identified by Bates number the "alleged tire building training documents" and "tire training documents" produced. Plaintiffs have the information and had it when MNA served its Third Supplemental Responses to Plaintiffs' First Request for Production of Documents on September 18, 2015. In response to Request for Production 19 MNA identified MNA 0003362 – MNA 0003515. Those are the oldest available tire building

MR 0792

procedures and documents used to train tire builders at the Dothan, Alabama plant that MNA was able to locate that relate to the components and conditions at issue in this case. See Exhibit A. Further in a letter dated October 26, 2015, MNA again identified those Bates numbers and explained that they were the oldest available tire building procedures and documents used to train tire builders at Dothan that MNA was able to locate that relate to the components and conditions at issue in this case. See Exhibit B.

Simply put, plaintiffs have and have had the information since September 18, 2015. Their motion is moot and should be denied.

WHEREFORE, PREMISES CONSIDERED, defendant Michelin North America, Inc. prays that this Court deny Plaintiffs' Short Motion to Compel Michelin to Comply with the Honorable Court's Order of October 5, 2105 Concerning Bates Stamp Range of Documents as moot.

Respectfully submitted,

GERMER BEAMAN & BROWN, P.L.L.C.
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By:    /s/ Thomas M. Bullion III
         Thomas M. Bullion III
         State Bar No. 03331005
         tbullion@germer.com
         Chris A. Blackerby
         State Bar No. 00787091
         cblackerby@germer-austin.com

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

4544503

MR 0793

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 30th day of October, 2015.

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

*Via E-Service and Facsimile*

James B. Ragan
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

*Via E-Service and Facsimile*

Noel Sevastianos
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

*Via E-Service and Facsimile*

Jose Bustillo d/b/a Mundo Cars
6422 Day Street
Dallas, Texas 75227

*Via Regular Mail*

/s/ Thomas M. Bullion III
Thomas M. Bullion III/Chris A. Blackerby

3

4544503

MR 0794

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

### MICHELIN NORTH AMERICA, INC.'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUEST FOR PRODUCTION

TO:     Plaintiffs, by and through their attorney of record, Luis P. Guerra, LLC, 6225 N. 24th Street, Suite 125, Phoenix, Arizona 85016.

COMES NOW Michelin North America, Inc. ("MNA"), defendant in the above-styled and numbered cause, and submits these, its third supplemental responses and objections to Plaintiff's First Set of Request for Production.

Respectfully submitted,

GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile



EXHIBIT
A

MR 0795

By: _____ with permission
08252800

Thomas M. Bullion III
tbullion@germer-austin.com
State Bar No. 03331005
Chris A. Blackerby
cblackerby@germer-austin.com
State Bar No. 00787091

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 18th day of September, 2015.

Luis P. Guerra                          *Via Certified Mail, Return Receipt Requested*
David C. Shapiro                        *& Electronic Mail*
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

James B. Ragan                          *Via Regular Mail*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, TX 78401

Noel Sevastianos                        *Via Regular Mail*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars          *Via Regular Mail*
6422 Day Street
Dallas, Texas 85227
*Pro Se*

_____
Thomas M. Bullion III/Chris A. Blackerby

2

4540175

of similar Michelin North America tires that contain nylon cap plies from the date the similar tire was first manufacture to the present or end of production.

RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the relevant scope. No tires in the relevant scope were manufactured with nylon cap plies. MNA objects to this request as being vague and ambiguous in its use of the term "nylon cap pules" and "similar tires," as those terms are undefined.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

THIRD SUPPLEMENTAL RESPONSE:

After a reasonable and diligent search, MNA has not located any documents responsive to this request for tires in the expanded scope. No tires in the expanded scope were manufactured with nylon cap plies. MNA objects to this request as being vague and ambiguous in its use of the term "nylon cap pules" and "similar tires," as those terms are undefined.

To the extent this request seeks documents outside the expanded scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire, plant, and time period relevant to this action.

REQUEST FOR PRODUCTION NO. 19:

Identify and produce any and all documents, relating to the building, tire builder training, testing, and inspection of passenger and light truck tires at the Dothan, Alabama plant where the

23

4540175

subject tire was manufactured. This request includes, but is not limited to standard practice binders, tire building manuals, tire builder training manuals, equipment manuals, and/or other materials and videotapes used to train tire builders. This request also includes documents, photographs, and charts used to illustrate defects, or potential defects, in tires and/or problems or potential problems in the tire building process.

RESPONSE:

MNA objects to this request because plaintiffs have not identified the specific design or manufacturing process that produced the defect alleged to be present in the tire in question. Accordingly, this request is nothing more than an impermissible "fishing expedition" for information generally related to every aspect of MNA's design and manufacturing process, whether or not related to plaintiffs' claims in this case. If plaintiffs will identify the components and processes at issue in this case, MNA will search for and produce documents responsive to this request for those components and processes during the relevant scope, if they exist.

To the extent this request seeks documents outside the relevant scope, MNA further objects to this request because it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the subject matter of this case nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs have failed to limit the scope of this request to the tire and time period relevant to this action.

MNA further objects to the extent this request seeks or attempts to seek information that constitutes commercially sensitive, confidential business information of MNA. Pursuant to Rule 507 of the Texas Rules of Evidence, MNA asserts trade secret protection for such information.

SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, MNA produces MNA-MEDINA-0001287 – MNA-MEDINA-0001312 and MNA-MEDINA-0001815 – MNA-MEDINA-0001820 for the relevant scope or the oldest available for the components and processes identified by plaintiffs.

24

4540175

MR 0798

MNA has located no additional responsive documents for the relevant scope for the components and processes identified by plaintiffs.

THIRD SUPPLEMENTAL RESPONSE:

MNA incorporates its objections above in its original response. Subject to the confidentiality protective order entered in this case, on September 11, 2015 MNA produced MNA-MEDINA-0003362 – MNA-MEDINA0003515, the oldest documents available for the expanded scope for the components and processes identified by plaintiffs. MNA has located no additional responsive documents for the expanded scope for the components and processes identified by plaintiffs.

REQUEST FOR PRODUCTION NO. 20:

Identify and produce any audits, reports, examinations, investigations, studies, or reviews, including any work papers, whether created within or outside Michelin North America, in any manner related to the return, failure, performance, durability, and life expectancy, design, or quality of the subject tire and model tires.

RESPONSE:

MNA produces claims forms for the model of the tire in question manufactured at Dothan during the relevant scope as MNA-MEDINA-0000011 - MNA-MEDINA-0000130, MNA-MEDINA-0000260 - MNA-MEDINA-0000563, and MNA-MEDINA-0000231. Upon entry of an appropriate confidentiality protective order, MNA will search for and produce claim forms for the tires common green to the tire in question manufactured at Dothan during the relevant scope. Also upon entry of an appropriate confidentiality protective order, MNA will produce a list of adjustment codes. To the extent plaintiffs identify codes relevant to the condition of the tire in question and plaintiffs' claims in this matter, MNA will produce documents reflecting the number of tires in the relevant scope returned with those conditions, if any.

25

4540175

MR 0799


**GERMER**
ATTORNEYS AT LAW

**AUSTIN** BEAUMONT HOUSTON
www.germer.com

**THOMAS M. BULLION III**
PARTNER

**Direct Dial: 512.482.3535**
tbullion@germer.com

October 26, 2015

VIA FACSIMILE & ELECTRONIC MAIL

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

> Re: *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134[th] District Court of Dallas County, Texas.*

Dear Counsel:

In response to plaintiffs' request for production 19, Michelin North America, Inc. produced MNA-MEDINA-0003362-3315, which are the oldest tire building materials and work procedures it was able to locate for the components and processes identified. Tire builders were trained on all of these documents and procedures.

Yours very truly,

Thomas M. Bullion III

Thomas M. Bullion III

TMB:lq

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4543939

**EXHIBIT**
**B**

MR 0800



AUSTIN BEAUMONT HOUSTON
www.germer.com

**THOMAS M. BULLION III**
PARTNER

**Direct Dial: 512.482.3535**
**tbullion@germer.com**

October 30, 2015

VIA FACSIMILE & ELECTRONIC MAIL

Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, AZ 85016

      *Re:*    *Cause No. DC-14-07255; Samuel Medina, et al. v. Michelin North America, Inc., and Jose Bustillo d/b/a Mundo Cars; In the 134th District Court of Dallas County, Texas.*

Dear Counsel:

      I am writing to let you know that there was a typographical error in my letter of October 26. The correct Bates number reference should be MNA-MEDINA-003362-**3515**, not 3315. The correct Bates numbers were included in our supplemental discovery responses and our response to plaintiffs' motion for sanctions.

      Yours very truly,

Thomas M. Bullion III

TMB:lq

**GERMER BEAMAN & BROWN PLLC**
301 CONGRESS AVE, SUITE 1700 AUSTIN, TX 78701
PHONE: 512.472.0288 • FAX: 512.472.0721

4544516

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

/s/ David C. Shapiro
David C. Shapiro

3

MR 0802

# EXHIBIT A

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. DC-14-07255

SAMUEL MEDINA AND OBDULIA ) IN THE DISTRICT COURT
MEDINA, HUSBAND AND WIFE, )
INDIVIDUALLY; NATALYE MEDINA )
INDIVIDUALLY; NAVIL GIBSON, )
INDIVIDUALLY, )
)
    Plaintiff(s), )
)
vs. ) DALLAS COUNTY, TEXAS
)
MICHELIN NORTH AMERICA, INC.; )
AND JOSE BUSTILLO D/B/A MUNDO )
CARS, AN IN STATE DEFENDANT, )
)
    Defendant(s). ) 134TH JUDICIAL DISTRICT

---

**SHORT MOTION TO STRIKE MICHELIN'S CLAIMS OF TIRE ABUSE HEARING**

---

    On the 5th day of October, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Dale B. Tillery, Judge Presiding, held in Dallas, Dallas County, Texas.

    Proceedings reported by computerized stenotype machine.

VIELICA DOBBINS, CSR, RPR

MR 0804

specifically. Without an order from the Court we produced 3,000 approximately more pages of documents since that hearing. We've referenced in our responses what we produced and they can go -- if they're willing to read it, they can go and find the documents we have produced. We have produced our builder. We've build machine setup type documents and tire builder training documents.

THE COURT: You said you got no tire builder training.

MR. BULLION: Your Honor --

THE COURT: Here is the way we are going to handle that. You know what you sent them. Bates stamped --

MR. BULLION: Yes, Your Honor. It's set out in our response --

THE COURT: Listen. Do me a little favor all right. Humor me. Send them the Bates Stamp range where you say tire training.

MR. SHAPIRO: Yes, Your Honor, tire training.

THE COURT: Tire training information exist.

MR. BULLION: That is set in out in our response to the motion for sanctions as well, but I will

MR 0805

send it again.

THE COURT: And just send a letter pursuant to my instruction to you that specifically addresses here are the Bates number ranges for the tire installation training or what is it tire --

MR. SHAPIRO: Your Honor, when some of --

THE COURT: What is it that you want?

MR. SHAPIRO: We want the orientation documents.

THE COURT: No. No. You started off with tire training information.

MR. SHAPIRO: Yes.

THE COURT: That's what I want you to Bates Stamp range.

MR. BULLION: Just backing up just briefly, Your Honor. We produced a lot of documents. We produced them even before we supplemented our discovery responses --

THE COURT: If they're Bates stamped just tell them ranges.

MR. BULLION: I am.

THE COURT: And then you're going to look at that and if none of that is tire training information, bring it to me. If it's not tire training information, I guess you overlooked and it's going to be a problem. It

MR 0806

# EXHIBIT B

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

October 8, 2014

<u>Via Email and U.S. Mail</u>
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

      Re:    Medina v. Michelin, et al

Dear Chris

      It was nice to see you in Dallas on Monday. Hope your trip back was pleasant. Documents provided by Michelin to date with Bates Nos. MNA-MEDINA3380-3386 and MNA-MEDINA1313-1365, 1530-1814, 3516-3615, 3819-4513 are indecipherable and thus useless without the code key. Please provide such code key and also identify what each and every acronym means. Since we will be using these documents in the upcoming depositions, we need this information immediately.

      In addition, on Monday the Judge ordered Michelin to produce the range of bates numbers that contain the tire building training documents Michelin allegedly produced. We have yet to receive such.

                      Very truly yours,

                      LUIS P. GUERRA, L.L.C.

                      Luis P. Guerra
                      David C. Shapiro

LPG/DCS/pm

LAW OFFICES
**LUIS P. GUERRA, L.L.C.**
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

October 13, 2015

Via Email and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX 78701

      Re:    Medina v. Michelin, et al

Dear Chris:

We have not heard from you concerning our letter of last week about the code key/acronym definitions for the documents provided by Michelin to date with Bates Nos. MNA-MEDINA3380-3386 and MNA-MEDINA1313-1365, 1530-1814, 3516-3615, 3819-4513. Again, please provide such code key and acronym definitions. As we told you last week, since we will be using these documents in the upcoming depositions, we need this information immediately.

Moreover, last Monday, the Court ordered Michelin to produce the range of bates numbers that contain the tire building training documents Michelin allegedly produced. Over a week has gone by, and Michelin still has not provided this information. Again, please provide it.

If we do not receive this requested information by the end of the week, Michelin will force us to contact the Court and seek its assistance.

We sincerely hope that we do not have to resort to this.

Very truly yours,

**LUIS P. GUERRA, L.L.C.**

Luis P. Guerra
David C. Shapiro

LPG/DCS/pm

MR 0809

LAW OFFICES
# LUIS P. GUERRA, L.L.C.
6225 North 24th Street, Suite 125
PHOENIX, ARIZONA 85016

LUIS P. GUERRA*
DAVID C. SHAPIRO
*MARTINDALE-HUBBELL AV RATED

Telephone (602) 381-8400
Telecopier (602) 381-8403
WWW.LPGUERRA.COM

October 15, 2015

Via Email and U.S. Mail
Chris Blackerby
Germer Beaman & Brown PLLC
301 Congress Ave, Ste. 1700
Austin, TX  78701

  Re: Medina v. Michelin, et al

Dear Chris:

  As you know, back on October 5, 2015, the Honorable Court ordered Michelin to send a letter specifically enumerating the Bates Number ranges for the tire training documents Michelin purportedly produced.  It has now been almost two (2) weeks. Again, please provide it. Failure to do so will result in court intervention.

      Very truly yours,

      LUIS P. GUERRA, L.L.C.

      Luis P. Guerra
      David C. Shapiro

LPG/DCS/pm

MR 0810

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIN GIBSON, INDIVIDUALLY, | § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| VS. | § § | |
| MICHELIN NORTH AMERICA, INC. AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § | 134th JUDICIAL DISTRICT |

### DEFENDANT MICHELIN NORTH AMERICA, INC'S MOTION FOR CLARIFICATION, RECONSIDERATION, AND FOR STAY

Defendant Michelin North America, Inc. ("MNA") files this Motion for Clarification, Reconsideration, and for Stay, and respectfully shows as follows:

### I.
### Background and Procedural History

This products liability case is based on a single vehicle accident which occurred on September 3, 2012 when the left rear tire on a 2000 Expedition driven by Adrian Rico failed. He lost control of the vehicle, it rolled over, and the plaintiff occupants were injured. Mr. Rico had purchased the Expedition approximately two months before the accident and had not checked or changed the tires. In fact, the vehicle had mis-matched tires of varying sizes, some of which were passenger tires, and one was a light truck tire. The tire at issue is a passenger tire, a P255/70R 16 LTX M/S manufactured at MNA's Dothan, Alabama plant during the 31st week of 2001. At the time of the accident, it was over eleven years old and should not have been in service.

**MOTION FOR CLARIFICATION AND FOR STAY – PAGE 1**

MR 0811

Plaintiffs moved to compel certain documents from MNA and multiple oral hearings were held on September 8, October 5, and November 3, 2015 on the following motions, among others:

- Plaintiffs' Amended Motion to Compel Michelin to Respond to Discovery and Identification of Withheld Michelin Documents, and

- Plaintiffs' Short Motion to Compel Michelin's Employee Most Knowledgeable about: 1) Michelin's Discovery Reponses and 2) Financial Information of Michelin North America (MNA).

In an Order dated November 11, 2015, this Court signed plaintiffs' proposed order on their Motion to Compel Michelin to Respond to Discovery, and required that confidential, trade secret aspect specifications be produced on or before November 24, 2015. The Court also expanded the scope of discovery to dissimilar tires from the tire at issue. The Court has not yet signed an order on the second motion listed above regarding "discovery on discovery" or on MNA's financial information. Although certain rulings were made from the bench at the November 3 hearing, the hearing transcript has not yet been provided by the court reporter.

## II.
### MNA's Aspect Specifications are Trade Secret

The November 11 Order compels MNA to produce "the oldest version of all aspect specifications." The Order is expansive in that it is not limited to the Dothan plant, where the tire at issue was manufactured, nor is it related to plaintiffs' specific defect theories. The aspect specifications regarding the tire defects that plaintiffs allege in this case have been voluntarily produced by MNA in an attempt at compromise, but plaintiffs insist that they need <u>all</u> of such proprietary documents, <u>even on unrelated defects.</u> All such aspect specifications were proven up as trade secret in the Affidavit of Vaneaton Price where he testified:

> Certain of Plaintiffs' requests seek MNA's design and manufacturing specifications, specification changes, testing and design related documents, research and development, tire adjustment processes and analysis, internal

MR 0812

research and studies, **proprietary manufacturing and inspection processes and procedures**, and tire production information. All such documents are highly protected trade secrets of MNA.

(V. Price Aff., ¶ 43, emphasis added) Additionally, Mr. Price testified by affidavit that "Plaintiffs have also requested information and documents relating to MNA's manufacturing and quality procedures," and he described the trade secret nature of such documents, the steps taken by MNA to protect their secrecy, and the competitive disadvantage to MNA from disclosure. *Id*. at ¶¶ 55-60.

This affidavit testimony encompasses the "aspect specifications" ordered to be produced in the November 11 Order. They fall within "MNA's proprietary inspection processes and procedures" and "quality procedures" referenced in the affidavit quoted above. To explain further, "aspect specifications" are procedures by which MNA classpectors inspect finished tires pursuant to certain quality assurance protocols to look for certain characteristics in the tires after they have been cured. Thus, they are part of the proprietary quality assurance systems and processes developed by MNA. There are hundreds of aspect specifications. MNA has clarified this point in the Supplemental Affidavit of Vaneaton Price attached hereto as Exhibit A. The November 11 Order requires such production of these confidential trade secrets of MNA.

This Court allowed plaintiffs to depose Mr. Price about his affidavit and his deposition was recently taken. He explained that MNA's aspect specifications are marked "D3" indicating confidential documents within MNA that are not allowed outside the company. (Depo. at 79-80) Plaintiffs counsel repeatedly chastised Mr. Price for MNA's "thought-out, premeditated actions to protect its secrets" and for "keeping information secret and away from the public," including plaintiffs who their counsel described as "just common folk, and that's common folk that is asking for these documents, not competitors. And you guys intentionally, Michelin intentionally

keeps all this information from these folks, right?" (Depo. at 97) Mr. Price explained that trade secret documents are proprietary and not disclosed to the public. *Id.* at 98.

Because aspect specifications were proven to be MNA's highly protected trade secrets, the burden then shifted to plaintiffs to show that such documents were "necessary for a fair adjudication of their case" under *In re Continental General Tire*, 979 S.W.2d 609 (Tex. 1998) and *In re Bridgestone/Firestone*, 106 S.W.3d 730 (2003). Plaintiffs provided no such proof whatsoever. In a case from the Dallas Court of Appeals in 2010, *In re Goodyear Tire and Rubber Co.*, 392 S.W.3d 687 (Tex. App. – Dallas 2010, orig. proc.), the Court granted mandamus and protected as trade secrets Goodyear's quality control information and quality assurance systems.

Consequently, MNA seeks reconsideration of the ruling requiring production of all aspect specifications, even those unrelated to plaintiffs' specific defect theories. MNA also respectfully requests a stay of the November 24 production date for aspect specifications so that it may pursue mandamus on production of these trade secret documents.

### III.
### Scope of Production Expanded to Non-Similar Tires

Additionally, the November 11 Order set the initial scope for discovery as the three common green tires of the tire at issue manufactured at the Dothan plant for 5 years, from 1998-2003. MNA has already provided documents to plaintiffs under this agreed upon scope, which are substantially similar tires. Dissatisfied, plaintiffs sought an even broader scope in their proposed order ultimately signed by this Court. By the November 11 Order, the scope has now been expanded to tire sizes and configurations which are different designs from the tire in question in this case, other than sharing the same brand name "LTX M/S."

MR 0814

MNA has already responded to a host of document requests related to the tire in question and all substantially similar tires. Yet the scope now expansively encompasses all documents related to three additional size LTX M/S tires – the 235, 245, and 265 LTX M/S – plus all size 255 tires, without regard to rim diameter, section width, load range, components, number of plies, types of plies, speed ratings, tread depth, or original equipment versus replacement tire program. MNA explained that "LTX M/S" is simply a marketing label, and not a designation by which substantial similarity can be defined. (Price Aff. at ¶17) Including various sizes of tires as substantially similar ignores critical differences which make the tire at issue different from other tires. (*Id.* at §20-27) The type and size of many individual components vary significantly, including different thicknesses of shoulder areas of the tread, tread widths, different top and bottom belt widths, belt gauges, tread compounds, other rubber formulas and many other items. *Id.* Further, the November 11 Order requires the scope for these four tire sizes to include all MNA manufacturing plants, not just the Dothan plant where the tire at issue was manufactured.

Texas law does not permit discovery regarding products that the plaintiff did not use. The Texas Supreme Court has granted mandamus relief to several product-liability defendants "when a discovery order covered products the plaintiff never used." *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600-01 (Tex. 2006) (holding alleged defect in harness clip of baby's car seat did not support production of other allegedly defective products that did not include harnesses) (citing *In re American Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (holding that discovery order that included all respiratory products manufactured by defendant was too broad because it included respiratory equipment plaintiffs never alleged they used); *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 814 (Tex. 1995)

MR 0815

Courts in Texas and across the country have defined the appropriate scope of discovery in products liability cases to relate to the specific product at issue, or substantially similar products. "Substantially similar" means of a similar design to the product at issue. A federal regulation defines substantial similarity for tires sold outside the United States compared to tires sold in the United States as: "the same size, speed rating, load index, load range, number of plies and belts, and similar ply and belt construction and materials, placement of components, and component materials, irrespective of plant of manufacture or tire line." 49 CFR 579.4 (d)(3).

In tire litigation, courts have limited the scope of discovery to tires made from the same specification, at the same plant, and in the same time period as the tire at issue:

- *Johnson v. Hankook Tire Mfg. Co.*, No. 2:09CV113-MPM-DAS, 2011 WL 39042 (N.D. Miss. Jan. 5, 2011). Plaintiff argued "that 'similar tires' would be tires that utilize the same skim stock, wedge material, inner liner, and/or (AO) package as the accident tire," while Hankook argued that only tires sharing a common green were similar tires. *Id.* at *2. The court observed that 49 C.F.R. § 579.4 defines green tires as "tires that are produced to the same internal specification but that have, or may have, different external characteristics and may be sold under different tire line names." *Id.* Noting that "how a particular component performs in a tire is totally dependent upon all of the other components in a tire and how they work together per their specifications," the court concluded that "[c]omparing tires that do not share common green internal specifications as defined by the CFR is, therefore, useless to the trier of fact." *Id.* The court thus limited Plaintiff's discovery requests to "the subject model and size tire and any tire that shares a common green internal specification as opposed to any tire that might share a generic component." *Id.*

- *Alvarez v. Cooper Tire & Rubber Co.*, 75 So. 3d 789 (Fla. Dist. Ct. App. 2011) (en banc). Cooper argued that differences in the processing and specifications made only tires with the same or related Green Tire Specification ("GTS") relevant. *Id.* at 791. The court found: "Looking to other courts, we find that in similar discovery disputes most courts have limited production to the GTS numbers which correspond to the tire which was the subject of the suit." *Id.* at 795.

- *Hajek v. Kumho Tire Co.*, No. 4:08CV3157, 2010 WL 503044, at *7-8 (D. Neb. Feb. 8, 2010) (denying motion to compel because plaintiffs failed to demonstrate that discovery targeted information regarding similar tires manufactured within relevant time period).

MR 0816

- *Murphy v. Cooper Tire & Rubber Co.*, No. 5:08cv40/RS/EMT, 2008 WL 5273548, at *6 (N.D. Fla. Dec. 18, 2008) (limiting scope of discovery to materials relating to tires manufactured from same specification, at same plant, and within one year of subject tire).

- *Bradley v. Cooper Tire & Rubber Co.*, No. 4:03CV94LR, 2006 WL 3360926, at *3 (S.D. Miss. Nov. 20, 2006) (limiting scope of discovery to materials relating to tires made from same specification as subject tire during same time period as subject tire).

- *Gonzales v. Goodyear Tire & Rubber Co.*, No. CV 05-941 BB/LFG, 2006 WL 7290047, at *15-17 (D.N.M. Mar. 10, 2006) (limiting discovery to "the subject tire and all other Goodyear tires made from the same green tire, and with the same tread pattern, as the subject tire");

- *Barcenas v. Ford Motor Co.*, No. C 03-04644RMWE, 2004 WL 2827249, at *7 (N.D. Cal. Dec. 9, 2004) (denying motion to compel production of documents relating to tire not substantially similar to subject tire);

As pointed out in MNA's Response to plaintiffs' motion to compel, *Hajek,* 2010 WL 503044, has similar arguments as those made by plaintiffs here. They moved to compel Kumho Tire to produce certain documents regarding "the entire 'Kumho Road Venture line of tires.'" *Id.* at *3. The district court found the requests overly broad. "There are many recognized causes for tread separation," the court reasoned, including "poor tire maintenance and motorist negligence." *Id.* at *7. And "nothing indicating a common component of all 'Kumho Road Venture line of tires' caused the accident tire to fail." *Id.* The court explained:

> Collecting volumes of information regarding all Kumho tires, without any threshold evidentiary showing of how those tires are similar to the accident tire for the purposes of this litigation, or that the information requested has any relationship to the underlying cause of the alleged tread separation at issue, is unduly burdensome and not likely to lead to the discovery of relevant information.

*Id.* at *8 (citations omitted).

The same is true here. MNA has shown that the different sizes of LTX M/S tires have nothing in common with the tire at issue. Without any showing whatsoever of substantial similarity, this Court's November 11 Order is overbroad and MNA seeks reconsideration to

MR 0817

limit the scope to the tire in question and 3 common green tires. Only tires manufactured to the same overall design specification are sufficiently similar to be capable of any meaningful comparison. Tires made to different designs are simply different products.

Also significant is the fact that the newly expanded scope applies to all of plaintiffs' requests for documents, which now include additional trade secret documents, including training materials, adjustment data, testing and design documents, specifications and changes, internal research and studies, manufacturing and inspection processes and procedures, among others. *See* Chart of Trade Secret Requested Production at Ex. B hereto. MNA proved the trade secret nature of such documents and it has not been refuted. Thus, it is error to order disclosure of trade secrets under the authority presented above.

## IV.
## Compound (Skim Stock) Formulas

The November 11 Order recites that "Michelin is allowed to respond" to Plaintiffs' Legal Authority Requiring Production of Belt Skim Stock filed on September 11, 2015. Yet MNA already filed its response on the belt skim stock argument on September 24, 2015. MNA requests that the Order be modified to delete the "allowed to respond" language and also seeks a ruling denying plaintiffs' request for MNA's trade secret compound formula.

## V.
## Rulings at November 3, 2015 Hearing

Finally, as noted, the November 3, 2015 hearing has not been transcribed, nor has an Order been entered. Given the short time frame imposed in the Order to produce trade secret aspect specifications by November 24, 2015 (the week of Thanksgiving), MNA seeks a stay of November 11 Order pending this Court finalizing its rulings on the November 3 hearing and the court reporter's preparation of the November 3 transcript, and until final resolution on mandamus of the rulings to the Dallas Court of Appeals or the Texas Supreme Court.

MR 0818

# VI.
## CONCLUSION & PRAYER

Wherefore, MNA prays that this Court grant this Motion for Clarification, Reconsideration, and for Stay, and for such other relief to which it may be entitled.

Respectfully submitted,

THOMPSON & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701-4238
(512) 469-6114
(512) 482-5028 Facsimile

By:          /s/ *Debora B. Alsup*
         Debora B. Alsup
         State Bar No. 02006200
         debora.alsup@tklaw.com


GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 Facsimile

By:          /s/ *Thomas M. Bullion III*
         Thomas M. Bullion III
         State Bar No. 03331005
         tbullion@germer.com
         Chris A. Blackerby
         State Bar No. 00787091
         cblackerby@germer-austin.com

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

MR 0819

## CERTIFICATE OF CONFERENCE

I certify that on the 18th day of November, 2015, I called the office of Luis P. Guerra, counsel for Plaintiffs, and was advised that he will not return to the office until later this week. I also contacted him by email and did not have a reply at the time of filing this motion. MNA assumes that he is opposed to this motion.

/s/ *Debora B. Alsup*
Debora B. Alsup

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via e-service, facsimile, e-mail, or U.S. Mail on this 18th day of November, 2015.

*Via E-Service and Facsimile*
Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

*Via E-Service and Facsimile*
James B. Ragan
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

*Via E-Service and Facsimile*
Noel Sevastianos
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

*Via Regular Mail*
Jose Bustillo d/b/a Mundo Cars
6422 Day Street
Dallas, Texas 75227

/s/ *Debora B. Alsup*
Debora B. Alsup

16369926.3

MR 0820

# EXHIBIT A

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually, | § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | | |
| vs. | | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC. and JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | | 134th JUDICIAL DISTRICT |
| Defendants. | | |

## SUPPLEMENTAL AFFIDAVIT OF VANEATON PRICE, III

Having first been duly sworn, I, Vaneaton Price, III, an employee of Defendant Michelin North America, Inc. ("MNA"), competently testify as follows:

1. This affidavit is based on my personal knowledge and my review of information available to me in my role at MNA. I am over 18 years of age, of sound mind, and competent to execute this Affidavit. This supplements my Affidavit filed September 1, 2105.

2. I have never been convicted of a felony or a crime of moral turpitude.

3. I am a Senior Technical Advisor employed by MNA. I was employed with Michelin Americas Research and Development Corporation ("MARC"), which merged with and became a division of MNA on January 1, 2008, from January 2007 to December 2011. Since May 1999, I have been employed by MNA. During my employment with MNA

MR 0822

and MARC, I have become familiar with the tires that are designed by MARC and manufactured by MNA, as well as the design and manufacturing procedures used.

4. I am familiar with the process by which tire specifications are developed, with the composition and dimensions of certain tires MNA has designed and manufactured during my employment, with MNA manufacturing processes, equipment, and quality assurance procedures, and with the efforts that MNA makes to protect its proprietary and trade secret information.

5. Certain of Plaintiffs' requests seek MNA's design and manufacturing specifications, specification changes, testing and design-related documents, research and development, tire adjustment processes and analysis, internal research and studies, propriety manufacturing and inspection processes and procedures, and tire production information. Plaintiffs also request all of MNA's Aspect Specifications which are used to inspect a finished tire following quality assurance protocols to look for certain characteristics in the tire after it is manufactured. There are hundreds of aspect specifications. They are part of an extensive quality assurance process developed internally by MNA based on years of experience and extensive testing and analysis. All such documents are highly protected trade secrets of MNA and kept secret by MNA under the steps outlined in my September 1, 2015 affidavit.

6. Tire builder and other employees in MNA's manufacturing plants receive extensive training to perform their jobs. They are trained on the processes and procedures and MNA's quality standards. These training programs are developed internally at MNA and are based on the equipment and procedures in each individual plant at a given time. These training materials contain the confidential manufacturing and quality procedures

MR 0823

all of which are trade secrets and kept secret by MNA under the steps outlined in my September 1, 2015 affidavit.

FURTHER, AFFIANT SAITH NAUGHT.

Dated this /6 day of November, 2015.

Vaneaton Price, III

SWORN to and subscribed before me
this 18 day of November, 2015.

(L.S.)
Notary Public for South Carolina
My Commission Expires: 11/13/2023

506333.000019 16390933.1

SUPPLEMENTAL AFFIDAVIT OF VANEATON PRICE, III – PAGE 3

MR 0824

# EXHIBIT B

# Exhibit B: Chart of Trade Secret Requested Production

| RFP# | Category | Trade Secret Documents Requested | Trade Secret Proof from Price Affidavit |
|---|---|---|---|
| RFP 2 | Aspect Specifications | Aspect Specifications | Aff. ¶¶43, 55-60<br><br>Supp. Aff. ¶5 |
| RFP 8 | | Discount Tire claims and code sheets for Michelin LTX M/S tires [Work-Product Privilege] | Aff. ¶¶20-24 |
| RFP 9 | Adjustment Data and Specifications | Documents related to adjustment data, specification changes, material changes and processing changes | Aff. ¶¶41, 44-47 |
| RFP 11 | Adjustment data | Documents related to incident reports, accident reports, product liability reports, correspondence, and photographs [Work-Product Privilege] | Aff. ¶¶35-36, 41-42 |
| RFP 12 | Adjustment data | Documents related to adjustment data for Michelin LTX M/S tires | Aff. ¶¶35-36, 41-42 |
| RFP 13 | Adjustment Data | Documents related to property damage claims including incident reports and accident reports [Work-Product Privilege] | Aff. ¶¶35-36, 41-42 |
| RFP 15 | Adjustment Data and Analysis | Documents containing internal recommendations, determinations, or guidelines regarding frequency of loss adjustment | Aff. ¶¶35-36, 41-42 |
| RFP 19 | Manufacturing Process | Documents in any way related to the entire manufacturing process (building, tire building training, testing, and inspection) of passenger and light truck tires at the Dothan plant | Aff. ¶¶41, 43-47, 56-61 |
| RFP 20 | Adjustment Data and Analysis | Reports and other documents reflecting return, failure, performance, durability, and life expectancy, design, or quality of subject tire and model tires | Aff. ¶¶35-36, 41-42 |

MR 0826

| RFP# | Category | Trade Secret Documents Requested | Trade Secret Proof from Price Affidavit |
|---|---|---|---|
| RFP 21 | Tire Builder Training Materials | All training documents provided to tire building employees at Dothan | Supp. Aff. ¶6 |
| RFP 22 | Tire Builder Training Materials | All training materials provided to employees building Michelin LTX M/S tires | Supp. Aff. ¶6 |
| RFP 24 | Testing | All documents related to testing of steel belted radial tires with same belt skim stock code as subject tire at Dothan plant | Aff. ¶¶41, 43-44, 61 |
| RFP 25 | Testing | All documents related to under-inflation testing that led to tread separation | Aff. ¶¶41, 43-44, 61 |
| RFP 26 | Internal Analysis | All documents relating to rim groove analysis in which the profile was generated by under-inflation and led to tread belt separation | Aff. ¶¶41, 43-44, 61 |
| RFP 29 | Design and Manufacturing | All documents related to the use, potential use, and application of nylon overlays, belt edge strips, belt edge wraps | Aff. ¶¶41, 43-44, 61 |
| RFP 32 | Testing, Internal Research and Studies | All documents relating to testing and recommendations regarding tire aging | Aff. ¶¶41, 43-44, 61 |
| RFP 37 | Formula and Ingredients | Listing of ingredients of subject tire's inner liner | Aff. ¶¶49-54 |
| RFP 40 | Testing | All specific regulatory compliance test results for subject tire and its common greens | Aff. ¶¶41, 43-44, 60-61 |
| RFP 41 | Adjustment and claim data | Adjustment and claim data after each change to design occurring after the manufacture date of the subject tire and its common greens | Aff. ¶¶35-36, 41-42, 44 |

MR 0827

| RFP# | Category | Trade Secret Documents Requested | Trade Secret Proof from Price Affidavit |
|---|---|---|---|
| RFP 42 | Aspect specifications | All aspect specifications | Aff. ¶¶43, 55-60<br><br>Supp. Aff. ¶5 |
| RFP 44 | Trade Secret Documents from Another Case | All discovery produced in *Velo* | Aff. ¶¶41, 43-47, 55-60 |
| RFP 45 | Prior Testimony | All depositions with certain Michelin employees | Aff. ¶¶41, 43-47, 55-60 |
| RFP 46 | Processes and Procedures | Quality control/work procedures | Aff. ¶¶43, 55-60<br><br>Supp. Aff. ¶5 |
| RFP 47 | Technical materials | Michelin Technical Notes | Aff. ¶¶41, 43-47, 55-60 |

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIN GIBSON, INDIVIDUALLY, | § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| VS. | § § | |
| MICHELIN NORTH AMERICA, INC. AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | § § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § | 134th JUDICIAL DISTRICT |

## <u>ORDER ON STAY</u>

By Order dated November 11, 2015 the Court granted Plaintiffs' Amended Motion to Compel Michelin to Respond to Discovery and Identification of Withheld Michelin Documents and ordered that Michelin North America, Inc. ("MNA") produce aspect specifications on or before November 24, 2015.

IT IS THEREFORE ORDERED that a stay of the November 24 deadline is hereby in all things GRANTED for the purpose of allowing this court to consider MNA's Motion for Clarification, Reconsideration, and Stay, and to permit MNA to pursue a writ of mandamus in the Texas intermediate appellate court or the Texas Supreme Court of the November 11 Order and any rulings from a hearing on November 3. The stay shall remain in effect until the court of appeals or the Texas Supreme Court resolves the mandamus petition and issues any mandate.

SIGNED this the ____ day of _____, 2015.

_____
Judge Dale Tillery, Presiding Judge
134th Judicial District Court,
Dallas County, Texas

ORDER ON STAY – SOLO PAGE

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually;  NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | |
| VS. | § § | 134TH JUDICIAL DISTRICT |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § § | DALLAS COUNTY, TEXAS (Oral Argument Requested) |
| DEFENDANTS, | § § | |

# *RESPONSE TO MICHELIN'S MOTION FOR CLARIFICATION, RECONSIDERATION, AND FOR STAY <u>BASED ON:</u> <u>BINDING TEXAS LAW</u>*

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA | § | IN THE DISTRICT COURT |
| MEDINA, husband and wife, | § | OF DALLAS COUNTY |
| individually; NATALYE MEDINA, | § | |
| individually; NAVIL GIBSON, | § | |
| individually; | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | 134TH JUDICIAL DISTRICT |
| VS. | § | |
| | § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; | § | |
| AND JOSE BUSTILLO d/b/a MUNDO | § | (Oral Argument Requested) |
| CARS, an in state defendant, | § | |
| | § | |
| DEFENDANTS, | § | |

## TABLE OF CONTENTS

Page

I.   Summary of Argument ..... 1

II.  Texas Discovery Standard ..... 2

III. Introduction ..... 3

IV.  Plaintiffs' Discovery Requests and Michelin's baseless claim
     of trade secrets" ..... 6

V.   The September 8, 2015 Hearing ..... 7

VI.  Price's Deposition ..... 9

VII. Price's affidavit has "no probative value" and is "legally
     insufficient". *Humphreys*, 888 S.W. 2d 469, 470 ..... 19

VIII. The Court ordered scope includes only tires that are 100% discoverable ..... 19

IX.  The Court's severe narrowing of discovery destroys Michelin's
     argument that the November 11, 2015 Order is "overbroad" ..... 21

X.   The requested documents are common to all tire lines as admitted
     by Price ..... 22

MR 0831

XI.    Case law and arguments used by Michelin were rejected by
the Texas Courts.  In re Exmark Mfg. Co., Inc., 299 S.W.3d at 527      22

XII.    Michelin has already agreed to produce the documents      23

Conclusion      23

MR 0832

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA MEDINA, husband and wife, individually; NATALYE MEDINA, individually; NAVIL GIBSON, individually; | § § § § § § | IN THE DISTRICT COURT OF DALLAS COUNTY |
| PLAINTIFFS, | § § | 134TH JUDICIAL DISTRICT |
| vs. | § § | DALLAS COUNTY, TEXAS |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO d/b/a MUNDO CARS, an in state defendant, | § § § | **(Oral Argument Requested)** |
| DEFENDANTS, | § § § | |

**RESPONSE TO MICHELIN'S MOTION FOR CLARIFICATION, RECONSIDERATION, AND FOR STAY[1] BASED ON BINDING TEXAS LAW**

TO THE HONORABLE JUDGE DALE TILLERY:

This Response contains binding Texas law holding that Michelin did not even come close to meet its heavy burden of establishing trade secrets concerning the information and documents requested since April of 2015. Therefore, Michelin's Motion should be denied.

I.    **Summary of Argument.**

1. **The information Plaintiffs have requested is discoverable.** *Tex. R. Civ. P. 1. Tex.R. Civ. P. 192.3(a)*; *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex.2003) (orig. proceeding); *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 525-526 (Tex. App. 2009).

2. **Michelin has not established that the requested information constitutes trade secrets and therefore is not entitled to obstruct discovery.** *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998); *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 555 (Tex. 1990); *State v. Lowry*, 802 S.W.2d 669, 671 (Tex. 1991); *United States v.*

---

[1] Yet another law firm. Yet another attorney. Yet another motion for clarification. Yet another motion to stay. Yet another motion for reconsideration. With this new attorney, Michelin has now working this case about ten separate lawyers and has filed multiple motions about the same exact discovery delaying and stonewalling its production for more than eight months.

1

MR 0833

*Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S. Ct. 983, 986-87, 2 L. Ed. 2d 1077 (1958); *Humphreys v. Caldwell,* 888 S.W.2d 469, 470-71 (Tex. 1994).

3. **The Court's September 8, 2015 Ruling** *severely* _narrowed_ **and correctly ordered the production of information since:**

    a. Michelin did not establish that the information requested constitutes trade secrets. *Id.*

    b. "[E]vidence of incidents involving other products besides the exact model at issue [are] . . . discoverable." *In re Exmark Mfg. Co., Inc.,* 299 S.W.3d 519, 528 (Tex. App. 2009)

4. **Michelin already agreed to produce the requested information.**

## II.    Texas Discovery Standard.

The Supreme Court of Texas holds that the purpose of discovery is "to seek truth, so that disputes may be decided by those facts that are revealed, rather than concealed." *Axelson, Inc,* 798 S.W.2d at 555. Therefore, "[d]iscovery is . . . the linchpin of the search for truth. *State,* 802 S.W.2d at 671. Discovery also makes trial a "fair contest with the issues and facts disclosed to the fullest practicable extent." *United States v,* 356 U.S. at 682, 78 S. Ct. 983, 986-87. Consequently, only under rare and "narrow circumstances is it appropriate to obstruct the search for truth by denying discovery":

> **Only in certain narrow circumstances is it appropriate to obstruct the search for truth by denying discovery.** Very limited exceptions to the strongly preferred policy of openness are recognized in our state procedural rules and statutes.

*State,* 802 S.W.2d at 671. See *Tex.R.Civ.Evid. 501*; *Tex.R.Civ.P. 166b(3).*

Thus, "the burden is on the party seeking to avoid discovery to plead the basis for exemption or immunity and to produce evidence supporting that claim" by providing **evidence** – not legally insufficient conclusory allegations, without personal knowledge – to the trial court to establish the claimed privilege:

2

MR 0834

**The burden is on the party seeking to avoid discovery to plead the basis for exemption or immunity and to produce evidence supporting that claim**. [citation omitted].

This means **a party should provide evidence to the trial court in the form of affidavits or testimony to establish the claimed privilege.**

*State*, 802 S.W.2d at 671. (e.a.).

That was Michelin's burden, and it failed to meet it. The sworn admissions made by its affiant Price at his deposition revealed his lack of personal knowledge of the contents in his affidavit. Hence, such affidavit in support of the alleged "privilege" is worthless because it is "legally invalid and therefore cannot serve as evidence in support of a claim of" trade secrets. *Humphreys*, 888 S.W.2d at 470-71. Moreover, Michelin's argument of concealing every internal document by simply claiming "trade secrets" has also been soundly rejected:

> Lowe's has cited no authority that a party's (or even expert's) conclusory opinion that information is a trade secret or is not used industry-wide, or a party's mere desire to avoid disclosing information to others, is sufficient to establish the privilege. **Nor would there appear to be any rationale for adopting such a position as it would seemingly allow the privilege to extend to almost any internal company records.**
>
> **Without evidence establishing any of the conventional trade secret factors with regard to the database, Lowe's has failed to demonstrate that the trial court erred in overruling its trade secret objection** to providing deposition testimony on the creation and use of the database. Accordingly, Lowe's first issue is overruled.

*In re Lowe's Companies, Inc.*, 134 S.W.3d 876, 879 (Tex. App. 2004). (e.a.).

For this reason, Michelin's Motion should be denied and immediate disclosure is required.

## III. Introduction.

The 2012 Labor Day weekend was great for the Medina family. Unfortunately, in the blink of an eye, the Medina's life changed forever. Suddenly and without warning, on

3

MR 0835

September 3, 2012, their vehicle's left rear tire[2] – the defective Michelin LTX M/S tire[3] – failed,

causing the vehicle to uncontrollably veer to the left and roll over and over and over into the

_____

[2] Michelin's reference to the fact that other tire brands were on the vehicle is a red-herring. While this fact is true, <u>only</u> the Michelin tire failed.

[3] Michelin's claim that the tire "should not have been in service" is a fraudulent argument. Michelin's litigation team has gone to the ends of the Earth to claim that there is no danger such tread belt separation caused by "old" tires:

> **Q.** **Is that Technical Bulletin a warning?**
> **A.** **No.**
> ******
> **Q.** **Would <u>you</u> be the person, ... – at Michelin ... most knowledgeable about this Technical Bulletin that is not a <u>warning</u>?**
> **A.** <u>**Yes**</u>**.**
> ******
> **Q.** When you were careful – I said, "this is a warning" – I kind of made that statement, you corrected me: **Luis, this is not a <u>warning</u>, correct?**
> **A.** **Yes –**
> **A.** **-- that's correct.**
>
> **Q.** **And you say it's not a warning because?**
> **A.** **It's <u>not a warning.</u> It's a communications piece.**
> ******
> **Q.** So – so **<u>this document would not warn anybody of anything</u>?**
> **A.** That was not the intent of the document, **<u>no</u>**.
>
> **Q.** **So you agree with me, right, would not <u>warn anyone of anything</u> because <u>it is not a warning, correct</u>?**
> **A.** <u>**That's a logical statement, I guess**</u>**.**
> ******
> **Q.** **Okay. So this Technical Bulletin is <u>not a warning of any danger</u>?**
> **A.** <u>**Correct.**</u>
> ******
> **Q.** **Of course. This Technical Bulletin is not a <u>warning of any hazard</u>?**
> **A.** <u>**Correct.**</u>
>
> **Q.** <u>**Is not a warning that as tires grow older, they are more likely to lead to treat belt separation**</u>**?**
> **A.** <u>**That is correct**</u>**. <u>It does not warn against that.</u>**
>
> **Q.** It's not a warning concerning <u>**tire aging and tread belt detachment**</u>?
> **A.** <u>**No**</u>**. <u>It is not a warning.</u>**
>
> **Q.** <u>**It is not a warning to the effect that if you don't do what it says, a tire may fall apart**</u>?
> **A.** <u>**No**</u>**. <u>It is not a warning.</u>**
> ******
> **Q.** Since your Technical Bulletin is not a warning, you warn no one of anything?
> **A.** **This document <u>warns no one of anything</u>.**

*Deposition of Wischhusen at pp. 15, 18, 23-24, 25-26, 29, 38.* (emphasis added)

4

MR 0836

ditch median. When the collision finally came to an end, Obdulia – a wife and mother – was a quadriplegic.

Terrifyingly, Obdulia is not Michelin's only victim. The following defective LTX M/S tire manufactured at Michelin's **Dothan** plant have killed, paralyzed, or maimed people across the country:

| TIRE TYPE | PLANT | MANUFACTURE DATE |
|---|---|---|
| 1. Michelin LTX P265/70R17 | Dothan, Alabama | 37th week, 1997 |
| 2. Michelin LTX P235/70R16 | Dothan, Alabama | 1st week, 1999 |
| 3. Michelin LTX P265/70R16 | Dothan, Alabama | 2nd week, 1999 |
| 4. Michelin LTX P265/70R17 | Dothan, Alabama | 12th week, 2000 |
| 5. Michelin LTX P265/70R17[4] | Dothan, Alabama | 28th week, 2001 |
| 6. **Michelin LTX P255/70/R16[5]** | **Dothan, Alabama** | **31st week, 2001** |
| 7. Michelin LTX P265/70R16 | Dothan, Alabama | 4th week, 2002 |
| 8. Michelin LTX P265/70R17 | Dothan, Alabama | 6th week, 2002 |
| 9. Michelin LTX LT245/75R16 | Dothan, Alabama | 47th week, 2002 |
| 10. Michelin LTX P265/70R16 | Dothan, Alabama | 6th week, 2003 |
| 11. Michelin LTX P265/70R17 | Dothan, Alabama | 8th week, 2006 |
| 12. Michelin LTX LT265/70R16 | Dothan, Alabama | 16th week, 2006 |
| 13. Michelin LTX LT245/75R16 | Dothan, Alabama | 34th week, 2006 |
| 14. Michelin LTX LT265/75R16 | Dothan, Alabama | 51st week, 2006 |

---

[4] This is the *Velo* tire that caused Sandra Velo to become a quadriplegic – just like Obdulia.

[5] This is the subject tire.

MR 0837

Not surprisingly, by baselessly claiming "trade secrets," Michelin's awful litigation strategy has enabled them to conceal their defective and shoddy tire design, manufacturing and inspection practices. It should not be allowed.

## IV. Plaintiffs' Discovery Requests and Michelin's baseless claim of trade secrets."

Back in April, Plaintiffs propounded discovery requests to Michelin to produce evidence concerning the design, manufacture and inspection of the subject LTX M/S tire for the duration of its production. *See Amended Motion to Compel dated August 25 at pp. 6-10.* With a few exceptions, Michelin refused disclosure by *wholesale* claiming "trade secrets" in response to more than twenty-five (25) of Plaintiffs' requests for production. However, Michelin provided no evidence[6] supporting its objection to producing the requested documents about the design, testing, manufacture, building, and inspection of the subject LTX M/S. *Id.* Despite repeated assurances[7] that the requested documentation would be produced once Plaintiffs executed

---

[6] As Plaintiffs' counsel pointed out to the Court, Michelin got Plaintiffs' requests in April and did not provide <u>any</u> evidence establishing that the information constituted trade secrets:

> MR. GUERRA: Your Honor, we got this request in April. No affidavit in May, June, July until we file the motion to compel no affidavit still. Now we got this affidavit.

*September 8, 2015 Transcript from Plaintiffs' Motion to Compel Hearing at 27:13-16.*

[7] Defense counsel **repeatedly** promised that if Plaintiffs *just signed* Michelin's Protective Order, they would get the remaining documents:

> Your email is correct that **MNA anticipates being able to make its supplemental production <u>within 10-14 days of the protective order being entered.</u>**

*E-Mail from Nelson Mullins, counsel for MNA, May 28, 2015, Exhibit C to Plaintiffs' August 25, 2015 Amended Motion to Compel.*

> [W]e will move forward with the agreed protective order and with **our supplemental production, which we would anticipate making <u>within 10-14 days of entry of the protective order</u>.**

*E-Mail from Nelson Mullins, counsel for MNA, May 29, 2015, Exhibit D to Plaintiffs' August 25, 2015 Amended Motion to Compel.*

6

MR 0838

Michelin's Protective Order, they never came. So, Plaintiffs filed their Motion to Compel on August 25, 2015. *See Amended Motion to Compel dated August 25, 2015.*

## V.     The September 8, 2015 Hearing.

At the September 8, 2015 concerning Plaintiffs' Motion to Compel, to justify its absconding of evidence, Michelin relied exclusively on the affidavit of Vaneaton Price – an affidavit[8] which Michelin knew did not *pass muster*. In Texas, to testify about privileged information the affiant must have personal knowledge of it. *Humphreys*, 888 S.W.2d 469, 470. Price does not have personal knowledge:

So, at this hearing, Plaintiffs' counsel informed the Honorable Court that Michelin's affiant Price was unqualified to testify about the contents of his affidavit. As explained, Price works in Michelin's **legal department.** He is **not** a tire builder, or a tire manufacturer, or a tire designer, or a tire project manager, or a tire manufacturer, or a skim stock compounder, or a tire inspector, or an adjustment inspector, and therefore did not have personal knowledge or competence to testify that the information requested constituted trade secrets:

> **He works on the litigation Defendant sic [department] of Michelin** . . . And going back to the affidavit . . . [he's] **not a tire builder, not a tire manufacturer . . . not a tire designer; didn't design this tire; was not a project manager; didn't work on the plant.**

*September 8, 2015 Transcript from Plaintiffs' Motion to Compel Hearing at 30:23 – 32:2.* (e.a.).

---

> **We are working on the production and still anticipate making it within 10-14 days of entry of the protective order** as originally estimated.

*E-Mail from Nelson Mullins, counsel for MNA, June 4, 2015, Exhibit E to Plaintiffs' August 25, 2015 Amended Motion to Compel.*

[8] Strangely, Michelin used Mr. Price's affidavit as both a sword and a shield. Michelin used the affidavit to prevent disclosure of discoverable evidence but then refused to allow Plaintiffs' to cross-examine him about the affidavit and his personal knowledge of the contents of such affidavit. The Honorable Court overruled Michelin's objection and ordered Mr. Price's deposition, which was conducted on October 22, 2015.

7

Accordingly, there was never a finding by the Court that Michelin established trade secrets.

### a. The Court's Ruling *severely* *narrowed* the discovery allowed.

Since by law Plaintiffs are entitled to conduct discovery about **1)** "evidence of incidents involving other products besides the exact model at issue" *In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 528 and also **2)** the multitude of components and conditions the parties have alleged are at issue (**Plaintiffs:** over-age rubber stock, liner pattern marks, thin inner liner, premature oxidation on the belt skin, improper splicing of belts, improper spacing and placement of the steel cords and belts, improper inspection and/or repair of the tire at the factory, lack of nylon overlay/nylon cap ply or safety, air migration through the inner liner, aging of the tire and its components, trapped air or steam inside the tire components, aging and/or contamination of pre-cured rubber and rubber coated tire components, and misplacement of the steel belts; **Defendants:** overdeflection, underinflation, impact damage), the Honorable Court:

1. <u>Severely</u> narrowed[9] the scope of discovery requested by Plaintiffs (**Transcript at 42:10-12; 45:5-6**).

   > **First**, the Court narrowed the other tire widths to only 235, 245 and 265 – far from what Plaintiffs requested. **<u>Second</u>**, the Court narrowed the scope to make sure that such tires were the *same type* of tire – P-Metric tires as opposed to also light truck tires (**Transcript at 45:8-12**). **<u>Third</u>**, the Court drastically reduced the *time scope* from Plaintiffs' request (tires made from the start of the manufacture of the LTX M/S to the end of production) to a very narrow scope of production: "**six months before and the year after.**"
   >
   > (**Transcript at 58:12-13**). Therefore, if any party should be complaining about the scope of production, it should be Plaintiffs.

2. Ordered production of "the oldest version" of its Aspect Specifications[10]. (**Transcript at 59:11**).

---

[9] Therefore, if any party should be complaining about the scope of production, it should be Plaintiffs.

8

MR 0840

## VI. Price's deposition

The Court's ruling was crystal clear[11]. Still, Michelin sat and never produced the documents in compliance with its strategy of delay and stonewalling. So, Plaintiffs deposed Price to further expose Michelin's fictitious claim of trade secrets. Aware of Price's shortcomings, but still using him as a *sword* to claim "trade secrets," Michelin tried to *shield* his cross-examination and refused to produce Price for deposition. More delay. More stonewalling. So, Plaintiffs were forced to file a Motion to Compel – which was granted.

Deeply worried about Price's lack of personal knowledge about his affidavit's contents, Michelin contacted and retained an army of attorneys from across the country to prepare him for deposition: **1)** Kate Helm, (from Atlanta, Georgia); **2)** Michael Wiggins, (from Orlando, Florida); **3)** Danean Sturino, (from Chicago, Illinois); **4)** Tom Bullion, (from Austin, Texas); and **5)** Nicole Buntin, (from Greenville, South Carolina).[12] These attorneys spent a minimum of seven (7) hours and some up to several days preparing the **unqualified** Price for his deposition. **It did not help Michelin**. Thus, it is no surprise that Michelin – in its Motion for Reconsideration/Clarification/Stay – omitted the hundreds of admissions that Price made under oath that exposed his lack of personal knowledge about the contents of his affidavit:

---

[10] **Aspect Specifications/Aspect Specification Repertoire/Aspect Specification Annexes** – are the actual manufacturing/quality control information/laser photographs that the tire inspectors use when they are looking for defects/anomalies/abnormal conditions (blisters, abnormal coloring, molding, cord/cable placement, improper creases, folds, and openings, mold or curing issues, foreign material found in the tire and other various conditions) found *after* the tire is manufactured but *before* it leaves the factory for distribution. The aspect specifications also provide a decision tree on what the inspector/verifier should do when a specific defect is found (repair, scrap, etc.).

Thus, these documents are necessary for Plaintiffs to prove their case so they can show that the defects/conditions/components alleged by Plaintiffs or the conditions that Michelin claim were caused by the tire's wear and tear left the factory that way.

[11] Michelin claims the Court did not rule until November 11. Wrong. The Court ordered production of all of these documents back on September 8, 2015. Michelin sat on this for months and on the eve of its deadline to produce the documents, seeks reconsideration and a stay. It should not be permitted.

[12] *Deposition of Mr. Price at pp. 22-27, Exhibit A.*

9

MR 0841

1. **Price** works in the legal department defending Michelin[13]:

> Q.   What is your department called?
> A.   <u>I'm in the Legal Department.</u>
>              *****
> Q.   All of your work as a Michelin employee in the Legal Department related to litigation?
> A.   <u>That's correct.</u>
>
> Q.   Helping defend Michelin in cases?
> A.   I'm not sure what you mean by that.
> Q.   Michelin gets sued and you help defend Michelin?
> A.   I work on these cases, <u>yes.</u>

2. Yet, **Price** has no personal knowledge of a single (1) Michelin's trade secret policy[14]:

> Q.   All right. Now, you <u>are not</u> the author of the policies concerning trade secret information within Michelin?
> A.   That's correct.
> Q.   Somebody else is?
> A.   <u>I am not aware of a singular policy.</u>

3. **Price's** Affidavit was *made up* by Michelin's legal team: Price and Kate Helm – Michelin's National Discovery Counsel[15]:

> Q.   All right. Did you write your affidavit?
> A.   I did.
> Q.   Okay. The affidavit was written by yourself; you typed it out?
> A.   I would say that there were parts of this that I did not type. And I was given a framework. But I did the work and did the lion's share of the material that's in it.
>
> Q.   Who gave you the framework?
> A.   <u>Kate Helm.</u>
>              *****
> Q.   So the document is a combination of your work and Ms. Helms' work?
> A.   Some of which on here came from Ms. Helm.

---

[13] *Deposition of Mr. Price at pp. 15:20-21, 62-63, Exhibit A.* (e.a.).

[14] *Deposition of Mr. Price at p. 91, Exhibit A.* (e.a.).

[15] *Deposition of Price at pp. 50-52, Exhibit A.*

10

MR 0842

4. **Price** never worked at Dothan where the subject tire was manufactured[16]:

> Q.   All right. You have never worked in Dothan?
> A.   I have never had a position in Dothan.
>
> Q.   You never had a position in Dothan in the plant itself?
> A.   <u>Correct.</u>
>
> Q.   Or in the office?
> A.   <u>Correct.</u>
> Q.   You never worked on the assembly line in Dothan?
> A.   <u>That's correct.</u>

5. **Price** never worked as <u>or</u> has been a tire builder, <u>or</u> a tire inspector, <u>or</u> a Licensed Professional Engineer, <u>or</u> a skim stock compounder <u>or</u> a formulator for Michelin[17]:

> Q.   You never had a position as assembly line workers?
> A.   <u>I have never been a tire builder.</u>
> Q.   That's right. You've never been a class spector?
> A.   <u>That's correct.</u>
>
> Q.   You've never been a rubber formulator?
> A.   <u>That's correct.</u>
>
>               ******
>
> Q.   <u>You're not licensed as a Professional Engineer?</u>
> A.   <u>That's correct.</u>
> Q.   That's right. You never created any chem stock formulas for Michelin?
> A.   <u>I did not.</u>

6. **Price** has never been an adjustment data inspector[18]:

> Q.   But you have never been one, right? You don't test? You never tested the LTX M/S prior to its releasing to the market?
> A.   <u>Not in that tire line, no.</u>
> Q.   Okay. You've never been an adjustment data inspector?
> A.   <u>That's correct.</u>
>
> Q.   You've never been a designated Michelin inspector at these designated inspection centers?

---

[16] *Deposition of Mr. Price at p. 52, Exhibit A.* (e.a.).

[17] *Deposition of Mr. Price at pp. 52-53, Exhibit A.* (e.a.).

[18] *Deposition of Mr. Price at p. 53, Exhibit A.* (e.a.).

11

MR 0843

A. **That's correct.**

7. **Price** did not author any aspect specifications, technical notes, general principles, tire non-conforming procedures, tire inspection procedures, or adjustment data policies[19]:

Q. **You didn't write the aspect specifications?**
A. **That's correct.**
*****
Q. **How many aspect specs?**
A. **I don't know how many aspect specs there are.**
Q. **You don't know?**
A. **Not an exact number, no. I know there would be hundreds.**

Q. **I know. I don't work for Michelin. You don't know?**
A. **I don't know the exact number of aspect specs, no.**
*****
Q. **You didn't write the technical notes?**
A. **That's correct.**

Q. **You didn't author or write the tire non-conforming procedures?**
A. **That's correct.**
Q. **You didn't write or author the general principles?**
A. **That's correct.**

Q. **You didn't write or author the adjustment data codes?**
A. **That's correct.**

Q. **You didn't set up the adjustment data policies?**
A. **That's correct.**
****
Q. **For the LTX M/S line or any other line?**
A. **That's correct.**
Q. **You didn't write or author any of the adjustment data manuals of Michelin?**
A. **That's correct.**

Q. **You didn't author or write any of the tire inspection procedures?**
A. **I'm not sure I know what –**
Q. **The tire inspection procedures for the adjustment data samples.**
A. **Correct.**

Q. **You didn't write any of the Michelin tire limited warranties?**
A. **That's correct.**

---

[19] *Deposition of Mr. Price at pp. 53-54, 130-131, Exhibit A.* (e.a.).

12

MR 0844

**8. Price** has no personal knowledge of the name or identify of a single skim stock formulator, tire builders, tire manufacturer inspectors or tire adjustment inspectors[20]:

Q.   Michelin also has tire builders, right?
A.   That's correct.

Q.   You are not one of them, right?
A.   <u>That's correct.</u>
Q.   Michelin also has chemists that do chem stock formulations and rubber formulations, right?
A.   <u>I don't know</u> what their backgrounds are but there are people that work for Michelin that formulate mixes.

Q.   You are not one of them?
A.   <u>That's correct.</u>
Q.   What do you call those folks?
A.   Formulators.

Q.   Do you know any of them?
A.   <u>Not personally.</u>
Q.   Do you know their names?
A.   Formulators for what?

Q.   For skim stock or for rubber.
A.   For what rubber?
Q.   LTX M/S tires?
A.   LTX M/S tires have dozens of different rubber components --

Q.   I understand. This subject tire.
A.   -- that are formulated by different people. <u>I don't know</u> the formulators in 2001.
Q.   Tell me the name of any formulator that you know here that works on LTX M/S --
A.   <u>I don't know</u> the names of the formulators that worked on the formulas and the compounds in the LTX line – the LTX M/S line.

Q.   Anything.
A.   <u>Not that I recall, no.</u>
                    *****
Q.   Do you know any of the formulators or their identity?
A.   <u>Not specifically.</u>

Q.   Not a single one?
A.   Not that comes to mind for the LTX M/S2 line, no.
Q.   Or the LTX M/S tire line?

---

[20] *Deposition of Mr. Price, pp. 53- 58, 82, Exhibit A.* (e.a.).

13

MR 0845

A. No.

*****

Q. Who runs the Formulation Department?

A. I don't know.

Q. Who is the Manager of the Formulation Department?

A. I don't know who manages the Formulation Department.

Q. Who is director of the Formulation Department?

A. I don't know the answer to that.

*****

Q. All right. What about tire builders? Tell me the name of anyone that worked on the LTX M/S line.

A. I don't know the name of the tire builder that I know worked on the LTX M/S line.

Q. What about -- Michelin has class spectors, right?

A. In the plant there are class spectors, yes.

Q. You are not one of them and you've never been one of them?

A. I have not been a class spector in a plant.

Q. And did you know the name of any of the class sectors at Dothan?

A. I don't recall the name of a class spector at Dothan.

Q. Michelin also has adjustment data inspectors, right?

A. That's correct.

Q. You are not one of them?

A. That's correct.

Q. Tell me the name of any adjustment data inspectors in any of the designated inspection centers.

A. I do not know any.

9. **Price** has no personal knowledge of the skim stock formula or even the identities of the formulators who worked on the subject skim stock formula[21]:

Q. That's right. You do not know the skim stock formula for this subject tire, right?

A. That's correct.

Q. You -- but there's folks within the company, within Michelin, that know that, right?

A. There would be people in the company that have access to that.

Q. And what -- who would that be? Who would those people be?

A. People in the compounding plant and compounders.

---

[21] *Deposition of Mr. Price at pp. 59-61, Exhibit A.* (e.a.).

14

> Q. Do you know the name of any compounder or people that work on the compounding plant that know the skim stock formula for this subject tire?
>
> A. <u>I do not.</u>

**10. Price** never built a tire for public sale or ever worked on a Michelin assembly line[22]:

> Q. But you have never built a tire?
>
> A. <u>I have not built a tire</u> that was intended for public sale, that's correct.
>
> Q. That's your business, right? That's Michelin's business?
>
> A. That is Michelin's business.
>
> Q. And you have never done that?
>
> A. <u>I have not built a tire</u> that was intended for sale, correct.
>
> Q. In fact, you told me you never -- you never worked in an assembly line for Michelin ever, right?
>
> A. <u>I never worked as a tire builder.</u>
>
> Q. At a Michelin assembly line?
>
> A. <u>That's correct.</u>
>
> *****
>
> Q. Again, not -- let's make it correct. Let's make it accurate. You never worked in the Michelin assembly line as a tire builder in any Michelin plant in the United States?
>
> A. That was never my job to be a tire builder in a Michelin plant.
>
> Q. Is that a yes or no?
>
> A. It's yes.

**11. Price** has no personal knowledge about the turnstile, badge reader, "Cyclone fence" or vendors[23]:

> Q. And what you say is that access turnstile and badge reader, right?
>
> A. That's correct.
>
> Q. All right. And did you write the policy concerning the turnstile and the badge reader?
>
> A. <u>No.</u> I wrote no policy with regards to the turnstile or the badge reader.
>
> Q. Who wrote that policy?
>
> A. <u>I don't know.</u>
>
> Q. Did you talk to him?

---

[22] *Deposition of Mr. Price at pp. 64-65, Exhibit A.* (e.a.).

[23] *Deposition of Mr. Price, pp. 112-114, Exhibit A.* (e.a.).

15

MR 0847

A. No.

Q. All right. Did you talk -- did you order the fence, the Cyclone fence?
A. No.
Q. Who ordered that?
A. I do not know.

Q. Did you talk to him, to the person that ordered it?
A. I did not talk to anyone about ordering the Cyclone fence.
Q. Did you talk to anybody that set the policy toward that specific eight-foot high Cyclone fence to keep the secrets out?
A. I did not talk to anyone about ordering the eight-foot high Cyclone fence.

\*\*\*\*\*\*

Q. All right. Who is the person that wrote the policy about vendors not allowed on the MNA premises?
A. I do not know.
Q. Did you speak with him?
A. I did not.

Q. Did you look at the policy?
A. I did not.
Q. Okay.
A. I am not aware that there is a policy other than security guidelines.

Q. All right. Have you seen those?
A. I have not.

12. **Price** has no personal knowledge of any of the outside vendors (except attorneys) entering Michelin[24]:

Q. Okay. Thank you. You say also that MNA vendors sign confidentiality agreements before they are provided access to documents. Who are these vendors that you're talking about?
A. Any vendor of MNA would have to sign a confidentiality agreement.
Q. That's great, but I want these vendors that you're talking about. Vendors, what are the names?
A. I'm talking about anybody that provides products and services to Michelin that would come on the facility grounds.

Q. I get it. What's their names? Anyone.
A. I don't have a specific name.

---

[24] *Deposition of Mr. Price at p. 120, Exhibit A. (e.a.).*

16

MR 0848

Q. A single one?
A. Any contractor doing work at the facility.

Q. Such as?
A. <u>I don't have the name of a contractor in mind.</u>
******
Q. Today, on this case, you're here on behalf of Michelin?
A. I am.

Q. As a Michelin employee?
A. That's correct.

13. **Price** did not talk to a single (1) Michelin tire builder, manufacturer, inspector, designer, compounder, formulator, or plant worker to draft his Affidavit[25]:

Q. Sir, just answer my question. You didn't speak to any single worker in design, build, class spec, inspector, this subject tire for your affidavit, right?
A. It was not necessary that I speak to any of those people to prepare this affidavit.

Q. Yes or no, did you speak with any of them?
A. It was not necessary and <u>I did not</u>.
Q. You did not?
A. <u>That's correct.</u>
*****
Q. Oaky. Anybody else that you have talked, either in preparation for this deposition or in preparation for the affidavit, related to being an employee of Michelin?
A. <u>Not that I recall.</u>
Q. Anybody from the plant in Dothan?
A. <u>Not in preparation for this.</u>

Q. Or for the affidavit?
A. Affidavit.
Q. Or the deposition?
A. Or to the deposition, correct.

Q. Anybody that works in the Chemical Laboratory for Michelin preparing formulations?
A. <u>No.</u>
Q. Any chemical engineer, licensed chemical engineer?
A. Preparation for this?

Q. For affidavit or depo.

---

[25] *Deposition of Price at 28-31, 109-110, Exhibit A.* (e.a.).

17

A. No.
Q. Okay. Anybody that is Adjustment Tire Inspector at Michelin --
A. No.

Q. -- in preparation for deposition or affidavit?
A. No.
Q. Anybody that works for any of the Designated Return Centers for Michelin?
A. No.

Q. For either of the events; affidavit or the deposition?
A. Not in preparation for this, no.

\*\*\*\*\*

Q. Did you speak with anybody in preparation of the affidavit or the deposition that was a tire spector or tire verifier in the production lines?
A. I am not familiar with the term "tire spector."
Q. Those guys at the Aspect Post.
A. I did not.

Q. Okay. Class Spector, I think that's the term that you guys use.
A. Yes, yes. I did not talk with anyone else in Class Spector in preparation.

\*\*\*\*\*

Q. Thank you so much. Thank you so much, Mr. Price. Anybody in the Designing Department?
A. No.

Q. Mr. Northrup?
A. No.
Q. Mr. Gruenholz?
A. No.

Q. Any of the designers of this specific tire in preparation for the deposition or the affidavit, did you speak to any of them?
A. No.

Price's sworn admissions speak for themselves. He has no personal knowledge about the

contents of his affidavit.

18

MR 0850

**VII. Price's affidavit has "no probative value" and is "legally insufficient".** *Humphreys,* **888 S.W. 2d 469, 470.**

Price's admitted lack of personal knowledge renders his affidavit worthless: Price's affidavit has "no probative value," is "legally invalid and therefore cannot serve as evidence in support of a claim of" trade secrets[26]. *Humphreys,* 888 S.W.2d 469, 470-71. Price's self-serving affidavit is also filled with worthless conclusory allegations:

> **Mark, however, had the burden to establish the seismic data is a trade secret.** (citations omitted). **Mark has failed to make this showing, simply making <u>the conclusory determination</u> that the seismic data is a trade secret.**

*TXO Prod. Co. v. M.D. Mark, Inc.,* 999 S.W.2d 137, 142 (Tex. App. 1999). (e.a.).

Therefore, Michelin has not met its burden in establishing that the information sought constitutes trade secrets, requiring denial of Michelin's Motion.

**VIII. The Court ordered scope includes only tires that are 100% discoverable.**

The Court correctly found that by precluding Plaintiffs from conducting discovery on other models, it would effectively bar Plaintiffs from proving several of its claims including but not limited to knowledge that Michelin was aware of tread separation problem, safer alternative design, failure to respond to known defect, inadequate recalls, feasibility of alternative designs, etc., etc.:

> **Indeed, because product liability claimants must prove a safer "alternative" design, see Tex. Civ. Prac. & Rem.Code Ann. § 82.005, it would be absurd to limit discovery to the specific model at issue because that would necessarily preclude discovery on alternative designs.**

*In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 529 (Tex. App. 2009). (e.a.).

---

[26] As shown above, Mr. Price did not talk to a single (1) person in order to obtain the information in his affidavit:

> In addition to a person's job title or position, **affiants should also explain how they became familiar with the facts in the affidavit**.

*Valenzuela v. State & Cty. Mut. Fire Ins. Co.,* 317 S.W.3d 550, 554 (Tex. App. 2010). (e.a.).; *Deposition of Mr. Price at pp. 28-31, 109-110, Exhibit A.*

MR 0851

As our Court of Appeals noted in *Exmark,* ***"decisions from courts around the nation reject** the notion that discovery in a strict product liability case is uniformly limited to the specific product at issue":*

> *In re Cooper Tire & Rubber Co.,* 568 F.3d 1180, 1191 (10th Cir.2009) (holding that discovery on other tires was not overbroad where plaintiffs alleged that defendant was aware of tread separation problem);

> *Brownlow v. General Motors Corp.,* No. 3:05CV–414–R, 2007 WL 2712925, at *5, 2007 U.S. Dist. LEXIS 67973, at *15 (W.D.Ky.2007) (order) ("Information concerning prior models of GM U–Vans would remain relevant to issues of defect, notice of defect and GM's possible failure to respond to an alleged defect; whereas, discovery of information related to later models would remain relevant to reasonable alternative designs and their performance.");

> *Mann ex rel. Akst v. Cooper Tire Co.,* 33 A.D.3d 24, 816 N.Y.S.2d 45, 55 (2006) (holding that scope of discovery in tread separation case should include "documents relating generally to the tread separation defect or problem" because otherwise the defendant would not produce "documents probative on the issues of notice, defectiveness and dangerousness");

> *Cardenas v. Dorel Juvenile Group, Inc.,* 230 F.R.D. 611, 614–16 (D.Kan.2005) (granting plaintiff's motion to compel the production of information concerning the defendant manufacturer's European version of a child car seat in a lawsuit involving a child car seat manufactured by the same parent corporation in the United States where the discovery was relevant to the feasibility of a safer alternative design);

> *Herman v. Andrews,* 50 S.W.3d 836, 844 (Mo.App. E.D.2001) (holding that plaintiffs' request for substantially similar product types was not overbroad, unduly burdensome or oppressive);

> *Preston v. Montana Eighteenth Judicial Dist. Court, Gallatin County,* 282 Mont. 200, 936 P.2d 814, 818–20 (1997) (allowing discovery of injuries caused by similar products and discovery about various product models as relevant to whether the design was unreasonably dangerous and whether the defendant was aware of the danger and a viable alternative design);

> *Calo v. Ahearn,* 135 A.D.2d 458, 522 N.Y.S.2d 555, 556 (1987) ("Although the vehicle type of the automobile involved in the accident was the subject of the recall campaign, it is undisputed that the Ahearn vehicle was not among those listed in the recall. However, it was within the legitimate scope of discovery to attempt to determine if the recall campaign erroneously omitted vehicles with the same or similar steering defects.");

20

MR 0852

*Culligan v. Yamaha Motor Corp., USA,* 110 F.R.D. 122, 124–25 (S.D.N.Y.1986) (holding that information about post-manufacture testing was relevant and discoverable in ATV rollover case even though it dealt with models other than the ATV model at issue in order to show feasibility of alternative designs).

*In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 529 (Tex. App. 2009). (e.a.).

Michelin claims that it "has shown that the different sizes of LTX M/S tires have nothing in common with the tire at issue." **Wrong**. Not only has *Exmark* rejected this argument, but as demonstrated above, Michelin did not establish or "show" anything. Rather, Price's lack of personal knowledge renders Michelin's argument that "the different sizes of LTX M/S tires have nothing in common with the tire at issue" worthless. Again, Price's affidavit has "no probative value," is "legally invalid and therefore cannot serve as evidence in support of a claim of" trade secrets[27]. *Humphreys,* 888 S.W.2d 469, 470-71.

## IX. The Court's severe narrowing of discovery destroys Michelin's argument that the November 11, 2015 Order is "overbroad."

Moreover, even if we were to accept this argument, to accommodate Michelin's request that the discovery order be narrower, the Court has already **significantly** and **severely** reduced Plaintiffs' requested discovery and its scope. **First**, the Court **narrowed** the other tire widths to **only** 235, 245 and 265 – far from what Plaintiffs requested. **Second,** the Court **narrowed** the scope to make sure that such tires were the **same type** of tire – P-Metric tires as opposed to also light truck tires (**Transcript at 45:8-12**). **Third**, the Court also **drastically reduced** the *time scope* from Plaintiffs' request (tires made from the start of the manufacture of the LTX M/S to

---

[27] As shown above, Mr. Price did not talk to a single (1) person in order to obtain the information in his affidavit:

> In addition to a person's job title or position, **affiants should also explain how they became familiar with the facts in the affidavit**.

*Valenzuela v. State & Cty. Mut. Fire Ins. Co.,* 317 S.W.3d 550, 554 (Tex. App. 2010). (e.a.).; *Deposition of Mr. Price at pp. 28-31, 109-110, Exhibit A.*

21

MR 0853

the end of production) to a **very narrow scope** of production: "**six months before and the year after.**" (**Transcript at 58:12-13**).

Therefore, the only party that could complain about the severely reduced discovery and narrow scope are the Plaintiffs.

## X. The requested documents are common to <u>all</u> tire lines as admitted by Price.

As admitted by Price, the documents requested by Plaintiffs (i.e. manufacturing and inspection documents) are used **across all** tire lines as

> **Q. Michelin has employees that write and set manufacturing and design processes, procedures and techniques for the LTX M/S line, right?**
> **A. <u>I am not aware of any documents that are specific to the LTX M/S line.</u>**
>
> **Q. And that is because?**
> **A. <u>Those types of documents are used on all tire lines</u>.**

*Deposition of Price at p. 58, Exhibit A.* (e.a.).

Thus, in trying to improperly narrow the scope even more, Michelin misled the Court when it stated that the documents sought by Plaintiffs are only used on the subject P255/70R 16 LTX M/S tire. At best, this is a misrepresentation. At worst, it is a . . .

## XI. Case law and arguments used by Michelin were rejected by the Texas Courts. *In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 527.

To support its Motion, Michelin cited *In re Graco Children's Prods.,* 210 S.W.3d 598, 600–01 (Tex.2006) (orig. proceeding), *In re Am. Optical Corp.,* 988 S.W.2d 711, 714 (Tex.1998) and *Texaco, Inc. v. Sanderson,* 898 S.W.2d 813, 815 (Tex.1995). The Texas Court of Appeals soundly distinguished *Graco*[28], *American Optical and Texaco,* holding that that discovery of safer alternative designs – an alleged defect pled by Plaintiffs – was required:

---

[28] Unlike here and in *In re Exmark,* the courts in *In re Graco, In re American Optical Corp.* or in *Texaco* did not discuss the discovery about "safer alternative design".

22

MR 0854

**Exmark's argument misconstrues the scope of allowable discovery under the rules pertaining to discovery and Texas Supreme Court precedent regarding the discovery of safer alternative designs.**

\*\*\*\*\*

We conclude that **the discovery order at issue here was reasonably tailored to the relevant product defect** and was not impermissibly overbroad. [citation omitted].

\*\*\*\*\*

**The order at issue is saliently different from the discovery orders that were reversed by the supreme court insofar as, in the instant case, there is a connection between the alleged defect and the discovery ordered.**

**The order compels discovery of documents that are reasonably calculated to lead to the discovery of admissible evidence regarding whether Exmark knew about the necessity for, or defects in, its rollover protective systems.**

*In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 527, 530. (e.a.).

Finally, Michelin's reliance on *In re Am. Optical Corp.,* 988 S.W.2d 711, 713 (1998) supports Plaintiffs since that case dealt with a discovery order that required production of nearly all its documents regarding its products for a **fifty-year (50) period**. Here, as shown above, the Court severely and narrowly reduced the discovery scope (including time) in this case, requiring denial of Michelin's motion.

## XII. Michelin has already agreed to produce the documents.

Plaintiffs are shocked by Michelin's Motion. In open Court, Michelin repeatedly agreed to produce the documents contained in the Court's November 11, 2015 Order.

- On September 8, 2015, counsel for Michelin "agreed to produce the oldest available copies of the general principles, technical notes and not tire marks, informed procedures (phonetic), [Mr. Bullion stated "Tire Non-Conforming Procedures]". **Michelin's counsel did not place any limitations, restrictions, conditions or qualifiers on its production of these documents.** *September 8, 2015 Transcript at 45:21-23.* (e.a.).

- On November 3, 2015, counsel for Michelin agreed to the production:

  > What I would like to say on the record if possibly, Your Honor, **is once we get a ruling on that on that motion to compel then we will be in a position to produce the additional documents** and they can ask all of these witnesses whatever questions they want to ask them with regard to all

23

MR 0855

of the documents we produced.  So that is what I would like to make sure it's clear on the record.

*November 3, 2015 Transcript at 17:4-11.*  (e.a.).

- On November 3, 2015, counsel for Michelin yet again agreed to the production:

> This tire was built in 2001 and Your Honor you wanted us to produce the oldest version of all of the aspect specifications . . . **So once you enter your written order, then we'll produce the oldest version.**

*November 3, 2015 Transcript at 24:13-22.*  (e.a.).

Over and over again, Michelin judicially admitted on the record that it would produce the documents ordered by the Court:

> In Texas a party may use a formal judicial admission made by a party opponent as a substitute for evidence . . . [citation omitted]
>
> The source of a judicial admission may be facts alleged in a pleading, an agreed upon statement of fact, a stipulation, **or a formal declaration made in open court by a party or counsel . . .** It is binding on the declarant and he cannot introduce evidence to contradict it.

*Smith v. Altman*, 26 S.W.3d 705, 708-09 (Tex. App. 2000).  (e.a.).

**Conclusion:** Michelin's time is up.  Plaintiffs have been waiting since April for the documents.  Then, the Court ordered their production back on **September 8[29], 2015**.  Michelin repeatedly agreed to produce the documents on the record.  Then, they sat on it for months and at the eleventh hour and on the eve of its deadline to produce the documents, seek reconsideration and a stay.  It should not be permitted.

In addition, the Court severely and significantly narrowed the discovery allowed.  Finally, Michelin has **failed** to establish that the documents and information requested by

---

[29] Michelin claims the Court did not rule until November 11.  Wrong.  The Court ordered production of all of these documents back on **September 8, 2015**.

24

MR 0856

Plaintiffs' Request for Production[30] are trade secrets[31] as required by *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613. Therefore, based upon binding Texas law, immediate disclosure is required. Tex. R. Civ. P. 1; Tex.R. Civ. P. 192.3(a); Tex.R.Civ.Evid. 501; Tex.R.Civ.P. 166b(3); *In re CSX Corp.*, 124 S.W.3d at 152; *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d at 525-526; *Axelson, Inc.*, 798 S.W.2d at 555; *Lowry*, 802 S.W.2d at 671; *United States,* 356 U.S. at 682; *Humphreys,* 888 S.W.2d at 470-71; *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA, LLC
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:  */s/ David C. Shapiro*
Luis P. Guerra (*Admitted Pro Hac Vice*)
AZ State Bar No. 015768
David C. Shapiro (*Admitted Pro Hac Vice*)
AZ State Bar No. 028056
ATTORNEYS FOR PLAINTIFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787

---

[30] #1, #2, #8-9, 11-13, #15, #19-22, #24-26, #29, #32, #37, #40-42, #44-47

[31] Michelin's citation to *Cont'l* and *In re Bridgestone/Firestone, Inc.* is unavailing. In both those cases, the plaintiffs conceded and stipulated that the requested information constituted trade secrets. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 615; *In re Bridgestone/Firestone, Inc.,* 106 S.W.3d 730, 732 (Tex. 2003).

Meanwhile, *In re Goodyear Tire & Rubber Co.*, 392 S.W.3d 687, 693 (Tex. App. 2010) is also inapplicable. Unlike Michelin who presented Price who had no personal knowledge of the contents of his affidavit, to prove that the requested documents constituted trade secrets, "**Goodyear presented the affidavit testimony of Richard Olsen, an engineer who worked at Goodyear for over forty years in various capacities involving the design, manufacture, testing, and analysis of tires, and James M. O'Neil, Goodyear's Director IT Security and Controls.**" *Id.* Thus, *Goodyear* hurts – not helps – Michelin.

25

MR 0857

Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via E-Mail & U.S. Mail, on this 2nd day of December, 2015:

*Via E-Service, E-Mail & U.S. Mail to*:

Noel A. Sevastianos
SEVASTIANOS & ASSOCIATES, P.C.
120 So. Central Ave., Suite 130
St. Louis, MO 63105

Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

Debora B. Alsup
THOMPSON & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Attorneys for Defendant
Michelin North America, Inc.

*Via Mail to*:

Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars


/s/ David C. Shapiro

26

MR 0858

# EXHIBIT A

CAUSE NO. DC-14-07255

SAMUEL MEDINA and OBDULIA ) IN THE DISTRICT COURT

MEDINA, husband and wife, ) OF DALLAS COUNTY

individually; NATALYE MEDINA, )

individually; NAVIL GIBSON, )

individually, ) 134th JUDICIAL DISTRICT

    Plaintiffs, )

v. )

MICHELIN NORTH AMERICA, ) DALLAS COUNTY

INC.; AND JOSE BUSTILLO )

d/b/a MUNDO CARS, an in- )

state defendant, )

    Defendants. )

VIDEOTAPED DEPOSITION OF VANEATON PRICE

(Taken by Plaintiffs)

October 21, 2015

Reported by: Rebecca L. Arrison

    Court Reporter

    Notary Public

MR 0860

## Page 2

APPEARANCE OF COUNSEL:

FOR THE PLAINTIFFS:

    BY: LUIS P. GUERRA

    DAVID C. SHAPIRO

    LAW OFFICES OF LUIS P. GUERRA

    6225 N. 24th Street, Suite 125

    Phoenix, AZ 85016

    (602) 381-8400

FOR DEFENDANT MICHELIN NORTH AMERICA, INC.:

    BY: THOMAS M. BULLION, III

    GERMER PLLC

    301 Congress Avenue, Suite 1700

    Austin, TX 78701

    (512) 472-0288

Also Present:

    Jack Marks, CLVS

    Videotaped deposition of VANEATON PRICE, taken by the Plaintiffs, at Nelson Mullins Riley & Scarborough LLP, 104 South Main Street, Suite 900, Greenville, South Carolina, on the 21st day of October, 2015, at 9:30 a.m., before Rebecca L. Arrison, Notary Public and Court Reporter.

## Page 3

### CONTENTS

THE WITNESS: VANEATON PRICE    EXAMINATION

BY MR. GUERRA    5

BY MR. BULLION    133

BY MR. GUERRA    137

BY MR. BULLION    139

### INDEX OF EXHIBITS

(There were no Exhibits marked.)

## Page 4

THE VIDEOGRAPHER: We now are on the record in the matter of Samuel Obdulia, et al., versus Michelin North America, Inc., et al. Today's date is Wednesday, October 21st, 2015. The time is approximately 9:28.

    This is the video recorded deposition of Vaneaton Price, being taken at the offices of Nelson Mullins Riley & Scarborough, 104 South Main Street in Greenville, South Carolina.

    I'm the camera operator, Jack Marks, Certified Legal Video Specialist in association with Alderson Reporting, located at 1155 Connecticut Avenue Northwest, Washington, D.C. The court reporter is Rebecca Arrison, also in association with Alderson Reporting.

    Will attorneys please identify themselves and the parties they represent, beginning with the party noticing this proceeding.

    MR. GUERRA: Luis Guerra and David Shapiro for the Medina family.

    MR. BULLION: Tom Bullion for Michelin North America, Incorporated.

    THE VIDEOGRAPHER: And will the

## Page 5

court reporter please administer the oath.

- - -

VANEATON PRICE, being first duly sworn, testified as follows:

- - -

EXAMINATION

BY MR. GUERRA:

Q. Nice to see you again.

A. Nice to see you.

Q. Mr. Price, throughout this deposition, I will call you Mr. Price, and you call me anything you want. I go by Luis, but people say differently so it doesn't really matter to me. Is that okay?

A. That's fine.

Q. We met before, maybe a couple of years ago, maybe a year and a half ago in the same office, right?

A. Yes.

Q. But I did not have an opportunity to talk to you on the record, correct?

A. That's correct.

Q. You work here in Greenville, right?

A. I do.

Q. You work at the MARC Center?

A. I do not currently work at the MARC Center

Alderson Reporting Company
1-800-FOR-DEPO

## Page 6

full time, though I am there several days a week, so it wouldn't be unusual for me to be there.

Q. Where is your office?

A. My office is at Pelham Road. It's the Headquarters North America building for Michelin North America.

Q. You are the building closest to the airport?

A. Yes, sir.

Q. And that is Michelin North America --

A. That's right.

Q. -- headquarters?

A. Yes, sir.

Q. You don't have to call me "sir." Say Luis or yes or whatever you want to call me. I will call you sir, you call me whatever you want. Deal?

A. That's fine. If I say "yes, sir" --

Q. Okay.

A. -- it's out of habit.

MR. BULLION: People from the South say "yes, sir" and "yes, ma'am" a lot.

BY MR. GUERRA:

Q. So would you be kind enough to tell me, please, how many folks, how many employees would you think that work at the MNA headquarters, the one, the building where you work?

## Page 7

A. I would be totally guessing at above 1,000.

Q. Above?

What about at the MARC Center?

A. Same type of number.

Q. Okay. How far is the MARC Center from your place, from your office in Greenville?

A. Twenty miles.

Q. Twenty miles.

Would you consider both to be in Greenville?

A. Yes.

Q. Okay. Mr. Price, I kind of jumped a little bit and I assumed you have been deposed before. Have you been deposed before?

A. I have not.

Q. Okay. In all the years that you have worked at Michelin, this is your first deposition?

A. That's correct.

Q. Okay. I am sure that you had an opportunity to speak with your attorney prior to the deposition?

A. I did.

Q. Okay. I'm just going to go over the -- like a brief overview of the rules.

We are here like if you were in a -- in a courtroom, and you do understand that, right?

A. I do.

## Page 8

Q. You are under oath and you know that, right?

A. I do.

Q. I'm going to ask you questions, you provide me the answers to the best of your knowledge.

A. I will.

Q. And if you need to take a break for any reason, we'll stop it at any time.

A. Okay.

Q. Your attorney's entitled to make objections. If he wants you to make an objection, he will say it on the record, and we will just give him a little time so he can put it on the record, then I'll ask the next question or give the answer. Okay?

A. Okay.

Q. That's about it.

You are not a registered -- registered Professional Engineer?

A. I am not a licensed Professional Engineer.

Q. Or a registered Professional Engineer.

A. I don't know the difference.

Q. Okay. Good.

You are not a licensed Professional Engineer in South Carolina?

A. That's correct.

Q. Or in Alabama?

## Page 9

A. That's correct.

Q. Or in Texas?

A. That's correct.

Q. And you have never been?

A. That's correct.

Q. Okay. You're not a licensed or registered Professional Engineer anywhere in the United States?

A. That's correct.

Q. Okay. Let's talk a little bit about your preparation to write your affidavit. You understand that you're here to talk about that?

A. Yes, I am.

Q. Did you, in preparation to -- for your affidavit, did you have an opportunity to speak with anyone in preparation of that affidavit?

A. Yes.

Q. Okay. Conversations with your attorneys are not to be discussed on the record or with me; you understand that?

A. I do.

Q. All right. But I can ask you about meetings, location of meetings, times of meetings, not surprising, and things of that nature. Okay?

A. Okay.

Q. Did you have an opportunity to speak with

Alderson Reporting Company
1-800-FOR-DEPO

MR 0862

## Page 10

your attorney in preparation for your affidavit?

A. I did.

Q. Okay. How many times?

A. I don't recall specifically, but probably three or four.

Q. Which attorneys?

A. I talked with internal Michelin attorneys and external.

Q. Okay. Would you be kind enough to tell me their names?

A. Nicole Buntin, Kate Helm.

Q. Nicole Buntin?

A. B-u-n-t-i-n.

Q. Would you say the name again?

A. Buntin.

Q. Buntin, B-u-n-e-t-i-n?

A. No E.

Q. Okay. B-u-n-t-i-n?

A. Yes, sir.

Q. Thank you so much, Mr. Price.
And also Kate, what's her last name?

A. Helm.

Q. Thank you.
And that would be -- are those the external attorneys or are those the internal and external

## Page 11

attorney?

A. Internal and external.

Q. Okay. So Nicole would be attorney -- internal attorney, Kate would be the external attorney?

A. That's correct.

Q. Thank you so much.
Anybody else?

A. In preparation of this affidavit, I don't recall anyone else.

Q. Okay. You said, Luis, I spoke with them three or four times. With both three or four times or with one more than the other?

A. I don't recall specifically which one I talked to more or less.

Q. Did you -- I assume that with Ms. Buntin, you talked with her personally?

A. On occasion, certainly, yes.

Q. Well, would you be kind enough to speak louder for the court reporter? She is having difficulty hearing you.

A. Certainly. I will try.

Q. I sometimes have the same problem.
How many times do you think you talked to Ms. Buntin or Buntin in preparation for your

## Page 12

affidavit personally?

A. Three or four.

Q. Okay. How long would those take -- would last, let's say that?

A. A few minutes to five minutes.

Q. What about with Ms. Helm, how many times do you think you spoke with her?

A. Three or four.

Q. Would that all be telephonically?

A. I don't recall. Occasionally she's in town, but --

Q. Okay.

A. -- my recollection is that would have been telephonically.

Q. How long would those contacts would have lasted with Ms. Helm on the phone?

A. Probably the same; a few minutes to five minutes.

Q. Okay. Did you -- did you cover everybody that you spoke, attorney wise, concerning your affidavit?

A. As I recall the preparation of the affidavit, yes.

Q. Thank you so much.
What about other individuals within the

## Page 13

company in preparation of your affidavit within Michelin?

A. I may have talked with someone in the specifications group.

Q. Who would that be?

A. I don't recall specifically who within the specifications group. I just know that I gathered some numbers, and I may have talked with somebody to validate numbers and specifications; that seems reasonable, but I don't have a specific recollection.

Q. Who would be that person that you know of? Who do you know in the specifications group?

A. Oh, there are several people that I know --

Q. Tell me their names, please.

A. -- in specifications.
Carla Wingate.

Q. Carlo?

A. Carla.

Q. Wingate?

A. Correct.

Q. Who else?

A. I don't remember anybody else in particular. It's likely Carla that I would have talked to.

Q. And what is Carla's group called?

A. Specifications.

MR 0863

## Page 14

Q. And what does that relate to?

A. Specifications for tires.

Q. Where does Carla work?

A. At MARC.

Q. And the department at MARC called the Specification Department?

A. I believe that's correct. I don't know the exact name, but I would refer to it as Specifications Department --

Q. Okay.

A. -- or Specifications Group.

Q. Thank you so much, Mr. Price. Anybody else that you would have spoken within Michelin concerning preparation of your affidavit?

A. Not that I recall.

Q. Okay. So Carla in Specs. How long have you known Carla?

A. Probably since 2007 when I started working at MARC.

Q. Okay. All right. And since you have known Carla, has she always work in Specs, Specifications?

A. To my recollection.

Q. Okay. And you called her concerning preparation for this affidavit on this case, and on

## Page 15

this specific case the tire that we're talking about is an LTX M/S is that right?

MR. BULLION: Objection; form.

THE WITNESS: It is, and I may have called her. She would have been a person, if I needed information on the number of specs, that person I would have gone to.

BY MR. GUERRA:

Q. So you're not sure if you called her?

A. I don't have a specific memory of talking to her.

Q. But if you did talk to somebody, would that have been her?

A. It would have been her related to the numbers of specifications involved in this affidavit.

Q. Okay. Anybody else, Mr. Price?

A. No, not that I'm --

Q. Okay.

A. -- aware of.

Q. What is your department called?

A. I'm in the Legal Department.

Q. Legal Department. How many people work at the Legal Department, please?

A. About 40.

## Page 16

Q. And they are -- what are they, I mean in general? Would you give me a summary of the people that work there?

A. They would generally be in Greenville. In Greenville.

Q. In Greenville. But who -- what are their -- what is their background; are they lawyers, are they paralegals, are they secretaries?

A. All of the above.

Q. All of the above.

A. And engineers.

Q. Okay. Registered engineers, licensed engineers?

A. I don't know if the other engineers are licensed.

Q. Any of them?

A. I don't know.

Q. Any of them?

A. I don't know if any of them are licensed.

Q. Okay. What you're saying is that they may have some -- they have education in engineering?

A. Yes, they have engineering degrees.

Q. Okay. But you don't know if a single one of those individuals that works up there in MARC review

## Page 17

is a licensed or registered engineer anywhere in the United States?

A. I don't know.

Q. Okay. Tell me the names of the engineers that work with you in the Legal Department.

A. Michael Wischhusen and Doug Slagh.

Q. You may have to spell that name for --

A. S-l-a-g-h.

Q. No, the other one.

A. Good luck.

MR. BULLION: You've deposed him twice, I would think you would know how to -- how to spell the name, probably.

MR. GUERRA: I'm sorry?

MR. BULLION: You've deposed him twice.

MR. GUERRA: Oh, I know, but the court reporter may not know.

MR. BULLION: W-i-s-c-h-h-u-s-e-n.

MR. GUERRA: I like Mr. Wischhusen a lot.

BY MR. GUERRA:

Q. So you said, Luis, that's three engineers, three people that are trained as engineers in your Legal Department group.

MR 0864

Page 18

A. That's correct.

Q. The rest of them -- how many attorneys?

A. I don't know the exact number of attorneys.

Q. Give me your best shot.

A. Twelve.

Q. Twelve. Including Nicole that we talked about?

A. That's correct.

Q. Including Ms. Foster?

A. Yes.

Q. She -- she heads the group, the legal group?

A. Not the Legal Department.

Q. But the legal group within the Legal Department?

A. Product Liability Group.

MR. GUERRA: Okay. Wischhusen, isn't that an Alabama fan? I thought that his kids went to Alabama, didn't they?

MR. BULLION: I don't know where his kids go to school.

MR. GUERRA: We talked a lot of football. I think it was Alabama. Maybe I'm wrong. Maybe I'm wrong.

BY MR. GUERRA:

Q. All right. You said, Luis, there's about

Page 19

three engineers, about 12 lawyers --

A. Yeah.

Q. -- give or take?

A. I know the exact number of engineers, I don't know the exact numbers of lawyers.

Q. So if we go with your numbers, then we have 25 other folks. Who are these 25 other folks?

A. There are paralegals, there are admins.

Q. Who else; secretaries?

A. Certainly there are secretaries.

Q. Anybody else I'm missing?

A. There are people who work in -- in Property Damage.

Q. Property Damage.

What do you call those folks?

A. Claims adjusters --

Q. Claims adjusters.

A. -- would be the term that I would use. I don't know if that's their title.

Q. Okay. How long have you worked at that department, Mr. Price, please?

A. Since 2012.

Q. 2012. Okay. All right.

Now, you -- you call yourself on that affidavit, job title, as Senior Technical Adviser,

Page 20

right?

A. That's the title of the position.

Q. That's your job title, right?

A. Yes.

Q. And you have held that position since 2012?

A. I have.

Q. What is the -- Mr. Slagh's job title?

A. Senior Technical Adviser.

Q. What is Mr. Wischhusen's job title?

A. Technical Director.

Q. Do you work with Mr. Wischhusen directly?

A. I do.

Q. Would it be fair to call him your boss?

A. He is not my boss.

Q. Who would be your boss?

A. Kip Foster.

Q. Kip Foster.

Does -- Wischhusen is the boss of anyone within the department?

A. No.

Q. Okay. Is anybody the boss of Wischhusen within the department?

A. Kip Foster.

Q. Kip Foster.

And is that Miss or Mrs.?

Page 21

A. Mrs.

Q. Mrs. Foster is a lawyer?

A. She is.

Q. All right. What about this lady Carla McMahan?

A. She's a paralegal.

Q. Paralegal.

How many paralegals do we have up there at your Legal Department, please?

A. I don't know the exact number.

Q. Give me your best shot, please.

A. Six or so.

Q. All right. Tell me, would you be kind enough to tell me, what is Ms. Foster -- Mrs. Foster's job title?

A. Director of Litigation.

Q. Director of Litigation.

And you said something about -- who is the director of products liability?

A. I didn't say anything about a director of products liability, but that would be Kip, she's head of the group.

Q. Okay.

A. The Litigation Group.

Q. Thank you so much.

MR 0865

## Page 22

What you're saying is, Luis, that's not a title, director of products liability, right?

A. I don't know the exact title.

Q. Okay. And Mr. Wischhusen, you said, is a Technical Director of Litigation?

A. That's correct.

Q. So you are a Senior Technical Adviser of Litigation?

A. In the Litigation Group.

Q. Now, in preparation for this deposition, did you have an opportunity to meet with the other attorneys?

A. I did.

Q. How many times?

A. I recall two times.

Q. Personal meetings?

A. I guess I would say yes to that. I don't know what you mean by "personal meetings."

Q. Thank you. Live.

A. Yes.

Q. Who would be the individuals that you would have met as your attorneys on those live meetings, please?

A. Tom Bullion.

Q. Anybody else?

## Page 23

A. At times, Nicole Buntin was there.

Q. Nicole, your colleague --

A. Yes.

Q. -- that we talked about?

All right. When did this personal meeting, the first one, took place, please?

A. Monday afternoon.

Q. This Monday afternoon, so if today is the 21st, would that have been the 20th?

A. That's correct.

MR. BULLION: 19th, I believe.

MR. GUERRA: I'm sorry.

MR. BULLION: Today's Wednesday.

MR. GUERRA: Oh, thank you, Tom. 19th.

BY MR. GUERRA:

Q. Was that the first meeting with Mr. Bullion?

A. Yes.

Q. Where did that meeting take place?

A. Here at this office.

Q. Nelson Mullins?

A. Yes.

Q. Anybody else present other than you and Mr. Bullion?

A. I believe Kate Helm.

## Page 24

Q. Was also live?

A. Yes.

Q. How long did that meeting take place?

A. Roughly an hour.

Q. Anybody else present or on the phone at that meeting?

A. On the 19th, there was no one else present that I recall.

Q. What about the second meeting, when did the second meeting take place, Mr. Price, please?

A. On the 20th.

Q. So yesterday, Tuesday?

A. It did.

Q. Where did that second meeting take place?

A. Here at this office.

Q. What time was that one?

A. I believe we got started in the morning around nine.

Q. And lasted until?

A. About four o'clock, as I recall.

Q. Who was present, please?

A. Tom Bullion.

Q. Anybody else?

A. Danean Sturino.

Q. Tell me that again, please.

## Page 25

A. Danean Sturino.

Q. Danean?

A. Yes.

Q. Sturina?

A. Sturino.

Q. Would you be kind enough to spell the last name, please?

A. I'm not sure that I know the correct spelling, but I would spell it phonetically S-t-o-r-i-n-o.

MR. BULLION: It's S-t-u-r-i-n-o, I think.

BY MR. GUERRA:

Q. Do you -- do you -- did you know Ms. Sturino prior to that meeting?

A. Yes, I did.

Q. Do you know where she works?

A. She works in Chicago.

Q. She works in Chicago for?

A. I believe a law firm called O'Hagan.

Q. Called what?

A. O'Hagan.

Q. O'Hagan.

All right. Is she a lawyer?

A. Yes.

Alderson Reporting Company
1-800-FOR-DEPO

MR 0866

## Page 26

Q. In Chicago?

A. Yes.

Q. And did you have an occasion to meet her before on other Michelin cases?

A. No, not related to cases.

Q. Would you be kind enough to tell me who introduced you to Ms. Sturino?

A. Nicole Buntin.

Q. Is she an employee of Michelin?

A. Ms. Sturino?

Q. Yeah.

A. No, she's not an employee of Michelin. She's an attorney that represents Michelin.

Q. Ms. -- would you say it again, the name, so I can remember it?

A. Danean.

Q. Just the last name.

A. Sturino.

Q. Is that Ms. or Mrs.?

A. I don't know.

Q. Okay. All right. So other than Tom Bullion and Ms. Sturino, anybody else present?

A. Kate Helm.

Q. Kate Helm.

Anybody else?

## Page 27

A. Michael Wiggins.

Q. Michael Wiggins.

Q. Who is Mr. Wiggins?

A. He's an attorney that works in Florida.

Q. Quite the powwow. Wow. Four attorneys and Mr. Price on a meeting yesterday?

MR. BULLION: Objection; form.

THE WITNESS: I believe that Nicole Buntin was there.

BY MR. GUERRA:

Q. So five attorneys. Thank you so much, Mr. Price.

Anybody else that we may have missed out?

A. Not that I recall.

Q. Any of the -- your other -- any of -- other co-workers that work with you at the Legal Department?

A. No.

Q. Thank you so much.

Did you know Mr. Wiggins prior to this meeting?

A. I did.

Q. Did you work with Mr. Wiggins on other cases?

A. I have worked on one case with Mr. Wiggins.

## Page 28

Q. Mr. Wiggins also is an attorney out of Florida that defends Michelin on cases?

A. That's correct.

Q. Thank you so much.

How were you introduced to Mr. Wiggins?

A. As I recall, the same way; probably through Ms. Buntin.

Q. Through your work?

A. That's correct.

Q. All right. Anybody else? Did you ever -- you said no?

A. I didn't understand the question.

Q. Anybody else?

A. Anybody else?

Q. Present on this second meeting.

A. No.

Q. Or on the phone during the second meeting?

A. No.

Q. Thank you.

That lady that you said, Luis, if I would have called would be Ms. Wingate or Mrs. Wingate, she wasn't present in any of the meetings?

A. No.

Q. Oaky. Anybody else that you have talked, either in preparation for this deposition or in

## Page 29

preparation for the affidavit, related to being an employee of Michelin?

A. Not that I recall.

Q. Anybody from the plant in Dothan?

A. Not in preparation for this.

Q. Or for the affidavit?

A. Affidavit.

Q. Or the deposition?

A. Or to the deposition, correct.

Q. Anybody that works in the Chemical Laboratory for Michelin preparing formulations?

A. No.

Q. Any chemical engineer, licensed chemical engineer?

A. Preparation for this?

Q. For affidavit or depo.

A. No.

Q. Okay. Anybody that is Adjustment Tire Inspector at Michelin --

A. No.

Q. -- in preparation for deposition or affidavit?

A. No.

Q. Anybody that works for any of the Designated Return Centers for Michelin?

MR 0867

Page 30

A. No.

Q. For either of the events; affidavit or the deposition?

A. Not in preparation for this, no.

Q. Anybody that is a tire spector or verifier, tire verifier at the production line?

A. I didn't understand the word.

Q. Did you speak with anybody in preparation of the affidavit or the deposition that was a tire spector or tire verifier in the production lines?

A. I am not familiar with the term "tire spector."

Q. Those guys at the Aspect Post.

A. I did not.

Q. Okay. Class Spector, I think that's the term that you guys use.

A. Yes, yes. I did not talk with anyone else in Class Spector in preparation.

Q. Thank you so much. Thank you so much, Mr. Price.

Anybody in the Designing Department?

A. No.

Q. Mr. Northrup?

A. No.

Q. Mr. Gruenholz?

Page 31

A. No.

Q. Any of the designers of this specific tire in preparation for the deposition or the affidavit, did you speak to any of them?

A. No.

Q. All right. Did you have an opportunity to look at the tire itself, the subject tire?

A. I have.

Q. Okay. When it was here?

A. Yes.

Q. Okay. Who else looked at that tire when you were looking at the tire?

MR. BULLION: Don't answer that.

MR. GUERRA: Excuse me?

MR. BULLION: I said: "Don't answer that."

MR. GUERRA: Based on what?

MR. BULLION: Based on privilege.

MR. GUERRA: I'm just asking who was present.

MR. BULLION: I've made my objection or my statement.

MR. GUERRA: I'm sorry?

MR. BULLION: I made my statement.

MR. GUERRA: And what is that.

Page 32

MR. BULLION: Don't answer that.

MR. GUERRA: Based on?

MR. BULLION: Privilege.

MR. GUERRA: Which privilege?

MR. BULLION: Work product.

MR. GUERRA: Which privilege? He is not an attorney.

MR. BULLION: Work product.

MR. GUERRA: All right.

BY MR. GUERRA:

Q. Are you going to follow the instructions of your attorney?

A. I am.

Q. Okay. How long did you yourself look at that tire?

A. Probably an hour or two.

Q. Okay. Did you yourself unwrap it?

A. No, I didn't.

Q. Did you yourself videotape it?

A. I videotaped the unpacking of the -- and the reception of the evidence, I did.

Q. Okay. Did you yourself took notes?

A. I did not take notes.

Q. Now, the --

A. I want to please clarify that.

Page 33

Q. Please.

A. If I may. I make notes related to reception in terms of the tire is here, what came with it, pieces and parts, wheels, for example, and where it came from, the date that it was received. I make a note of those things. But in terms of the tire itself, beyond recording the DOT, I didn't make notes about the tire.

Q. You were not the person designated to inspect that tire; is that what you're telling me?

A. That's correct.

Q. Okay. Somebody else was, and I understand that your attorney --

MR. GUERRA: You're going to make an objection if I ask that question, right?

MR. BULLION: We're not going to talk about Michelin's experts.

MR. GUERRA: All right. No problem.

So my point being is if I ask questions about that, you're going to tell your client: Don't answer that, work product or attorney-client privilege?

MR. BULLION: Right.

MR. GUERRA: Okay.

Alderson Reporting Company
1-800-FOR-DEPO

MR 0868

## Page 34

MR. BULLION: It has more to do with the fact that we haven't designated experts yet --

MR. GUERRA: That's okay.

MR. BULLION: -- and you're not entitled to know who our experts are.

MR. GUERRA: I'm not going to fight you on that here, for sure. I'm not waiving any objections that I have, pure objection from an argument standpoint that I may make, but I respect what you're saying and I'm not going to waste time today because of your objections.

BY MR. GUERRA:

Q. So if I were to ask you, Mr. Price, give me all your notes of your inspection of the tire, you would say, Luis, first, I have no notes of that, right?

A. That's correct.

Q. And second, I was not inspecting the tire, right?

A. I looked at the tire when it came in.

Q. You looked at it?

A. Yes.

Q. But you were not the tire inspector for that

## Page 35

inspection?

A. That's correct.

Q. On any days it was here in South Carolina?

A. That's correct.

Q. And it was -- where was it located, the tire?

A. At MARC.

Q. At MARC.

Within which department at MARC?

A. The Litigation Group has a room at MARC for that purpose.

Q. Was it in a room, like an office?

A. I wouldn't consider it an office.

Q. What would you call it?

A. We would refer to it as The Lab.

Q. The Lab. Okay.

That's not your place of employment, your traditional place of employment?

A. I work there probably a couple of days a week.

Q. Okay. But that's not what you call your office?

A. That's correct.

Q. But you said it's part of the Litigation Department, so occasionally I go there.

## Page 36

A. That's correct.

Q. All right. Who --

MR. GUERRA: Would you object to the question, Tom, if I asked him how many people present?

MR. BULLION: When he inspected it?

MR. GUERRA: When he -- when he looked at the tire.

MR. BULLION: No, no.

BY MR. GUERRA:

Q. When you looked at the tire, how many people were present in the room?

A. To my knowledge, just myself.

Q. Okay. And if I -- if I -- if I'm going to press you on your notes, all I will find in your notes is the logistics of the arrival of the tire, right?

A. That's correct.

Q. I will get the videotaping of the unpacking of the tire, part of your file?

A. There is a videotape of unpacking.

Q. And do you do the same on the packing and sending it out, do you --

A. That's correct.

## Page 37

Q. Do you also videotape it?

A. I do.

Q. And you also write notes?

A. Yes.

Q. Okay. During the time that the tire was here, was there a log for the people that got to inspect it?

A. Not to my knowledge.

Q. Okay. What would be -- what would be your role concerning that tire?

A. I would receive the evidence, log the evidence in, look at the evidence, and --

Q. Videotape.

A. -- video -- well, videotape when I log it in and videotape when I pack it and ship it back out.

Q. Is that a -- is that a specific designation for the person that does that?

A. The STAs that are assigned to the individual case would do that.

Q. So the Senior Technical Adviser assigned to the case does that?

A. That's correct.

Q. All right. You are also not an attorney, right?

A. I am not.

Page 38

Q. You don't have -- you don't have any law degree?

A. That's correct.

Q. All right.

THE VIDEOGRAPHER: Could we go off the record?

MR. GUERRA: Yes.

THE VIDEOGRAPHER: Going off the video record at 10:02.

(A recess was taken.)

THE VIDEOGRAPHER: We are going back on the video record at 10:11.

BY MR. GUERRA:

Q. Mr. Price, so if I -- if I go back and ask you -- if I were to press you and say, Hey, Mr. Price, I want to see every single note that you took concerning your inspection of the tire, you would say, Luis, I have none? That's what you told me, right?

A. That's correct.

Q. Thank you. And by "note," I mean anything that you wrote down or that you typed on your computer; you didn't do any of that, right?

A. Other than the information I told you about the reception.

Page 39

Q. Thank you so much.

Did you -- so would it be fair to say that you were -- can I assume or is it correct for my -- me to assume that you were present on the arrival of the tire and on the departure of the tire?

A. I unpacked --

Q. Subject tire.

A. -- the tire and I packed the tire.

Q. Any other time in between that you were present with the tire?

A. I am certain that I was in The Lab at other times and the tire was in The Lab at those times.

Q. At any other time that you were present with the tire, did you write any other notes?

A. I want to make sure I understand the question.

Q. Sure. You told me the notes that you wrote about the --

A. Reception.

Q. -- receiving the tire, and you -- I think you told me that you wrote no notes of the packing of the tire?

A. That's correct.

Q. Other than that, any other notes that you may have written about that subject tire?

Page 40

A. When the tire is reviewed with the attorneys.

Q. Okay. Okay. All right.

MR. GUERRA: I assume that you object to my questions on this area?

MR. BULLION: If you're going to ask him for a list of notes and discussions with experts or lawyers, I'm going to object to that.

MR. GUERRA: Okay. All right. I was going to ask you that and you're going to say?

MR. BULLION: I'm going to say: Don't answer that.

MR. GUERRA: Okay.

BY MR. GUERRA:

Q. Okay. Other than those notes that you may have done with the attorneys, any other notes that you have taken there?

A. No.

Q. Okay. So to make sure that I am correct, you have the receiving and packing notes, departure and packing notes, and notes that you have from conversations with attorneys or experts?

A. Correct.

Q. No other notes?

Page 41

A. That's correct.

Q. All right. How many pages do you have of notes altogether?

A. What notes?

Q. All of them.

A. With regards to the subject tire?

Q. That's correct.

A. I don't know.

Q. Give me your best shot.

A. Ten.

Q. Ten pages.

How many of those would be packing and unpacking?

A. I wouldn't consider those pages; they're entries in a log.

Q. I'm sorry?

A. I would not consider those pages; they're entries in a log.

Q. Okay. So the -- so the notes that we're talking about are not the notes related to the packing and unpacking?

A. That's correct.

Q. You have ten notes, and those notes would be notes of conversations with your attorneys?

A. That's correct.

11 (Pages 38 to 41)

MR 0870

Page 42

Q. Ten pages. Thank you so much.

All right. Did you --

MR. GUERRA: Tom, you did say that, Luis, I don't want you to -- I'm going to instruct him not to answer questions that relate to conversations with attorneys and experts, right?

MR. BULLION: Right.

MR. GUERRA: So I'm only asking other people present. Do you have a problem with that?

MR. BULLION: I don't understand what you're asking. Ask the question -- ask the question and I will --

BY MR. GUERRA:

Q. When you -- did you speak with anybody about the subject tire other than the experts or the attorneys?

A. Not to my recollection.

Q. Okay. Anybody else, Michelin employee that is not an attorney or an expert retained for this case?

A. Not that I recall.

Q. Anybody at MARC?

A. Not that I recall.

Page 43

Q. Okay. Anybody at the headquarters?

A. Not that I recall.

Q. Okay. Anybody of your co-workers that is not an attorney within your Litigation Department?

A. Not that I recall.

Q. And you understand that I'm talking about the subject tire, right?

A. I do.

Q. All right. Any -- any -- any e-mails or text messages with anybody that is not an attorney regarding this subject tire?

A. Not that I recall.

Q. Did you review any documents in preparation for this deposition?

A. I reviewed my affidavit.

Q. Anything else?

A. I reviewed a 2001 data book.

Q. Anything else?

A. That's all that I recall.

Q. Any photographs?

A. No.

Q. Any videos?

A. No.

Q. Any documentation for Michelin that was produced in this case, other than this, these two

Page 44

documents that you just referred?

A. I referred to the discovery requests.

Q. Okay. Did you review them?

A. No, I did not review them.

Q. But you have a copy available?

A. I had a copy available, yes.

Q. Anything else, Mr. Price?

A. That's all that I recall.

Q. All right. And that would have been when? When was that review, these things?

A. In the past two days.

Q. On your affidavit, you repeatedly referred to what plaintiffs' requested, either referred to plaintiffs' request or plaintiffs' request for documents or plaintiffs' request for production. Do you remember that?

A. I do.

Q. Did you have an opportunity to participate in the answers to those discovery requests?

A. At times I go and look at the technical information and help if there are questions regarding the tires, technical information.

Q. Did you do that in this specific case?

A. It's very likely that I did. I don't have a specific memory of that.

Page 45

Q. Okay. Did you -- is there a person -- when a discovery request like this comes in, is there a specific person that is in charge of that within your department?

MR. BULLION: Don't answer that.

MR. GUERRA: And by that, what is your objection, Tom?

MR. BULLION: Work product.

MR. GUERRA: Okay.

MR. BULLION: And also, I sent -- we responded to your Notice, and Texas law is very clear, you can't do discovery about discovery, and you're -- that's what you're attempting to do.

MR. GUERRA: Discovery about discovery, what do you mean by that? I just want to find out who is the person that gave the information.

MR. BULLION: Texas case law is very specific that discovery about discovery is not permitted. We've filed a response to the notice setting out the cases.

MR. GUERRA: No, I mean, I have never seen your response but, you know, I take your word for it, but -- when did you do it?

12 (Pages 42 to 45)

MR 0871

Page 46

MR. BULLION: Yesterday.

MR. BULLION: Oh, okay.

MR. BULLION: I will forward it to David.

MR. GUERRA: Thank you so much. But the reality is that, you know, the affidavit is about the discovery responses, and that's why, you know, I am entitled to ask questions about it, but --

MR. BULLION: You're entitled to ask questions about the affidavit, no question. But when you get into the process of us responding to your discovery requests or the work done to look for documents or any of that, that's not permitted under Texas law.

MR. GUERRA: I -- I disagree with you but, you know, I -- you know, you make an objection. I'm sure you're going to abide -- abide by the objection of your attorney.

THE WITNESS: I am.

MR. GUERRA: Okay. I'm not going to argue about it here, for sure.

BY MR. GUERRA:

Q. Mr. Price, other than the attorneys, when a request for documentation like the plaintiffs did on

Page 47

this case comes into your office, is that a Senior Technical Adviser or anybody else that is not an attorney or a paralegal that is assigned to respond to that discovery?

MR. BULLION: Don't answer that.

MR. GUERRA: Okay. Same objection, Tom?

MR. BULLION: Yes.

MR. GUERRA: Okay.

BY MR. GUERRA:

Q. And do you understand that my question is related to non-legal attorneys or paralegals; you understand that, right?

A. I do.

MR. GUERRA: And your objection stands?

MR. BULLION: Yes.

MR. GUERRA: You make -- okay.

MR. BULLION: Everybody in the Legal Department that does this works for the lawyers.

MR. GUERRA: Okay.

MR. BULLION: They're all representatives of lawyers.

MR. GUERRA: Okay.

Page 48

BY MR. GUERRA:

Q. Is -- is anybody -- when a request like this comes in that is non-legal, no lawyers, no paralegals, and don't even work in the legal department that is tasked with obtaining the information?

MR. BULLION: Don't answer that.

MR. GUERRA: Same objection, Tom?

MR. BULLION: Yes.

MR. GUERRA: Thank you.

BY MR. GUERRA:

Q. Concerning this specific request made by plaintiffs, were you the person assigned within Michelin to obtain the information in response to discovery requests?

MR. BULLION: You're talking about -- are you talking about what -- what -- are you talking about your discovery request?

MR. GUERRA: Yes.

MR. BULLION: Don't answer that. He's not going to talk about any of the -- any of the -- what was done to respond to your discovery requests; it's not fair game.

MR. GUERRA: Okay. I just want the identity of the person.

Page 49

MR. BULLION: Okay.

MR. GUERRA: And you object to that?

MR. BULLION: Yes.

MR. GUERRA: On the same basis?

MR. BULLION: Yes.

MR. GUERRA: Work product, attorney-client privilege?

MR. BULLION: Right. And the cases cited in our response.

MR. GUERRA: Okay. Thank you so much.

Can I get you some water?

THE WITNESS: My bottle's down there. I don't need it right now but -- I'm okay.

MR. GUERRA: Tom, can we get that water for your man. Thank you so much?

MR. BULLION: Here's your water, my man.

THE WITNESS: Thank you.

MR. GUERRA: Good move. Are you going to drink it?

THE WITNESS: I am.

MR. GUERRA: We'll stop it for a

13 (Pages 46 to 49)

MR 0872

Page 50

second so we don't do a Rubio.

THE WITNESS: I'm fine right now.

BY MR. GUERRA:

Q. All right. Did you write your affidavit?

A. I did.

Q. Okay. The affidavit was written by yourself; you typed it out?

A. I would say that there were parts of this that I did not type. And I was given a framework. But I did the work and did the lion's share of the material that's in it.

Q. Who gave you the framework?

A. Kate Helm.

Q. By "framework," what do you mean?

A. Well, the header, for example; the very ending; and then some of the points that needed to be covered in response to the discovery that I did.

Q. Did you -- so would you be kind enough to tell me which is your work within the affidavit?

A. Well, the majority of what's here would be directly from me. It's -- so it's difficult to select out. It's more along the lines of points that needed to be developed is what I'm referring to as a framework.

Q. How can we -- how can we figure out what was

Page 51

exactly your work and what was the framework? I mean, do we have any physical evidence of that that we can go track down?

A. No. We would have to go line by line, and the majority of it is going to be my work. The framework is, you know, would be along the lines of we need information about LTX tires LTX M/S tires from 2001, and then I did the work and wrote the document in terms of that factual information.

Q. Would you say that the affidavit -- would you call it your own original document?

A. I would.

Q. With your own original thoughts?

A. Yes. The information in here is from me.

Q. With your original sentences?

A. Yes.

Q. And your own original ideas?

A. Yes, with guidance on what ideas needed to be covered.

Q. How were you provided that framework?

A. As I recall, I was given the beginnings of this document, the header and the footer, and then some points in it that are really no longer here other than in the framework.

Q. So the document is a combination of your

Page 52

work and Ms. Helms' work?

A. Some of which on here came from Ms. Helm.

Q. And the document was sent to you by e-mail?

A. As I recall, yes.

Q. All right. You have never worked in Dothan?

A. I have never had a position in Dothan.

Q. You never had a position in Dothan in the plant itself?

A. Correct.

Q. Or in the office?

A. Correct.

Q. You never worked on the assembly line in Dothan?

A. That's correct.

Q. Or in any other plant of Michelin?

A. Could you clarify the question?

Q. You never had a position as assembly line workers?

A. I have never been a tire builder.

Q. That's right.
You've never been a class spector?

A. That's correct.

Q. You've never been a rubber formulator?

A. That's correct.

Q. You've never been a licensed chemist?

Page 53

A. I don't know what the term means.

Q. Chemical engineer.

A. I'm a chemical engineer.

Q. Licensed chemical engineer?

A. I'm a degreed chemical engineer.

Q. You're not licensed as a Professional Engineer?

A. That's correct.

Q. That's right.
You never created any chem stock formulas for Michelin?

A. I did not.

Q. You have never been a professional tester of Michelin's tires?

A. I don't recognize that term.

Q. But you have never been one, right? You don't test? You never tested the LTX M/S prior to its releasing to the market?

A. Not in that tire line, no.

Q. Okay. You've never been an adjustment data inspector?

A. That's correct.

Q. You've never been a designated Michelin inspector at these designated inspection centers?

A. That's correct.

14 (Pages 50 to 53)

MR 0873

Page 54

Q. You didn't write the aspect specifications?
A. That's correct.
Q. You didn't write the technical notes?
A. That's correct.
Q. You didn't author or write the tire non-conforming procedures?
A. That's correct.
Q. You didn't write or author the general principles?
A. That's correct.
Q. You didn't write or author the adjustment data codes?
A. That's correct.
Q. You didn't set up the adjustment data policies?
A. That's correct.
Q. You didn't author the owner's manuals for the LTX or any other Michelin tire?
A. I'm not familiar with what document you're referring to.
Q. The Passenger and Light Truck Tire Owner's Manual of Limited Warranty, you never authored that?
A. That's correct.
Q. For the LTX M/S line or any other line?
A. That's correct.

Page 55

Q. You didn't write or author any of the adjustment data manuals of Michelin?
A. That's correct.
Q. You didn't author or write any of the tire inspection procedures?
A. I'm not sure I know what --
Q. The tire inspection procedures for the adjustment data samples.
A. Correct.
Q. You didn't write any of the Michelin tire limited warranties?
A. That's correct.
Q. You didn't design the LTX M/S tires?
A. I did not design the LTX M/S tires, correct.
Q. Okay. There are people that do that or did that at Michelin?
A. There were, yes.
Q. Who, who are they?
A. I know that Paul Northrup was a tire designer on that tire line.
Q. Anybody else?
A. Not that comes to mind.
Q. But you are not one of those folks, right?
A. Not for the LTX M/S tire line, correct.
Q. Michelin also has tire builders, right?

Page 56

A. That's correct.
Q. You are not one of them, right?
A. That's correct.
Q. Michelin also has chemists that do chem stock formulations and rubber formulations, right?
A. I don't know what their backgrounds are but there are people that work for Michelin that formulate mixes.
Q. You are not one of them?
A. That's correct.
Q. What do you call those folks?
A. Formulators.
Q. Do you know any of them?
A. Not personally.
Q. Do you know their names?
A. Formulators for what?
Q. For skim stock or for rubber.
A. For what rubber?
Q. LTX M/S tires?
A. LTX M/S tires have dozens of different rubber components --
Q. I understand. This subject tire.
A. -- that are formulated by different people. I don't know the formulators in 2001.
Q. Tell me the name of any formulator that you

Page 57

know here that works on LTX M/S --
MR. BULLION: You're talking about the 2001 time frame or what?
MR. GUERRA: No. Just for the LTX M/S line.
THE WITNESS: I don't know the names of the formulators that worked on the formulas and the compounds in the LTX line -- the LTX M/S line.
BY MR. GUERRA:
Q. Anything.
A. Not that I recall, no.
Q. They're still manufactured today, right?
A. There may be an LTX M/S tire manufactured today, but I'm not certain of that. That line is -- is generally not in production today.
Q. The LTX M/S2?
A. There is a LTX M/S2.
Q. Do you know any of the formulators or their identity?
A. Not specifically.
Q. Not a single one?
A. Not that comes to mind for the LTX M/S2 line, no.
Q. Or the LTX M/S tire line?

15 (Pages 54 to 57)

MR 0874

Page 58

A. No.

Q. All right. What about tire builders? Tell me the name of anyone that worked on the LTX M/S line.

A. I don't know the name of the tire builder that I know worked on the LTX M/S line.

Q. What about -- Michelin has class spectors, right?

A. In the plant there are class spectors, yes.

Q. You are not one of them and you've never been one of them?

A. I have not been a class spector in a plant.

Q. And did you know the name of any of the class sectors at Dothan?

A. I don't recall the name of a class spector at Dothan.

Q. Michelin also has adjustment data inspectors, right?

A. That's correct.

Q. You are not one of them?

A. That's correct.

Q. Tell me the name of any adjustment data inspectors in any of the designated inspection centers.

A. I do not know any.

Page 59

Q. Okay. Michelin also has employees that write and set forth manufacturing design and design processes, procedures and techniques for the LTX M/S line; you are not one of them?

A. I don't think there are any such documents, as I understood your question.

Q. My fault.

Michelin has employees that write and set manufacturing and design processes, procedures and techniques for the LTX M/S line, right?

A. I am not aware of any documents that are specific to the LTX M/S line.

Q. And that is because?

A. Those types of documents are used on all tire lines.

Q. That's right.

You do not know the skim stock formula for this subject tire, right?

A. That's correct.

Q. You -- but there's folks within the company, within Michelin, that know that, right?

A. There would be people in the company that have access to that.

Q. And what -- who would that be? Who would those people be?

Page 60

A. People in the compounding plant and compounders.

Q. Could you repeat that? I couldn't hear you. I apologize.

A. I said people in the compounding plant or compounders.

Q. Where is the compounding plant located?

A. There are several.

Q. Is there one here in Greenville?

A. There is not.

Q. So where are they located, tell me, please.

A. Anderson, South Carolina.

Q. Where else?

A. Starr, South Carolina.

Q. Anything else?

A. Tuscaloosa, Alabama.

Q. Any more?

A. Ardmore, Oklahoma; Fort Wayne, Indiana; Pictou, Ontario, Canada.

Q. That's it?

A. That's all that I am aware of in North America.

Q. Do you know the name of any compounder or people that work on the compounding plant that know the skim stock formula for this subject tire?

Page 61

A. I do not.

Q. Who would you go to find that information? How would you go about it?

A. I would contact somebody in the compounding department at MARC.

Q. Who would that be?

A. It depends on the compound.

Q. For this specific one.

A. Which specific one?

Q. Skim stock for the subject tire.

A. I believe the manager of that group is Bergman.

Q. Would you speak -- say it again?

A. I believe his name is Bergman, is the manager of the group that compounds tires like that.

Q. What is that group called?

A. I don't know. It would be in the Materials Compounding Group or Formulating Group.

Q. Marking the materials, Compounding or Formulating Group at MARC?

A. That's correct.

Q. And it would -- the last name is Bergman?

A. That's correct.

Q. And the first name?

A. It's -- I can't recall his first name, as I

Alderson Reporting Company
1-800-FOR-DEPO

MR 0875

## Page 62

sit here.

Q. Okay. All right. What about the rubber formulator for the tread, who would you -- how would you go about finding out who would know that formula?

A. I don't know who's in compounding for tread.

Q. How would you go about finding him?

A. I would ask someone at MARC in the compounding area.

Q. Who would that be?

A. Certainly Bergman is one that I could go to that would point me in the right direction.

Q. He is the manager, that's what you guys call it?

A. He is a manager in that area.

Q. All right. Your work is related to litigation nowadays within Michelin? All your work related to litigation nowadays as a Michelin employee?

A. I didn't understand the question.

Q. All of your work as a Michelin employee in the Legal Department related to litigation?

A. That's correct.

Q. Helping defend Michelin in cases?

A. I'm not sure what you mean by that.

Q. Michelin gets sued and you help defend

## Page 63

Michelin?

A. I work on these cases, yes.

Q. On behalf of Michelin?

A. That's correct.

Q. Today, on this case, you're here on behalf of Michelin?

A. I am.

Q. As a Michelin employee?

A. That's correct.

Q. Your entire testimony or affidavit, all of it provided here as a Michelin employee?

A. That's correct.

Q. You never used an aspect spec to build a tire?

A. I don't understand the question.

Q. You never used an aspect specification of Michelin to build a tire?

A. An aspect specification is not used to build a tire.

Q. It's to inspect at the end of the building process, right?

A. That's correct.

Q. So it's part of it, right?

A. It's an inspection of the finished tire.

Q. Yes. And alterations may be made, fixes may

## Page 64

be made, so it's part of the manufacturing process, right?

MR. BULLION: Objection; form.

THE WITNESS: It's used in the inspection of the finished product.

BY MR. GUERRA:

Q. Okay. Do you know what an aspect specification is?

A. I do.

Q. All right. But you never used it to -- in the process of building a tire?

A. I don't think that's accurate.

Q. You have used it?

A. I have, at times.

Q. In the building of a tire?

A. I have, at times, applied aspect specifications, read aspect specifications, I've looked at tires.

Q. Looked at what?

A. Looked at finished tires in part of my training, I have.

Q. But you have never built a tire?

A. I have not built a tire that was intended for public sale, that's correct.

Q. That's your business, right? That's

## Page 65

Michelin's business?

A. That is Michelin's business.

Q. And you have never done that?

A. I have not built a tire that was intended for sale, correct.

Q. In fact, you told me you never -- you never worked in an assembly line for Michelin ever, right?

A. I never worked as a tire builder.

Q. At a Michelin assembly line?

A. That's correct.

Q. Not in Dothan, not anywhere?

A. As a tire builder, that was never my role.

Q. That's right, as a tire builder; is that accurate?

A. That's correct.

Q. Again, not -- let's make it correct. Let's make it accurate. You never worked in the Michelin assembly line as a tire builder in any Michelin plant in the United States?

A. That was never my job to be a tire builder in a Michelin plant.

Q. Is that a yes or no?

A. It's yes.

Q. You certainly did not design or build any LTX M/S tire similar to this one?

Alderson Reporting Company
1-800-FOR-DEPO

MR 0876

## Page 66

A. I don't know that that's accurate to say. When I began work as a tire designer at MARC, I may have been assigned certain LTX M/S tires, especially as -- in the early parts of my training, but I did not design the subject tire in this case.

Q. So you designed similar ones?

A. I designed Michelin light truck SUV tires.

Q. Is that a yes, similar ones?

A. They would have been different in their design, but they would have been tires intended for the SUV light truck market.

Q. So have you ever designed or built a LTX M/S tire similar to this one?

A. I had responsibility for converting a design of an LTX M/S from OE to replacement. I do not remember the size, and I don't think it was this dimension.

Q. So you know that you have done that because you say you may or may not, but you know that you have done that?

A. I know that I converted a tire early in my tire design experience from the OE market design to the replacement market design as basically part of my introduction into the tire design business, and it was an LTX M/S tire.

## Page 67

Q. When was that?

A. It would have been in the 2007 time frame.

Q. 2007?

A. Correct.

Q. Where would you go about finding your output ship, those documents?

A. I -- I don't -- I don't know that there would be documents, but if I created the specification, there would a specification.

Q. So how would you go about finding that?

A. I would have to ask someone in the specifications group.

Q. Who would you ask?

A. I would probably ask Carla.

Q. Carla Wingate?

A. Correct.

Q. And what would we ask about?

A. Well, I don't know exactly what she would need to know. My question to her would be: Are you able to search the specifications and find a specification with --

Q. For what?

A. -- with my name on it for an LTX M/S tire.

Q. Since then, have you worked --

A. I don't recall ever working on another LTX

## Page 68

M/S tire.

Q. So it would be one? One?

A. I only recall one.

Q. In this case, you have been designated out of the thousands and thousands of employees of Michelin in South Carolina to be the guy to talk about secrets, Michelin secrets, right?

A. Correct.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. All right. And what we're talking about is documents that Michelin wants to keep away from the public, correct?

A. These are documents that are trade secrets, proprietary and, yes, would cause harm to Michelin if they were in the public.

Q. Those are specific documents that you speak of in your affidavit that Michelin wants to keep away from the public eye?

A. They are company trade secrets that could do harm to Michelin if they were in the public, available to our competitors, that's correct.

Q. I got your answer. Do you say your peace? So my question is: Michelin wants, intentionally and cautiously, to keep them away from

## Page 69

the public?

MR. BULLION: Objection; form.

THE WITNESS: To keep them away from our competitors.

BY MR. GUERRA:

Q. Not from the public? I can have them?

MR. BULLION: Objection.

THE WITNESS: No.

BY MR. GUERRA:

Q. Okay. So it wants to keep them away from the public, from the consumer?

A. That's not the object. The objective is to keep them away from competitors.

Q. No, that's -- that -- the result is that you -- the public does not see them, right?

A. These are trade secrets documents, they're proprietary documents, and there's always a chance that they could leak to competitors.

Q. Yeah, I understand that. But they are not what you -- what Michelin does is does not make them available to the public, to the consumers, right?

MR. BULLION: Objection; form. Luis, if I could, if you would let him finish his answer --

MR. GUERRA: Yes.

18 (Pages 66 to 69)

MR 0877

## Page 70

MR. BULLION: -- you're -- you're kind of getting going fast --

MR. GUERRA: Yes.

MR. BULLION: -- and you have that tendency, so let him finish --

MR. GUERRA: No problem.

MR. BULLION: -- if you don't mind before you -- before you start the next question.

MR. GUERRA: No problem.

MR. BULLION: Thank you.

BY MR. GUERRA:

Q. Your answer was "yes," right?

A. You will have to repeat the question.

Q. There are documents that Michelin intentionally and purposefully keeps them away from the public eye?

MR. BULLION: Objection; form.

THE WITNESS: Michelin protects them and keeps them away from anyone outside the company.

BY MR. GUERRA:

Q. Including the public?

A. They would be outside of Michelin; that's correct.

Q. Including the American consumer, right?

## Page 71

A. That's correct.

Q. And you talk about -- you make a comment on your affidavit about patents, right? Do you remember that comment that you made?

A. Not specifically. Could you refer to me -- to what line you're referring?

Q. You specifically talk about Michelin not --

A. Yes.

Q. -- patenting.

A. I do.

Q. And the reason is is because patent documents are public documents, right?

A. That's correct.

Q. So what you're saying is that to keep them away from the public eye and public disclosure, Michelin does not even patent some of its processes and procedures?

A. Michelin designs its own processes and procedures, and they are company secrets that would do us harm if they were in the public; that's correct.

Q. And that would include, concerning the documents that we're talking about here, and that's what you're talking about is this aspects specifications used by the class spectors, right?

## Page 72

A. Any company document is what I would refer to.

Q. But that includes the aspects specifications used by the class spectors?

A. They are company documents, yes.

Q. Those are some of the company documents Michelin keeps secret?

A. That's correct.

Q. Okay. Patent non-conforming procedures; those are some of the documents that Michelin keeps secret.

A. Those are Michelin company documents, yes.

Q. All right. General principles, those are some of the documents that Michelin keeps secret?

A. Those are company documents, yes.

Q. Adjustment data, those are some of the documents that you claim Michelin keeps secret?

A. That's company data, yes.

Q. All right. Adjustment document policies, right?

A. That's correct; those are company documents.

MR. GUERRA: We need to go off the record, Tom, the tape is about to be over.

MR. BULLION: Okay.

THE VIDEOGRAPHER: We're going off

## Page 73

the video record of media number one at 10:52.

(A recess was taken.)

THE VIDEOGRAPHER: This is media number two of the video deposition. Going back on the video record at 11:03.

MR. GUERRA: Thank you.

BY MR. GUERRA:

Q. Thank you, Mr. Price. Some of the documents that Michelin wants to keep secret are the physical evidence that Michelin -- strike that. Some of the physical evidence and documents that Michelin keeps secret and away from the public includes manufacturing specifications?

A. Manufacturing --

MR. BULLION: Objection. Objection; form.

THE WITNESS: -- specifications are trade secrets and proprietary information; that's correct.

BY MR. GUERRA:

Q. And those are kept secret and away from the public by Michelin?

MR. BULLION: Objection.

THE WITNESS: Absolutely. They

Alderson Reporting Company
1-800-FOR-DEPO

MR 0878

Page 74

are trademark -- or I'm sorry. They are proprietary and trade secret information.

BY MR. GUERRA:

Q. I got that.

And Michelin keeps that secret and away from the public?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Yes or no?

A. Yes.

Q. All right. Specification changes --

A. Yes.

Q. -- Michelin keeps that secret and away from the public?

A. Specifications are proprietary information, they're trade secrets of Michelin, and, yes.

Q. And Michelin uses its designation of trade -- trade secrets concerning this information and documents to keep them away from the public?

MR. BULLION: Objection to form.

BY MR. GUERRA:

Q. Yes or no?

A. These documents are trade secrets, they are proprietary information, and they are designated as such to protect them from anyone outside the company,

Page 75

competitors.

Q. And as such, Michelin keeps these documents and physical information away from the public?

A. That's correct

MR. BULLION: Object to the form.

BY MR. GUERRA:

Q. All right. Testing and design related documents requested by us, plaintiffs in this discovery, Michelin keeps them secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: Those documents are trade secrets, they're proprietary information, yes --

BY MR. GUERRA:

Q. And as such --

A. -- and kept from the public.

Q. I'm sorry?

A. They're kept out of the public, that's correct.

Q. All right. The formulas, asked by plaintiffs, Michelin keeps them secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: Not only are

Page 76

formulas kept away from the public, they're kept away from almost all internal Michelin employees.

BY MR. GUERRA:

Q. What is your level of security clearance?

A. I am not aware of such levels.

Q. You call it heightened protection? What is the level of your heightened protection security clearance?

A. I don't know what's meant by that question.

Q. Have you ever read an aspect specification?

A. I have.

Q. It tells you right on there, level of protection, heightened security. Do you have that -- what is your clearance level?

A. To my knowledge, that information is put on documents as they're produced outside of the company, not internally.

Q. Produced outside. Okay.

What about the -- you just told me, Luis, I -- there's people in the company that only certain people have access to certain areas. What are those areas? Go ahead, Mister --

A. I didn't understand your question.

Q. Oh, no problem.

You told me, Luis, in fact, there's areas of

Page 77

the company that only certain people has access to. You just told me that.

A. You asked me a question about the compound formulas, and I said they are not available to most people inside the company.

Q. But on your affidavit, you specifically talked about certain areas. Do you remember that?

A. Yes.

Q. All right. Tell me those areas, please.

MR. BULLION: Objection; form. I don't understand what you're asking.

MR. GUERRA: In his affidavit, Mr. Price states that certain areas of the company are restricted and only available to certain people.

MR. BULLION: Certain areas or certain documents?

MR. GUERRA: Areas. Areas.

THE WITNESS: So MARC is only -- is restricted to people that have access to MARC, and then within MARC, there are areas that are restricted to people that have access to those areas.

BY MR. GUERRA:

Q. That's the areas that I'm asking about.

Alderson Reporting Company
1-800-FOR-DEPO

MR 0879

## Page 78

What are those areas?

A. I don't know all of those areas.

Q. Tell me the ones you know, please.

A. I know The Lab where we store -- stored the subject tire, for example, has limited access.

Q. And you have access to it?

A. I do.

Q. Who else has access to it?

A. The attorneys and the other technical advisers in the group.

Q. So the Legal Department people have access to it?

A. That's my understanding, yes.

Q. Okay. Any other areas that you discussed included on the areas that you discussed on your affidavit that are those areas that only limited people have access to it?

A. There are other areas.

Q. Would you please tell me. What are those areas?

A. I know there is an area where machine development is being done; that area is limited.

Q. Do you have access back there?

A. I do not.

Q. You do not? Who does have access to that

## Page 79

area?

A. I do not know.

Q. For instance, the aspect specification that were produced in this case have Michelin restricted section.

A. May I see it?

Q. I'm going to show you one that doesn't have my writing. Okay?

A. Okay.

Q. Do you see that?

A. Yes.

Q. What is that?

A. That is the classification of the document as D3.

Q. As Michelin restricted, so D3 is what?

A. I don't remember the exact language that goes with the D3 classification.

Q. Tell me a -- give me your best shot.

A. It would be a document that would not be allowed outside the company.

Q. That's all?

A. People that had access to it would not be allowed to take it outside the company; in other words, they would only be able to use it at their place of work.

## Page 80

Q. So it's the level of restriction?

A. That's correct.

Q. And that's your level of clearance too, D3? You got access to D3 documents?

A. There is not an assigned level of clearance that I'm aware of. It would depend on the job at the time, the needs of that job. Certainly I would have access to D3 documents.

Q. You would?

Which areas of the company don't you have access at MARC?

A. Well, I have given you an example of one that I know of.

Q. Okay.

A. I don't have access to the -- to the computers that house the formulation information, for example.

Q. And they are located at?

A. At MARC.

Q. Where?

A. I don't know where the computers are located.

Q. What department?

A. I don't know what department they're in.

Q. Okay. Who would know that?

## Page 81

A. I don't know who would know that.

Q. How would you go about finding out? Who would you ask?

A. I wouldn't know where to begin with that particular question.

Q. So how do you know that the computers are even at MARC?

A. Well, I know that the formulators work at MARC, and if I had a question about a formula and I were to call a formulator, they would access the information through the computer.

Q. And you would go to Bergman?

A. For the compound that we discussed, I would.

Q. What about for formulations?

A. For the formulation of that compound that we discussed earlier, that's correct.

Q. From the formulation of the -- of the tread, the rubber compound or the skim stock, that would be Bergman?

A. Not all of those different compounds, no.

Q. For the LTX M/S.

A. It wouldn't be specific to a tire line.

Q. So how would you go about, other than Bergman, to find out?

A. I don't know. I know because of the skim

Page 82

stock question that you asked me about that Bergman is the person that I would ask.

Q. What other formula do you know out of MARC?

A. I don't -- another name of a formulator --

Q. Yes.

A. -- doesn't come to mind.

Q. Not a single --

A. And in what time period, for what --

Q. Right now.

A. I don't know of another formulator's name right now.

Q. Who runs the Formulation Department?

A. I don't know.

Q. Who is the Manager of the Formulation Department?

A. I don't know who manages the Formulation Department.

Q. Who is director of the Formulation Department?

A. I don't know the answer to that.

Q. Okay. How would you go about finding out? Who would you ask?

A. I could ask Mr. Bergman, perhaps he would know.

Q. All right. Okay. Tire adjustment

Page 83

processes, it's a type of information and physical evidence that Michelin keeps secret?

MR. BULLION: Objection; form.

THE WITNESS: That information is confidential and trade secret, proprietary information, that's correct.

BY MR. GUERRA:

Q. Just a yes or no. That's information that Michelin keeps secrets, right, sir?

A. It is.

Q. All right. Tire adjustment analysis, that's information that Michelin keeps secret?

A. That is proprietary and trade secret information, yes.

Q. Yes or no, sir?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. That tire adjustment analysis is information that Michelin keeps secret? Yes or no, sir?

A. I'm sorry, would you repeat the question?

Q. Tire adjustment analysis information and physical evidence is information and physical evidence that Michelin keeps secret?

MR. BULLION: Objection.

Page 84

BY MR. GUERRA:

Q. Yes or no, sir?

A. That's trade secret and proprietary and, yes, we keep it secret.

Q. Yes, sir. I got it, I got your speech. And you can keep doing it, and that's fine, but I want to tell you, that I'm -- I will play this tape to the Jury. You understand that? I'm asking you for a simple answer, yes or no. You understand that, right?

A. I do.

Q. All right.

MR. BULLION: Your questions are argumentative. When you say "secret," it's argumentative, and he can -- he's entitled to answer it the way he wants to.

MR. GUERRA: Is that your objection?

MR. BULLION: Trying to help you out.

MR. GUERRA: I don't need your help.

MR. BULLION: You don't?

MR. GUERRA: I don't need your help, but you are entitled to make objections.

Page 85

MR. BULLION: I have been.

MR. GUERRA: But that's not a proper objection.

MR. BULLION: Okay.

BY MR. GUERRA:

Q. Who would be the tire adjustment analysis person that you would speak to if you needed to obtain information about it?

A. With regards to?

Q. Tire adjustment, tire adjustment codes, tire adjustments.

A. For what time period?

Q. Analysis, market research, changes on the design, who would you go talk to for the LTX M/S?

A. For the tire made in 2001, for example?

Q. For example.

A. Probably Tom Gruenholz.

Q. Okay. And after 2001, who would you talk to?

A. I don't -- I would go talk to Tom Gruenholtz if I had questions about that.

Q. Does he still work for the company?

A. He does not work; he is retired.

Q. So tell me a guy that works for the company that you would go talk to.

Page 86

A. I don't have a name of a person that I would go talk to today.

Q. How would you --

A. That I know, I would --

Q. How would you go find out about it?

A. If I needed to know that, I would go to that department and ask.

Q. And that department is?

A. QTB.

Q. And who would be the person that you would talk with at QTB?

A. I don't know who's there now.

Q. Who would you ask for? Who would you know that was there before?

A. I knew Tom Gruenholtz when he was there.

Q. Would you go about and ask -- how would you go about -- who would you ask for at QTB, even if you don't know a name? Can I speak with?

A. It depends on the question that I wanted an answer to, and I'm not clear what -- what I'm hypothetically looking for.

Q. Tire adjustment analysis, tire adjustment changes, tire adjustment trims.

A. I don't know what tire adjustment changes are.

Page 87

Q. Forget that one. So the other two.

A. There is not a person that I know of in the QTB department that --

Q. I understand that. Who would you ask for? Is there a job title? You have been working with the company --

A. I would ask for -- I would ask for who managed that department.

Q. And who is that manager?

A. I don't know who currently manages --

Q. How would you find out who is the manager?

A. I would go to that department and ask.

Q. So the only person that you, under oath, and you even though you have been working with the company for -- let me check here. Even though you have been working with the company since the year of 2000 and -- 1999, since 1999, the only person that you could tell me the name in the adjustment department is Tom Gruenholtz that stopped working there six years ago?

A. He's the one that I would go to if I had a question about tires that were made in the -- in the LTX M/S, which is what you asked me.

Q. Ask you nowadays, too.

A. I don't know who's there today.

Page 88

Q. Yesterday, a year ago, two years ago, anybody else in --

A. When I was a tire designer at MARC, I would go to Larry Mimms, and he is retired; he is no longer with the company.

Q. What's his name?

A. Larry Mimms.

Q. Okay. Anybody else? Somebody that works for the company, because they do still have people that work in the Tire Adjustment Department, right?

A. There are certainly people in that area. I don't know the name of the person in that area.

Q. Not a single one?

A. Not that I can recall as I sit here.

Q. With all your non-litigation experience with the company, you can't still tell me a single one, right?

MR. BULLION: Objection; form.

THE WITNESS: That's correct.

BY MR. GUERRA:

Q. And now with the legal experience within the company, you cannot tell me also any other name than Tom Guenholtz and Larry Mimms, both of them prior employees, not current employees?

A. To answer your question --

Page 89

MR. BULLION: Objection; form.

THE WITNESS: -- the question that you asked me about, that's correct, I don't know who is in that role.

BY MR. GUERRA:

Q. I asked you in 2001, I asked you since 2001 up to today. No other names?

A. I gave you the ones that I can recall, yes.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. No other names, right?

A. That's correct.

Q. Now, manufacturing and inspection processes and procedures, this is also information that Michelin keeps secret and away from the public, yes or no, sir?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret and proprietary and we do keep it secret.

BY MR. GUERRA:

Q. Secret and away from the public?

A. Yes.

Q. Tire production information is also information and physical evidence that Michelin keeps

23 (Pages 86 to 89)

MR 0882

Page 90

secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret and proprietary, and we do keep it away from the public, yes.

BY MR. GUERRA:

Q. Keep it secret and away from the public, correct, sir?

MR. BULLION: Objection; form.

THE WITNESS: We do keep it away from the public, yes.

BY MR. GUERRA:

Q. All right. And I'm just going down your affidavit. You see that, right?

A. I understand.

Q. Concerning our specific requests, MNA design and manufacturer specification, manufacturers, that's information that Michelin keeps secret and away from the public?

A. That information --

MR. BULLION: Objection; form.

THE WITNESS: -- is trade secret and proprietary and we do keep it out of public, yes.

Page 91

BY MR. GUERRA:

Q. Keep it away, secret and away from the public, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Correct?

A. Yes.

Q. All right. Now, you are not the author of the policies concerning trade secret information within Michelin?

A. That's correct.

Q. Somebody else is?

A. I am not aware of a singular policy.

Q. Not singular policy. Policies, all the policies related to trade secrets. There has to be some creator, some author of it, right?

A. So what is the question, please?

Q. The question is: How would you go about finding that person, or those persons or that committee or who they are, their identity?

MR. BULLION: Objection; form.

THE WITNESS: I don't really know how to answer that question because you're -- you're not telling me about a specific document; you're talking about all company confidential

Page 92

documents and trade secrets?

BY MR. GUERRA:

Q. Trade -- trade secret policies. Not the documents. The policies about what is trade secret and what is not.

A. I'm not aware of who would have written the policy, if one exists.

Q. Certainly not you?

A. That's correct.

Q. And certainly it's not willy nilly. It has to be some kind of framework, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Or you guys keep all secret, all information secret? There has to be some framework, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. To decide what is trade secret and what is not, right?

A. I'm not sure that I'm understanding your question.

Q. But let me make it clear for you. It's okay. There has to be some kind of policy at Michelin that decides what documents are to be -- will be classified as trade secrets and keep secret

Page 93

as opposed to ones that are not, correct?

A. There would be a policy that would define how -- and I should -- I don't like the word define because I haven't seen the document -- but that would describe which types of documents, for example, would be D3, as you pointed to one previously.

Q. And which documents would be trade secret.

A. That's correct.

Q. You are not the author of those policies?

A. Right, I am not.

Q. Okay. And how would you go about getting those documents and talking to the person that authored them or are responsible for them?

A. I don't know.

Q. How would you go about finding out?

A. I'm not sure how I would go about finding out. I would ask the attorneys if they knew who authored those documents.

Q. Okay. And by "attorneys," you mean?

A. The folks that I work with in the Legal Department.

Q. Such as?

A. Any of the attorneys in the Legal Department.

Q. Nicole?

24 (Pages 90 to 93)

MR 0883

Page 94

A. She could be one, yes.

Q. Is that Mrs. Buntin?

A. Yes.

Q. Okay. I apologize. Mrs. Buntin would be one of the people that you would talk to?

A. That I would ask, but I don't -- I don't know who would know.

Q. Ms. Foster?

A. Perhaps.

Q. Okay. All right. Adjustment processes and analysis, that's information that Michelin keeps secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret and proprietary and, yes, we do keep it away from the public.

BY MR. GUERRA:

Q. Keep it secret and away from the public, correct?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Correct?

A. Yes.

Q. Manufacturing and inspection processes and procedures, that's information that Michelin keeps

Page 95

secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: That information is trade secret, proprietary, and we do keep it away.

BY MR. GUERRA:

Q. Michelin keeps it secret and away from the public, correct?

A. That's correct.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. And you understand this is specifically related to requests on this case? You understand that, right?

A. No, I don't understand your statement.

Q. It's paragraph 43 of your --

A. That's correct.

Q. -- affidavit?

And that paragraph reads -- specifically relates to plaintiffs' request, yes.

A. 43 does refer to plaintiffs' request for manufacturing specification, that's correct.

Q. You did write that?

A. I did.

Q. All right. You did review it?

Page 96

A. I did.

Q. You did say this: Information that we have here is information that Michelin intentionally, cautiously, in a premeditated manner, keep secret and away from the public?

MR. BULLION: Objection; form.

THE WITNESS: The information is trade secret, proprietary, and we do keep it out of the public, yes.

BY MR. GUERRA:

Q. And you do keep it away from the public intentionally, right?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Thought out, premeditated?

A. Me personally?

Q. You are the face of the company on this. You are the secrets man here.

MR. BULLION: Objection; form.

THE WITNESS: These documents are company trade secret documents, they're proprietary, and we keep them out of the public, yes.

BY MR. GUERRA:

Q. And you understand that plaintiffs -- you

Page 97

understand that plaintiffs -- you read the discovery requests, you have been involved in this litigation, right?

A. I am familiar with some of the discovery requests, that's correct.

Q. You know -- sorry.

And you know that those folks are just folks, right, just common folk?

A. I don't know to whom you're referring.

Q. My clients, Sam and Obdulia, right; just folks?

A. Okay.

Q. Right?

A. I don't know them.

Q. Do you know that they work for a competitor?

A. No, I don't know that.

Q. All right. Has anybody told you that they are working for a competitor?

A. No, no one's told me that.

Q. Just common folk, and that's common folk that is asking for these documents, not competitors. And you guys intentionally, Michelin intentionally keeps all this information from these folks, right?

MR. BULLION: Objection; form.

THE WITNESS: These documents are

Alderson Reporting Company
1-800-FOR-DEPO

MR 0884

Page 98

proprietary, trade secret and, yes, we keep them
out of the public.
BY MR. GUERRA:
Q. Not only the public. Your first -- your
first story was it's because of our competition. I'm
telling you, we're no competition. My people are
just common folk. The lady that I represent is
quadraplegic. We are saying, we need these documents
to prove our case. And you're saying, on behalf of
Michelin, here today and in your affidavit, we will
not give these documents that I am enumerating here
because they are secret and we keep them away from
the public, right?
        MR. BULLION: Objection; form.
BY MR. GUERRA:
Q. Right?
A. I'm saying that these documents are trade
secret, proprietary, and they are not out in the
public, that's correct.
Q. Not even to your clients, Luis, right?
        MR. BULLION: Objection; form.
BY MR. GUERRA:
Q. Not even to your clients, right? That's
what you're telling me?
A. I believe that we have turned over many

Page 99

documents related to the subject tire, and that's --
Q. I get it. You are aware that many other
documents that I have asked and I've been fighting in
court for, you have not turned away, right?
A. I'm aware of that, yes.
Q. And you know that I represent people that
are not competitors. You know that.
        MR. BULLION: Objection; form.
        THE WITNESS: These documents are
proprietary --
BY MR. GUERRA:
Q. I didn't ask you for that.
A. -- trade secret --
Q. I asked you: You know that the people that
I represent are not competitors of Michelin, right?
        MR. BULLION: Objection; form
        THE WITNESS: Any chance those
documents have of getting out into the public
could be a risk to the company, yes, sir.
BY MR. GUERRA:
Q. Okay. That's not what I asked. I asked
you: Do you know that the people that I represent
are not competitors of Michelin, yes or no?
        MR. BULLION: Objection; form.
        THE WITNESS: I don't know their

Page 100

role.
BY MR. GUERRA:
Q. You never heard, nobody has ever told you
that they are competitors, right?
A. No one's ever told me that.
Q. Nobody told you that they work for a
competitor tire manufacturer, right?
A. Correct, no one's told me that.
Q. Nobody -- nobody told you that they ever
worked for a dealer, a tire dealer manufacturer or a
tire dealership, right?
A. No one has ever told me that, that's
correct.
Q. In your affidavit, you say "we," and by
"we," you understand that I am talking about
Michelin, right?
A. I do.
Q. And by "we," you understand that out of the
thousands of employees that Michelin has in its
company, they didn't designate you for anything but
for to talk about the secrets of Michelin. You
understand that?
        MR. BULLION: Objection; form.
        THE WITNESS: I understand that I
wrote an affidavit regarding Michelin's trade

Page 101

secret, proprietary information.
BY MR. GUERRA:
Q. They come to you -- they came to you to ask
you to write that affidavit, correct?
A. That's correct.
Q. You are the chosen one, right, to talk about
the secrets?
A. To write this affidavit, I was asked to do
that; that's correct.
Q. Nobody else in the company; you, you,
Mr. Price.
A. That's correct.
Q. All right. And then you go on, and you --
when I read this affidavit, I get the impression that
this is done intentionally; am I incorrect?
        MR. BULLION: Objection; form.
        THE WITNESS: The writing of
the --
BY MR. GUERRA:
Q. The keeping --
A. -- affidavit was intentionally --
Q. The keeping the documents secret, that's the
gist of your affidavit.
        MR. BULLION: Objection; form.

26 (Pages 98 to 101)

MR 0885

Page 102

BY MR. GUERRA:

Q. This is done intentionally. Michelin does this on purpose, right?

A. Those documents are trade secrets, they're proprietary, and they're not out in the public.

Q. And it's done intentionally and purposefully. That's my question, sir; yes or no?

MR. BULLION: Objection; form.

THE WITNESS: Yes.

BY MR. GUERRA:

Q. All right. And it's done in a thought-out manner and in a premeditated manner.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Right?

A. There is a policy about how to assign trade secret status to documents, yes.

Q. We do that way thought out, and we say, we, Michelin say, these documents we're going to keep hidden and away from the public?

MR. BULLION: Don't answer. Don't answer any more questions about this. You have asked this at least 20 times, and it's beyond harassing. He's not going to answer any more questions about that.

Page 103

MR. GUERRA: Harassing, that's such a strong word, Tom.

MR. BULLION: It seems to be harassing to me, it's --

MR. GUERRA: No, it's not -- no, it's not harassing.

MR. BULLION: Don't answer any more questions.

MR. GUERRA: We're here and we're relaxed. We're talking about -- you're smiling.

THE WITNESS: I'm on camera.

MR. GUERRA: Thank you, buddy. Thank you for you help, Tom.

MR. BULLION: It wasn't really in an effort to help you. I'm just tired of -- I'm tired of listening to the same questions over and over and over again, and your -- and your tone and -- I just think you've beat the dead horse completely.

MR. GUERRA: Come on, you're calling Mr. Price a dead horse? Come on, that's unfair and maybe rude. I would say that's rude, Tom. But I'm just going down his affidavit. I don't know how many times he wrote it. I'm just reading the different paragraphs. If you think

Page 104

that's too much, maybe you should have written less, or he should have written less.

MR. BULLION: Ask him about his affidavit.

MR. GUERRA: I'm asking. This is straight out of his affidavit. That was paragraph 41, paragraph 43. I don't have much more to go, and you're telling me that he can't answer those questions.

BY MR. GUERRA:

Q. All right. Be that as it may, let's talk about the intentional actions of Michelin to protect its secrets.

You said an eight-foot high Cyclone topped with barbed wire fence. That's one of the steps that Michelin takes actively to keep the secrets away from the public?

A. There is a security fence around the MARC campus, that's correct.

Q. No, no. You say it's to protect the secrecy.

A. That's correct.

Q. And this is -- this is your words, right?

A. It is.

Q. I didn't make this up, right?

Page 105

A. That's correct.

Q. I had no involvement on your affidavit, right?

A. That's correct.

Q. It was you and your attorney, right, that wrote the affidavit?

A. I wrote this document.

Q. It was you and Michelin's attorneys that came up with the affidavit, right?

A. I wrote the affidavit.

Q. You told me part. You can tell me what Kate did, but part, framework, right?

A. I told you specific parts that she wrote. She wrote the header at the top of the document, the footer at the bottom of the document and, yes, there was some framework information that went along with it.

Q. In fact, you said there was more stuff, right? You said there was more stuff than just the footer and the other.

A. I said there was framework for the document, that's correct.

Q. But you said, I can't give you the physical evidence of what she gave me, right?

A. The physical evidence is here in the

27 (Pages 102 to 105)

MR 0886

## Page 106

affidavit. These were the areas that were identified as being detailed information.

Q. No, no. Before you wrote it, I want to see the framework.

A. I don't have that document.

Q. I get it.

Now -- but what I'm saying is that you had the opportunity and the availability of Michelin Legal Department concerning your affidavit, right? You had the opportunity to talk to them anytime you wanted about it?

A. Certainly.

Q. And you did have the opportunity and you did speak with them about it.

A. Yes.

Q. All right. And then you had the opportunity to prepare for this deposition about this affidavit, right?

A. Yes.

Q. And you talked to your attorneys, you talked to Nicole, right?

A. Yes.

Q. You talked to Kate Helm?

A. Yes.

Q. You talked to the lady from Chicago?

## Page 107

A. Yes.

Q. You talked to the gentleman from Florida?

A. I did.

Q. You talked to Mr. Bullion?

A. I did.

Q. You had a meeting that lasted an entire day about it, right, from nine to four?

A. The meeting was that long.

Q. Okay. With five attorneys.

A. That's correct.

Q. From Michelin, right?

A. Correct.

Q. I certainly had nothing to do with your affidavit, right?

A. That's correct.

Q. Or they, right?

A. Except that it's written in response to your discovery request.

Q. No. But I didn't. No. So I chose the words that you put in the affidavit, I chose the information to be put on the affidavit?

A. No.

Q. I chose how you wrote it?

A. No, it's based on your discovery request.

Q. Yeah, but it has nothing to do with me,

## Page 108

right? I had no input on the way you wrote that.

A. That's correct.

Q. Other folks did. You and Michelin folks did, right?

A. I wrote the document.

Q. With the framework, right?

A. That's correct.

Q. And then you seek advice from those attorneys, right?

A. I didn't characterize it that way.

Q. You didn't?

A. They were involved in the process. I talked with them.

Q. I get it.

But you had the opportunity and the availability of all these folks to talk to about your affidavit, right?

A. I'm not sure which folks and at what time you're referring to now.

A. Since you wrote the affidavit, since before you wrote the affidavit up to today.

A. Okay. Those people weren't all involved in writing the affidavit, no.

Q. No. They were involved in writing the affidavit and preparing for the depositions about the

## Page 109

affidavit, right?

MR. BULLION: Object to form.

THE WITNESS: I don't think they were all involved in preparing me for the affidavit.

BY MR. GUERRA:

Q. And for preparing for the deposition concerning the affidavit?

A. I don't believe they were all involved in preparing me for the deposition or the affidavit.

Q. Okay. All right. And you also had the opportunity in preparing your affidavit to talk to the formulators and the compounders and the class spectors and the designing of the tire, you had that opportunity if you wanted to?

A. If I needed to for the information that I put in the affidavit, I had the opportunity.

Q. But you didn't. Those folks you didn't talk to.

A. I didn't need to to have the information that I needed for the affidavit.

Q. Sir, just answer my question. You didn't speak to any single worker in design, build, class spec, inspector, this subject tire for your affidavit, right?

Alderson Reporting Company
1-800-FOR-DEPO

MR 0887

Page 110

MR. BULLION: Objection; form.

THE WITNESS: It was not necessary that I speak to any of those people to prepare this affidavit.

BY MR. GUERRA:

Q. Yes or no, did you speak with any of them?

MR. BULLION: Objection; form.

THE WITNESS: It was not necessary and I did not.

BY MR. GUERRA:

Q. You did not?

A. That's correct.

Q. I don't know your couch and your words, just yes you did or no you didn't. If you did, I would like to know. That's all my question is.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. If you don't, just say, Luis, I didn't.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. You didn't, right?

MR. BULLION: Objection; form.

THE WITNESS: That's correct.

BY MR. GUERRA:

Q. You talked to attorneys, right?

Page 111

A. I did.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. You got the framework from attorneys?

MR. BULLION: Objection; form.

THE WITNESS: I did.

BY MR. GUERRA:

Q. All right. Now let's go back to the thought-out, premeditated actions taken by Michelin to protect its secrets.

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. In addition to the Cyclone fence, you say there is a limited access turnstile and badge reader; is that correct?

A. That's correct.

Q. To keep the secrets protected?

A. That's correct.

Q. All right.

A. And to control access to the facility.

Q. No, no, no, no, no, no, that's not what you said. You said on your paragraph 47, the step that MNA has in place to protect the secrecy of its confidential design and developmental information include, not limited, not access to the facility, to

Page 112

keep the secrecy, right, sir; that's what you wrote?

A. And that's the process by which we keep the secrecy is limiting access through this turnstile, for example.

Q. I'm just reading what you wrote. You don't like what you wrote, that's no problem, but I am reading what you wrote, right?

MR. BULLION: Objection; form.

THE WITNESS: Yes.

BY MR. GUERRA:

Q. And what you say is that access turnstile and badge reader, right?

A. That's correct.

Q. All right. And did you write the policy concerning the turnstile and the badge reader?

A. No. I wrote no policy with regards to the turnstile or the badge reader.

Q. Who wrote that policy?

A. I don't know.

Q. Did you talk to him?

A. No.

Q. All right. Did you talk -- did you order the fence, the Cyclone fence?

A. No.

Q. Who ordered that?

Page 113

A. I do not know.

Q. Did you talk to him, to the person that ordered it?

A. I did not talk to anyone about ordering the Cyclone fence.

Q. Did you talk to anybody that set the policy toward that specific eight-foot high Cyclone fence to keep the secrets out?

A. I did not talk to anyone about ordering the eight-foot high Cyclone fence.

Q. To keep the secrets in. I apologize. No doubt, you understood the question.

A. To limit the access to the facility, yes.

Q. No. To keep the secrets in. You said to protect its secrecy, right? The Cyclone fence is to protect the secrecy, right?

MR. BULLION: Objection; form.

THE WITNESS: It is.

BY MR. GUERRA:

Q. That's what you wrote.

The security gate's manned Monday through Friday, 6:30 to 5:00 p.m., patrolled by security at all other hours, weekends and holidays.

Did you talk to those folks?

A. I have at times talked to people in

29 (Pages 110 to 113)

MR 0888

Page 114

security, yes.

Q. For this affidavit?

A. No, I did not.

Q. All right. For this deposition?

A. No, I did not.

Q. All right. For the guy that wrote the policy about the manned gates from Monday through Friday?

A. No, I'm not aware of any such --

Q. Who is that person?

A. I don't know who that person would be.

Q. All right. Who is the person that wrote the policy about vendors not allowed on the MNA premises?

A. I do not know.

Q. Did you speak with him?

A. I did not.

Q. Did you look at the policy?

A. I did not.

Q. Okay.

A. I am not aware that there is a policy other than security guidelines.

Q. All right. Have you seen those?

A. I have not.

Q. Certain areas of the MARC campus are accessible only to MARC personnel with heightened

Page 115

security access. Do you have that heightened security access?

A. I think that would depend on the area. And I mentioned one earlier, for example, The Lab where we had the subject tire in this case stored, I had access to; most would not.

Q. Tell me -- tell me -- two questions. First, what are the other areas, since you say several, what are the other areas that are only accessible to certain people?

A. Every building has badge access control.

Q. You say certain areas. Not every building. You say certain areas of the MARC campus are accessible only to MARC personnel with heighten security access. Who are those certain areas? Not every building, certain areas.

A. I mentioned the area where machine development is done.

Q. What else?

A. I don't know the other areas. There are more, but I don't know them.

Q. Tell me their names.

A. I don't know their names.

Q. Who would know that?

A. I don't know.

Page 116

Q. Is there a facility manager?

A. I am certain that there is and I am certain that they would know.

Q. Who is it?

A. I do not know.

Q. How would you go about finding out?

A. I'm not sure. I would ask the attorneys if they knew who the facility manager is.

Q. Oh, the attorneys that are your co-workers?

A. Yes.

Q. Okay. What about the personnel with heightened security access, does everybody that works with you have heightened security access?

A. The folks that work with me in my group have access to that lab, the attorneys and the other technical people.

Q. I'm just using your words. Paragraph 47, the subsection J, you use the words "heightened security access," and that's why I am using that. You understand that, right, Mr. Price?

A. I do understand.

Q. So who -- does everybody that works with you -- I mean, let's start small. The two other folks that are the Technical Adviser and the Technical Director over Litigation, do they have

Page 117

heightened security access?

A. I'm not familiar with the term "heightened security access" except that certain areas are only accessible to certain people, that context they have heightened security access. I don't know every area that has that, and I don't know every person that has access to those different areas.

Q. I'm not asking for every person. I'm just asking for the people that work with you. Because you say certain areas of the camp -- of the campus are only accessible to MARC personnel with heightened security access. You understand that I am reading exactly what you wrote, right?

A. I do.

Q. And you understand the questions that I am asking is related to that, right?

A. I understand that you asked me who all had heightened security access.

Q. Not all, just the people that work with you, right? There's thousands of employees, and I'm not asking -- you understand that, right?

A. I do now.

Q. Oh. I thought I made it clear that I was talking about the folks that work with you.

So tell me about the guy -- the people that

Page 118

work with you. Who -- who has heightened security access other than yourself?

A. To what area?

Q. To these certain areas that you talk here on your affidavit.

A. I don't know what areas each individual has access to.

Q. Do you know if they have access to any area at all, the people that work with you?

A. As I mentioned earlier, the people that work with me have access to The Lab where we stored the subject tire.

Q. What about the other areas?

A. I don't know what other areas they may have access to.

Q. And other than The Lab that you what? You said The Lab that what?

A. Where we stored the subject tire.

Q. The Lab that were -- the subject area. Do you have access to any other areas of MARC with restricted access?

A. I have access to other buildings at MARC that have security badge, scanning security.

Q. Not security scan. I'm just reading your words. I mean, it doesn't seem that you know the

Page 119

information that you wrote, because what I'm asking is: Do you have access to any other areas of MARC only accessible to personnel with heightened security access? You told me The Lab. Any other areas with this heightened security access at MARC that you have access to?

MR. BULLION: Objection; form.

THE WITNESS: Every building that has a badge reader to allow a person in has heightened security.

BY MR. GUERRA:

Q. So what are those buildings?

A. Another one that I have access to is a building where the designers work.

Q. What's that called?

A. I don't know the name of the building.

Q. Do you know the name of the department?

A. Tire Design.

Q. Tire Design.

What else? What other areas or buildings?

A. Nothing that's coming to mind.

Q. Not a single one?

A. Not that I enter with a badge access, that's correct.

Q. Okay. So the only areas that you know of is

Page 120

The Lab? You call it "Lab?"

A. That's correct.

Q. Is there any other name than Lab?

A. Not that I'm aware of.

Q. Lab department, lab building, laboratory?

A. We refer to it as The Lab.

Q. Okay. Thank you.

You say also that MNA vendors sign confidentiality agreements before they are provided access to documents. Who are these vendors that you're talking about?

A. Any vendor of MNA would have to sign a confidentiality agreement.

Q. That's great, but I want these vendors that you're talking about. Vendors, what are the names?

A. I'm talking about anybody that provides products and services to Michelin that would come on the facility grounds.

Q. I get it. What's their names? Anyone.

A. I don't have a specific name.

Q. A single one?

A. Any contractor doing work at the facility.

Q. Such as?

A. I don't have the name of a contractor in mind.

Page 121

Q. Anyone? You wrote it.

A. I did.

Q. And I'm just asking for identity.

MR. BULLION: Objection; form.

THE WITNESS: I don't know the identity as I sit here.

BY MR. GUERRA:

Q. Okay.

A. And I would like to correct that answer --

Q. Yes, please.

A. Because I have escorted external attorneys. They would be considered vendors.

Q. Okay. Such as?

A. Such as Tom Bullion.

Q. Okay. Who else?

A. Other attorneys that represent Michelin.

Q. Such as?

A. I have escorted Marvin Quattlebaum.

Q. What else? Who else?

A. I have escorted Ed Stewart.

Q. Who else?

A. I don't recall any others as I sit here.

Q. To where?

A. To The Lab.

Q. Where else?

Alderson Reporting Company
1-800-FOR-DEPO

MR 0890

Page 122

A. That's the only location.

Q. When have you done that?

A. When it was necessary in the case of litigation.

Q. When was that?

A. Monday morning.

Q. Okay. 2015, October 19th?

A. That's correct.

Q. All right. When else?

A. I don't recall specific dates.

Q. Who did you escort on October 19, 2015?

A. Ed Stewart.

Q. Who?

A. Ed Stewart.

Q. Who else?

A. He had an assistant with him. All I know, her name is Teresa. That's all I know.

Q. Who are those folks?

A. They're attorneys that represent Michelin.

Q. Both?

A. Yes.

Q. All right. Who else? Who else in the year of 2015?

A. I don't remember specifically.

Q. When did you escort Mr. Bullion to the -- to

Page 123

the facility?

A. I don't recall a specific date that I escorted him.

Q. This year, 2015?

A. It may have been.

Q. 2014?

A. It may have been.

Q. 2013?

A. It may have been.

Q. 2012?

A. It may have been.

Q. 2011?

A. No.

Q. Were you -- because you were not working there.

A. In that group, that's correct.

Q. All right. All right. All right. Another type of information that Michelin takes active steps to keep it hidden and secret from the public at quality assurance processes, right?

MR. BULLION: Objection; form.

THE WITNESS: That's correct; those documents are trade secret and proprietary.

BY MR. GUERRA:

Q. And those are some of the documents that

Page 124

Michelin intentionally and cautiously keeps away and secret?

MR. BULLION: Objection; form.

BY MR. GUERRA:

Q. Right?

A. Those documents are trade secret and proprietary and we keep them out of the public, yes.

Q. And secret, right?

A. They are, yes.

Q. Keep them secret and away from the public, correct?

A. They are trade secret, yes.

Q. And Michelin keeps them secret and away from the public, correct?

A. That's correct.

MR. BULLION: Objection to form.

MR. GUERRA: All right. Let me take, if that's okay, Tom, can I take five minutes?

MR. BULLION: Yeah, sure. It's almost noon. Are we going to take a lunch break, or what are y'all doing?

MR. GUERRA: No, I'm going to be done.

MR. BULLION: Oh, you are?

Page 125

MR. GUERRA: Yeah.

THE VIDEOGRAPHER: We're going off the video record at 11:50.

(A recess was taken.)

THE VIDEOGRAPHER: Going back on the video record at 12 o'clock.

BY MR. GUERRA:

Q. Thank you so much. Mr. Price, I think you're going to make lunch. You'll be --

A. Sounds good. I'm hungry.

Q. That's good. What do you recommend? Where do we go?

MR. BULLION: Two Chefs.

MR. SHAPIRO: That's what Judy said.

THE WITNESS: If you want -- if you want a hamburger, you go across the road to Grill Marks.

MR. GUERRA: Grill?

THE WITNESS: Grill Marks.

MR. SHAPIRO: Judy said Nose Dive had the best burger.

THE WITNESS: Really? Everybody's entitled to their opinion.

MR. GUERRA: Right. So you said

32 (Pages 122 to 125)

MR 0891

Page 126

this one and that one?

MR. SHAPIRO: Yeah.

MR. GUERRA: Okay. First of all, are we on the record?

THE VIDEOGRAPHER: Yes.

BY MR. GUERRA:

Q. All right. Thank you for coming today. It was a pleasure talking to you. I hope I treated you politely and kindly and that you appreciate this conversation that we had; is that correct?

A. Those are your words, and I'm happy to be here to help in any way I can.

Q. And I treated you politely and kindly?

A. You did.

Q. All right. If you will look at your paragraph 57, Mr. Price, of your affidavit.

A. Yes, sir.

Q. Just -- I just want to know if I read -- if what I'm going to read is correct. This is what you wrote on the first line: The divulgence of MNA's proprietary manufacturing and quality processes to the public or to a competitor would cause an unacceptable high risk of irreparable harm and injury. That's your sentence, right?

A. That's correct.

Page 127

Q. And my point is, you have been telling Luis about competitor, but the reality is that MNA, Michelin, keeps the information that we requested intentionally secret from the public itself, and you wrote that in your affidavit.

A. I did.

Q. Thank you.

Now, concerning -- all right. You say here -- you told me before, Luis, I never had a position, an employment position at the Dothan plant in Alabama, and that's correct?

A. That's correct.

Q. All right. You said MNA's building procedures employ that the Dothan plant would develop, in an extensive amount of time at tremendous expense. What are those procedures that you're talking about here?

A. Any procedures involved in the manufacture of the tire, the quality process that we follow in the plant, would be included in those documents.

Q. Tell me what they are. Tell me the names.

A. I don't know the specific names of the documents.

Q. Tell me any names of the documents of this building procedures documents, any one of these

Page 128

document plans.

A. There are thousands of them.

Q. Go ahead, tell me the ones you know.

A. There are tire building work instructions for workplace tire building, and there are also other buildings that they would use at their post associated with tire building.

Q. Tell me -- tell me the names of all the ones you know.

A. I don't know the names of the documents. They would be related to the quality control standards and procedures that they're following.

Q. How big are they?

A. I don't know the exact size of the documents.

Q. How many pages?

A. I don't know how many pages.

Q. How many inches in height for this tire building procedures that you're speaking of on paragraph 58?

A. It would be hundreds and hundreds, if not thousands of pages of documents in total.

Q. Okay. You told me one name of one document. Tell me other names that you know. You said that there were thousands. Tell me any other name that

Page 129

you know of this building procedures.

A. Just the tire building procedures.

Q. What are you talking --

A. There would also be second stage tire building procedures and the --

Q. What else?

A. -- quality and process documents that go along with those.

Q. I'm sorry?

A. The quality and process documents that go along with those.

Q. Such as?

A. I don't know the names of the documents, but --

Q. More specific. More specifics, please, about the names of this tire building procedure.

A. I don't know the names of the documents. There would be documents that total what tolerances, there would be documents that gave them the recipe for the specific tire they were building, the component parts and --

Q. What else?

A. -- and the dimensions of those parts.

Q. What else? What other documents? You said thousands. I mean, you have told me maybe five.

33 (Pages 126 to 129)

MR 0892

## Page 130

Tell me, please.

A. Well, every tire would have -- that they build would have different documents. So by the volume of the different tire specifications they're building, there would be different documents associated with those tires. There is all of the inspection documents --

Q. Such as?

A. We refer to the aspect specifications, for example.

Q. What else?

A. The procedures that they follow --

Q. Such as?

A. -- when they inspect the tires.

I don't know the name of the inspection procedures that they follow.

Q. Who would know that?

A. Someone at the plant would know the names of those documents.

Q. All right. What else, Mr. Price? You said thousands of documents. You gave me maybe seven now.

A. No. Those seven represent thousands of documents. Just the aspect specs alone would be hundreds.

Q. How many aspect specs?

## Page 131

A. I don't know how many aspect specs there are.

Q. You don't know?

A. Not an exact number, no. I know there would be hundreds.

Q. I know. I don't work for Michelin. You don't know?

A. I don't know the exact number of aspect specs, no.

Q. Okay. What else? What about these recipes that you're talking about, what do they look like?

A. They would be the local tire building specifications.

Q. And what do they look like? Describe them for me physically, please.

A. They would have the component parts that are put in the tire and their specification measurements, for example. And I don't know what all other information would be in those documents.

Q. What are these recipes called?

A. Local specifications.

Q. You refer to them as recipes. Why is that?

A. It's another term for the component, the listing of the component parts that go into the tire.

Q. How would you describe them accurately? If

## Page 132

I wanted to ask them for documents accurately, how would you -- how would you describe them?

A. The local tire building specifications.

Q. Or the local tire building recipe?

A. I don't know if they would use that term.

Q. Where have you heard that term?

A. It's a term that's used within Michelin when it's -- when you're discussing a list of products that go into a component part.

Q. Okay. Anything else that you want to add that I haven't asked you that you think is important for me to know?

A. Not that comes to mind.

Q. Anything else that I haven't asked you that you believe it's important for the Jury?

MR. BULLION: Objection; form.

THE WITNESS: Not that comes to mind.

MR. GUERRA: It was a pleasure seeing you again, Mr. Price. I hope you have a wonderful lunch.

THE WITNESS: Thank you.

MR. GUERRA: And that you have a great week.

THE WITNESS: Thank you.

## Page 133

MR. GUERRA: I hope that I will see you soon. Okay?

THE VIDEOGRAPHER: This then completes our videotape --

MR. GUERRA: Oh, no.

THE VIDEOGRAPHER: I'm sorry.

MR. GUERRA: Hold on a second. Thomas?

MR. BULLION: I want to ask you just a few questions, Vandy.

EXAMINATION

BY MR. BULLION:

Q. One is: Mr. Guerra asked you some questions about your job within the Legal Department. I just want to ask you a couple follow-ups on that.

Do you work for and at the direction of lawyers for Michelin North America?

A. I do.

Q. And do you serve as a representative of the in-house lawyers and sometimes the outside lawyers for Michelin in terms of your job as a Senior Technical Advisor?

A. I do.

MR. GUERRA: I'm sorry, Tom, what did you say? Can you -- can you repeat that

34 (Pages 130 to 133)

MR 0893

## Page 134

question? I don't want him to answer, but can you be kind enough to tell me again?

MR. BULLION: Just that he serves as a representative for the lawyers, both the internal lawyers and the outside lawyers.

MR. GUERRA: Okay.

BY MR. BULLION:

Q. Mr. Guerra asked you --

MR. GUERRA: Call me Luis, man.

MR. BULLION: Well, I think it's more appropriate I call you Mr. Guerra when I'm referring to you on the record, but --

MR. GUERRA: Call me Luis or anything close to it.

BY MR. BULLION:

Q. Mister -- Mr. Guerra asked you a whole bunch of questions about Michelin keeping documents hidden and secret from the public. Do you remember generally that series of questions?

A. I do.

Q. What I want you to do is, with regard to the types of things that are referred to in your affidavit, information about Michelin's processes and various documents, if you would, just explain why it is that it's important for Michelin to keep those,

## Page 135

the trade secret and the proprietary information that you referred to, confidential.

A. My response to that would be that the tire industry is extremely competitive, and the company has invested hundreds of millions of dollars, we invest hundreds of millions of dollars in research and development every year, and the information that we develop over time couldn't be known by our competitors without them doing the same work. And that's why it's important that the company keep those -- that information and those documents secret.

Q. And Mr. Guerra tried to make that point that, well, his folks aren't in the tire business, they're just regular folks. Do you remember that?

A. I do.

Q. Is -- what -- in the -- in terms of confidential business information or trade secret information, once the cat is out of the bag, is there -- is it possible to put the cat back in the bag?

MR. GUERRA: It's always possible. If it's a cat, you can do it.

THE WITNESS: Once that information is out, it cannot be retrieved.

## Page 136

BY MR. BULLION:

Q. And -- and the -- one of the -- one of the reasons that you all designate documents as confidential and certain trade secret protection for documents that are -- that are either sought or produced in discovery in lawsuit have to do with this concept that documents may get leaked or the cat might get out of the bag and you might not be able to put it back, fair?

A. That's certainly a consideration, yes.

Q. Now, with respect to your affidavit, it's obviously very detailed; it's 17 pages long, and Mr. Guerra has asked you about some of the paragraphs but certainly not all of them. But in terms of the factual assertions that are included within your affidavit, do you have support for each and every one of those?

MR. GUERRA: Form. Form.

THE WITNESS: Yes.

MR. GUERRA: And leading.

THE WITNESS: I do.

BY MR. BULLION:

Q. And if he wanted to take you through paragraph by paragraph through this affidavit and ask you about that, he certainly would be entitled to do

## Page 137

it today?

A. Yes, he would.

MR. BULLION: Okay. That's all I have. Thank you.

EXAMINATION

BY MR. GUERRA:

Q. Do you have any physical evidence in this report of your affidavit that would go with your affidavit that you brought here today with you?

A. I do not.

Q. All right. And you understand by "physical evidence," I mean documentation as opposed to talk?

A. I do.

Q. And you have none, right?

A. That's correct.

Q. All right. Now, the point that is made is that the reason for the secrecy is, as you say on page 15, paragraph 57, that would be a direct financial threat to MNA. Do you see that?

A. Yes, I do.

Q. You wrote that, right?

A. I did.

Q. And that's the reason why; the secrets represent and information kept out would be a direct financial threat to MNA.

35 (Pages 134 to 137)

MR 0894

## Page 138

A. That's correct.

Q. To Michelin.

A. That's correct.

Q. Financial reasons.

A. That's correct.

MR. GUERRA: All right. Thank you so much. Hold on one second.

I'm sorry, say that again?

Hey, Tom, can I take a one-minute break?

MR. BULLION: Sure.

MR. GUERRA: And it won't take me much longer.

THE VIDEOGRAPHER: Going off the video record at 12:13.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record at 12:14:45.

BY MR. GUERRA:

Q. Do you know the term freezing the kicker? I didn't mean to go back, but I was -- David was telling me something and we -- we had to talk about it.

You didn't bring a single piece of physical evidence with you today in support or as a basis or

## Page 139

foundation to your affidavit, right?

A. Only the affidavit itself.

Q. No physical evidence?

A. That's correct.

MR. GUERRA: Thank you so much.

EXAMINATION

BY MR. BULLION:

Q. Did the note -- you saw the Notice of your deposition to come here, Vandy?

A. I did.

Q. Did it -- did it have a request that you produce any documents at the time of the deposition?

A. It did not.

MR. BULLION: That's all.

MR. GUERRA: Thank you.

THE VIDEOGRAPHER: This then completes our videotaped deposition. We've used two media, and it lasted approximately two hours and 16 minutes. We're going off the video record at 12:16.

(The deposition concluded at 12:16 p.m.)

## Page 140

Notice Date: November 4, 2015

Deposition Date: October 21, 2015

Deponent: Vaneaton Price

Case Name: Medina and Obdula v. Michelin North America, Inc.

Page:Line        Now Reads        Should Read

## Page 141

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2015, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

_____

County Name

MY COMMISSION EXPIRES:

36 (Pages 138 to 141)

MR 0895

Page 142

STATE OF SOUTH CAROLINA

COUNTY OF SPARTANBURG

REPORTER'S CERTIFICATE

I, Rebecca L. Arrison, a Notary Public in and for the State of South Carolina, do hereby certify that there came before me on the 21st day of October, 2015, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was there upon examined under oath, the examination reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this 28th day of October, 2015.

_____

Rebecca L. Arrison, Notary Public

My Commission Expires: 4/30/2017

MR 0896

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIL GIBSON, INDIVIDUALLY, | ) ) ) ) ) ) | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | ) ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) ) | |
| MICHELIN NORTH AMERICA, INC.; AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | ) ) ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

DEFENDANT MICHELIN NORTH AMERICA, INC.'S
MOTION FOR BIFURCATED TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Michelin North America, Inc. ("MNA"), one of the defendants in the above-styled and numbered cause, and respectfully requests the Court to bifurcate the determination of the amount of punitive damages, if any, from all remaining issues in the trial of this case. As grounds for this motion, MNA shows the Court as follows:

I.

Plaintiffs seek actual and punitive damages from MNA in this case. A trial court, if presented with a timely motion, shall bifurcate the determination of the amount of punitive damages from the remaining issues. TEX. CIV. PRAC. & REM. CODE ANN. § 41.009. This Court should bifurcate the determination of the amount of punitive damages, if any, to avoid prejudice, further convenience, and promote the ends of justice.

MR 0897

WHEREFORE, PREMISES CONSIDERED, defendant Michelin North America, Inc. prays that this Court enter an order bifurcating the determination of the amount of punitive damages from all remaining issues and grant MNA such further relief to which it may be justly entitled.

Respectfully submitted,

GERMER BEAMAN & BROWN, P.L.L.C.
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By:   /s/ Thomas M. Bullion III
        Thomas M. Bullion III
        State Bar No. 03331005
        tbullion@germer.com
        Chris A. Blackerby
        State Bar No. 00787091
        cblackerby@germer-austin.com

ATTORNEYS FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.

2

4547317

MR 0898

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 30th day of November, 2015.

Luis P. Guerra                          *Via E-Service and Facsimile*
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

James B. Ragan                          *Via E-Service and Facsimile*
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

Noel Sevastianos                        *Via E-Service and Facsimile*
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

Jose Bustillo d/b/a Mundo Cars          *Via Regular Mail*
6422 Day Street
Dallas, Texas 75227


                                        /s/ Thomas M. Bullion III
                                        Thomas M. Bullion III/Chris A. Blackerby

3

4547317

MR 0899

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA | ) | IN THE DISTRICT COURT OF |
| MEDINA, HUSBAND AND WIFE, | ) | |
| INDIVIDUALLY; NATALYE MEDINA, | ) | |
| INDIVIDUALLY; NAVIL GIBSON, | ) | |
| INDIVIDUALLY, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | DALLAS COUNTY, TEXAS |
| VS. | ) | |
| | ) | |
| MICHELIN NORTH AMERICA, INC.; AND | ) | |
| JOSE BUSTILLO D/B/A MUNDO CARS, AN | ) | |
| IN STATE DEFENDANT, | ) | |
| | ) | |
| DEFENDANTS. | ) | 134TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANT MICHELIN NORTH AMERICA, INC.'S MOTION FOR BIFURCATED TRIAL

On this day came to be considered Defendant Michelin North America, Inc.'s ("MNA") Motion for Bifurcated Trial. The Court is of the opinion that said motion is well taken and should therefore be GRANTED in its entirety.

IT IS, THEREFORE, ORDERED that Defendant Michelin North America, Inc.'s Motion for Bifurcated Trial is granted in its entirety, and that the determination of the amount of punitive damages is bifurcated from all remaining issues in the trial of this case.

SIGNED this _____ day of _____, 2015.

_____
JUDGE PRESIDING

4

4547317

MR 0900

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIN GIBSON, INDIVIDUALLY, | § § § § § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| MICHELIN NORTH AMERICA, INC. AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | § § § | DALLAS COUNTY, TEXAS |
| | § | |
| Defendants. | § | 134th JUDICIAL DISTRICT |

**DEFENDANT MICHELIN NORTH AMERICA, INC.'S MOTION
FOR STAY OF DISCLOSURE OF FINANCIAL INFORMATION AND
SUPPLEMENT TO MICHELIN'S RESPONSE OPPOSING
DISCLOSURE OF FINANCIAL INFORMATION**

Defendant Michelin North America, Inc. ("MNA") files this Motion for Stay of Disclosure of Financial Information ordered to be produced under the Order re: November 3, 2015 Hearing, and Supplement to Response Opposing Disclosure of Financial Information, and respectfully shows as follows:

**I.     Introduction**

On November 21, 2015, this Court signed an order entitled "ORDER re: November 3, 2015 Hearing" ("Nov. 21 Order") requiring MNA to "produce a Corporate Representative to testify about the financial condition, wealth, assets, and financial statements of Michelin North America, Inc." MNA files this Supplement to its October 30, 2015 Response to Plaintiffs' Short Motion re: Michelin Employee with Most Knowledge about Financial Information, and objects to such required disclosure as this information is highly confidential, trade secret information, as evidenced by the affidavit of Marcel Chabot (attached as Exhibit A).

**MOTION FOR STAY OF DISCLOSURE OF FINANCIAL INFORMATION – PAGE 1**

After the hearing, a deposition notice was issued by Plaintiffs for a Corporate Representative to testify about "the financial condition, wealth, assets, and financial statements of Michelin North America, Inc. (attached as Exhibit B). A "request for production" was included with the deposition notice seeking "Financial statements of Defendant Michelin North America, Inc. from 1998 to 2014," thus seeking an incredibly expansive production of **fourteen years of financial statements**. Such information is clearly sought as a litigation strategy for purposes of harassment and should not be allowed by this Court.

At the November 3, 2015 hearing, this Court orally ordered that the deposition on MNA's financials be taken, but "if [MNA] choses to seek the writ of mandamus, I will stay the discovery on the net worth while you do that." (Hearing at 32). Consequently, MNA requests a stay of the Nov. 21 Order regarding MNA's financial information, and also requests this Court to defer discovery on MNA's net worth until the second phase of the bifurcated trial.

## II.    MNA's Financial Information is Highly Confidential, Trade Secret, and Unnecessary to Plaintiffs' Case at this Juncture.

MNA demonstrated in its Response filed on October 30, 2015 that its financial information is highly sensitive and confidential, and "disclosure of such information will result in a grave risk to MNA and endanger MNA's ability to remain financially competitive in a highly competitive business environment." Response at 6. This position is supported by the affidavit of Marcel Chabot, which further states that MNA is not a publicly-traded company, and therefore MNA does not make public SEC disclosures regarding its net worth, financial condition, nor does MNA publish its financial statements. Aff. ¶ 3. MNA is a subsidiary of its ultimate parent company, Compagnie Generale Des Establissements Michelin ("CGEM"), a French corporation that is publicly traded on the Paris Stock Exchange. For accounting purposes, MNA's financial position is fully consolidated with CGEM's financial position, and CGEM's

MR 0902

public filings reflect an overall picture of the Michelin Group of companies, and do not reflect information on MNA's specific financial information. *Id*. Therefore, MNA's financial information is not known outside of those individuals at MNA or within the Michelin Group who have a business need to know, and it cannot easily be obtained. *Id*.

Mr. Charbot's affidavit also proves that MNA "considers its financial information highly confidential and vitally sensitive, and treats this information as a carefully guarded trade secret." *Id*. ¶ 4. MNA takes extreme care to protect its financial information from disclosure. *Id*. ¶ 6. If disclosed, such information could seriously endanger MNA's ability to remain financially competitive in the highly competitive tire industry. *Id*. ¶ 7.

Texas law recognizes financial information trade secret under the Texas Uniform Trade Secrets Act:

> "Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique, process, **financial data**, or list of actual or potential customer or suppliers that:
>
> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6) (emphasis added).

The financial data requested by Plaintiffs clearly meets this statutory definition of protected trade secrets.[1] MNA's financial information, including its "financial condition, wealth,

---

[1] MNA's financial information also meets the factors for trade secret under the Restatement of Torts § 757: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the information's secrecy; (4) the value of the information to the owner and the owner's competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others. The Affidavit of Marcel Charbot proves all of these factors. *See* Aff. ¶¶ 3-7.

MR 0903

assets, and financial statements" required to be disclosed under the Nov. 21 Order, has great economic value in not being known because otherwise competitors could use this information to infer, calculate, estimate, and deduce highly confidential information about MNA's corporate strategies, financial condition, research and development capabilities and options, and other such vital aspects of its corporate objectives, plans, governance, and management. Aff. ¶ 5. Competitors could then use this information to develop a competitive edge against MNA and gravely impair MNA's ability to remain competitive. *Id.* MNA takes "extreme care" and makes "stringent efforts" to protect its financial information in order to remain financially competitive in a highly competitive business environment. Aff. ¶¶ 6, 7. Its financial information is stored on a secured database and only MNA personnel with heightened security access are permitted to obtain it, and only on a need to know basis. Aff. ¶ 7. Employees who work with this information sign strict confidentiality agreements. *Id.*

In short, MNA's private financial information is a closely guarded trade secret of MNA, and qualifies as a trade secret under Texas law.

## III. This Court Should Defer Discovery of Highly Confidential and Trade Secret Financial Information until there is Proof of Necessity for Such Information.

MNA has filed a motion to bifurcate the trial under § 41.009 of the Texas Civil Practices & Remedies Code. This Court should defer discovery of financial information until the second phase of a bifurcated trial for two reasons. First, highly confidential financial information is not relevant until the second phase of a bifurcated trial. Second, MNA's financial information is trade secret, and, as such, Plaintiffs had the burden to demonstrate that it is necessary for a fair adjudication of the case. There is no such proof. Indeed, financial information cannot be necessary at this point in the litigation, because there is only a mere allegation of punitive damages, and no evidence to support liability for punitive damages. Deferring discovery of net

MR 0904

worth or other financial information until the second phase of the bifurcated trial would be a proper exercise of "the [trial court's] necessary management tools to control the sequence, timing, and scope of discovery to minimize burden, maximize efficiency, and protect privacy rights." *In re Jacobs*, 300 S.W.3d 35, 52 (Tex. App.—Houston [14th Dist.] 2009, orig. proc.) (Sullivan, J., concurring).

Net worth discovery serves little practical purpose in most cases, given the statutory limitations on exemplary damages. Texas Rule of Civil Procedure 192.4 sets out a benefit-to-burden analysis and provides that discovery should be limited when "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Because the financial information Plaintiffs seek is highly confidential, intrudes on MNA's substantial privacy rights, and is trade secret, discovery of this information should be deferred to the second phase of the bifurcated trial, if it becomes relevant and necessary. *See* TEX. CIV. PRAC. & REM. CODE § 41.009.

Finally, Texas Rule of Evidence 507 imposes a "heightened burden for obtaining trade secret information." Mere relevance is not sufficient. *See Continental General Tire*, 979 S.W.2d 610-13 (Tex. 1998). After the party resisting discovery establishes that the information is a trade secret, the burden shifts to the requesting party to establish that the information is "necessary for a fair adjudication of tis claims." *Id.* In each case, a court must conduct a balancing, weighing the degree of the requesting party's need for the information with the potential harm of disclosure. The Court further clarified the burden of proof in *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732-33 (Tex. 2003), by requiring the requesting party to "demonstrate with specificity," by

competent evidence, the necessity of the trade secret information. As stated, there is simply no necessity for such information at this point in the litigation – net worth evidence is inadmissible and irrelevant in the first phase of a bifurcated trial. TEX. CIV. PRAC. & REM. CODE §§ 41.011(b). Plaintiffs have not, and cannot show necessity. Therefore, This Court should protect MNA's trade secret financial information, and only order its disclosure if it becomes necessary for a fair adjudication of this case. There is no prejudice to Plaintiffs if discovery of financial information is deferred until the second phase of the bifurcated trial, if it becomes relevant and necessary at that point.

## IV. Conclusion and Prayer

Wherefore, MNA prays that this Court disallow discovery of MNA's financial information. Alternatively MNA seeks a stay of such financial discovery for the issue to be considered on mandamus at the Dallas Court of Appeals, or Texas Supreme Court, and for such other relief to which it may be entitled.

Respectfully submitted,

THOMPSON & KNIGHT LLP
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701-4238
(512) 469-6114
(512) 482-5028 Facsimile

By:        /s/ *Debora B. Alsup*
        Debora B. Alsup
        State Bar No. 02006200
        debora.alsup@tklaw.com

GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 Facsimile

MR 0906

By:       /s/ *Thomas M. Bullion III*

                  Thomas M. Bullion III
                  State Bar No. 03331005
                  tbullion@germer.com
                  Chris A. Blackerby
                  State Bar No. 00787091
                  cblackerby@germer-austin.com

                  ATTORNEYS FOR DEFENDANT
                  MICHELIN NORTH AMERICA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via e-service, facsimile, e-mail, or U.S. Mail on this 30th day of November, 2015.

*Via E-Service and Facsimile*
Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona  85016

*Via E-Service and Facsimile*
James B. Ragan
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas  78401

*Via E-Service and Facsimile*
Noel Sevastianos
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri  63105

*Via Regular Mail*
Jose Bustillo d/b/a Mundo Cars
6422 Day Street
Dallas, Texas  75227

                  /s/ *Debora B. Alsup*
                  Debora B. Alsup

506333 000019 16416988.3

MR 0907

# EXHIBIT A

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIN GIBSON, INDIVIDUALLY, | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| VS. | § § | |
| MICHELIN NORTH AMERICA, INC. AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § § | 134th JUDICIAL DISTRICT |

## AFFIDAVIT OF MARCEL CHABOT

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

Before me, the undersigned authority, personally appeared Marcel Chabot, who is an employee of Defendant Michelin North America, Inc. ("MNA"), who being by me duly sworn on oath deposes and says:

1.  My name is Marcel Chabot and I am the Controller at MNA. I have personal knowledge of the facts set forth herein and if called upon, could and would, competently testify to them. I am over 18 years of age, of sound mind, and competent to execute this Affidavit.

2.  I have reviewed the Order re: November 3, 2015 hearing in this case that orders MNA to "produce a corporate representative to testify about the financial condition, wealth, assets, and financial statements of Defendant Michelin North America, Inc."

AFFIDAVIT OF MARCEL CHABOT – PAGE 1

MR 0909

3. MNA is not a publicly-traded company. Consequently it does not make public disclosures concerning its net worth, financial condition, or financial statements. Additionally, MNA is indirectly owned by a public French holding company, Compagnie Generale Des Etablissements Michelin ("CGEM"). For accounting purposes, MNA's financial position is fully consolidated with CGEM's financial position, and CGEM's public filings reflect an overall picture of the Michelin Group, and do not reflect information on MNA's specific financial position. Consequently, MNA's financial information is not known outside of those individuals at MNA or within the Michelin Group who have a business need to know, and it cannot easily be obtained.

4. MNA considers its financial information highly confidential and vitally sensitive, and treats this information as a carefully guarded trade secret.

5. Disclosure of MNA's financial information could seriously endanger MNA's ability to remain financially competitive in the tire industry, which is a highly competitive business environment. Financial information, including evidence of net worth, can allow competitors to infer, calculate, estimate, and deduce highly confidential information about MNA's corporate strategies, research and development capabilities and options, and other vital aspects of its corporate objectives, plans, financial position, governance, and management. Competitors could then use this information to develop a competitive advantage against MNA and impair MNA's ability to maintain its competitive position in the market.

6. MNA takes extreme care to protect its financial information from being disclosed. MNA has a competitive advantage by not having such information available in

MR 0910

the public domain. Any disclosure, direct or indirect, of such confidential financial information would severely and permanently impair MNA's competitive position. Disclosure of this confidential information would subject MNA to a substantial risk of subsequent disclosure to MNA's competitors, the consequences of which would be irreversible.

7.    MNA undertakes stringent efforts to protect the secrecy of its financial information. The financial information is stored in a manner that restricts access to those individuals with heightened security access and a business need. MNA employees who work with its financial information sign strict confidentiality agreements.


FURTHER AFFIANT SAYETH NOT.


By:

_____
Marcel Chabot


Sworn to and subscribed before me this 30ᵗʰ day of November, 2015.

_____
Notary Public

My Commission Expires
September 14, 2016

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below via e-service, facsimile, e-mail, or U.S. Mail on this __30__ day of November, 2015.

MR 0911

*Via E-Service and Facsimile*
Luis P. Guerra
David C. Shapiro
Luis P. Guerra, L.L.C.
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016

*Via E-Service and Facsimile*
Noel Sevastianos
Sevastianos & Associates, PC
120 S. Central Avenue, Suite 130
St. Louis, Missouri 63105

*Via E-Service and Facsimile*
James B. Ragan
Law Offices of James B. Ragan
723 Coleman Ave.
Corpus Christi, Texas 78401

*Via Regular Mail*
Jose Bustillo d/b/a Mundo Cars
6422 Day Street
Dallas, Texas 75227

16418695.1

_/s/ Debora B. Alsup_
Debora B. Alsup

MR 0912

# EXHIBIT B

CAUSE NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA and OBDULIA | § | IN THE DISTRICT COURT |
| MEDINA, husband and wife, | § | OF DALLAS COUNTY |
| individually; NATALYE MEDINA, | § | |
| individually; NAVIL GIBSON, | § | |
| individually; PLAINTIFFS, | § | |
| | § | |
| | § | 134TH JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| | § | |
| MICHELIN NORTH AMERICA, INC.; | § | |
| AND JOSE BUSTILLO d/b/a MUNDO | § | DALLAS COUNTY, TEXAS |
| CARS, an in state defendant, | § | |

DEFENDANTS

**PLAINTIFFS' NOTICE OF INTENT TO TAKE THE ORAL AND VIDEOTAPED
DEPOSITION OF THE CORPORATE REPRESENTATIVE FOR DEFENDANT
MICHELIN NORTH AMERICA, INC.**

TO:   Michelin North America, Inc. c/o GERMER BEAMAN & BROWN, P.L.L.C.,
301 Congress Avenue, Suite 1700, Austin, Texas 78701, (512) 472-0288.

Please take notice that pursuant to the Texas Rules of Civil Procedure, Plaintiffs

will take the oral and videotaped deposition of the Corporate Representative of Michelin

North America, Inc., as to all matters known to Michelin North America, Inc. relating to

financial condition, wealth, assets, and financial statements of Defendant Michelin North

America, Inc.

The deposition will beginning on a date, time and place to be decided. The

deposition will take place before a certified court reporter and videographer. The

deposition will continue until completed, and when taken may be used as evidence in the

above-referenced civil action.

A reasonable time before the above noticed deposition, Michelin North America,

Inc. will designate one or more individuals to testify about financial condition, wealth,

MR 0914

assets, and financial statements of Defendant Michelin North America, Inc. pursuant to Rule 199.2(b)(1), Tex. R. Civ. P.

Michelin North America, Inc. is hereby requested to produce a copy of the documents and things described on Exhibit A attached hereto at least seven (7) days prior to the deposition.

Respectfully submitted,

LAW OFFICES OF LUIS P. GUERRA
6225 N. 24th Street, Suite 125
Phoenix, Arizona 85016
Telephone: (602) 381-8400
Facsimile: (602) 381-8403

By:    /s/ David C. Shapiro
Luis P. Guerra (*Admitted Pro Hac Vice*)
AZ State Bar No. 015768
David C. Shapiro (*Admitted Pro Hac Vice*)
AZ State Bar No. 028056
ATTORNEYS FOR PLAINITFFS

LAW OFFICES OF JAMES B. RAGAN
723 Coleman Avenue
Corpus Christi, Texas 78401
Telephone: (361) 884-7787
Facsimile: (361) 884-9144
James B. Ragan
State Bar No. 16466100

SEVASTIANOS & ASSOCIATES, PC
120 S. Central Ave., #130
St. Louis, Missouri 63105
Telephone: (314) 725-7577
Facsimile: (314) 862-8050
Noel Sevastianos (*Pro Hac Vice*)
State Bar No. 45970

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record as set forth below on this 12th day of November, 2015.

MR 0915

**Via E-Mail, Facsimile & U.S. Mail to:**
Thomas M. Bullion III
Chris A. Blackerby
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Attorneys for Defendant Michelin North America, Inc.


**Via U.S. Mail only to:**
Jose Bustillo d/b/a/ Mundo Cars
6422 Day Street
Dallas, Texas 85227
Pro Per Defendant Jose Bustillo d/b/a/ Mundo Cars

                                        /s/ David C. Shapiro
                                        David C. Shapiro

MR 0916

EXHIBIT A

REQUEST FOR PRODUCTION

1. Financial statements of Defendant Michelin North America, Inc. from 1998 to 2014.

NO. DC-14-07255

| | | |
|---|---|---|
| SAMUEL MEDINA AND OBDULIA MEDINA, HUSBAND AND WIFE, INDIVIDUALLY; NATALYE MEDINA, INDIVIDUALLY; NAVIN GIBSON, INDIVIDUALLY, | § § § § § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| MICHELIN NORTH AMERICA, INC. AND JOSE BUSTILLO D/B/A MUNDO CARS, AN IN STATE DEFENDANT, | § § § | DALLAS COUNTY, TEXAS |
| | § | |
| Defendants. | § | 134th JUDICIAL DISTRICT |

## ORDER ON STAY OF DISCLOSURE OF FINANCIAL INFORMATION

By Order dated November 21, 2015 the Court ordered that a corporate representative of Michelin North America, Inc. ("MNA") testify about MNA's "financial condition, wealth, assets, and financial statements."

IT IS THEREFORE ORDERED that a stay of November 21 Order regarding financial information is hereby in all things GRANTED to permit MNA to pursue a writ of mandamus to a Texas intermediate appellate court or to the Texas Supreme Court. The stay shall remain in effect until the court of appeals or the Texas Supreme Court resolves the mandamus petition and issues any mandate.

SIGNED this the _____ day of _____, 2015.

_____
Judge Dale Tillery, Presiding Judge
134th Judicial District Court,
Dallas County, Texas

**ORDER ON STAY OF DISCLOSURE OF FINANCIAL INFORMATION – SOLO PAGE**